**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ASTROPOWER LIQUIDATING TRUST,
f/k/a ASTROPOWER, INC.,

        Plaintiff,

   v.

KPMG, LLP,

        Defendant.

Civil Action No. 06-469 (JJF)

## <u>AMENDED COMPLAINT AND JURY DEMAND</u>

    Plaintiff, the AstroPower Liquidating Trust (the "Trust") files its Amended Complaint and alleges as follows:

### <u>PARTIES</u>

    1.    On or about February 1, 2004, AstroPower, Inc. ("AstroPower," "Debtor," or the "Company") filed its petition under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (as amended, the "Bankruptcy Code"). On or about December 3, 2004, this Court entered an order (the "Confirmation Order") confirming the Revised Liquidating Plan Proposed by AstroPower, Inc. and the Official Committee of Unsecured Creditors (as supplemented, amended and modified) (the "Plan").[1] On December 27, 2004 (the "Effective Date"), the Plan became effective.

    2.    On the Effective Date, pursuant to and as provided for in the Plan, the Confirmation Order, and the Liquidating Trust Agreement, all property comprising the Debtor's estate was transferred to and vested in the Trust, including, without limitation, all Litigation Claims.

---

[1] All capitalized terms not defined herein shall have the same meaning as ascribed to them in the Plan.

3.     Litigation Claims include, without limitation, any and all claims that could otherwise be brought by the Debtor or on behalf of the Debtor's estate.  Pursuant to and as provided for in the Plan, the Confirmation Order, and the Liquidating Trust Agreement, the Trust has the sole and exclusive right to prosecute, compromise, and/or settle Litigation Claims.

4.     The Trust brings this action against KPMG, LLP ("KPMG").  KPMG is a public accounting and auditing firm and a limited liability partnership organized under the laws of the State of Delaware.  KPMG may be served with process through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

5.     Pursuant to Articles 6.1.5 and 12.2 of the Plan, the Trust is authorized to assert claims and causes of action that are the property of the AstroPower estate.  The causes of action asserted herein are claims by AstroPower arising under the Bankruptcy Code and state law, and, thus, are property of the estate.   These claims are both core proceedings and non-core proceedings, the latter arising in, arising under, or related to the Debtor's chapter 11 bankruptcy case.  This Court has jurisdiction over claims asserted in this proceeding pursuant to 28 U.S.C. §§ 1334(a), (b) and (e).

6.     In addition, pursuant to Article 16 of the Plan and paragraph HH of the Confirmation Order, jurisdiction in this Court is appropriate for all Litigation Claims.

7.     This district is the proper venue for this proceeding pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

**A.    AstroPower's Rise and Fall**

8.    AstroPower was founded in 1983.    The Company manufactured and sold photovoltaic solar cells, modules, and panels for generating solar electric power.

9.    Through the 1980s and early 1990s, AstroPower's primary customer was the United States Government and AstroPower's business steadily grew.    During the late 1990s, AstroPower's business increasingly focused on the commercial production of solar energy.

10.    In 1992, AstroPower retained the services of KPMG to be its auditor and outside accounting firm.    KPMG remained as the Company's auditors, tax consultants, and accountants, until December 2003.

11.    On February 12, 1998, AstroPower issued its initial public offering ("IPO").    Its stock debuted at $6 per share and it raised approximately $14.6 million.

12.    In October 1999, AstroPower announced a follow-on offering of 2,700,000 shares of common stock at $13.375 per share.    This follow-on offering was completed in March 2001 resulting in net proceeds to AstroPower of $56.6 million.

13.    During the late 1990s and early 2000s, AstroPower rode the wave of "green energy production" and Wall Street took greater notice.

14.    On February 26, 2001, the Company reported record numbers: for fiscal year ended December 31, 2000, total revenues were $49,787,000—a 43.7% increase over the previous year.    As a consequence of these reported numbers, AstroPower's stock value continued to rise.

15.    In March 2001, the Company announced a third follow-on offering and raised approximately an additional $30 million.    In April 2001, the Company's stock reached a high of $57.58 per share.

16.    In late March 2003, KPMG notified the Company that it would not certify its 2002 financials. Because of this KPMG declaration, on April 1, 2003, AstroPower filed with the SEC a Notification of Inability to Timely File its Form 10-K. The Company's notification stated that it required additional time to gather and evaluate data relating to 2002 revenue recognition matters. The notification also asserted that a restatement of certain 2002 quarters would likely be necessary and certain revenue recognition matters may impact reporting for certain quarters of 2001.

17.    The market reacted negatively to this pronouncement causing the stock price to decline. This resulted in significant damage to AstroPower's enterprise value. As a further consequence of AstroPower's delayed financials, AstroPower lost access to capital and debt markets.

18.    With no audited financials and no ability to meet its public-filing requirements, the Company was unable to obtain any funding. These KPMG-created delays eliminated AstroPower's access to capital and debt.

19.    AstroPower now faced a potential restatement, mounting accounting irregularities, and a plummeting stock price. AstroPower's audit committee (the "Audit Committee") retained the law firm of Hale & Dorr as independent counsel and the accounting firm Ernst & Young ("E&Y"). E&Y was charged with conducting a full forensic accounting.

20.    Weeks later, on May 16, 2003, AstroPower announced, that because of its ongoing accounting review, it had yet to file its Form 10-K for the period ended December 31, 2002 and it would be unable to do so until it received its audited balance sheet for that period.

21.    On May 29, 2003, AstroPower received a NASDAQ Staff Determination Letter indicating that, in addition to its Form 10-K delinquency, AstroPower had not filed its Quarterly Report on Form 10-Q for the period ended March 31, 2003.

22.    The Company received notice from the NASDAQ Listing Qualifications Panel on July 24, 2003 that because of the Company's failure to file its 2002 10-K and its Q1 2003 10-Q it would be de-listed from the NASDAQ effective July 25, 2003.

23.    During the subsequent months, AstroPower's business suffered as vendors refused to extend credit, the Company was without access to capital and debt markets, and AstroPower's reputation in the marketplace was tarnished because of its lack of audited financials. AstroPower's management tried desperately to salvage its business while at the same time trying in vain to appease KPMG's increasingly onerous requests.    But, with no access to funding, this was an exercise in futility.    As set forth more fully below, and despite being significantly compensated for it, KPMG never completed its audit of the Company's 2002 financials. KPMG's failure to do so caused the company's ultimate demise.

24.    On February 1, 2004, AstroPower filed a voluntary petition for chapter 11 bankruptcy protection.

**B.    KPMG's Relationship with AstroPower**

25.    KPMG served as AstroPower's accountants and independent auditors from 1992 to December 29, 2003.    KPMG contracted with AstroPower to provide it with (i) auditing services; (ii) tax consulting; and (iii) other accounting-related advisory services.

26.    KPMG was retained by AstroPower to act as its independent auditor and financial advisor and KPMG acted in this capacity from 1992 to 2003.

27.    In order to issue a yearly opinion regarding AstroPower's financial reporting under Generally Accepted Accounting Principles (GAAP) and under Generally Accepted

Accounting Standard (GAAS), KPMG had to review and analyze AstroPower's consolidated balance sheet and related statements of income, stockholder equity and cash flows for each year. Indeed, KPMG was contractually obligated to do so.

28.     KPMG's duties included, but were not limited to: (i) the duty to audit AstroPower's financial statements and prepare written and audited reports in accordance with GAAS; (ii) the duty to express an opinion as to whether the presentation of the consolidated financial statements, taken as a whole, conformed with GAAP; (iii) the duty to advise the Board of Directors, management, and shareholders of AstroPower as to the lack of internal controls, errors, ongoing illegal or fraudulent activities, irregularities, and materially false statements of which KPMG was aware or of which KPMG should have been aware; and (iv) the duty to exercise due care in the timely rendering of audits and to provide guidance to the Company in connection with the issues for which KPMG was retained.

29.     In connection with these duties, KPMG conducted AstroPower's annual audits and prepared its consolidated audited financial statements through 2001. As of 1998 when the Company went public, KPMG's role expanded such that it was now conducting all tasks necessary for AstroPower's quarterly and year-end SEC filings.    KPMG also provided tax-consulting services to AstroPower.

30.     Upon information and belief, in all years prior to the 2002 year-end audit, including year-end 2001, KPMG certified AstroPower's financials and did not report any financial improprieties or raise any disagreement it had with AstroPower's internal accounting processes.

31.     The services KPMG provided generated millions of dollars in aggregate fees. During the course of their relationship, AstroPower paid significant professional fees to KPMG.

C.    **Accounting Irregularities**

32.    From 1992 to 2003, AstroPower entrusted the verification and certification of its financials to KPMG and relied upon KMPG to verify compliance with internal controls.

33.    In December 2002, the KPMG accountant responsible for the AstroPower file was injured.    As a result, KPMG inserted a new senior accountant, who initially identified irregularities with the Company's booking of revenues generated from transactions using the CIF Incoterm.

34.    "CIF" is an acronym for "Cost Insurance Freight." This term denotes whether the buyer or the seller bears the costs associated with shipping the goods and when title passes. At KPMG's direction, AstroPower had been recognizing revenue when the Company's solar products left its shipping docks. KPMG's new senior accountant now insisted that revenue should be recognized when the solar products cross the bow of the shipping vehicle because that is when title passes. This issue had never been raised before by KPMG. To the contrary, KPMG had previously instructed the Company how to book these revenues inconsistent with the procedures it was now proposing.

35.    Then, in April 2003, KPMG raised additional concerns about the Company's accounting practices. Based on these concerns, and at the suggestion of counsel, AstroPower's Audit Committee retained Hale & Dorr and E&Y to investigate accounting irregularities. Hale & Dorr was retained as the Audit Company's independent counsel, and E&Y was engaged to investigate AstroPower's internal controls and revenue recognition policies and procedures. As a result of its forensic investigation, E&Y quickly pinpointed areas in which AstroPower's financial reporting was irregular: (i) Revenue Recognition; (ii) Inventory Valuation; and (iii) Equipment Under Construction (EUC).

36.    Throughout this time, KPMG remained as the Company's outside auditors.

37.    In June 2003, after the Company incurred approximately $1,500,000 in fees resultant from E&Y's forensic accounting review, the Audit Committee completed its preliminary internal investigation and highlighted numerous accounting irregularities.

38.    These irregularities were not just isolated incidents. These irregularities were symptomatic of a lack of internal controls at the Company and a years-long failure by KPMG to notify the Company, its Board, management, and shareholders of these crucial accounting and, consequently, reporting, errors.

39.    KPMG knew, or recklessly ignored, that AstroPower's internal controls and accounting systems were deficient and/or wholly inaccurate. As a result, KPMG's audit opinions and financial certifications were grossly deficient, inaccurate, and unreliable.

40.    As the E&Y forensic investigation revealed, AstroPower's financials were rife with accounting misstatements including the improper recognition of revenues, deficient and incorrect or incomplete documentation or contracts evidencing purported sales transactions, and a host of other issues that painted a financial picture for AstroPower that was facially wrong. KPMG was the Company's auditor during all operative times.

41.    One of KPMG's duties was to review and audit the Company's internal controls—activities such as these are indicia of KPMG's failures to discharge those duties and to comply with its contractual obligations.

42.    It was KPMG's responsibility to ensure the accuracy and comprehensiveness of AstroPower's accounting protocols and KPMG wholesale failed to do so. Indeed, AstroPower contracted with KPMG for it to provide these services, services that KPMG did not provide.

43.    KPMG failed to properly audit and properly account for AstroPower's revenue recognition. The result of this flawed accounting practice was that AstroPower further deepened its insolvency.

44.    Amongst the numerous accounting errors and omissions highlighted by the E&Y audit, four categories were the most glaring: (i) revenue recognition; (ii) Days Sales Outstanding (DSOs); (iii) inventory valuation; and, (iv) incorrect billings to and capitalization of EUC.

i.    **Revenue Recognition**

45.    The Company's revenue recognition policy was to recognize revenue when products were shipped. In other words, when AstroPower's solar cells left its warehouse, the Company generated and realized revenue.

46.    During the years that KPMG was contractually obligated to audit AstroPower's financials and charged with other auditing functions, AstroPower recognized revenue on goods that were not yet delivered; on sales pursuant to the CIF Incoterm (when KPMG's interpretation on the propriety of this revenue recognition was incorrect); on contracts that had not yet been signed; on payments that had not yet been received; and on goods that were delivered to customers even if those customers did not request that those goods be sent. Furthermore, at times the Company failed to adjust revenue based upon returned goods in the correct reporting period.

47.    KPMG, as the Company's auditors and accountants failed to alert AstroPower's management to these problems. Moreover, KPMG certified that the Company's financials were fair, accurate, and in compliance with GAAP and GAAS when, in fact, they were not.

ii.    **Days Sales Outstanding (DSOs)**

48.    Because AstroPower recognized revenue when product was shipped, it was incentivized to ship as much product as possible. As an example, despite AstroPower's payment

terms being 30 to 60 days, payment terms of 180 days or more were often allowed to international customers and those without proper credit ratings. Thus, even if a customer had not yet paid for solar cells it had received, AstroPower would still ship more product and, consequently, would book additional revenue while contemporaneously creating massive receivables. These growing aged receivables skewed the Company's financial records. These practices was known and blessed by KPMG.

### iii.    Inventory Valuation

49.    As a result of the process of making solar cells and modules, silicon scrap is produced.

50.    For example, when a silicon wafer is cut to create a photovoltaic solar cell, the shape is altered. The silicon wafers used by AstroPower to create solar cells are cut from a rectangular sheet of silicon. After removing the corners from the rectangle, the final shape for the solar cell remains. The removed corners are called "ears." In addition to the silicon ears, other components of scrap silicon are damaged silicon wafers and silicon breakage.

51.    The value of this scrap inventory is based on the purity content of the silicon. For instance, silicon metal is generally 98% pure. The ears removed in AstroPower's wafer-production process were 99.9999% pure.

52.    In 2001, AstroPower decided to begin stockpiling its scrap inventory for potential future use. KPMG instructed AstroPower to assign a value to this growing inventory and KPMG determined the value to be assigned.

53.    Unfortunately, the value assigned by KPMG was incorrect. The result of KPMG's incorrect accounting treatment and valuation was that the Company did not know the real value of the Silicon in its inventory.

54.     When E&Y conducted its forensic review, it immediately identified this incorrect accounting treatment.

55.     KPMG's incorrect advice caused AstroPower to incorrectly book the value of its scrap silicon.

### iv.     Equipment Under Construction

56.     AstroPower employed a pool of engineers to design and build the specialized equipment the company required to manufacture its solar products.  When these engineers expended time and materials on their design and build projects, they were instructed to bill that time and material to the specific piece of equipment that was under construction.  Through this accounting treatment, that time and material was not booked as overhead; rather, it was applied to and capitalized in that specific project.

57.     This accounting treatment was suggested and consistently blessed by KPMG. This treatment, however, could also be susceptible to abuse.  Engineers would book costs and time related to one project to an entirely different project and would book costs and time to projects after that project was closed.  Through this inappropriate booking of costs and labor, AstroPower's financials inaccurately portrayed the true cost of certain projects and improperly capitalized projects.  The Company did so at the direction and with the blessing of KPMG.

### D.     KPMG Raises Concerns and, Ultimately, Fires AstroPower as a Smokescreen and a Mechanism to Contrive a Defense to Their Decade-Old Failures

58.     Until the winter of 2002, KPMG raised no concerns regarding how it had been keeping AstroPower's books and certifying the Company's financials to the public.  In the summer of 2002, however, the Sarbanes-Oxley Act was signed into law.  For the first time, KPMG became more concerned with its certification of AstroPower's financials than with the fees it derived from the AstroPower engagement.

59.     On or about January 30, 2003, KPMG corresponded with AstroPower regarding KPMG's audit of AstroPower's financials as of December 31, 2002 and 2001. The engagement letter was countersigned by the chairman of AstroPower's Audit Committee on June 10, 2003.

60.     Under this agreement, KPMG was to:

> [I]ssue a written report upon our audit of the consolidated balance sheets of AstroPower, Inc. and subsidiaries as of December 31, 2002 and 2001, the related consolidated statements of income and comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2002, and schedules supporting such financial statements, all of which are to be included in the annual report (Form 10-K) proposed to be filed by the Company under the Securities Exchange Act of 1934.

61.     KPMG estimated its fees for this retention would be $245,650.

62.     During April 2003, in connection with its work on the 2002 year-end audit, KPMG expressed concerns about AstroPower's financials. The concerns KPMG raised at this late hour focused on AstroPower's revenue recognition practices and lax internal controls. The Company's management, Board, and Audit Committee were incredulous that KPMG was only now raising concerns at this late stage of the auditing process. The Company's surprise was further heightened because not since 1998 had KPMG provided any management letters raising these concerns about revenue recognition and internal controls even though these practices had not been materially modified during KPMG's engagement.

63.     Moreover, KPMG now stated that the audit could not be completed with the Company's current CEO and CFO in place. Thus, KPMG forced the ouster of the Company's two officers that could serve a critical role in completing the audit.

64.     Suddenly, KPMG's auditors and accountants were taking up residence at the AstroPower facility. An army of KPMG accountants and auditors were on-site at AstroPower

every day for months scrubbing transactions from prior years. Presumably, KPMG was now concerned about its own hand in AstroPower's demise.

65. In the fall of 2003, KPMG declared that it was not prepared to complete the audit process unless AstroPower undertook additional forensic procedures beyond the scope of those matters already evaluated. KPMG, however, did not define the scope of these procedures.

66. The Audit Committee advised KPMG that, while it did not believe additional forensic work was necessary, it would be willing to undertake such efforts if KPMG provided guidance regarding the scope, potential cost, and timing of these additional procedures and, in particular, how these additional procedures would affect the timing and cost for completing the audit.

67. KPMG, however, refused to provide the guidance requested by the Audit Committee. AstroPower advised KPMG that it could not assist KPMG with its requests if KMPG did not cooperate.

68. AstroPower's heightened concerns were meritorious; for months, KPMG had been stringing AstroPower along. KPMG would indicate that the audit could be completed if AstroPower would provide certain information, but, as soon as that information was provided, KPMG would request new and different information.

69. With no audited financials and no ability to meet its public-filing requirements, the Company was unable to obtain any funding. These KPMG-created delays eliminated AstroPower's access to capital and debt. Debt and equity would have been available to AstroPower; but only if the Company could provide audited financials.

70. Additionally, KPMG's fees had ballooned from its initial estimate of $246,650. AstroPower cooperated with each of KPMG's requests. But, AstroPower could no longer

blindly write KPMG blank checks as it continued to prolong an audit that, by this time, it was clear KPMG never intended to and never would complete.

71.    On or about December 29, 2003, AstroPower received correspondence from KPMG in which KPMG advised that "the client-auditor relationship between AstroPower, Inc. and KPMG has ceased." The audit for which AstroPower paid KPMG excessive fees was never completed.

72.    KPMG's role in AstroPower's improper revenue recognition, asset valuation, and other accounting practices prevented AstroPower's management, and the independent members of the board and of the Audit Committee from being able to discover and correct the misstatements. Moreover, KPMG's acts and omissions caused AstroPower to make critically flawed business decisions. Finally, despite promising to complete the 2002 audit, KPMG failed to do so and ultimately caused the Company's demise.

E.    **AstroPower's Bankruptcy**

73.    On February 1, 2004, AstroPower filed for bankruptcy protection.

74.    On or about April 2, 2004, the Debtor filed its First Amended Schedule F – Creditors Holding Unsecured Non-Priority Claims (the "Amended Schedules"). On the Amended Schedules, the Debtor listed KPMG as a general unsecured creditor with a claim in the amount of $592,275.00 (the "KPMG Claim").

75.    On or about April 22, 2004, KPMG filed proof of claim number 158 in the amount of $2,050.00 (the "KPMG Filed Claim," together with the KPMG Claim, the "KPMG Claims").

76.    On or about July 27, 2005, the Court entered the Order Approving Stipulation and Agreed Order Resolving Motion of AstroPower Liquidating Trust Pursuant to Sections 105 and 1142 of the Bankruptcy Code for an Order Establishing Maximum Reserve Amounts for Certain

Disputed Claims for Distribution Purposes as Between AstroPower Liquidating Trust and KPMG LLP (the "Reserve Order").    Pursuant to the Reserve Order and related stipulation, KPMG agreed that the KPMG Claim was a Disputed Claim.

## COUNT I - BREACH OF CONTRACT

77.    The Trust hereby incorporates the facts and allegations set forth in Paragraphs 1 through 76 above as if fully set forth herein.

78.    AstroPower entered into contracts with KPMG under which KPMG agreed to audit the consolidated balance sheets of AstroPower, Inc., and its related subsidiaries, the related consolidated statements of income and comprehensive income, shareholders' equity, and cash flows for prior years ended, and schedules supporting each financial statements, all of which were to be included in the annual reports (Forms 10-K) proposed to be filed by the Company under the Securities Exchange Act of 1934.  KPMG also contracted to provide AstroPower with written reports on these financial statements.

79.    KPMG contractually agreed to perform its audit in accordance with GAAS and GAAP.

80.    KPMG breached its contracts with AstroPower by failing to provide the bargained-for services and failing to conduct its audits in accordance with GAAP and GAAS.

81.    KPMG's breach of its contracts with AstroPower caused AstroPower to suffer damages in an amount to be determined at trial.

## COUNT II - PROFESSIONAL NEGLIGENCE/ACCOUNTING MALPRACTICE

82.    The Trust hereby incorporates the facts and allegations set forth in paragraphs 1 through 81 above as if fully set forth herein.

83.    KPMG had a duty, as a professional accounting firm, financial consultant, and auditor to use such skill, prudence, and diligence as other members of its profession commonly possess and exercise.

84.    KPMG breached the duties it owed AstroPower in at least the following respects:

a.    Failing to audit AstroPower's financial statements and prepare reports with appropriate skill and diligence;

b.    Failing to advise adequately, inquire into, and to investigate independently accounting and financial information;

c.    Failing to properly and fully advise AstroPower's management, Board of Directors, Audit Committee, and shareholders of the lack of internal controls, ongoing accounting irregularities, and incorrect financial statements of which KPMG was or should have been aware through reasonable diligence and skill;

d.    Failing to inquire into suspect transactions and/or records in order to undertake appropriate steps to account for and/or inform management about those suspect transactions and/or records;

e.    Certifying AstroPower's financial statements to the Company's management, Board, Audit Committee, and shareholders as true, accurate, and correct when KPMG knew or should have known of their inaccuracy and/or falsity;

f.    Failing to investigate the proper accounting treatment for (1) AstroPower's revenue recognition practices; (2) inventory valuation practices; and, (3) EUC capitalization practices;

g.    Failing to advise AstroPower on its (1) revenue recognition practices; (2) Inventory valuation practices; and, (3) EUC capitalization practices;

h.     Failing to complete AstroPower's 2002 year-end financial audit, and in fact, being more concerned about its own liability exposure than the effect of its failure to complete these financials;

i.     Failing to timely notify AstroPower that its financials from 2002 and prior were not performed in accordance with GAAP and GAAS; and

j.     Failing to staff the 2002 audit and prior AstroPower auditing, accounting, and consulting engagements with personnel of sufficient knowledge, training, and expertise.

85.     As set forth above, KPMG owed AstroPower duties as its professional accounting firm, tax consultant, and auditor to use such skill, prudence, and diligence as other members of its profession commonly possess and exercise.

86.     KPMG breached the duties it owed AstroPower by failing to discharge those duties and using such skill, prudence, and diligence as other members of its profession commonly possess.

87.     KPMG's breaches of its duties caused AstroPower to suffer damages in an amount to be determined at trial.

## COUNT III – NEGLIGENT MISREPRESENTATION

88.     The Trust hereby incorporates the facts and allegations set forth in paragraphs 1 through 87 above as if fully set forth herein.

89.     KPMG represented to AstroPower that it had expertise in analyzing accounting issues to determine their proper treatment in accordance with GAAP, in recognizing revenue, in valuing inventory, and in the correct capitalization and depreciation issues.    These representations were made with the intent to induce AstroPower to engage KPMG as its accounting firm, tax consultant, and auditor.    KPMG further represented that its work in connection with its auditing of the Company's year-end financials was done in accordance with

GAAP and GAAS when it was not. KPMG intended for AstroPower to rely on the representations in order to publish its year-end financials.

90.    AstroPower justifiably relied on the representations made by KPMG. AstroPower, in reliance on KPMG's representations, engaged KPMG as its accounting firm, tax consultant, and auditor and AstroPower was damaged as a result.

## COUNT IV – GROSS NEGLIGENCE

91.    The Trust hereby incorporates the facts and allegations set forth in paragraphs 1 through 90 above as if fully set forth herein.

92.    KPMG's negligence as described above rose to the level of gross negligence. KPMG exhibited a wholesale want of care such that its acts and omissions were intentional, the result of recklessness, the result of or conscious indifference to AstroPower's rights and welfare. As a result, KPMG was grossly negligent.

93.    KPMG's grossly negligent conduct warrants an award of exemplary damages, for which the Trust hereby sues.

## COUNT V – UNJUST ENRICHMENT

94.    The Trust hereby incorporates the facts and allegations set forth in paragraphs 1 through 93 above as if fully set forth herein.

95.    In the alternative, and/or with respect to conduct not governed by the existence of an express contract, the Trust seeks the equitable remedy of unjust enrichment.

96.    AstroPower paid to KPMG millions of dollars during their business relationship. AstroPower paid excessive fees to KPMG with regard to the 2002 audit alone.

97.    In exchange for the millions of dollars paid by AstroPower to KPMG, AstroPower received improper and inaccurate auditing, accounting, and tax consulting services which hastened AstroPower's demise, if not doomed it completely. With regard to the 2002

audit alone, AstroPower paid KPMG excessive fees for GAAP and GAAS compliant audited financials and a written report on same. In exchange for these fees, AstroPower received only a letter terminating their relationship.

98.    There was no justification for KPMG's receipt of these monies and for the loss suffered by AstroPower's as correlating to its payment of these monies to KPMG.

99.    The Trust seeks this equitable remedy as there is no adequate remedy at law under which the Trust may recover.

## COUNT VI – EQUITABLE SUBORDINATION

100.    The Trust hereby incorporates the facts and allegations set forth in paragraphs 1 through 99 above as if fully set forth herein.

101.    As alleged herein, KPMG engaged in wrongful conduct to the detriment of the Debtor and its arms' length creditors.

102.    KPMG failed to audit AstroPower's financial statements and prepare reports with the appropriate skill, prudence and diligence that was required.

103.    KPMG failed to advise the Company adequately, inquire into, and to investigate independently accounting and financial information.

104.    KPMG failed to properly and fully advise AstroPower's management, Board of Directors, Audit Committee and shareholders of the lack of internal controls, ongoing accounting irregularities, and incorrect financial statements of which KPMG was or should have been aware through reasonable diligence and skill.

105.    KPMG failed to inquire into suspect transactions and/or records in order to undertake appropriate steps to account for and/or inform the Company's management about those suspect transactions and/or records.

106.    KPMG failed to certify AstroPower's financial statements to the Company's management, Board of Directors, Audit Committee, creditors and shareholders as true, accurate, and correct, when KPMG knew or should have known or their inaccuracy and/or falsity.

107.    KPMG failed to advise and investigate the proper accounting treatment for (a) AstroPower's Revenue Recognition Practices, (b) Inventory Valuation Practices; and (c) EUC Capitalization practices.

108.    Following the enactment of Sarbanes-Oxley Act, KPMG first raised concerns regarding AstroPower's books and records, including accounting practices it either implemented or suggested. Based on these new concerns, KPMG sent an army of KPMG accountants and auditors to do the Company's 2002 audit. KPMG repeatedly requested additional forensic work in order to complete the audit and the Company complied with KPMG's requests. KPMG refused, however, to provide the Company with guidance on the time and scope of such additional information or provide a time frame for when KPMG would complete the 2002 audit. Ultimately, KPMG terminated its relationship with the Company and failed to complete AstroPower's 2002 year-end financial audit.

109.    KPMG's role in AstroPower's improper revenue recognition, asset valuation, and other accounting practices prevented AstroPower's management, and the independent members of the board and the Audit Committee from being able to discover and correct the misstatements.

110.    KPMG's acts and omissions caused AstroPower to make critically flawed business decisions.

111.    KPMG's acts and omissions and its failure to complete the 2002 audit in a timely manner caused the Company's demise to the detriment of its creditors, while KPMG received payment for its failure to complete the audit.

112.    Equitable subordination of the KPMG Claims is consistent with the Bankruptcy Code.

113.    Accordingly, the KPMG Claims should be subordinated to the prior payment of all unsecured claims of the Debtor pursuant to Section 510(c) of the Bankruptcy Code.

### COUNT VII – DISALLOWANCE OF KPMG CLAIMS

114.    The Trust hereby incorporates the facts and allegations set forth in paragraphs 1 through 113 above as if fully set forth herein.

115.    During the ninety days prior to the Petition Date, the Debtor made certain transfers totaling not less than $20,556.00 (the "Avoidable Transfers") to or for the benefit of KPMG.

116.    KPMG was a creditor of the Debtor at the time of each of the Avoidable Transfers.

117.    The Avoidable Transfers were on account of antecedent debt(s) owed by the Debtor to or for the benefit of the KPMG.

118.    The Debtor is presumed to have been and was insolvent at the time of each of the Avoidable Transfers.

119.    The Avoidable Transfers enabled KPMG to recover more than it would have received if (a) the Debtor's case was filed under chapter 7 of the Bankruptcy Code, (b) the Avoidable Transfers had not been made, and (c) KPMG received payment of its debt to the extent provided by the provisions of the Bankruptcy Code.

120.    The Avoidable Transfers are avoidable as preferential transfers pursuant to Section 547(b) of the Bankruptcy Code.

121.    KPMG is the recipient of avoidable transfers pursuant to Sections 547(b) and 550(a) of the Bankruptcy Code.

122.    Accordingly, pursuant to 11 U.S.C. § 502(d), any claim asserted by KPMG in the Debtor's case, including, but limited to the KPMG Claims, must be disallowed until such time as KPMG pays to the Debtor an amount equal to the aggregate amount of all the Avoidable Transfers and the fraudulent transfer, plus interest thereon and costs.

## DAMAGES AND OTHER REMEDIES

123.    The Trust hereby incorporates the facts and allegations set forth in paragraphs 1 through 122 above as if fully set forth herein.

124.    As a result of the wrongful conduct described above, the Trust is entitled to recover its direct damages and consequential damages resulting from KPMG's wrongful conduct.

125.    The Trust is also entitled to a constructive trust on any sums AstroPower paid to KPMG as a result of KPMG's wrongful conduct, and to an order compelling KPMG to disgorge all such sums to the Trust, including any sums earned in whole or in part because of KPMG malfeasance or nonfeasance.

126.    The Trust is also entitled to recover its reasonable and necessary attorneys' fees and expenses incurred in connection with its prosecution of this lawsuit.

## PUNITIVE DAMAGES

127.    The Trust hereby incorporates the facts and allegations set forth in paragraphs 1 through 126 above as if fully set forth herein.

128.    The Trust is also entitled to punitive damages.  KPMG is liable for acts of gross negligence.   Such conduct was committed knowingly, intentionally, willfully, wantonly, maliciously, or with reckless disregard for the rights of AstroPower.  Accordingly, the Trust seeks recovery of punitive damage in order to punish KPMG's actions and deter such conduct in the future.

## JURY DEMAND

The Trust demands a trial by jury for all issues so properly triable.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, the Trust prays that Defendant KPMG be cited to appear herein and, that upon trial of the matter, the Trust be awarded judgment as follows:

1.      All actual damages as established at trial;

2.      Exemplary damages as established by the finder of fact, if applicable;

3.      Pre and post-judgment interest to the extent allowed by law;

4.      Reasonable and necessary attorneys' fees to the extent allowed by law;

5.      All costs of suit;

6.      Disallowance of the KPMG Claims;

7.      Subordination of the KPMG Claims to all general unsecured claims; and

8.      Any and all further relief to which the Trust has shown itself justly entitled whether at law or in equity, and whether general or special.

Dated: October ⅃C, 2006

**LANDIS RATH & COBB LLP**

Daniel B. Rath (No. 3022)
Kerri K. Mumford (No. 4186)
James S. Green, Jr. (No. 4406)
919 Market Street, Suite 600
P.O. Box 2087O. Box 2087
Wilmington, DE 19899
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**MUNSCH HARDT KOPF & HARR, P.C.**
Phil C. Appenzeller, Jr. (Tex. Bar #24003710)
Ross H. Parker (Tex. Bar #24007804)
500 N. Akard, Suite 3800
Dallas, TX 75201
Telephone:  (214) 855-7500
Facsimile:   (214) 855-7584

**COUNSEL TO THE ASTROPOWER
LIQUIDATING TRUST**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ASTROPOWER LIQUIDATING TRUST,<br>f/k/a ASTROPOWER, INC.,<br><br>       Plaintiff,<br><br>   v.<br><br>KPMG, LLP,<br><br>       Defendant. | Civil Action No. 06-469 (JJF) |

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing document has been served **via electronic mail and first class mail** on counsel of record for Defendant KPMG, LLP on this _10_ day of October, 2006, as follows:

Michael D. Warden
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C.  20005

Kerri K. Mumford (No. 4186)