# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ASTROPOWER LIQUIDATING TRUST, f/k/a ASTROPOWER, INC., | |
| Plaintiff, | |
| vs. | Civil Action No. 06-469 (JJF) |
| KPMG LLP, | |
| Defendant. | |

## OPENING BRIEF IN SUPPORT OF DEFENDANT KPMG LLP'S MOTION TO DISMISS

YOUNG CONAWAY STARGATT & TAYLOR, LLP
John T. Dorsey (No. 2988)
Maribeth L. Minella (No. 4185)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

Joseph Warganz                      SIDLEY AUSTIN LLP
Associate General Counsel           Michael D. Warden
KPMG LLP                            David S. Petron
757 Third Avenue                    1501 K Street, N.W.
New York, NY 10017                  Washington, D.C. 20005
                                    Telephone: (202) 736-8000
                                    Facsimile: (202) 736-8711

Dated: December 12, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.     NATURE AND STAGE OF PROCEEDINGS ...................................................................1

II.    SUMMARY OF ARGUMENT ..........................................................................................1

III.   STATEMENT OF FACTS ..................................................................................................2

       A.     The Role and Responsibilities of a Financial Statement Auditor ...........................2

       B.     KPMG Discovers the Fraud ...................................................................................6

       C.     Plaintiff's Demise and Its Complaint ....................................................................10

IV.    ARGUMENT .....................................................................................................................12

       A.     Standard of Review ...............................................................................................14

       B.     The Elements of AstroPower's Claims .................................................................15

       C.     AstroPower's Complaint Fails Because KPMG Did Not Breach Its
              Contract or Violate Its Professional Obligations. .................................................16

       D.     AstroPower Has Not and Cannot Plead Facts Necessary to Show that
              KPMG Caused AstroPower's Alleged Damages...................................................21

              1.     KPMG's Alleged Role in the Causal Chain Leading to
                     AstroPower's Demise is Too Speculative and Remote to Hold
                     KPMG Liable....................................................................................................21

              2.     AstroPower's Accounting Fraud Is Imputed to the Trust and
                     Defeats the Trust's Claims Against KPMG..............................................26

       E.     The *In Pari Delicto* Doctrine Bars the Trust's Claims Against KPMG. ...............29

       F.     The Trust's Purported Claims for Gross Negligence and Exemplary
              Damages Must be Dismissed. ...............................................................................31

       G.     The Trust's Purported Claims for Unjust Enrichment and Equitable
              Subordination Must be Dismissed. .......................................................................33

V.     CONCLUSION..................................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*In re Agribiotech, Inc.,*
No. CV-S-02-0537, 2005 U.S. Dist. LEXIS 6467 (D. Nev. April 1, 2005) ................................27

*American Original Corp.* v. *Legend, Inc.,*
689 F. Supp. 372 (D. Del. 1988) ................................................................................................32

*Amron* v. *Morgan Stanley Inv. Advisors, Inc.,*
464 F.3d 338 (2d Cir. 2006) ......................................................................................................15

*Baena* v. *KPMG LLP,*
453 F.3d 1 (1st Cir 2006) .................................................................................26, 27, 29, 30, 31

*Bakerman* **v.** *Sidney Frank Importing Co.,*
No. Civ.A 1844-N, 2006 WL 2987020 (Del. Ch. Oct. 10, 2006) .................................................33

*Bank of Marin* v. *England,*
385 U.S. 99 (1966) .....................................................................................................................28

*Bellanca Corp.* v. *Bellanca,*
169 A.2d 620 (Del. 1961) ...........................................................................................................26

*In re Bennett Funding Group, Inc.,*
336 F.3d 94 (2d Cir. 2003) .........................................................................................................29

*Bily* v. *Arthur Young & Co.,*
834 P.2d 745 (Cal. 1992) ....................................................................................................3, 6, 23

*Board of Trs. of Bricklayers & Allied Craftsmen Local 6* v. *Wettlin Assocs., Inc.,*
237 F.3d 270 (3d Cir. 2001) .......................................................................................................14

*Browne* v. *Robb,*
583 A.2d 949 (Del. 1990) ...........................................................................................................31

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410 (3d Cir. 1997) .......................................................................................................3

*In re CITX Corp., Inc.,*
448 F.3d 672 (3d Cir. 2006) .......................................................................................................24

*Cenco Inc.* v. *Seidman & Seidman,*
686 F.2d 449 (7th Cir. 1982) ...............................................................................................15, 30

DB02:5664258.2                                                                            065539.1001

*CitiCorp Venture Capital, Ltd.* v. *Comm. of Creditors Holding Unsecured Claims,*
160 F.3d 982, (3d Cir. 1998)........................................................................................34

*Copy-Data Sys., Inc.* v. *Toshiba Am., Inc.,*
755 F.2d 293 (2d Cir. 1985)........................................................................................23

*David B. Lilly, Co.* v. *Fisher,*
800 F. Supp. 1203 (D. Del. 1992)................................................................................26

*Deephaven Private Placement Trading, Ltd.* v. *Grant Thornton & Co.,*
454 F.3d 1168 (10th Cir. 2006) ................................................................................3, 6

*Derickson* v. *Derickson,*
281 A.2d 487 (Del. 1971) ............................................................................................34

*Drabkin* v. *Alexander Grant & Co.,*
905 F.2d 453 (D.C. Cir. 1990)...........................................................................6, 21, 25

*In re Dublin Sec., Inc.,*
133 F.3d 377 (6th Cir. 1997) .......................................................................................29

*Dura Pharms., Inc.* v. *Broudo,*
544 U.S. 336 (2005)..........................................................................14, 19, 20, 24, 32

*FDIC* v. *Ernst & Young,*
967 F.2d 166 (5th Cir. 1992) ..................................................................................21, 28

*Falkenberg Capital Corp.* v. *Dakota Cellular, Inc.,*
925 F. Supp. 231 (D. Del. 1996)..................................................................................17

*Grassmueck* v. *American Shorthorn Ass'n,*
402 F.3d 833 (8th Cir. 2005) .......................................................................................29

*H-M Wexford LLC* v. *Encorp, Inc.,*
832 A.2d 129 (Del. Ch. 2003)......................................................................................16

*Hartman* v. *Pathmark Stores, Inc.,*
No. 05-403-JJF, 2006 WL 571852 (D. Del. Mar. 8, 2006) ........................................14

*Healy* v. *Healy,*
No. 19816-NC, 2006 WL 3289623 (Del. Ch. Oct. 31, 2006)......................................34

*In re Hedged-Investments Associates, Inc.,*
84 F.3d 1281 (10th Cir. 1996) ................................................................................29, 31

iv

*Holmes* v. *Securities Inv. Prot. Corp.*,
503 U.S. 258 (1992)............................................................................................25

*Jardel Co.* v. *Hughes*,
523 A.2d 518 (Del. 1987) ....................................................................................32

*Leveto* v. *Lapina*,
258 F.3d. 156 (3d Cir. 2001)...............................................................................29

*Morse* v. *Lower Merion Sch. Dist.*,
132 F.3d 902 (3d Cir. 1997).........................................................................14, 23

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2006).................................................................................7

*New Haverford P'ship v. Stroot*,
772 A.2d 792 (Del. 2001) ...................................................................................16

*Nisselson* v. *Lernout*,
__ F.3d__, No. 05-1774, 2006 WL 3216998 (1st Cir. Nov. 8, 2006)..............29

*Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP*,
322 F.3d 147 (2d Cir. 2003).................................................................................30

*Official Comm. of Unsecured Creditors of PSA, Inc.* v. *Edwards*,
437 F.3d 1145 (11th Cir. 2006), *cert. denied sub nom.*
*Ladden v. Reliance Trust Co.,* 127 S. Ct. 45 (2006) .....................................28, 31

*Official Comm. of Unsecured Creditors* v. *R.F. Lafferty & Co.*,
267 F.3d 340 (3d Cir. 2001)...........................................................27, 28, 29, 30, 31

*PNC Bank* v. *Housing Mortgage Corp.*,
899 F. Supp. 1399 (W.D. Pa. 1994)...............................................................21, 29

*Pinter* v. *Dahl*,
486 U.S. 622 (1988)............................................................................................29

*Production Res. Group, L.L.C.* v. *NCT Group, Inc.*,
863 A.2d 772 (Del. Ch. 2004).............................................................................32

*In re Radnor Holdings*,
___ B.R. ___, No. 06-10894 PJW, 2006 WL 3346191 (Bankr. D. Del. Nov. 17, 2006) .............24

*Republic of Pan.* v. *American Tobacco Co.*,
No. 05C-07-181-RRC, 2006 WL 1933740 (Del. Super. Ct.  June 23, 2006)................33

DB02:5664258.2                                                                      065539.1001

*Satellite Fin. Planning Corp.* v. *First Nat'l Bank of Wilmington*,
633 F. Supp. 386 (D. Del. 1986)..................................................................26

*Shearson Lehman Hutton, Inc.* v. *Wagoner*,
944 F.2d 114 (2d Cir. 1991)........................................................................30

*Smolen* v. *Deloitte, Haskins & Sells*,
921 F.2d 959 (9th Cir. 1990) ......................................................................21

*Steamfitters Local Union No. 420 Welfare Fund* v. *Philip Morris, Inc.*,
171 F.3d 912 (3d Cir. 1999)........................................................................33

*In re SubMicron Sys. Corp.*,
432 F.3d 448 (3d Cir. 2006)........................................................................34

*Teachers' Ret. Sys. of La.* v. *Aidinoff*,
900 A.2d 654 (Del. Ch. 2006)....................................................................26

*Trenwick Am. Litig. Trust* v. *Ernst & Young*,
906 A.2d 168 (Del. Ch. 2006)...............................................................25, 31

*U.S. ex rel. Grynberg* v. *Ernst & Young LLP*,
323 F. Supp. 2d 1152 (D. Wyo. 2004)..........................................................4

*VLIW Tech., LLC* v. *Hewlett-Packard Co.*,
840 A.2d 606 (Del. 2003) ...........................................................................15

*Wood* v. *Coastal States Gas Corp.*,
401 A.2d 932 (Del. 1972) ...........................................................................33

## STATUTES

11 U.S.C. § 541..........................................................................................28

Securities Exchange Act of 1934 § 10A, 15 U.S.C. § 78j-1.............12, 18, 19

Securities Exchange Act of 1934 § 13(a), 15 U.S.C. § 78m.......................2, 3

## OTHER AUTHORITIES

AICPA, Codification of Statements on Auditing Standards, AU § 110.....................3, 4

AICPA, Codification of Statements on Auditing Standards, AU § 230..........................6

AICPA, Codification of Statements on Auditing Standards, AU § 316................3, 8, 18

vi

AICPA, Codification of Statements on Auditing Standards, AU § 317 ............................ 5, 18, 19

AICPA, Codification of Statements on Auditing Standards, AU § 341 ................................... 6, 23

AICPA, Codification of Statements on Auditing Standards, AU § 508 ....................... 6, 16, 17, 18

Black's Law Dictionary (6th ed. 1990) ......................................................................................... 29

Stephen M. Bainbridge & Christina J. Johnson, *Managerialism, Legal Ethics, and Sarbanes-Oxley Section 307*, 2004 MICH. ST. L. REV. 299, 323 ................................................................... 7

Practicing Law Institute, *The SEC Speaks in 2006*, 1531 PLI/Corp. 995, 1019 (2006) ................. 8

DB02:5664258.2                                                                                      065539.1001

Defendant KPMG LLP ("KPMG") respectfully submits this brief in support of its motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Amended Complaint ("Complaint") of plaintiff AstroPower Liquidating Trust ("AstroPower" or the "Company") for failure to state a claim upon which relief can be granted.

## I.    NATURE AND STAGE OF PROCEEDINGS

Plaintiff is a trustee standing in the shoes of a bankrupt company that was engaged in a financial statement fraud.  As AstroPower's financial statement auditor, KPMG discovered that fraud and blew the whistle on management.  Showing that no good deed goes unpunished, AstroPower has now brought this action, attempting to shift blame for the collapse of the Company to KPMG and going so far as to claim that KPMG somehow "caused AstroPower to make critically flawed business decisions."  Compl. ¶ 72.  As much as AstroPower's Complaint tries to paint a picture that everything was KPMG's fault, the *facts* alleged in the Complaint tell a compelling story of KPMG's acting precisely as a financial statement auditor should.  To the extent that AstroPower's Complaint attempts to state causes of action against KPMG, those claims fail as a matter of law and logic.

## II.    SUMMARY OF ARGUMENT

1.    Counts I through III of AstroPower's Complaint must be dismissed because KPMG did not breach its contracts, violate its professional obligations, or make negligent misrepresentations in connection with its financial statement audits of AstroPower.

2.    Counts I through III of AstroPower's Complaint must be dismissed because, under any possible theory, AstroPower cannot establish that KPMG caused any of AstroPower's alleged damages, and AstroPower's accounting fraud is imputed to plaintiff and thereby defeats its claims.

3.     Counts I through III of AstroPower's Complaint must be dismissed because the *in pari delicto* doctrine bars those claims against KPMG.

4.     Count IV of AstroPower's Complaint, as well as any prayer for punitive damages, must be dismissed because AstroPower's bald assertions of gross negligence are insufficient to state a claim and fail to carry AstroPower's substantial burden to justify punitive damages.

5.     Count V of AstroPower's Complaint must be dismissed because AstroPower cannot state a claim for unjust enrichment where there is an express contract or where that claim merely restates a traditional tort claim.

6.     Count VI of AstroPower's Complaint must be dismissed because the deficiencies in AstroPower's others theories of liability defeat its claim for equitable subordination.

## III.     STATEMENT OF FACTS

### A.     The Role and Responsibilities of a Financial Statement Auditor

As a public company, AstroPower was required by the federal securities laws to prepare and file with the United States Securities and Exchange Commission ("SEC") annual financial statements as part of its Form 10-K and quarterly financial statements with its Form 10-Q.  *See* Securities Exchange Act of 1934 § 13(a), 15 U.S.C. § 78m; *see also* Compl. ¶ 16 (referring to AstroPower's Form 10-K). [1]  Annual financial statements filed with the SEC must be audited by

---

[1] For purposes of this motion only, KPMG assumes the truth of the allegations in plaintiff's Complaint.  With that said, however, many of the allegations in the Complaint are flatly inconsistent with AstroPower's prior representations to the Bankruptcy Court or with its contemporaneous SEC filings.  For example, AstroPower now asserts that "KPMG forced the ouster of the Company's two officers that could serve a critical role in completing the audit." Compl. ¶ 63.  Yet in its Revised Disclosure Statement (dated October 4, 2004) filed with the Bankruptcy Court, AstroPower stated that these officers resigned "subsequent to [its independent investigator's] preliminary report on the Debtor's internal controls," with no mention of KPMG's "forcing their ouster."  *See* Revised Disclosure Statement § 2.4.8 (A-28).

independent public accountants; no such audit requirement applies to quarterly reports on Form 10-Q.[2]

KPMG served as the independent public accounting firm that audited AstroPower's *annual* financial statements. Compl. ¶¶ 25, 26. Each year, KPMG entered into an engagement letter with AstroPower that constituted the "agreement" (Complaint ¶ 60) or "contract[]" (Complaint ¶ 78) between the parties for KPMG to audit AstroPower's financial statements. For the year ending December 31, 2002, KPMG and AstroPower executed an engagement letter for KPMG to audit AstroPower's annual financial statements. Compl. ¶¶ 59-61 (quoting selectively from Engagement Letter). We are providing that letter to the Court. *See* Letter from Carl E. Hertrich, Partner, KPMG LLP, to Thomas J. Stiner, AstroPower, Inc. (dated January 30, 2003) (A-5 to A-11) ("Engagement Letter").[3]

An auditor is required to plan and perform an audit to obtain reasonable assurance as to whether the financial statements are free of material misstatement, whether caused by error or fraud. *See generally* AICPA, Codification of Statements on Auditing Standards ("AU") § 316 (A-38 *et seq.*).[4] An auditor performs tests of the company's accounting records, obtains

---

[2] *See* Exchange Act § 13(a)(2), 15 U.S.C. § 78m(a)(2) (requiring annual reports be "certified if required by the rules and regulations of the Commission by independent public accountants," while requiring only "such quarterly reports . . . as the Commission may prescribe).

[3] Because the Complaint quotes from and explicitly relies upon the engagement letter, the Court may consider that document in ruling on the motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

[4] GAAS includes ten general standards that guide financial statement audits. *See Deephaven Private Placement Trading, Ltd.* v. *Grant Thornton & Co.*, 454 F.3d 1168, 1170 n.1 (10th Cir. 2006); *Bily* v. *Arthur Young & Co.*, 834 P.2d 745, 750 (Cal. 1992). Specific guidance as to what GAAS requires is found in the Statements on Auditing Standards ("SAS"), issued by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA"). *See* AICPA, Codification of Statements on Auditing Standards ("AU") §§ 110-901 (2006). The Statements on Auditing Standards may be found at http://www.aicpa.org/Professional+Resources/Accounting+and+Auditing/Authoritative+Standards/auditing_standards.htm. We have included in the Appendix the specific AU sections cited in this brief at A-31 to A-112.

3

representations from management, and performs other procedures that the auditor considers necessary. Engagement Letter at A-6. "The responses to [the auditor's] inquiries, the written representations, and the results of audit tests, among other things, comprise the evidential matter [the auditor] will rely upon in forming an opinion on the consolidated financial statements." *Id*.

A company's management remains responsible for all of its financial statements, including those audited by a CPA firm. *See U.S. ex rel. Grynberg* v. *Ernst & Young LLP*, 323 F. Supp. 2d 1152, 1157 (D. Wyo. 2004) ("A company's management is responsible for the presentation of financial statements in conformity with generally accepted accounting principles (GAAP)."); Engagement Letter at A-6 ("The management of the Company has responsibility for the consolidated financial statements and all representations contained therein."). An auditor's responsibility, like KPMG's here, is to "conduct the audit in accordance with auditing standards generally accepted in the United States of America ['GAAS'], with the objective of expressing an opinion as to whether the presentation of the consolidated financial statements, taken as a whole, conforms to accounting principles generally accepted in the United States of America ['Generally Acceptable Accounting Principles' or 'GAAP']." Engagement Letter at A-5; *see also* AU § 110.01 (A-31); Compl. ¶¶ 60, 78.

AstroPower makes much of the fact that KPMG did not issue an opinion on AstroPower's December 31, 2002 financial statements, and it asserts that KPMG was contractually obligated to issue a report. *See* Compl. ¶¶ 60, 78. But AstroPower's theory goes beyond the claim that KPMG was obligated to issue *a* report on AstroPower's December 31, 2002 financial statements. Implicit in all of AstroPower's claims is that KPMG did not issue an *unqualified* opinion that AstroPower's financial statements were fairly presented in accordance with GAAP, for AstroPower asserts that "[w]ith no audited financials and no ability to meet its

4

public filing requirements, the Company was unable to obtain any funding," Compl. ¶ 69, and

that it "lost access to capital and debt markets." *Id*. ¶ 17.  It defies logic to suggest that an

auditor should issue an unqualified opinion on financial statements that contain (or are not free

from) material misstatement.

Rather, as KPMG's Engagement Letter and professional standards make clear, in the

exercise of its judgment, an auditor can both (1) resign from an engagement and (2) refuse to

issue an unqualified opinion.  Thus, the Engagement Letter provides:

> Circumstances may arise in which it is necessary for us to . . . withdraw from the
> engagement.  In such circumstances, our findings or reasons for withdrawal will
> be communicated to the audit committee.

Engagement Letter at A-6.  GAAS similarly permits an auditor to withdraw from an engagement

under certain circumstances.  *See* AU §§ 317.20, 317.22 (A-74).  Likewise, the SEC's rules

specifically contemplate that a CPA firm like KPMG may be required to withdraw from an

engagement and impose disclosure obligations on a public company when its CPA firm "resigns

(or indicates that it declines to stand for re-appointment after completion of the current audit."

*See* Instructions, Form 8-K, at 13 (instructions for Item 4.01), *available at*

http://www.sec.gov/about/forms/form8-k.pdf.  This is a form of "noisy withdrawal" so that the

investing public will be notified by the CPA firm's client in an SEC filing as to the CPA firm's

withdrawal and its reasons.

It is, of course, all but impossible to access the financial markets without an unqualified

audit opinion.  Contrary to the assumption in AstroPower's theory, an auditor's report on a

company's financial statements need not be unqualified and can take any number of forms.

Where an auditor is able to obtain reasonable assurance that the financial statements present, in

all material respects, the financial position, results of operations, and cash flows of the entity in

conformity with GAAP, it may issue an unqualified opinion (sometimes referred to colloquially

as a "clean" opinion.  *See* AU § 508.10 (A-88); *Bily*, 834 P.2d at 748.[5]  In other situations, the auditor may need to issue a qualified opinion, stating the specific qualifications that apply to any conclusions reached during the audit.  *See* AU § 508.10 (A-88).  For example, if the audit client restricts or limits the work that can be performed by the auditor, or if circumstances—such as the inability to obtain sufficient competent evidential matter or accounting records—interfere with the completion of the audit, an auditor may disclaim an opinion or issue an opinion that is qualified as to scope.  *See id.*; *id.* §§ 508.22, 508.24, 508.61 (A-93, A-104).  Similarly, if an auditor develops "substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time," it may issue a so-called "going concern opinion" that includes an explanatory paragraph expressing that "substantial doubt" about the entity's ability to continue as a going concern.  *See* AU §§ 341.02, 341.12 (A-77, A-81); *see also Drabkin* v. *Alexander Grant & Co.*, 905 F.2d 453, 455 (D.C. Cir. 1990).  If the auditor concludes that the financial statements are not fairly presented in conformity with GAAP, it may issue an adverse opinion.  *See* AU §§ 508.10, 508.58 (A-88, A-103).  Given the variety of possible audit reports, KPMG's Engagement Letter cautioned that KPMG could not assure AstroPower that it would render an unqualified opinion.  Engagement Letter at A-6.

**B.    KPMG Discovers the Fraud**

During its audit of AstroPower's December 31, 2002 financial statements, KPMG discovered that AstroPower's management was engaged in an apparent revenue recognition fraud.  Compl. ¶ 33.  KPMG then did what one would expect an independent auditor to do and what its professional obligations and the federal securities laws require:  it blew the whistle.  In

---

[5] Even when auditors issue an unqualified opinion, "auditors do not 'certify' a  company's financial statements in the sense that they 'guarantee' or 'insure' them." *Deephaven*, 454 F.3d at 1174; *accord* AU § 230.13 (A-37) (noting that "the  auditor is not an insurer and his or her report does not constitute a guarantee").

March 2003, KPMG reported the management fraud to the Audit Committee of AstroPower's Board of Directors. *See id*. ¶¶ 16, 35. Because of the fraud (and because the financial statements were not "free from" material misstatements), KPMG notified AstroPower that it could not issue an unqualified opinion stating that AstroPower's December 31, 2002 financial statements were fairly presented in accordance with GAAP. *See id*. ¶ 16.

Without the required audit report from KPMG, AstroPower was unable to file in a timely manner its annual report on Form 10-K with the SEC. It instead notified the SEC (and the investing public) on April 1, 2003 that it would not be able to meet the filing deadline because it was reevaluating "revenue recognition matters" and that its *unaudited* 2002 quarterly financial statements previously filed with the SEC contained material misstatements that would "likely" require restatement. *See* AstroPower Form 12b-25 (dated April 1, 2003) (A-13); Compl. ¶ 16. [6]

KPMG continued its work, and, in early April, it identified "additional concerns about [AstroPower's] accounting practices." Compl. ¶ 35. Based on these findings by and at the request of KPMG, AstroPower's Audit Committee launched its own investigation of the accounting fraud. It engaged the law firm of Hale & Dorr as independent counsel and Ernst & Young as "forensic" auditors to scour the records of AstroPower for management fraud in much more detail than a normal financial statement audit. *See id*. A forensic audit of the kind undertaken by Ernst & Young is far more extensive than an ordinary financial statement audit, such as those performed by KPMG of AstroPower's financials. [7] This difference between a

---

[6] In ruling on the motion to dismiss, the court is permitted to consider AstroPower's public filings with the SEC. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2006).

[7] *See* Stephen M. Bainbridge & Christina J. Johnson, *Managerialism, Legal Ethics, and Sarbanes-Oxley Section 307*, 2004 MICH. ST. L. REV. 299, 323 ("[E]ven a full-fledged accounting audit is not a true forensic audit designed to uncover wrongdoing, but rather only a sampling audit that may entirely miss the problem."); Practicing Law Institute, *The SEC Speaks in 2006*, 1531 PLI/Corp. 995, 1019 (2006) ("[A] 'normal' audit of an issuer's financial

forensic audit and a financial statement audit is starkly demonstrated by the difference in fees between the Ernst & Young and KPMG engagements. Over a three-month period, "the Company incurred approximately $1,500,000 in fees resultant from E&Y's forensic accounting review." Compl. ¶ 37. In contrast, KPMG estimated that its fees for the entire December 31, 2002 audit (before it learned of the fraud) would be $245,650 (Complaint ¶ 61).

This "preliminary" independent investigation concluded that management had engaged in financial statement fraud in several areas.[8] Most significantly, AstroPower improperly inflated its revenue. For example, according to the Complaint, AstroPower "recognized revenue on goods that were not yet delivered . . . ." *Id*. ¶ 46. AstroPower thus claimed to have earned revenue on products that remained in the Company's own warehouses or that it shipped to its own facilities. Similarly, AstroPower recognized revenue on contracts that had not yet been signed. *See id*. AstroPower also recognized revenues "on goods that were delivered to customers even if those customers did not request that those goods be sent." *Id*.

AstroPower also admits in its Complaint that its own improper revenue recognition practices "incentivized [it] to ship as much product as possible," resulting in growing and "massive receivables." *Id*. ¶ 48. Of course, the growing receivables appeared on AstroPower's financial statements for all to see. *See id*. (noting that "[t]hese growing aged receivables skewed the Company's financial records"). The Complaint further alleges that it shipped products to

---

statements is not a forensic audit of the kind necessary to detect deliberate, elaborate financial fraud.").

[8] Although plaintiff studiously avoids any reference in its Complaint to "management fraud" (in apparent fear of the legal consequences of so doing), its constant use of the term "irregularity" to describe the problems with AstroPower's financial statements is both telling and accurate. "Irregularity" means "an[] *intentional* misstatement of financial statements." *See* AU § 316.79 n.37 (A-63). An "irregularity," as opposed to an "error" (which may include an honest mistake), involves a deliberate misrepresentation by management.

8

customers without properly checking those customers' credit ratings (*see id*.), as if that were somehow KPMG's responsibility.

After Hale & Dorr made its preliminary report to the Audit Committee in May 2003, the two top AstroPower officials—Chief Executive Officer Allen M. Barnett and Chief Financial Officer Thomas J. Stiner—resigned.  Revised Disclosure Statement § 2.4.8 (A-28).  The Audit Committee also removed two other management employees involved in the improprieties.  *See* AstroPower Form 8-K (dated Jan. 7, 2004) (A-16).   Meanwhile, on May 16, 2003, AstroPower announced that it would need yet more time to complete its investigation and to file its December 31, 2002 report on Form 10-K. Compl. ¶ 20.   Because of its inability to file either its 10-K or its March 31, 2003 10-Q in a timely manner, AstroPower's common stock was "delisted" from the NASDAQ. *Id.* ¶¶ 21-22.

Meanwhile, "a myriad of factors combined to negatively impact [AstroPower's] financial performance."   Revised Disclosure Statement § 2.4.1 (A-26).   For example, "AstroPower experienced increased competitive pressures in 2002, particularly in Europe, resulting in decreased and reduced pricing for its products, reductions in customer order forecasts, cancellation of orders already placed, and customer returns." *Id.* § 2.4.2 (A-26).  By at least early November 2003, AstroPower was insolvent.  *See* Compl. ¶¶ 115, 118 (alleging that AstroPower "was insolvent" 90 days before the petition date in February 2004).

Following the resignations of the CEO and CFO, KPMG attempted to work with AstroPower so that the Audit Committee could complete its internal investigation and KPMG could complete its audit of AstroPower's 2002 consolidated financial statements. *See generally id.* ¶¶ 64-66.  KPMG needed to be able to rely on a full and complete forensic audit to satisfy itself as to the scope of the fraud at AstroPower, including the extent to which the financial

statements were intentionally misstated and the identities of the members of management who involved in the fraud.   Ultimately, AstroPower was unwilling to broaden the scope of the investigation to satisfy KPMG's purposes for its audit work.   When AstroPower halted the forensic investigation in 2003, KPMG concluded that AstroPower was no longer "taking timely and appropriate remedial action with respect to a possible illegal act" as mandated by the federal securities laws and "therefore was not in compliance with Section 10A of the Securities and Exchange Act of 1934."  *See* Form 8-K/A-1 (dated Feb. 2, 2004) (A-23).   As a result, by letter dated December 23, 2003 and received by AstroPower on December 29, 2003, KPMG advised the Company that "the client-auditor relationship between AstroPower, Inc. and KPMG has ceased."  *See* Form 8-K (A-16); Compl. ¶ 71.[9]

## C.    Plaintiff's Demise and Its Complaint

Exactly 33 days after AstroPower received KPMG's resignation letter, AstroPower filed for Chapter 11.  In fact, *before* the Bankruptcy Petition was ever filed, AstroPower had already decided that its best future was not survival, but a sale of all its assets.   Revised Disclosure Statement § 2.5.1 (A-29 to A-30).

Plaintiff AstroPower Liquidating Trust was created pursuant to the Revised Liquidating Plan proposed by AstroPower and approved by the United States Bankruptcy Court on

---

[9]   AstroPower now asserts that one of its reasons for stopping its investigation was that "AstroPower could no longer blindly write KPMG blank checks."   Compl. ¶ 70.   Plaintiff apparently got carried away with rhetoric and innuendo when it drafted this allegation.   The *facts* alleged in the Complaint make clear that there were no "blank checks" to KPMG because there were *no* checks.   AstroPower *never* paid KPMG what it was owed.   When AstroPower filed its Chapter 11 petition on February 1, 2004, it owed KPMG nearly $600,000.   *See* Compl. ¶ 74 (listing KPMG "as a general unsecured creditor with a claim in the amount of $592,275.00").   And during the period November 1, 2003 through January 31, 2004, AstroPower paid KPMG only $20,556.  Compl. ¶ 115.

December 27, 2004.  Compl. ¶ 1.  Plaintiff filed its original Complaint against KPMG on July 31, 2006 and its Amended Complaint on October 10, 2006.

In its Complaint, AstroPower ignores the fact that its own management was responsible for the Company's financial statements and that AstroPower itself engaged in a revenue recognition fraud to inflate its apparent earnings.  Instead, AstroPower incredibly asserts that KPMG "ultimately caused the Company's demise." *Id.* ¶ 72.  The Complaint is vague on exactly *how* KPMG—as opposed to AstroPower's own conduct—caused this unfortunate end.  It is likewise unclear how AstroPower could have or would have acted differently had KPMG told AstroPower what it already knew through its own management.  AstroPower suggests that the Company somehow could have survived if only KPMG had been able to complete the 2002 financial statement audit, thereby supposedly allowing AstroPower to raise additional capital or debt in the marketplace.  *See id.* ¶¶ 17, 18, 23, 69.  But it identifies no facts to support its rank speculation that an investor would have stepped forward to rescue AstroPower from the consequences of its own fraud.  Indeed, under its own theory of the case, AstroPower affirmatively defrauded the very debt and equity markets from which it now claims KPMG cut it off.  AstroPower raised $30 million in equity in March 2001 (Complaint ¶ 15) and borrowed an additional $10 million in March 2003 (Revised Disclosure Statement § 2.3.3 (A-25)), all based on financial statements that AstroPower now claims were fraudulent.

It was AstroPower that made "critically flawed business decisions" that led to its collapse; indeed, AstroPower filed for bankruptcy protection a mere 33 days after KPMG was compelled to resign from the engagement.  As described below, KPMG is not responsible for— and it certainly cannot be held liable for—alleged harm caused by AstroPower and its own

management.  The Complaint's wishful thinking to the contrary fails to state a claim against KPMG upon which relief can be granted, and the Complaint should be dismissed.

## IV.    ARGUMENT

AstroPower's Complaint against KPMG must be dismissed.  *First*, to the extent AstroPower asserts claims based on KPMG's refusal to issue an unqualified audit opinion on AstroPower's 2002 financial statements, those claims fail on their face.  It is hard to imagine a legal theory more antithetical to the role of independent public accountant than the claim that an auditor is somehow *obligated* to issue an unqualified opinion simply because its client demands as much.  Indeed, our system of financial reporting would come crashing down if a CPA firm's client could insist that an auditor issue such a report.  As much as AstroPower wanted a lapdog rather than a watchdog, it was not going to get one.  KPMG was under no professional or contractual duty to issue an unqualified audit opinion simply because AstroPower wanted one. On the contrary, the contract on which AstroPower relies explicitly stated that KPMG might be required to resign without issuing an opinion and might not issue an unqualified opinion if facts and circumstances did not permit that conclusion.  KPMG's professional obligations similarly required that it not issue an unqualified audit opinion if AstroPower's accounting irregularities meant that the Company's financial statements were not fairly presented in accordance with GAAP.

Moreover, both professional standards and the federal securities laws imposed an obligation on KPMG to report possible illegal acts at AstroPower to the company's audit committee, and, when AstroPower failed to take appropriate remedial action, as required by law, KPMG was compelled to withdraw from the audit.  *See* Securities Exchange Act of 1934 § 10A, 15 U.S.C. § 78j-1.  In short, because the facts alleged in the Complaint, including the Engagement Letter incorporated by reference, demonstrate that AstroPower has not alleged a

12

breach of professional or contractual duty based on KPMG's not issuing an opinion on its 2002 financial statements, those claims fail as a matter of law. Further, to the extent AstroPower asserts claims based on KPMG's financial statement audits for years prior to 2002, those claims also fail because the Complaint's bare assertions do not provide fair notice of what alleged professional breaches KPMG supposedly committed that in any way harmed AstroPower.

*Second*, all of AstroPower's claims fail for lack of causation. AstroPower has not—and cannot—allege facts that would be sufficient to establish the necessary causal nexus between KPMG's alleged conduct and any cognizable injury to AstroPower. AstroPower's causation theory with respect to KPMG's resignation is speculative nonsense. AstroPower provides no support for its naked claim that it would have been able to raise capital and borrow money given that it announced that (1) its financial statements were fraudulently overstated, (2) assuming its theory to be true, it defrauded lenders and the capital markets of tens of millions of dollars, and (3) it was insolvent and days from filing bankruptcy. Even on a motion to dismiss, this Court need not accept AstroPower's mere say-so as sufficient to plead the causal connection necessary to its theory of liability.

AstroPower's second causal argument fares no better. In a complete about-face, AstroPower asserts that KPMG is somehow responsible for its "deepening insolvency." According to that theory, had KPMG found the fraud earlier, AstroPower would *not* have borrowed more money on that news, but instead would have shut itself down and avoided "deepening" its "insolvency." Of course, that is the exact opposite of what AstroPower now claims—that even knowing of the fraud it would have borrowed more and "deepened" its "insolvency." The Court need not resolve this contradiction, however, because this theory of damages has been rejected by both the Third Circuit and the Delaware Chancery Court. In all

events, each of the plaintiff's causation theories fails for the additional, independent reason that AstroPower's senior management's knowledge of its revenue recognition fraud is now imputed to the plaintiff. Plaintiff simply cannot show it would have acted differently had it known what is imputed to it. This negates any reliance or similar causation element that would be necessary to hold KPMG liable.

   *Third*, the *in pari delicto* doctrine independently bars the claims against KPMG. Because management's conduct and knowledge is imputed to AstroPower, AstroPower cannot recover on its claims because it is *at least* at equal fault as KPMG with respect to management's accounting fraud.

   *Finally*, AstroPower's cursory allegations regarding gross negligence and unjust enrichment, let alone its naked request for punitive damages, cannot survive this motion to dismiss.

### A.    Standard of Review

   On a motion to dismiss, the Court is required to accept all well-pleaded allegations in the complaint as true and draw all inferences from them in the light most favorable to the plaintiff. *Board of Trs. of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare Fund* v. *Wettlin Assocs., Inc.*, 237 F.3d 270, 272 (3d Cir. 2001). "But a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse* v. *Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997); *Hartman* v. *Pathmark Stores, Inc.*, No. 05-403-JJF, 2006 WL 571852, at *1 (D. Del. Mar. 8, 2006) (A-127) ("The Court is not required to accept legal conclusions either alleged or inferred from the pleaded facts.") (internal quotation marks omitted). Although Rule 8 requires only a "'short and plain statement of the claim showing that the pleader is entitled to relief,'" that statement "must provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Dura Pharms., Inc.* v.

14

*Broudo*, 544 U.S. 336, 346 (2005); *accord Amron* v. *Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 343 (2d Cir. 2006) ("A plaintiff must allege, as the Supreme Court has held, those facts *necessary* to a finding of liability.").

**B.    The Elements of AstroPower's Claims**

Counts I through III of the Complaint purport to assert causes of action for breach of contract, professional negligence, and negligent misrepresentation, but the gravamen of all three claims is the same:  an accounting malpractice claim in which AstroPower alleges that KPMG somehow breached its professional duties to AstroPower, thereby causing the Company's downfall.  *See* Compl. ¶ 80 (alleging that KPMG breached its contract with AstroPower by "failing to conduct its audits in accordance with GAAP and GAAS"); *id*. ¶ 84 (alleging duties that KPMG allegedly breached); *id*. ¶ 89 (alleging that KPMG represented that its audits were performed in accordance with GAAP and GAAS when they allegedly were not).  Although styled differently, all three claims require AstroPower to establish that KPMG somehow breached its professional obligations and thereby caused damage to AstroPower.  *See Cenco Inc.* v. *Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) (finding that "breach of contract, negligence, and fraud, when committed by auditors, are a single form of wrongdoing under different names.").  Specifically:

1. the breach of contract claim requires a showing of the existence of the contract between KPMG and AstroPower, the breach of an obligation imposed by that contract and, as a consequence, damage to AstroPower, *see VLIW Tech., LLC* v. *Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003);

2. the professional negligence/accounting malpractice claim requires a showing that KPMG owed AstroPower a duty of care, a breach of that duty, and

damage to AstroPower that was proximately caused by KPMG's alleged breach, *see New Haverford P'ship* v. *Stroot*, 772 A.2d 792, 798 (Del. Super. 2001); and

3. the negligent misrepresentation claim requires that KPMG had a duty to provide AstroPower accurate information, that KPMG supplied false information, that KPMG failed to exercise reasonable care in obtaining or communicating information, and that AstroPower suffered a pecuniary loss caused by justifiable reliance on the false information. *See H-M Wexford LLC* v. *Encorp, Inc.*, 832 A.2d 129, 147 n.44 (Del. Ch. 2003).

At bottom, each of these claims requires—and founders on—(1) breach of duty (2) that caused cognizable injury.

## C.    AstroPower's Complaint Fails Because KPMG Did Not Breach Its Contract or Violate Its Professional Obligations.

The December 31, 2002 Audit.  AstroPower's effort to state a claim based on KPMG's work on the 2002 audit, *see* Compl. ¶¶ 59-61, 72, 84(h)-(j), is facially deficient because there was no (1) breach of contract, (2) violation of professional obligation or (3) negligent misrepresentation associated with that audit.  AstroPower contends that, after KPMG discovered the fraud, it was somehow a violation of KPMG's contractual and professional obligations for KPMG to (1) withdraw from the engagement and (2) refuse to give AstroPower an unqualified audit opinion that could have stated that AstroPower's 2002 financial statements were "present[ed] fairly, in all materials respects, . . . in conformity with generally accepted accounting principles." AU § 508.08(h) (A-86); *see also* Compl. ¶ 80.  Such a claim is nonsense.

AstroPower specifically alleges that the Engagement Letter is its contract with KPMG. Compl. ¶ 59-60.  The contract is properly before the Court, and the plain language of the contract compels the conclusion that KPMG did not breach any duty.  For purposes of this motion, the

Court need not—and should not—rely on AstroPower's contrary characterizations of that contract. *Falkenberg Capital Corp. v. Dakota Cellular, Inc.*, 925 F. Supp. 231, 236 (D. Del. 1996) (noting that court considering motion to dismiss does not accept as true non-moving party's "construction" of unambiguous contract language, which is for the court). KPMG's Engagement Letter unambiguously states that "[w]e can not provide assurance that an unqualified opinion will be rendered," and "[c]ircumstances may arise in which it is necessary for us to modify our report or withdraw from the engagement." Engagement Letter at A-6. The contract between KPMG and AstroPower for the 2002 financial statement audit, therefore, specifically contemplated that KPMG might not be able to provide AstroPower an unqualified audit opinion and might be required to withdraw from the audit prior to its completion. That is precisely what happened, and there can be no liability for doing what a contract permits. AstroPower's breach of contract claim based on the 2002 financial statement audit fails on its face.[10]

Given that KPMG complied with its contractual obligations, AstroPower must then show that KPMG's conduct breached professional standards. The Complaint is tellingly silent in its failure to cite any specific professional standard KPMG allegedly violated by refusing to issue an unqualified opinion, and with good reason—there is none. One unambiguous professional obligation, however, is that an auditor cannot issue an unqualified audit opinion unless it is able to obtain reasonable assurance that the client's financial statements are fairly presented in accordance with GAAP. *See* AU § 508.10 (A-88) (describing unqualified audit opinion).

---

[10] KPMG cannot be liable because its "fees had ballooned from its initial estimate of $246,650" (Complaint ¶ 70), especially when roughly $600,000 of those fees remain unpaid (*id.* ¶ 74). In all events, the Engagement Letter plainly stated that "Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates." Engagement Letter at A-10.

In the case of AstroPower, KPMG's audit revealed exactly the opposite. KPMG discovered an accounting fraud at AstroPower, yet AstroPower claims KPMG's failure to issue an audit opinion on AstroPower's fraudulent 2002 financial statements constituted a breach of KPMG's duty of care. *See* Compl. ¶ 84. KPMG had no duty to issue an unqualified audit opinion on AstroPower's financial statements. To the contrary, because AstroPower's 2002 financial statements had fraudulently inflated the Company's reported revenues, KPMG could not, while conforming to its professional obligations, conclude that the financial statements were consistent with GAAP. *See* AU §§ 508.10, 508.58 (A-88, A-103). The only possible accounting malpractice that could have resulted would have been if KPMG had done what AstroPower now alleges KPMG should have done: buckle under to AstroPower's pressure and issue an unqualified audit opinion on AstroPower's financial statements that AstroPower now acknowledges were chock full of fraud. *See* Compl. ¶¶ 17-18, 69. Thus, there can be no claim based on KPMG's audit of AstroPower's 2002 financial statements.[11]

Furthermore, KPMG's discovery of the accounting fraud at AstroPower triggered KPMG's obligation under the federal securities laws and professional standards to report this possible illegal act to AstroPower's audit committee. *See* Securities Exchange Act of 1934 § 10A, 15 U.S.C. § 78j-1; *see also* AU § 317.17 (A-73 to A-74) (requiring auditor to assure itself that the audit committee is fully informed of illegal acts that come to the auditor's attention); *cf.* AU §§ 316.82 n.39, 317.23 n.3 (A-64, A-75) (referencing legal obligations under § 10A). If a company fails to take appropriate remedial measures following such a report, an auditor is required to withdraw from the engagement. *See* Exchange Act § 10A(a)(3), 15 U.S.C. § 78j-

---

[11] A negligent misrepresentation claim for the uncompleted 2002 audit likewise fails. Because KPMG never completed its audit and never issued an audit opinion, no "representation" was ever made, much less relied upon by AstroPower.

1(a)(3) (requiring auditor to withdraw from engagement under certain circumstances); AU §§ 317.20, 317.22 (A-74) (requiring an auditor to withdraw from the engagement if a company fails to take timely appropriate remedial actions). KPMG informed AstroPower on December 23, 2003, that the Company's decision to stop its forensic investigation meant that it was no longer taking timely and appropriate remedial action with respect to a possible illegal act. *See* Form 8-K/A-1 (A-23). KPMG had no option but to withdraw from the AstroPower engagement.[12]

> December 31, 2001 and Earlier Audits. As to AstroPower's claims based upon KPMG's financial statement audits for years prior to 2002, the Complaint never even attempts to articulate the bare outlines of a cause of action. The *only* facts alleged relate to the December 31, 2002 audit. With respect to other audits, the Complaint never says: (1) what financial statements are at issue, (2) whether and by how much those financial statements might be misstated, (3) in what way the financial statements were not fairly presented in accordance with GAAP, and (4) what provisions of GAAS KPMG allegedly violated. There is no indication from either the Complaint or AstroPower's public filings exactly what it is KPMG is alleged to have done incorrectly, and what effect KPMG's alleged conduct would have had on AstroPower. The lack of specificity in the Complaint does not provide any notice of any alleged breach of a duty or causal theory upon which AstroPower's accounting malpractice and other claims are based. AstroPower must allege *some* facts that would give fair notice of what its supposed claim actually is. *See Dura*, 544 U.S.

---

[12] To the extent AstroPower's Complaint is based on KPMG's withdrawal from the 2002 financial statement audit engagement, that claim is barred by the federal securities laws. Under § 10A(c), "No registered public accounting firm shall be liable in a private action for any finding, conclusion, or statement expressed in a report made pursuant to paragraph (3) or (4) of subsection (b) of this section . . . ." 15 U.S.C. § 78j-1(c). KPMG's withdrawal from the AstroPower engagement was part and parcel of its conclusion in its § 10A report to AstroPower. Any claim based on that withdrawal is therefore barred by § 10A(c).

at 347.  If AstroPower's allegations against KPMG have any foundation, AstroPower needs to give some indication of what it has in mind, instead of filing this lawsuit with the faint hope that discovery might somehow yield a viable theory.  *See id.*

Non-Audit Work.  At various times in its Complaint, AstroPower tries to suggest that KPMG's duties were broader than those of a financial statement auditor.  AstroPower thus alleges that KPMG also served as its "tax consultants," "accountants" (Complaint ¶ 10), provider of "other accounting-related advisory services" (*id.* ¶ 25), and "financial advisor" (*id.* ¶ 26).  It is not at all clear whether AstroPower attempts to attach any legal import to these allegations.  For example, KPMG did provide certain tax services to AstroPower, but the Complaint never so much as hints at a tax malpractice action.

With respect to the other services, none of them are identified in the Engagement Letter. In fact, the federal securities laws require as part of a public company's annual proxy process that the company file with the SEC disclosures of the audit and non-audit services provided and fees paid to their independent public accountants.  Other than audit and tax services, the only other KPMG services disclosed in AstroPower's last proxy statement were audit-related services related to AstroPower's stock offering, its acquisition of Atersa, an employee-benefit plan, and its Singapore subsidiary.  *See* AstroPower Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (filed April 12, 2002) (A-3 to A-4).

The one area where plaintiff does assert that KPMG had some broader duty than that of a financial statement auditor is with respect to AstroPower's internal controls.  *See* Compl. ¶¶ 28, 32, 39, 41-42.  On this point, KPMG's Engagement Letter could not be more clear:  "[W]e will consider the Company's internal control in order to determine the nature, timing and extent of our audit procedures for the purpose of expressing an opinion on the consolidated financial

statements and not to provide assurance on internal control. . . . [W]e are not being engaged to report on the Company's internal control . . . ."  Engagement Letter at A-7.  Plainly, KPMG cannot be liable for failing to do something that AstroPower agreed it would not do (and certainly did not pay for).

### D.  AstroPower Has Not and Cannot Plead Facts Necessary to Show that KPMG Caused AstroPower's Alleged Damages.

Whether stated as consequential damages from a breach of contract, or as proximate cause, or as justifiable reliance, a common element to all three of AstroPower's principal claims is that there must be a causal link between KPMG's alleged conduct and the alleged damage suffered by AstroPower.  *See Smolen* v. *Deloitte, Haskins & Sells*, 921 F.2d 959, 964 (9th Cir. 1990) (holding that there must be some basis to establish the element of causation on professional negligence and negligent misrepresentation claims); *FDIC* v. *Ernst & Young*, 967 F.2d 166, 170 (5th Cir. 1992) (requiring proximate cause as part of professional negligence claim and noting that "a claim that reliance is not a component of causation strains credulity"); *Drabkin*, 905 F.2d at 455 (finding "causal link is necessary regardless of whether failed some test of professional care, and it applies to all three theories of recovery," *i.e.*, fraud, negligence, and breach of contract); *PNC Bank* v. *Housing Mortgage Corp.*, 899 F. Supp. 1399, 1406 (W.D. Pa. 1994) (finding no proximate cause because there was no evidence of reliance on allegedly inaccurate audit).  The necessary causal link is lacking in this case, requiring AstroPower's claims to be dismissed.

### 1.  KPMG's Alleged Role in the Causal Chain Leading to AstroPower's Demise is Too Speculative and Remote to Hold KPMG Liable.

AstroPower's Complaint pursues a series of different causal theories that are at war with each other.  On the one hand, with respect to the 2002 financial statement audit, AstroPower alleges that, but for KPMG's allegedly negligent audit, AstroPower would have had access to

21

capital and debt that would have allowed the Company to right the ship and stay out of bankruptcy. *See* Compl. ¶¶ 17, 18, 23, 69. On the other hand, with respect to financial statement audits prior to 2002, AstroPower's only available recourse is the repudiated theory of so-called "deepening insolvency." *See* Compl. ¶ 43. Both theories are independently flawed, but when pled together in the same Complaint, they have less merit still.

The December 31, 2002 Audit. AstroPower contends that in 2003, shortly before it filed for bankruptcy, "Debt and equity would have been available to AstroPower; but only if the Company could provide audited financials." *Id.* ¶ 69. This causal theory depends upon two separate and wildly speculative premises: first, debt and equity would have been available to AstroPower, and second, AstroPower would have been able to receive an unqualified audit opinion on its financial statements.

As to the first premise, AstroPower admits that, by at least November 3, 2003, AstroPower was insolvent. *See* Compl. ¶¶ 115, 118. AstroPower was faced with the following facts, all of which can be gleaned from its own Complaint or its bankruptcy disclosure plan: (1) it was insolvent, (2) its business was collapsing, (3) it had announced a major revenue recognition fraud, (4) it had just used its overstated financial statements to raise $30 million in equity and $10 million in loans, (5) it had fired its CEO and CFO because of its internal investigation, and (6) it was days from bankruptcy. In the face of these facts, it now asserts that "[d]ebt and equity would have been available to AstroPower" in Fall 2003. *Id.* ¶¶ 65, 69. Tellingly, AstroPower has not identified a single prospective investor or lender who might have been willing to provide it with additional funding, let alone the terms of any such offering or borrowing, or the security it could post. AstroPower has not explained whether any existing covenants prohibited or permitted such actions, whether an underwriter would have been willing to assist AstroPower to

22

raise capital through additional stock offerings, or how it could pay the professional and other fees to raise that money, given that it could not pay KPMG for its financial statement audit. These omissions are fatal. The Court need not credit the Trust's "bald assertions" that it could have raised additional capital. *See Morse*, 132 F.3d at 906. AstroPower's rank speculation that debt and equity would have been available to it is insufficient for its complaint to survive.

Even if AstroPower could make some meaningful allegations as to just where and how it would obtain additional debt or equity, its expansive causal theory still fails at its second premise. To raise additional debt or equity, AstroPower would have undoubtedly needed an *unqualified* audit opinion to be able to attract additional funding. *See Bily*, 834 P.2d at 751 ("The *unqualified* audit report of a CPA firm, particularly one of the 'Big Six,' is often an admission ticket to venture capital markets—a necessary condition precedent to attracting the kind and level of outside funds essential to the client's financial growth and survival.") (emphasis added). But had KPMG issued an audit report when AstroPower insisted, it would have been a qualified opinion at best, or possibly even a disclaimer opinion. *See* Engagement Letter at A-6 ("We can not provide assurance that an unqualified opinion will be rendered."). A qualified opinion would have had just as negative an effect—or more so—on AstroPower's ability to raise capital. Further, AstroPower admits it was insolvent in November 2003, and as such, there was at least "substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time." *See* AU §341.02 (A-77). In that circumstance, KPMG's audit report likely would have included an explanatory paragraph expressing substantial doubt as to AstroPower's ability to continue as a going concern. *See* AU § 341.12 (A-81).[13] AstroPower's causal theory

---

[13] With a going concern opinion on its 2002 financial statements, AstroPower almost certainly could not have raised additional capital or debt from any source. *See Copy-Data Sys., Inc.* v. *Toshiba Am., Inc.*, 755 F.2d 293, 299 (2d Cir. 1985) (describing "going concern opinion" as the

therefore fails at its second step; even if KPMG had been able to issue its audit opinion on AstroPower's 2002 financial statements, it would not have been the opinion AstroPower wanted (and needed).

AstroPower's vague allegations that some unnamed third party hypothetically would have swooped in and provided additional financial resources to AstroPower is so remote from KPMG's alleged negligence that it amounts to nothing more than a blatant effort to shift responsibility for AstroPower's downfall from its own management to its auditor.  *See* Compl. ¶ 72 ("KPMG's acts and omissions caused AstroPower to make critically flawed business decisions.").  Such a theory of liability admits of almost no stopping point; "[i]t would permit a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence."  *Dura*, 544 U.S. at 347 (internal quotation marks omitted) (second alteration in original).

The December 31, 2001 and Earlier Audits.  With respect to its financial statement audits prior to 2002, AstroPower alleges exactly the opposite theory—that it would not have taken on additional debt, thereby avoiding "deepening its insolvency."  *See* Compl. ¶ 43.  This contrary theory fares no better.  "Deepening insolvency" has been conclusively rejected as a theory of damages by the Third Circuit.  *See In re CITX Corp.*, *Inc.,* 448 F.3d 672, 681 (3d Cir. 2006) ("[D]eepening insolvency is not a valid theory of damages for negligence."); *In re Radnor Holdings*, ___ B.R. ___, No. 06-10895 PJW, 2006 WL 3346191, at *23 (Bankr. D. Del. Nov. 17, 2006) (A-192) (finding deepening insolvency to be an impermissible measure of damages . . . .").

---

"most serious qualification on a financial statement because it generally indicates the auditor's opinion that a company is faced with a serious risk of bankruptcy, and, therefore, that valuation of its assets as part of a going concern may be incorrect.").

Moreover, "deepening insolvency" is not recognized as a cause of action under Delaware law, so the Trust cannot restate its flawed damages theory as an independent cause of action. *See Trenwick Am.* v. *Ernst & Young*, 906 A.2d 168, 204-205 (Del. Ch. 2006) (holding that Delaware law does not permit a cause of action for deepening insolvency). The Trust's "deepening insolvency" theory of damages is therefore unsustainable.

The Two Causal Theories Considered Together. Plaintiff's deepening insolvency theory has even less merit alongside its other causal theory. If AstroPower were truly a viable company that would have had access to capital in order to continue operations if only KPMG had completed its audit, then nothing KPMG did could have "deepened" its insolvency; in that case, AstroPower would not have been insolvent. But if AstroPower were already insolvent when KPMG withdrew from the engagement, then there is no reason to think AstroPower would have been able to raise additional capital, even if KPMG had been able to complete its audit. AstroPower simply cannot have it both ways.

The Trust's theories of harm are thus exactly like those raised in *Drabkin*—"rescue obstructed or liquidation deferred"—and similar to that case, neither theory crosses the threshold of making out a causal connection sufficient to hold an auditor liable. *See Drabkin*, 905 F.2d at 455, 457. In the end, "[l]ife is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." *Holmes* v. *Securities Inv. Prot. Corp.*, 503 U.S. 258, 287 (1992) (Scalia, J., concurring). Plaintiff's allegations against KPMG lack a "direct relation between the injury asserted and the injurious conduct," *see id.* at 268 (opinion of the court), and the remoteness between KPMG's alleged conduct and AstroPower's injury requires that the Complaint be dismissed.

###### 2.    AstroPower's Accounting Fraud Is Imputed to the Trust and Defeats the Trust's Claims Against KPMG.

Elementary and well-settled principles of imputation cut off any causal connection between KPMG's alleged conduct and AstroPower's alleged damages. At bottom, AstroPower's various causal theories depend upon the allegation that AstroPower somehow would have acted differently if it had known about the accounting irregularities that KPMG discovered during its 2002 financial statement audit. But AstroPower *did* know about those accounting irregularities, since its own senior management was responsible for them. There is simply no way that AstroPower's management could have relied on KPMG's audit work. The knowledge of AstroPower's senior management must be imputed to the Company, and because the Trust now stands in AstroPower's shoes to bring this action, that knowledge is also imputed to the Trust.

First, "it is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation." *Teachers' Ret. Sys. of La.* v. *Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006); *David B. Lilly, Co.* v. *Fisher*, 800 F. Supp. 1203, 1207 (D. Del. 1992) (noting that an officer's knowledge is imputed to the corporation); *Satellite Fin. Planning Corp.* v. *First Nat'l Bank of Wilmington*, 633 F. Supp. 386, 400 (D. Del. 1986) ("Knowledge and actions of a corporation's agent ordinarily are imputed to the corporation when the agent acts on the corporation's behalf."); *Bellanca Corp.* v. *Bellanca*, 169 A.2d 620, 625 (Del. 1961) (finding corporation chargeable with acts and knowledge of its directors). "The approval and oversight of such [financial] statements is an ordinary function of management that is done on the company's behalf, which is typically enough to attribute management's actions to the company itself." *Baena* v. *KPMG LLP*, 453 F.3d 1, 7 (1st Cir 2006). There is no reason that the revenue recognition fraud perpetrated by AstroPower's senior management should not be imputed to AstroPower as an entity.

26

The Trust cannot avoid imputation of AstroPower's fraud by attempting to drive a wedge between itself and AstroPower's former senior management with the so-called "adverse interest" exception to the doctrine of imputation. *See Official Comm. of Unsecured Creditors* v. *R.F. Lafferty & Co.*, 267 F.3d 340, 359 (3d Cir. 2001) (describing adverse interest exception). Under this exception, "imputation may be avoided where the wrongdoing is done primarily for personal benefit of the officers and is 'adverse' to the interest of the company." *Baena*, 453 F.3d at 7. But the accounting fraud at AstroPower does not fit the mold of self-dealing conduct by officers and directors that is covered by the adverse interest exception. The adverse interest exception may apply in cases involving the misappropriation of corporate assets, because such "looting" is necessarily adverse to the corporation. *See id.* at 8 (describing looting as a fact pattern that might support application of the adverse interest exception); *In re Agribiotech, Inc.*, No. CV-S-02-0537-PMP, 2005 U.S. Dist. LEXIS 6466, at *36 (D. Nev. Apr. 1, 2005) (A-122) (citing looting, embezzling, or converting corporate assets to personal use as typical acts that are adverse to company). Fraudulent financial reporting, however, is what happened at AstroPower, and it does not implicate the adverse interest exception. "A fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company; but, like price-fixing, it profits the company in the first instance and the company is still civilly and criminally liable." *Baena*, 453 F.3d at 7; *cf.* AU § 316.06 (A-40 to A-41) (distinguishing financial misstatements that arise from fraudulent financial reporting and those that arise from the misappropriation of assets). Indeed, the Complaint admits that AstroPower raised tens of millions of dollars in capital during 2001, when AstroPower itself alleges its financial results were inflated by the revenue recognition fraud. *See* Compl. ¶ 15. Thus, AstroPower's revenue recognition fraud was not adverse to the Company's interests. There is therefore no basis for

27

applying the adverse interest exception to defeat the imputation of the accounting fraud to AstroPower.

Second, in bringing the instant action, the Trust stands in the shoes of AstroPower. "[I]n actions brought by the trustee as successor to the debtor's interest under section 541, the trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor." *Lafferty*, 267 F.3d at 356 (internal quotation marks omitted). *See also* 11 U.S.C. § 541; *Bank of Marin* v. *England*, 385 U.S. 99, 101 (1966) ("The trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition."); *Official Comm. of Unsecured Creditors of PSA, Inc.* v. *Edwards*, 437 F.3d 1145, 1149 (11th Cir.), *cert. denied sub nom. Ladden* v. *Reliance Trust Co.*, 127 S. Ct. 45 (2006) ("A trustee, as the representative of the estate, succeeds into the rights of the debtor-in-bankruptcy and has standing to bring any suit that the debtor corporation could have brought outside of bankruptcy."); *accord* Compl. ¶ 3 (recounting that the Trust has the sole and exclusive right to prosecute any and all claims that could otherwise be brought by AstroPower or its estate). As such, the Trust steps into the shoes of AstroPower, including AstroPower's role in the accounting fraud.

The imputation of the accounting fraud, first from AstroPower's senior management to AstroPower itself, and then from AstroPower to the Trust, defeats essential elements of the Trust's breach of contract, accounting malpractice, and negligent misrepresentation claims against KPMG. *See also FDIC* v. *Ernst & Young*, 967 F.2d at 170 (imputing conduct and knowledge of bank officer to the bank, thereby eliminating any reliance on allegedly faulty audit); *PNC Bank*, 899 F. Supp. at 1405-06 (imputing principals' knowledge of a fraud to their corporate entity, defeating reliance element necessary to claims against auditor).

28

###### E.    The *In Pari Delicto* Doctrine Bars the Trust's Claims Against KPMG.

Even assuming AstroPower could overcome the above defects in the elements of its claims, recovery by the Trust against KPMG is independently barred by the *in pari delicto* doctrine.[14]  *In pari delicto* means literally "in equal fault."  *See* Black's Law Dictionary 791 (6th ed. 1990).[15]  The doctrine is applied "to prevent a deliberate wrongdoer from recovering from a co-conspirator or accomplice."  *Baena*, 453 F.3d at 6.  "In substance, the doctrine offers a policy-based defense reflecting an obvious but visceral judgment, one echoed in other, somewhat different legal doctrines, *e.g.*, the 'unclean hands' defense in equity and contributory negligence in tort actions."  *Id.* (citations omitted).  If the plaintiff bears equal or greater responsibility for the fault he seeks to redress than does the defendant, the *in pari delicto* doctrine bars claims against the defendant.  *See Pinter* v. *Dahl*, 486 U.S. 622, 633 (1988) (citing *Bateman Eichler, Hill Richards, Inc.* v. *Berner*, 472 U.S. 299, 310-11 (1985)).

Every court of appeals to have considered the issue has held that the defense of *in pari delicto* may be asserted against a bankruptcy trustee.  *See Lafferty*, 267 F.3d at 356-57 (Third Circuit); *Baena*, 453 F.3d at 7 (First Circuit); *In re Bennett Funding Group, Inc.,* 336 F.3d 94, 102 (2d Cir. 2003); *In re Dublin Sec., Inc.*, 133 F.3d 377, 380 (6th Cir. 1997); *Grassmueck* v. *American Shorthorn Ass'n*, 402 F.3d 833, 837 (8th Cir. 2005); *In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1281, 1284-85 (10th Cir. 1996); *Edwards*, 437 F.3d at 1151 (Eleventh Circuit); *see also Official Comm.. of Unsecured Creditors of Color Tile* v. *Coopers & Lybrand, LLP*, 322 F.3d

---

[14]  A complaint may be dismissed on the basis of an affirmative defense—such as *in pari delicto*—if that defense appears on the face of the complaint or other allowable sources.  *Leveto* v. *Lapina*, 258 F.3d 156, 161 (3d Cir. 2001); *Nisselson* v. *Lernout*, No. 05-1774, ___ F.3d ___, 2006 WL 3216998, at *4 (1st Cir. Nov. 8, 2006) (A-174).

[15]  The complete Latin maxim is *in pari delicto potior est conditio defendentis*, meaning "In a case of equal or mutual fault [between two parties], the position of the party . . . [defending] is the better one."  Black's Law Dictionary 791 (6th ed. 1990) (alterations in original).

147, 158-66 (2d Cir. 2003) (applying *in pari delicto* to bar Texas law claims brought by bankruptcy trustee).[16]   The *in pari delicto* doctrine cuts across claims for breach of contract, professional negligence, and negligent misrepresentation with equal force.  *See Lafferty*, 267 F.3d at 355; *Cenco*, 686 F.2d at 453-54 (noting that *in pari delicto* is a defense against charges of breach of contract, negligence, all of which are different names for a single form of alleged wrongdoing by auditors).

Here, the *in pari delicto* doctrine applies with full force to bar AstroPower's claims against KPMG.  As explained above, the Trust stands in the shoes of AstroPower, and there can be no question that any misconduct on the part of AstroPower must be imputed to the Trust.  *See Lafferty*, 267 F.3d at 354.   Moreover, the Complaint alleges exactly the kind of fraudulent financial reporting for which AstroPower is necessarily the primary wrongdoer.  *See Baena*, 453 F.3d at 7 (noting that management is the primary wrongdoer in cases involving fraudulent financial statements).  According to the Complaint, AstroPower had a "lack of internal controls" and that controls and accounting systems were "deficient and/or wholly inaccurate."  Complaint ¶¶ 38-39.   AstroPower's records were "rife with accounting misstatements including the improper recognition of revenues, deficient and incorrect or incomplete documentation or contracts evidencing purported sales transactions, and a host of other issues that painted a financial picture . . . that was facially wrong."  *Id*. ¶ 40.  AstroPower also engaged in numerous fraudulent revenue recognition practices.  *See id*. ¶¶ 46-48.

These fraudulent practices, which are imputed to the Trust, make AstroPower *in pari delicto* with KPMG.  Try as AstroPower might shift blame to KPMG, *see, e.g.,* Compl. ¶¶ 42,

---

[16] Some courts—dubiously, *see Baena*, 453 F.3d at 6—treat *in pari delicto* as an issue of standing.  *See Shearson Lehman Hutton, Inc.* v. *Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991).  That terminology makes no practical difference in the application of the doctrine to this case.

47, 48, 57, the Company is responsible for its own financial statements.  *See* AU § 110.01 (A-31); Engagement Letter at A-6 ("The management of the Company has responsibility for the consolidated financial statements and all representations contained therein.").  AstroPower's financial statement fraud precludes any claims against KPMG for injuries caused by AstroPower's own wrongdoing.  *See Lafferty*, 267 F.3d at 354.  Because the *in pari delicto* doctrine applies here, all of AstroPower's contract and tort claims against KPMG must be dismissed.[17]

> **F.    The Trust's Purported Claims for Gross Negligence and Exemplary Damages Must be Dismissed.**

In Count IV, AstroPower purports to state a claim against KPMG for gross negligence in a patent, but futile, effort to claim entitlement to punitive damages.  The Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'"  *Browne* v. *Robb*, 583 A.2d 949, 953 (Del. 1990).  Gross negligence has also been described as signifying "more than ordinary inadvertence or inattention." *Jardel Co.* v. *Hughes*, 523 A.2d 518, 530 (Del. Super. 1987).  Gross negligence is an exacting standard under Delaware law, and it requires specific allegations to support such a

---

[17] The recent critical comments on *in pari delicto* by Vice Chancellor Strine do not alter this conclusion.  *See Trenwick Am. Litig. Trust*, 906 A.2d at 212 n.132.  For one thing, that opinion's discussion of *in pari delicto* is pure *dicta*.  *See id.* (finding that the complaint fails to state a claim against the defendants for other reasons, but then discussing *in pari delicto* solely as "another defense I do not rely upon").  For another, *Trenwick*'s hypothesized situation in which the *in pari delicto* doctrine should not bar recovery—a case in which a board of directors conspires with its auditors to embezzle from the company—would invoke the adverse interest exception to imputation. This, in turn, precludes the operation of the *in pari delicto* defense.  *See, e.g., Baena*, 453 F.3d at 8 (noting that adverse interest exception applies to looting).  There is no basis for applying the adverse interest exception in this case; AstroPower's revenue recognition fraud benefited AstroPower by exaggerating the company's financial health, boosting its stock price and enabling it to raise additional capital.  *See supra* p. 27.  Finally, Vice Chancellor Strine relies upon *Scholes* v. *Lehmann*, 56 F.3d 750 (7th Cir. 1995), a decision that has been rejected by numerous other Circuits, especially in cases involving bankruptcy trustees.  *See Hedged-Invs.*, 84 F.3d at 1285; *Edwards*, 437 F.3d at 1151; *Lafferty*, 267 F.3d at 357; *Baena*, 453 F.3d at 9-10.

claim.  *See id*.  Yet the Complaint makes no such allegations.  AstroPower's claims of negligence are general and conclusory, providing no specific allegations of what KPMG did, did not do, or should have done differently.  *See* Compl. ¶ 84 (recounting general audit standards). AstroPower then appends bald assertions that KPMG's alleged negligence was "intentional, the result of recklessness, the result of or [sic] conscious indifference to AstroPower's rights and welfare."  *Id.* ¶ 92.  Such conclusory allegations are wholly insufficient to state a claim against KPMG.  *See Production Res. Group, L.L.C.* v. *NCT Group, Inc.*, 863 A.2d 772, 798-99 (Del. Ch. 2004).  The allegation of gross negligence fails to provide KPMG with "fair notice" of the grounds upon which this claim rests, *see Dura*, 544 U.S. at 346, and it must therefore be dismissed.

AstroPower's prayer for punitive damages, Complaint ¶ 128, is based upon its allegations of gross negligence, *see id.* ¶ 93, and it fails along with that claim.[18]  Under Delaware law, punitive damages are not available absent "'outrageous'" conduct that results from "'reckless indifference to the rights of others'; mere inadvertence, mistake, or errors of judgment will not suffice."  *See Jardel*, 523 A.2d at 529 (internal citation omitted).  "It is not enough that a decision be wrong.  It must result from a conscious indifference to the decision's foreseeable effect."  *Id*.  The Complaint alleges that KPMG's accounting judgments were erroneous, but in such a case, "the plaintiff's burden is substantial.  It must be shown that the *precise* harm that eventuated must have been reasonably apparent but consciously ignored in the formulation of the judgment."  *Id*. at 531 (emphasis added).  Given AstroPower's inability to articulate a coherent theory of the causal connection between KPMG's alleged conduct and the alleged harm to

---

[18] As a general matter, "[i]t is well established in Delaware that punitive damages ordinarily are not recoverable in an action for breach of contract," *see American Original Corp.* v. *Legend,*

AstroPower, *see supra* Part III.D, the Complaint falls woefully short of carrying this "substantial burden." Merely reciting the Delaware legal standard, *see* Complaint ¶ 92, is not enough. AstroPower's claim for exemplary damages should be dismissed.

### G. The Trust's Purported Claims for Unjust Enrichment and Equitable Subordination Must be Dismissed.

In Count V, AstroPower attempts to state a claim against KPMG for unjust enrichment. That claim must be dismissed. Under Delaware law, "When the complaint alleges an express, enforceable contract that controls the parties' relationship"—as AstroPower's Complaint against KPMG does—"a claim for unjust enrichment will be dismissed." *Bakerman* v. *Sidney Frank Importing Co.*, No. Civ.A 1844-N, 2006 WL 2987020, at *18 (Del. Ch. Oct. 10, 2006) (A-162; *see also Wood* v. *Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1972) ("Because the contract is the measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it.").

Further, in the tort context, an unjust enrichment claim is nothing more than another way of stating a traditional tort claim, and "once it has been determined that the tort claims have properly been dismissed, there is no reason to allow the unjust enrichment claim to proceed." *Republic of Pan.* v. *American Tobacco Co.*, No. 05C-07-181-RRC, 2006 WL 1933740, at *8 (Del. Super. Ct. June 23, 2006) (A-142); *see also Steamfitters Local Union No. 420 Welfare Fund* v. *Philip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir. 1999) ("We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that

---

*Inc.*, 689 F. Supp. 372, 380 (D. Del. 1988), which is one of the principal ways AstroPower has styled its Complaint. *See* Compl. Count I.

the District Court properly dismissed the traditional tort claims because of the remoteness of plaintiffs' injuries from defendants' wrongdoing.").[19]

As for AstroPower's claim in Count VI for equitable subordination of the nearly $600,000 that AstroPower owes KPMG for the 2002 financial statement audit, the deficiencies in AstroPower's other claims require the dismissal of the equitable subordination claim as well. To justify equitable subordination, AstroPower would need to establish, among other things, that KPMG's alleged misconduct "resulted in injury to the creditors or conferred an unfair advantage on the claimant . . . ." *See CitiCorp Venture Capital, Ltd.* v. *Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986 (3d Cir. 1998). Equitable subordination thus requires a causal element similar to that required for AstroPower's breach of contract, professional malpractice, and negligent misrepresentation claims. As explained *supra*, Part III.D, there is no causal link between KPMG's alleged conduct and any harm to AstroPower or AstroPower's creditors. Without that causal link, "equitable subordination would serve no purpose . . . ." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 463 (3d Cir. 2006) (affirming the dismissal of an equitable subordination claim where there was no harm flowing from the alleged misconduct). For this reason alone, the equitable subordination claim must be dismissed.[20]

---

[19] Even if AstroPower could assert an equitable claim for unjust enrichment, that claim would be barred by the equitable doctrine of unclean hands. *See Healy* v. *Healy*, No. 19816-NC, 2006 WL 3289623, at *2 (Del. Ch. Oct. 31, 2006) (A-166) ("Fraud will typically suffice to hold a party ineligible for relief under the unclean hands doctrine."); *accord Derickson* v. *Derickson*, 281 A.2d 487, 488 (Del. 1971).

[20] In the Third Circuit, it remains an open question whether "misconduct is always a prerequisite to equitable subordination . . . ." *See CitiCorp Venture Capital*, 160 F.3d at 987 n.2; *see also SubMicron Systems*, 432 F.3d at 462 (same). If misconduct is required, then the equitable subordination claim must be dismissed because AstroPower has not plead any misconduct on the part of KPMG in connection with the 2002 financial statement audit. *See supra* Part III.C. Because the lack of a causal connection is alone a sufficient reason to dismiss the equitable subordination claim, the Court need not address this open issue. *See SubMicron Systems*, 432 F.3d at 462 (declining to reach this issue); *CitiCorp Venture Capital*, 160 F.3d at 987 n.2 (same).

## V.    CONCLUSION

For all of the above reasons, Counts I through V of the Complaint should be dismissed.

Respectfully submitted,

Dated:  December 12, 2006          YOUNG CONAWAY STARGATT & TAYLOR, LLP


_____/s/ Maribeth L. Minella_____
John T. Dorsey (No. 2988)
Maribeth L. Minella (No. 4185)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

- and -

Joseph Warganz                    SIDLEY AUSTIN LLP
Associate General Counsel          Michael D. Warden
KPMG LLP                          David S. Petron
757 Third Avenue                   1501 K Street, N.W.
New York, NY  10017                Washington, D.C. 20005
                                   Telephone:  (202) 736-8000
                                   Facsimile:  (202) 736-8711

DB02:5664258.2                                                065539.1001

## CERTIFICATE OF SERVICE

I, Maribeth L. Minella, Esquire, hereby certify that on this 12th day of December 2006, I caused a true and correct copy of the Opening Brief in Support of Defendant KPMG LLP's Motion to Dismiss to be filed with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Daniel Bartley Rath (rath@lrclaw.com)
Maribeth Leslie Minella (bank@ycst.com)
Kerri King Mumford (mumford@lrclaw.com)
Ross H. Parker (rparker@munsch.com)
Phil C. Appenzeller, Jr (pappenzeller@munsch.com)

I further certify that I have served the parties listed on the service list below in the manner indicated.

/s/ Maribeth L. Minella
Maribeth L. Minella

Jr. Phil C. Appenzeller, Esq
Ross H. Parker, Esq.
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard, Suite 3800
Dallas, TX 75201
(Astropower Liquidating Trust)
*First Class Mail*

Daniel B. Rath, Esq
Kerri K. Mumford, Esq.
James S. Green, Jr., Esq.
Landis Rath & Cobb LLP
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, DE 19899
(Atropower Liquidating Trust)
*Hand Delivery*

Michael D. Warden, Esq
David S. Petron, Esq.
Sidley Austin LLP
1501 K. Street, N.W.
Washington, D.C. 20005
(KPMG, LLP)
*First Class Mail*

Joseph Warganz
Associate General Counsel
KPMG LLP
757 Third Avenue
New York, NY  10017
*First Class Mail*