# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ASTROPOWER LIQUIDATING TRUST, f/k/a
ASTROPOWER, INC.,

               Plaintiff,

               vs.                            Civil Action No. 06-469 (JJF)

KPMG LLP,

               Defendant.

## APPENDIX TO OPENING BRIEF IN SUPPORT OF DEFENDANT KPMG LLP'S MOTION TO DISMISS

YOUNG CONAWAY STARGATT & TAYLOR, LLP
John T. Dorsey (No. 2988)
Maribeth L. Minella (No. 4185)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

Joseph Warganz
Associate General Counsel
KPMG LLP
757 Third Avenue
New York, NY 10017


Dated: December 12, 2006

SIDLEY AUSTIN LLP
Michael D. Warden
David S. Petron
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

## Table of Contents

Item                                                                                          Page

1.  AstroPower, Inc. Proxy Statement Pursuant to Section 14(a) of the Securities
    Exchange Act of 1934 (dated April 12, 2002) (excerpts)..................................................... A-1

2.  Letter from Carl E. Hertrich, KPMG LLP, to Thomas J. Stiner, AstroPower, Inc.
    (dated Jan. 30, 2003) ("Engagement Letter") ....................................................... A-5

3.  AstroPower, Inc. Form 12b-25 (dated April 1, 2003)........................................................ A-12

4.  AstroPower, Inc. Form 8-K (dated Jan. 7, 2004)............................................................... A-15

5.  AstroPower, Inc. Form 8-K/A-1 (dated Feb. 2, 2004)....................................................... A-20

6.  Revised Disclosure Statement Regarding Liquidating Plan Proposed by AstroPower,
    Inc. and the Official Committee of Unsecured Creditors (Dated Oct. 5, 2004)
    (excerpts)........................................................................................................................ A-24

7.  AICPA, Codification of Statements on Auditing Standards, AU § 110............................ A-31

8.  AICPA, Codification of Statements on Auditing Standards, AU § 230............................ A-34

9.  AICPA, Codification of Statements on Auditing Standards, AU § 316 (exhibit
    omitted)........................................................................................................................... A-38

10. AICPA, Codification of Statements on Auditing Standards, AU § 317............................ A-70

11. AICPA, Codification of Statements on Auditing Standards, AU § 341............................ A-77

12. AICPA, Codification of Statements on Auditing Standards, AU § 508............................ A-84

13. *In re Agribiotech*, No. CV-S-02-0537-PMP, 2005 U.S. Dist. LEXIS 6446 (D. Nev.
    Apr. 1, 2005).................................................................................................................. A-113

14. *Hartman* v. *Pathmark Stores, Inc.*, No. 05-403-JJF, 2006 WL 571852 (D. Del. Mar.
    8, 2006) .......................................................................................................................... A-126

15. *Republic of Panama* v. *American Tobacco Co.*, No. 5C-07-181-RRC, 2006 WL
    1933740 (Del. Super. June 23, 2006) ............................................................................ A-130

16. *Bakerman* v. *Sidney Frank Importing Co.*, No. Civ.A 1844-N, 2006 WL 2987020
    (Del. Ch. Oct. 10, 2006).................................................................................................. A-145

17. *Healy* v. *Healy*, No. 19816-NC, 2006 WL 3289623 (Del. Ch. Oct. 31, 2006)................. A-165

18. *Nisselson* v. *Lernout*, No. 06-1774, ___ F.3d ___, 2006 WL 3216998 (1st Cir. Nov. 8,
    2006) .............................................................................................................................. A-168

19. *In re Radnor Holdings*, No. 06-10894 PJW, ___ B.R. ___, 2006 WL 3346191 (Bankr. D. Del. Nov. 17, 2006)................................................................................................ A-181

```
<DOCUMENT>Case 1:06-cv-00469-JJF    Document 13    Filed 12/12/2006    Page 4 of 201
<TYPE>DEF 14A
<SEQUENCE>1
<FILENAME>ddef14a.txt
<DESCRIPTION>DEFINITIVE PROXY STATEMENT--ASTROPOWER
<TEXT>
<PAGE>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No.  )

Filed by the Registrant [X]

Filed by a Party other than the Registrant [_]

Check the appropriate box:

[_] Preliminary Proxy Statement

[_] CONFIDENTIAL, FOR USE OF THE
COMMISSION ONLY (AS PERMITTED BY
RULE 14A-6(E)(2))

[X] Definitive Proxy Statement

[_] Definitive Additional Materials

[_] Soliciting Material Pursuant to (S) 240.14a-11(c) or (S) 240.14a-12

ASTROPOWER, INC.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.

[_] Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to
Exchange Act Rule 0-11 (set forth the amount on which the filing fee is
calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

[_] Fee paid previously with preliminary materials.

[_] Check box if any part of the fee is offset as provided by Exchange Act Rule
0-11(a)(2) and identify the filing for which the offsetting fee was paid
previously. Identify the previous filing by registration statement number, or
the Form or Schedule and the date of its filing.

A-1

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Notes:
<PAGE>


[LOGO]


300 Executive Drive
Newark, Delaware 19702-3316

Telephone: (302) 366-0400

April 12, 2002

Dear Shareholder:

  Please accept my personal invitation to attend our Annual Meeting of
Shareholders on Wednesday, May 8, 2002 at 12 noon following the dedication of
our new solar-powered manufacturing and office facility. You are cordially
invited to attend this dedication, which commences at 11 am. This year's
meeting will be held at the new facility, 300 Executive Drive, Pencader
Corporate Center, Newark, Delaware.

  The business to be conducted at the meeting is set forth in the formal
notice that follows. In addition, Management will provide a review of 2001
operating results and discuss the outlook for the future. After the formal
presentation, the Directors and Management will be available to answer any
questions that you may have.

  Mr. Charles R. Schaller will retire from the Board in May and is not a
nominee for reelection. Mr. Schaller has served on our Board for more than ten
years. We are very grateful to him for his many contributions and we will miss
his participation on the Board.

  Your vote is important. I urge you to complete, sign and return the enclosed
Proxy Card. Please note our request to advise us whether you plan to attend
the meeting by marking the proxy card.

  I look forward to seeing you on May 8.

                                    Sincerely,

                                    /s/ Allen M. Barnett

                                    Allen M. Barnett
                                    President and Chief Executive
                                     Officer
<PAGE>

                          AstroPower, Inc.
           300 Executive Drive, Newark, Delaware 19702

                     Telephone: (302) 366-0400

              NOTICE OF ANNUAL MEETING OF SHAREHOLDERS

To Our Shareholders:                        **A-2**

and was approved by our shareholders in June 1999. The plan originally
authorized the issuance of up to 600,000 shares of our common stock and was
amended with shareholder approval to increase that to 1,100,000 shares at our
2000 Annual Meeting and to 1,600,000 at our 2001 Annual Meeting. As of March
28, 2002, options to purchase an aggregate of 1,414,906 shares at a weighted
average exercise price of $25.47 per share were outstanding. See "Employee
Benefit Plans-1999 Stock Option Plan" above.

The 1999 Plan is intended to induce new employees to become associated with
us, and to provide a closer identity of interest between present employees and
us by encouraging their ownership of our common stock. Since the approval of
the amendment to the 1999 plan by our shareholders in June 2001, we have
completed the acquisition of Atersa and extended the option plan to their
employees. In addition we have expanded our manufacturing capacity and intend
to continue to do so. From March 31, 2001 through March 31, 2002 we have
increased the number of our employees who will be eligible to participate in
the 1999 plan from 447 to 717 and expect to increase our workforce in the
future. Consistent with our expectations, our Board of Directors believed it
would be in our best interest and our shareholders best interest to increase
the number of shares currently available under the 1999 plan from 1,600,000 to
2,350,000, and voted to do so on February 27, 2002, subject to shareholder
approval.

The Board of Directors unanimously recommends that the shareholders vote FOR
the following resolution, approval of which requires an affirmative vote of a
majority in voting power of the shares of common stock present in person or by
proxy and entitled to vote at the meeting:

RESOLVED, that the second sentence of section 5 of the 1999 Stock Option Plan
be amended to read as follows:

"Section 5. Stock.

The total number of shares of common stock that may be issued or transferred
under the Plan pursuant to Options granted thereunder may not exceed 2,350,000
shares (subject to adjustment as described below)."

       PROPOSAL 3. RATIFICATION OF APPOINTMENT OF INDEPENDENT ACCOUNTANTS

The Board of Directors of the Company, upon the recommendation of the audit
committee has appointed KPMG LLP as independent accountants to examine the
financial statements of the Company for the fiscal year 2002. The Board of
Directors has directed that such appointment be submitted for ratification by
the shareholders at the meeting.

KPMG LLP has served as the independent accountant for the Company since 1992.
A representative of KPMG LLP is expected to be present at the Meeting and will
have the opportunity to make a statement if he or she desires to do so and
will be available to respond to appropriate questions.

Audit and Non-Audit Fees

Fees for professional audit services rendered by KPMG LLP for the audit of the
Company's annual financial statements for the year ended December 31, 2001,
the reviews of the financial statements included in our quarterly reports for
that fiscal year and for tax provision preparation assistance, aggregated
$161,550. All other fees for professional services rendered by KPMG LLP
consisting of audit related fees in connection with our public offering on
March 15, 2001, our acquisition of Atersa in September 2001, the audit of our
employee benefit plan for 2000 and the statutory audit of our Singapore
subsidiary, aggregated $101,350; and other non-audit fees consisting of a
research and experimentation credit study, federal and state tax return
preparation, international tax services, tax due diligence for the Atersa
acquisition, matters relating to our foreign sales subsidiary, and
miscellaneous tax matters, aggregated $138,963.

<PAGE>

The audit committee of the Company's Board of Directors evaluated whether the provision of non-audit services by KPMG LLP for the fiscal year ended December 31, 2001 is compatible with maintaining the principal accountant's independence.

The affirmative vote of a majority of the voting power of the shares of common stock present, in person or by proxy, and entitled to vote at the meeting, is required for ratification of the appointment of KPMG LLP as the independent accountants.

The Board of Directors unanimously recommends that Shareholders vote FOR ratification of the appointment of KPMG LLP.

## OTHER MATTERS

Management knows of no other matters to come before the meeting other than those referred to in the Notice of Meeting. However, should any other matters properly come before the meeting, the shares represented by the proxy solicited hereby will be voted on such matters in accordance with the best judgment of the persons voting the shares represented by the proxy.

## ADDITIONAL INFORMATION

Shareholder Proposals for the 2003 Annual Meeting

Our 2003 Annual Meeting is expected to be held on Thursday, May 9, 2003. If any shareholder wishes to submit a proposal for inclusion in the Proxy Statement for the Company's 2003 Annual Meeting, the rules of the Securities and Exchange Commission require that such proposal be received at the Company's principal executive office by December 11, 2002.

Annual Report

A copy of the Company's annual report on form 10-K for the year ended December 31, 2001, as filed with the Securities and Exchange Commission, will be mailed without charge to shareholders upon request. Requests should be addressed to the company at 300 Executive Drive, Newark, Delaware, 19702, Attention: Thomas Stiner, Senior Vice President and CFO. The form 10-K includes certain exhibits, which will be provided only upon payment of a fee covering the Company's reasonable expenses.

Proxy Solicitation

Solicitations will be made by mail and possibly supplemented by telephone or other personal contact to be made without special compensation by our regular officers and employees. We may reimburse shareholder's nominees or agents (including brokers holding shares on behalf of clients) for the cost incurred in obtaining from their principals authorization to execute forms of proxy. No solicitation will be made by specifically engaged employees or soliciting agents. The cost of solicitation will be borne by us.

                        BY ORDER OF THE BOARD OF DIRECTORS

                        Allen M. Barnett
                        President and Chief Executive
                         Officer

                             18

<PAGE>

                                                    EXHIBIT A

                              **A-4**
                          AstroPower, Inc.



1601 Market Street
Philadelphia, PA 19103-2499

Mr. Thomas J. Stiner
AstroPower, Inc.
300 Executive Drive
Newark, DE 19702

January 30, 2003

Dear Tom:

This letter will confirm our understanding of our engagement to provide professional services to AstroPower, Inc. and subsidiaries (the "Company").

**Audit Services**

We will issue a written report upon our audit of the consolidated balance sheets of AstroPower, Inc. and subsidiaries as of December 31, 2002 and 2001, the related consolidated statements of income and comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2002, and schedules supporting such financial statements, all of which are to be included in the annual report (Form 10-K) proposed to be filed by the Company under the Securities Exchange Act of 1934.

Should the Company wish to include or incorporate these consolidated financial statements and our report thereon by reference into a future filing under the Securities Act of 1933 or other offering document, we would consider our consent to the inclusion of our report and the terms thereof at that time.

We will conduct the audit in accordance with auditing standards generally accepted in the United States of America, with the objective of expressing an opinion as to whether the presentation of the consolidated financial statements, taken as a whole, conforms with accounting principles generally accepted in the United States of America. It should be understood that our report and the consolidated financial statements and schedules may be subject to review by the Securities and Exchange Commission staff and to the application by them of their interpretation of the relevant rules and regulations.

KPMG LLP. KPMG LLP, a U.S. limited liability partnership, is a member of KPMG International, a Swiss association.

A-5

Page 2

In conducting the audit, we will perform tests of the accounting records and such other procedures as we consider necessary in the circumstances to provide a reasonable basis for our opinion on the consolidated financial statements. We also will assess the accounting principles used and significant estimates made by management, and evaluate the overall consolidated financial statement presentation.

Our report will be addressed to the board of directors and stockholders of the Company and will be in a form that is in accordance with the published rules and regulations of the Securities and Exchange Commission. We can not provide assurance that an unqualified opinion will be rendered. Circumstances may arise in which it is necessary for us to modify our report or withdraw from the engagement. In such circumstances, our findings or reasons for withdrawal will be communicated to the audit committee.

We will read the other information in your annual report (Form 10-K) and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements. However, our audit does not include the performance of procedures to corroborate such other information (including forward-looking statements).

The Company agrees that all records, documentation, and information we request in connection with our audit will be made available to us, that all material information will be disclosed to us, and that we will have the full cooperation of the Company's personnel. As required by auditing standards generally accepted in the United States of America, we will make specific inquiries of management about the representations embodied in the consolidated financial statements and the effectiveness of internal control, and obtain a representation letter from management about these matters. The responses to our inquiries, the written representations, and the results of audit tests, among other things, comprise the evidential matter we will rely upon in forming an opinion on the consolidated financial statements.

The management of the Company has responsibility for the consolidated financial statements and all representations contained therein. Management also is responsible for identifying and ensuring that the Company complies with laws and regulations applicable to its activities, for preventing and detecting fraud, for adopting sound accounting policies, and for establishing and maintaining effective internal control over financial reporting to maintain the reliability of the consolidated financial statements and to provide reasonable assurance against the possibility of misstatements that are material to the consolidated financial statements.

Our audit is planned and performed to obtain reasonable, but not absolute assurance about whether the consolidated financial statements are free of material misstatement, whether caused by error or fraud. Absolute assurance is not attainable because of the nature of audit evidence

Page 3

and the characteristics of fraud. Therefore, there is a risk that material errors, fraud (including fraud that may be an illegal act), and other illegal acts may exist and not be detected by an audit performed in accordance with auditing standards generally accepted in the United States of America. Also, an audit is not designed to detect matters that are immaterial to the consolidated financial statements.

To the extent that they come to our attention, we will inform management about any material errors and any instances of fraud or illegal acts. Further, to the extent that they come to our attention, we will inform the audit committee about fraud and illegal acts that involve senior management, fraud that in our judgment causes a material misstatement of the consolidated financial statements of the Company, and illegal acts, unless clearly inconsequential, that have not otherwise been communicated to the committee. In the case of illegal acts which in our judgment would have a material effect on the consolidated financial statements of the Company, we are also required to follow the procedures set forth in the Private Securities Litigation Reform Act of 1995, which under certain circumstances would require us to communicate our conclusions to the Securities and Exchange Commission.

Management is responsible for adjusting the consolidated financial statements to correct material misstatements and for affirming to the auditor in the representation letter that the effects of any uncorrected misstatements aggregated by the auditor during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements being reported upon taken as a whole.

In planning and performing our audit, we will consider the Company's internal control in order to determine the nature, timing and extent of our audit procedures for the purpose of expressing an opinion on the consolidated financial statements and not to provide assurance on internal control.

While we are not being engaged to report on the Company's internal control and are not obligated to search for reportable conditions, we will communicate reportable conditions to you to the extent they come to our attention. Reportable conditions are significant deficiencies in the design or operation of internal control which could adversely affect the organization's ability to record, process, summarize and report financial data consistent with the assertions of management in the consolidated financial statements. The definition of "reportable conditions" does not include potential future internal control problems, i.e., control problems coming to our attention that do not affect the preparation of consolidated financial statements for the period under audit.

A-7

Page 4

**Quarterly Review Services**

We will review the condensed consolidated balance sheets of the Company as of March 31, June 30, and September 30, 2002 and 2003, and the related condensed consolidated statements of income and comprehensive income, stockholders' equity, and cash flows for the quarterly and year-to-date periods then ended, which are to be included in the quarterly reports (Form 10-Q) proposed to be filed by the Company under the Securities Exchange Act of 1934. We will also review the selected quarterly financial data specified by Item 302 of Regulation S-K, which is required to be included in the annual report (Form 10-K) proposed to be filed by the Company under the Securities Exchange Act of 1934.

We will conduct our reviews in accordance with the professional standards set forth in Statement on Auditing Standards No. 71, as amended, issued by the American Institute of Certified Public Accountants. Our procedures will be substantially less in scope than an audit of financial statements performed in accordance with auditing standards generally accepted in the United States of America, and accordingly, we will not express an opinion on the Company's quarterly financial information.

Our reviews will consist primarily of inquiries of Company personnel and analytical procedures applied to financial data and we will require a representation letter from management. It should be understood that the management of the Company is responsible for the representations contained in the Company's quarterly financial information.

A review does not contemplate tests of internal controls or accounting records, tests of responses to inquiries by obtaining corroborating evidential matter, and certain other procedures ordinarily performed during an audit. Thus, a review does not provide assurance that we will become aware of all significant matters that would be disclosed in an audit.

Our review cannot be relied upon to disclose errors, fraud or illegal acts that may exist. However, to the extent that they come to our attention in completing our quarterly review procedures, we will inform management about any material errors and any instances of fraud or illegal acts. Further, to the extent that they come to our attention, we will inform the audit committee about fraud and illegal acts that involve senior management, fraud that in our judgment causes a material misstatement of the interim financial information, and illegal acts, unless clearly inconsequential, that have not otherwise been communicated to the committee.

Page 5

If we become aware of matters during our review that cause us to believe that interim financial information, filed or to be filed with the Securities and Exchange Commission is probably materially misstated as a result of a departure from accounting principles generally accepted in the United States of America, we will discuss the matter with management and, if appropriate, communicate such matters to the audit committee.

As agreed, we will not issue a written report upon completion of each review. However, we will inform you if we become aware of any material modifications that should be made to the quarterly financial information for it to be in conformity with accounting principles generally accepted in the United States of America. Should conditions preclude us from completing a review, we will advise you and the audit committee of the Company promptly.

## Registration Statements and Other Offering Documents

We understand that the consolidated financial statements and schedules and our written report thereon, as described above, are to be included by the Company in its annual report (Form 10-K) and that in so doing, the Company will be incorporating by reference these consolidated financial statements and schedules and our reports thereon in previously filed and effective Form S-8. Prior to issuing our consent to the incorporation by reference in these registration statements of our report with respect to the consolidated financial statements and schedules described above, we will perform procedures as required by Statement on Auditing Standards No. 37, *Filings Under Federal Securities Statutes*, including, but not limited to, reading information incorporated by reference in these registration statements, and performing subsequent event procedures.

Should the Company wish to include or incorporate by reference these consolidated financial statements and our report thereon into a future filing under the Securities Act of 1933, or an exempt offering, prior to our consenting to include or incorporate by reference our report on such consolidated financial statements, we will be required to perform procedures as required by Statement on Auditing Standards No. 37, *Filings Under Federal Securities Statutes*, including, but not limited to, reading other information incorporated by reference in the registration statement or other offering document, and performing subsequent event procedures. Our reading of the other information included or incorporated by reference in the offering document will consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements. However, we will not perform procedures to corroborate such other information (including forward-looking statements). The specific terms of our future services with respect to future filings or other offering documents will be negotiated and agreed to at the time the services are to be performed.

A-9

Page 6

Should a comfort letter be requested in connection with a future filing under the Securities Act of 1933 or an exempt offering, the specific terms of our services will be negotiated and agreed to at that time. Prior to our issuance of a comfort letter, management of the Company agrees to supply us with a representation letter that will, among other things, confirm that no events have occurred that would require adjustments to (or additional disclosures in) the audited consolidated financial statements referred to above and confirm the Company's responses to certain inquiries made in connection with our issuance of the comfort letter.

\* \* \* \*

The work papers for this engagement are the property of KPMG LLP (KPMG). In the event KPMG is requested pursuant to subpoena or other legal process to produce its documents relating to this engagement for the Company in judicial or administrative proceedings to which KPMG is not a party, the Company shall reimburse KPMG at standard billing rates for its professional time and expenses, including reasonable attorney's fees, incurred in responding to such requests.

While the audit report may be sent to the Company electronically by the KPMG engagement partner for the Company's convenience, only the manually signed audit report constitute the Company's record copy.

Based upon our discussions with and representations of Company management, we estimate that our fees for these services will be $245,650, as indicated in the attachment to this letter. This estimate is based on the level of experience of the individuals who will perform the services. In addition, expenses are billed for reimbursement as incurred. Expenses for items such as travel, telephone, postage, and typing, printing, and reproduction of financial statements are estimated at $6,500. Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates. We will endeavor to notify you of any such circumstances as they are assessed.

Our fees will be invoiced as follows:

| | |
|---|---|
| December 15, 2002 | $ 106,000 |
| January 20, 2003 | 72,000 |
| March 20, 2003 | 41,650 |
| June 20, 2003 | 13,000 |
| September 20, 2003 | 13,000 |
| | |
| Total | $ 245,650 |

Page 7

We shall be pleased to discuss this letter with you at any time. For your convenience in confirming these arrangements, we enclose a copy of this letter. Please sign and return it to us.

Very truly yours,

KPMG LLP

*Carl*

Carl E. Hertrich
*Partner*

**ACCEPTED:**

AstroPower, Inc.

_____
Authorized Signature

CHAIRMAN-AUDIT COMMITTEE
Title

_____ 6/10/03 _____
Date

Case 1:06-cv-00469-JJF    Document 13    Filed 12/12/2006    Page 15 of 201

```
<DOCUMENT>
<TYPE>NT 10-K
<SEQUENCE>1
<FILENAME>dnt10k.txt
<DESCRIPTION>NOTICE OF LATE FILING OF ASTROPOWER FORM 10-K
<TEXT>
<PAGE>
```

```
                                        ---------------------------
                                               OMB APPROVAL
                                        ---------------------------
                                        OMB Number: 3235-0058
                                        Expires: January 31, 2005
                                        ---------------------------
                                        SEC FILE NUMBER: 000-23657
                                        ---------------------------
                                        CUSIP NUMBER: 0464A101
                                        ---------------------------
```

                          UNITED STATES
                SECURITIES AND EXCHANGE COMMISSION
                     Washington, D.C. 20549

                          FORM 12b-25

                   NOTIFICATION OF LATE FILING

     (Check One): [X] Form 10-K [_] Form 20-F [_] Form 11-K [_] Form 10-Q

     For Period Ended: December 31, 2002
                       ----------------

     [_] Transition Report on Form 10-K
     [_] Transition Report on Form 20-F
     [_] Transition Report on Form 11-K
     [_] Transition Report on Form 10-Q
     [_] Transition Report on Form N-SAR
     For the Transition Period Ended:
                                      --------------------------------

--------------------------------------------------------------------------------
     Nothing in this form shall be construed to imply that the Commission has
                verified any information contained herein.
--------------------------------------------------------------------------------

If the notification relates to a portion of the filing checked above, identify
the Item(s) to which the notification relates:

--------------------------------------------------------------------------------

PART I - REGISTRANT INFORMATION

AstroPower, Inc.
--------------------------------------------------------------------------------
Full Name of Registrant


--------------------------------------------------------------------------------
Former Name if Applicable

300 Executive Drive
--------------------------------------------------------------------------------
Address of Principal Executive Office (Street and Number)

Newark, DE 19702-3316
---------------------------------------A-12-------------------------------------
City, State and Zip Code

<PAGE>

PART II - RULES 12b-25(b) AND (c)

If the subject report could not be filed without unreasonable effort or expense
and the registrant seeks relief pursuant to Rule 12b-25(b), the following should
be completed. (Check box if appropriate)

[X]  (a)  The reasons described in reasonable detail in Part III of this form
          could not be eliminated without unreasonable effort or expense;

[ ]  (b)  The subject annual report on Form 10-K will be filed on or before the
          fifteenth calendar day following the prescribed due date.

PART III - NARRATIVE

State below in reasonable detail the reasons why Form 10-K could not be filed
within the prescribed time period.

The Company is unable to file its Annual Report on Form 10-K as we require
additional time to gather and evaluate data relating to 2002 revenue recognition
matters. However, we cannot predict the time required to complete our
evaluation, but will make every effort to do so within fifteen days. Upon
completion, it is likely that a restatement of certain 2002 quarters will be
necessary. However we are not, as yet, able to estimate the amount or periods of
such restatement. Certain revenue recognition matters may impact 2001, however,
we are not, as yet, able to estimate the impact, if any.


PART IV - OTHER INFORMATION

(1)  Name and telephone number of person to contact in regards to this
     notification.


Thomas J. Stiner                  302               366-0400
-------------------------------------------------------------------------------
 (Name)                        (Area Code)        (Telephone Number)

(2)  Have all other periodic reports required under Section 13 or 15(d) of
     the Securities Exchange Act of 1934 during the preceding 12 months or for
     such shorter period that the registrant was required to file such report(s)
     been filed? If answer is no, identify reports.      [X] Yes    [_] No

(3)  Is it anticipated that any significant change in results of operations
     from the corresponding period for the last fiscal year will be reflected by
     the earnings statements to be included in the subject report or portion
     thereof?      [X] Yes    [_] No

If so, attach an explanation of the anticipated change, both narratively and
quantitatively, and, if appropriate, state the reason why a reasonable estimate
of the results cannot be made.

(a reasonable estimate of the results cannot be made due to the reasons
discussed in Part III.)
-------------------------------------------------------------------------------

                          AstroPower, Inc.
           ----------------------------------------------------------
                 (Name of Registrant as Specified in Charter)
has caused this notification to be signed on its behalf by the undersigned
hereunto duly authorized.

<PAGE>                        **A-13**

Case 1:06-cv-00469-JJF     Document 13     Filed 12/12/2006     Page 17 of 201

```
Date     April 1, 2003                    By /s/ Thomas J. Stiner
         -----------------------------    -----------------------------------
                                          Thomas J. Stiner
                                          Sr. VP & CFO
```

INSTRUCTIONS: The form may be signed by an executive officer of the registrant
or by any other duly authorized representative. The name and title of the person
signing the form shall be typed or printed beneath the signature. If the
statement is signed on behalf of the registrant by an authorized representative
(other than an executive officer), evidence of the representative's authority to
sign on behalf of the registrant shall be filed with the form.


</TEXT>
</DOCUMENT>

**A-14**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, DC 20549**

---

# FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported) December 29, 2003**

---

# AstroPower, Inc

**(Exact name of registrant as specified in its charter)**

---

| | | |
|---|---|---|
| **Delaware** | **000-23657** | **51-0315860** |
| (State or other jurisdictions of incorporation) | (Commission file number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **231 Lake Drive, Newark, Delaware** | **19702** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (302) 366-0400**

**300 Executive Drive Newark, Delaware 19702-3316**
**(Former address, if changed since last report)**

A-15

**Item 4. Changes in Registrant's Certifying Accountant.**

By letter dated December 23, 2003 and received by management on December 29, 2003, KPMG LLP ("KPMG") advised the Company "that the client-auditor relationship between AstroPower, Inc. and KPMG has ceased." A copy of the letter was delivered to the Securities and Exchange Commission.

The reports of KPMG on the financial statements of the Company for each of the fiscal years ended December 31, 2000 and December 31, 2001 contained no adverse opinions or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles. Except to the extent discussed below, for the fiscal years ended December 31, 2000 and December 31, 2001 and through the date of this report, there were no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure or audit scope or procedure which, if not resolved to the satisfaction of KPMG, would have caused it to make reference to the subject matter of such disagreement in its reports on the financial statements for such fiscal years. Nor, except to the extent discussed below, were there any reportable events within the meaning of Item 304(a)(1)(v) of Regulation S-K for the fiscal years ended December 31, 2000 and December 31, 2001 and through the date of this report. With respect to the matters discussed below, the Audit Committee authorized KPMG to respond fully to inquiries of any successor accountant.

In the course of work undertaken in connection with the audit for the fiscal year ended December 31, 2002, KPMG advised the Company's Audit Committee that it noted potential inadequacies in internal controls relevant to revenue recognition with respect to certain transactions during 2002, that it had therefore expanded the scope of the audit, and further that it believed that the Audit Committee should engage the services of outside professionals to undertake forensic procedures to assist the Audit Committee with respect to revenue recognition. The Audit Committee then engaged an independent "Big 4" accounting firm and independent law firm to undertake procedures to investigate certain transactions for which revenue had been recognized during 2002. On May 16, 2003, AstroPower announced that, because of its ongoing review of revenue recognition matters, the Company had yet to file its Form 10-K for the fiscal year ended December 31, 2002, and until such time as the Company had an audited balance sheet for the fiscal year ended December 31, 2002 it would be unable to file its quarterly report. Thereafter, they reported to the Audit Committee regarding observations they had made with respect to certain transactions for which revenue had been recognized during 2002. While the expanded procedures were being performed, KPMG informed the Audit Committee and management that KPMG was unwilling to rely on representations by two senior executives.

As previously announced on May 27, 2002, the Board of Directors then accepted the resignations of Allen Barnett, Ph.D., the Company's Chief Executive Officer, and of Thomas Stiner, the Company's Chief Financial Officer, from their respective executive positions with AstroPower and removed two other management employees. The Company also appointed George Roland, a director of the Company, as acting Chief Executive Officer, and Gilbert Steinberg, also a director of the Company, as acting Chief Financial Officer.

A-16

Thereafter, the management of the Company, working in conjunction with KPMG, moved toward completion of the audit for the year ended December 31, 2002.

On June 5, 2003, the Company announced that it had received a Nasdaq Staff Determination letter on May 29, 2003 indicating that in addition to its Form 10-K delinquency AstroPower had not filed its Quarterly Report on Form 10-Q for the period ended March 31, 2003 with the Securities and Exchange Commission and Nasdaq, as required by Nasdaq Marketplace Rule 4310(c)(14). The Company also announced at that time that it was making every effort to file its reports on Form 10-K and Form 10-Q as soon as possible, but there could be no assurance the Company would be able to file those reports prior to the time that Nasdaq might effect the delisting of its Common Stock. Acting management of AstroPower, and the Audit Committee, believed, based on communications it had had with KPMG, that the work necessary to complete the audit, and to file a Form 10-K, could be completed before an actual delisting of the Company's stock took place. Shortly thereafter, however, KPMG advised AstroPower for the first time that it would not be willing to issue an audit report until successor management had been engaged by the Company. On July 24, 2003, AstroPower announced that it had received notice from a Nasdaq Listing Qualifications Panel indicating that the Company's common stock would be delisted from the Nasdaq National Market effective with the open of business on Friday, July 25, 2003. On July 25, 2003, AstroPower also announced the engagement of Bridge Associates LLC, a nationally known restructuring, turnaround management and expanded capabilities firm, to take charge of the day-to-day operations of AstroPower and its subsidiaries and to stabilize the Company's financial position. The Company further announced that Bridge Associates would also analyze all of AstroPower's operations and make recommendations to the Company's Board of Directors with respect to raising additional working capital as well as the overall future strategy of the Company. The Company's principal efforts thereafter were focused on stabilizing the operations of the business. On August 6, 2003, the Company announced that it had reduced its workforce by 10% through a layoff of approximately 55 employees. The Company also announced that it was evaluating the totality of AstroPower's overhead expenses and focusing on reducing those expenses throughout the Company's operations.

In the course of discussions during the fall of 2003, KPMG indicated that it was not prepared to complete the audit process unless the Company undertook additional forensic procedures, the scope of which were not defined, but which would entail the evaluation of matters beyond the scope of the forensic work undertaken previously. The Audit Committee advised KPMG that, while it did not believe that additional forensic work was necessary, it would be willing to undertake such efforts if it could receive guidance from KPMG regarding the scope, potential cost and timing of such procedures and, in particular, how such procedures would affect the timing and cost of completing the audit for 2002. KPMG declined to provide such guidance. The Company advised KPMG that it was concerned because KPMG would not offer any assurance of when the

A-17

audit might be completed and what the cost of such efforts might be. The Company further advised KPMG that its concerns were heightened by the fact that, in the past, KPMG had indicated that, subject to the completion of certain procedures, the audit would be substantially completed. However, in those prior instances, once the procedures were completed, KPMG raised additional issued or procedures which would have to be completed in connection with the audit. Further, the Company advised KPMG that it had already spent very substantial amounts on effort to complete work required by KPMG in connection with the audit, that it had cooperated with KPMG in every request that KPMG had made, and that it would be irresponsible for the Company to undertake further, open-ended and costly expenditures in light of the Company's financial condition, particularly without any assurance from KPMG that such procedures would result in completion of the audit.

The Company and the Audit Committee continue to believe that they have complied with all prior requests made by KPMG with respect to the completion of the 2002 audit, including additional requirements and procedures that were required by KPMG over time and which affected the Company's ability to complete the audit prior to July 24, 2003. The Company and the Audit Committee believe that KPMG's introduction of additional requirements or conditions to completion of the audit also adversely affected the overall cost of the procedures undertaken to date. In light of these facts, and in light of the Company's current financial condition, the Audit Committee did not believe that it would be prudent or appropriate to make further, open-ended expenditures of Company resources for additional forensic or audit procedures, absent some reliable assurance for that, by doing so, the audit could be completed.

The Company has provided KPMG a copy of this Report and requested KPMG to furnish it with a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made herein. The Company has requested that KPMG provide such letter as promptly as possible, so that the Company can file such letter as an Exhibit to this Current Report on Form 8-K within 10 business days after the date of this Report.

**Item 7. Financial Statements and Exhibits.**

    (c)    Exhibits

        Exhibit 1.   Letter From KPMG
                (To be supplied by amendment)

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

AstroPower, Inc.
_____
(Registrant)

Date: January 7, 2004                    By:    _____
                                                        /s/ Carl H. Young III

                                                         Carl H. Young III
                                                 Interim Chief Executive Officer

**A-19**

Case 1:06-cv-00469-JJF    Document 13    Filed 12/12/2006    Page 23 of 201

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

---

## FORM 8-K / A-1

---

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of
### the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported) January 29, 2004**

---

# AstroPower, Inc
###### (Exact name of registrant as specified in its charter)

---

| | | |
|---|---|---|
| **Delaware** | **000-23657** | **51-0315860** |
| (State or other jurisdictions of incorporation) | (Commission file number) | (IRS Employer Identification No.) |
| **231 Lake Drive, Newark, Delaware** | | **19702** |
| (Address of principal executive offices) | | (Zip Code) |

### Registrant's telephone number, including area code: (302) 366-0400

A-20

This amendment relates to a Form 8-K filed by Registrant on January 7, 2004 with respect to <u>Item 4. Changes in Registrants Certifying Accountant</u>.

Registrant provided KPMG a copy of the above Report and requested KPMG to furnish it with a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made therein. Registrant requested that KPMG provide such letter as promptly as possible, so Registrant could file such letter as an Exhibit to the Current Report on Form 8-K within 10 business days after the date of the Report.

**Item 7. Financial Statements and Exhibits.**

(c) Exhibits

Exhibit 1. Letter from KPMG to the Securities and Exchange Commission dated January 22, 2004 and received by Registrant on January 29, 2004.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this amendment to be signed on its behalf by the undersigned hereunto duly authorized.

AstroPower, Inc.<br>
(Registrant)

Date: February 2, 2004                    By:                    /s/ Carl H. Young III
                                                           _____
                                                           Carl H. Young III
                                                           Interim Chief Executive Officer

**A-21**

**Exhibit 1**

KPMG LLP                                                                     Telephone 267 256 7000
1601 Market Street                                                          Fax 267 256 7200
Philadelphia, PA 19103-2499

January 22, 2004

Securities and Exchange Commission
Washington, D.C. 20549

Ladies and Gentlemen:

We were previously principal accountants for AstroPower, Inc. ("AstroPower" or the "Company") and, under the date February 20, 2002 we reported on the consolidated financial statements of AstroPower, Inc. and subsidiaries as of and for the years ended December 31, 2001 and 2002. On December 23, 2003 we resigned. We have read AstroPower, Inc.'s statements included under Item 4 of its Form 8-K dated January 7, 2004, and we agree with such statement, except that

    a.    we disagree with the statement made in the first sentence of the second paragraph, since the auditor's report for the year ended December 31, 2001 was modified as follows: "As discussed in Notes 1 and 4 to the consolidated financial statements, effective July 1, 2001, the Company adopted the provisions of *Statement of Financial Accounting Standards (SFAS) No. 141, "Business Combinations"*, and certain provisions of *SFAS No. 142, "Goodwill and Other Intangible Assets"*, as required for good will and intangible assets resulting from business combination consummated after June 30, 2001;

    b.    we disagree with the phrase "potential inadequacies in internal control" appearing in the first sentence of the third paragraph, since KPMG informed the Chairman of the audit committee via telephone on April 2, 2003 that there were materials weaknesses in internal control, specifically in the design and effectiveness of controls over revenue recognition, which constituted a reportable condition and therefore communicated directly to the Audit Committee;

    c.    we disagree with the date of the announcement appearing in the first sentence in the fourth paragraph, which may be the product of a typographical error since such announcement appeared in a press release dated May 27, 2003 and not May 27, 2002;

d.   we disagree with the statement made in the first sentence of the seventh paragraph, since KPMG advised the Audit Committee of our recommendation for specific areas of focus for the forensic investigation in July, 2003.

e.   we disagree with the statement made in the third sentence of the seventh paragraph, since KPMB advised the Audit Committee and its forensic advisors of our recommendations for specific additional areas of focus for the forensic investigation in a meeting in KPMG's Philadelphia office on October 16, 2003. On a conference call held on October 21, 2003, KPMG again provided its recommendations to the Company's forensic investigation team;

f.   we disagree with the statement made in the sixth sentence of the seventh paragraph, since the Company's forensic team did not complete procedures to our satisfaction and;

g.   while we agree that the Company advised us of the various matters described in the seventh sentence of the seventh paragraph, we disagree with the statement that the "Company cooperated with KPMG in every requests that KPMG had made". There were various requests for documentation and analysis to be provided by the Company or its forensic accountants that were not provided to us prior to July 29, 2003, which is the date the acting Chief Financial Officer of the Company informed KPMG to suspend its audit of the Company's financial statements.

We are not in a position to agree or disagree with the statements appearing in the third and eighth sentences of the sixth paragraph, and the entire eighth paragraph.

The Company also failed to mention in Item 4 that by the letter dated December 23, 2003, KPMG informed the Company that, as a result of the Company's decision to stop the forensic investigation, the Company had stopped taking timely and appropriate remedial action with respect to a possible illegal act and therefore was not in compliance with Section 10A of the Securities and Exchange Act of 1934. The Company advised us that it sent a copy of our December 23, 2003 letter to the Securities and Exchange Commission.

Very truly yours,

KPMG LLP

A-23

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASTROPOWER, INC., | ) | Case No. 04-10322 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**REVISED DISCLOSURE STATEMENT REGARDING LIQUIDATING PLAN**
**PROPOSED BY ASTROPOWER, INC. AND**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Dated: October 5, 2004

MORRIS, NICHOLS, ARSHT & TUNNELL
Derek C. Abbott, Esq. (No. 3376)
Gregory T. Donilon, Esq. (No. 4244)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200

Counsel for AstroPower, Inc.
Debtor and Debtor in Possession

LANDIS RATH & COBB LLP
Adam G. Landis, Esq. (No. 3407)
Kerri K. Mumford, Esq. (No. 4186)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware  19899-2087
(302) 467-4400

Counsel for the Official Committee
Of Unsecured Creditors

THIS IS A SOLICITATION BY ASTROPOWER, INC., THE DEBTOR IN THIS CHAPTER 11 CASE, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND IS NOT A SOLICITATION BY THEIR ATTORNEYS, FINANCIAL ADVISORS AND OTHER PROFESSIONAL ADVISORS.  INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.

as of November 4, 1998 and amended by that certain Change in Terms Agreement dated as of September 7, 2001, by AstroPower in favor of WTC, in the original principal amount (as amended) of $6,000,000 (the "WTC $6M Demand Note").

        **2.3.3**      In connection with the WTC $10M Demand Loan, AstroPower executed that certain Business Loan Agreement, dated as of March 14, 2003, in the principal amount of $10,000,000 (the "WTC $10M Demand Loan Agreement"). The WTC $10M Demand Loan is evidenced by that certain Promissory Note, dated as of March 14, 2003, by AstroPower in favor of WTC, in the original principal amount of $10,000,000 (the "WTC $10M Demand Note").

        **2.3.4**      WTC opened an Irrevocable Documentary Standby Letter of Credit in favor of AstroPower for the aggregate sum of $200,000 (the "WTC LOC" and, collectively, with the WTC $6M Demand Loan Agreement, the WTC $6M Demand Note, the WTC $10M Demand Loan Agreement, and the WTC $10M Demand Note, together with all instruments, agreements and documents executed in connection therewith, the "WTC Loan Documents").

        **2.3.5**      In connection with that certain Basic Agreement (the "Sedona Lake/McConnell Basic Agreement") dated October 15, 2003, between and among AstroPower, Sedona Lake, LLC ("Sedona Lake") and McConnell Real Estate Company, LLC ("McConnell"), AstroPower executed notes payable to Sedona Lake in the amount of $3,416,048.40 (the "Sedona Lake Note") and to McConnell Real Estate, LLC (the "McConnell Note") in the amount of $4,500,000. Also in connection with the Sedona Lake/McConnell Basic Agreement, AstroPower granted (a) a security interest to Sedona Lake in the amount of $431,600 in certain Assets and (b) a security interest to McConnell in the amount of $568,400 in certain Assets; in each case subordinate to WTC.

        **2.3.6**      As a result of certain defaults under the WTC Loan Documents, AstroPower requested that WTC forbear from exercising WTC's remedies under the WTC Loan Documents and applicable law for a limited time, and WTC agreed to do so upon the terms and conditions set forth in that certain Forbearance Agreement dated as of August 28, 2003, by and between AstroPower and WTC, as amended by that certain First Amendment to Forbearance Agreement dated as of November 25, 2003, by and between AstroPower and WTC and that certain Second Amendment to Forbearance Agreement dated as of January 15, 2004 by and between AstroPower and WTC (the "WTC Forbearance Agreement" and, together with the WTC Loan Documents, collectively, the "WTC Forbearance Documents").

        **2.3.7**      WTC's security interests and liens, to the extent they are valid, binding, enforceable and perfected, in certain of the Assets (the "WTC Liens") were documented, recorded or evidenced by various contracts, instruments, financing statements, and documents, including certain of the WTC Loan Documents (all as may have been amended from time to time, collectively, the "WTC Documents").

        **2.3.8**      Sedona Lake's and McConnell's security interests and liens, to the extent they are valid, binding, enforceable and perfected, in certain of the Assets (the "McConnell Liens") were documented, recorded or evidenced by various contracts, instruments, financing statements, and documents (all as may have been amended from time to time, collectively, the "McConnell Documents").

## 2.4    EVENTS LEADING TO THE BANKRUPTCY FILING.

2.4.1    Prior to 2002, demand for AstroPower's products was generally strong, and the business was constrained by manufacturing capacity. Late in the second quarter of 2002 and through the end of that year, however, a myriad of factors combined to negatively impact the Debtor's financial performance. These factors are discussed in the following paragraphs.

2.4.2    **Competitive Pressures.** AstroPower's growth in both manufacturing capacity and number of employees during the period from 2000 through 2002 outpaced its operational, financial and management systems capacity. AstroPower experienced increased competitive pressures in 2002, particularly in Europe, resulting in decreased and reduced pricing for its products, reductions in customer order forecasts, cancellation of orders already placed, and customer returns. A number of large U.S., Japanese and European companies are actively engaged in the development, manufacturing and marketing of solar electric power components and systems. These include BP Solar, Shell Solar, Kyocera Corporation, Sanyo Electric Company and Sharp Corporation. In Spain, Atersa's principal competitors are BP Solar and Isofoton. All of these companies have significantly greater resources to devote to research, development, manufacturing and marketing than AstroPower. There are also a large number of smaller companies involved in both the development of, as well as the ongoing manufacturing and marketing of, solar electric power components and systems. Several of AstroPower's competitors have announced plans to enter the residential roof top market, initially in California. There are a variety of competing technologies currently under active development by a large number of organizations. These technologies include amorphous silicon, cadmium telluride and copper indium diselenide, as well as advanced concepts for both bulk ingot based and thin film crystalline silicon. Any of these competing technologies could achieve manufacturing costs per watt lower than the technology developed by AstroPower. In addition to direct competition from other solar electric power product manufacturers, AstroPower faced competition from companies using alternative technologies in the distributed generation and wholesale electric power markets. In distributed generation, competing technologies include diesel generators, microturbines and fuel cells. Other wholesale electric power market technologies are based on fuels such as natural gas, coal, oil and uranium, as well as renewable resources such as hydro, geothermal and wind.

2.4.3    **Problems with International Sales.** AstroPower's international sales, which were an important component of product sales in 2002-2003, affected the Debtor's overall business because: (a) export, import and customer requirements encountered by AstroPower and Atersa caused lengthy delays in revenue recognition of sales and made forecasting difficult; (b) AstroPower experienced difficulties in collecting accounts receivable; and (c) AstroPower extended accounts receivable cycles. AstroPower experienced many difficulties in integrating the business culture of Atersa. A large portion of Atersa's business involves large and often long-term contracts with customers in Africa and South America where government agencies are the contracting parties. The approval process is commonly lengthy and involves substantial administrative attention. AstroPower had little historical experience with such markets. As such, projecting deliveries and payment was difficult and substantial delays were commonplace.

2.4.4    **Slow Adoption of Solar Energy.** While governmental assistance and enhanced consumer choice have accelerated the use of solar electric power for on-grid applications, the widespread utilization of solar electric power by customers connected to the

utility grid has been limited principally by production costs. Most of the solar electric power technologies that have been commercialized to date have not adequately reduced costs while maintaining the requisite levels of performance and reliability. Manufacture of AstroPower's products still required expensive equipment, consumed large amounts of electricity, wasted a significant portion of raw materials and took several days to complete. Although AstroPower's production technology appeared to offer the potential to reduce cost, low efficiency, poor stability and high capital costs hampered the commercialization of its silicon thin-film solar electric power technologies.

      **2.4.5    Internal Factors.**    In April 2003, KPMG LLP ("KPMG"), AstroPower's independent accountants, raised concerns regarding internal controls and discovered information that provided a basis for: (a) reexamining AstroPower's accounting with respect to revenue recognition in connection with transactions in the United States and (b) evaluating AstroPower's internal controls. Upon the request of KPMG, the audit committee, which consisted of Gilbert Steinberg, George W. Roland, Clare E. Nordquist and Jeff W. Edington, retained, with the consent of the Board of Directors, Hale & Dorr as its independent counsel. The audit committee, with the consent of the Board of Directors, authorized Hale & Dorr to engage Ernst & Young as forensic accountants to commence an investigation of internal controls and revenue recognition practices and procedures. The preliminary internal investigation was completed in June 2003 and revealed the following: (x) accounting for transactions whereby timing and title transfer issues resulted in recording revenues in the wrong quarter; (y) accounting for transactions recorded as sales which should not have been recorded as sales due to unwritten understandings, delays in receiving formal acceptance of underlying contracts and a general failure to ascertain all pertinent terms of the transactions; and (z) customer returns and allowance issues which were not dealt with or closed out on a timely basis or in the proper quarterly reporting period. On May 16, 2003, AstroPower announced that, because of its ongoing review of accounting matters, it had yet to file its Form 10-K for the period ended December 31, 2002, and until such time as it had an audited balance sheet for the year ended December 31, 2002, upon which the preparation of a balance sheet for the quarter ended March 31, 2003 is dependant, it would be unable to file the quarterly report. On May 29, 2003, AstroPower received a Nasdaq Staff Determination letter indicating that in addition to its Form 10-K delinquency, AstroPower had not filed its Quarterly Report on form 10-Q for the period ended March 31, 2003 with the SEC and NASDAQ, as required by NASDAQ Marketplace Rule 4310(c)(14). On July 24, 2003, AstroPower announced that it received notice from a NASDAQ Listing Qualifications Panel indicating that the Company's common stock would be delisted from the NASDAQ National Market effective with the open of business on July 25, 2003. The decision arose as a result of AstroPower's failure to timely file its Annual Report on Form 10-K for the December 31, 2002 fiscal year and its Quarterly Report on Form 10-Q for the first quarter of 2003 because of its ongoing review of accounting matters. The Listing Qualifications Panel denied AstroPower any further extension of time to make these filings. Following delisting, AstroPower's common stock was not eligible to trade on the OTC Bulletin Board until AstroPower became current in all of its periodic reporting requirements under the Exchange Act of 1934, and a market maker thereafter made an application to register in and quote AstroPower's common stock in accordance with applicable SEC requirements. The delisting of AstroPower's common stock had a material adverse effect on its stock price and trading volume.

2.4.6    In the course of discussions during the fall of 2003, KPMG indicated that it was not prepared to complete the audit process unless AstroPower undertook additional forensic procedures, the scope of which was not defined, but which would entail the evaluation of matters beyond the scope of the forensic work undertaken previously. The audit committee advised KPMG that, while it did not believe that additional forensic work was necessary, it would be willing to undertake such efforts if it could receive guidance from KPMG regarding the scope, potential cost and timing of such procedures and, in particular, how such procedures would affect the timing and cost of completing the audit for 2002. KPMG declined to provide such guidance. AstroPower advised KPMG that it was concerned because KPMG would not offer any assurance of when the audit might be completed and what the cost of such efforts might be. AstroPower further advised KPMG that its concerns were heightened by the fact that, in the past, KPMG had indicated that, subject to the completion of certain procedures, the audit would be substantially completed. However, in those prior instances, once the procedures were completed, KPMG raised additional issues or procedures which would have to be completed in connection with the audit. Further, AstroPower advised KPMG that it already had spent very substantial amounts on efforts to complete work required by KPMG in connection with the audit, that it had cooperated with KPMG in every request that KPMG had made and that it would be irresponsible for AstroPower to undertake further, open-ended and costly expenditures in light of AstroPower's financial condition, particularly without any assurance from KPMG that such procedures would result in completion of the audit.

2.4.7    By letter dated December 23, 2003, and received by AstroPower on December 29, 2003, KPMG advised AstroPower "that the client-auditor relationship between AstroPower, Inc. and KPMG has ceased." AstroPower and the audit committee continue to believe that they have complied with all prior requests made by KPMG with respect to the completion of the 2002 audit, including additional requirements procedures that were required by KPMG over time and which affected AstroPower's ability to complete the audit prior to July 24, 2003. AstroPower and the audit committee believe that KPMG's introduction of additional requirements or conditions to completion of the audit also adversely affected the overall cost of the procedures undertaken to date. In light of these facts, and in light of AstroPower's financial condition, the audit committee did not believe that it would be prudent or appropriate to make further, open-ended expenditures of AstroPower's resources for additional forensic or audit procedures, absent some reliable assurance that, by doing so, the audit would be completed.

2.4.8    **Departure of Debtor's Officers and Directors.** On May 23, 2003, subsequent to Hale & Dorr's preliminary report on the Debtor's internal controls, Dr. Allen M. Barnett, President and Chief Executive Officer, and Thomas J. Stiner, Chief Financial Officer, resigned as officers of AstroPower. On December 18, 2003, Mr. Stiner resigned as a director. In addition, Peter Aschenbrenner, AstroPower's former Vice President, Sales and Marketing, left AstroPower. AstroPower began a search for a new CEO and CFO of the company. In the interim, the independent directors assumed the responsibility of running the day-to-day business of AstroPower. Dr. George W. Roland was appointed acting CEO and Gilbert Steinberg was appointed acting CFO. Director Gilbert Steinberg was also elected as a non-executive Chairman of the Board of Directors of AstroPower.

2.4.9    The current Board of Directors of AstroPower consists of: Allen M. Barnett, Gilbert Steinberg, Jeff Edington, George Roland and Clare Nordquist.

(d)    **Securities Actions.**  In Spring 2003, a number of federal securities class actions were commenced to seek remedies under the Securities Exchange Act of 1934 (the "Exchange Act") for certain purchasers of the Debtor's common stock.  These actions include: John Savage v. AstroPower, Inc., Allen M. Barnett, and Thomas J. Stiner, C.A. No. 03-CV-260 (JJF); Fievel Alter v. AstroPower, Inc., Allen M. Barnett, and Thomas J. Stiner, C.A. No. 03-CV-268 (SLR); Robert Scott v. AstroPower, Inc., Allen M. Barnett, and Thomas J. Stiner, C.A. 03-CV-284(SLR); Matthew Bregoff v. AstroPower, Inc., Allen M. Barnett, and Thomas J. Stiner, C.A. 03-CV-337 (SLR); Larry Quick v. AstroPower, Inc. Allen M. Barnett, and Thomas J. Stiner, C.A. No. 03-CV-391 (SLR); Rita Peterson v. AstroPower, Inc. Allen M. Barnett, and Thomas J. Sinter, C.A. 03-CV-337 (SLR) (collectively, the "Securities Actions").  On June 10, 2003, as amended on October 21, 2003, the Securities Actions were consolidated for all purposes and are proceeding as In re AstroPower, Inc. Securities Litigation, C.A. No. 03-CV-260 (JJF).

(i)    The Securities Actions allege that AstroPower, Inc., Allen M. Barnett, and Thomas J. Stiner (collectively, the "Defendants") violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 by issuing a number of allegedly materially false and misleading statements.  The Securities Actions further allege that the Defendants claimed throughout applicable time periods that it was capable of taking advantage of the increasing demand of solar power products.  The Securities Actions claim that the Defendants reported, during the applicable periods, a strong revenue and earnings growth, which formed the basis of positive research analysts' reports on the Debtor.  Based on the Debtor's information and these reports, the Debtor's stock rose to a high of $27.00/share at the end of March 2002.

(ii)    The Securities Actions further allege that the Defendants were unable to effectively manage the Debtor's expanding operations and to allocate resources among the Debtor's manufacturing facilities to meet the demand of its customers.  The Securities Actions state on August 1, 2002, the Debtor announced its second quarter results for 2002 showing that the Debtor's reported revenue had declined and its net income was marginally greater than the previous year, in stark contrast to the Debtor and analysts' projections.

(iii)    The claimants request damages for the Defendants jointly and severally, for all damages sustained as a result of the alleged wrongdoing plus interest, costs and expenses.  On July 7, 2003, Judge Farnan entered an order requiring the lead plaintiff to file and serve a consolidated amended complaint within 45 days of the date the Debtor files with the SEC its Form 10-K for the fiscal year ended December 31, 2002.

(iv)    As a result of, among other things, the Debtor's failure to make timely filings with the SEC, the SEC began an investigation into certain matters relating to the Debtor's prepetition operations.  The Debtor believes that, as a result of its cooperation and under the particular facts and circumstances of this case, the SEC does not have a substantial allowed claim against the Debtor.

## 2.5    PRE-PETITION EFFORTS TO RESTRUCTURE.

2.5.1    Prior to the Petition Date, AstroPower, with the assistance of its management and professionals, explored a variety of strategic and financial alternatives, including the sale of AstroPower's business (the "Business") and assets (the "Purchased

Assets"). After investigating these alternatives, AstroPower determined that a sale of its Purchased Assets and Business was the option most likely to yield the most value for AstroPower's stakeholders.

   **2.5.2** In connection with these efforts, AstroPower commenced a formal marketing process with the assistance of SSG Capital Advisors, L.P. ("SSG"). SSG conducted an extensive prepetition marketing process, focusing on buyers selected on the basis of a variety of factors, including perceived interest in the Business and the Purchased Assets, familiarity with the solar energy industry and financial ability to consummate a transaction with the Debtor. SSG sent initial marketing materials to approximately ninety parties, entered fifty-nine confidentiality agreements with potential buyers, sent offering memoranda to fifty-seven potential buyers, facilitated due diligence with fourteen such potential buyers, and arranged for actual on site visits for nine potential buyers. AstroPower, with the assistance of SSG, its attorneys and other representatives, assembled data and documents to facilitate the diligence process and prepared business presentations to provide for an organized and efficient transmission of a large amount of data related to the Business.

**2.6** <u>**DEBTOR'S BANKRUPTCY PROCEEDINGS.**</u>

   **2.6.1** **Petition Date.** On February 1, 2004, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

   **2.6.2** **First Day Orders.** On the Petition Date, the Debtor filed several motions seeking certain relief by virtue of so-called first day orders. The first day orders assisted the Debtor in transitioning into operating as a debtor-in-possession by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. The first day orders in the Debtor's case authorized, among other things:

- The continued maintenance of the Debtor's bank accounts, continued use of existing business forms and continued use of the Debtor's existing cash management system;

- The appointment of Donlin Recano & Company, Inc. as the claims, noticing and balloting agent in this case;

- Continued utility service during the pendency of the chapter 11 case;

- Granting an administrative expense status to certain obligations arising from the postpetition delivery of goods;

- Payments to employees of accrued prepetition wages, salaries and benefits;

- Payment of prepetition sales, use and other taxes; and

# AU Section 110

## *Responsibilities and Functions of the Independent Auditor*

*For the PCAOB Interim Standard, please click here*

Source: SAS No. 1, section 110; SAS No. 78; SAS No. 82.

**Issue date, unless otherwise indicated: November, 1972.**

**.01**    The objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states whether his audit has been made in accordance with generally accepted auditing standards. These standards require him to state whether, in his opinion, the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period.

## Distinction Between Responsibilities of Auditor and Management

**.02**    The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.[1] Because of the nature of audit evidence and the characteristics of fraud, the auditor is able to obtain reasonable, but not absolute, assurance that material misstatements are detected.[2] The auditor has no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by errors or fraud, that are not material to the financial statements are detected. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

---

[1]   See section 312 , *Audit Risk and Materiality in Conducting an Audit*, and section 316 , *Consideration of Fraud in a Financial Statement Audit*. The auditor's consideration of illegal acts and responsibility for detecting misstatements resulting from illegal acts is defined in section 317 , *Illegal Acts by Clients*. For those illegal acts that are defined in that section as having a direct and material effect on the determination of financial statement amounts, the auditor's responsibility to detect misstatements resulting from such illegal acts is the same as that for error or fraud. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

[2]   See section 230, *Due Professional Care in the Performance of Work*, paragraphs .10 through .13 . [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.03**    The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets,

liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles[3] is an implicit and integral part of management's responsibility. The independent auditor may make suggestions about the form or content of the financial statements or draft them, in whole or in part, based on information from management during the performance of the audit. However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them. [Revised, April 1989, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards Nos. 53 through 62. As amended, effective for audits of financial statements for periods beginning on or after January 1, 1997, by Statement on Auditing Standards No. 78. Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997. Revised, April 2002, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 94.]

---

[3]  The responsibilities and functions of the independent auditor are also applicable to financial statements presented in conformity with a comprehensive basis of accounting other than generally accepted accounting principles: references in this section to financial statements presented in conformity with generally accepted accounting principles also include those presentations. [Footnote added, effective for audits of financial statements for periods beginning on or after January 1, 1997, by Statement on Auditing Standards No. 78. Footnote renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

# Professional Qualifications

**.04**    The professional qualifications required of the independent auditor are those of a person with the education and experience to practice as such. They do not include those of a person trained for or qualified to engage in another profession or occupation. For example, the independent auditor, in observing the taking of a physical inventory, does not purport to act as an appraiser, a valuer, or an expert in materials. Similarly, although the independent auditor is informed in a general manner about matters of commercial law, he does not purport to act in the capacity of a lawyer and may appropriately rely upon the advice of attorneys in all matters of law. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

**.05**    In the observance of generally accepted auditing standards, the independent auditor must exercise his judgment in determining which auditing procedures are necessary in the circumstances to afford a reasonable basis for his opinion. His judgment is required to be the informed judgment of a qualified professional person. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

# Detection of Fraud

**[.06-.09]**

[Superseded January 1977 by Statement on Auditing Standards No. 16, as superseded by Statement on Auditing Standards No. 53, as superseded by section 316 . Paragraphs renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

# Responsibility to the Profession

**.10**    The independent auditor also has a responsibility to his profession, the responsibility to comply with the standards accepted by his fellow practitioners. In

recognition of the importance of such compliance, the American Institute of Certified Public Accountants has adopted, as part of its Code of Professional Conduct , rules which support the standards and provide a basis for their enforcement. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 82, February 1997.]

Copyright © 2006 by American Institute of Certified Public Accountants, Inc., New York, NY. All rights reserved.

© Copyright 2006 RIA. All rights reserved.

# AU Section 230

## *Due Professional Care in the Performance of Work*[*] [§]

[*]  [Title amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]
[§]  This section has been amended by Statement on Auditing Standards No. 104, Amendment to Statement on Auditing Standards No. 1, Codification of Auditing Standards and Procedures ("Due Professional Care in the Performance of Work"). This section will be amended closer to the effective date of Statement on Auditing Standards No. 104, which is effective for audits of financial statements for periods beginning on or after December 15, 2006. Earlier application is permitted. Statement on Auditing Standards No. 104 is included in the " AU Risk Assessment Standards: SAS No. 104—SAS No. 111 " section, following the " AU Section 900—Special Reports of the Committee on Auditing Procedure " section, of this publication.

*For the PCAOB Interim Standard, please click here*

Source: SAS No. 1, section 230; SAS No. 41; SAS No. 82; SAS No. 99.

**Issue date, unless otherwise indicated: November, 1972.**

**.01**    The third general standard is:

> Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.[1]

[As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

[1]  This amendment revises the third general standard of the ten generally accepted auditing standards. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.02**    This standard requires the independent auditor to plan and perform his or her work with due professional care. Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting. [As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.03**    *Cooley on Torts*, a legal treatise, describes the obligation for due care as follows:

> Every man who offers his services to another and is employed assumes the duty to exercise in the employment such skill as he possesses with reasonable care and diligence. In all these employments where peculiar skill is requisite, if one offers his services, he is understood as holding himself out to the public as possessing the degree of skill commonly possessed by others in the same employment, and if his pretentions are unfounded, he commits a species of fraud upon every man who employs him in reliance on his public profession. But no man, whether skilled or unskilled, undertakes that the task he assumes shall be performed successfully, and without fault or error; he undertakes for good faith and integrity, but not for infallibility, and he is liable to his employer for

negligence, bad faith, or dishonesty, but not for losses consequent upon pure errors of judgment.[2]

[As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

---

[2]   D. Haggard, *Cooley on Torts*, 472 (4th ed., 1932). [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.04**    The matter of due professional care concerns what the independent auditor does and how well he or she does it. The quotation from *Cooley on Torts* provides a source from which an auditor's responsibility for conducting an audit with due professional care can be derived. The remainder of the section discusses the auditor's responsibility in the context of an audit. [As amended, April 1982, by Statement on Auditing Standards No. 41. As amended, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.05**    An auditor should possess "the degree of skill commonly possessed" by other auditors and should exercise it with "reasonable care and diligence" (that is, with due professional care). [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.06**    Auditors should be assigned to tasks and supervised commensurate with their level of knowledge, skill, and ability so that they can evaluate the audit evidence they are examining. The auditor with final responsibility for the engagement should know, at a minimum, the relevant professional accounting and auditing standards and should be knowledgeable about the client.[3] The auditor with final responsibility is responsible for the assignment of tasks to, and supervision of, assistants.[4] [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

---

[3]   See section 311, *Planning and Supervision*, paragraph .07 . [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]
[4]   See section 311.11 . [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

# Professional Skepticism

**.07**    Due professional care requires the auditor to exercise *professional skepticism*. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.08**    Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.09**    The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

## Reasonable Assurance

**.10**    The exercise of due professional care allows the auditor to obtain *reasonable assurance* that the financial statements are free of material misstatement, whether caused by error or fraud. Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud. Therefore, an audit conducted in accordance with generally accepted auditing standards may not detect a material misstatement. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.11**    The independent auditor's objective is to obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion. The nature of most evidence derives, in part, from the concept of selective testing of the data being audited, which involves judgment regarding both the areas to be tested and the nature, timing, and extent of the tests to be performed. In addition, judgment is required in interpreting the results of audit testing and evaluating audit evidence. Even with good faith and integrity, mistakes and errors in judgment can be made. Furthermore, accounting presentations contain accounting estimates, the measurement of which is inherently uncertain and depends on the outcome of future events. The auditor exercises professional judgment in evaluating the reasonableness of accounting estimates based on information that could reasonably be expected to be available prior to the completion of field work.[5] As a result of these factors, in the great majority of cases, the auditor has to rely on evidence that is persuasive rather than convincing.[6] [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

---

[5]   See section 342 , *Auditing Accounting Estimates*. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]
[6]   See section 326 , *Evidential Matter*. [Footnote added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

**.12**    Because of the characteristics of fraud, a properly planned and performed audit may not detect a material misstatement. Characteristics of fraud include (*a*) concealment through collusion among management, employees, or third parties; (*b*) withheld, misrepresented, or falsified documentation; and (*c*) the ability of management to override or instruct others to override what otherwise appears to be effective controls. For example, auditing procedures may be ineffective for detecting an intentional misstatement that is concealed through collusion among personnel within the entity and third parties or among management or employees of the entity. Collusion may cause the auditor who has properly performed the audit to conclude that evidence provided is persuasive when it is, in fact, false. In addition, an audit conducted in accordance with generally accepted auditing standards rarely involves authentication of documentation, nor are auditors trained as or expected to be experts in such authentication. Furthermore, an auditor may not discover the existence of a modification of documentation through a side agreement that management or a third party has not disclosed. Finally, management has the ability to directly or indirectly manipulate accounting records and present fraudulent financial information by overriding controls in unpredictable ways. [Paragraph added, effective for audits of financial statements for

periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82. As amended, effective for audits of financial statements for periods beginning on or after December 15, 2002, by Statement on Auditing Standards No. 99.]

**.13**    Since the auditor's opinion on the financial statements is based on the concept of obtaining reasonable assurance, the auditor is not an insurer and his or her report does not constitute a guarantee. Therefore, the subsequent discovery that a material misstatement, whether from error or fraud, exists in the financial statements does not, in and of itself, evidence (*a*) failure to obtain reasonable assurance, (*b*) inadequate planning, performance, or judgment, (*c*) the absence of due professional care, or (*d*) a failure to comply with generally accepted auditing standards. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

Copyright © 2006 by American Institute of Certified Public Accountants, Inc., New York, NY. All rights reserved.

© Copyright 2006 RIA. All rights reserved.

# AU Section 316

## *Consideration of Fraud in a Financial Statement Audit*

*For the PCAOB Interim Standard, please click here*

(Supersedes SAS No. 82)

Source: SAS No. 99.

**Effective for audits of financial statements for periods beginning on or after December 15, 2002.**

# Introduction and Overview

**.01**    Section 110, *Responsibilities and Functions of the Independent Auditor*, paragraph .02 , states, "The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud. [footnote omitted]"[1] This section establishes standards and provides guidance to auditors in fulfilling that responsibility, as it relates to fraud, in an audit of financial statements conducted in accordance with generally accepted auditing standards (GAAS).[2]

---

[1]  The auditor's consideration of illegal acts and responsibility for detecting misstatements resulting from illegal acts is defined in section 317 , *Illegal Acts by Clients*. For those illegal acts that are defined in that section as having a direct and material effect on the determination of financial statement amounts, the auditor's responsibility to detect misstatements resulting from such illegal acts is the same as that for errors (see section 312 , *Audit Risk and Materiality in Conducting an Audit*, or fraud).

[2]  Auditors are sometimes requested to perform other services related to fraud detection and prevention, for example, special investigations to determine the extent of a suspected or detected fraud. These other services usually include procedures that extend beyond or are different from the procedures ordinarily performed in an audit of financial statements in accordance with generally accepted auditing standards (GAAS). AT section 101 , *Attest Engagements*, and CS section 100 , *Consulting Services: Definitions and Standards*, provide guidance to accountants relating to the performance of such services.

**.02**    The following is an overview of the organization and content of this section:

- *Description and characteristics of fraud.* This section describes fraud and its characteristics. (See paragraphs .05 through .12 .)
- *The importance of exercising professional skepticism.* This section discusses the need for auditors to exercise professional skepticism when considering the possibility that a material misstatement due to fraud could be present. (See paragraph .13 .)
- *Discussion among engagement personnel regarding the risks of material misstatement due to fraud.* This section requires, as part of planning the audit, that there be a discussion among the audit team members to consider how and where the entity's financial statements might be susceptible to material misstatement due to fraud and to reinforce the importance of adopting an appropriate mindset of professional skepticism. (See paragraphs .14 through .18 .)
- *Obtaining the information needed to identify risks of material misstatement due to fraud.* This section requires the auditor to gather information necessary to identify risks of material misstatement due to fraud, by

*a.*    Inquiring of management and others within the entity about the risks of fraud. (See paragraphs .20 through .27 .)
*b.*    Considering the results of the analytical procedures performed in planning the audit. (See paragraphs .28 through .30 .)
*c.*    Considering fraud risk factors. (See paragraphs .31 through .33 , and the Appendix, "Examples of Fraud Risk Factors" [ paragraph .85 ].)
*d.*    Considering certain other information. (See paragraph .34 .)

- *Identifying risks that may result in a material misstatement due to fraud.* This section requires the auditor to use the information gathered to identify risks that may result in a material misstatement due to fraud. (See paragraphs .35 through .42 .)
- *Assessing the identified risks after taking into account an evaluation of the entity's programs and controls.* This section requires the auditor to evaluate the entity's programs and controls that address the identified risks of material misstatement due to fraud, and to assess the risks taking into account this evaluation. (See paragraphs .43 through .45 .)
- *Responding to the results of the assessment.* This section emphasizes that the auditor's response to the risks of material misstatement due to fraud involves the application of professional skepticism when gathering and evaluating audit evidence. (See paragraph .46 through .49 .) The section requires the auditor to respond to the results of the risk assessment in three ways:

    *a.*    A response that has an overall effect on how the audit is conducted, that is, a response involving more general considerations apart from the specific procedures otherwise planned. (See paragraph .50 .)
    *b.*    A response to identified risks that involves the nature, timing, and extent of the auditing procedures to be performed. (See paragraphs .51 through .56 .)
    *c.*    A response involving the performance of certain procedures to further address the risk of material misstatement due to fraud involving management override of controls. (See paragraphs .57 through .67 .)

- *Evaluating audit evidence.* This section requires the auditor to assess the risks of material misstatement due to fraud throughout the audit and to evaluate at the completion of the audit whether the accumulated results of auditing procedures and other observations affect the assessment. (See paragraphs .68 through .74 .) It also requires the auditor to consider whether identified misstatements may be indicative of fraud and, if so, directs the auditor to evaluate their implications. (See paragraphs .75 through .78 .)
- *Communicating about fraud to management, the audit committee, and others.* This section provides guidance regarding the auditor's communications about fraud to management, the audit committee, and others. (See paragraphs .79 through .82 .)
- *Documenting the auditor's consideration of fraud.* This section describes related documentation requirements. (See paragraph .83 .)

**.03**    The requirements and guidance set forth in this section are intended to be integrated into an overall audit process, in a logical manner that is consistent with the requirements and guidance provided in other sections, including section 311 , *Planning and Supervision*; section 312 , *Audit Risk and Materiality in Conducting an Audit*; and section 319 , *Consideration of Internal Control in a Financial Statement Audit.* Even though some requirements and guidance set forth in this section are presented in a manner that suggests a sequential audit process, auditing in fact involves a continuous process of gathering, updating, and analyzing information throughout the audit.

Accordingly the sequence of the requirements and guidance in this section may be implemented differently among audit engagements.

**.04**   Although this section focuses on the auditor's consideration of fraud in an audit of financial statements, it is management's responsibility to design and implement programs and controls to prevent, deter, and detect fraud.[3] That responsibility is described in section 110.03 , which states, "Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements." Management, along with those who have responsibility for oversight of the financial reporting process (such as the audit committee, board of trustees, board of directors, or the owner in owner-managed entities), should set the proper tone; create and maintain a culture of honesty and high ethical standards; and establish appropriate controls to prevent, deter, and detect fraud. When management and those responsible for the oversight of the financial reporting process fulfill those responsibilities, the opportunities to commit fraud can be reduced significantly.

---

[3]   In its October 1987 report, the National Commission on Fraudulent Financial Reporting, also known as the Treadway Commission, noted, "The responsibility for reliable financial reporting resides first and foremost at the corporate level. Top management, starting with the chief executive officer, sets the tone and establishes the financial reporting environment. Therefore, reducing the risk of fraudulent financial reporting must start with the reporting company."

# Description and Characteristics of Fraud

**.05**   Fraud is a broad legal concept and auditors do not make legal determinations of whether fraud has occurred. Rather, the auditor's interest specifically relates to acts that result in a material misstatement of the financial statements. The primary factor that distinguishes fraud from error is whether the underlying action that results in the misstatement of the financial statements is intentional or unintentional. For purposes of the section, *fraud* is an intentional act that results in a material misstatement in financial statements that are the subject of an audit.[4]

---

[4]   Intent is often difficult to determine, particularly in matters involving accounting estimates and the application of accounting principles. For example, unreasonable accounting estimates may be unintentional or may be the result of an intentional attempt to misstate the financial statements. Although an audit is not designed to determine intent, the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether the misstatement is intentional or not.

**.06**   Two types of misstatements are relevant to the auditor's consideration of fraud— misstatements arising from fraudulent financial reporting and misstatements arising from misappropriation of assets.

- *Misstatements arising from fraudulent financial reporting* are intentional misstatements or omissions of amounts or disclosures in financial statements designed to deceive financial statement users where the effect causes the financial statements not to be presented, in all material respects, in conformity with generally accepted accounting principles (GAAP).[5] Fraudulent financial reporting may be accomplished by the following:

    -   Manipulation, falsification, or alteration of accounting records or supporting documents from which financial statements are prepared
    -   Misrepresentation in or intentional omission from the financial statements of events, transactions, or other significant information

**A-40**

-    Intentional misapplication of accounting principles relating to amounts, classification, manner of presentation, or disclosure

Fraudulent financial reporting need not be the result of a grand plan or conspiracy. It may be that management representatives rationalize the appropriateness of a material misstatement, for example, as an aggressive rather than indefensible interpretation of complex accounting rules, or as a temporary misstatement of financial statements, including interim statements, expected to be corrected later when operational results improve.

•    *Misstatements arising from misappropriation of assets* (sometimes referred to as theft or defalcation) involve the theft of an entity's assets where the effect of the theft causes the financial statements not to be presented, in all material respects, in conformity with GAAP. Misappropriation of assets can be accomplished in various ways, including embezzling receipts, stealing assets, or causing an entity to pay for goods or services that have not been received. Misappropriation of assets may be accompanied by false or misleading records or documents, possibly created by circumventing controls. The scope of this section includes only those misappropriations of assets for which the effect of the misappropriation causes the financial statements not to be fairly presented, in all material respects, in conformity with GAAP.

---

[5]  Reference to generally accepted accounting principles (GAAP) includes, where applicable, a comprehensive basis of accounting other than GAAP as defined in section 623, *Special Reports*, paragraph .04 .

**.07**    Three conditions generally are present when fraud occurs. First, management or other employees have an *incentive* or are under *pressure*, which provides a reason to commit fraud. Second, circumstances exist—for example, the absence of controls, ineffective controls, or the ability of management to override controls—that provide an *opportunity* for a fraud to be perpetrated. Third, those involved are able to *rationalize* committing a fraudulent act. Some individuals possess an *attitude*, character, or set of ethical values that allow them to knowingly and intentionally commit a dishonest act. However, even otherwise honest individuals can commit fraud in an environment that imposes sufficient pressure on them. The greater the incentive or pressure, the more likely an individual will be able to rationalize the acceptability of committing fraud.

**.08**    Management has a unique ability to perpetrate fraud because it frequently is in a position to directly or indirectly manipulate accounting records and present fraudulent financial information. Fraudulent financial reporting often involves management override of controls that otherwise may appear to be operating effectively.[6] Management can either direct employees to perpetrate fraud or solicit their help in carrying it out. In addition, management personnel at a component of the entity may be in a position to manipulate the accounting records of the component in a manner that causes a material misstatement in the consolidated financial statements of the entity. Management override of controls can occur in unpredictable ways.

---

[6]  Frauds have been committed by management override of existing controls using such techniques as (*a*) recording fictitious journal entries, particularly those recorded close to the end of an accounting period to manipulate operating results, (*b*) intentionally biasing assumptions and judgments used to estimate account balances, and (*c*) altering records and terms related to significant and unusual transactions.

**.09**    Typically, management and employees engaged in fraud will take steps to conceal the fraud from the auditors and others within and outside the organization. Fraud may be concealed by withholding evidence or misrepresenting information in response to

inquiries or by falsifying documentation. For example, management that engages in fraudulent financial reporting might alter shipping documents. Employees or members of management who misappropriate cash might try to conceal their thefts by forging signatures or falsifying electronic approvals on disbursement authorizations. An audit conducted in accordance with GAAS rarely involves the authentication of such documentation, nor are auditors trained as or expected to be experts in such authentication. In addition, an auditor may not discover the existence of a modification of documentation through a side agreement that management or a third party has not disclosed.

**.10**    Fraud also may be concealed through collusion among management, employees, or third parties. Collusion may cause the auditor who has properly performed the audit to conclude that evidence provided is persuasive when it is, in fact, false. For example, through collusion, false evidence that controls have been operating effectively may be presented to the auditor, or consistent misleading explanations may be given to the auditor by more than one individual within the entity to explain an unexpected result of an analytical procedure. As another example, the auditor may receive a false confirmation from a third party that is in collusion with management.

**.11**    Although fraud usually is concealed and management's intent is difficult to determine, the presence of certain conditions may suggest to the auditor the possibility that fraud may exist. For example, an important contract may be missing, a subsidiary ledger may not be satisfactorily reconciled to its control account, or the results of an analytical procedure performed during the audit may not be consistent with expectations. However, these conditions may be the result of circumstances other than fraud. Documents may legitimately have been lost or misfiled; the subsidiary ledger may be out of balance with its control account because of an unintentional accounting error; and unexpected analytical relationships may be the result of unanticipated changes in underlying economic factors. Even reports of alleged fraud may not always be reliable because an employee or outsider may be mistaken or may be motivated for unknown reasons to make a false allegation.

**.12**    As indicated in paragraph .01 , the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by fraud or error.[7] However, absolute assurance is not attainable and thus even a properly planned and performed audit may not detect a material misstatement resulting from fraud. A material misstatement may not be detected because of the nature of audit evidence or because the characteristics of fraud as discussed above may cause the auditor to rely unknowingly on audit evidence that appears to be valid, but is, in fact, false and fraudulent. Furthermore, audit procedures that are effective for detecting an error may be ineffective for detecting fraud.

---

[7]   For a further discussion of the concept of reasonable assurance, see section 230, *Due Professional Care in the Performance of Work*, paragraphs .10 through .13 .

# The Importance of Exercising Professional Skepticism

**.13**    Due professional care requires the auditor to exercise professional skepticism. See section 230, *Due Professional Care in the Performance of Work*, paragraphs .07 through .09 . Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a

mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

## Discussion Among Engagement Personnel Regarding the Risks of Material Misstatement Due to Fraud

**.14**    Prior to or in conjunction with the information-gathering procedures described in paragraphs .19 through .34 of this section, members of the audit team should discuss the potential for material misstatement due to fraud. The discussion should include:

- An exchange of ideas or "brainstorming" among the audit team members, including the auditor with final responsibility for the audit, about how and where they believe the entity's financial statements might be susceptible to material misstatement due to fraud, how management could perpetrate and conceal fraudulent financial reporting, and how assets of the entity could be misappropriated. (See paragraph .15 .)
- An emphasis on the importance of maintaining the proper state of mind throughout the audit regarding the potential for material misstatement due to fraud. (See paragraph .16 .)

**.15**    The discussion among the audit team members about the susceptibility of the entity's financial statements to material misstatement due to fraud should include a consideration of the known external and internal factors affecting the entity that might (*a*) create incentives/pressures for management and others to commit fraud, (*b*) provide the opportunity for fraud to be perpetrated, and (*c*) indicate a culture or environment that enables management to rationalize committing fraud. The discussion should occur with an attitude that includes a questioning mind as described in paragraph .16 and, for this purpose, setting aside any prior beliefs the audit team members may have that management is honest and has integrity. In this regard, the discussion should include a consideration of the risk of management override of controls.[8] Finally, the discussion should include how the auditor might respond to the susceptibility of the entity's financial statements to material misstatement due to fraud.

[8]   See footnote 6.
[Footnote 6: Management may elect to have internal audit play an active role in the development, monitoring, and ongoing assessment of the entity's fraud risk-management program. This may include an active role in the development and communication of the entity's code of conduct or ethics policy, as well as in investigating actual or alleged instances of noncompliance.].

**.16**    The discussion among the audit team members should emphasize the need to maintain a questioning mind and to exercise professional skepticism in gathering and evaluating evidence throughout the audit, as described in paragraph .13 . This should lead the audit team members to continually be alert for information or other conditions (such as those presented in paragraph .68 ) that indicate a material misstatement due to fraud may have occurred. It should also lead audit team members to thoroughly probe the issues, acquire additional evidence as necessary, and consult with other team members and, if appropriate, experts in the firm, rather than rationalize or dismiss

information or other conditions that indicate a material misstatement due to fraud may have occurred.

**.17**    Although professional judgment should be used in determining which audit team members should be included in the discussion, the discussion ordinarily should involve the key members of the audit team. A number of factors will influence the extent of the discussion and how it should occur. For example, if the audit involves more than one location, there could be multiple discussions with team members in differing locations. Another factor to consider in planning the discussions is whether to include specialists assigned to the audit team. For example, if the auditor has determined that a professional possessing information technology skills is needed on the audit team (see section 319.32 ), it may be useful to include that individual in the discussion.

**.18**    Communication among the audit team members about the risks of material misstatement due to fraud also should continue throughout the audit—for example, in evaluating the risks of material misstatement due to fraud at or near the completion of the field work. (See paragraph .74 and footnote 28 .)

## Obtaining the Information Needed to Identify the Risks of Material Misstatement Due to Fraud

**.19**    Section 311.06–.08 provides guidance about how the auditor obtains knowledge about the entity's business and the industry in which it operates. In performing that work, information may come to the auditor's attention that should be considered in identifying risks of material misstatement due to fraud. As part of this work, the auditor should perform the following procedures to obtain information that is used (as described in paragraphs .35 through .42 ) to identify the risks of material misstatement due to fraud:

> *a.*    Make inquiries of management and others within the entity to obtain their views about the risks of fraud and how they are addressed. (See paragraphs .20 through .27 .)
> *b.*    Consider any unusual or unexpected relationships that have been identified in performing analytical procedures in planning the audit. (See paragraphs .28 through .30 .)
> *c.*    Consider whether one or more fraud risk factors exist. (See paragraphs .31 through .33 , and the Appendix [ paragraph .85 ].)
> *d.*    Consider other information that may be helpful in the identification of risks of material misstatement due to fraud. (See paragraph .34 .)

## Making Inquiries of Management and Others Within the Entity About the Risks of Fraud

**.20**    The auditor should inquire of management about:[9]

- Whether management has knowledge of any fraud or suspected fraud affecting the entity
- Whether management is aware of allegations of fraud or suspected fraud affecting the entity, for example, received in communications from employees, former employees, analysts, regulators, short sellers, or others

- Management's understanding about the risks of fraud in the entity, including any specific fraud risks the entity has identified or account balances or classes of transactions for which a risk of fraud may be likely to exist
- Programs and controls[10] the entity has established to mitigate specific fraud risks the entity has identified, or that otherwise help to prevent, deter, and detect fraud, and how management monitors those programs and controls. For examples of programs and controls an entity may implement to prevent, deter, and detect fraud, see the exhibit titled "Management Antifraud Programs and Controls" [ paragraph .86 ] at the end of this section.
- For an entity with multiple locations, (*a*) the nature and extent of monitoring of operating locations or business segments, and (*b*) whether there are particular operating locations or business segments for which a risk of fraud may be more likely to exist
- Whether and how management communicates to employees its views on business practices and ethical behavior

---

[9]  In addition to these inquiries, section 333 , *Management Representations*, requires the auditor to obtain selected written representations from management regarding fraud.
[10]  Section 319, *Consideration of Internal Control in a Financial Statement Audit*, paragraphs .06 and .07 , defines internal control and its five interrelated components (the control environment, risk assessment, control activities, information and communication, and monitoring). Entity programs and controls intended to address the risks of fraud may be part of any of the five components discussed in section 319 .

**.21**    The inquiries of management also should include whether management has reported to the audit committee or others with equivalent authority and responsibility[11] (hereafter referred to as the audit committee) on how the entity's internal control[12] serves to prevent, deter, or detect material misstatements due to fraud.

---

[11]  Examples of "others with equivalent authority and responsibility" may include the board of directors, the board of trustees, or the owner in an owner-managed entity, as appropriate.
[12]  See footnote 10.
[Footnote 10: See section 325A , *Communication of Internal Control Related Matters Noted in an Audit*, and section 380 , *Communications With Audit Committees*.].

**.22**    The auditor also should inquire directly of the audit committee (or at least its chair) regarding the audit committee's views about the risks of fraud and whether the audit committee has knowledge of any fraud or suspected fraud affecting the entity. An entity's audit committee sometimes assumes an active role in oversight of the entity's assessment of the risks of fraud and the programs and controls the entity has established to mitigate these risks. The auditor should obtain an understanding of how the audit committee exercises oversight activities in that area.

**.23**    For entities that have an internal audit function, the auditor also should inquire of appropriate internal audit personnel about their views about the risks of fraud, whether they have performed any procedures to identify or detect fraud during the year, whether management has satisfactorily responded to any findings resulting from these procedures, and whether the internal auditors have knowledge of any fraud or suspected fraud.

**.24**    In addition to the inquiries outlined in paragraphs .20 through .23 , the auditor should inquire of others within the entity about the existence or suspicion of fraud. The auditor should use professional judgment to determine those others within the entity to whom inquiries should be directed and the extent of such inquiries. In making this determination, the auditor should consider whether others within the entity may be able to provide information that will be helpful to the auditor in identifying risks of material

misstatement due to fraud—for example, others who may have additional knowledge about or be able to corroborate risks of fraud identified in the discussions with management (see paragraph .20 ) or the audit committee (see paragraph .22 ).

**.25**    Examples of others within the entity to whom the auditor may wish to direct these inquiries include:

- Employees with varying levels of authority within the entity, including, for example, entity personnel with whom the auditor comes into contact during the course of the audit in obtaining (*a*) an understanding of the entity's systems and internal control, (*b*) in observing inventory or performing cutoff procedures, or (*c*) in obtaining explanations for fluctuations noted as a result of analytical procedures
- Operating personnel not directly involved in the financial reporting process
- Employees involved in initiating, recording, or processing complex or unusual transactions—for example, a sales transaction with multiple elements, or a significant related party transaction
- In-house legal counsel

**.26**    The auditor's inquiries of management and others within the entity are important because fraud often is uncovered through information received in response to inquiries. One reason for this is that such inquiries may provide individuals with an opportunity to convey information to the auditor that otherwise might not be communicated. Making inquiries of others within the entity, in addition to management, may be useful in providing the auditor with a perspective that is different from that of individuals involved in the financial reporting process. The responses to these other inquiries might serve to corroborate responses received from management, or alternatively, might provide information regarding the possibility of management override of controls—for example, a response from an employee indicating an unusual change in the way transactions have been processed. In addition, the auditor may obtain information from these inquiries regarding how effectively management has communicated standards of ethical behavior to individuals throughout the organization.

**.27**    The auditor should be aware when evaluating management's responses to the inquiries discussed in paragraph .20 that management is often in the best position to perpetrate fraud. The auditor should use professional judgment in deciding when it is necessary to corroborate responses to inquiries with other information. However, when responses are inconsistent among inquiries, the auditor should obtain additional audit evidence to resolve the inconsistencies.

## Considering the Results of the Analytical Procedures Performed in Planning the Audit

**.28**    Section 329, *Analytical Procedures*, paragraphs .04 and .06 , requires that analytical procedures be performed in planning the audit with an objective of identifying the existence of unusual transactions or events, and amounts, ratios, and trends that might indicate matters that have financial statement and audit planning implications. In performing analytical procedures in planning the audit, the auditor develops expectations about plausible relationships that are reasonably expected to exist, based on the auditor's understanding of the entity and its environment. When comparison of those expectations with recorded amounts or ratios developed from recorded amounts yields unusual or unexpected relationships, the auditor should consider those results in identifying the risks of material misstatement due to fraud.

**.29**    In planning the audit, the auditor also should perform analytical procedures relating to revenue with the objective of identifying unusual or unexpected relationships involving revenue accounts that may indicate a material misstatement due to fraudulent financial reporting. An example of such an analytical procedure that addresses this objective is a comparison of sales volume, as determined from recorded revenue amounts, with production capacity. An excess of sales volume over production capacity may be indicative of recording fictitious sales. As another example, a trend analysis of revenues by month and sales returns by month during and shortly after the reporting period may indicate the existence of undisclosed side agreements with customers to return goods that would preclude revenue recognition.[13]

[13]    See paragraph .70 for a discussion of the need to update these analytical procedures during the overall review stage of the audit.

**.30**    Analytical procedures performed during planning may be helpful in identifying the risks of material misstatement due to fraud. However, because such analytical procedures generally use data aggregated at a high level, the results of those analytical procedures provide only a broad initial indication about whether a material misstatement of the financial statements may exist. Accordingly, the results of analytical procedures performed during planning should be considered along with other information gathered by the auditor in identifying the risks of material misstatement due to fraud.

## Considering Fraud Risk Factors

**.31**    Because fraud is usually concealed, material misstatements due to fraud are difficult to detect. Nevertheless, the auditor may identify events or conditions that indicate incentives/pressures to perpetrate fraud, opportunities to carry out the fraud, or attitudes/rationalizations to justify a fraudulent action. Such events or conditions are referred to as "fraud risk factors." Fraud risk factors do not necessarily indicate the existence of fraud; however, they often are present in circumstances where fraud exists.

**.32**    When obtaining information about the entity and its environment, the auditor should consider whether the information indicates that one or more fraud risk factors are present. The auditor should use professional judgment in determining whether a risk factor is present and should be considered in identifying and assessing the risks of material misstatement due to fraud.

**.33**    Examples of fraud risk factors related to fraudulent financial reporting and misappropriation of assets are presented in the Appendix [ paragraph .85 ]. These illustrative risk factors are classified based on the three conditions generally present when fraud exists: *incentive/pressure* to perpetrate fraud, an *opportunity* to carry out the fraud, and *attitude/rationalization* to justify the fraudulent action. Although the risk factors cover a broad range of situations, they are only examples and, accordingly, the auditor may wish to consider additional or different risk factors. Not all of these examples are relevant in all circumstances, and some may be of greater or lesser significance in entities of different size or with different ownership characteristics or circumstances. Also, the order of the examples of risk factors provided is not intended to reflect their relative importance or frequency of occurrence.

## Considering Other Information That May Be Helpful in Identifying Risks of Material Misstatement Due to Fraud

**.34**    The auditor should consider other information that may be helpful in identifying risks of material misstatement due to fraud. Specifically, the discussion among the engagement team members (see paragraphs .14 through .18 ) may provide information helpful in identifying such risks. In addition, the auditor should consider whether information from the results of (*a*) procedures relating to the acceptance and continuance of clients and engagements[14] and (*b*) reviews of interim financial statements may be relevant in the identification of such risks. Finally, as part of the consideration of audit risk at the individual account balance or class of transaction level (see section 312.24 through .33 ), the auditor should consider whether identified inherent risks would provide useful information in identifying the risks of material misstatement due to fraud (see paragraph .39 ).

---

[14]    See Statement on Quality Control Standards (SQCS) No. 2, *System of Quality Control for a CPA Firm's Accounting and Auditing Practice* [ QC section 20.14–.16 ], as amended.

# Identifying Risks That May Result in a Material Misstatement Due to Fraud

## Using the Information Gathered to Identify Risk of Material Misstatements Due to Fraud

**.35**    In identifying risks of material misstatement due to fraud, it is helpful for the auditor to consider the information that has been gathered (see paragraphs .19 through .34 ) in the context of the three conditions present when a material misstatement due to fraud occurs—that is, incentives/pressures, opportunities, and attitudes/rationalizations (see paragraph .07 ). However, the auditor should not assume that all three conditions must be observed or evident before concluding that there are identified risks. Although the risk of material misstatement due to fraud may be greatest when all three fraud conditions are observed or evident, the auditor cannot assume that the inability to observe one or two of these conditions means there is no risk of material misstatement due to fraud. In fact, observing that individuals have the requisite attitude to commit fraud, or identifying factors that indicate a likelihood that management or other employees will rationalize committing a fraud, is difficult at best.

**.36**    In addition, the extent to which each of the three conditions referred to above are present when fraud occurs may vary. In some instances the significance of incentives/pressures may result in a risk of material misstatement due to fraud, apart from the significance of the other two conditions. For example, an incentive/pressure to achieve an earnings level to preclude a loan default, or to "trigger" incentive compensation plan awards, may alone result in a risk of material misstatement due to fraud. In other instances, an easy opportunity to commit the fraud because of a lack of controls may be the dominant condition precipitating the risk of fraud, or an individual's attitude or ability to rationalize unethical actions may be sufficient to motivate that individual to engage in fraud, even in the absence of significant incentives/pressures or opportunities.

**.37**    The auditor's identification of fraud risks also may be influenced by characteristics such as the size, complexity, and ownership attributes of the entity. For example, in the case of a larger entity, the auditor ordinarily considers factors that generally constrain improper conduct by management, such as the effectiveness of the audit committee and the internal audit function, and the existence and enforcement of a formal code of conduct. In the case of a smaller entity, some or all of these considerations may be inapplicable or less important, and management may have developed a culture that

emphasizes the importance of integrity and ethical behavior through oral communication and management by example. Also, the risks of material misstatement due to fraud may vary among operating locations or business segments of an entity, requiring an identification of the risks related to specific geographic areas or business segments, as well as for the entity as a whole.[15]

---

[15]   Section 312.18 provides guidance on the auditor's consideration of the extent to which auditing procedures should be performed at selected locations or components.

**.38**   The auditor should evaluate whether identified risks of material misstatement due to fraud can be related to specific financial-statement account balances or classes of transactions and related assertions, or whether they relate more pervasively to the financial statements as a whole. Relating the risks of material misstatement due to fraud to the individual accounts, classes of transactions, and assertions will assist the auditor in subsequently designing appropriate auditing procedures.

**.39**   Certain accounts, classes of transactions, and assertions that have high inherent risk because they involve a high degree of management judgment and subjectivity also may present risks of material misstatement due to fraud because they are susceptible to manipulation by management. For example, liabilities resulting from a restructuring may be deemed to have high inherent risk because of the high degree of subjectivity and management judgment involved in their estimation. Similarly, revenues for software developers may be deemed to have high inherent risk because of the complex accounting principles applicable to the recognition and measurement of software revenue transactions. Assets resulting from investing activities may be deemed to have high inherent risk because of the subjectivity and management judgment involved in estimating fair values of those investments.

**.40**   In summary, the identification of a risk of material misstatement due to fraud involves the application of professional judgment and includes the consideration of the attributes of the risk, including:

- The *type* of risk that may exist, that is, whether it involves fraudulent financial reporting or misappropriation of assets
- The *significance* of the risk, that is, whether it is of a magnitude that could lead to result in a possible material misstatement of the financial statements
- The *likelihood* of the risk, that is, the likelihood that it will result in a material misstatement in the financial statements[16]
- The *pervasiveness* of the risk, that is, whether the potential risk is pervasive to the financial statements as a whole or specifically related to a particular assertion, account, or class of transactions.

---

[16]   The occurrence of material misstatements of financial statements due to fraud is relatively infrequent in relation to the total population of published financial statements. However, the auditor should not use this as a basis to conclude that one or more risks of a material misstatement due to fraud are not present in a particular entity.

## A Presumption That Improper Revenue Recognition Is a Fraud Risk

**.41**   Material misstatements due to fraudulent financial reporting often result from an overstatement of revenues (for example, through premature revenue recognition or recording fictitious revenues) or an understatement of revenues (for example, through improperly shifting revenues to a later period). Therefore, the auditor should ordinarily

presume that there is a risk of material misstatement due to fraud relating to revenue recognition. (See paragraph .54 for examples of auditing procedures related to the risk of improper revenue recognition.)[17]

[17]  For a discussion of indicators of improper revenue recognition and common techniques for overstating revenue and illustrative audit procedures, see the AICPA Audit Guide *Auditing Revenue in Certain Industries* .

## A Consideration of the Risk of Management Override of Controls

**.42**    Even if specific risks of material misstatement due to fraud are not identified by the auditor, there is a possibility that management override of controls could occur, and accordingly, the auditor should address that risk (see paragraph .57 ) apart from any conclusions regarding the existence of more specifically identifiable risks.

## Assessing the Identified Risks After Taking Into Account an Evaluation of the Entity's Programs and Controls That Address the Risks

**.43**     Section 319 requires the auditor to obtain an understanding of each of the five components of internal control sufficient to plan the audit. It also notes that such knowledge should be used to identify types of potential misstatements, consider factors that affect the risk of material misstatement, design tests of controls when applicable, and design substantive tests. Additionally, section 319 notes that controls, whether manual or automated, can be circumvented by collusion of two or more people or inappropriate management override of internal control.

**.44**    As part of the understanding of internal control sufficient to plan the audit, the auditor should evaluate whether entity programs and controls that address identified risks of material misstatement due to fraud have been suitably designed and placed in operation.[18] These programs and controls may involve (*a*) specific controls designed to mitigate specific risks of fraud—for example, controls to address specific assets susceptible to misappropriation, and (*b*) broader programs designed to prevent, deter, and detect fraud—for example, programs to promote a culture of honesty and ethical behavior. The auditor should consider whether such programs and controls mitigate the identified risks of material misstatement due to fraud or whether specific control deficiencies may exacerbate the risks (see paragraph .80 ). The exhibit at the end of this section [ paragraph .86 ] discusses examples of programs and controls an entity might implement to create a culture of honesty and ethical behavior, and that help to prevent, deter, and detect fraud.

[18]  See footnote 10.
[Footnote 10: See section 325A , *Communication of Internal Control Related Matters Noted in an Audit*, and section 380 , *Communications With Audit Committees*.].

**.45**    After the auditor has evaluated whether the entity's programs and controls that address identified risks of material misstatement due to fraud have been suitably designed and placed in operation, the auditor should assess these risks taking into account that evaluation. This assessment should be considered when developing the auditor's response to the identified risks of material misstatement due to fraud (see paragraphs .46 through .67 ).[19]

[19] Notwithstanding that the auditor assesses identified risks of material misstatement due to fraud, the assessment need not encompass an overall judgment about whether risk for the entity is classified as *high, medium,* or *low* because such a judgment is too broad to be useful in developing the auditor's response described in paragraphs .46 through .67 .

# Responding to the Results of the Assessment

**.46**    The auditor's response to the assessment of the risks of material misstatement due to fraud involves the application of professional skepticism in gathering and evaluating audit evidence. As noted in paragraph .13 , professional skepticism is an attitude that includes a critical assessment of the competency and sufficiency of audit evidence. Examples of the application of professional skepticism in response to the risks of material misstatement due to fraud are (*a*) designing additional or different auditing procedures to obtain more reliable evidence in support of specified financial statement account balances, classes of transactions, and related assertions, and (*b*) obtaining additional corroboration of management's explanations or representations concerning material matters, such as through third-party confirmation, the use of a specialist, analytical procedures, examination of documentation from independent sources, or inquiries of others within or outside the entity.

**.47**    The auditor's response to the assessment of the risks of material misstatement of the financial statements due to fraud is influenced by the nature and significance of the risks identified as being present ( paragraphs .35 through .42 ) and the entity's programs and controls that address these identified risks ( paragraphs .43 through .45 ).

**.48**    The auditor responds to risks of material misstatement due to fraud in the following three ways:

> *a.*    A response that has an overall effect on how the audit is conducted—that is, a response involving more general considerations apart from the specific procedures otherwise planned (see paragraph .50 ).
> *b.*    A response to identified risks involving the nature, timing, and extent of the auditing procedures to be performed (see paragraphs .51 through .56 ).
> *c.*    A response involving the performance of certain procedures to further address the risk of material misstatement due to fraud involving management override of controls, given the unpredictable ways in which such override could occur (see paragraphs .57 through .67 ).

**.49**    The auditor may conclude that it would not be practicable to design auditing procedures that sufficiently address the risks of material misstatement due to fraud. In that case, withdrawal from the engagement with communication to the appropriate parties may be an appropriate course of action (see paragraph .78 ).

## Overall Responses to the Risk of Material Misstatement

**.50**    Judgments about the risk of material misstatement due to fraud have an overall effect on how the audit is conducted in the following ways:

> •    *Assignment of personnel and supervision.* The knowledge, skill, and ability of personnel assigned significant engagement responsibilities should be commensurate with the auditor's assessment of the risks of material misstatement due to fraud for the engagement (see section 210, *Training and Proficiency of the Independent Auditor*, paragraph .03 ). For example, the auditor may respond to an identified risk of material misstatement due to fraud by

assigning additional persons with specialized skill and knowledge, such as forensic and information technology (IT) specialists, or by assigning more experienced personnel to the engagement. In addition, the extent of supervision should reflect the risks of material misstatement due to fraud (see section 311.11 ).

- *Accounting principles.* The auditor should consider management's selection and application of significant accounting principles, particularly those related to subjective measurements and complex transactions. In this respect, the auditor may have a greater concern about whether the accounting principles selected and policies adopted are being applied in an inappropriate manner to create a material misstatement of the financial statements. In developing judgments about the quality of such principles (see section 380, *Communication With Audit Committees*, paragraph .11 ), the auditor should consider whether their collective application indicates a bias that may create such a material misstatement of the financial statements.

- *Predictability of auditing procedures.* The auditor should incorporate an element of unpredictability in the selection from year to year of auditing procedures to be performed—for example, performing substantive tests of selected account balances and assertions not otherwise tested due to their materiality or risk, adjusting the timing of testing from that otherwise expected, using differing sampling methods, and performing procedures at different locations or at locations on an unannounced basis.

## Responses Involving the Nature, Timing, and Extent of Procedures to Be Performed to Address the Identified Risks

**.51**    The auditing procedures performed in response to identified risks of material misstatement due to fraud will vary depending upon the types of risks identified and the account balances, classes of transactions, and related assertions that may be affected. These procedures may involve both substantive tests and tests of the operating effectiveness of the entity's programs and controls. However, because management may have the ability to override controls that otherwise appear to be operating effectively (see paragraph .08 ), it is unlikely that audit risk can be reduced to an appropriately low level by performing only tests of controls.

**.52**    The auditor's responses to address specifically identified risks of material misstatement due to fraud may include changing the nature, timing, and extent of auditing procedures in the following ways:

- The *nature* of auditing procedures performed may need to be changed to obtain evidence that is more reliable or to obtain additional corroborative information. For example, more evidential matter may be needed from independent sources outside the entity, such as public-record information about the existence and nature of key customers, vendors, or counterparties in a major transaction. Also, physical observation or inspection of certain assets may become more important (see section 326, *Evidential Matter*, paragraphs .15 through .21 ). Furthermore, the auditor may choose to employ computer-assisted audit techniques to gather more extensive evidence about data contained in significant accounts or electronic transaction files. Finally, inquiry of additional members of management or others may be helpful in identifying issues and corroborating other evidential matter (see paragraphs .24 through .26 and paragraph .53 ).

- The *timing* of substantive tests may need to be modified. The auditor might conclude that substantive testing should be performed at or near the end of the reporting period to best address an identified risk of material misstatement due to fraud (see section 313 , *Substantive Tests Prior to the Balance-Sheet Date*). That

is, the auditor might conclude that, given the risks of intentional misstatement or manipulation, tests to extend audit conclusions from an interim date to the period-end reporting date would not be effective.

In contrast, because an intentional misstatement—for example, a misstatement involving inappropriate revenue recognition—may have been initiated in an interim period, the auditor might elect to apply substantive tests to transactions occurring earlier in or throughout the reporting period.

- The *extent* of the procedures applied should reflect the assessment of the risks of material misstatement due to fraud. For example, increasing sample sizes or performing analytical procedures at a more detailed level may be appropriate (see section 350, *Audit Sampling*, paragraph .23 , and section 329 ). Also, computer-assisted audit techniques may enable more extensive testing of electronic transactions and account files. Such techniques can be used to select sample transactions from key electronic files, to sort transactions with specific characteristics, or to test an entire population instead of a sample.

**.53**    The following are examples of modification of the nature, timing, and extent of tests in response to identified risks of material misstatements due to fraud.

- Performing procedures at locations on a surprise or unannounced basis, for example, observing inventory on unexpected dates or at unexpected locations or counting cash on a surprise basis.
- Requesting that inventories be counted at the end of the reporting period or on a date closer to period end to minimize the risk of manipulation of balances in the period between the date of completion of the count and the end of the reporting period.
- Making oral inquiries of major customers and suppliers in addition to sending written confirmations, or sending confirmation requests to a specific party within an organization.
- Performing substantive analytical procedures using disaggregated data, for example, comparing gross profit or operating margins by location, line of business, or month to auditor-developed expectations.[20]
- Interviewing personnel involved in activities in areas where a risk of material misstatement due to fraud has been identified to obtain their insights about the risk and how controls address the risk (also see paragraph .24 ).
- If other independent auditors are auditing the financial statements of one or more subsidiaries, divisions, or branches, discussing with them the extent of work that needs to be performed to address the risk of material misstatement due to fraud resulting from transactions and activities among these components.

---

[20]    Section 329 , *Analytical Procedures*, provides guidance on performing analytical procedures as substantive tests.

## *Additional Examples of Responses to Identified Risks of Misstatements Arising From Fraudulent Financial Reporting*

**.54**    The following are additional examples of responses to identified risks of material misstatements relating to fraudulent financial reporting:

- *Revenue recognition.* Because revenue recognition is dependent on the particular facts and circumstances, as well as accounting principles and practices

that can vary by industry, the auditor ordinarily will develop auditing procedures based on the auditor's understanding of the entity and its environment, including the composition of revenues, specific attributes of the revenue transactions, and unique industry considerations. If there is an identified risk of material misstatement due to fraud that involves improper revenue recognition, the auditor also may want to consider:

-    Performing substantive analytical procedures relating to revenue using disaggregated data, for example, comparing revenue reported by month and by product line or business segment during the current reporting period with comparable prior periods. Computer-assisted audit techniques may be useful in identifying unusual or unexpected revenue relationships or transactions.
-    Confirming with customers certain relevant contract terms and the absence of side agreements, because the appropriate accounting often is influenced by such terms or agreements.[21] For example, acceptance criteria, delivery and payment terms, the absence of future or continuing vendor obligations, the right to return the product, guaranteed resale amounts, and cancellation or refund provisions often are relevant in such circumstances.
-    Inquiring of the entity's sales and marketing personnel or in-house legal counsel regarding sales or shipments near the end of the period and their knowledge of any unusual terms or conditions associated with these transactions.
-    Being physically present at one or more locations at period end to observe goods being shipped or being readied for shipment (or returns awaiting processing) and performing other appropriate sales and inventory cutoff procedures.
-    For those situations for which revenue transactions are electronically initiated, processed, and recorded, testing controls to determine whether they provide assurance that recorded revenue transactions occurred and are properly recorded.

•    *Inventory quantities.* If there is an identified risk of material misstatement due to fraud that affects inventory quantities, examining the entity's inventory records may help identify locations or items that require specific attention during or after the physical inventory count. Such a review may lead to a decision to observe inventory counts at certain locations on an unannounced basis (see paragraph .53 ) or to conduct inventory counts at all locations on the same date. In addition, it may be appropriate for inventory counts to be conducted at or near the end of the reporting period to minimize the risk of inappropriate manipulation during the period between the count and the end of the reporting period.

It also may be appropriate for the auditor to perform additional procedures during the observation of the count, for example, more rigorously examining the contents of boxed items, the manner in which the goods are stacked (for example, hollow squares) or labeled, and the quality (that is, purity, grade, or concentration) of liquid substances such as perfumes or specialty chemicals. Using the work of a specialist may be helpful in this regard.[22] Furthermore, additional testing of count sheets, tags, or other records, or the retention of copies of these records, may be warranted to minimize the risk of subsequent alteration or inappropriate compilation.

Following the physical inventory count, the auditor may want to employ additional procedures directed at the quantities included in the priced out inventories to further test the reasonableness of the quantities counted—for example, comparison of quantities for the current period with prior periods by class or category of inventory, location or other criteria, or comparison of quantities counted with perpetual records. The auditor also may consider using computer-

assisted audit techniques to further test the compilation of the physical inventory counts—for example, sorting by tag number to test tag controls or by item serial number to test the possibility of item omission or duplication.

- *Management estimates.* The auditor may identify a risk of material misstatement due to fraud involving the development of management estimates. This risk may affect a number of accounts and assertions, including asset valuation, estimates relating to specific transactions (such as acquisitions, restructurings, or disposals of a segment of the business), and other significant accrued liabilities (such as pension and other postretirement benefit obligations, or environmental remediation liabilities). The risk may also relate to significant changes in assumptions relating to recurring estimates. As indicated in section 342 , *Auditing Accounting Estimates*, estimates are based on subjective as well as objective factors and there is a potential for bias in the subjective factors, even when management's estimation process involves competent personnel using relevant and reliable data.

  In addressing an identified risk of material misstatement due to fraud involving accounting estimates, the auditor may want to supplement the audit evidence otherwise obtained (see section 342.09 through .14 ). In certain circumstances (for example, evaluating the reasonableness of management's estimate of the fair value of a derivative), it may be appropriate to engage a specialist or develop an independent estimate for comparison to management's estimate. Information gathered about the entity and its environment may help the auditor evaluate the reasonableness of such management estimates and underlying judgments and assumptions.

  A retrospective review of similar management judgments and assumptions applied in prior periods (see paragraphs .63 through .65 ) may also provide insight about the reasonableness of judgments and assumptions supporting management estimates.

---

[21]   Section 330 , *The Confirmation Process*, provides guidance about the confirmation process in audits performed in accordance with GAAS.
[22]   Section 336 , *Using the Work of a Specialist*, provides guidance to an auditor who uses the work of a specialist in performing an audit in accordance with GAAS.

## *Examples of Responses to Identified Risks of Misstatements Arising From Misappropriations of Assets*

**.55**   The auditor may have identified a risk of material misstatement due to fraud relating to misappropriation of assets. For example, the auditor may conclude that the risk of asset misappropriation at a particular operating location is significant because a large amount of easily accessible cash is maintained at that location, or there are inventory items such as laptop computers at that location that can easily be moved and sold.

**.56**   The auditor's response to a risk of material misstatement due to fraud relating to misappropriation of assets usually will be directed toward certain account balances. Although some of the audit responses noted in paragraphs .52 through .54 may apply in such circumstances, such as the procedures directed at inventory quantities, the scope of the work should be linked to the specific information about the misappropriation risk that has been identified. For example, if a particular asset is highly susceptible to misappropriation and a potential misstatement would be material to the financial

statements, obtaining an understanding of the controls related to the prevention and detection of such misappropriation and testing the operating effectiveness of such controls may be warranted. In certain circumstances, physical inspection of such assets (for example, counting cash or securities) at or near the end of the reporting period may be appropriate. In addition, the use of substantive analytical procedures, such as the development by the auditor of an expected dollar amount at a high level of precision, to be compared with a recorded amount, may be effective in certain circumstances.

## Responses to Further Address the Risk of Management Override of Controls

**.57**   As noted in paragraph .08 , management is in a unique position to perpetrate fraud because of its ability to directly or indirectly manipulate accounting records and prepare fraudulent financial statements by overriding established controls that otherwise appear to be operating effectively. By its nature, management override of controls can occur in unpredictable ways. Accordingly, in addition to overall responses ( paragraph .50 ) and responses that address specifically identified risks of material misstatement due to fraud (see paragraphs .51 through .56 ), the procedures described in paragraphs .58 through .67 should be performed to further address the risk of management override of controls.

**.58**   *Examining journal entries and other adjustments for evidence of possible material misstatement due to fraud.* Material misstatements of financial statements due to fraud often involve the manipulation of the financial reporting process by (*a*) recording inappropriate or unauthorized journal entries throughout the year or at period end, or (*b*) making adjustments to amounts reported in the financial statements that are not reflected in formal journal entries, such as through consolidating adjustments, report combinations, and reclassifications. Accordingly, the auditor should design procedures to test the appropriateness of journal entries recorded in the general ledger and other adjustments (for example, entries posted directly to financial statement drafts) made in the preparation of the financial statements. More specifically, the auditor should:

> *a.*   Obtain an understanding of the entity's financial reporting process[23] and the controls over journal entries and other adjustments. (See paragraphs .59 and .60 .)
> *b.*   Identify and select journal entries and other adjustments for testing. (See paragraph .61 .)
> *c.*   Determine the timing of the testing. (See paragraph .62 .)
> *d.*   Inquire of individuals involved in the financial reporting process about inappropriate or unusual activity relating to the processing of journal entries and other adjustments.

[23]   Section 319 requires the auditor to obtain an understanding of the automated and manual procedures an entity uses to prepare financial statements and related disclosures, and how misstatements may occur. This understanding includes (*a*) the procedures used to enter transaction totals into the general ledger; (*b*) the procedures used to initiate, record, and process journal entries in the general ledger; and (*c*) other procedures used to record recurring and nonrecurring adjustments to the financial statements.

**.59**   The auditor's understanding of the entity's financial reporting process may help in identifying the type, number, and monetary value of journal entries and other adjustments that typically are made in preparing the financial statements. For example, the auditor's understanding may include the sources of significant debits and credits to an account, who can initiate entries to the general ledger or transaction processing systems, what approvals are required for such entries, and how journal entries are recorded (for example, entries may be initiated and recorded online with no physical evidence, or may be created in paper form and entered in batch mode).

**.60**    An entity may have implemented specific controls over journal entries and other adjustments. For example, an entity may use journal entries that are preformatted with account numbers and specific user approval criteria, and may have automated controls to generate an exception report for any entries that were unsuccessfully proposed for recording or entries that were recorded and processed outside of established parameters. The auditor should obtain an understanding of the design of such controls over journal entries and other adjustments and determine whether they are suitably designed and have been placed in operation.

**.61**    The auditor should use professional judgment in determining the nature, timing, and extent of the testing of journal entries and other adjustments. For purposes of identifying and selecting specific entries and other adjustments for testing, and determining the appropriate method of examining the underlying support for the items selected, the auditor should consider:

- *The auditor's assessment of the risk of material misstatement due to fraud.* The presence of fraud risk factors or other conditions may help the auditor to identify specific classes of journal entries for testing and indicate the extent of testing necessary.
- *The effectiveness of controls that have been implemented over journal entries and other adjustments.* Effective controls over the preparation and posting of journal entries and adjustments may affect the extent of substantive testing necessary, provided that the auditor has tested the operating effectiveness of those controls. However, even though controls might be implemented and operating effectively, the auditor's procedures for testing journal entries and other adjustments should include the identification and testing of specific items.
- *The entity's financial reporting process and the nature of the evidence that can be examined.* The auditor's procedures for testing journal entries and other adjustments will vary based on the nature of the financial reporting process. For many entities, routine processing of transactions involves a combination of manual and automated steps and procedures. Similarly, the processing of journal entries and other adjustments might involve both manual and automated procedures and controls. Regardless of the method, the auditor's procedures should include selecting from the general ledger journal entries to be tested and examining support for those items. In addition, the auditor should be aware that journal entries and other adjustments might exist in either electronic or paper form. When information technology (IT) is used in the financial reporting process, journal entries and other adjustments might exist only in electronic form. Electronic evidence often requires extraction of the desired data by an auditor with IT knowledge and skills or the use of an IT specialist. In an IT environment, it may be necessary for the auditor to employ computer-assisted audit techniques (for example, report writers, software or data extraction tools, or other systems-based techniques) to identify the journal entries and other adjustments to be tested.
- *The characteristics of fraudulent entries or adjustments.* Inappropriate journal entries and other adjustments often have certain unique identifying characteristics. Such characteristics may include entries (*a*) made to unrelated, unusual, or seldom-used accounts, (*b*) made by individuals who typically do not make journal entries, (*c*) recorded at the end of the period or as post-closing entries that have little or no explanation or description, (*d*) made either before or during the preparation of the financial statements that do not have account numbers, or (*e*) containing round numbers or a consistent ending number.
- *The nature and complexity of the accounts.* Inappropriate journal entries or adjustments may be applied to accounts that (*a*) contain transactions that are complex or unusual in nature, (*b*) contain significant estimates and period-end

adjustments, (*c*) have been prone to errors in the past, (*d*) have not been reconciled on a timely basis or contain unreconciled differences, (*e*) contain intercompany transactions, or (*f*) are otherwise associated with an identified risk of material misstatement due to fraud. The auditor should recognize, however, that inappropriate journal entries and adjustments also might be made to other accounts. In audits of entities that have several locations or components, the auditor should consider the need to select journal entries from locations based on the factors set forth in section 312.18 .

- *Journal entries or other adjustments processed outside the normal course of business.* Standard journal entries used on a recurring basis to record transactions such as monthly sales, purchases, and cash disbursements, or to record recurring periodic accounting estimates generally are subject to the entity's internal controls. Nonstandard entries (for example, entries used to record nonrecurring transactions, such as a business combination, or entries used to record a nonrecurring estimate, such as an asset impairment) might not be subject to the same level of internal control. In addition, other adjustments such as consolidating adjustments, report combinations, and reclassifications generally are not reflected in formal journal entries and might not be subject to the entity's internal controls. Accordingly, the auditor should consider placing additional emphasis on identifying and testing items processed outside of the normal course of business.

**.62**  Because fraudulent journal entries often are made at the end of a reporting period, the auditor's testing ordinarily should focus on the journal entries and other adjustments made at that time. However, because material misstatements in financial statements due to fraud can occur throughout the period and may involve extensive efforts to conceal how it is accomplished, the auditor should consider whether there also is a need to test journal entries throughout the period under audit.

**.63**  ***Reviewing accounting estimates for biases that could result in material misstatement due to fraud.*** In preparing financial statements, management is responsible for making a number of judgments or assumptions that affect significant accounting estimates[24] and for monitoring the reasonableness of such estimates on an ongoing basis. Fraudulent financial reporting often is accomplished through intentional misstatement of accounting estimates. As discussed in section 312.36 , the auditor should consider whether differences between estimates best supported by the audit evidence and the estimates included in the financial statements, even if they are individually reasonable, indicate a possible bias on the part of the entity's management, in which case the auditor should reconsider the estimates taken as a whole.

---

[24]  See section 342, *Auditing Accounting Estimates,* paragraphs .02 and .16 , for a definition of accounting estimates and a listing of examples.

**.64**  The auditor also should perform a retrospective review of significant accounting estimates reflected in the financial statements of the prior year to determine whether management judgments and assumptions relating to the estimates indicate a possible bias on the part of management. The significant accounting estimates selected for testing should include those that are based on highly sensitive assumptions or are otherwise significantly affected by judgments made by management. With the benefit of hindsight, a retrospective review should provide the auditor with additional information about whether there may be a possible bias on the part of management in making the current-year estimates. This review, however, is not intended to call into question the auditor's professional judgments made in the prior year that were based on information available at the time.

**.65**    If the auditor identifies a possible bias on the part of management in making accounting estimates, the auditor should evaluate whether circumstances producing such a bias represent a risk of a material misstatement due to fraud. For example, information coming to the auditor's attention may indicate a risk that adjustments to the current-year estimates might be recorded at the instruction of management to arbitrarily achieve a specified earnings target.

**.66**    ***Evaluating the business rationale for significant unusual transactions.***
During the course of the audit, the auditor may become aware of significant transactions that are outside the normal course of business for the entity, or that otherwise appear to be unusual given the auditor's understanding of the entity and its environment. The auditor should gain an understanding of the business rationale for such transactions and whether that rationale (or the lack thereof) suggests that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets.

**.67**    In understanding the business rationale for the transactions, the auditor should consider:

- Whether the form of such transactions is overly complex (for example, involves multiple entities within a consolidated group or unrelated third parties).
- Whether management has discussed the nature of and accounting for such transactions with the audit committee or board of directors.
- Whether management is placing more emphasis on the need for a particular accounting treatment than on the underlying economics of the transaction.
- Whether transactions that involve unconsolidated related parties, including special purpose entities, have been properly reviewed and approved by the audit committee or board of directors.
- Whether the transactions involve previously unidentified related parties[25] or parties that do not have the substance or the financial strength to support the transaction without assistance from the entity under audit.

---

[25]    Section 334 , *Related Parties*, provides guidance with respect to the identification of related-party relationships and transactions, including transactions that may be outside the ordinary course of business (see, in particular, section 334.06 ).

# Evaluating Audit Evidence

**.68**    ***Assessing risks of material misstatement due to fraud throughout the audit.*** The auditor's assessment of the risks of material misstatement due to fraud should be ongoing throughout the audit. Conditions may be identified during fieldwork that change or support a judgment regarding the assessment of the risks, such as the following:

- Discrepancies in the accounting records, including:

    - Transactions that are not recorded in a complete or timely manner or are improperly recorded as to amount, accounting period, classification, or entity policy
    - Unsupported or unauthorized balances or transactions
    - Last-minute adjustments that significantly affect financial results
    - Evidence of employees' access to systems and records inconsistent with that necessary to perform their authorized duties

**A-59**

- Tips or complaints to the auditor about alleged fraud

- Conflicting or missing evidential matter, including:

  - Missing documents
  - Documents that appear to have been altered[26]
  - Unavailability of other than photocopied or electronically transmitted documents when documents in original form are expected to exist
  - Significant unexplained items on reconciliations
  - Inconsistent, vague, or implausible responses from management or employees arising from inquiries or analytical procedures (See paragraph .72 .)
  - Unusual discrepancies between the entity's records and confirmation replies
  - Missing inventory or physical assets of significant magnitude
  - Unavailable or missing electronic evidence, inconsistent with the entity's record retention practices or policies
  - Inability to produce evidence of key systems development and program change testing and implementation activities for current-year system changes and deployments

- Problematic or unusual relationships between the auditor and management, including:

  - Denial of access to records, facilities, certain employees, customers, vendors, or others from whom audit evidence might be sought[27]
  - Undue time pressures imposed by management to resolve complex or contentious issues
  - Complaints by management about the conduct of the audit or management intimidation of audit team members, particularly in connection with the auditor's critical assessment of audit evidence or in the resolution of potential disagreements with management
  - Unusual delays by the entity in providing requested information
  - Unwillingness to facilitate auditor access to key electronic files for testing through the use of computer-assisted audit techniques
  - Denial of access to key IT operations staff and facilities, including security, operations, and systems development personnel
  - An unwillingness to add or revise disclosures in the financial statements to make them more complete and transparent

---

[26]   As discussed in paragraph .09 , auditors are not trained as or expected to be experts in the authentication of documents; however, if the auditor believes that documents may not be authentic, he or she should investigate further and consider using the work of a specialist to determine the authenticity.

[27]   Denial of access to information may constitute a limitation on the scope of the audit that may require the auditor to consider qualifying or disclaiming an opinion on the financial statements. (See section 508, *Reports on Audited Financial Statements*, paragraph .24 .)

**.69   *Evaluating whether analytical procedures performed as substantive tests or in the overall review stage of the audit indicate a previously unrecognized risk of material misstatement due to fraud.*** As discussed in paragraphs .28 through .30 , the auditor should consider whether analytical procedures performed in planning the audit result in identifying any unusual or unexpected relationships that should be considered in assessing the risks of material misstatement due to fraud. The auditor also should evaluate whether analytical procedures that were performed as substantive tests or in the overall review stage of the audit (see section 329 ) indicate a previously unrecognized risk of material misstatement due to fraud.

**.70**    If not already performed during the overall review stage of the audit, the auditor should perform analytical procedures relating to revenue, as discussed in paragraph .29 , through the end of the reporting period.

**.71**    Determining which particular trends and relationships may indicate a risk of material misstatement due to fraud requires professional judgment. Unusual relationships involving year-end revenue and income often are particularly relevant. These might include, for example, (*a*) uncharacteristically large amounts of income being reported in the last week or two of the reporting period from unusual transactions, as well as (*b*) income that is inconsistent with trends in cash flow from operations.

**.72**    Some unusual or unexpected analytical relationships may have been identified and may indicate a risk of material misstatement due to fraud because management or employees generally are unable to manipulate certain information to create seemingly normal or expected relationships. Some examples are as follows:

- The relationship of net income to cash flows from operations may appear unusual because management recorded fictitious revenues and receivables but was unable to manipulate cash.
- Changes in inventory, accounts payable, sales, or cost of sales from the prior period to the current period may be inconsistent, indicating a possible employee theft of inventory, because the employee was unable to manipulate all of the related accounts.
- A comparison of the entity's profitability to industry trends, which management cannot manipulate, may indicate trends or differences for further consideration when identifying risks of material misstatement due to fraud.
- A comparison of bad debt write-offs to comparable industry data, which employees cannot manipulate, may provide unexplained relationships that could indicate a possible theft of cash receipts.
- An unexpected or unexplained relationship between sales volume as determined from the accounting records and production statistics maintained by operations personnel—which may be more difficult for management to manipulate—may indicate a possible misstatement of sales.

**.73**    The auditor also should consider whether responses to inquiries throughout the audit about analytical relationships have been vague or implausible, or have produced evidence that is inconsistent with other evidential matter accumulated during the audit.

**.74**    ***Evaluating the risks of material misstatement due to fraud at or near the completion of fieldwork.*** At or near the completion of fieldwork, the auditor should evaluate whether the accumulated results of auditing procedures and other observations (for example, conditions and analytical relationships noted in paragraphs .69 through .73 ) affect the assessment of the risks of material misstatement due to fraud made earlier in the audit. This evaluation primarily is a qualitative matter based on the auditor's judgment. Such an evaluation may provide further insight about the risks of material misstatement due to fraud and whether there is a need to perform additional or different audit procedures. As part of this evaluation, the auditor with final responsibility for the audit should ascertain that there has been appropriate communication with the other audit team members throughout the audit regarding information or conditions indicative of risks of material misstatement due to fraud.[28]

---

[28]    To accomplish this communication, the auditor with final responsibility for the audit may want to arrange another discussion among audit team members about the risks of material misstatement due to fraud (see paragraphs .14 through .18 ).

**.75**  ***Responding to misstatements that may be the result of fraud.*** When audit test results identify misstatements in the financial statements, the auditor should consider whether such misstatements may be indicative of fraud.[29] That determination affects the auditor's evaluation of materiality and the related responses necessary as a result of that evaluation.[30]

---

[29]  See footnote 4.
[Footnote 4: Some organizations also have considered follow-up investigations, particularly for employees in positions of trust, on a periodic basis (for example, every five years) or as circumstances dictate.].
[30]  Section 312.34 states in part, "Qualitative considerations also influence the auditor in reaching a conclusion as to whether misstatements are material." Section 312.11 states, "As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements."

**.76**  If the auditor believes that misstatements are or may be the result of fraud, but the effect of the misstatements is not material to the financial statements, the auditor nevertheless should evaluate the implications, especially those dealing with the organizational position of the person(s) involved. For example, fraud involving misappropriations of cash from a small petty cash fund normally would be of little significance to the auditor in assessing the risk of material misstatement due to fraud because both the manner of operating the fund and its size would tend to establish a limit on the amount of potential loss, and the custodianship of such funds normally is entrusted to a nonmanagement employee.[31] Conversely, if the matter involves higher-level management, even though the amount itself is not material to the financial statements, it may be indicative of a more pervasive problem, for example, implications about the integrity of management.[32] In such circumstances, the auditor should reevaluate the assessment of the risk of material misstatement due to fraud and its resulting impact on (*a*) the nature, timing, and extent of the tests of balances or transactions and (*b*) the assessment of the effectiveness of controls if control risk was assessed below the maximum.

---

[31]  However, see paragraphs .79 through .82 of this section for a discussion of the auditor's communication responsibilities.
[32]  Section 312.08 states that there is a distinction between the auditor's response to detected misstatements due to error and those due to fraud. When fraud is detected, the auditor should consider the implications for the integrity of management or employees and the possible effect on other aspects of the audit.

**.77**  If the auditor believes that the misstatement is or may be the result of fraud, and either has determined that the effect could be material to the financial statements or has been unable to evaluate whether the effect is material, the auditor should:

> *a.*  Attempt to obtain additional evidential matter to determine whether material fraud has occurred or is likely to have occurred, and, if so, its effect on the financial statements and the auditor's report thereon.[33]
> *b.*  Consider the implications for other aspects of the audit (see paragraph .76 ).
> *c.*  Discuss the matter and the approach for further investigation with an appropriate level of management that is at least one level above those involved, and with senior management and the audit committee.[34]
> *d.*  If appropriate, suggest that the client consult with legal counsel.

---

[33]  See section 508 for guidance on auditors' reports issued in connection with audits of financial statements.
[34]  If the auditor believes senior management may be involved, discussion of the matter directly with the audit committee may be appropriate.

**.78**  The auditor's consideration of the risks of material misstatement and the results of audit tests may indicate such a significant risk of material misstatement due to fraud that

the auditor should consider withdrawing from the engagement and communicating the reasons for withdrawal to the audit committee or others with equivalent authority and responsibility.[35] Whether the auditor concludes that withdrawal from the engagement is appropriate may depend on (*a*) the implications about the integrity of management and (*b*) the diligence and cooperation of management or the board of directors in investigating the circumstances and taking appropriate action. Because of the variety of circumstances that may arise, it is not possible to definitively describe when withdrawal is appropriate.[36] The auditor may wish to consult with legal counsel when considering withdrawal from an engagement.

[35]  See footnote 11.
[Footnote 11: Examples of "others with equivalent authority and responsibility" may include the board of directors, the board of trustees, or the owner in an owner-managed entity, as appropriate.].
[36]  If the auditor, subsequent to the date of the report on the audited financial statements, becomes aware that facts existed at that date that might have affected the report had the auditor been aware of such facts, the auditor should refer to section 561 , *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*, for guidance. Furthermore, section 315, *Communications Between Predecessor and Successor Auditors*, paragraphs .21 and .22 , provide guidance regarding communication with a predecessor auditor.

# Communicating About Possible Fraud to Management, the Audit Committee, and Others[37]

[37]  The requirements to communicate noted in paragraphs .79 through .82 extend to any intentional misstatement of financial statements (see paragraph .03 ). However, the communication may use terms other than fraud—for example, irregularity, intentional misstatement, misappropriation, or defalcations—if there is possible confusion with a legal definition of fraud or other reason to prefer alternative terms.

**.79**    Whenever the auditor has determined that there is evidence that fraud may exist, that matter should be brought to the attention of an appropriate level of management. This is appropriate even if the matter might be considered inconsequential, such as a minor defalcation by an employee at a low level in the entity's organization. Fraud involving senior management and fraud (whether caused by senior management or other employees) that causes a material misstatement of the financial statements should be reported directly to the audit committee. In addition, the auditor should reach an understanding with the audit committee regarding the nature and extent of communications with the committee about misappropriations perpetrated by lower-level employees.

**.80**    If the auditor, as a result of the assessment of the risks of material misstatement, has identified risks of material misstatement due to fraud that have continuing control implications (whether or not transactions or adjustments that could be the result of fraud have been detected), the auditor should consider whether these risks represent reportable conditions relating to the entity's internal control that should be communicated to senior management and the audit committee.[38] (See section 325A, *Communication of Internal Control Related Matters Noted in an Audit*, paragraph .04 ). The auditor also should consider whether the absence of or deficiencies in programs and controls to mitigate specific risks of fraud or to otherwise help prevent, deter, and detect fraud (see paragraph .44 ) represent reportable conditions that should be communicated to senior management and the audit committee.

[38]  Alternatively, the auditor may decide to communicate solely with the audit committee.

**.81**    The auditor also may wish to communicate other risks of fraud identified as a result of the assessment of the risks of material misstatements due to fraud. Such a

communication may be a part of an overall communication to the audit committee of business and financial statement risks affecting the entity and/or in conjunction with the auditor communication about the quality of the entity's accounting principles (see section 380.11 ).

**.82**    The disclosure of possible fraud to parties other than the client's senior management and its audit committee ordinarily is not part of the auditor's responsibility and ordinarily would be precluded by the auditor's ethical or legal obligations of confidentiality unless the matter is reflected in the auditor's report. The auditor should recognize, however, that in the following circumstances a duty to disclose to parties outside the entity may exist:

> *a.*    To comply with certain legal and regulatory requirements[39]
> *b.*    To a successor auditor when the successor makes inquiries in accordance with section 315 , *Communications Between Predecessor and Successor Auditors*[40]
> *c.*    In response to a subpoena
> *d.*    To a funding agency or other specified agency in accordance with requirements for the audits of entities that receive governmental financial assistance[41]

Because potential conflicts between the auditor's ethical and legal obligations for confidentiality of client matters may be complex, the auditor may wish to consult with legal counsel before discussing matters covered by paragraphs .79 through .81 with parties outside the client.

---

[39]   These requirements include reports in connection with the termination of the engagement, such as when the entity reports an auditor change on Form 8-K and the fraud or related risk factors constitute a *reportable event* or is the source of a *disagreement*, as these terms are defined in Item 304 of Regulation S-K . These requirements also include reports that may be required, under certain circumstances, pursuant to Section 10A(b)1 of the Securities Exchange Act of 1934 relating to an illegal act that has a material effect on the financial statements.
[40]   Section 315 requires the specific permission of the client.
[41]   For example, *Government Auditing Standards* (the Yellow Book) require auditors to report fraud or illegal acts directly to parties outside the audited entity in certain circumstances.

# Documenting the Auditor's Consideration of Fraud

**.83**    The auditor should document the following:

- The discussion among engagement personnel in planning the audit regarding the susceptibility of the entity's financial statements to material misstatement due to fraud, including how and when the discussion occurred, the audit team members who participated, and the subject matter discussed (See paragraphs .14 through .17 .)
- The procedures performed to obtain information necessary to identify and assess the risks of material misstatement due to fraud (See paragraphs .19 through .34 .)
- Specific risks of material misstatement due to fraud that were identified (see paragraphs .35 through .45 ), and a description of the auditor's response to those risks (See paragraphs .46 through .56 .)
- If the auditor has not identified in a particular circumstance, improper revenue recognition as a risk of material misstatement due to fraud, the reasons supporting the auditor's conclusion (See paragraph .41 .)
- The results of the procedures performed to further address the risk of management override of controls (See paragraphs .58 through .67 .)

- Other conditions and analytical relationships that caused the auditor to believe that additional auditing procedures or other responses were required and any further responses the auditor concluded were appropriate, to address such risks or other conditions (See paragraphs .68 through .73 .)
- The nature of the communications about fraud made to management, the audit committee, and others (See paragraphs .79 through .82 .)

## Effective Date

**.84**   This section is effective for audits of financial statements for periods beginning on or after December 15, 2002. Early application of the provisions of this section is permissible.

## Appendix

## Examples of Fraud Risk Factors

**.85   A.1** This appendix contains examples of risk factors discussed in paragraphs .31 through .33 of the section. Separately presented are examples relating to the two types of fraud relevant to the auditor's consideration—that is, fraudulent financial reporting and misappropriation of assets. For each of these types of fraud, the risk factors are further classified based on the three conditions generally present when material misstatements due to fraud occur: (*a*) incentives/pressures, (*b*) opportunities, and (*c*) attitudes/rationalizations. Although the risk factors cover a broad range of situations, they are only examples and, accordingly, the auditor may wish to consider additional or different risk factors. Not all of these examples are relevant in all circumstances, and some may be of greater or lesser significance in entities of different size or with different ownership characteristics or circumstances. Also, the order of the examples of risk factors provided is not intended to reflect their relative importance or frequency of occurrence.

## Risk Factors Relating to Misstatements Arising From Fraudulent Financial Reporting

**A.2** The following are examples of risk factors relating to misstatements arising from fraudulent financial reporting.

### *Incentives/Pressures*

*a.*   Financial stability or profitability is threatened by economic, industry, or entity operating conditions, such as (or as indicated by):
-   High degree of competition or market saturation, accompanied by declining margins
-   High vulnerability to rapid changes, such as changes in technology, product obsolescence, or interest rates
-   Significant declines in customer demand and increasing business failures in either the industry or overall economy
-   Operating losses making the threat of bankruptcy, foreclosure, or hostile takeover imminent
-   Recurring negative cash flows from operations or an inability to generate cash flows from operations while reporting earnings and earnings growth

A-65

-    Rapid growth or unusual profitability, especially compared to that of other companies in the same industry

-    New accounting, statutory, or regulatory requirements

b.    Excessive pressure exists for management to meet the requirements or expectations of third parties due to the following:

-    Profitability or trend level expectations of investment analysts, institutional investors, significant creditors, or other external parties (particularly expectations that are unduly aggressive or unrealistic), including expectations created by management in, for example, overly optimistic press releases or annual report messages

-    Need to obtain additional debt or equity financing to stay competitive—including financing of major research and development or capital expenditures

-    Marginal ability to meet exchange listing requirements or debt repayment or other debt covenant requirements

-    Perceived or real adverse effects of reporting poor financial results on significant pending transactions, such as business combinations or contract awards

c.    Information available indicates that management or the board of directors' personal financial situation is threatened by the entity's financial performance arising from the following:

-    Significant financial interests in the entity

-    Significant portions of their compensation (for example, bonuses, stock options, and earn-out arrangements) being contingent upon achieving aggressive targets for stock price, operating results, financial position, or cash flow[1]

-    Personal guarantees of debts of the entity

d.    There is excessive pressure on management or operating personnel to meet financial targets set up by the board of directors or management, including sales or profitability incentive goals.

## Opportunities

a.    The nature of the industry or the entity's operations provides opportunities to engage in fraudulent financial reporting that can arise from the following:

-    Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm

-    A strong financial presence or ability to dominate a certain industry sector that allows the entity to dictate terms or conditions to suppliers or customers that may result in inappropriate or non-arm's-length transactions

-    Assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate

-    Significant, unusual, or highly complex transactions, especially those close to period end that pose difficult "substance over form" questions

-    Significant operations located or conducted across international borders in jurisdictions where differing business environments and cultures exist

-    Significant bank accounts or subsidiary or branch operations in tax-haven jurisdictions for which there appears to be no clear business justification

b.    There is ineffective monitoring of management as a result of the following:

-    Domination of management by a single person or small group (in a nonowner-managed business) without compensating controls

-    Ineffective board of directors or audit committee oversight over the financial reporting process and internal control

c.    There is a complex or unstable organizational structure, as evidenced by the following:

-    Difficulty in determining the organization or individuals that have controlling interest in the entity

- Overly complex organizational structure involving unusual legal entities or managerial lines of authority
- High turnover of senior management, counsel, or board members
*d.*   Internal control components are deficient as a result of the following:
- Inadequate monitoring of controls, including automated controls and controls over interim financial reporting (where external reporting is required)
- High turnover rates or employment of ineffective accounting, internal audit, or information technology staff
- Ineffective accounting and information systems, including situations involving reportable conditions

## *Attitudes/Rationalizations*

Risk factors reflective of attitudes/rationalizations by board members, management, or employees, that allow them to engage in and/or justify fraudulent financial reporting, may not be susceptible to observation by the auditor. Nevertheless, the auditor who becomes aware of the existence of such information should consider it in identifying the risks of material misstatement arising from fraudulent financial reporting. For example, auditors may become aware of the following information that may indicate a risk factor:

- Ineffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards
- Nonfinancial management's excessive participation in or preoccupation with the selection of accounting principles or the determination of significant estimates
- Known history of violations of securities laws or other laws and regulations, or claims against the entity, its senior management, or board members alleging fraud or violations of laws and regulations
- Excessive interest by management in maintaining or increasing the entity's stock price or earnings trend
- A practice by management of committing to analysts, creditors, and other third parties to achieve aggressive or unrealistic forecasts
- Management failing to correct known reportable conditions on a timely basis
- An interest by management in employing inappropriate means to minimize reported earnings for tax-motivated reasons
- Recurring attempts by management to justify marginal or inappropriate accounting on the basis of materiality
- The relationship between management and the current or predecessor auditor is strained, as exhibited by the following:

  - Frequent disputes with the current or predecessor auditor on accounting, auditing, or reporting matters
  - Unreasonable demands on the auditor, such as unreasonable time constraints regarding the completion of the audit or the issuance of the auditor's report
  - Formal or informal restrictions on the auditor that inappropriately limit access to people or information or the ability to communicate effectively with the board of directors or audit committee
  - Domineering management behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work or the selection or continuance of personnel assigned to or consulted on the audit engagement

# Risk Factors Relating to Misstatements Arising From Misappropriation of Assets

**A.3** Risk factors that relate to misstatements arising from misappropriation of assets are also classified according to the three conditions generally present when fraud exists: incentives/pressures, opportunities, and attitudes/rationalizations. Some of the risk factors related to misstatements arising from fraudulent financial reporting also may be present when misstatements arising from misappropriation of assets occur. For example, ineffective monitoring of management and weaknesses in internal control may be present when misstatements due to either fraudulent financial reporting or misappropriation of assets exist. The following are examples of risk factors related to misstatements arising from misappropriation of assets.

## *Incentives/Pressures*

*a.*    Personal financial obligations may create pressure on management or employees with access to cash or other assets susceptible to theft to misappropriate those assets.

*b.*    Adverse relationships between the entity and employees with access to cash or other assets susceptible to theft may motivate those employees to misappropriate those assets. For example, adverse relationships may be created by the following:
- Known or anticipated future employee layoffs
- Recent or anticipated changes to employee compensation or benefit plans
- Promotions, compensation, or other rewards inconsistent with expectations

## *Opportunities*

*a.*    Certain characteristics or circumstances may increase the susceptibility of assets to misappropriation. For example, opportunities to misappropriate assets increase when there are the following:
- Large amounts of cash on hand or processed
- Inventory items that are small in size, of high value, or in high demand
- Easily convertible assets, such as bearer bonds, diamonds, or computer chips
- Fixed assets that are small in size, marketable, or lacking observable identification of ownership

*b.*    Inadequate internal control over assets may increase the susceptibility of misappropriation of those assets. For example, misappropriation of assets may occur because there is the following:
- Inadequate segregation of duties or independent checks
- Inadequate management oversight of employees responsible for assets, for example, inadequate supervision or monitoring of remote locations
- Inadequate job applicant screening of employees with access to assets
- Inadequate recordkeeping with respect to assets
- Inadequate system of authorization and approval of transactions (for example, in purchasing)
- Inadequate physical safeguards over cash, investments, inventory, or fixed assets
- Lack of complete and timely reconciliations of assets
- Lack of timely and appropriate documentation of transactions, for example, credits for merchandise returns
- Lack of mandatory vacations for employees performing key control functions
- Inadequate management understanding of information technology, which enables information technology employees to perpetrate a misappropriation
- Inadequate access controls over automated records, including controls over and review of computer systems event logs.

### *Attitudes/Rationalizations*

Risk factors reflective of employee attitudes/rationalizations that allow them to justify misappropriations of assets, are generally not susceptible to observation by the auditor. Nevertheless, the auditor who becomes aware of the existence of such information should consider it in identifying the risks of material misstatement arising from misappropriation of assets. For example, auditors may become aware of the following attitudes or behavior of employees who have access to assets susceptible to misappropriation:

- Disregard for the need for monitoring or reducing risks related to misappropriations of assets
- Disregard for internal control over misappropriation of assets by overriding existing controls or by failing to correct known internal control deficiencies
- Behavior indicating displeasure or dissatisfaction with the company or its treatment of the employee
- Changes in behavior or lifestyle that may indicate assets have been misappropriated

---

[1]  Management incentive plans may be contingent upon achieving targets relating only to certain accounts or selected activities of the entity, even though the related accounts or activities may not be material to the entity as a whole.

## Appendix

## Exhibit—Management Antifraud Programs and Controls

### Guidance to Help Prevent, Deter, and Detect Fraud

**.86**   (This exhibit is reprinted for the reader's convenience but is not an integral part of the section.)

This document is being issued jointly by the following organizations:

American Institute of Certified Public Accountants

Association of Certified Fraud Examiners

Financial Executives International

Information Systems Audit and Control Association

The Institute of Internal Auditors

Institute of Management Accountants

# AU Section 317

## *Illegal Acts by Clients*

*For the PCAOB Interim Standard, please click here*

(Supersedes section 328)

Source: SAS No. 54.

**See** section 9317 **for interpretations of this section.**

**Effective for audits of financial statements for periods beginning on or after January 1, 1989, unless otherwise indicated**

**.01**    This section prescribes the nature and extent of the consideration an independent auditor should give to the possibility of illegal acts by a client in an audit of financial statements in accordance with generally accepted auditing standards. The section also provides guidance on the auditor's responsibilities when a possible illegal act is detected.

# Definition of Illegal Acts

**.02**    The term *illegal acts*, for purposes of this section, refers to violations of laws or governmental regulations. Illegal acts by clients are acts attributable to the entity whose financial statements are under audit or acts by management or employees acting on behalf of the entity. Illegal acts by clients do not include personal misconduct by the entity's personnel unrelated to their business activities.

## Dependence on Legal Judgment

**.03**    Whether an act is, in fact, illegal is a determination that is normally beyond the auditor's professional competence. An auditor, in reporting on financial statements, presents himself as one who is proficient in accounting and auditing. The auditor's training, experience, and understanding of the client and its industry may provide a basis for recognition that some client acts coming to his attention may be illegal. However, the determination as to whether a particular act is illegal would generally be based on the advice of an informed expert qualified to practice law or may have to await final determination by a court of law.

## Relation to Financial Statements

**.04**    Illegal acts vary considerably in their relation to the financial statements. Generally, the further removed an illegal act is from the events and transactions ordinarily reflected in financial statements, the less likely the auditor is to become aware of the act or to recognize its possible illegality.

**.05**    The auditor considers laws and regulations that are generally recognized by auditors to have a direct and material effect on the determination of financial statement amounts. For example, tax laws affect accruals and the amount recognized as expense in the accounting period; applicable laws and regulations may affect the amount of revenue accrued under government contracts. However, the auditor considers such laws or

regulations from the perspective of their known relation to audit objectives derived from financial statements assertions rather than from the perspective of legality *per se.* The auditor's responsibility to detect and report misstatements resulting from illegal acts having a direct and material effect on the determination of financial statement amounts is the same as that for misstatements caused by error or fraud as described in section 110 , *Responsibilities and Functions of the Independent Auditor.*

**.06**    Entities may be affected by many other laws or regulations, including those related to securities trading, occupational safety and health, food and drug administration, environmental protection, equal employment, and price-fixing or other antitrust violations. Generally, these laws and regulations relate more to an entity's operating aspects than to its financial and accounting aspects, and their financial statement effect is indirect. An auditor ordinarily does not have sufficient basis for recognizing possible violations of such laws and regulations. Their indirect effect is normally the result of the need to disclose a contingent liability because of the allegation or determination of illegality. For example, securities may be purchased or sold based on inside information. While the direct effects of the purchase or sale may be recorded appropriately, their indirect effect, the possible contingent liability for violating securities laws, may not be appropriately disclosed. Even when violations of such laws and regulations can have consequences material to the financial statements, the auditor may not become aware of the existence of the illegal act unless he is informed by the client, or there is evidence of a governmental agency investigation or enforcement proceeding in the records, documents, or other information normally inspected in an audit of financial statements.

## The Auditor's Consideration of the Possibility of Illegal Acts

**.07**    As explained in paragraph .05 , certain illegal acts have a direct and material effect on the determination of financial statement amounts. Other illegal acts, such as those described in paragraph .06 , may, in particular circumstances, be regarded as having material but indirect effects on financial statements. The auditor's responsibility with respect to detecting, considering the financial statement effects of, and reporting these other illegal acts is described in this section. These other illegal acts are hereinafter referred to simply as *illegal acts.* The auditor should be aware of the possibility that such illegal acts may have occurred. If specific information comes to the auditor's attention that provides evidence concerning the existence of possible illegal acts that could have a material indirect effect on the financial statements, the auditor should apply audit procedures specifically directed to ascertaining whether an illegal act has occurred. However, because of the characteristics of illegal acts explained above, an audit made in accordance with generally accepted auditing standards provides no assurance that illegal acts will be detected or that any contingent liabilities that may result will be disclosed.

## Audit Procedures in the Absence of Evidence Concerning Possible Illegal Acts

**.08**    Normally, an audit in accordance with generally accepted auditing standards does not include audit procedures specifically designed to detect illegal acts. However, procedures applied for the purpose of forming an opinion on the financial statements may bring possible illegal acts to the auditor's attention. For example, such procedures include reading minutes; inquiring of the client's management and legal counsel concerning litigation, claims, and assessments; performing substantive tests of details of transactions or balances. The auditor should make inquiries of management concerning

the client's compliance with laws and regulations. Where applicable, the auditor should also inquire of management concerning—

- The client's policies relative to the prevention of illegal acts.
- The use of directives issued by the client and periodic representations obtained by the client from management at appropriate levels of authority concerning compliance with laws and regulations.

The auditor also obtains written representations from management concerning the absence of violations or possible violations of laws or regulations whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency. (See section 333 , *Management Representations*.) The auditor need perform no further procedures in this area absent specific information concerning possible illegal acts.

## Specific Information Concerning Possible Illegal Acts

**.09**   In applying audit procedures and evaluating the results of those procedures, the auditor may encounter specific information that may raise a question concerning possible illegal acts, such as the following:

- Unauthorized transactions, improperly recorded transactions, or transactions not recorded in a complete or timely manner in order to maintain accountability for assets
- Investigation by a governmental agency, an enforcement proceeding, or payment of unusual fines or penalties
- Violations of laws or regulations cited in reports of examinations by regulatory agencies that have been made available to the auditor
- Large payments for unspecified services to consultants, affiliates, or employees
- Sales commissions or agents' fees that appear excessive in relation to those normally paid by the client or to the services actually received
- Unusually large payments in cash, purchases of bank cashiers' checks in large amounts payable to bearer, transfers to numbered bank accounts, or similar transactions
- Unexplained payments made to government officials or employees
- Failure to file tax returns or pay government duties or similar fees that are common to the entity's industry or the nature of its business

## Audit Procedures in Response to Possible Illegal Acts

**.10**   When the auditor becomes aware of information concerning a possible illegal act, the auditor should obtain an understanding of the nature of the act, the circumstances in which it occurred, and sufficient other information to evaluate the effect on the financial statements. In doing so, the auditor should inquire of management at a level above those involved, if possible. If management does not provide satisfactory information that there has been no illegal act, the auditor should—

   *a.*   Consult with the client's legal counsel or other specialists about the application of relevant laws and regulations to the circumstances and the possible effects on the financial statements. Arrangements for such consultation with client's legal counsel should be made by the client.
   *b.*   Apply additional procedures, if necessary, to obtain further understanding of the nature of the acts.

**.11**    The additional audit procedures considered necessary, if any, might include procedures such as the following:

> *a.*    Examine supporting documents, such as invoices, canceled checks, and agreements and compare with accounting records.
> *b.*    Confirm significant information concerning the matter with the other party to the transaction or with intermediaries, such as banks or lawyers.
> *c.*    Determine whether the transaction has been properly authorized.
> *d.*    Consider whether other similar transactions or events may have occurred, and apply procedures to identify them.

# The Auditor's Response to Detected Illegal Acts

**.12**    When the auditor concludes, based on information obtained and, if necessary, consultation with legal counsel, that an illegal act has or is likely to have occurred, the auditor should consider the effect on the financial statements as well as the implications for other aspects of the audit.

## The Auditor's Consideration of Financial Statement Effect

**.13**    In evaluating the materiality of an illegal act that comes to his attention, the auditor should consider both the quantitative and qualitative materiality of the act. For example, section 312, *Audit Risk and Materiality in Conducting an Audit*, paragraph .11 , states that "an illegal payment of an otherwise immaterial amount could be material if there is a reasonable possibility that it could lead to a material contingent liability or a material loss of revenue."

**.14**    The auditor should consider the effect of an illegal act on the amounts presented in financial statements including contingent monetary effects, such as fines, penalties and damages. Loss contingencies resulting from illegal acts that may be required to be disclosed should be evaluated in the same manner as other loss contingencies. Examples of loss contingencies that may arise from an illegal act are: threat of expropriation of assets, enforced discontinuance of operations in another country, and litigation.

**.15**    The auditor should evaluate the adequacy of disclosure in the financial statements of the potential effects of an illegal act on the entity's operations. If material revenue or earnings are derived from transactions involving illegal acts, or if illegal acts create significant unusual risks associated with material revenue or earnings, such as loss of a significant business relationship, that information should be considered for disclosure.

## Implications for Audit

**.16**    The auditor should consider the implications of an illegal act in relation to other aspects of the audit, particularly the reliability of representations of management. The implications of particular illegal acts will depend on the relationship of the perpetration and concealment, if any, of the illegal act to specific control procedures and the level of management or employees involved.

## Communication With the Audit Committee

**.17**    The auditor should assure himself that the audit committee, or others with equivalent authority and responsibility, is adequately informed with respect to illegal acts

that come to the auditor's attention.[1] The auditor need not communicate matters that are clearly inconsequential and may reach agreement in advance with the audit committee on the nature of such matters to be communicated. The communication should describe the act, the circumstances of its occurrence, and the effect on the financial statements. Senior management may wish to have its remedial actions communicated to the audit committee simultaneously. Possible remedial actions include disciplinary action against involved personnel, seeking restitution, adoption of preventive or corrective company policies, and modifications of specific control activities. If senior management is involved in an illegal act, the auditor should communicate directly with the audit committee. The communication may be oral or written. If the communication is oral, the auditor should document it.

---

[1]  For entities that do not have audit committees, the phrase "others with equivalent authority and responsibility" may include the board of directors, the board of trustees, or the owner in owner-managed entities.

## Effect on the Auditor's Report

**.18**  If the auditor concludes that an illegal act has a material effect on the financial statements, and the act has not been properly accounted for or disclosed, the auditor should express a qualified opinion or an adverse opinion on the financial statements taken as a whole, depending on the materiality of the effect on the financial statements.

**.19**  If the auditor is precluded by the client from obtaining sufficient competent evidential matter to evaluate whether an illegal act that could be material to the financial statements has, or is likely to have, occurred, the auditor generally should disclaim an opinion on the financial statements.

**.20**  If the client refuses to accept the auditor's report as modified for the circumstances described in paragraphs .18 and .19 , the auditor should withdraw from the engagement and indicate the reasons for withdrawal in writing to the audit committee or board of directors.

**.21**  The auditor may be unable to determine whether an act is illegal because of limitations imposed by the circumstances rather than by the client or because of uncertainty associated with interpretation of applicable laws or regulations or surrounding facts. In these circumstances, the auditor should consider the effect on his report.[2]

---

[2]  See section 508 , *Reports on Audited Financial Statements.*

## Other Considerations in an Audit in Accordance With Generally Accepted Auditing Standards

**.22**  In addition to the need to withdraw from the engagement, as described in paragraph .20 , the auditor may conclude that withdrawal is necessary when the client does not take the remedial action that the auditor considers necessary in the circumstances even when the illegal act is not material to the financial statements. Factors that should affect the auditor's conclusion include the implications of the failure to take remedial action, which may affect the auditor's ability to rely on management representations, and the effects of continuing association with the client. In reaching a conclusion on such matters, the auditor may wish to consult with his own legal counsel.

**.23**   Disclosure of an illegal act to parties other than the client's senior management and its audit committee or board of directors is not ordinarily part of the auditor's responsibility, and such disclosure would be precluded by the auditor's ethical or legal obligation of confidentiality, unless the matter affects his opinion on the financial statements. The auditor should recognize, however, that in the following circumstances a duty to notify parties outside the client may exist:[3]

> *a.*   When the entity reports an auditor change under the appropriate securities law on Form 8-K [4]
> *b.*   To a successor auditor when the successor makes inquiries in accordance with section 315 , *Communications Between Predecessor and Successor Auditors*[5]
> *c.*   In response to a subpoena
> *d.*   To a funding agency or other specified agency in accordance with requirements for the audits of entities that receive financial assistance from a government agency

Because potential conflicts with the auditor's ethical and legal obligations for confidentiality may be complex, the auditor may wish to consult with legal counsel before discussing illegal acts with parties outside the client.

---

[3]   Auditors may be required, under certain circumstances, pursuant to the Private Securities Litigation Reform Act of 1995 (codified in section 10A(b)1 of the Securities Exchange Act of 1934 ) to make a report to the Securities and Exchange Commission relating to an illegal act that has a material effect on the financial statements. [Footnote added, July 1997, to reflect conforming changes necessary due to the issuance of the Private Securities Litigation Reform Act of 1995.]

[4]   Disclosure to the Securities and Exchange Commission may be necessary if, among other matters, the auditor withdraws because the board of directors has not taken appropriate remedial action. Such failure may be a reportable disagreement on Form 8-K . [Footnote renumbered, July 1997, to reflect conforming changes necessary due to the issuance of the Private Securities Litigation Reform Act of 1995.]

[5]   In accordance with section 315 , communications between predecessor and successor auditors require the specific permission of the client. [Footnote renumbered, July 1997, to reflect conforming changes necessary due to the issuance of the Private Securities Litigation Reform Act of 1995.]

## Responsibilities in Other Circumstances

**.24**   An auditor may accept an engagement that entails a greater responsibility for detecting illegal acts than that specified in this section. For example, a governmental unit may engage an independent auditor to perform an audit in accordance with the Single Audit Act of 1984. In such an engagement, the independent auditor is responsible for testing and reporting on the governmental unit's compliance with certain laws and regulations applicable to Federal financial assistance programs. Also, an independent auditor may undertake a variety of other special engagements. For example, a corporation's board of directors or its audit committee may engage an auditor to apply agreed-upon procedures and report on compliance with the corporation's code of conduct under the attestation standards.

## Effective Date

**.25**   This section is effective for audits of financial statements for periods beginning on or after January 1, 1989. Early application of the provisions of this section is permissible.

Copyright © 2006 by American Institute of Certified Public Accountants, Inc., New York, NY. All rights reserved.

© Copyright 2006 RIA. All rights reserved.

# AU Section 341

## *The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern*

*For the PCAOB Interim Standard, please click here*

(Supersedes section 340)

Source: SAS No. 59; SAS No. 64; SAS No. 77; SAS No. 96.

**See section 9341 for interpretations of this section.**

**Effective for audits of financial statements for periods beginning on or after January 1, 1989, unless otherwise indicated.**

**.01**    This section provides guidance to the auditor in conducting an audit of financial statements in accordance with generally accepted auditing standards with respect to evaluating whether there is substantial doubt about the entity's ability to continue as a going concern.[1][2] Continuation of an entity as a going concern is assumed in financial reporting in the absence of significant information to the contrary. Ordinarily, information that significantly contradicts the going concern assumption relates to the entity's inability to continue to meet its obligations as they become due without substantial disposition of assets outside the ordinary course of business, restructuring of debt, externally forced revisions of its operations, or similar actions.

---

[1]    This section does not apply to an audit of financial statements based on the assumption of liquidation (for example, when [*a*] an entity is in the process of liquidation, [*b*] the owners have decided to commence dissolution or liquidation, or [*c*] legal proceedings, including bankruptcy, have reached a point at which dissolution or liquidation is probable). See Auditing Interpretation, "Reporting on Financial Statements Prepared on a Liquidation Basis of Accounting" ( section 9508.33-.38 ).
[2]    The guidance provided in this section applies to audits of financial statements prepared either in accordance with generally accepted accounting principles or in accordance with a comprehensive basis of accounting other than generally accepted accounting principles. References in this section to generally accepted accounting principles are intended to include a comprehensive basis of accounting other than generally accepted accounting principles (excluding liquidation basis).

## The Auditor's Responsibility

**.02**    The auditor has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited (hereinafter referred to as *a reasonable period of time*). The auditor's evaluation is based on his knowledge of relevant conditions and events that exist at or have occurred prior to the completion of fieldwork. Information about such conditions or events is obtained from the application of auditing procedures planned and performed to achieve audit objectives that are related to management's assertions embodied in the financial statements being audited, as described in section 326 , *Evidential Matter.*

**.03**    The auditor should evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time in the following manner:

a.   The auditor considers whether the results of his procedures performed in planning, gathering evidential matter relative to the various audit objectives, and completing the audit identify conditions and events that, when considered in the aggregate, indicate there could be substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. It may be necessary to obtain additional information about such conditions and events, as well as the appropriate evidential matter to support information that mitigates the auditor's doubt.

b.   If the auditor believes there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, he should (1) obtain information about management's plans that are intended to mitigate the effect of such conditions or events, and (2) assess the likelihood that such plans can be effectively implemented.

c.   After the auditor has evaluated management's plans, he concludes whether he has substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. If the auditor concludes there is substantial doubt, he should (1) consider the adequacy of disclosure about the entity's possible inability to continue as a going concern for a reasonable period of time, and (2) include an explanatory paragraph (following the opinion paragraph) in his audit report to reflect his conclusion. If the auditor concludes that substantial doubt does not exist, he should consider the need for disclosure.

**.04**   The auditor is not responsible for predicting future conditions or events. The fact that the entity may cease to exist as a going concern subsequent to receiving a report from the auditor that does not refer to substantial doubt, even within one year following the date of the financial statements, does not, in itself, indicate inadequate performance by the auditor. Accordingly, the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern.

## Audit Procedures

**.05**   It is not necessary to design audit procedures solely to identify conditions and events that, when considered in the aggregate, indicate there could be substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. The results of auditing procedures designed and performed to achieve other audit objectives should be sufficient for that purpose. The following are examples of procedures that may identify such conditions and events:

- Analytical procedures
- Review of subsequent events
- Review of compliance with the terms of debt and loan agreements
- Reading of minutes of meetings of stockholders, board of directors, and important committees of the board
- Inquiry of an entity's legal counsel about litigation, claims, and assessments
- Confirmation with related and third parties of the details of arrangements to provide or maintain financial support

## Consideration of Conditions and Events

**.06**   In performing audit procedures such as those presented in paragraph .05 , the auditor may identify information about certain conditions or events that, when considered in the aggregate, indicate there could be substantial doubt about the entity's ability to

continue as a going concern for a reasonable period of time. The significance of such conditions and events will depend on the circumstances, and some may have significance only when viewed in conjunction with others. The following are examples of such conditions and events:

- *Negative trends*—for example, recurring operating losses, working capital deficiencies, negative cash flows from operating activities, adverse key financial ratios
- *Other indications of possible financial difficulties* —for example, default on loan or similar agreements, arrearages in dividends, denial of usual trade credit from suppliers, restructuring of debt, noncompliance with statutory capital requirements, need to seek new sources or methods of financing or to dispose of substantial assets
- *Internal matters*—for example, work stoppages or other labor difficulties, substantial dependence on the success of a particular project, uneconomic long-term commitments, need to significantly revise operations
- *External matters that have occurred*—for example, legal proceedings, legislation, or similar matters that might jeopardize an entity's ability to operate; loss of a key franchise, license, or patent; loss of a principal customer or supplier; uninsured or underinsured catastrophe such as a drought, earthquake, or flood

## Consideration of Management's Plans

**.07**    If, after considering the identified conditions and events in the aggregate, the auditor believes there is substantial doubt about the ability of the entity to continue as a going concern for a reasonable period of time, he should consider management's plans for dealing with the adverse effects of the conditions and events. The auditor should obtain information about the plans and consider whether it is likely the adverse effects will be mitigated for a reasonable period of time and that such plans can be effectively implemented. The auditor's considerations relating to management plans may include the following:

- Plans to dispose of assets

    - Restrictions on disposal of assets, such as covenants limiting such transactions in loan or similar agreements or encumbrances against assets
    - Apparent marketability of assets that management plans to sell
    - Possible direct or indirect effects of disposal of assets

- Plans to borrow money or restructure debt

    - Availability of debt financing, including existing or committed credit arrangements, such as lines of credit or arrangements for factoring receivables or sale-leaseback of assets
    - Existing or committed arrangements to restructure or subordinate debt or to guarantee loans to the entity
    - Possible effects on management's borrowing plans of existing restrictions on additional borrowing or the sufficiency of available collateral

- Plans to reduce or delay expenditures

    -   Apparent feasibility of plans to reduce overhead or administrative expenditures, to postpone maintenance or research and development projects, or to lease rather than purchase assets
    -   Possible direct or indirect effects of reduced or delayed expenditures

- Plans to increase ownership equity

    -   Apparent feasibility of plans to increase ownership equity, including existing or committed arrangements to raise additional capital
    -   Existing or committed arrangements to reduce current dividend requirements or to accelerate cash distributions from affiliates or other investors

**.08**   When evaluating management's plans, the auditor should identify those elements that are particularly significant to overcoming the adverse effects of the conditions and events and should plan and perform auditing procedures to obtain evidential matter about them. For example, the auditor should consider the adequacy of support regarding the ability to obtain additional financing or the planned disposal of assets.

**.09**   When prospective financial information is particularly significant to management's plans, the auditor should request management to provide that information and should consider the adequacy of support for significant assumptions underlying that information. The auditor should give particular attention to assumptions that are—

- Material to the prospective financial information.
- Especially sensitive or susceptible to change.
- Inconsistent with historical trends.

The auditor's consideration should be based on knowledge of the entity, its business, and its management and should include (*a*) reading of the prospective financial information and the underlying assumptions and (*b*) comparing prospective financial information in prior periods with actual results and comparing prospective information for the current period with results achieved to date. If the auditor becomes aware of factors, the effects of which are not reflected in such prospective financial information, he should discuss those factors with management and, if necessary, request revision of the prospective financial information.

## Consideration of Financial Statement Effects

**.10**   When, after considering management's plans, the auditor concludes there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, the auditor should consider the possible effects on the financial statements and the adequacy of the related disclosure. Some of the information that might be disclosed includes—

- Pertinent conditions and events giving rise to the assessment of substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time.
- The possible effects of such conditions and events.
- Management's evaluation of the significance of those conditions and events and any mitigating factors.
- Possible discontinuance of operations.
- Management's plans (including relevant prospective financial information).[3]

- Information about the recoverability or classification of recorded asset amounts or the amounts or classification of liabilities.

---

[3]  It is not intended that such prospective financial information constitute prospective financial statements meeting the minimum presentation guidelines set forth in AT section 301 , *Financial Forecasts and Projections*, nor that the inclusion of such information require any consideration beyond that normally required by generally accepted auditing standards. [Footnote revised, January 2001, to reflect conforming changes necessary due to the issuance of Statement on Standards for Attestation Engagements No. 10.]

**.11**    When, primarily because of the auditor's consideration of management's plans, he concludes that substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time is alleviated, he should consider the need for disclosure of the principal conditions and events that initially caused him to believe there was substantial doubt. The auditor's consideration of disclosure should include the possible effects of such conditions and events, and any mitigating factors, including management's plans.

## Consideration of the Effects on the Auditor's Report

**.12**    If, after considering identified conditions and events and management's plans, the auditor concludes that substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time remains, the audit report should include an explanatory paragraph (following the opinion paragraph) to reflect that conclusion.[4] The auditor's conclusion about the entity's ability to continue as a going concern should be expressed through the use of the phrase "substantial doubt about its (the entity's) ability to continue as a going concern" [or similar wording that includes the terms substantial doubt *and* going concern] as illustrated in paragraph .13 . [As amended, effective for reports issued after December 31, 1990, by Statement on Auditing Standards No. 64.]

---

[4]  The inclusion of an explanatory paragraph (following the opinion paragraph) in the auditor's report contemplated by this section should serve adequately to inform the users of the financial statements. Nothing in this section, however, is intended to preclude an auditor from declining to express an opinion in cases involving uncertainties. If he disclaims an opinion, the uncertainties and their possible effects on the financial statements should be disclosed in an appropriate manner ( see paragraph .10 ), and the auditor's report should give all the substantive reasons for his disclaimer of opinion ( see section 508 , *Reports on Audited Financial Statements*).

**.13**    An example follows of an explanatory paragraph (following the opinion paragraph) in the auditor's report describing an uncertainty about the entity's ability to continue as a going concern for a reasonable period of time.[5]

> The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note X to the financial statements, the Company has suffered recurring losses from operations and has a net capital deficiency that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note X. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

[As amended, effective for reports issued after December 31, 1990, by Statement on Auditing Standards No. 64.]

---

[5]  In a going-concern explanatory paragraph, the auditor should not use conditional language in expressing a conclusion concerning the existence of substantial doubt about the entity's ability to continue as a going concern. Examples of

inappropriate wording in the explanatory paragraph would be, "If the Company continues to suffer recurring losses from operations and continues to have a net capital deficiency, there may be substantial doubt about its ability to continue as a going concern" or "The Company has been unable to renegotiate its expiring credit agreements. Unless the Company is able to obtain financial support, there is substantial doubt about its ability to continue as a going concern." [Footnote added, effective for reports issued after December 15, 1995, by Statement on Auditing Standards No. 77.]

**.14**    If the auditor concludes that the entity's disclosures with respect to the entity's ability to continue as a going concern for a reasonable period of time are inadequate, a departure from generally accepted accounting principles exists. This may result in either a qualified (except for) or an adverse opinion. Reporting guidance for such situations is provided in section 508 , *Reports on Audited Financial Statements*.

**.15**    Substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time that arose in the current period does not imply that a basis for such doubt existed in the prior period and, therefore, should not affect the auditor's report on the financial statements of the prior period that are presented on a comparative basis. When financial statements of one or more prior periods are presented on a comparative basis with financial statements of the current period, reporting guidance is provided in section 508 .

**.16**    If substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time existed at the date of prior period financial statements that are presented on a comparative basis, and that doubt has been removed in the current period, the explanatory paragraph included in the auditor's report (following the opinion paragraph) on the financial statements of the prior period should not be repeated.

# Documentation

**.17**    As stated in paragraph .03 of this section, the auditor considers whether the results of the auditing procedures performed in planning, gathering evidential matter relative to the various audit objectives, and completing the audit identify conditions and events that, when considered in the aggregate, indicate there could be substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. If, after considering the identified conditions and events in the aggregate, the auditor believes there is substantial doubt about the ability of the entity to continue as a going concern for a reasonable period of time, he or she follows the guidance in paragraphs .07 through .16 . In connection with that guidance, the auditor should document all of the following:

> *a.*    The conditions or events that led him or her to believe that there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time.
> *b.*    The elements of management's plans that the auditor considered to be particularly significant to overcoming the adverse effects of the conditions or events.
> *c.*    The auditing procedures performed and evidence obtained to evaluate the significant elements of management's plans.
> *d.*    The auditor's conclusion as to whether substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time remains or is alleviated. If substantial doubt remains, the auditor also should document the possible effects of the conditions or events on the financial statements and the adequacy of the related disclosures. If substantial doubt is alleviated, the auditor also should document the conclusion as to the need for disclosure of the principal conditions and events that initially caused him or her to believe there was substantial doubt.

*e.*    The auditor's conclusion as to whether he or she should include an explanatory paragraph in the audit report. If disclosures with respect to an entity's ability to continue as a going concern are inadequate, the auditor also should document the conclusion as to whether to express a qualified or adverse opinion for the resultant departure from generally accepted accounting principles.

[Paragraph added, effective for audits of financial statements for periods beginning on or after May 15, 2002, by Statement on Auditing Standards No. 96.]

## Effective Date

**.18**    This section is effective for audits of financial statements for periods beginning on or after January 1, 1989. Early application of the provisions of this section is permissible. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 96, January 2002.]

Copyright © 2006 by American Institute of Certified Public Accountants, Inc., New York, NY. All rights reserved.

© Copyright 2006 RIA. All rights reserved.

# AU Section 508[*]

[*] This section has been revised to reflect the conforming changes necessary due to the issuance of Statement on Auditing Standards No. 93.

## *Reports on Audited Financial Statements*

*For the PCAOB Interim Standard, please click here*

Supersedes sections 505, 509, 542, 545, and 546)

Source: SAS No. 58; SAS No. 64; SAS No. 79; SAS No. 85; SAS No. 93; SAS No. 98.

**See** section 9508 **for interpretations of this section.**

**Effective for reports issued or reissued on or after January 1, 1989, unless otherwise indicated.**

## Introduction

**.01**    This section applies to auditors' reports issued in connection with audits[1] of historical financial statements that are intended to present financial position, results of operations, and cash flows in conformity with generally accepted accounting principles. It distinguishes the types of reports, describes the circumstances in which each is appropriate, and provides example reports.

[1]   An audit, for purposes of this section, is defined as an examination of historical financial statements performed in accordance with generally accepted auditing standards in effect at the time the audit is performed. Generally accepted auditing standards include the ten standards as well as the Statements on Auditing Standards that interpret those standards. In some cases, regulatory authorities may have additional requirements applicable to entities under their jurisdiction and auditors of such entities should consider those requirements.

**.02**    This section does not apply to unaudited financial statements as described in section 504 , *Association With Financial Statements*, nor does it apply to reports on incomplete financial information or other special presentations as described in section 623 , *Special Reports*.

**.03**    Justification for the expression of the auditor's opinion rests on the conformity of his or her audit with generally accepted auditing standards and on the findings. Generally accepted auditing standards include four standards of reporting.[2] This section is concerned primarily with the relationship of the fourth reporting standard to the language of the auditor's report.

[2]   This section revises the second standard of reporting as follows:
The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.
Previously, the second standard required the auditor's report to state whether accounting principles had been consistently applied. As revised, the second standard requires the auditor to add an explanatory paragraph to his report only if accounting principles have not been applied consistently. (See section 420, *Consistency of Application of Generally Accepted Accounting Principles*.) Paragraphs .17-.19 of this section provide reporting guidance under these circumstances.

**.04**   The fourth standard of reporting is as follows:

> The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

**.05**   The objective of the fourth standard is to prevent misinterpretation of the degree of responsibility the auditor is assuming when his or her name is associated with financial statements. Reference in the fourth reporting standard to the financial statements "taken as a whole" applies equally to a complete set of financial statements and to an individual financial statement (for example, to a balance sheet) for one or more periods presented. ( Paragraph .65 discusses the fourth standard of reporting as it applies to comparative financial statements.) The auditor may express an unqualified opinion on one of the financial statements and express a qualified or adverse opinion or disclaim an opinion on another if the circumstances warrant.

**.06**   The auditor's report is customarily issued in connection with an entity's basic financial statements—balance sheet, statement of income, statement of retained earnings and statement of cash flows. Each financial statement audited should be specifically identified in the introductory paragraph of the auditor's report. If the basic financial statements include a separate statement of changes in stockholders' equity accounts, it should be identified in the introductory paragraph of the report but need not be reported on separately in the opinion paragraph since such changes are part of the presentation of financial position, results of operations, and cash flows.

## The Auditor's Standard Report

**.07**   The auditor's standard report states that the financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flows in conformity with generally accepted accounting principles. This conclusion may be expressed only when the auditor has formed such an opinion on the basis of an audit performed in accordance with generally accepted auditing standards.

**.08**   The auditor's standard report identifies the financial statements audited in an opening (introductory) paragraph, describes the nature of an audit in a scope paragraph, and expresses the auditor's opinion in a separate opinion paragraph. The basic elements of the report are the following:

> *a.*   A title that includes the word *independent*[3]
> *b.*   A statement that the financial statements identified in the report were audited
> *c.*   A statement that the financial statements are the responsibility of the Company's management[4] and that the auditor's responsibility is to express an opinion on the financial statements based on his or her audit
> *d.*   A statement that the audit was conducted in accordance with generally accepted auditing standards and an identification of the United States of America as the country of origin of those standards (for example, auditing standards generally accepted in the United States of America or U.S. generally accepted auditing standards)

*e.*    A statement that those standards require that the auditor plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement

*f.*    A statement that an audit includes—

(1)    Examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements

(2)    Assessing the accounting principles used and significant estimates made by management

(3)    Evaluating the overall financial statement presentation[5]

*g.*    A statement that the auditor believes that his or her audit provides a reasonable basis for his or her opinion

*h.*    An opinion as to whether the financial statements present fairly, in all material respects, the financial position of the Company as of the balance sheet date and the results of its operations and its cash flows for the period then ended in conformity with generally accepted accounting principles. The opinion should include an identification of the United States of America as the country of origin of those accounting principles (for example, accounting principles generally accepted in the United States of America or U.S. generally accepted accounting principles[6])

*i.*    The manual or printed signature of the auditor's firm

*j.*    The date[7] of the audit report

The form of the auditor's standard report on financial statements covering a single year is as follows:

<u>Independent Auditor's Report</u>

We have audited the accompanying balance sheet of X Company as of December 31, 20XX, and the related statements of income, retained earnings, and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of X Company as of [at] December 31, 20XX, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

[*Signature*]

[*Date*]

**A-86**

The form of the auditor's standard report on comparative financial statements[8] is as follows:

<u>Independent Auditor's Report</u>

We have audited the accompanying balance sheets of X Company as of December 31, 20X2 and 20X1, and the related statements of income, retained earnings, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of X Company as of [at] December 31, 20X2 and 20X1, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

[*Signature*]

[*Date*]

[As amended, effective for reports issued or reissued on or after June 30, 2001, by Statement on Auditing Standards No. 93.]

---

[3]  This section does not require a title for an auditor's report if the auditor is not independent. See section 504 , *Association With Financial Statements*, for guidance on reporting when the auditor is not independent.

[4]  In some instances, a document containing the auditor's report may include a statement by management regarding its responsibility for the presentation of the financial statements. Nevertheless, the auditor's report should state that the financial statements are management's responsibility.

[5]  Section 411, *The Meaning of* Present Fairly in Conformity With Generally Accepted Accounting Principles, paragraphs .03 and .04 , discuss the auditor's evaluation of the overall presentation of the financial statements. [As amended, effective for reports issued or reissued on or after June 30, 2001, by Statement on Auditing Standards No. 93.]

[6]  A U.S. auditor also may be engaged to report on the financial statements of a U.S. entity that have been prepared in conformity with accounting principles generally accepted in another country. In those circumstances, the auditor should refer to the guidance in section 534 , *Reporting on Financial Statements Prepared for Use in Other Countries*. [Footnote added, effective for reports issued or reissued on or after June 30, 2001 by Statement on Auditing Standards No. 93.]

[7]  For guidance on dating the auditor's report, see section 530A , *Dating of the Independent Auditor's Report*. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

[8]  If statements of income, retained earnings, and cash flows are presented on a comparative basis for one or more prior periods, but the balance sheet(s) as of the end of one (or more) of the prior period(s) is not presented, the phrase "for the years then ended" should be changed to indicate that the auditor's opinion applies to each period for which statements of income, retained earnings, and cash flows are presented, such as "for each of the three years in the period ended [date of latest balance sheet]." [Footnote renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

**.09**    The report may be addressed to the company whose financial statements are being audited or to its board of directors or stockholders. A report on the financial statements of an unincorporated entity should be addressed as circumstances dictate, for example, to the partners, to the general partner, or to the proprietor. Occasionally, an auditor is retained to audit the financial statements of a company that is not a client; in such a case, the report is customarily addressed to the client and not to the directors or stockholders of the company whose financial statements are being audited.

**.10**    This section also discusses the circumstances that may require the auditor to depart from the standard report and provides reporting guidance in such circumstances. This section is organized by type of opinion that the auditor may express in each of the various circumstances presented; this section describes what is meant by the various audit opinions:

- *Unqualified opinion.* An unqualified opinion states that the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles. This is the opinion expressed in the standard report discussed in paragraph .08 .
- *Explanatory language added to the auditor's standard report.* Certain circumstances, while not affecting the auditor's unqualified opinion on the financial statements, may require that the auditor add an explanatory paragraph (or other explanatory language) to his or her report.
- *Qualified opinion.* A qualified opinion states that, except for the effects of the matter(s) to which the qualification relates, the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles.
- *Adverse opinion.* An adverse opinion states that the financial statements do not present fairly the financial position, results of operations, or cash flows of the entity in conformity with generally accepted accounting principles.
- *Disclaimer of opinion.* A disclaimer of opinion states that the auditor does not express an opinion on the financial statements.

These opinions are discussed in greater detail throughout the remainder of this section.

## Explanatory Language Added to the Auditor's Standard Report

**.11**    Certain circumstances, while not affecting the auditor's unqualified opinion, may require that the auditor add an explanatory[9] paragraph (or other explanatory language) to the standard report.[10] These circumstances include:

- *a.*    The auditor's opinion is based in part on the report of another auditor ( paragraphs .12 and .13 ).
- *b.*    To prevent the financial statements from being misleading because of unusual circumstances, the financial statements contain a departure from an accounting principle promulgated by a body designated by the AICPA Council to establish such principles ( paragraphs .14 and .15 ).
- *c.*    There is substantial doubt about the entity's ability to continue as a going concern.[11]
- *d.*    There has been a material change between periods in accounting principles or in the method of their application ( paragraphs .16 through .18 ).

**A-88**

*e.*    Certain circumstances relating to reports on comparative financial statements exist ( paragraphs .68 , .69 , and .72 through .74 ).

*f.*    Selected quarterly financial data required by SEC Regulation S-K has been omitted or has not been reviewed. (See section 722, *Interim Financial Information*, paragraph .50 .)

*g.*    Supplementary information required by the Financial Accounting Standards Board (FASB), the Governmental Accounting Standards Board (GASB), or the Federal Accounting Standards Advisory Board (FASAB) has been omitted, the presentation of such information departs materially from FASB, GASB, or FASAB guidelines, the auditor is unable to complete prescribed procedures with respect to such information, or the auditor is unable to remove substantial doubts about whether the supplementary information conforms to FASB, GASB, or FASAB guidelines. (See section 558, *Required Supplementary Information*, paragraph .02. )

*h.*    Other information in a document containing audited financial statements is materially inconsistent with information appearing in the financial statements. (See section 550, *Other Information in Documents Containing Audited Financial Statements*, paragraph .04. )

In addition, the auditor may add an explanatory paragraph to emphasize a matter regarding the financial statements ( paragraph .19 ). [As amended, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79. Revised, November 2002, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 100.]

---

[9]  Unless otherwise required by the provisions of this section, an explanatory paragraph may precede or follow the opinion paragraph in the auditor's report. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

[10]  See footnote 3. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

[11]  Section 341 , *The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern*, describes the auditor's responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time and, when applicable, to consider the adequacy of financial statement disclosure and to include an explanatory paragraph in the report to reflect his or her conclusions. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

## Opinion Based in Part on Report of Another Auditor

**.12**    When the auditor decides to make reference to the report of another auditor as a basis, in part, for his or her opinion, he or she should disclose this fact in the introductory paragraph of his or her report and should refer to the report of the other auditor in expressing his or her opinion. These references indicate division of responsibility for performance of the audit. ( See section 543 , *Part of Audit Performed by Other Independent Auditors*.)

**.13**    An example of a report indicating a division of responsibility follows:

<u>Independent Auditor's Report</u>

We have audited the consolidated balance sheets of ABC Company and subsidiaries as of December 31, 20X2 and 20X1, and the related consolidated statements of income, retained earnings, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the financial statements of B Company, a wholly-owned subsidiary, which

statements reflect total assets of $_____ and $_____ as of
December 31, 20X2 and 20X1, respectively, and total revenues of
$_____ and $_____ for the years then ended. Those statements
were audited by other auditors whose report has been furnished to us, and
our opinion, insofar as it relates to the amounts included for B Company,
is based solely on the report of the other auditors.

We conducted our audits in accordance with auditing standards generally
accepted in the United States of America. Those standards require that we
plan and perform the audit to obtain reasonable assurance about whether
the financial statements are free of material misstatement. An audit
includes examining, on a test basis, evidence supporting the amounts and
disclosures in the financial statements. An audit also includes assessing
the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement
presentation. We believe that our audits and the report of other auditors
provide a reasonable basis for our opinion.

In our opinion, based on our audits and the report of other auditors, the
consolidated financial statements referred to above present fairly, in all
material respects, the financial position of ABC Company and subsidiaries
as of December 31, 20X2 and 20X1, and the results of their operations
and their cash flows for the years then ended in conformity with
accounting principles generally accepted in the United States of America.

## Departure From a Promulgated Accounting Principle

**.14**    Rule 203 [ ET section 203.01 ] of the Code of Professional Conduct of the AICPA
states:

A member shall not (1) express an opinion or state affirmatively that the
financial statements or other financial data of any entity are presented in
conformity with generally accepted accounting principles or (2) state that
he or she is not aware of any material modifications that should be made
to such statements or data in order for them to be in conformity with
generally accepted accounting principles, if such statements or data
contain any departure from an accounting principle promulgated by bodies
designated by Council to establish such principles that has a material
effect on the statements or data taken as a whole. If, however, the
statements or data contain such a departure and the member can
demonstrate that due to unusual circumstances the financial statements
or data would otherwise have been misleading, the member can comply
with the rule by describing the departure, its approximate effects, if
practicable, and the reasons why compliance with the principle would
result in a misleading statement.

**.15**    When the circumstances contemplated by Rule 203 [ ET section 203.01 ] are
present, the auditor's report should include, in a separate paragraph or paragraphs, the
information required by the rule. In such a case, it is appropriate for the auditor to
express an unqualified opinion with respect to the conformity of the financial statements
with generally accepted accounting principles unless there are other reasons, not
associated with the departure from a promulgated principle, not to do so. ( See section
411 , *The Meaning of* Present Fairly in Conformity With Generally Accepted Accounting

Principles.) [Title of section 411 amended, effective for reports issued or reissued on or after June 30, 2001, by Statement on Auditing Standards No. 93.]

Former paragraphs .16 through .33 and related footnotes have been deleted and all subsequent paragraphs and footnotes renumbered by the issuance of Statement on Auditing Standards No. 79, effective for reports issued or reissued on or after February 29, 1996.

## Lack of Consistency

**.16**    The auditor's standard report implies that the auditor is satisfied that the comparability of financial statements between periods has not been materially affected by changes in accounting principles and that such principles have been consistently applied between or among periods because either (*a*) no change in accounting principles has occurred, or (*b*) there has been a change in accounting principles or in the method of their application, but the effect of the change on the comparability of the financial statements is not material. In these cases, the auditor should not refer to consistency in the report. If, however, there has been a change in accounting principles or in the method of their application that has a material effect on the comparability of the company's financial statements, the auditor should refer to the change in an explanatory paragraph of the report. Such explanatory paragraph (following the opinion paragraph) should identify the nature of the change and refer the reader to the note in the financial statements that discusses the change in detail. The auditor's concurrence with a change is implicit unless he or she takes exception to the change in expressing his or her opinion as to fair presentation of the financial statements in conformity with generally accepted accounting principles.[12] When there is a change in accounting principles, there are also other matters that the auditor should consider ( see paragraphs .50 through .57 ). [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

---

[12]   With respect to the method of accounting for the effect of a change in accounting principle, see Accounting Principles Board Opinion No. 20 , *Accounting Changes*, including paragraph 4 [AC section A06.103], which states that methods of accounting for changes in principles resulting from the implementation of new pronouncements is provided in those pronouncements. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

**.17**    Following is an example of an appropriate explanatory paragraph:

>    As discussed in Note X to the financial statements, the Company changed its method of computing depreciation in 20X2.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.18**    The addition of this explanatory paragraph in the auditor's report is required in reports on financial statements of subsequent years as long as the year of the change is presented and reported on.[13] However, if the accounting change is accounted for by retroactive restatement of the financial statements affected, the additional paragraph is required only in the year of the change since, in subsequent years, all periods presented will be comparable. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

---

[13]   An exception to this requirement occurs when a change in accounting principle that does not require a cumulative

effect adjustment is made at the beginning of the earliest year presented and reported on. That exception is addressed in the auditing interpretation of section 420 , *Consistency of Application of Generally Accepted Accounting Principles*, titled "Impact on the Auditor's Report of FIFO to LIFO Change in Comparative Financial Statements," ( section 9420.16-.23 ). [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

## Emphasis of a Matter

**.19**    In any report on financial statements, the auditor may emphasize a matter regarding the financial statements. Such explanatory information should be presented in a separate paragraph of the auditor's report. Phrases such as "with the foregoing [following] explanation" should not be used in the opinion paragraph if an emphasis paragraph is included in the auditor's report. Emphasis paragraphs are never required; they may be added solely at the auditor's discretion. Examples of matters the auditor may wish to emphasize are—

- That the entity is a component of a larger business enterprise.
- That the entity has had significant transactions with related parties.
- Unusually important subsequent events.
- Accounting matters, other than those involving a change or changes in accounting principles, affecting the comparability of the financial statements with those of the preceding period.

[Paragraph renumbered and amended, effective for reports issued or reissued on or after February 29, 1996, by the issuance of Statement on Auditing Standards No. 79.]

# Departures From Unqualified Opinions

## Qualified Opinions

**.20**    Certain circumstances may require a qualified opinion. A qualified opinion states that, *except for* the effects of the matter to which the qualification relates, the financial statements present fairly, in all material respects, financial position, results of operations, and cash flows in conformity with generally accepted accounting principles. Such an opinion is expressed when—

   *a.*    There is a lack of sufficient competent evidential matter or there are restrictions on the scope of the audit that have led the auditor to conclude that he or she cannot express an unqualified opinion and he or she has concluded not to disclaim an opinion ( paragraphs .22-.34 ).
   *b.*    The auditor believes, on the basis of his or her audit, that the financial statements contain a departure from generally accepted accounting principles, the effect of which is material, and he or she has concluded not to express an adverse opinion ( paragraphs .35-.57 ).

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.21**    When the auditor expresses a qualified opinion, he or she should disclose all of the substantive reasons in one or more separate explanatory paragraph(s) preceding the opinion paragraph of the report. The auditor should also include, in the opinion paragraph, the appropriate qualifying language and a reference to the explanatory paragraph. A qualified opinion should include the word *except* or *exception* in a phrase such as *except for* or *with the exception of*. Phrases such as *subject to* and *with the*

*foregoing explanation* are not clear or forceful enough and should not be used. Since accompanying notes are part of the financial statements, wording such as *fairly presented, in all material respects, when read in conjunction with Note 1* is likely to be misunderstood and should not be used. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

## Scope Limitations

**.22** The auditor can determine that he or she is able to express an unqualified opinion only if the audit has been conducted in accordance with generally accepted auditing standards and if he or she has therefore been able to apply all the procedures he considers necessary in the circumstances. Restrictions on the scope of the audit, whether imposed by the client or by circumstances, such as the timing of his or her work, the inability to obtain sufficient competent evidential matter, or an inadequacy in the accounting records, may require the auditor to qualify his or her opinion or to disclaim an opinion. In such instances, the reasons for the auditor's qualification of opinion or disclaimer of opinion should be described in the report. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.23** The auditor's decision to qualify his or her opinion or disclaim an opinion because of a scope limitation depends on his or her assessment of the importance of the omitted procedure(s) to his or her ability to form an opinion on the financial statements being audited. This assessment will be affected by the nature and magnitude of the potential effects of the matters in question and by their significance to the financial statements. If the potential effects relate to many financial statement items, this significance is likely to be greater than if only a limited number of items is involved. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.24** Common restrictions on the scope of the audit include those applying to the observation of physical inventories and the confirmation of accounts receivable by direct communication with debtors.[14] Another common scope restriction involves accounting for long-term investments when the auditor has not been able to obtain audited financial statements of an investee. Restrictions on the application of these or other audit procedures to important elements of the financial statements require the auditor to decide whether he or she has examined sufficient competent evidential matter to permit him or her to express an unqualified or qualified opinion, or whether he or she should disclaim an opinion. When restrictions that significantly limit the scope of the audit are imposed by the client, ordinarily the auditor should disclaim an opinion on the financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

---

[14] Circumstances such as the timing of the work may make it impossible for the auditor to accomplish these procedures. In this case, if the auditor is able to satisfy himself or herself as to inventories or accounts receivable by applying alternative procedures, there is no significant limitation on the scope of the work, and the report need not include a reference to the omission of the procedures or the use of alternative procedures. It is important to understand, however, that section 331 , *Inventories*, states that "it will always be necessary for the auditor to make, or observe, some physical counts of the inventory and apply appropriate tests of intervening transactions." [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

**.25** When a qualified opinion results from a limitation on the scope of the audit or an insufficiency of evidential matter, the situation should be described in an explanatory paragraph preceding the opinion paragraph and referred to in both the scope and opinion paragraphs of the auditor's report. It is not appropriate for the scope of the audit to be explained in a note to the financial statements, since the description of the audit scope is

the responsibility of the auditor and not that of the client. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.26** When an auditor qualifies his or her opinion because of a scope limitation, the wording in the opinion paragraph should indicate that the qualification pertains to the possible effects on the financial statements and not to the scope limitation itself. Wording such as "In our opinion, except for the above-mentioned limitation on the scope of our audit …" bases the exception on the restriction itself, rather than on the possible effects on the financial statements and, therefore, is unacceptable. An example of a qualified opinion related to a scope limitation concerning an investment in a foreign affiliate (assuming the effects of the limitation are such that the auditor has concluded that a disclaimer of opinion is not appropriate) follows:

<u>Independent Auditor's Report</u>

[*Same first paragraph as the standard report*]

Except as discussed in the following paragraph, we conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

We were unable to obtain audited financial statements supporting the Company's investment in a foreign affiliate stated at $_____ and $_____ at December 31, 20X2 and 20X1, respectively, or its equity in earnings of that affiliate of $_____ and $_____, which is included in net income for the years then ended as described in Note X to the financial statements; nor were we able to satisfy ourselves as to the carrying value of the investment in the foreign affiliate or the equity in its earnings by other auditing procedures.

In our opinion, except for the effects of such adjustments, if any, as might have been determined to be necessary had we been able to examine evidence regarding the foreign affiliate investment and earnings, the financial statements referred to in the first paragraph above present fairly, in all material respects, the financial position of X Company as of December 31, 20X2 and 20X1, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.27** ***Other scope limitations.*** Sometimes, notes to financial statements may contain unaudited information, such as pro forma calculations or other similar disclosures. If the unaudited information (for example, an investor's share, material in amount, of an investee's earnings recognized on the equity method) is such that it should be subjected

to auditing procedures in order for the auditor to form an opinion with respect to the financial statements taken as a whole, the auditor should apply the procedures he or she deems necessary to the unaudited information. If the auditor has not been able to apply the procedures he or she considers necessary, the auditor should qualify his or her opinion or disclaim an opinion because of a limitation on the scope of the audit. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.28**    If, however, these disclosures are not necessary to fairly present the financial position, operating results, or cash flows on which the auditor is reporting, such disclosures may be identified as *unaudited* or as *not covered by the auditor's report*. For example, the pro forma effects of a business combination or of a subsequent event may be labelled unaudited. Therefore, while the event or transaction giving rise to the disclosures in these circumstances should be audited, the pro forma disclosures of that event or transaction would not be. The auditor should be aware, however, that section 530 , *Dating of the Independent Auditor's Report*, states that, if the auditor is aware of a material subsequent event that has occurred after the completion of fieldwork but before issuance of the report that should be disclosed, the auditor's only options are to dual date the report or date the report as of the date of the subsequent event and extend the procedures for review of subsequent events to that date. Labelling the note unaudited is not an acceptable alternative in these circumstances. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.29    *Uncertainties and scope limitations.*** A matter involving an uncertainty is one that is expected to be resolved at a future date, at which time conclusive evidential matter concerning its outcome would be expected to become available. Uncertainties include, but are not limited to, contingencies covered by Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*, and matters related to estimates covered by Statement of Position 94-6 , *Disclosure of Certain Significant Risks and Uncertainties*. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.30**    Conclusive evidential matter concerning the ultimate outcome of uncertainties cannot be expected to exist at the time of the audit because the outcome and related evidential matter are prospective. In these circumstances, management is responsible for estimating the effect of future events on the financial statements, or determining that a reasonable estimate cannot be made and making the required disclosures, all in accordance with generally accepted accounting principles, based on management's analysis of existing conditions. An audit includes an assessment of whether the evidential matter is sufficient to support management's analysis. Absence of the existence of information related to the outcome of an uncertainty does not necessarily lead to a conclusion that the evidential matter supporting management's assertion is not sufficient. Rather, the auditor's judgment regarding the sufficiency of the evidential matter is based on the evidential matter that is, or should be, available. If, after considering the existing conditions and available evidence, the auditor concludes that sufficient evidential matter supports management's assertions about the nature of a matter involving an uncertainty and its presentation or disclosure in the financial statements, an unqualified opinion ordinarily is appropriate. [Paragraph added, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79.]

**.31**    If the auditor is unable to obtain sufficient evidential matter to support management's assertions about the nature of a matter involving an uncertainty and its presentation or disclosure in the financial statements, the auditor should consider the need to express a qualified opinion or to disclaim an opinion because of a scope limitation. A qualification or disclaimer of opinion because of a scope limitation is

appropriate if sufficient evidential matter related to an uncertainty does or did exist but was not available to the auditor for reasons such as management's record retention policies or a restriction imposed by management. [Paragraph added, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79.]

**.32**    Scope limitations related to uncertainties should be differentiated from situations in which the auditor concludes that the financial statements are materially misstated due to departures from generally accepted accounting principles related to uncertainties. Such departures may be caused by inadequate disclosure concerning the uncertainty, the use of inappropriate accounting principles, or the use of unreasonable accounting estimates. Paragraphs .45 to .49 provide guidance to the auditor when financial statements contain departures from generally accepted accounting principles related to uncertainties. [Paragraph added, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79.]

**.33**    *Limited reporting engagements.* The auditor may be asked to report on one basic financial statement and not on the others. For example, he or she may be asked to report on the balance sheet and not on the statements of income, retained earnings or cash flows. These engagements do not involve scope limitations if the auditor's access to information underlying the basic financial statements is not limited and if the auditor applies all the procedures he considers necessary in the circumstances; rather, such engagements involve limited reporting objectives. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.34**    An auditor may be asked to report on the balance sheet only. In this case, the auditor may express an opinion on the balance sheet only. An example of an unqualified opinion on a balance-sheet-only audit follows (the report assumes that the auditor has been able to satisfy himself or herself regarding the consistency of application of accounting principles):

<u>Independent Auditor's Report</u>

We have audited the accompanying balance sheet of X Company as of December 31, 20XX. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the balance sheet is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the balance sheet. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall balance sheet presentation. We believe that our audit of the balance sheet provides a reasonable basis for our opinion.

In our opinion, the balance sheet referred to above presents fairly, in all material respects, the financial position of X Company as of December 31, 20XX, in conformity with accounting principles generally accepted in the United States of America.

**A-96**

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

## *Departure From a Generally Accepted Accounting Principle*

**.35**    When financial statements are materially affected by a departure from generally accepted accounting principles and the auditor has audited the statements in accordance with generally accepted auditing standards, he or she should express a qualified ( paragraphs .36 through .57 ) or an adverse ( paragraphs .58 through .60 ) opinion. The basis for such opinion should be stated in the report. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.36**    In deciding whether the effects of a departure from generally accepted accounting principles are sufficiently material to require either a qualified or adverse opinion, one factor to be considered is the dollar magnitude of such effects. However, the concept of materiality does not depend entirely on relative size; it involves qualitative as well as quantitative judgments. The significance of an item to a particular entity (for example, inventories to a manufacturing company), the pervasiveness of the misstatement (such as whether it affects the amounts and presentation of numerous financial statement items), and the effect of the misstatement on the financial statements taken as a whole are all factors to be considered in making a judgment regarding materiality. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.37**    When the auditor expresses a qualified opinion, he or she should disclose, in a separate explanatory paragraph(s) preceding the opinion paragraph of the report, all of the substantive reasons that have led him or her to conclude that there has been a departure from generally accepted accounting principles. Furthermore, the opinion paragraph of the report should include the appropriate qualifying language and a reference to the explanatory paragraph(s). [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.38**    The explanatory paragraph(s) should also disclose the principal effects of the subject matter of the qualification on financial position, results of operations, and cash flows, if practicable.[15] If the effects are not reasonably determinable, the report should so state. If such disclosures are made in a note to the financial statements, the explanatory paragraph(s) may be shortened by referring to it. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

---

[15]    Section 431 , *Adequacy of Disclosure in the Financial Statements*, defines *practicable* as "... the information is reasonably obtainable from management's accounts and records and that providing the information in the report does not require the auditor to assume the position of a preparer of financial information." For example, if the information can be obtained from the accounts and records without the auditor substantially increasing the effort that would normally be required to complete the audit, the information should be presented in the report. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

**.39**    An example of a report in which the opinion is qualified because of the use of an accounting principle at variance with generally accepted accounting principles follows (assuming the effects are such that the auditor has concluded that an adverse opinion is not appropriate):

<u>Independent Auditor's Report</u>

[*Same first and second paragraphs as the standard report*]

The Company has excluded, from property and debt in the accompanying balance sheets, certain lease obligations that, in our opinion, should be capitalized in order to conform with accounting principles generally accepted in the United States of America. If these lease obligations were capitalized, property would be increased by $_____ and $_____, long-term debt by $_____ and $_____, and retained earnings by $_____ and $_____ as of December 31, 20X2 and 20X1, respectively. Additionally, net income would be increased (decreased) by $_____ and $_____ and earnings per share would be increased (decreased) by $_____ and $_____, respectively, for the years then ended.

In our opinion, except for the effects of not capitalizing certain lease obligations as discussed in the preceding paragraph, the financial statements referred to above present fairly, in all material respects, the financial position of X Company as of December 31, 20X2 and 20X1, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.40**   If the pertinent facts are disclosed in a note to the financial statements, a separate paragraph (preceding the opinion paragraph) of the auditor's report in the circumstances illustrated in paragraph .39 might read as follows:

As more fully described in Note X to the financial statements, the Company has excluded certain lease obligations from property and debt in the accompanying balance sheets. In our opinion, accounting principles generally accepted in the United States of America require that such obligations be included in the balance sheets.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.41**   *Inadequate disclosure.* Information essential for a fair presentation in conformity with generally accepted accounting principles should be set forth in the financial statements (which include the related notes). When such information is set forth elsewhere in a report to shareholders, or in a prospectus, proxy statement, or other similar report, it should be referred to in the financial statements. If the financial statements, including accompanying notes, fail to disclose information that is required by generally accepted accounting principles, the auditor should express a qualified or adverse opinion because of the departure from those principles and should provide the information in the report, if practicable,[16] unless its omission from the auditor's report is recognized as appropriate by a specific Statement on Auditing Standards. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

---

[16]   See footnote 15. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

**.42**    Following is an example of a report qualified for inadequate disclosure (assuming that the auditor has concluded that it is not practicable to present the required information and the effects are such that the auditor has concluded an adverse opinion is not appropriate):

<u>Independent Auditor's Report</u>

[*Same first and second paragraphs as the standard report*]

The Company's financial statements do not disclose [*describe the nature of the omitted information that it is not practicable to present in the auditor's report*].[Dagger:] In our opinion, disclosure of this information is required by accounting principles generally accepted in the United States of America.

In our opinion, except for the omission of the information discussed in the preceding paragraph, ...

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

[Dagger:]   This sentence reflects generally accepted auditing standards modified by the AICPA after April 16, 2003. As such, this sentence is not part of the standards adopted or established by the Public Company Accounting Oversight Board.

**.43**    If a company issues financial statements that purport to present financial position and results of operations but omits the related statement of cash flows, the auditor will normally conclude that the omission requires qualification of his opinion. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.44**    The auditor is not required to prepare a basic financial statement (for example, a statement of cash flows for one or more periods) and include it in the report if the company's management declines to present the statement. Accordingly, in these cases, the auditor should ordinarily qualify the report in the following manner:

<u>Independent Auditor's Report</u>

We have audited the accompanying balance sheets of X Company as of December 31, 20X2 and 20X1, and the related statements of income and retained earnings for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

[*Same second paragraph as the standard report*]

The Company declined to present a statement of cash flows for the years ended December 31, 20X2 and 20X1. Presentation of such statement summarizing the Company's operating, investing, and financing activities is required by accounting principles generally accepted in the United States of America.

> In our opinion, except that the omission of a statement of cash flows results in an incomplete presentation as explained in the preceding paragraph, the financial statements referred to above present fairly, in all material respects, the financial position of X Company as of December 31, 20X2 and 20X1, and the results of its operations for the years then ended in conformity with accounting principles generally accepted in the United States of America.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.45** ***Departures from generally accepted accounting principles involving risks or uncertainties, and materiality considerations.*** Departures from generally accepted accounting principles involving risks or uncertainties generally fall into one of the following categories:

- Inadequate disclosure ( paragraphs .46 and .47 )
- Inappropriate accounting principles ( paragraph .48 )
- Unreasonable accounting estimates ( paragraph .49 )

[Paragraph added, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79.]

**.46**    If the auditor concludes that a matter involving a risk or an uncertainty is not adequately disclosed in the financial statements in conformity with generally accepted accounting principles, the auditor should express a qualified or an adverse opinion. [Paragraph added, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79.]

**.47**    The auditor should consider materiality in evaluating the adequacy of disclosure of matters involving risks or uncertainties in the financial statements in the context of the financial statements taken as a whole. The auditor's consideration of materiality is a matter of professional judgment and is influenced by his or her perception of the needs of a reasonable person who will rely on the financial statements. Materiality judgments involving risks or uncertainties are made in light of the surrounding circumstances. The auditor evaluates the materiality of reasonably possible losses that may be incurred upon the resolution of uncertainties both individually and in the aggregate. The auditor performs the evaluation of reasonably possible losses without regard to his or her evaluation of the materiality of known and likely misstatements in the financial statements. [Paragraph added, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79.]

**.48**    In preparing financial statements, management estimates the outcome of certain types of future events. For example, estimates ordinarily are made about the useful lives of depreciable assets, the collectibility of accounts receivable, the realizable value of inventory items, and the provision for product warranties. FASB Statement No. 5 , *Accounting for Contingencies*, paragraphs 23 and 25, describes situations in which the inability to make a reasonable estimate may raise questions about the appropriateness of the accounting principles used. If, in those or other situations, the auditor concludes that the accounting principles used cause the financial statements to be materially misstated, he or she should express a qualified or an adverse opinion. [Paragraph added, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79.]

**.49**    Usually, the auditor is able to satisfy himself or herself regarding the reasonableness of management's estimate of the effects of future events by considering various types of evidential matter, including the historical experience of the entity. If the auditor concludes that management's estimate is unreasonable ( see section 312 , *Audit Risk and Materiality*, and section 342 , *Auditing Accounting Estimates*) and that its effect is to cause the financial statements to be materially misstated, he or she should express a qualified or an adverse opinion. [Paragraph added, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79.]

**.50    *Accounting changes.*** The auditor should evaluate a change in accounting principle to satisfy himself that (*a*) the newly adopted accounting principle is a generally accepted accounting principle, (*b*) the method of accounting for the effect of the change is in conformity with generally accepted accounting principles, and (*c*) management's justification for the change is reasonable. If a change in accounting principle does not meet these conditions, the auditor's report should so indicate, and his opinion should be appropriately qualified as discussed in paragraphs .51 and .52 . [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.51**    If (*a*) a newly adopted accounting principle is not a generally accepted accounting principle, (*b*) the method of accounting for the effect of the change is not in conformity with generally accepted accounting principles, or (*c*) management has not provided reasonable justification for the change in accounting principle, the auditor should express a qualified opinion or, if the effect of the change is sufficiently material, the auditor should express an adverse opinion on the financial statements. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.52**    Accounting Principles Board Opinion No. 20 , *Accounting Changes*, paragraph 16 [AC section A06.112], states: "The presumption that an entity should not change an accounting principle may be overcome only if the enterprise justifies the use of an alternative acceptable accounting principle on the basis that it is preferable." If management has not provided reasonable justification for the change in accounting principles, the auditor should express an exception to the change having been made without reasonable justification. An example of a report qualified for this reason follows:

<u>Independent Auditor's Report</u>

[*Same first and second paragraphs as the standard report*]

As disclosed in Note X to the financial statements, the Company adopted, in 20X2, the first-in, first-out method of accounting for its inventories, whereas it previously used the last-in, first-out method. Although use of the first-in, first-out method is in conformity with accounting principles generally accepted in the United States of America, in our opinion the Company has not provided reasonable justification for making this change as required by those principles.[17]

In our opinion, except for the change in accounting principle discussed in the preceding paragraph, the financial statements referred to above present fairly, in all material respects, the financial position of X Company as of December 31, 20X2 and 20X1, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

[17]   Section 420 , *Consistency of Application of Generally Accepted Accounting Principles,* states that a change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error and that such a change requires recognition in the auditor's report as to consistency. Therefore, the auditor should add an explanatory paragraph to the report discussing the accounting change. However, because the middle paragraph included in the example presented contains all of the information required in an explanatory paragraph on consistency, a separate explanatory paragraph (following the opinion paragraph) as required by paragraphs .16 through .18 of this section is not necessary in this instance. A separate paragraph that identifies the change in accounting principle would be required if the substance of the disclosure did not fulfill the requirements outlined in these paragraphs. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

**.53**   Whenever an accounting change results in an auditor expressing a qualified or adverse opinion on the conformity of financial statements with generally accepted accounting principles for the year of change, the auditor should consider the possible effects of that change when reporting on the entity's financial statements for subsequent years, as discussed in paragraphs .54 through .57 . [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.54**   If the financial statements for the year of such change are presented and reported on with a subsequent year's financial statements, the auditor's report should disclose his or her reservations with respect to the statements for the year of change. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.55**   If an entity has adopted an accounting principle that is not a generally accepted accounting principle, its continued use might have a material effect on the statements of a subsequent year on which the auditor is reporting. In this situation, the independent auditor should express either a qualified opinion or an adverse opinion, depending on the materiality of the departure in relation to the statements of the subsequent year. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.56**   If an entity accounts for the effect of a change prospectively when generally accepted accounting principles require restatement or the inclusion of the cumulative effect of the change in the year of change, a subsequent year's financial statements could improperly include a charge or credit that is material to those statements. This situation also requires that the auditor express a qualified or an adverse opinion. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.57**   If management has not provided reasonable justification for a change in accounting principles, the auditor's opinion should express an exception to the change having been made without reasonable justification, as previously indicated. In addition, the auditor should continue to express his or her exception with respect to the financial statements for the year of change as long as they are presented and reported on. However, the auditor's exception relates to the accounting change and does not affect the status of a newly adopted principle as a generally accepted accounting principle. Accordingly, while expressing an exception for the year of change, the independent auditor's opinion regarding the subsequent years' statements need not express an exception to use of the newly adopted principle. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

## Adverse Opinions

A-102

**.58**    An adverse opinion states that the financial statements do not present fairly the financial position or the results of operations or cash flows in conformity with generally accepted accounting principles. Such an opinion is expressed when, in the auditor's judgment, the financial statements taken as a whole are not presented fairly in conformity with generally accepted accounting principles. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.59**    When the auditor expresses an adverse opinion, he or she should disclose in a separate explanatory paragraph(s) preceding the opinion paragraph of the report (*a*) all the substantive reasons for his or her adverse opinion, and (*b*) the principal effects of the subject matter of the adverse opinion on financial position, results of operations, and cash flows, if practicable.[18] If the effects are not reasonably determinable, the report should so state.[19] [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

[18]    See footnote 15. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No 93, October 2000.]
[19]    When the auditor expresses an adverse opinion, he or she should also consider the need for an explanatory paragraph under the circumstances identified in paragraph .11 , subsection (*c*), (*d*), and (*e*) of this section. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

**.60**    When an adverse opinion is expressed, the opinion paragraph should include a direct reference to a separate paragraph that discloses the basis for the adverse opinion, as shown below:

Independent Auditor's Report

[*Same first and second paragraphs as the standard report*]

As discussed in Note X to the financial statements, the Company carries its property, plant and equipment accounts at appraisal values, and provides depreciation on the basis of such values. Further, the Company does not provide for income taxes with respect to differences between financial income and taxable income arising because of the use, for income tax purposes, of the installment method of reporting gross profit from certain types of sales. Accounting principles generally accepted in the United States of America require that property, plant and equipment be stated at an amount not in excess of cost, reduced by depreciation based on such amount, and that deferred income taxes be provided.

Because of the departures from accounting principles generally accepted in the United States of America identified above, as of December 31, 20X2 and 20X1, inventories have been increased $_____ and $_____ by inclusion in manufacturing overhead of depreciation in excess of that based on cost; property, plant and equipment, less accumulated depreciation, is carried at $_____ and $_____ in excess of an amount based on the cost to the Company; and deferred income taxes of $_____ and $_____ have not been recorded; resulting in an increase of $_____ and $_____ in retained earnings and in appraisal surplus of $_____ and $_____, respectively. For the years ended December 31, 20X2 and 20X1, cost of goods sold has been increased $_____ and $_____, respectively, because of the effects of the depreciation accounting referred to above and deferred income taxes of $_____ and

A-103

$_____ have not been provided, resulting in an increase in net income of $_____ and $_____, respectively.

In our opinion, because of the effects of the matters discussed in the preceding paragraphs, the financial statements referred to above do not present fairly, in conformity with accounting principles generally accepted in the United States of America, the financial position of X Company as of December 31, 20X2 and 20X1, or the results of its operations or its cash flows for the years then ended.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

## Disclaimer of Opinion

**.61**    A disclaimer of opinion states that the auditor does not express an opinion on the financial statements. An auditor may decline to express an opinion whenever he or she is unable to form or has not formed an opinion as to the fairness of presentation of the financial statements in conformity with generally accepted accounting principles. If the auditor disclaims an opinion, the auditor's report should give all of the substantive reasons for the disclaimer. [Paragraph renumbered and amended, effective for reports issued or reissued on or after February 29, 1996, by the issuance of Statement on Auditing Standards No. 79.]

**.62**    A disclaimer is appropriate when the auditor has not performed an audit sufficient in scope to enable him or her to form an opinion on the financial statements.[20] A disclaimer of opinion should not be expressed because the auditor believes, on the basis of his or her audit, that there are material departures from generally accepted accounting principles ( see paragraphs .35 through .57 ). When disclaiming an opinion because of a scope limitation, the auditor should state in a separate paragraph or paragraphs all of the substantive reasons for the disclaimer. He or she should state that the scope of the audit was not sufficient to warrant the expression of an opinion. The auditor should not identify the procedures that were performed nor include the paragraph describing the characteristics of an audit (that is, the scope paragraph of the auditor's standard report); to do so may tend to overshadow the disclaimer. In addition, the auditor should also disclose any other reservations he or she has regarding fair presentation in conformity with generally accepted accounting principles. [Paragraph renumbered and amended, effective for reports issued or reissued on or after February 29, 1996, by the issuance of Statement on Auditing Standards No. 79.]

---

[20]   If an accountant is engaged to conduct an audit of the financial statements of a nonpublic entity in accordance with generally accepted auditing standards, but is requested to change the engagement to a review or a compilation of the statements, he or she should look to the guidance in paragraphs 46 through 51 of Statement on Standards for Accounting and Review Services No. 1, *Compilation and Review of Financial Statements* [ AR section 100.46-.51 ]. Section 504, *Association With Financial Statements*, paragraph .05 , provides guidance to an accountant who is associated with the financial statements of a public entity, but has not audited such statements. [Footnote renumbered and amended, effective for reports issued or reissued on or after February 29, 1996, by the issuance of Statement on Auditing Standards No. 79. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000. Footnote revised, November 2002, to reflect conforming changes necessary due to the issuance of Statement on Standards for Accounting and Review Services No. 9.]

**.63**    An example of a report disclaiming an opinion resulting from an inability to obtain sufficient competent evidential matter because of the scope limitation follows:

Independent Auditor's Report

A-104

We were engaged to audit the accompanying balance sheets of X Company as of December 31, 20X2 and 20X1, and the related statements of income, retained earnings, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management.[21]

[*Second paragraph of standard report should be omitted*]

The Company did not make a count of its physical inventory in 20X2 or 20X1, stated in the accompanying financial statements at $_____ as of December 31, 20X2, and at $_____ as of December 31, 20X1. Further, evidence supporting the cost of property and equipment acquired prior to December 31, 20X1, is no longer available. The Company's records do not permit the application of other auditing procedures to inventories or property and equipment.

Since the Company did not take physical inventories and we were not able to apply other auditing procedures to satisfy ourselves as to inventory quantities and the cost of property and equipment, the scope of our work was not sufficient to enable us to express, and we do not express, an opinion on these financial statements.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

---

[21]  The wording in the first paragraph of the auditor's standard report is changed in a disclaimer of opinion because of a scope limitation. The first sentence now states that "we were engaged to audit" rather than "we have audited" since, because of the scope limitation, the auditor was not able to perform an audit in accordance with generally accepted auditing standards. In addition, the last sentence of the first paragraph is also deleted, because of the scope limitation, to eliminate the reference to the auditor's responsibility to express an opinion. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

## Piecemeal Opinions

**.64**   Piecemeal opinions (expressions of opinion as to certain identified items in financial statements) should not be expressed when the auditor has disclaimed an opinion or has expressed an adverse opinion on the financial statements *taken as a whole* because piecemeal opinions tend to overshadow or contradict a disclaimer of opinion or an adverse opinion. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

# Reports on Comparative Financial Statements

**.65**   The fourth standard of reporting requires that an auditor's report contain either an expression of opinion regarding the financial statements *taken as a whole* or an assertion to the effect that an opinion cannot be expressed. Reference in the fourth reporting standard to the financial statements *taken as a whole* applies not only to the financial statements of the current period but also to those of one or more prior periods that are presented on a comparative basis with those of the current period. Therefore, a continuing auditor[22] should update[23] the report on the individual financial statements of the one or more prior periods presented on a comparative basis with those of the current period.[24] Ordinarily, the auditor's report on comparative financial statements should be dated as of the date of completion of fieldwork for the most recent audit. (See section

530A, *Dating of the Independent Auditor's Report*, paragraph .01 .) [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. As amended, effective September 2002, by Statement on Auditing Standards No. 98.]

---

[22]  A *continuing auditor* is one who has audited the financial statements of the current period and of one or more consecutive periods immediately prior to the current period. If one firm of independent auditors merges with another firm and the new firm becomes the auditor of a former client of one of the former firms, the new firm may accept responsibility and express an opinion on the financial statements for the prior period(s), as well as for those of the current period. In such circumstances, the new firm should follow the guidance in paragraphs .65 through .69 and may indicate in its report or signature that a merger took place and may name the firm of independent auditors that was merged with it. If the new firm decides not to express an opinion on the prior-period financial statements, the guidance in paragraphs .70 through .74 should be followed. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

[23]  An updated report on prior-period financial statements should be distinguished from a reissuance of a previous report (see section 530A, *Dating of the Independent Auditor's Report*, paragraphs .06 through .08 ), since in issuing an updated report the continuing auditor considers information that he or she has become aware of during his or her audit of the current-period financial statements (see paragraph .68 ) and because an updated report is issued in conjunction with the auditor's report on the current-period financial statements. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

[24]  A continuing auditor need not report on the prior-period financial statements if only summarized comparative information of the prior period(s) is presented. For example, entities such as state and local governmental units frequently present total-all-funds information for the prior period(s) rather than information by individual funds because of space limitations or to avoid cumbersome or confusing formats. Also, not-for-profit organizations frequently present certain information for the prior period(s) in total rather than by net asset class. In some circumstances, the client may request the auditor to express an opinion on the prior period(s) as well as the current period. In those circumstances, the auditor should consider whether the information included for the prior period(s) contains sufficient detail to constitute a fair presentation in conformity with generally accepted accounting principles. In most cases, this will necessitate including additional columns or separate detail by fund or net asset class, or the auditor would need to modify his or her report. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000. Revised, April 2002, to reflect conforming changes necessary due to the issuance of FASB Statement No. 117 .]

**.66**    During the audit of the current-period financial statements, the auditor should be alert for circumstances or events that affect the prior-period financial statements presented ( see paragraph .68 ) or the adequacy of informative disclosures concerning those statements. ( See section 431 , *Adequacy of Disclosure in Financial Statements*, and ARB No. 43 , Chapter 2A [AC section F43].) In updating his or her report on the prior-period financial statements, the auditor should consider the effects of any such circumstances or events coming to his or her attention. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

## Different Reports on Comparative Financial Statements Presented

**.67**    Since the auditor's report on comparative financial statements applies to the individual financial statements presented, an auditor may express a qualified or adverse opinion, disclaim an opinion, or include an explanatory paragraph with respect to one or more financial statements for one or more periods, while issuing a different report on the other financial statements presented. Following are examples of reports on comparative financial statements (excluding the standard introductory and scope paragraphs, where applicable) with different reports on one or more financial statements presented.

**Standard Report on the Prior-Year Financial Statements and a Qualified Opinion on the Current-Year Financial Statements**

<u>Independent Auditor's Report</u>

[*Same first and second paragraphs as the standard report*]

The Company has excluded, from property and debt in the accompanying 20X2 balance sheet, certain lease obligations that were entered into in 20X2 which, in our opinion, should be capitalized in order to conform with accounting principles generally accepted in the United States of America. If these lease obligations were capitalized, property would be increased by $_____, long-term debt by $_____, and retained earnings by $_____ as of December 31, 20X2, and net income and earnings per share would be increased (decreased) by $_____ and $_____, respectively, for the year then ended.

In our opinion, except for the effects on the 20X2 financial statements of not capitalizing certain lease obligations as described in the preceding paragraph, the financial statements referred to above present fairly, in all material respects, the financial position of ABC Company as of December 31, 20X2 and 20X1, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

**Standard Report on the Current-Year Financial Statements With a Disclaimer of Opinion on the Prior-Year Statements of Income, Retained Earnings, and Cash Flows**

<u>Independent Auditor's Report</u>

[*Same first paragraph as the standard report*]

Except as explained in the following paragraph, we conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform our audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

We did not observe the taking of the physical inventory as of December 31, 20X0, since that date was prior to our appointment as auditors for the Company, and we were unable to satisfy ourselves regarding inventory quantities by means of other auditing procedures. Inventory amounts as of December 31, 20X0, enter into the determination of net income and cash flows for the year ended December 31, 20X1.[25]

Because of the matter discussed in the preceding paragraph, the scope of our work was not sufficient to enable us to express, and we do not express, an opinion on the results of operations and cash flows for the year ended December 31, 20X1.

In our opinion, the balance sheets of ABC Company as of December 31, 20X2 and 20X1, and the related statements of income, retained earnings,

and cash flows for the year ended December 31, 20X2, present fairly, in
all material respects, the financial position of ABC Company as of
December 31, 20X2 and 20X1, and the results of its operations and its
cash flows for the year ended December 31, 20X2, in conformity with
accounting principles generally accepted in the United States of America.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79,
December 1995.]

[25]  It is assumed that the independent auditor has been able to satisfy himself or herself as to the consistency of
application of generally accepted accounting principles. See section 420 , *Consistency of Application of Generally
Accepted Accounting Principles,* for a discussion of consistency. [Footnote renumbered by the issuance of Statement on
Auditing Standards No. 79, December 1995: the former footnote 29 has been deleted and subsequent footnotes
renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently
renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

## Opinion on Prior-Period Financial Statements Different From the Opinion Previously Expressed

**.68**    If, during the current audit, an auditor becomes aware of circumstances or events
that affect the financial statements of a prior period, he or she should consider such
matters when updating his or her report on the financial statements of the prior period.
For example, if an auditor has previously qualified his or her opinion or expressed an
adverse opinion on financial statements of a prior period because of a departure from
generally accepted accounting principles, and the prior-period financial statements are
restated in the current period to conform with generally accepted accounting principles,
the auditor's updated report on the financial statements of the prior period should
indicate that the statements have been restated and should express an unqualified
opinion with respect to the restated financial statements. [Paragraph renumbered by the
issuance of Statement on Auditing Standards No. 79, December 1995.]

**.69**    If, in an updated report, the opinion is different from the opinion previously
expressed on the financial statements of a prior period, the auditor should disclose all the
substantive reasons for the different opinion in a separate explanatory paragraph(s)
preceding the opinion paragraph of his or her report.[29] The explanatory paragraph(s)
should disclose (*a*) the date of the auditor's previous report, (*b*) the type of opinion
previously expressed, (*c*) the circumstances or events that caused the auditor to express
a different opinion, and (*d*) that the auditor's updated opinion on the financial statements
of the prior period is different from his or her previous opinion on those statements. The
following is an example of an explanatory paragraph that may be appropriate when an
auditor issues an updated report on the financial statements of a prior period that
contains an opinion different from the opinion previously expressed:

Independent Auditor's Report

[*Same first and second paragraphs as the standard report*]

In our report dated March 1, 20X2, we expressed an opinion that the 20X1
financial statements did not fairly present financial position, results of
operations, and cash flows in conformity with accounting principles
generally accepted in the United States of America because of two
departures from such principles:  (1) the Company carried its property,
plant, and equipment at appraisal values, and provided for depreciation on
the basis of such values, and (2) the Company did not provide for deferred

income taxes with respect to differences between income for financial reporting purposes and taxable income. As described in Note X, the Company has changed its method of accounting for these items and restated its 20X1 financial statements to conform with accounting principles generally accepted in the United States of America. Accordingly, our present opinion on the 20X1 financial statements, as presented herein, is different from that expressed in our previous report.[26]

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of X Company as of December 31, 20X2 and 20X1, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

[Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

---

[29]   [Footnote renumbered and deleted by the issuance of Statement on Auditing Standards No. 79, December 1995.]
[26]   See footnote 17. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

## Report of Predecessor Auditor

**.70**    A predecessor auditor ordinarily would be in a position to reissue his or her report on the financial statements of a prior period at the request of a former client if he or she is able to make satisfactory arrangements with the former client to perform this service and if he or she performs the procedures described in paragraph .71 .[27] [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

---

[27]   It is recognized that there may be reasons why a predecessor auditor's report may not be reissued and this section does not address the various situations that could arise. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

## *Predecessor Auditor's Report Reissued*

**.71**    Before reissuing (or consenting to the reuse of) a report previously issued on the financial statements of a prior period, when those financial statements are to be presented on a comparative basis with audited financial statements of a subsequent period, a predecessor auditor should consider whether his or her previous report on those statements is still appropriate. Either the current form or manner of presentation of the financial statements of the prior period or one or more subsequent events might make a predecessor auditor's previous report inappropriate. Consequently, a predecessor auditor should (*a*) read the financial statements of the current period, (*b*) compare the prior-period financial statements that he or she reported on with the financial statements to be presented for comparative purposes, and (*c*) obtain representation letters from management of the former client and from the successor auditor. The representation letter from management of the former client should state (*a*) whether any information has come to management's attention that would cause them to believe that any of the previous representations should be modified, and (*b*) whether any events have occurred subsequent to the balance-sheet date of the latest prior-period financial statements reported on by the predecessor auditor that would require adjustment to or disclosure in

those financial statements.[28] The representation letter from the successor auditor should state whether the successor's audit revealed any matters that, in the successor's opinion, might have a material effect on, or require disclosure in, the financial statements reported on by the predecessor auditor. Also, the predecessor auditor may wish to consider the matters described in section 543, *Part of Audit Performed by Other Independent Auditors*, paragraphs .10 through .12 . However, the predecessor auditor should not refer in his or her reissued report to the report or work of the successor auditor. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. As amended, effective for reports reissued on or after June 30, 1998, by Statement on Auditing Standards No. 85.]

[28]   See section 333, *Management Representations*, appendix C [ paragraph .18 ], "Illustrative Updating Management Representation Letter." [Footnote added, effective for reports reissued on or after June 30, 1998, by Statement on Auditing Standards No. 85. Footnote renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

**.72**    A predecessor auditor who has agreed to reissue his or her report may become aware of events or transactions occurring subsequent to the date of his or her previous report on the financial statements of a prior period that may affect his or her previous report (for example, the successor auditor might indicate in the response that certain matters have had a material effect on the prior-period financial statements reported on by the predecessor auditor). In such circumstances, the predecessor auditor should make inquiries and perform other procedures that he or she considers necessary (for example, reviewing the working papers of the successor auditor as they relate to the matters affecting the prior-period financial statements). The auditor should then decide, on the basis of the evidential matter obtained, whether to revise the report. If a predecessor auditor concludes that the report should be revised, he or she should follow the guidance in paragraphs .68 , .69 , and .73 of this section. [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

**.73**    A predecessor auditor's knowledge of the current affairs of his former client is obviously limited in the absence of a continuing relationship. Consequently, when reissuing the report on prior-period financial statements, a predecessor auditor should use the date of his or her previous report to avoid any implication that he or she has examined any records, transactions, or events after that date. If the predecessor auditor revises the report or if the financial statements are restated, he or she should dual-date the report. (See section 530A, *Dating of the Independent Auditor's Report*, paragraph .05 .) [Paragraph renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995.]

## *Predecessor Auditor's Report Not Presented*

**.74**    If the financial statements of a prior period have been audited by a predecessor auditor whose report is not presented, the successor auditor should indicate in the introductory paragraph of his or her report (*a*) that the financial statements of the prior period were audited by another auditor,[29] (*b*) the date of his or her report, (*c*) the type of report issued by the predecessor auditor, and (*d*) if the report was other than a standard report, the substantive reasons therefor.[30] An example of a successor auditor's report when the predecessor auditor's report is not presented is shown below:

<u>Independent Auditor's Report</u>

We have audited the balance sheet of ABC Company as of December 31, 20X2, and the related statements of income, retained earnings, and cash

flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of ABC Company as of December 31, 20X1, were audited by other auditors whose report dated March 31, 20X2, expressed an unqualified opinion on those statements.

[*Same second paragraph as the standard report*]

In our opinion, the 20X2 financial statements referred to above present fairly, in all material respects, the financial position of ABC Company as of December 31, 20X2, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

If the predecessor auditor's report was other than a standard report, the successor auditor should describe the nature of and reasons for the explanatory paragraph added to the predecessor's report or the opinion qualification. Following is an illustration of the wording that may be included in the successor auditor's report:

... were audited by other auditors whose report dated March 1, 20X2, on those statements included an explanatory paragraph that described the change in the Company's method of computing depreciation discussed in Note X to the financial statements.

If the financial statements have been restated, the introductory paragraph should indicate that a predecessor auditor reported on the financial statements of the prior period before restatement. In addition, if the successor auditor is engaged to audit and applies sufficient procedures to satisfy himself or herself as to the appropriateness of the restatement adjustments, he or she may also include the following paragraph in his report:

We also audited the adjustments described in Note X that were applied to restate the 20X1 financial statements. In our opinion, such adjustments are appropriate and have been properly applied.

[Paragraph renumbered and amended, effective for reports issued or reissued on or after February 29, 1996, by the issuance of Statement on Auditing Standards No. 79.]

---

[29]   The successor auditor should not name the predecessor auditor in his or her report; however, the successor auditor may name the predecessor auditor if the predecessor auditor's practice was acquired by, or merged with, that of the successor auditor. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 85, November 1997. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]
[30]   If the predecessor's report was issued before the effective date of this section and contained an uncertainties explanatory paragraph, a successor auditor's report issued or reissued after the effective date hereof should not make reference to the predecessor's previously required explanatory paragraph. [Footnote added, effective for reports issued or reissued on or after February 29, 1996, by Statement on Auditing Standards No. 79. Footnote renumbered by the issuance of Statement on Auditing Standards No. 85, November 1997. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

## Effective Date and Transition

**.75**   This section is effective for reports issued or reissued on or after February 29, 1996. Earlier application of the provisions of this section is permissible. [Paragraph

renumbered and amended, effective for reports issued or reissued on or after February 29, 1996, by the issuance of Statement on Auditing Standards No. 79.]

**.76**    An auditor who previously included an uncertainties explanatory paragraph in a report should not repeat that paragraph and is not required to include an emphasis paragraph related to the uncertainty in a reissuance of that report or in a report on subsequent periods' financial statements, even if the uncertainty has not been resolved. If the auditor decides to include an emphasis paragraph related to the uncertainty, the paragraph may include an explanation of the change in reporting standards.[31] [Paragraph renumbered and amended, effective for reports issued or reissued on or after February 29, 1996, by the issuance of Statement on Auditing Standards No. 79.]

---

[31]    [Footnote renumbered and deleted by the issuance of Statement on Auditing Standards No. 79, December 1995. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 85, November 1997. Footnote subsequently renumbered by the issuance of Statement on Auditing Standards No. 93, October 2000.]

Copyright © 2006 by American Institute of Certified Public Accountants, Inc., New York, NY. All rights reserved.

© Copyright 2006 RIA. All rights reserved.

10 of 11 DOCUMENTS

**In re: AGRIBIOTECH, INC., Debtor. ANTHONY H.N. SCHNELLING, as Trustee of the Agribiotech Creditors' Trust, the Duly Appointed and Authorized Representative of the Chapter 11 Estates of AGRIBIOTECH INC., et al., as Assignee of Growers, Plaintiff, v. JOHNNY R. THOMAS, et al., Defendants.**

**CV-S-02-0537-PMP (LRL)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

*2005 U.S. Dist. LEXIS 6466*

**April 1, 2005, Decided**

**PRIOR HISTORY: [*1]** BK-S-00-10533-LBR. ADV-02-1023-LBR.

**COUNSEL:** For Las Vegas Fertilizer Co., Inc., Schnelling, Anthony H.N., Agribiotech Inc., Garden West Distributors, Inc., Geo. W. Hill & Co., Inc., Plaintiffs: Candi Carlyon, Shea & Carlyon, Ltd., Las Vegas, NV; Allan Diamond, M. Bryant, Diamond McCarthy Taylor Finley Bryant & Lee, LLP, Dallas, TX; Arley Finley, III, C. Carr, Scott DeWolf, Diamond McCarthy, et al, Austin, TX; Donald Campbell, Donald F. Campbell, Dallas, TX; Eric Madden, Diamond McCarthy, et al, Dallas, TX; Jay Madrid, Talmage Boston, Winstead Sechrest & Minick, PC, Dallas, TX.

For Gillespie, Kathleen L., Counter Claimant: Joseph Kistler, William Noall, Gordon & Silver, Ltd., Las Vegas, NV; Andrew Jacobson, Ross Bricker, Jenner & Block, LLC, Chicago, IL.

For Gillespie, Kathleen L., Defendant: Joseph Kistler, William Noall, Gordon & Silver, Ltd., Las Vegas, NV; Andrew Jacobson, Ross Bricker, Jenner & Block, LLC, Chicago, IL.

For Hodges, Halina, Hodges, Thomas, Distributions Only: Matthew Zirzow, Thomas Fell, Gordon & Silver, Ltd., Las Vegas, NV; Rodney Jean, Lionel, Sawyer & Collins, Las Vegas, NV; Thomas Eckerle, PRO HAC VICE FIRM, Indianapolis, IN.

For Hopkins, James, **[*2]** Ingalls, Henry, Rice, Thomas B., Defendants: Andi Chang; Janet Chubb, Jones Vargas, Las Vegas, NV; Terry Leavitt, Graves & Leavitt, Las

Vegas, NV; Clifford Anderson, James Kremer, Joseph Hammell, Michael Iwan, Roy Ginsburg, Dorsey & Whitney, Minneapolis, MN.

For Ingram, Randy, Defendant: Andi Chang; Janet Chubb, Jones Vargas, Las Vegas, NV; Terry Leavitt, Graves & Leavitt, Las Vegas, NV; Alan Ruley, PRO HAC VICE FIRM, Winston-Salem, NC; Clifford Anderson, James Kremer, Joseph Hammel, Michael Iwan, Roy Ginsburg, Dorsey & Whitney, Minneapolis, MN; Daniel Quesnel, PRO HAC VICE FIRM, Winston-Salem, NC; William Davis, Winston-Salem, NC.

For Johnston James W., Defendant: Santoro Driggs Walch Kearney, et al, Las Vegas, NV; Alan Ruley, PRO HAC VICE FIRM, Winston-Salem, NC; Daniel Quesnel, PRO HAC VICE FIRM, Winston-Salem, NC; William K. Davis, Winston-Salem, NC.

For Kinder, Drew, Defendant: Elizabeth Gonzalez, Gonzalez Howard & Reade, Ltd., Las Vegas, NV; H. Kinder, John O'Neill, Rudloff, Wood & Barrows LLP, Emeryville, CA; Drew Kinder, Williamsville, NY.

For KPMG Consulting, Inc., Defendant: Brent Eckersley, Pauline Lee, Hale Lane Peek, et al, Las Vegas, NV; Gary Gruciani, **[*3]** Robert Manley, McKool Smith PC, Dallas, TX.

For Annas Jonathan, Defendant: Thomas Fell, Gordon & Silver, Ltd., Las Vegas, NV.

For Baines, Harrison M. Jr., Defendant: Jeffrey Silvestri, John Laxague, McDonald Carano Wilson, Las Vegas,

2005 U.S. Dist. LEXIS 6466, *

NV; Hal Shaftel, Louis Solomon, Michael Smith, Proskauer Rose, New York, NY.

For BearingPoint, Inc., Defendant: Brent Eckersley, Pauline Lee, Hale Lane Peek, et al, Las Vegas, NV; Gary Gruciani, McKool Smith PC, Dallas, TX; John DeGroote, Bearing Point, Inc., McLean, VA; L. Anderson, Robert Manley, McKool Smith PC, Dallas, TX.

For Beauchamp, Michael, Defendant: Thomas Fell, Gordon & Silver, Ltd., Las Vegas, NV.

For Budd, Kenneth, Budd, Richard P., Defendants: Richard Holley, Santoro Driggs Walch Kearney, et al, Las Vegas, NV; Alan Ruley, PRO HAC VICE FIRM, Winston-Salem, NC; Daniel Quesnel, PRO HAC VICE FIRM, Winston-Salen, NC; William Davis, Winston-Salem, NC.

For Fisher, Doug, Counter Claimant: Andi Chang; Janet Chubb, Jones Vargas, Las Vegas, NV; Terry Leavit, Graves & Leavitt, Las Vegas, NV; Clifford Anderson, James Kremer, Roy Ginsburg, Dorsey & Whitney, Minneapolis, MN.

For Fisher Doug, Defendant: Andi Chang; Janet **[*4]** Chubb, Las Vegas, NV; Richard Holley, Santoro Driggs Walch Kearney, et al, Las Vegas, NV; Terry Leavit, Graves & Leavitt, Las Vegas, NV; Alan Ruley, PRO HAC VICE FIRM, Winston-Salem, NC; Clifford Anderson, James Kremer, Joseph Hammel, Micahel Iwan, Roy Ginsburg, Dorsey & Whitney, Minneapolis, MN; Daniel Quesnel, PRO HAC VICE FIRM, Winston-Salem, NC; William K. Davis, Winston-Salem, NC; Doug Fisher, Austin, TX.

For Francis, John C., Cross Claimant: William Noall, Gordon & Silver, Ltd., Las Vegas, NV; Andrew Jacobson, Richard Levy, Ross Bricker, Jenner & Block, LLC, Chicago, IL.

For Francis, John C., Defendant: Joseph Kistler, William Noall, Gordon & Silver, Ltd., Las Vegas, NV; Andrew Jacobson, Ross Bricker, Jenner & Block, LLC, Chicago, IL.

For Schnelling, Anthony H.N., Trustee: Candi Carlyon, Shea & Carlyon, Ltd., Las Vegas, NV; Allan Diamond, M. Bryant, Diamond McCarthy Taylor Finley Bryant & Lee, LLP, Dallas, TX; Arley Finley, III, C. Carr, Diamond McCarthy, et al, Austin, TX; Deborah Williamson, Cox & Smith, Inc., San Antonio, TX; Donald F. Campbell, Dallas, TX; Eric Madden, Diamond McCarthy, et al, Dallas, TX; Jay Madrid, Winstead

Sechrest & Minick, PC; Dallas, **[*5]** TX; Scott DeWolf, Diamond McCarthy, et al, Dallas, TX; Talmage Boston, Winstead Sechrest & Minick, PC, Dallas, TX.

For Schultze, Kent, Defendant: Andi Chang; Janet Chubb, Jones Vargas, Las Vegas, NV; Terry Leavit, Graves & Leavitt, Las Vegas, NV; Clifford Anderson, James Kremer, Joseph Hammel, Michael Iwan, Roy Ginsburg, Dorsey & Whitney, Minneapolis, MN.

For Snow Becker Krauss Attys, Defendant: Robert Charles, Von Heinz, Lewis & Roca, LLP, Las Vegas, NV; Alexander Oses, Fred Petti,Patricia Norris, Robert McKirgan, Lewis & Roca, LLP, Phoenix, AZ.

For Thomas, Johnny, Defendant: William Noall, Gordon & Silver, Ltd., Las Vegas, NV.

For Thomas, Johnny R., Cross Claimant: William Noall, Gordon & Silver, Las Vegas, NV; Andrew Jacobson, Richard Levy, Ross Bricker, Jenner & Block, LLC, Chicago, IL.

For Thomas, Johnny R., Defendant: Joseph Kistler, William Noall, Gordon & Silver, Las Vegas, NV; Andrew Jacobson, Ross Bricker, Jenner & Block, LLC, Chicago, IL.

For Womble Carlyle Sandridge & Rice PLLC, Defendant: Patrick Byrne, Snell & Wilmer, Las Vegas, NV; Russell Stowers, Snell & Wilmer, Tuscon, AZ; William, Raper, Womble Carlyle, et al, Charlotte, NC.

For **[*6]** Loomis, Scott, J., Croos Claimant: William Noall, Gordon & Silver, Ltd., Las Vegas, NV; Andrew Jacobson, Richard Levy, Ross Bricker, Jenner & Block, LLC, Chicago, IL.

For Loomis, Scott J., Defendant: Joseph Kistler, William Noall, Gordon & Silver, Ltd., Las Vegas, NV; Andrew Jacobson, Richard Levy, Ross Bricker, Jenner & Block, LLC, Chicago, IL.

For Lutzker, Elliot, Defendant: Robert Charles, Von Heinz, Lewis & Roca, LLP, Las Vegas, NV; Alexander Oses, Fred Petti, Patricia Norris, Robert McKirgan, Lewis & Roca, LLP, Phoenix, AZ.

For McPeak, Elwynn T., Defendant: Thomas Fell, Gordon & Silver, Ltd., Las Vegas, NV.

For Orr, L. Glenn Jr., Defendant: Richard Holley, Santoro Driggs Walch Kearney, et al, Las Vegas, NV; Alan Ruley, PRO HAC VICE FIRM, Bell Davis Pitt, PA, Winston-Salem, NC; Daniel Quesnel, PRO HAC

2005 U.S. Dist. LEXIS 6466, *

VICE FIRM, Winston-Salen, NC; William K. Davis, Winston-Salem, NC.

For Agribiotech Inc., Counter Defendant: Candi Carlyon, Shea & Carlyon, Las Vegas, NV; Allan Diamond, M. Bryant, Diamond McCarthy Taylor Finley Bryant & Lee, LLP, Dallas, TX; Arley Finley, III, C. Carr, Scott DeWolf, Diamond McCarthy, et al, Austin, TX; Donald Campbell, Donald F. Campbell, **[*7]** Dallas, TX; Eric Madden, Diamond McCarthy, et al, Dallas, TX; Jay Madrid, Talmage Boston, Winstead Sechrest & Minick, PC, Dallas, TX.

For Agribiotech Inc., Debtor: Candi Carlyon, Shea & Carlyon, Las Vegas, NV; Allan Diamond, M. Bryant, Diamond McCarthy Taylor Finley Bryant & Lee, LLP, Dallas, TX; Arley Finley, III, C. Carr, Scott DeWolf, Diamond McCarthy, et al, Austin, TX; Donald Campbell, Donald F. Campbell, Dallas, TX; Eric Madden, Diamond McCarthy, et al, Dallas, TX; Jay Madrid, Talmage Boston, Winstead Sechrest & Minick, PC, Dallas, TX.

For KPMG Peat Marwick LLP, Cross Defendant: Michael Rawlins, Rooker Rawlins & Bailey, LLP, Henderson, NV; Cheryl Mori-Atkinson, U.S. Securities & Exchange Commission, Saly Lake City, UT; Gary Bendinger, Karen Martinez, Bendinger, Crockett Peterson & Casey, Salt Lake City, UT; Richard Casey, Bendinger, Crocket Peterson & Casey, Salt Lake City, UT.

For KPMG Peat Marwick LLP, Defendant: C. Rooker, Michael Rawlins, Rooker Rawlins & Bailey, LLP, Henderson, NV; Cheryl Mori-Atkinson, U.S. Securities & Exchange Commission, Saly Lake City, UT; Gary Bendinger, Karen Martinez, Marcia Fuller, R. Saber, Richard Casey, Wesley Felix, Bendinger, **[*8]** Crockett Peterson & Casey, Salt Lake City, UT.

**JUDGES:** PHILIP M. PRO, Chief United States District Judge.

**OPINIONBY:** PHILIP M. PRO

**OPINION:**

ORDER

Presently before the Court is KPMG LLP's Motion for Summary Judgment (Imputation, In Pari Delicto, and Causation-Damages) (Doc. ##691, 692), filed on July 20, 2004. Defendant KPMG LLP ("KPMG") also filed Sealed Exhibits and Errata Exhibits supporting the Motion (Doc. ##693, 735, 736, 777). Plaintiff Anthony H. N. Schnelling filed the Trustee's Response to KPMG

LLP's Motion for Summary Judgment (Imputation, In Pari Delicto, and Causation-Damages) and supporting exhibits (Doc. ##704, 705, 706) on August 13, 2004. KPMG filed its Reply (Doc. #734) on September 13, 2004.

**I. BACKGROUND**

AgriBioTech, Inc. ("AgriBioTech" or "ABT") was founded in 1983. (Third Am. Compl. (Doc. #328) P 51.) ABT was a developer, producer, marketer, and distributor of forage and turfgrass seed. (KPMG LLP's Mot. for Summ. J. (Imputation, In Pari Delicto, and Causation-Damages) (Doc. #691). Ex. 6 at 2.) n1 ABT developed a three-stage business strategy to capitalize on the fragmented seed industry by acquiring companies in the industry, realizing efficiencies from integrating **[*9]** these companies, and developing higher value proprietary seed varieties. (Id.) Between 1995 and 1999, ABT acquired thirty-four companies, and increased revenues from $ 26 million to $ 370 million. (Id. at 4.) As of 1998, AgriBioTech was the largest forage and turfgrass seed producer in the United States. (Third Am. Compl. P 1.)

> n1 For ease of reference, KPMG's exhibits to its Motion for Summary Judgment and its sealed and errata exhibits will be cited as "KPMG's Ex. ." The Trustee's exhibits in its Response and two volumes of exhibits will be cited as "Trustee's Ex. ."

To record ABT's acquisitions in its financial statements, ABT used a recording method the parties refer to as "effective date" accounting. (Trustee's Ex. 17 at 38; Trustee's Ex. 2 at KPMG000042895, KPMG000042947). Rather than record the acquired company's earnings on the date of closing, ABT used effective date accounting to report the acquired company's earnings as its own upon the date ABT took effective control of **[*10]** the purchased company. (KPMG's Ex. 6 at F8.) ABT used this method with KPMG's knowledge and concurrence, based on an opinion by the Accounting Principles Board ("APB"), APB-16. (Id.; Trustee's Ex. 17 at 38-42.) Paragraph 93 of APB-16 states:

> The Board believes that the date of acquisition of a company should ordinarily be the date assets are received and other assets are given or securities are issued. However, the parties may for convenience, designate as the effective date the end of an accounting period

between the dates a business combination is initiated and consummated. The designated date should ordinarily be the date of acquisition for accounting purposes if a written agreement provides that effective control of the acquired company is transferred to the acquiring corporation on that date without restrictions except those required to protect the stockholders or other owners of the acquired company--for example, restrictions on significant changes in the operations, permission to pay dividends equal to those regularly paid before the effective date, and the like. Designating an effective date other than the date assets or securities are transferred requires adjusting **[*11]** the cost of an acquired company and net income otherwise reported to compensate for recognizing income before consideration is transferred. The cost of an acquired company and net income should therefore be reduced by imputed interest at an appropriate current rate on assets given, liabilities incurred, or preferred stock distributed as of the transfer date to acquire the company.

(Trustee's Ex. 8 at 247.) APB-16 was part of generally accepted accounting principles ("GAAP") during the relevant time period. (Trustee's Ex. 17 at 43-44.)

KPMG's own Business Combinations Manual, although not part of GAAP, contained guidance for KPMG auditors on when using effective date accounting was appropriate:

> To use a date prior to the acquisition date . . . the following conditions should be met:
> (a) The parties reach a firm purchase agreement that includes specifying the date of acquisition other than the closing date.
> (b) Effective control of the acquired enterprise, including the risks and rewards of ownership, transfers to the acquiring enterprise as of the designated effective date.
> (c) The time period between the designated effective date and the closing date is relatively **[*12]** short (say, less than 30 days), except if the delay is caused by obtaining required regulatory approval.

> (d) The designated effective date and the closing date fall in the same accounting period (i.e., same interim and annual accounting period).

(Trustee's Ex. 11 at KPMG000053456.)

There is some evidence that ABT timed its acquisitions and the reported time of the effective date at least in part to maximize reported earnings from the companies it purchased. (Trustee's Ex. 35 at 3.) ABT disclosed its use of effective date accounting in its financial statements. (Trustee's Ex. 1 at KPMG000043058, Trustee's Ex. 2 at KPMG000042947, Trustee's Ex. 3 at Item 7, page 27.)

In early 1998, ABT filed a registration statement with the Securities and Exchange Commission ("SEC") to raise equity and debt funding. (Trustee's Ex. 5 at 250-53.) The SEC initiated a review and issued comments on the registration statement. (Id.; KPMG's Ex. 17.) Among the SEC's comments was a concern about the propriety of ABT's use of effective date accounting. (Id.)

After the SEC initiated its review, ABT Chief Financial Officer Henry Ingalls ("Ingalls") informed ABT Vice President of Acquisitions **[*13]** and Operations Kathleen Gillespie ("Gillespie") that ABT had to show the SEC that ABT was managing the acquired companies. (Trustee's Ex. 35 at 3.) He asked her document things she did at each acquired entity to justify the effective dates used. (Id.) In response to this request, Gillespie told Ingalls that ABT "did not have control at all." (Id.) According to Gillespie, Ingalls responded, "Yeah, I know, and ABT could lose them all." (Id.)

On June 11, 1998, ABT responded to the SEC's comments, and indicated ABT obtained effective control of the acquired entities as of the effective date in the letters of intent. (KPMG's Ex. 19.) On July 7, 1998, the SEC responded that at least with respect to ABT's acquisition of Olsen Fennell Seeds, Inc., the letter of intent did "not contain provisions for the transfer of effective control" to ABT. (KPMG's Ex. 20 at 3.) The SEC directed ABT to revise its financial statements to reflect a different acquisition date for Olsen Fennell Seeds, Inc. (Id.)

In July 1998, ABT had a meeting with the SEC to discuss the effective date accounting issue. (KPMG's Ex. 24 at 72.) Although ABT Chief Executive Officer Johnny Thomas ("Thomas") originally **[*14]** was slated to attend, a death in the family required his presence out of state. (Trustee's Ex. 6 at 21-22; Trustee's Ex. 35 at 4.) Consequently, Gillespie took his place at the meeting with the SEC. (Trustee's Ex. 6 at 21-22.)

Case 1:06-cv-00469-JJF    Document 13    Filed 12/12/2006    Page 120 of 201

Page 5
2005 U.S. Dist. LEXIS 6466, *

The morning of the meeting, Gillespie met with Elliot Lutzker of Snow Becker Krauss, ABT's outside attorneys, and Terry Iannaconi of KPMG. (Trustee's Ex. 6 at 25-29.) At that meeting, Gillespie asked whether she should convince the SEC that ABT had effective control. (Trustee's Ex. 35 at 4.) She was told that she should, although it is unclear whether Lutzker or Iannaconi advised Gillespie on this point. (Trustee's Ex. 37 at 10.) Gillespie responded: "So you don't want me to tell them we put together a bunch of letters so we could get profits up front, right? You basically want me to convince them that we did have control?" (Trustee's Ex. 35 at 4; Trustee's Ex. 37 at 10.)

Gillespie, Lutzker, and Iannaconi met with the SEC later that day. (KPMG's Ex. 24 at 127-28.) At the meeting, Lutzker offered ABT's legal position that the letters of intent were binding agreements reflecting a meeting of the minds between ABT and the purchased companies that ABT would assume [*15] effective control as of the effective date. (KPMG's Ex. 24 at 129-32; Trustee's Ex. 6 at 35-37.) Iannaconi supported ABT's position from an accounting standpoint, arguing on ABT's behalf that its activities fell within APB-16 paragraph 93. (KPMG's Ex. 24 at 133-34; Trustee's Ex. 6 at 37-38.) Gillespie told the SEC that ABT did have control as of the dates reflected in the letters of intent, and that the acquired companies could not make major decisions without ABT's approval. (Trustee's Ex. 6 at 39-42.) Gillespie later indicated that she had "stretched" or "flowered up" the truth at the SEC meeting. (Trustee's Ex. 35 at 4.)

After the meeting and further correspondence, the SEC stated it was concerned about ABT's use of effective date accounting because it was unclear whether the letter of intent ABT entered into with other companies actually gave ABT control on the reported date. (KPMG's Ex. 25 at 2.) The SEC also was concerned that "ABT's recognition of acquisitions was not consistent with its auditor's own published guidance regarding the use of an effective date earlier than the consummation date." (Id.) The SEC noted that the market and ABT had emphasized aggregate revenues [*16] and revenue growth during the reporting period, and thus "any premature recognition of revenues may have materially affected investment decisions with respect to ABT's securities." (Id.)

Despite these concerns, the SEC concluded it was "not in a position at this time to verify [ABT's] representations or test [its] legal conclusions." (Id.) The SEC did not decline the registration statement or require ABT to restate its financial information, provided ABT made certain disclosures, including the "effect on reported results of using a business acquisition date earlier than its consummation." (Id.) ABT did as

requested, putting the required information in a press release and in its 10-K annual report for the fiscal year ending June 30, 1998. (KPMG's Ex. 28 at 2; Trustee's Ex. 3 at 27, 34-36.) ABT also announced it no longer would use effective date accounting. (KPMG's Ex. 28 at 2; Trustee's Ex. 3 at 27.)

Throughout 1998 and 1999, ABT was experiencing operational and financial pressures brought on by its rapid acquisition of numerous companies requiring extensive funding, and its initial focus on acquisition rather than on integrating the new companies into a single, efficient [*17] whole. (Trustee's Ex. 24 at 1-3; Trustee's Ex. 23 at 124; 205; KPMG's Ex. 6 at 17, 21-22; KPMG's Ex. 15 at 6; Trustee's Ex. 5 at 237-38; Trustee's Ex. 31 at 177-78.) Despite ABT's continuous liquidity crunch, its inefficiencies in integrating acquired companies, and its difficulties with the SEC and effective date accounting, KPMG issued unqualified audit reports on ABT's financial statements throughout 1998 and 1999. (Trustee's Exs. 3, 4.) KPMG did not advise ABT to restate its financial statements regarding the misuse of effective date accounting, and did not qualify its opinion of ABT's financial statements based on ABT's use of effective date accounting. (Id.) KPMG also never issued a going concern opinion to reflect doubt about ABT's status as a going concern. (Id.)

On January 25, 2000, ABT and three of its subsidiaries commenced jointly administered Chapter 11 cases by filing voluntary petitions under Chapter 11 of the United States Bankruptcy Code. (Third Am. Compl. P 12.) The Debtors created a Creditors' Trust pursuant to the First Amended Joint Plan of Reorganization ("Reorganization Plan" or "Plan"), which United States Bankruptcy Judge Linda B. Riegle confirmed. [*18] (Id.; Trustee's Resp. to KPMG LLP's Mot. for Summ. J. on All Claims Purportedly Brought by Trustee on Behalf of Non-Debtor Third Parties, Ex. B.)

Plaintiff Anthony H. N. Schnelling ("Trustee"), as Trustee of the AgriBioTech Creditors' Trust, brought this lawsuit against certain former ABT professionals based on the rights assigned to him pursuant to the Plan. (First Am. Compl. (Doc. #438) PP 1, 7.) The Trustee asserts against KPMG claims for professional negligence (count 8), participation in breach of fiduciary duty (count 9), actual and constructive fraud (count 16), and aiding and abetting actual and constructive fraud (count 18). (Third Am. Compl. PP 351-387, 393-97, 403-09.)

KPMG asserts that because ABT's officers knew they were engaged in effective date accounting fraud, that knowledge is imputed to ABT. Because ABT knew of the fraud through the imputed knowledge of its officers, ABT could not have justifiably relied on KPMG's audit work. Additionally, KPMG argues that

2005 U.S. Dist. LEXIS 6466, *

because ABT through its officers was involved in the alleged fraud. ABT was in pari delicto with KPMG and cannot recover for injuries arising out of its own wrongdoing. KPMG argues that under the Bankruptcy **[*19]** Code, the Trustee takes no greater rights than the debtor, and thus these defenses are as good against the Trustee as they would have been against ABT. Finally, KPMG argues it is entitled to summary judgment because the Trustee has failed to provide sufficient evidence to raise a genuine issue of material fact as to causation and damages.

The Trustee responds that it is an innocent successor to ABT and thus these equitable doctrines should not apply against the Trustee. According to the Trustee, once the officers engaged in the wrongdoing were removed, the reason for applying the equitable doctrines disappeared, and it would be inequitable to use equitable defenses at the expense of innocent creditor-victims to protect KPMG from its own misconduct. The Trustee also argues that its expert's testimony and report raise genuine issues of material fact as to causation and damages.

## II. LEGAL STANDARDS

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" demonstrate "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter **[*20]** of law." *Fed. R. Civ. P. 56(c)*. The substantive law defines which facts are material. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. All justifiable inferences must be viewed in the light most favorable to the non-moving party. *County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001)*.

The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 531 (9th Cir. 2000)*. The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial. Id.; *Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 997 (9th Cir. 2001)*.

## III. DISCUSSION

Under Nevada law, the knowledge of an officer or agent is imputed to the corporation when the agent obtains the knowledge "while acting in the course of his employment and within the scope of his authority." *Strohecker v. Mut. Bldg. & Loan Ass'n of Las Vegas, 55 Nev. 350, 34 P.2d 1076, 1077 (Nev. 1934)* (quotation omitted); **[*21]** see also *Bates v. Cottonwood Cove*

*Corp., 84 Nev. 388, 441 P.2d 622, 624 (Nev. 1968)*. Nevada also recognizes the equitable doctrine of in pari delicto. *Shimrak v. Garcia-Mendoza, 112 Nev. 246, 912 P.2d 822, 826 (Nev. 1996)*. In pari delicto, literally meaning "of equal fault," historically "has been used to protect the integrity of the court where it was called upon to decide between two wrongdoers." *Berner v. Lazzaro, 730 F.2d 1319, 1321 (9th Cir. 1984)*. Essentially, the in pari delicto doctrine prohibits a plaintiff who has participated in wrongdoing from recovering when he suffers injury as a result of the wrongdoing. *First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co., 612 F.2d 1164, 1172 (9th Cir. 1980)*.

Because Nevada law recognizes the equitable principles of imputation and in pari delicto, two questions arise. First, do state law equitable defenses apply against an innocent bankruptcy trustee to the same degree as those defenses would apply to the debtor? If so, do the defenses factually apply to bar the Trustee from recovering in this case?

### A. Equitable Defenses Against a Bankruptcy Trustee

The commencement **[*22]** of a bankruptcy proceeding creates an estate, and the bankruptcy trustee is required to marshal all of the estate's property for the estate's benefit. *11 U.S.C. § § 541(a), 704*. Pursuant to *11 U.S.C. § 541(a)*, property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Id. § 541(a)(1). This includes causes of action. H.R. Rep. 95-595, 95th Cong., 1st Sess. 367-68 (1977); S. Rep. 95-989, 95th Cong., 2d Sess. 82-83 (1978). A bankruptcy trustee stands in the debtor's shoes and "take[s] no greater rights than the debtor himself had." H.R. Rep. 95-595, 95th Cong., 1st Sess. 367-68 (1977); S. Rep. 95-989, 95th Cong., 2d Sess. 82-83 (1978); see also *Bank of Marin v. England, 385 U.S. 99, 101, 17 L. Ed. 2d 197, 87 S. Ct. 274 (1966)* ("The trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition.").

The Trustee contends that although ABT was engaged in the effective date accounting fraud, the wrongdoing ABT officers have been removed, **[*23]** and therefore equitable defenses such as imputation and in pari delicto should not apply against the Trustee who represents the innocent creditors. The Trustee rests its argument primarily upon a case in the United States Court of Appeals for the Ninth Circuit, *F.D.I.C. v. O'Melveny & Myers, 969 F.2d 744 (9th Cir. 1992)*.

In O'Melveny, the Federal Deposit Insurance Corporation ("FDIC") took over as receiver for an

2005 U.S. Dist. LEXIS 6466, *

insolvent bank whose principals had been involved in fraud. *F.D.I.C. v. O'Melveny & Myers, 969 F.2d at 746-47.* As receiver, the FDIC sued the bank's outside attorneys for professional negligence, negligent misrepresentation, and breach of fiduciary duty based on the law firm's alleged participation in preparing misleading documents designed to induce outside investment in real estate deals. Id. The law firm argued that the wrongdoing of the bank's officers should be imputed to the bank, that the FDIC stood in the bank's shoes, and therefore the FDIC could not recover against the law firm. *Id. at 747.*

The Ninth Circuit concluded that federal, not state, law governed the application of defenses against the FDIC. **[\*24]** *Id. at 751.* Analyzing the issue under a federal rule of decision, the Ninth Circuit ruled that equitable defenses good against the bank should not apply to the FDIC as its receiver:

> A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the bank's assets to cure any associated defects or force the bank to pay for incurable defects. . . .
>
> Also significant is the fact that the receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets.

*Id. at 751-52.* The Court clarified that equitable defenses sometimes may be asserted against the FDIC acting as a receiver, but **[\*25]** the bank's inequitable conduct in this case should not be imputed to the FDIC. *Id. at 752; see also Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995)* (holding that receiver is not barred by in pari delicto because once wrongdoers were removed, the reason for application of the rule no longer applied).

Every other Circuit to analyze this issue in the bankruptcy context has reached the contrary conclusion, however. See *In re Bennett Funding Group, Inc., 336 F.3d 94 (2d Cir. 2003); Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340 (3d*

*Cir. 2001); In re Dublin Secs., Inc., 133 F.3d 377 (6th Cir. 1997); In re Hedged-Investments Assocs., Inc., 84 F.3d 1281 (10th Cir. 1996).* The United States Courts of Appeals for the Third and Tenth Circuits distinguished O'Melveny and Scholes on the basis that those cases involved receivers while a bankruptcy trustee derives its powers from the Bankruptcy Code. *Lafferty, 267 F.3d at 358; In re Hedged-Investments Assocs., Inc., 84 F.3d at 1284-85.* According to these Circuits, § *541(a)* 's **[\*26]** language defining estate property as the debtor's interests "as of the commencement of the case" limits the estate's rights as no stronger than when actually held by the debtor. *Lafferty, 267 F.3d at 356-58; In re Hedged-Investments Assocs., Inc., 84 F.3d at 1285.* The Third and Tenth Circuits cite legislative history to note congressional intent that the trustee stand in the debtor's shoes and "take no greater rights than the debtor himself had." *Lafferty, 267 F.3d at 356* (citing H.R. Rep. 95-595, 95th Cong., 1st Sess. 367-68 (1977)); *In re Hedged-Investments Assocs., Inc., 84 F.3d at 1285* (same). Although acknowledging the Trustee's position may be the better policy, the Tenth Circuit concluded deference to Congress' intent was required. *In re Hedged-Investments Assocs., Inc., 84 F.3d at 1285-86.* Additionally, the United States Courts of Appeals for the Second and Sixth Circuits also have applied imputation and in pari delicto doctrines to bankruptcy trustees. See *In re Bennett Funding Group, Inc., 336 F.3d 94, 100 (2d Cir. 2003);* n2 *In re Dublin Secs., Inc., 133 F.3d 377 (6th Cir. 1997).* **[\*27]**

> n2 The Second Circuit's application of imputation to a trustee has developed through that Circuit's use of imputation rules to determine whether a trustee has standing to pursue claims against third parties. See *Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991).* The Second Circuit thus has made imputation a federalized test for standing. Standing is a separate question from the application of state law equitable defenses on the merits, however. As this Court held in its prior Order, the Trustee has standing to pursue the causes of action in the Third Amended Complaint because those claims belonged to ABT at the commencement of bankruptcy proceedings. (Order dated Dec. 8, 2004 (Doc. #775) at 3-12.)

The distinguishing factor between the Ninth Circuit's decision in O'Melveny and the other Circuits' opinions with respect to bankruptcy trustees lies in the differing rules of decision governing the application of defenses against the FDIC as a receiver versus a bankruptcy trustee. **[\*28]** The Ninth Circuit's original opinion in

O'Melveny was reversed by the United States Supreme Court on the ground that the Ninth Circuit had used a federal rule of decision to decide whether defenses apply against the FDIC as a receiver. *O'Melveny & Myers v. F.D.I.C., 512 U.S. 79, 83-89, 129 L. Ed. 2d 67, 114 S. Ct. 2048(1994).* The Supreme Court stated that federal law generally does not supplant state law on imputation of knowledge to corporate agents because "there is no federal general common law." *Id. at 83* (quotation omitted). The Court then addressed whether federal law displaced state law on the more narrow question of whether imputation ought to apply to FDIC as a receiver. *Id. at 85.*

On this question, the Supreme Court concluded the federal statute allowing the FDIC to step in as receiver "places the FDIC in the shoes of the insolvent [bank], to work out its claims under state law, except where some provision in the extensive [statutory] framework provides otherwise." *Id. at 86.* In reaching this conclusion, the Court pointed out that matters left unaddressed in a comprehensive statutory and regulatory scheme presumably are left to resolution **[*29]** by state law, but an explicit federal statutory provision or a comprehensive and detailed federal statutory regulation could displace state law and create a federal rule of decision. *Id. at 85.* n3

n3 The Supreme Court thus remanded to the Ninth Circuit to determine whether California state law would apply the equitable defense against the FDIC. *Id. at 89.* On remand, the Ninth Circuit concluded California likewise would not apply equitable defenses against a bank's receiver where it would be inequitable to do so. *F.D.I.C. v. O'Melveny & Myers, 61 F.3d 17, 19 (9th Cir. 1995)* ("While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law."). In doing so, the Ninth Circuit reaffirmed its earlier language that "[a] receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank" and thus to apply the equitable defenses against the receiver would frustrate the intricate regulatory scheme designed to protect innocent third parties. Id. The Court also reiterated that it was ruling only that the bank's inequitable conduct is not imputed to FDIC, not that equitable defenses never can be asserted against FDIC as a receiver. Id.

**[*30]**

Pursuant to the Supreme Court's decision in O'Melveny, the Court must determine whether it is a state or federal rule of decision governing the application of a state law's general imputation rules to a bankruptcy trustee. Under O'Melveny, explicit federal statutory provisions may displace state law. *O'Melveny, 512 U.S. at 85.* As the four Circuits that have examined the issue have concluded, *11 U.S.C. § 541(a)* displaces state law for determining the force of state law defenses against a bankruptcy trustee. n4 Pursuant to *§ 541(a),* the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Both the Senate and House of Representatives reports on this language indicate that Congress intended the trustee to "take no greater rights than the debtor himself had." H.R. Rep. 95-595, 95th Cong., 1st Sess. 367-68 (1977); S. Rep. 95-989, 95th Cong., 2d Sess. 82-83 (1978). Accordingly, an equitable defense is as good against a bankruptcy trustee as it would have been against the debtor as of the commencement of the bankruptcy case. n5

n4 Only a few scattered bankruptcy courts have considered whether the relevant state law would apply equitable defenses against a bankruptcy trustee to the same degree as against the debtor. See *In re Jack Greenberg, Inc., 240 B.R. 486, 501-06 (Bankr. E.D. Pa. 1999)* (holding that Pennsylvania would leave it to court's discretion whether equitable defenses should apply against bankruptcy trustee when it would produce an inequitable result); *Welt v. Sirmans, 3 F. Supp. 2d 1396, 1402-03 (S.D. Fla. 1997)* (holding that Florida would permit a trustee to bring a claim for damages stemming from a third party's negligent failure to discover a fraud perpetrated by such corporation's officers and directors). In re Jack Greenberg retains little authority, however, because the Third Circuit in Lafferty rejected the bankruptcy trustee's argument, in which it cited that case for support, that Pennsylvania would allow courts to reject the in pan delicto defense against a bankruptcy trustee when its invocation would produce an inequitable result. *Lafferty, 267 F.3d at 355-57.* **[*31]**

n5 This is consistent with this Court's prior Order denying KPMG's motion to dismiss on the same grounds. In that Order, the Court denied KPMG's motion because Nevada's in pari delicto doctrine required a fact specific inquiry into

2005 U.S. Dist. LEXIS 6466, *

KPMG's relationship with ABT, and the Court declined to dismiss without further discovery on the matter. (Order dated July 31, 2002 (Doc. #234) at 4.)

The Ninth Circuit's O'Melveny decision is not at odds with this conclusion. O'Melveny involved a receiver, not a bankruptcy trustee. Therefore, although the Ninth Circuit likened a receiver to a bankruptcy trustee, its references to a bankruptcy trustee were dicta. The Ninth Circuit had no occasion to consider whether § 541(a)'s language altered the equation. Although the statutory language for appointing a receiver states that the FDIC succeeds to all the insured depository institution's rights, titles, powers, and privileges, it does not contain the limiting phrase "as of the commencement of the case," which both the House and Senate reports state was intended to grant the trustee no greater rights than **[*32]** those held by the debtor.

As the Tenth Circuit recognized, the Trustees position arguably is the better policy. See *In re Hedged-Investments Assocs., Inc., 84 F.3d at 1285-86*. The reasons for applying the equitable defenses in this case no longer exist, with the effect that an equitable defense may allow a wrongdoer to escape at the expense of innocent creditors. Under the above-stated rule, this result would hold even if Nevada explicitly stated that its law would not apply in pari delicto or imputation against a bankruptcy trustee. Nevertheless, Congress has expressed its intent and fashioned an explicit statutory rule which this Court is bound to apply. If a policy change is to occur, it must come from Congress. Accordingly, the Court holds that the Trustee is subject to the imputation and in pari delicto doctrines to the same effect and degree as the debtor ABT would have been as of the commencement of the bankruptcy proceedings.

**B. Applying the Defenses**

1. Imputation

Under Nevada law, the knowledge of an officer or agent is imputed to the corporation when the agent obtains the knowledge "while acting in the course of his employment and within **[*33]** the scope of his authority, and the corporation is charged with such knowledge even though the officer or agent does not in fact communicate his knowledge to the corporation." *Strohecker v. Mut. Bldg. & Loan Ass'n of Las Vegas, 55 Nev. 350, 34 P.2d 1076, 1077 (Nev. 1934)*; see also *Bates v. Cottonwood Cove Corp., 84 Nev. 388, 441 P.2d 622, 624 (Nev. 1968)*. This is so because a corporation can acquire knowledge or receive notice only through its officers and agents. *Strohecker, 34 P.2d at 1077*. An officer or director's knowledge will not be imputed to the corporation when

the agent is acting on his own behalf and not on behalf of the corporation. *Keyworth v. Nev. Packard Mines Co., 43 Nev. 428, 186 P. 1110, 1113 (Nev. 1920)*. This "adverse interest" exception is itself subject to an exception where the agent is the sole representative of the principal corporation. 3 Fletcher Cyclopedia of Private Corp. § 789.

By the Trustee's own allegations and offered evidence, several ABT officers were aware of the improper use of effective date accounting, and such knowledge was obtained during the course of their employment and within the scope of their authority. According **[*34]** to notes of an interview with Gillespie, ABT's Chief Financial Officer Ingalls knew ABT did not have effective control of the companies they were purchasing, yet he told Gillespie to prepare documentation for the SEC suggesting they did have control. (Trustee's Ex. 17 at 61-62; Trustee's Ex. 35 at 3-4.) Ingalls worked for KPMG prior to joining ABT and had advised ABT on using effective date accounting. (Trustee's Ex. 17 at 16-20, 38-44, 48-55.) Ingalls thus would have been familiar with APB-16 paragraph 93's requirements, and would have known that ABT's lack of control meant that ABT had misstated its financial statements.

Additionally, ABT's Vice President of Acquisitions and Operations Kathleen Gillespie knew she did not have effective control by the date reported in ABT's financial statements. (Trustee's Ex. 35 at 4.) Gillespie later admitted she stretched or flowered up the truth before the SEC to convince the SEC that ABT had control. (Id.) Gillespie also indicated that ABT's CEO Thomas knew about ABT's lack of effective control, an allegation echoed by the Trustee's Complaint. (Trustee's Ex. 35 at 4; Third Am. Compl. P 210.)

The Trustee argues that Thomas, Ingalls, and **[*35]** Gillespie were acting on their own interests because their actions inflated ABT's value and stock price, and several ABT officers sold their ABT stock. The Trustee thus contends their knowledge should not be imputed to ABT under the adverse interest exception. KPMG responds that ABT officers actually engaged in very little trading of ABT's stock, selling only when forced to by margin calls and even holding on to much of their stock all the way through ABT's bankruptcy.

Nevada has not indicated whether an officer or agent's interest must be completely adverse to its principal to invoke the adverse interest exception. Other jurisdictions would require an agent to completely abandon the principal's interests and act entirely for his own purposes. See *In re Bennett Funding Group, Inc., 336 F.3d at 100* (indicating adverse interest exception applies only when the agent has "totally abandoned" the

principal's interests); *In re Crazy Eddie Secs. Litig., 802 F. Supp. 804, 817 (E.D.N.Y. 1992)* (stating that when the agent acts both for himself and for the principal, the agent's knowledge is imputed to the principal even if agent's primary interest is inimical **[*36]** to the principal). According to Fletcher's Cyclopedia of the Law of Private Corporations, the agent's relations to the subject matter must be "so adverse as practically to destroy the relation of agency." 3 Fletcher Cyclopedia of Private Corp. § 789. The Ninth Circuit, in evaluating an Idaho case, adopted the Restatement (Second) of Agency's formulation of the rule that "the mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests." *Funk v. Tifft, 515 F.2d 23, 26 n.4 (9th Cir. 1975)* (citing *Restatement (Second) of Agency, § 282 comment c & illustration 4* at 613 (1958)). Based on these authorities, the Court concludes Nevada would adopt a similar rule.

No evidence shows any of the officers looted ABT, embezzled from the corporation, or converted corporate assets to personal use. The Trustee suggests the officers acted in their own interests to inflate ABT's stock price, and then opportunistically sold their shares. In February 1999, Thomas sold over 900,000 shares **[*37]** at approximately $ 5 a share. (Trustee's Ex. 5 at 385-89; Trustee's Ex. 50.) In November 1998, Gillespie sold 80,000 options to her partner who sold them for Gillespie on the market. (Trustee's Ex. 35 at 5.) Ingalls purchased ABT stock for himself and his children and exercised stock options, but he and his children held all of these shares until after AST's bankruptcy, except for some shares Ingalls sold at a loss in 1999. (KPMG's Ex. 26 at 25-34.)

This evidence does not raise a genuine issue of material fact that ABT officers were acting adversely to ABT or acting solely in their own interests. The only shares Ingalls sold before ABT's bankruptcy he sold at a loss, and thus no evidence supports a conclusion he was attempting to artificially increase ABT stock prices only for his own benefit to cash in on the inflated price. This corresponded with ABT's unofficial policy that officers and directors should not sell their ABT stock. (KPMG's Ex. 37 at 80-83.) Ingalls' knowledge therefore should be imputed to ABT.

Although Gillespie made sales in November 1998, she had wanted to exercise options earlier in the year when she thought ABT's price was artificially high but she did not do **[*38]** so at Thomas' direction. (Trustee's Ex. 35 at 5.) Her decision to forego sales at a time she thought ABT's stock price was artificially high suggests she was not acting solely for her own interests. Additionally, when Gillespie finally did sell, Thomas

asked her to space out her sales a few thousand shares at a time so ABT's stock price would not be affected negatively. (Id.)

As for Thomas, he made sales when ABT's stock price was relatively low, and sold then because he was forced to meet margin calls. (Trustee's Ex. 5 at 340, 385-89.) In July 1997 he agreed to reduce his salary. (KPMG's Ex. 5 at 46.) His wife invested $ 3 million in ABT stock in November 1998. (KPMG's Ex. 18 at 362.) Even after Thomas resigned from the Board of Directors in 1999, he agreed to consult for the company compensated primarily with stock options that would not vest until 2000 and 2001. (KPMG's Ex. 54 at 1.) Consequently, even if Gillespie and Thomas were acting partly in their own interests to cash in on ABT's value, these sales do not raise a genuine issue of material fact that Gillespie and Thomas were acting solely for their own purposes such that their knowledge should not be imputed to ABT. **[*39]**

Finally, the Trustee argues that where a corporation has innocent directors not participating in or aware of the fraud, the knowledge of the wrongdoing officers should not be imputed to the corporation. KPMG responds that the Trustee has not consistently identified the so-called innocent directors, and in any event, the Trustee has presented no evidence the innocent directors could or would have stopped the fraud.

The "innocent decision-maker" doctrine was developed in the Second Circuit as an exception to that Circuit's framework of imputation rules to determine whether a trustee has standing. For example, in *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34, 36 (S.D.N.Y. 1997)*, the district court adopted the rule that fraud by corporate agents cannot be imputed to the corporation unless all relevant shareholders and/or decision-makers are involved in the fraud. The Wechsler court found, however, that the trustee had not alleged any such innocent decision-makers. Id. Similarly, in *In re CBI Holding Co., Inc., 247 B.R. 341, 364-65 (Bankr. S.D.N.Y. 2000)*, the court reiterated the rule that the trustee had to show at **[*40]** least one decision-maker in management or among its stockholders who was innocent of the fraud and could have stopped it. The evidence in that case showed that the debtor's forty-eight percent shareholder was innocent of the fraud, and one of its representatives on the debtor's board of directors testified that had he known of the fraud, he would have taken steps to stop it. *Id. at 365.* Accordingly, the court held that the wrongdoing on the part of the debtor's management was not imputable to the debtor. In *In re Bennett Funding Group, Inc., 336 F.3d at 101*, the Second Circuit declined to adopt or reject this rule, holding instead that even if the rule applied the trustee had failed to demonstrate an innocent director who could

have acted to stop the fraud. The Second Circuit found the "so-called independent" directors were "impotent to actually do anything," and that a " would-a, could-a, should-a test" is insufficient to defeat imputation. Id.

The Court finds it unnecessary to decide if Nevada would adopt the "one innocent decision-maker" rule as part of its state imputation law because even if Nevada followed the rule, the Trustee has **[*41]** failed to present evidence that the innocent directors could or would have done anything to stop the fraud. The Trustee has not consistently identified the innocent directors. In one set of answers to interrogatories, the Trustee identified the innocent directors as Byron Ford ("Ford"), James Hopkins ("Hopkins"), and Harrison Bains. (KPMG's Ex. 45 at 4.) In its Response to the pending Motion for Summary Judgment, the Trustee contends it has presented evidence of innocent directors with the depositions of Hopkins, Kent Schulze ("Schulze"), and Richard Budd ("Budd"). (Trustee's Resp. to KPMG LLP's Mot. Summ. J. (Imputation, In Pari Delicto, Causation-Damages) at 20 n.75.) The Trustee also notes that it never sued Ford. (*Id.*)

Although the Trustee has identified these individuals as innocent officers or directors, the Trustee has offered no evidence to support that conclusion. The Trustee does not offer any affidavit or deposition testimony from any of these officers or directors that had they known ABT was misstating its financial information through effective date accounting fraud, they could or would have taken steps to stop it.

Although the Trustee points to the depositions of **[*42]** Hopkins, Schulze, and Budd as evidence of innocent directors, the Trustee does not provide a single page citation in these depositions that would support the Trustee's position. The Court will not scan the record to find a triable issue of fact on the Trustee's behalf. *Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)* (noting that it is not the district court's task "to scour the record in search of a genuine issue of triable fact"); see also *Orr v. Bank of Am., NT & SA, 285 F.3d 764, 774-75 (9th Cir. 2002)* (holding that "when a party relies on deposition testimony in a summary judgment motion without citing to page and line numbers, the trial court may in its discretion exclude the evidence"). At the summary judgment stage, the Trustee must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan, 91 F.3d at 1279* (quotation omitted).

Additionally, the Court notes that in prior pleadings, the Trustee contended Budd was aware of the fraud. (KPMG's Ex. 16 at 6.) Further, the Trustee has asserted in other pleadings that Hopkins was unqualified to understand financial information and was negligent **[*43]**

in performing his director duties. (KPMG's Ex. 7 at 56-57.) At the summary judgment stage, the Trustee's mere allegation unsupported by any record evidence that there were innocent officers and directors is insufficient to raise a genuine issue of material fact that these officers could or would have stopped the fraud such that the wrongdoing officers' knowledge should not be imputed to ABT. Because several ABT officers were aware of the alleged effective date accounting fraud, that knowledge is imputed to ABT, and by operation of *§ 541(a)* to the Trustee.

The Trustee asserts against KPMG claims for professional negligence (count 8), fraud (count 16), and aiding and abetting fraud (count 18). One element of a professional negligence claim is that the negligence proximately caused the client's damages. *Semenza v. Nevada Med. Liability Ins. Co., 104 Nev. 666, 765 P.2d 184, 185 (Nev. 1988)*. An element of a fraud claim is that the plaintiff justifiably relied on the misrepresentation resulting in damages. *Bulbman, Inc. v. Nevada Bell, 108 Nev. 105, 825 P.2d 588, 592 (Nev. 1992)*. Because ABT knew of and participated in the fraud, it could not have justifiably relied on KPMG's audits **[*44]** to uncover a fraud of which it already was aware. *Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 454 (7th Cir. 1982)* ("[A] participant in a fraud cannot also be a victim entitled to recover damages, for he cannot have relied on the truth of the fraudulent representations, and such reliance is an essential element in a case of fraud."); *PNC Bank, Kentucky, Inc. v. Housing Mortg. Corp., 899 F. Supp. 1399, 1406 (W.D. Pa. 1994)* (noting that where principals and officers were engaged in fraud, they knew the audit reports were not accurate, and hence did not rely on them). Additionally, "if nobody relied upon the audit, then the audit could not have been a 'substantial factor in bringing about the injury.'" *F.D.I.C. v. Ernst & Young, 967 F.2d 166, 170 (5th Cir. 1992)*. Accordingly, the Court will grant KPMG's motion for summary judgment as to counts 8, 16, and 18.

### 2. In Pari Delicto

Nevada recognizes the defense of in pari delicto, but has cautioned courts applying Nevada law not to be "so enamored with the latin phrase 'in pari delicto' that they blindly extend the rule to every case where illegality appears somewhere in **[*45]** the transaction." *Shimrak v. Garcia-Mendoza, 112 Nev. 246, 912 P.2d 822, 826 (Nev. 1996)*. The Nevada Supreme Court has outlined when use of the rule is appropriate:

> The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, [1] the public cannot be protected because the

transaction has been completed, [2] where no serious moral turpitude is involved, [3] where the defendant is the one guilty of the greatest moral fault and [4] where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.

Id. (citing *Magill v. Lewis, 74 Nev. 381, 333 P.2d 717, 719 (1958)*).

As this Court noted in its prior Order, the transaction between KPMG and ABT has been completed; therefore, the public cannot be protected. (Order dated July 31, 2002 (Doc. #234) at 4.) Under the second factor, the Trustee has alleged and offered evidence that both ABT officers and KPMG were involved in conduct which could be construed as "serious moral turpitude." n6 According to the Trustee, KPMG and ABT insiders were involved **[*46]** in a fraud upon the investing public and lied to the SEC to cover it up.

> n6 "Moral turpitude" is defined as "an act of baseness vileness, or depravity in the private and social duties which a man owes to his fellowmen or to society in general contrary to the accepted rule of right and duty between man and man." *State ex rel. Conklin v. Buckingham, 59 Nev. 36, 84 P.2d 49, 50-51 (Nev. 1938)*.

With respect to the third factor, however, the Trustee cannot show that KPMG is the one guilty of the greatest moral fault. The Court has little doubt that had ABT sued KPMG for damages arising out of the fraud the moment before commencing bankruptcy proceedings, Nevada would waste little time in denying relief. ABT's theory essentially is that because KPMG did not stop ABT from defrauding its own investors and creditors, KPMG owes damages to ABT. Although policy favors holding watchdogs like auditors to a heightened standard, n7 the Court concludes Nevada courts would not allow ABT to recover from KPMG for the fraud ABT **[*47]** initiated and perpetrated on others. ABT, as originator of the fraud, is at least as guilty as its aider and abetter. See *In re Dublin Secs., Inc., 133 F.3d at 380* (stating that where the debtors perpetrated a fraud on their investors, such purposeful conduct made the debtors at least as culpable as the attorneys who knew or should have known of the fraud but failed to apprise the businesses of those illegalities); cf. *Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 313, 86 L. Ed. 2d 215, 105 S. Ct. 2622 (1985)* (stating that in insider trading context, the Court could not say that "a person whose liability is

solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place").

> n7 *U.S. v. Arthur Young & Co.,. 465 U.S. 805, 817-18 (1984)* (noting that independent certified public accountants assume public watchdog function when certifying a company's public financial documents and therefore have responsibility to the public).

**[*48]**

Because the defense of in pari delicto applies against the Trustee with equal force as it would apply against ABT itself as of the commencement of bankruptcy proceedings, the Trustee is barred from recovering from KPMG. The Court therefore will grant KPMG's motion for summary judgment on counts 8, 9, 16, and 18.

Because the Court will grant KPMG's motion on the basis of imputation and in pari delicto, the Court need not consider KPMG's causation and damages arguments. Additionally, all other pending motions in the action as between KPMG and the Trustee will be denied as moot.

### III. CONCLUSION

IT IS THEREFORE ORDERED that KPMG LLP's Motion for Summary Judgment (Imputation, In Pari Delicto, and Causation-Damages) (Doc. #691) is hereby GRANTED. All claims against Defendant KPMG LLP in the Third Amended Complaint are hereby dismissed with prejudice.

IT IS FURTHER ORDERED that KPMG LLP's Motion to Strike Portions of the Declaration of D. Paul Regan, CPA, CFE (Doc. #740) is hereby DENIED as moot.

IT IS FURTHER ORDERED that KPMG LLP's Motion to Preclude Anthony Schnelling From Testifying as an Expert Witness (Doc. #745) is hereby DENIED as moot.

DATED: April 1, 2005 **[*49]**

PHILIP M. PRO

Chief United States District Judge

JUDGMENT IN A CIVIL CASE

**Decision by Court.** This action came to be considered by the Court. The issues have been considered and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that KPMG LLP's motion for Summary Judgment is hereby

2005 U.S. Dist. LEXIS 6466, *

GRANTED. All claims against D KPMG LLP in the Third Amended Complaint are hereby DISMISSED with prejudice. Judgment is hereby entered in favor of the defendant, KPMG LLP, and against plaintiffs, Anthony H.N. Schnelling, et al.

April 1, 2005

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 571852 (D.Del.), Fed. Sec. L. Rep. P 93,718
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Hartman v. Pathmark Stores, Inc.D.Del.,2006.
United States District Court,D. Delaware.
Rick HARTMAN, individually and on behalf of all
others similarly situated, Plaintiff,
v.
PATHMARK STORES, INC., et al. Defendants.
**No. Civ.A. 05-403-JJF.**

March 8, 2006.

Elizabeth M. McGeever, of Prickett, Jones & Elliot,
P.A., Wilmington, Delaware, Sherrie R. Savett, and
Arthur Stock, of Berger & Montague, P.C.,
Philadelphia, Pennsylvania; Abbott A. Leban of
Berger & Montague, P.C., Wilmington, Delaware;
James M. Orman, Philadelphia, Pennsylvania, for
Plaintiff, of counsel.

William M. Lafferty, and Susan W. Waesco, of
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware; Richard F. Schwed, and Alan S.
Rabinowitz, of Shearman & Sterling LLP, New
York, New York, for Defendant, of counsel.

*MEMORANDUM OPINION*
FARNAN, J.
**\*1** Pending before the Court are two motions,
Plaintiff's Motion By Rick Hartman, For
Appointment As Lead Plaintiff And For Approval Of
Lead Plaintiff's Selection Of Lead Counsel (D.I.6)
and Defendant's Motion To Dismiss (D.I.10). For the
reasons discussed, the Court will grant Defendant's
Motion To Dismiss and deny Plaintiff's Motion as
moot.

BACKGROUND

Defendant Pathmark Stores, Inc. ("Pathmark") is a
Delaware corporation that operates a chain of
supermarkets in Delaware, New Jersey, New York,
and Pennsylvania. The individual Defendants were
Directors of Pathmark at all relevant times. Plaintiff
Rick Hartman held Pathmark common stock at all
relevant times. Plaintiff brings this action as a class
action pursuant to Federal Rules of Civil Procedure
23(a) and (b)(3).

On May 6, 2005, Pathmark issued a Proxy Statement

to shareholders of record as of that date, seeking
approval of a proposed transaction with The Yucaipa
Companies LLC ("Yucaipa").[FN1] Under a purchase
agreement between Pathmark and Yucaipa dated
March 23, 2005, Yucaipa was to invest $150,000,000
in cash in Pathmark in exchange for 20,000,000
shares of Pathmark common stock and warrants to
purchase additional shares. The purchase agreement
did not provide for any direct payment to existing
Pathmark shareholders. On May 19, 2005, an
unidentified bidder ("Bidder No. 2") offered to
purchase all outstanding shares of Pathmark stock at
$8.75 per share, subject to a period of due diligence.
On May 26, Pathmark issued an amendment to the
Proxy Statement that notified shareholders about the
May 19th offer and its rejection by the Board of
Directors. On June 1, 2005, Bidder No. 2 renewed its
offer, but removed the condition that the offer was
subject to a period of due diligence. On June 2 and 3,
2005, Pathmark issued two further amendments to
the Proxy Statement in which it did not disclose
Bidder No. 2's June 1st offer. On June 7, 2005,
Pathmark issued a final amendment to the Proxy
Statement that notified shareholders of the June 1st
offer and of the Board of Director's decision to
continue to recommend approval of the transaction
with Yucaipa. On June 9, 2005, Pathmark held a
special shareholder's meeting at which the
shareholders voted to approve the transaction with
Yucaipa.

> FN1. All facts in this section are taken from
> Plaintiff's Complaint (D.I.1).

Plaintiff's Complaint alleges three counts. Count I
alleges that Defendants violated § 14(a) of the
Securities Exchange Act of 1934 (the "Exchange
Act") and Rule 14a-9 promulgated thereunder, by
failing to disclose Bidder No. 2's June 1st offer in the
amendment to the Proxy Statement issued on June 3,
2005. Count II alleges that the individual Defendants
are liable for the violation alleged in Count I because
they were controlling persons within the meaning of
§ 20(a) of the Exchange Act. Count III alleges
breach of fiduciary duty by the individual Defendants
under Delaware law.

DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2006 WL 571852 (D.Del.), Fed. Sec. L. Rep. P 93,718
**(Cite as: Not Reported in F.Supp.2d)**

### I. Legal Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff. *Neitzke v. Williams,* 490 U.S. 319, 326 (1989); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994). The Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost,* 1 F.3d at 183. Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45 (1957). The burden of demonstrating that the plaintiff has failed to state a claim upon which relief may be granted rests on the movant. *Young v. West Coast Industrial Relations Assoc., Inc.,* 763 F.Supp. 64, 67 (D.Del.1991) (citations omitted).

### II. Whether Count I States A Claim For Violation Of § 14(a) Of The Exchange Act

**\*2** In order to state a claim under § 14(a) of the Exchange Act, a plaintiff must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Shaev v. Saper,* 320 F.3d 373, 379 (3d Cir.2003) (internal quotation marks and citations omitted).

The Court concludes that Plaintiff has failed adequately to allege an injury. The Supreme Court has held that in private securities litigation, the complaint must "provide the defendants with notice of what the relevant economic loss might be" and the causal connection between the defendants' misrepresentation or omission and that loss. *Dura Pharmaceuticals, Inc., et al. V. Broudo et al.,* 125

S.Ct. 1627, 1634 (2005). While recognizing that "ordinary pleading rules are not meant to impose a great burden upon a plaintiff," the Court concluded that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* (internal citations omitted). Here, Count I alleges only that "Plaintiff and the Class have sustained damages by reason of Defendants' misrepresentations and omissions in connection with the Yucaipa Transaction." (D.I. 1 at 9.) Counts II and III contain only similarly conclusory allegations. The Court concludes that these allegations are insufficient to provide Defendants with the requisite notice. Therefore, the Court concludes that Count I fails to state a claim upon which relief can be granted. Accordingly, the Court will grant Defendants' Motion To Dismiss with respect to Count I.

Moreover, the Court will not grant Plaintiff leave to amend Count I. Although Federal Rule of Civil Procedure 15(a) states that leave to amend "shall be freely given when justice so requires," leave to amend "need not be granted when amending the complaint would clearly be futile." *Cowell v. Palmer Tp.,* 263 F.3d 286, 296 (3d Cir.2001) (citing *Maio v. Aetna, Inc.,* 221 F.3d 472, 500-01 n. 19 (3d Cir.2000)). In his Brief In Opposition To Defendants' Motion To Dismiss (D.I.17), Plaintiff elaborates on his theory of damages, contending that Defendants' alleged omission deprived him of the opportunity to vote to reject the Yucaipa transaction in favor of Bidder No. 2's offer. (D.I. 17 at 12.) However, the loss of that opportunity could not have caused an economic loss to Plaintiff. Bidder No. 2's offer was to buy all outstanding shares of Pathmark common stock at $8.75 per share. On June 9, 2005, the day of the shareholder vote to approve the Yucaipa transaction, the closing market price of Pathmark stock was $8.86. (D.I.12, Ex. G.) [FN2] The price remained above $8.75 at least as late as August 18, 2005. (*Id.*) Plaintiff had a period of at least two months following the shareholder vote in which he could have sold his Pathmark stock for a price greater than that offered by Bidder No. 2. In essence, Plaintiff contends that he was deprived of the opportunity to sell his Pathmark stock at a price lower than the market price. It would be clearly futile to allow Plaintiff to amend his Complaint to clarify that theory of damages.

FN2. Pursuant to Federal Rules of Evidence 201(b) and (d), the Court takes judicial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 571852 (D.Del.), Fed. Sec. L. Rep. P 93,718
**(Cite as: Not Reported in F.Supp.2d)**

notice of the stock price data provided by Defendants in the Declaration Of Alan Rabinowitz (D.I.12) in support of the Motion To Dismiss. The Court notes that it relied on this data only in deciding whether to grant leave to amend and not in deciding whether to grant Defendants' Motion To Dismiss.

### III. Whether Count II States A Claim Against The Individual Defendants Under § 20(a) Of The Exchange Act

**\*3** Section 20(a) of the Exchange act provides that Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Accordingly, in order to state a claim under § 20(a), Plaintiff must first adequately plead an independent violation of the Exchange Act by some person controlled by the individual Defendants. *In re Merck & Co., Inc. Sec. Litig.,* 432 F.3d 261, 275 (3d Cir.2005). Here, Plaintiff alleges § 20(a) liability only "by reason of the conduct alleged in Count I of the Complaint." (D.I. 1 at 10.) In light of the Court's conclusion that Count I fails to state a claim upon which relief can be granted, this allegation is insufficient to plead an independent violation of the Exchange Act. Therefore, the Court concludes that Count II fails to state a claim upon which relief can be granted. Accordingly, the Court will grant Defendants' Motion To Dismiss with respect to Count II. Because the Court will not grant Plaintiff leave to amend Count I, it would be equally futile to allow amendment of Count II.

### IV. Whether Count III States A Claim For Breach Of Fiduciary Duty Under Delaware Law

In Count III of his Complaint, Plaintiff alleges that the individual Defendants breached their fiduciary duty of loyalty to Plaintiff by "entering into a Purchase Agreement with Yucaipa containing a 'force the vote' provision; ... refusing to postpone the shareholders' meeting and continuing to recommend a favorable vote on the Yucaipa Transaction even after an alternative offer was made

on June 1, 2005; and ... declining to continue negotiations with interested bidders after the receipt of the June 1 offer ..."

(D.I. 1 at 10.) Plaintiff contends that, in evaluating this allegation, the Court should subject the individual Defendants' conduct to the enhanced scrutiny prescribed by the Delaware Supreme Court in *Revlon, Inc. v. MacAndrews & Forbes Holdings,* 506 A.2d 173 (Del.1986). (D.I. 17 at 16-17.) That scrutiny is triggered "when a corporation undertakes a transaction which will cause: (a) a change in corporate control; or (b) a break-up of the corporate entity ..." *Paramount Communications Inc., v. QVC Network, Inc.,* 637 A.2d 34, 48 (Del.1994). Although it is not clear whether the Yucaipa transaction involved a potential change in corporate control,[FN3] the Court will assess the sufficiency of Count III under the *Revlon* standard because, even with the benefit of that enhanced scrutiny, Count III fails to state a claim upon which relief can be granted.

> FN3. Plaintiff's Complaint alleges that the transaction would result in Yucaipa owning, at most, 50% of Pathmark's shares (D.I. 1 at 6), while his Brief In Opposition To Defendants' Motion To Dismiss contends that Yucaipa could acquire up to 60% (D.I. 17 at 16).

Under *Revlon,* a sale of corporate control imposes on the directors the obligation of "acting reasonably to seek the transaction offering the best value reasonably available to the stockholders." *QVC,* 637 A.2d at 43. In *QVC,* the Delaware Supreme Court outlined the "key features" of the enhanced scrutiny test:
**\*4** (a) a judicial determination regarding the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision; and (b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing. The directors have the burden of proving that they were adequately informed and acted reasonably.

637, A.2d at 45. Thus, in order to state a claim for breach of the fiduciary duty of loyalty under this standard, a plaintiff must allege that the directors' decision making process was inadequate, i .e. that the directors were not adequately informed, and that their action was unreasonable. Plaintiff here alleges neither. Furthermore, Plaintiff does not allege that any of the individual Defendants had a conflict of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 4
Not Reported in F.Supp.2d, 2006 WL 571852 (D.Del.), Fed. Sec. L. Rep. P 93,718
**(Cite as: Not Reported in F.Supp.2d)**

interest. Nor does he allege facts from which the Court could reasonably infer that the loyalty of the individual Defendants was conflicted or that they acted in bad faith. Therefore, the Court concludes that Count III fails to state a claim upon which relief can be granted. Accordingly, the Court will grant Defendants' Motion To Dismiss with respect to Count III.

CONCLUSION

In sum, the Court concludes that each of Plaintiff's Counts fails to state a claim upon which relief can be granted. Therefore the Court will grant Defendants' Motion To Dismiss (D.I.10). Counts I and II will be dismissed with prejudice.

An Appropriate order will be entered.

*ORDER*

At Wilmington, this 8th day of March, 2006, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that:

1. Defendant's Motion To Dismiss (D.I.10) is *GRANTED;*

2. Counts I and II of Plaintiff's Complaint (D.I.1) are *DISMISSED* with prejudice;

3. Count III of Plaintiff's Complaint (D.I.1) is *DISMISSED* without prejudice;

4. Plaintiff's Motion By Rick Hartman, For Appointment As Lead Plaintiff And For Approval Of Lead Plaintiff's Selection Of Lead Counsel (D.I.6) is *DENIED* as moot.

D.Del.,2006.
Hartman v. Pathmark Stores, Inc.
Not Reported in F.Supp.2d, 2006 WL 571852 (D.Del.), Fed. Sec. L. Rep. P 93,718

Briefs and Other Related Documents (Back to top)

• 2005 WL 3667236 (Trial Motion, Memorandum and Affidavit) Reply Brief in Further Support of Defendants' Motion to Dismiss (Oct. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 2603867 (Trial Motion, Memorandum

and Affidavit) Opening Brief in Support of Defendants' Motion to Dismiss (Aug. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 2603866 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion by Rick Hartman, for Appointment as Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel (Aug. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 1529544 (Trial Pleading) Class Action Complaint for Violations of Federal Securities Laws and the Common Law of Delaware (Jun. 15, 2005)
• 2005 WL 1838040 (Trial Pleading) Class Action Complaint for Violations of Federal Securities Laws and the Common Law of Delaware (Jun. 15, 2005) Original Image of this Document (PDF)
• 1:05cv00403 (Docket) (Jun. 15, 2005)
• 2005 WL 2868174 (Trial Pleading) Brief in Opposition to Defendants' Motion to Dismiss (2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                         Page 1
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Republic of Panama v. American Tobacco
Co.Del.Super.,2006.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
        Superior Court of Delaware,New Castle County.
                REPUBLIC OF PANAMA, Plaintiff,
                                v.
        The AMERICAN TOBACCO COMPANY, et al.,
                            Defendants.
        The State of Sao Paulo, Brazil, Plaintiff,
                                v.
        The American Tobacco Company, et al., Defendants.
        **C.A. Nos. 05C-07-181-RRC, 05C-07-180-RRC.**

                    Submitted: April 7, 2006.
                    Decided: June 23, 2006.
                    Modified: July 13, 2006.

**Background:** Two foreign governments, the
Republic of Panama and the State of São Paulo,
Brazil, brought action against domestic tobacco
company, to recover medical expenses allegedly
incurred in treating foreign citizens' health problems
associated with company's tobacco products.
Company filed motion to dismiss for failure to state a
claim upon which relief can be granted.

**Holdings:** The Superior Court, Cooch, J., held that:

(1) affidavits from non-legal experts were insufficient
to establish substance of foreign law;

(2) foreign governments failed to prove proximate
causation, given that their alleged injuries were
related to tobacco company only indirectly via the
conduct of their citizen smokers; and

(3) foreign governments were not entitled to parens
patriae standing on behalf of their citizens.

Motion granted.
West Headnotes
**[1] Pretrial Procedure 307A ⬤══685**

307A Pretrial Procedure
    307AIII Dismissal

        307AIII(B) Involuntary Dismissal
            307AIII(B)6 Proceedings and Effect
                307Ak685 k. Affidavits or Other
Showing of Merit. Most Cited Cases
Affidavits from non-legal experts were insufficient to
establish substance of foreign law, and thus the
Republic of Panama and the State of São Paulo,
Brazil, failed to establish, on motion to dismiss, that
Panamanian or Brazilian law, rather than Delaware
law, would apply in their action against domestic
tobacco company to recover medical expenses
allegedly incurred in treating foreign citizens' health
problems associated with company's tobacco
products; although affiants headed their respective
governments' health agencies and had some
understanding of their countries' laws, affiants did not
proffer that they had an expertise in law of their
jurisdictions, and affiants were not attorneys, law
professors, or judges.

**[2] Products Liability 313A ⬤══59**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
            313Ak59 k. Tobacco Products. Most Cited
Cases
Two foreign governments, the Republic of Panama
and the State of São Paulo, Brazil, failed to establish
that domestic tobacco company's alleged wrongful
conduct in intentionally misleading consumers
regarding risks of cigarette smoking was the
proximate cause of foreign governments' increased
medical costs as health-care providers, and thus
foreign governments could not prevail on claim
against tobacco company; foreign governments'
alleged injuries were related to tobacco company
only indirectly via the conduct of their citizen
smokers.

**[3] Implied and Constructive Contracts 205H
⬤══3**

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(A) In General
            205Hk2 Constructive or Quasi Contracts
                205Hk3 k. Unjust Enrichment. Most
Cited Cases
Once it has been determined that underlying tort
claims have properly been dismissed, there is no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 2
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

reason to allow unjust enrichment claim to proceed.

[4] **Conspiracy 91** ☞1.1

91 Conspiracy
   91I Civil Liability
      91I(A) Acts Constituting Conspiracy and Liability Therefor
         91k1 Nature and Elements in General
            91k1.1 k. In General. Most Cited Cases
Claim for civil conspiracy can proceed only when there is a cause of action for an underlying act.

[5] **International Law 221** ☞10.27

221 International Law
   221k10.27 k. Actions by Sovereign or Instrumentality. Most Cited Cases

**Products Liability 313A** ☞59

313A Products Liability
   313AI Scope in General
      313AI(B) Particular Products, Application to
         313Ak59 k. Tobacco Products. Most Cited Cases
The Republic of Panama and the State of São Paulo, Brazil were not entitled to parens patriae standing on behalf of their citizens in order to recover from domestic tobacco company for alleged wrongful conduct in intentionally misleading consumers regarding risks of cigarette smoking, despite claim that their citizens were too impoverished to seek redress by themselves in their local jurisdictions; there was no indication by the three co-equal branches of government that parens patriae should be recognized in tobacco cases brought by foreign nations, and requiring determinations of whether individual countries were sufficiently "developed" for parens patriae standing would place excessive burden on courts.

On "Certain Defendants' Motions to Dismiss." **GRANTED.**

Randall E. Robbins, Esquire, and Richard D. Heins, Esquire, Ashby & Geddes, Wilmington, Delaware, Michael X. St. Martin, Esquire, and Conrad S.P. Williams, III, Esquire, St. Martin & Williams, Houma, Louisiana, George J. Fowler, III, Esquire, and Jon W. Wise, Esquire, Fowler, Rodriguez & Chalos, New Orleans, Louisiana, Calvin C. Fayard, Jr., Esquire, Fayard and Honeycutt, Denham Springs,

Louisiana, Attorneys for Plaintiffs.

Donald E. Reid, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Kenneth J. Parsigian, Esquire, Goodwin Procter, LLP, Boston, Massachusetts, Attorneys for Phillip Morris USA, Inc.

Bonnie Glantz Fatell, Esquire, and Steven L. Caponi, Esquire, Blank Rome LLP, Wilmington, Delaware, Robert. F. McDermott, Jr., Esquire, and Paul S. Ryerson, Esquire, Jones Day, Washington, D.C., Attorneys for R.J. Reynolds Tobacco Company; R.J. Reynolds Tobacco Holdings, Inc. (f/k/a RJR Nabisco, Inc.); Brown & Williamson Tobacco Corp. (individually and as successor by merger to The American Tobacco Company); BATUS Retail Services, Inc. (individually and as successor by merger to BATUS, Inc.); BATUS Holdings, Inc.; and Fortune Brands, Inc. (f/k/a American Brands, Inc.).

Paul J. Lockwood, Esquire, Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, Delaware, Attorney for U.S. Smokeless Tobacco Co. (f/k/a United States Tobacco Co.), and UST, Inc.

John E. James, Esquire, Potter, Anderson & Corroon, LLP, Wilmington, Delaware, Attorney for Liggett Group, Inc., and Liggett & Myers, Inc.

***MEMORANDUM OPINION***

COOCH, J.

**I. INTRODUCTION**

*\*1* Pending before this Court is Moving Defendants'[FN1] Motion to Dismiss for failure to state a claim upon which relief can be granted.[FN2] Plaintiffs, the Republic of Panama and the State of São Paulo, Brazil (collectively "the Foreign Governments") seek to recover medical expenses they say they have incurred for decades in treating their citizens' health problems, allegedly caused by their citizens' consumption of Moving Defendants' tobacco products. In their own words, the Foreign Governments "do not seek damages for personal injuries suffered by smokers; [we] seek damages for separate injuries to plaintiffs' property and national patrimony that is wholly distinct from the harms suffered by individuals."[FN3]

     FN1. The defendants originally named by the plaintiffs were: The American Tobacco Company; American Brands, Inc.; Fortune Brands, Inc.; Brown & Williamson Tobacco Corp.; Reynolds American, Inc.; R.J. Reynolds Tobacco Company; RJR Nabisco, Inc.; BATUS, Inc.; BATUS Retail Services,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 3
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
(Cite as: Not Reported in A.2d)

Inc.; BATUS Holdings, Inc.; Philip Morris, Inc.; Phillip Morris Companies, Inc.; Phillip Morris USA, Inc.; Altria Group, Inc.; B.A.T. Industries; Lorillard Tobacco Co.; Lorillard, Inc.; Loews Corp.; United States Tobacco Co.; UST, Inc.; Liggett Group, Inc.; Liggett & Myers, Inc.; Tobacco Institute, Inc.; Quaglino Tobacco and Candy Co., Inc.; and J & R Vending Services, Inc.

Moving Defendants are: Philip Morris USA Inc.; R.J. Reynolds Tobacco Company; R.J. Reynolds Tobacco Holdings, Inc. (f/k/a RJR Nabisco, Inc.); Brown & Williamson Tobacco Corp. (individually and as successor by merger to The American Tobacco Company); BATUS Retail Services, Inc. (individually and as successor by merger to BATUS, Inc.); BATUS Holdings, Inc.; Fortune Brands, Inc. (f/k/a American Brands, Inc.); U.S. Smokeless Tobacco Co. (f/k/a United Stated Tobacco Co.); UST, Inc.; Liggett Group, Inc.; and Liggett & Myers, Inc.

The non-moving defendants are: B.A.T Indus., Tobacco Institute, Inc., Quaglino Tobacco and Candy Co., Inc., and J & R Vending Services, Inc.

The defendants that have been voluntarily dismissed, pursuant to Super. Ct. Civ. R. 41(a)(1)(II), are: Lorillard Tobacco Co., Lorillard, Inc., and Loews Corp.

FN2. Super. Ct. Civ. R. 12(b)(6).

FN3. Plaintiffs' Response to the Motion to Dismiss at 3.

To that end, the Republic of Panama pleads negligence, strict liability, and unjust enrichment under Panamanian civil law.[FN4] The State of São Paulo, Brazil claims breach of public health obligations, strict liability, and unjust enrichment under Brazilian civil law.[FN5] Also, both Foreign Governments appear to assert negligence, breach of voluntary undertaking, unjust enrichment, fraud, and civil conspiracy under Delaware law.

FN4. *Id.* at 15-17.

FN5. *Id.* at 17, 18. No party has suggested that the potentially applicable law of the State of São Paulo, Brazil, is different than Brazilian law generally. The Court thus understands the pertinent laws of the State

of São Paulo, Brazil to be the same as the laws of Brazil.

The issue in the pending motion to dismiss is whether the Foreign Governments have sufficiently pled, as a matter of law, that the particular allegations concerning Moving Defendants' manufacture and distribution of tobacco products were potentially a proximate cause of the Foreign Governments' economic injuries. The Court further finds that Delaware law will apply to the claims made by the Foreign Governments. Accepting, on this motion to dismiss, the Foreign Governments' facts as true, this Court concludes that the Foreign Governments cannot, as a matter of law, establish proximate causation of their injury. Therefore, Moving Defendants' Motion to Dismiss is granted.

## II. FACTS AND PROCEDURAL BACKGROUND

The relevant facts of this case are excerpted from the Foreign Governments' complaint and, for the purposes of this motion, accepted as true.[FN6] Moving Defendants are the primary manufacturers, distributors, and marketers of tobacco products in Panama and the State of São Paulo, Brazil.[FN7] Human consumption of tobacco causes cardiovascular disease, lung and other cancers, emphysema, complications to pregnancy, low birth weight in newborn children of smoking mothers, and many other health problems regardless of the manner or method of consumption. The World Health Organization, the United States Surgeon General's Office, the Delaware Department of Health and Social Services, the American Medical Association, and numerous other governmental, medical, and public health entities recognize that tobacco is both harmful to the user's health, harmful to non-users breathing second-hand smoke, and addictive. The Foreign Governments fund nonprofit health care systems that are responsible for providing health care to their citizens. Consequently, the Foreign Governments pay for the medical care of their citizens who have acquired illnesses resulting from their tobacco consumption. Treatment for these illnesses can take many years and is very costly.

FN6. *Plant v. Catalytic Construction Co.,* 287 A.2d 682, 686 (Del.Super.1972) *aff'd* 297 A.2d 37 (Del.1972) (stating that for 12(b)(6) motions, the plaintiff's facts are accepted as true).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 4
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
(Cite as: Not Reported in A.2d)

FN7. For purposes of this litigation the specific tobacco products manufactured, distributed, sold and marketed by Moving Defendants are indistinguishable.

*2 For many years, the complaint alleges, Moving Defendants worked in collusion with each other in order to conceal accurate medical evidence, which proved that tobacco is harmful to a user's health and can be potentially fatal. At the same time, the Foreign Governments assert, Moving Defendants intentionally misled consumers about the true nature of the health consequences to tobacco.FN8 Allegedly, Moving Defendants had the ability to manufacture and distribute safer cigarettes, but chose not to, for the sake of preserving stability within the industry.FN9 Also, the Foreign Governments allege that Moving Defendants intentionally manipulated the quantity and quality of nicotine in their products in order to maximize its addictive properties, making it difficult for their citizens to quit using tobacco.FN10 The Foreign Governments also assert that Moving Defendants intentionally misled the public by denying the addictive nature of their products.FN11

FN8. The Foreign Governments rely on the following documents that were not attached to the complaint: A 1953 business strategy agreed to by at least two Defendants, Phillip Morris and Brown & Williamson, which stated, among other things, that tobacco companies would deny knowledge that smoking was dangerous and suppress any efforts to develop safer or healthier cigarettes, Plaintiffs' Complaint ¶ 64; a report by Arthur D. Little, Inc., that was concealed by Defendant Liggett, duplicated Dr. Wynder's 1953 study, and produced scientifically accurate results proving that cigarette smoking causes cancer, Plaintiffs' Complaint ¶ 35; a 1963 statement by Addison Yeaman, then general counsel of Defendant Brown & Williamson, who wrote that smoking cigarettes "cause, or predispose, lung cancer." Plaintiffs' Complaint ¶ 78. The Foreign Governments contrast that quote with 1994 Congressional testimony by tobacco executives who testified that they did not believe that there was conclusive scientific evidence that smoking was harmful to a user's health. Plaintiffs' Complaint ¶ 68.

FN9. In 1968 Liggett began the 'XA' project, which neutralized cigarette tar, but the project was abandoned pursuant to a 1954 industry-wide agreement. Plaintiffs' Complaint ¶ 82.

FN10. Plaintiffs' Complaint ¶ 43-59.

FN11. Foreign Governments cite, inter alia, two statements to support this claim. First, a 1963 statement made by Addison Yeaman, then general counsel of Defendant Brown & Williamson, "[w]e are, then, in the business of selling nicotine, an addictive drug." Plaintiffs' Complaint ¶ 41. Second, statements made before Congress in 1994 by the then CEO of Defendant Brown & Williamson that nicotine was not addictive. Plaintiffs' Complaint ¶ 68. Taken together, the Foreign Governments claim, these statements show that the Defendants gave misleading statements or intentionally lied and misled the public about the real addictive qualities of their tobacco products.

This litigation apparently began in 1998 in the Civil District Court for the Parish of Orleans, State of Louisiana.FN12 The Louisiana court dismissed the case based upon forum non conveniens principles. However, prior to that dismissal, the parties stipulated to venue in the State of Delaware. The Foreign Governments then filed their complaint against Moving Defendants in this Court in July 2005. The instant motion to dismiss soon followed.

FN12. Defendants Reynolds American, Inc., Phillip Morris USA, Inc., Altria Group, Inc., and BATUS Retail Services, Inc. did not exist at the time of the initial filing in 1998 and have been subsequently added. Plaintiffs' Complaint ¶ 1.

In opposition to Moving Defendants' motion to dismiss, the Foreign Governments submitted two affidavits to the Court. One affiant was Camillo Alleyne Marshall, the acting Minister of Health in the Republic of Panama, and the other affiant was Luiz Roberto Barradas Barata, the acting Secretary of Public Care of the State of São Paulo. Neither of the Foreign Governments' purported experts on Panamanian or Brazilian law are lawyers or law professors. However, both affiants stated, inter alia, that under Panamanian and Brazilian law, the Foreign Governments have respectively stated valid causes of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 5
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

action.

In response, and in support of their motion to dismiss, Moving Defendants submitted two affidavits to the Court seeking to establish the substance of Panamanian and Brazilian law as that law applies in support of their motion. One affiant was Narciso Jose Arellano Moreno, the Dean of Universidad Santa Maria La Antiqu, a Panamanian law school. The other affiant was Luis Roberto Barroso, a law professor at the State University of Rio de Janeiro. Both affiants stated, inter alia, that under Panamanian and Brazilian law, the Foreign Governments have not stated valid causes of action.

### III. STANDARD OF REVIEW

When deciding a motion to dismiss, "all factual allegations of the complaint are accepted as true." [FN13] A complaint will not be dismissed under Superior Court Civil Rule 12(b)(6) "unless it appears to a certainty that under no set of facts which could be proved to support the claim asserted would the plaintiff be entitled to relief." [FN14] Therefore, the Court must determine "whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint." [FN15]

   FN13. *Plant,* 287 A.2d at 686.

   FN14. *Id.*

   FN15. *Spence v. Funk,* 396 A.2d 967, 968 (Del.1978).

### IV. CONTENTIONS OF THE PARTIES

#### A. Moving Defendants' Contentions

**\*3** The gravamen of Moving Defendants' argument is that the Foreign Governments' claims are too "remote" and indirect to provide any legal basis to justify recovery. Moving Defendants advise the Court that:
[The Foreign Governments] do not dispute that thirty-four identical suits by other foreign governments have been dismissed, and that all twenty appellate courts that have considered such claims by foreign governments, hospitals, insurers, union health and welfare funds, and even United States' states have ruled that the claims are barred because the

alleged losses are too remote and indirect. [FN16]

   FN16. Defendant's Reply Memorandum at 1.

Moving Defendants claim that in this lawsuit, the Foreign Governments are acting as nothing more than third party payors of medical expenses and should seek subrogation claims on behalf of actual citizens. Since, however, the Foreign Governments are not seeking subrogation claims, Moving Defendants argue that the Foreign Governments' claims should be dismissed pursuant to the common law doctrine of proximate cause. Moving Defendants argue that the Foreign Governments have failed to establish, as a matter or law, that their actions, even if true, could be the proximate cause of the Foreign Governments' injury. Further, Moving Defendants argue that any potential damages arising from the Foreign Governments' claims would be so speculative that the Court could not accurately calculate them, apportion the damages between the plaintiffs, nor prevent the possibility of duplicative recovery. Moving Defendants also assert that the "Master Settlement Agreement" the tobacco companies entered into with forty six United States' states and most United States territories, is not evidence of liability in this litigation.

With respect to the choice of law issues, Moving Defendants urge the Court to reject the Foreign Governments' argument that Panamanian and Brazilian law should be applied for four reasons. Moving Defendants argue (1) the Foreign Governments have failed to meet their burden of demonstrating the content of the foreign law; (2) the Foreign Governments have not shown that a conflict of law exists; (3) when this litigation was still in Louisiana the Foreign Governments conceded in the Louisiana court that "[m]ost of the activities relating to liability occurred within the United States" [FN17], and (4) the factors of Delaware's "most significant relationship" [FN18] test favor the application of Delaware law where choice of law is at issue. Alternatively, the Moving Defendants assert that the "federal common law of foreign relations" should govern this action. [FN19]

   FN17. Defendants' Reply Memorandum, Ex. F at 7 (citing Foreign Governments' Louisiana Memorandum in Opposition to Motion to Dismiss Under Forum Non

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 6

Conveniens at 7).

FN18. *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 44-47 (Del.1991) (holding that the most significant relationship test will be used in determining choice of law issues).

FN19. Defendants' Memorandum in Support of Motion to Dismiss at 6, n. 3.

**B. Foreign Governments' contentions**

The Foreign Governments assert that, but for Moving Defendants' intentional distortion and concealment of medical evidence, they would have enacted significant public health measures, thus enabling them to reduce their medical expenses by educating their citizens. The Foreign Governments allege that Moving Defendants' refusal to take remedial action, by decreasing the adverse physical effects of tobacco, caused great physical harm to their citizens, thus increasing the amount of medical care necessary to treat that harm. This allegedly increased the aggregate cost of medical care, and thus created greater economic injury. Furthermore, the Foreign Governments maintain that, but for Moving Defendants' intentional manipulation of nicotine levels, their tobacco cessation programs would be more successful, reducing their number of tobacco users, and decreasing their medical expenses.

**\*4** The Foreign Governments also argue that under Delaware's "most significant relationship" test,FN20 Panamanian and Brazilian law should apply. Applying this test, the Foreign Governments argue that their claims should be analyzed under foreign law because, although the evidence of liability is in the United States, the injuries complained of occurred in Panama and the State of São Paulo, Brazil. Also, the Foreign Governments claim to have significant public policy concerns, such as improving the social, economic, and environmental damages caused by tobacco, which would require the claims to be governed by those jurisdictions' respective laws.

FN20. *Travelers,* 594 A.2d at 44-47.

The Foreign Governments assert that many of the Moving Defendants entered into a "Master Settlement Agreement" with forty six United States' states, including Delaware. The Foreign Governments argue that they are making essentially the same argument against the Moving Defendants that Delaware and other states made against the

tobacco companies, and if Delaware's claim was not too remote, their claims should not be too remote either. Furthermore, the Foreign Governments argue that remoteness considerations are just initial factors of the proximate cause analysis, not necessarily a complete bar to recovery, and have "no place in a 21st century world." FN21

FN21. Plaintiff's Response to the Motion to Dismiss at 1.

The Foreign Governments further argue that proximate cause is merely a judicial tool, so that the Court, where justice demands, can relax the standard. From this, the Foreign Governments deduce that because the injuries were "foreseeable" to Moving Defendants, they have made a sufficient showing to establish that Moving Defendants' actions were the proximate cause of their injury. The Foreign Governments argue further that the proximate cause test can also be relaxed because they have a quasi-sovereign interest, thus giving them *parens patriae* standing.

**V. DISCUSSION**

The issue in the pending motion to dismiss is whether the Foreign Governments have sufficiently pled, as a matter of law, that the particular allegations concerning Moving Defendants' manufacture and distribution of tobacco products were potentially a proximate cause of the Foreign Governments' economic injuries. In resolving this question, the Court must initially determine whether the laws of Delaware will control the substantive claims brought by the Foreign Governments, or whether the laws of Panama and Brazil will control the claims of each respective Foreign Government. For the following reasons, the Court concludes that Delaware law will control all claims brought by the Foreign Governments, and that Moving Defendants' conduct, as a matter of Delaware law, could not have been the proximate cause of the Foreign Governments' injury.

**A. Delaware law will control all claims made by the Foreign Governments because the Foreign Governments have not established that Panamanian or Brazilian law potentially applies.**

[1] The Court need not reach the substantive issues regarding the possible application of foreign law FN22 because the Foreign Governments have failed to meet

Not Reported in A.2d                                                                                   Page 7
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

their threshold procedural burden in establishing the substantive applicable law of Panama and Brazil. In order for the Court to consider the application of foreign law, the party seeking the application of foreign law has the burden of not only raising the issue that foreign law applies, but also the burden of adequately proving the substance of the foreign law.[FN23]

> FN22. The Republic of Panama asserts that, under Article 1644 of the Panamanian Civil Code, the Defendants are joint and severally liable for negligence and breach of duty of care. Marshall Affidavit at 4. Also, the Republic of Panama argues that Article 1643(a) establishes a cause of unjust enrichment, which the Defendants breached when they neglected to meet their obligation to pay for the health costs of Panamanian smokers. *Id.* at 6.

The State of São Paulo, Brazil argues that, under Article 196 of the Federal Constitution of Brazil and Article 219 of the Constitution of the State of São Paulo, health is a protected right, and the Defendants violated that right. Barata Affidavit at 2. Furthermore, the State of São Paulo, Brazil asserts that under Article 186 of the Brazilian Civil Code, the Defendants have, "committed a tort since the substances contained in the cigarettes cause damages to the smokers' health and increase the State's health care costs." *Id.* at 4. They further argue that they have stated valid claims of strict liability under Article 927 of the Brazilian Civil Code and unjust enrichment under Article 884 of the Brazilian Civil Code. *Id.* at 4, 6.

> FN23. *See* 9 James Wm. Moore et al., *Moore's Federal Practice,* § 44.1.04[1] (3d ed.2006) (stating that "the party that wishes to rely on foreign law has the responsibility of demonstrating its content"); Jeffery P. Ghent, Annotation, *Pleading and Proof of Law of Foreign Country,* 75 A.L.R.3d 177, 2a (2004) (stating that "the courts appear to be in agreement on the general rule that the burden of proving the law of a foreign country is on the party relying on it"); Richard P. Shafer, Annotation, *Federal Constitution Limitations, Under Full Faith and Credit Clause (Art IV § 1) And Fourteenth Amendment's Due Process*

> *Clause, On Forum's Application of Its Own Law to Litigation Having Multistate Aspects,* 66 L.Ed.2d 948, § 2b (1982) ("The traditional common-law view is that foreign law is a fact that must be pleaded and proved by the party seeking its application, and this approach still applies in jurisdictions where it has not been altered by statute, court rule, or judicial law") (citing *Talbot v. Seeman,* 1 Cranch 1, 5 U.S. 1, 2 L.Ed. 15 (1801)); *Integral Res. (PVT) Limited v. ISTIL Group, Inc.,* 155 Fed. Appx. 69, 73 (3d Cir.2005) (quoting *Bel-Ray Co. v. Chemrite Ltd.,* 181 F.3d 435, 440-41 (3d Cir.1999) (stating that "the parties ... generally carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case")).

**\*5** In order to apply foreign law, Superior Court Civil Rule 44.1 provides that the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Delaware Rules of Evidence." [FN24] Typically, the movant will submit enough "relevant material" to the Court to sufficiently establish the content of foreign law.[FN25] The problem in this case is that the Foreign Governments' affiants on Panamanian and Brazilian law, Mr. Barata and Mr. Marshall, apparently have no formal legal training.

> FN24. Super. Ct. Civ. R. 44.1:
> "A party who intends to raise an issue concerning the law of a foreign country shall give notice in the party's pleadings or other reasonable written notice. The Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Delaware Rules of Evidence. The Court's determination shall be treated as a ruling on a question of law."

> FN25. *Kostolany v. Davis,* 1995 WL 662683, \*1 (Del.Ch.1995) (noting that issues of foreign law were fully developed by expert witnesses).

Both affiants head their respective governments' health agencies and, of course, it is inevitable that in that capacity they will gain some understanding of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                            Page 8
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

their countries' laws. Their governments are each a party to this action, and their governments are seeking to recover the medical expenses incurred by the very same agencies the affiants head. However, neither of these two affiants have proffered that they have an expertise in law of their jurisdictions. The affiants are not attorneys, law professors, or judges. Moving Defendants appropriately point out that when this litigation was in Louisiana, the Foreign Governments submitted affidavits from Jorge Fabrega, a law professor at the University of Panama, and Jose Jorge Tannus, a law professor at the Law School of the University of São Paulo, in their opposition to the motion to dismiss on grounds on the forum non conveniens at issue in the Louisiana court.[FN26]

> **FN26.** Defendants Reply Memorandum at 5 n. 2. The Court further notes that the Foreign Governments have been on notice since at least March 13, 2006, the date the Moving Defendants filed their Reply Memorandum, that the Moving Defendants challenge the legal sufficiency of their affiants on these grounds.

While courts have, on occasion, accepted a non-lawyer's testimony or affidavit as to the basis of foreign law,[FN27] the courts have " 'wide latitude' in determining what evidence to take on the [foreign law] and in what form." [FN28] Given the far-reaching relief sought by the Foreign Governments in this case, and their emphatic assertions that Panamanian and Brazilian law should apply to their substantive claims, at the very least the Foreign Governments should have submitted affidavits from legal experts. This Court concludes that the Foreign Governments have not satisfied their threshold requirement of establishing the substance of Panamanian or Brazilian law because they have insufficiently articulated the substance of the foreign law.[FN29] Therefore, the Court does not reach the issue of, assuming that the substance of Panamanian and Brazilian law was properly established, whether the foreign law would apply. For all the preceding reasons, Delaware law will control all claims made by the Foreign Governments.[FN30]

> **FN27.** Ghent, supra note 23, at § 2a
> "The broad proposition that the testimony of qualified experts is admissible to prove foreign law has been expressly stated in some form in a number of cases involving,

or allegedly involving, the law of a foreign country, and the courts have sometimes further recognized that a person familiar with the foreign country's law may qualify as an expert on it even though he is not a member of the bar (of that country)."

> **FN28.** 9 James Wm. Moore et al., *Moore's Federal Practice*, § 44.1.04 [1] (3d ed.2006).

> **FN29.** Ghent, supra note 23 at § 3
> "[O]ne who submits to the court foreign law which he claims is applicable should do more than merely allege conclusions or short excerpts from the allegedly pertinent statute; he should set out the substance of the alleged foreign law to such an extent that the court may judge whether it has the effect that he ascribes to it."

> **FN30.** While Moving Defendants argued that the "federal common law of foreign relations" should independently apply in addition to Delaware law, the Court declines to apply it because the federal common law of foreign relations and Delaware common law both appear to use the same proximate cause standard. Furthermore, other courts have declined to apply the federal common law of foreign relations in similar litigation, preferring to apply state common law. *Republic of Venez. v. Philip Morris, Inc.,* 287 F.3d 192, 195 (D.C.Cir.2002).

**B. The Foreign Governments' claims fail because they cannot, as a matter of law, establish proximate cause.**

**1. Proximate cause considerations generally.**

Delaware will generally apply the common law, except where the General Assembly has provided otherwise.[FN31] The General Assembly has not enacted any statute defining proximate cause; therefore, in Delaware, proximate cause is controlled by the common law. The Supreme Court of Delaware has stated "proximate cause exists if a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." [FN32] Specifically, "[p]roximate cause is [the] cause that directly produces the harm." [FN33] "Most simply stated, proximate cause is that direct cause without

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 9
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

which the accident would not have occurred."[FN34] For this reason, "a plaintiff who complains of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover."[FN35]

> FN31. *Wilson v. State,* 305 A.2d 312, 317 (Del.1973) (holding that "Delaware follows the common law except when changed by statute").

> FN32. *Wilmington Country Club v. Cowee,* 747 A.2d 1087, 1097 (Del.2000).

> FN33. Delaware Superior Court Civil Pattern Jury Instruction § 21.1 (2000).

> FN34. *Chudnofsky v. Edwards,* 208 A.2d 516, 518 (Del.1965).

> FN35. *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268-69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (U.S.1992).

**\*6** Proximate cause is a judicial mechanism used to limit the liability for the consequences of an actor's actions. It is a rule of exclusion decided under considerations for social policy.[FN36] Nevertheless, proximate cause is a necessary rule because if courts employed only a but for, or cause in fact, analysis, the line of liability would go back so far that it would consume the courts. Two leading scholars on tort law have stated:

> FN36. *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99, 103 (N.Y.1928) (Andrews, J., dissenting) ("What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point").

[T]he consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on the edge and fill the courts with endless litigation." As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing

liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.[FN37]

> FN37. Prosser & Keeton, *The Law of Torts* § 41 (5th ed.1984) (quoting *North v. Johnson,* 58 Minn. 242, 59 N.W. 1012, 1012 (Minn.1894)).

With this concern in mind, the Court can extend potential liability only to those causes that directly result in the plaintiffs' harm.

### 2. Proximate cause considerations in tobacco litigation.

[2] At least two federal courts have dismissed tobacco related claims similar to the claims in the case at hand by foreign governments because their claimed injuries were held too "remote" to establish proximate cause.[FN38] In a suit brought by the Republic of Venezuela, the court stated that "settled common-law principles establish that one who pays for the medical expenses of another[ ] may not bring a direct, independent action to recover those expenses from the alleged tortfeasor."[FN39] That court found that "the government of Venezuela does not have a direct independent cause of action against the tobacco companies to recover for smoking-related medical expenses incurred by its citizens."[FN40] Similarly, in litigation brought by the Republic of Guatemala, the court ruled that "the common law notions of proximate cause and directness of injury cannot support the claims asserted in this case because there is no 'direct relation between the injury asserted and the injurious conduct alleged.' "[FN41] The court ultimately concluded that "Guatemala's alleged injury is too remote to permit suit."[FN42]

> FN38. *Republic of Venez. v. Philip Morris Cos.,* 827 So.2d 339 (Fla.Dist.Ct.App.2002) (finding the tobacco claims were too "remote" and indirect, and that damages were too speculative to be recovered independently of the physically injured parties); *Republic of Guat. v. Tobacco Inst., Inc.,* 83 F.Supp.2d 125 (D.D.C.1999) (finding that the plaintiff's tobacco claims were too remote to establish proximate cause).

> FN39. *Republic of Venez.,* 827 So.2d at 341.

Not Reported in A.2d                                                                                    Page 10
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN40. *Id.*

FN41. *Republic of Guat.,* 83 F.Supp.2d at 130 (quoting *Holmes,* 503 U.S. at 268).

FN42. *Id.* at 133.

The Foreign Governments argue that, at least on one occasion, a health insurance company's claims survived tobacco defendants' motion to dismiss at the trial court level.[FN43] However, Moving Defendants have cited numerous cases to this Court showing that on at least eighteen previous occasions, states of the United States, hospitals, insurance companies, ERISA health plans and a Native American tribe brought claims, similar to the Foreign Governments' claim, against the tobacco companies, but the cases were all eventually dismissed because, despite possible foreseeable injuries, the plaintiffs were held not to have been able, as a matter of law, to establish the proximate causation of their injuries.[FN44] The Foreign Governments' assertion that the tobacco companies' "Master Settlement Agreement" with forty six states, including Delaware, somehow imposes potential liability on Moving Defendants is erroneous because prior settlements do not generally implicate future liability.[FN45] The Foreign Governments have come to Delaware asking this Court to grant relief where numerous other state and federal courts analyzing the same issues have not. In essence, and in the words of a Florida state court rejecting Venezuela's claims in that court, the Foreign Governments have asked Delaware to become a potential "courthouse for the world." [FN46]

FN43. Plaintiffs' Response to the Motion to Dismiss at 34 (quoting *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 36 F.Supp.2d 560, 579 (D.N.Y.1999) (finding "[t]he analysis of proximate cause is driven by considerations of policy, fairness, and practicability, not a blind adherence to ancient rigid legal classifications and abstractions"). This Court notes that this decision was later vacated and eventually every one of Blue Cross' claims were dismissed.

FN44. *Perry v. Am. Tobacco Co.,* 324 F.3d 845 (6th Cir.2003) (finding no proximate causation of injury); *Al-Coushatta Tribe of Tex. v. Am. Tobacco Co.,* 46 Fed. Appx. 225 (5th Cir.2002), *cert. denied,* 537 U.S. 1159,

123 S.Ct. 967, 154 L.Ed.2d 893 (2003) (decision without published opinion); *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.,* 241 F.3d 696 (9th Cir.2001), *cert. denied,* 534 U.S. 891, 122 S.Ct. 207, 151 L.Ed.2d 147 (2001) (finding no proximate cause and that there was a potential for duplicative recovery); *Regence Blueshield v. Philip Morris, Inc.,* 5 Fed. Appx. 651 (9th Cir.2001) (finding claimed damages not proximately caused by defendant's actions); *UFCW v. Philip Morris, Inc.,* 223 F.3d 1271 (11th Cir.2000) (finding alleged conspiracy was not the proximate cause of plaintiff's increased medical expenses); *Lyons v. Philip Morris, Inc.,* 225 F.3d 909 (8th Cir.2000) (finding that plaintiffs had no standing under RICO and federal anti-trust laws); *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429 (3d Cir.2000) (finding no proximate cause because injuries too remote from alleged misconduct); *Texas Carpenters Health Benefit Fund v. Philip Morris, Inc.,* 199 F.3d 788 (5th Cir.2000) (loss of plaintiffs was too remote to justify recovery); *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 185 F.3d 957 (9th Cir.1999), *cert. denied,* 528 U.S. 1075, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000) (finding injury too remote for recovery, possibility of duplicative recovery, and complex apportionment of damages warranted dismissal); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.,* 196 F.3d 818 (7th Cir.1999) (finding that without subrogation of smokers' rights, plaintiffs' injuries were too remote to justify recovery); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912 (3d Cir.1999), *cert. denied,* 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000) (finding plaintiffs failed to plead fraudulent and conspiratorial conduct that proximately caused their injuries); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229 (2d Cir.1999), *cert. denied,* 528 U.S. 1080, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000) (finding plaintiffs' injuries were wholly derivative of harm to a third party and too remote to recover damages); *Owens Corning v. R.J. Reynolds Tobacco Co.,* 868 So.2d 331 (Miss.2004) (finding that plaintiff's claims failed to allege direct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

injury); *State ex rel. Miller v. Philip Morris, Inc.,* 577 N.W.2d 401 (Iowa 1998) (finding the claims too remote because the State made no subrogation claim and had no common law right of indemnity); *State v. Philip Morris, Inc.,* 551 N.W.2d 490 (Minn.1996) (finding plaintiff had no claim in tort because the injury was too remote from the cause of the harm); *County of Cook v. Philip Morris, Inc.,* 353 Ill.App.3d 55, 288 Ill.Dec. 389, 817 N.E.2d 1039 (Ill.App.Ct.2004), *appeal denied,* 213 Ill.2d 556, 293 Ill.Dec. 861, 829 N.E.2d 786 (Ill.2005) (finding plaintiff could not sufficiently allege proximate cause); *A.O. Fox Mem'l Hosp. v. Am. Tobacco Co.,* 302 A.D.2d 413, 754 N.Y.S.2d 368 (N.Y.App.Div.2003), *appeal denied,* 100 N.Y.2d 503, 762 N.Y.S.2d 873, 793 N.E.2d 410 (N.Y.2003) (finding plaintiffs' causes of action were too derivative to recover); *Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.,* 2000 Tenn.App. LEXIS 644 (Tenn.Ct.App.2000) (finding plaintiff's injuries too indirect as a matter of law to recover).

FN45. *Litman v. Prudential-Bache Properties,* 1994 Del. Ch. LEXIS 3, *20 (finding that a prior settlement agreement by the Defendant with another party was not evidence of misconduct in the case at hand).

FN46. *Republic of Venez.,* 827 So.2d at 341 (stating that it is "inappropriate for Venezuela to attempt to turn Miami-Dade County into the 'courthouse for the world,' especially with regard to claims that have been uniformly rejected by other courts throughout the country) (citing *Kinney Sys., Inc. v. Continental Ins. Co.,* 674 So.2d 86 (Fla.1996)).

**\*7** The Foreign Governments do not seek damages on behalf of individual smokers, but seek compensation for the economic losses they incurred paying for the smokers' medical expenses for many decades. Therefore, the Foreign Governments are essentially making a claim as a health care provider. However, "[t]he usual common law rule is that a health-care provider has no direct cause of action in tort against one who injures the provider's beneficiary, imposing increased costs upon the provider." [FN47] The Foreign Governments' argument that this rule should not apply here because they

operate a nonprofit healthcare system is unpersuasive. No Delaware statute or case law exempts non-profit entities from establishing proximate cause in tort claims. Moreover, the Foreign Governments cite no Delaware case where a health-care provider, without subrogation or its equivalent, was allowed to proceed with a negligence claim against a third party who injured the provider's beneficiary.

FN47. *UFCW v. Philip Morris, Inc.,* 223 F.3d 1271, 1274 (11th Cir .2000) (citing *Anthony v. Slaid,* 52 Mass. 290, 290-91 (1846) (finding that the plaintiff, who had contracted to support indigent citizens, could not recover from the defendant, whose wife assaulted a town pauper, because the damage was "too remote and indirect" from the conduct)).

Acting as a healthcare provider, the Foreign Governments cannot establish proximate causation of their injury because their injury is only related to Moving Defendants via the actions or inactions of their citizens. Standing between Moving Defendants' alleged tortious conduct and the Foreign Governments' injury are their citizen smokers. The smokers break the chain of causation and disrupt the "natural and continuous sequence" [FN48] between the act and the injury.[FN49] "When an injury is indirect, remote, and many steps away from alleged cause, it is unadvisable to allow a case to proceed." [FN50] The Foreign Governments correctly point out that remoteness is not the only factor in analyzing proximate cause; however, the influence of the other factors are not enough, by themselves, to potentially constitute proximate cause in this action.

FN48. *Wilmington Country Club,* 747 A.2d at 1097.

FN49. *See Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 444 (3d Cir.2000) (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 933 (3d Cir.1999) (stating "[I]f the Hospitals are allowed to sue, the court would need to determine the extent to which their increased costs for smoking-related illnesses resulted from the tobacco companies' conspiracy to suppress health and safety information, as opposed to smokers' other health problems, smokers'

independent (i.e ., separate from the fraud and conspiracy) decisions to smoke, smokers' ignoring of health and safety warnings, etc.... This causation chain is much too speculative and attenuated to support a RICO claim"); *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc., 185 F.3d 957, 963 (9th Cir.1999)* (finding "[A]ll of plaintiffs' claims rely on alleged injury to smokers-without any injury to smokers, plaintiffs would not have incurred the additional expenses in paying for the medical expenses of those smokers. Thus, there is no "direct" link between the alleged misconduct of defendants and the alleged damage to plaintiffs").

FN50. *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* at 445 (citing *Palsgraf., 162 N.E. at 103).*

The United States Supreme Court has ruled that direct injury, as opposed to remoteness, "is not the sole requirement of [proximate] causation, it has been one of its central elements." [FN51] Courts have concluded that "to plead a direct injury is a key element for establishing proximate causation, independent of and in addition to other traditional elements of proximate cause." [FN52] The Foreign Governments' argument that the Court should find proximate cause because their injury was foreseeable is not persuasive. In order for the Court to find that Moving Defendants' actions were the proximate cause of the Foreign Governments injury, the Foreign Governments must show directness of their injury. This is because "the other traditional rules requiring that defendant's acts were a substantial cause of the injury, and that plaintiff's injury was reasonably foreseeable, are additional elements, not substitutes for alleging (and ultimately, showing) a direct injury." [FN53]

FN51. *Holmes,* 503 U.S. at 268.

FN52. *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235 (2d Cir.1999)*

FN53. *Id.* at 235-36.

Moving Defendants contend that if the Foreign Governments were allowed to proceed, any potential damages would be highly speculative, would be

difficult to apportion, and would result in a probable risk of duplicative recovery. [FN54] The United States Supreme Court stated that each of these concerns can be used to determine the directness or remoteness of an injury while addressing proximate cause in the context of anti-trust litigation. [FN55] The Foreign Governments argue that *Holmes* is not controlling here because that case involved an antitrust RICO action and that decision was not intended to "set forth an all-purpose test for determining 'remoteness' in all instances." [FN56] While the *Holmes* Court noted that it did not intend to announce the "blackletter rule that will dictate the result in every case," the Court specifically stated that "our use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry." [FN57] Although the three complications involved with damages can be used to establish directness or remoteness of an injury, this Court finds that the Foreign Governments have failed to establish proximate cause on other grounds. Therefore, any further discussion of damages is omitted because establishing proximate cause is a condition precedent to recovering damages. [FN58] Proximate cause is an essential element to the Foreign Governments' additional and related claims of negligence, fraud, and breach of voluntary undertaking, [FN59] and as such, each other related claim fails.

FN54. Defendant's Memorandum in Support of Motion to Dismiss at 10-11.

FN55. *Holmes,* 503 U.S. at 269-70 (finding that in a RICO action, directness of an injury in an alleged violation of the Clayton Act is analogous to proximate cause considerations of directness, and will be analyzed under a three part test: (1) the difficultly in assessing the plaintiff's damages; (2) complications of apportioning damages; and (3) the ability of injured victims to act as private attorneys general).

FN56. Plaintiffs' Reply to Motion to Dismiss at 39.

FN57. *Holmes,* 503 U.S. at 274 n. 20.

FN58. *Id.* at 286-87 (Scalia, J., concurring) (finding "it has always been the practice of common-law courts (and probably of all courts, under all legal systems) to require as a condition of recovery, unless the legislature specifically prescribes otherwise,

Not Reported in A.2d                                                                                          Page 13
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

that the injury have been proximately caused
by the offending conduct").

FN59. *See, e.g., Allegheny Gen. Hosp.,* 228
A.2d at 445-46 (finding that the plaintiffs'
fraud, negligence, and special duty claims
all fail because proximate cause could not be
established); *Laborers Local 17 Health &
Benefit Fund,* 191 F.3d at 242 (finding that
the plaintiffs' inability to establish proximate
cause prevented common law fraud and
special duty claims from proceeding beyond
the pleading stage); *Oregon Laborers-
Employers Health & Welfare Trust Fund,*
185 F.3d at 968 (finding that an insufficient
showing of proximate cause barred the
plaintiffs from bringing negligence and
fraud claims).

**3. The Foreign Governments' other related non-
tort based claims also fail for insufficiently
establishing proximate cause.**

**\*8** [3] The Foreign Governments' unjust enrichment
claim fails for an insufficient showing of proximate
cause.<sup>FN60</sup> While proximate cause is traditionally not
an element of unjust enrichment, "in the tort setting,
an unjust enrichment claim is essentially another way
of stating a traditional tort claim (i.e., if defendant is
permitted to keep the benefit of his tortious conduct,
he will be unjustly enriched)."<sup>FN61</sup> Therefore, once it
has been determined that the tort claims have
properly been dismissed, there is no reason to allow
the unjust enrichment claim to proceed.<sup>FN62</sup>

FN60. *Perry v. Am. Tobacco Co.,* 324 F.3d
845, 851 (6th Cir.2003) (finding that unjust
enrichment claims brought by the plaintiffs
in a class action against the tobacco
companies, "should be dismissed on
remoteness grounds."); *see also SEIU
Health & Welfare Fund v. Philip Morris
Inc.,* 249 F.3d 1068, 1076 n. 6
(D.C.Cir.2001) (stating that plaintiffs could
not proceed with common law claims,
including unjust enrichment, once the Court
found that they had failed to establish
proximate causation of their injury).

FN61. *Steamfitters Local Union No. 420
Welfare Fund,* 171 F.3d at 936.

FN62. *Allegheny Gen. Hosp.,* 228 A.2d at
446-47 (quoting *Steamfitters Local Union*

*No. 420 Welfare Fund,* 171 F.3d at 936-37).

[4] The Foreign Governments' civil conspiracy claim
also fails because the prima facie civil conspiracy
case is predicated upon an underlying tort supporting
the conspiracy.<sup>FN63</sup> In other words, "[a] claim for civil
conspiracy can proceed only when there is a cause of
action for an underlying act." <sup>FN64</sup> The Foreign
Governments have failed to successfully plead any
tort supporting their civil conspiracy claim; therefore,
that claim must be dismissed.

FN63. *Nicolet, Inc. v. Nutt,* 525 A.2d 146,
150 (Del.1987) (stating that there must be an
independent tort supporting the conspiracy).

FN64. *Allegheny Gen. Hosp.,* 228 F.3d at
446 (quoting *Caplan v. Fellheimer Eichen
Braverman & Kaskey,* 884 F.Supp. 181, 184
(E.D.Pa.1995)).

**4. The Foreign Governments cannot assert *parens
patriae* standing.**

[5] If the Foreign Governments, acting as a third
party payor, want to recover from a party who injures
their beneficiaries, the General Assembly has
provided an avenue for recovery through
subrogation.<sup>FN65</sup> Subrogation is statutorily defined as
"the doctrine of law which enables insurers to
recover payments from any third party who is
responsible for an injury." <sup>FN66</sup> However, instead of
making a subrogation claim, the
Foreign Governments argue that they have a quasi-sovereign
interest and should be granted *parens patriae*
standing <sup>FN67</sup> to recover on behalf of their citizens.<sup>FN68</sup>

FN65. This Court does recognize the
practical difficulties of any foreign
government seeking to bring individual
subrogation claims on behalf of individual
citizens in the courts of any state.

FN66. Del.Code. Ann. tit. 31, § 522(a)
(2005).

FN67. Guatemala argued in the *Guatemala*
case that it had a quasi-sovereign interest
and should be granted *parens patriae*
standing. The *Guatemala* Court found that
"[e]ven if the Court were to find that
Guatemala had asserted some cognizable
quasi-sovereign interest, the fact that there

are individual Guatemalan smokers capable of bringing suit to redress these injuries in the courts of Guatemala would prevent Guatemala from bringing suit as *parens patriae.*" *Republic of Guat.,* 83 F.Supp.2d at 134.

FN68. Foreign Governments' Response to Motion to Dismiss at 37.

*Parens patriae* is a "doctrine by which a government has standing to prosecute a lawsuit on behalf of a citizen." [FN69] However, "parens patriae standing should not be recognized in a foreign nation (by contrast with a State in this country) unless there is a clear indication by the [United States] Supreme Court or one of the two coordinate branches of government to grant such standing." [FN70] Furthermore, a government seeking parens patriae standing must still assert all the elements of a prima facie tort case in the same manner as the citizens on whose behalf they are acting.[FN71]

FN69. BLACK'S LAW DICTIONARY 1137 (7th ed.1999).

FN70. *SEIU Health & Welfare Fund,* 249 F.3d at 1073.

FN71. *Id.* (explaining that *parens patriae* is merely a status for procedural standing but does not relieve the obligation of showing proximate cause).

Instead of citing an "indication" from any one of the three co-equal branches of government that *parens patiae* should be recognized in tobacco cases brought by foreign nations, or instead of sufficiently pleading directness of their injury, the Foreign Governments make a policy argument. The Foreign Governments argue, apparently in response to *Guatemala,* that "developing" countries should be allowed to recover in a *parens patriae* standing because their citizens are too impoverished to seek redress by themselves in their local jurisdictions. [FN72] Along those lines, the Foreign Governments asserted at oral argument that "developing countries," such as Panama and Brazil, they asserted, should be allowed to proceed with *parens patriae* standing because there would be little risk of duplicative recovery from Moving Defendants. The Foreign Governments conceded that the risk of duplicative recovery would be greater in claims possibly brought by more "developed countries," which might prevent such nations from

successfully seeking *parens patriae* standing, because those citizens have greater access to their courts. If this Court accepted the Foreign Governments' argument, that *parens patriae* standing might be applicable in Delaware Superior Court to some countries in this world, but not to others (because of considerations of whether or not a particular country seeking *parens patriae* standing was sufficiently "developed" or not) that would create a near-impossible burden for this Court to determine the availability of *parens patriae* standing on a country-by-country basis.

FN72. Plaintiff's Response to Motion to Dismiss at 1 (citing Brian S. Appel, *The Developing World Takes on the Tobacco Industry: An Analysis of Recent Litigation and its Future Implications,* 16 Am. U. Int'l L.Rev. 809, 841-42 (2001)) (arguing that the doctrine of parens patriae would enable the "poorest of developing nations" to obtain standing against tobacco companies while preventing duplicative recovery).

**\*9** The Court finds the logic employed in the *Guatemala* and *Venezuela* and in the other cases persuasive. Both cases involved foreign governments seeking relief for medical costs incurred paying for their citizens' tobacco related health problems. Those courts found that a foreign government's claims could not proceed beyond the pleadings because the injuries were too remote and indirect from the alleged tortious conduct to constitute proximate cause. Similarly, this Court finds that the Foreign Governments have failed to set forth a claim that could result in a finding of proximate cause.

### VI. Conclusion

This opinion dismisses all claims against all defendants, for the substantive reasons set forth in this opinion, even though not all defendants joined in the Motion to Dismiss. For the foregoing reasons, Moving Defendants' motion to dismiss the Foreign Governments' complaint for failure to state a claim upon which relief can be granted is **GRANTED.**

**IT IS SO ORDERED.**

Del.Super.,2006.
Republic of Panama v. American Tobacco Co.
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 15
Not Reported in A.2d, 2006 WL 1933740 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                     Page 1
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

C
[Briefs and Other Related Documents](#)
Bakerman v. Sidney Frank Importing Co.,
Inc.Del.Ch.,2006.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Bruce M. BAKERMAN, Plaintiff,
v.
SIDNEY FRANK IMPORTING CO., INC., Estate of
Sidney E. Frank, Lee R. Einsidler, John R. Frank,
Stuart W. Moselman, William F. Thompson, and
Thomas Bruno, Defendants,
andGREY GOOSE BOTTLING CO., L.L.C.,
Nominal Defendant.
**No. Civ.A. 1844-N.**

Submitted Aug. 31, 2006.
Decided Oct. 10, 2006.

[Norman Monhait](#), of Rosenthal, Monhait & Goddess,
P.A., Wilmington, Delaware; [William T. Reid, IV](#),
Lisa Tsai, and [Eric D. Madden](#), of Diamond
McCarthy Taylor Finley & Lee, LLP, Austin, Texas,
and [Eric D. Madden](#), of Diamond McCarthy Taylor
Finley & Lee, LLP, Dallas, Texas, for Plaintiff, of
counsel.
[Stephen C. Norman](#), of Potter Anderson & Corroon
LLP, Wilmington, Delaware; [Jay W. Waks](#), [Gregory
J. Wallance](#), [Christine A. Neagle](#), and [William
Poorten](#), of Kaye Scholer LLP, New York, New
York, for Defendants, of counsel.

*MEMORANDUM OPINION*
[CHANDLER](#), J.
**\*1** In 2000, a company's chief legal counsel was
granted a membership interest in a non-wholly owned
subsidiary. Four years later, the company negotiated
a multi-billion dollar sale of it and its subsidiary's
assets to a third party that required the unanimous
consent of the subsidiary's members. After receipt of
such consents, the transaction was consummated.
One month following the sale, the chief legal counsel
to the parent was terminated. He has since brought
this lawsuit, claiming among other things that the
managers of the subsidiary breached their fiduciary
duty by abdicating nearly all of the consideration
paid by the third party acquiror to the subsidiary's
parent. In addition, he alleges that his consent as a

member of the subsidiary was coerced.

Before me is defendants' motion to dismiss the
complaint. For the reasons set forth below, the
motion is granted in part and denied in part. Part I of
this Opinion sets out the factual background that gave
rise to this lawsuit. Part II delineates plaintiff's
claims, defendants' responses to those claims, and the
standard to be applied at this stage of the
proceedings. Part III examines and applies the legal
principles governing each claim. This Part concludes
that two claims, for tortious interference with
contract and for unjust enrichment, must be
dismissed. The remaining claims-direct and
derivative claims related to fiduciary breaches and to
contractual breaches-all survive the defendants'
challenge at this stage. Finally, Part IV summarizes
the conclusions.

I. FACTUAL BACKGROUND

As required, the facts are drawn from the complaint,
the documents it incorporates, and facts not subject to
reasonable dispute.[FN1]

> [FN1.](#) *See* [In re Gen. Motors (Hughes)
> S'holder Litig., 897 A.2d 162, 169
> (Del.2006)](#) (on a motion to dismiss, trial
> court may properly take judicial notice of
> matters that are not subject to reasonable
> dispute).

*A. The Makings of a Superpremium Vodka*

Sidney Frank began working in the liquor business
for his in-laws in the 1940's and for thirty years sold
Scotch all over the world. After a falling out with the
family in 1972, Sidney Frank formed Sidney Frank
Importing Co. ("SFIC"). SFIC purchased the U.S.
rights to a brandy and a then little-known German
sipping liqueur called Jägermeister and plodded on
until the mid-1980's, when Frank discovered a bar in
New Orleans that served shots of chilled
Jägermeister. Promoting chilled shots of Jägermeister
in college bars, and sending out teams of models to
college barrooms to sell and dispense the shots and
other merchandise, SFIC began enjoying a period of
relative success and created a network of solid
relationships with major liquor distributors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

throughout the country that would later prove very useful.

SFIC was not alone in creating sensations in the liquor market. In 1979, a Swedish distillery repackaged its vodka into a clear Swedish medicine bottle with crisp blue lettering. With the help of an original and hugely popular ad campaign, Absolut launched vodka from a well drink to a hip drink. Over fifteen years later, following on a more recent trend in the mid-1990's of superpremium vodkas offered in frosted bottles, Sidney Frank decided to launch his own superpremium vodka.

**\*2** In the late 1990's, however, SFIC was merely a liquor distribution company, which had built its fortune as the U.S. distributor of Jägermeister. SFIC enlisted the help of H. Mounier ("Mounier"), a company already engaged in liquor production in the Cognac region of France. Mounier concocted and developed the formulas and production processes for Grey Goose Vodka, using water that had been filtered through champagne limestone from the Gentè Springs of Cognac, France. SFIC developed a distinctive bottle that was frosted and taller than the rest, with a cutaway of geese in flight, and the French flag.

Mounier, as the exclusive manufacturer of Grey Goose Vodka, began full-scale production in 1997. SFIC, in turn, imported and distributed Grey Goose Vodka, primarily in the United States, the only major market at the time. During 1997, the first year of production, SFIC sold only about 45,000 cases of Grey Goose Vodka. In 1998, Grey Goose Vodka received the number one vodka rating from the Beverage Testing Institute, a company that produces Consumer Reports-style rankings of alcoholic beverages. By 1999, sales were up to 190,000 cases. SFIC continued to market Grey Goose Vodka as one of the best vodkas in the world, and as a result of the ensuing success, Mounier began producing flavored versions of the vodka, including orange, citrus, and vanilla variations.

*B. Problems with Mounier and the Creation of the LLC and SAS*

Throughout this time period, SFIC and Mounier operated without any written contract between them. Mounier considered its relationship with SFIC to be a partnership, while SFIC claimed sole rights to the formulas and production processes for Grey Goose Vodka. In September 1999, Mounier's corporate parent filed for bankruptcy protection in France.

In November 1999, Sidney Frank hired Bakerman to serve as his special assistant at SFIC. Several months later, Sidney Frank promoted Bakerman, a licensed attorney, to the position of SFIC's Chief Legal Counsel. Shortly after joining SFIC, Bakerman developed a strategy that would protect and enhance SFIC's and Sidney Frank's interests in Grey Goose Vodka, while also minimizing their potential tax and other liability exposure.

On May 22, 2000, Bakerman, Sidney Frank and Lee Einsidler (collectively, the "Founding Members"), formed Grey Goose LLC (the "LLC"). The LLC served as the holding company for a second company formed in July 2000, Grey Goose Bottling France S.A.S. ("SAS"), which would acquire Mounier's interests in the formulas and productions processes for Grey Goose Vodka. The Founding Members intended for the LLC and SAS to generate their own significant profits from the production and sale of vodka.

The SAS bylaws charged management to the individual managers of the LLC; any transfer, assignment or other action with respect to the intellectual property rights of SAS, however, required the approval of the LLC itself. On August 2, 2000, the Founding Members approved the issuance of membership units in the LLC as follows:

| Member | Units | Ownership % |
| --- | --- | --- |
| SFIC | 100 | 50% |
| Sidney Frank | 25 | 12.5% |
| Eugene Frank | 15 | 7.5% |
| Bruce Bakerman | 10 | 5% |
| Thomas | 10 | 5% |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 3
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
(Cite as: Not Reported in A.2d)

| | | |
|---|---|---|
| Bruno Lee Einsidler | 10 | 5% |
| John Frank | 10 | 5% |
| Stuart Moselman | 10 | 5% |
| William Thompson | 10 | 5% |
| Total: | 200 units | 100% |

**\*3** According to the LLC's Articles of Organization, the members received their ownership interests due to "their individual efforts and work in organizing the [LLC]," which represented "full and satisfactory consideration for their respective Membership Interests ." On more than one occasion, Bakerman communicated to Sidney Frank and Lee Einsidler that he had a potential conflict of interest in obtaining a membership interest in the LLC. Independent legal counsel, White & Case LLP, advised SFIC and the LLC throughout the formation of the LLC and did not object to Bakerman's membership in the LLC.

The LLC's Operating Agreement contained several important riders, the most important of which required the unanimous written consent by the members for, among other things, any sale of all or substantially all of the LLC's business or assets.

During the next few years, SAS operated as a subsidiary of SFIC (controlled through the LLC). SAS obtained the trademark and trade dress of Grey Goose Vodka in approximately 40 countries. Finally resolving the dispute with Mounier in 2002, SAS secured complete control of the production process and rights in the formula for Grey Goose Vodka. SAS further received significant controls over Mounier's actual production of the vodka. With the dispute resolved, SAS entered into numerous distributorship agreements for Grey Goose Vodka in countries throughout the world, including Australia, China, Hong Kong, Greece, Italy, Russia, and the United Kingdom.

### C. Exponential Growth and the Bacardi Sale

Sales of Grey Goose Vodka increased exponentially between 1999 and 2004. In 1999, SFIC sold approximately 190,000 cases of the vodka. In 2003 SAS sold more than 2.3 million cases of Grey Goose Vodka. SFIC estimated that SAS would sell nearly 3 million cases in 2004. SAS sold most of its production to SFIC for distribution in the United States. Plaintiff alleges that the transfer price (from SAS to SFIC) sorely undervalued the cases of vodka. SAS received only a few dollars per case from SFIC, but SFIC received as much as $72 per case from its arm's-length sales of the vodka in various international markets. Nonetheless, even with these allegedly depressed transfer prices on the bulk of its sales, SAS had annualized net income of approximately $2.5 million as of June 2004.

The success of Grey Goose Vodka and other superpremium vodkas did not go unnoticed by the larger spirits companies. After a period of confidential negotiations, SFIC signed a letter of intent on March 2, 2004, to sell the Grey Goose Vodka business to Bacardi, the world's largest privately held spirits company. The negotiations proceeded over the course of the next three months and were largely handled by SFIC executives and outside counsel, to the exclusion of Bakerman.

### D. The Allocation and Bakerman's Consent

Only in early June was Bakerman informed of the imminent sale to Bacardi. On June 17, Bakerman asked William Presti, an SFIC officer and in-house counsel who had participated in the Bacardi negotiations, about the purchase price allocation. Presti responded that he believed that one-third of the proceeds would be allocated to each of the three entities. While such a symmetrical allocation may have been the earliest plan, a number of factors favored an allocation advantageous to SFIC.

**\*4** First, any portion of the purchase price allocated to SAS would be subject to a host of taxes under French law, including a French transfer tax, which would be higher than U.S. taxes and would reduce the overall proceeds obtained from the sale.

Second, Sidney Frank himself, the controlling shareholder of SFIC, which in turn controlled the LLC and SAS, would receive $0.70 on the dollar for proceeds to SFIC but only $0.475 on the dollar for proceeds to the LLC.

Third, two LLC members, Bakerman and Linda Rodman,[FN2] held shares only in the LLC and did not hold any shares in SFIC. All the other members of the LLC either owned equity in SFIC previously, or had received equity in SFIC pursuant to SFIC's "Stock Warrant Plan for Key Employees" (the "Warrant Plan"). Therefore,

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

while allocations to the LLC would have to be shared with these two LLC members, allocations to SFIC could exclude these two LLC members.

FN2. Linda Rodman is the daughter of the late Eugene Frank, and the sister of John Frank. Rodman acquired her 3.75% interest in the LLC from her father's estate. She never held an equity interest in SFIC, however. Am. Compl. ¶ ¶ 77-78.

On June 18, 2004, one day after Presti discussed the allocation with Bakerman, and shortly before the scheduled public announcement of the Bacardi sale, Lee Einsidler, on behalf of defendants, asked Bakerman, as a member of the LLC, to sign a unanimous written consent of the members. The consent would authorize the LLC to sell all of SAS's interests in the Grey Goose Vodka product line to Bacardi. After reviewing the consent, Bakerman repeatedly asked for, and eventually received, what was identified as the current draft of the Asset Purchase Agreement between SFIC, the LLC, SAS, and Bacardi (the "APA"). Under the draft APA, the cash portion of the purchase price would be allocated among the sellers as follows:
1. $2.24 billion to SFIC for "[t]rademark for US, Canada and other markets and production know-how, recipes, formulas and any other production related intangible";
2. $200,000 to SAS for "[t]rademark for France and some other countries";
3. $5.5 million to SAS for the Production Facility in France;
4. $5.4 million to SAS for machinery and other assets in France; and
5. undetermined amounts to SFIC and SAS for inventory.

In addition, under the draft APA, SAS was to receive only about $11 million of the approximately $2.25 billion cash purchase price-less than 0.49% of the purchase price.

Bakerman did not think that the allocation reflected the true value of the LLC and SAS. Bakerman proposed to Einsidler, John Frank, and Moselman that SAS's allocation should be greatly increased. When this proposal was roundly rejected, Bakerman responded that he would not sign the consent due to the apparent misallocation of the purchase price. Bakerman then attempted to contact Sidney Frank, who was out of the SFIC office that day. Einsidler, however, intervened and instructed him not to call Sidney Frank.

Einsidler brought Bakerman into an office for a meeting with several SFIC executives, including Moselman and John Frank. The executives repeatedly asserted that SAS

had received its fair share of the purchase price allocation under the draft APA.

**\*5** Einsidler then convened a private meeting with the SFIC executives. After that meeting, Einsidler told Bakerman that "the lawyers" believed that: (a) Bakerman had a "major conflict of interest" based upon his dual role as SFIC's in-house legal counsel and as a member of the LLC; and (b) Einsidler could act on behalf of the LLC, with or without Bakerman's consent to the transaction. Einsidler then delivered an ultimatum to Bakerman. He stated that Bakerman had less than half an hour to make one of three choices:
a. Bakerman could sign the consent, keep his employment at SFIC, and receive $700,000 (similar to the bonuses that all SFIC employees would receive upon the closing of the sale with Bacardi);
b. Bakerman could sign the consent, resign his employment at SFIC, and receive $1,000,000 in severance from SFIC; or
c. Bakerman could refuse to sign the consent, have his employment terminated by SFIC, and be sued by SFIC.

Einsidler added that if Bakerman failed to choose one of these three options within the allotted time, then the third option would be chosen for him.

Bakerman initially responded that he would sign the consent with an express caveat related to his disagreement over the purchase price allocation. Einsidler promptly rejected that proposal, stating that the lawyers required the consent to be signed as drafted.

Bakerman returned to meet with Einsidler and the other SFIC executives, and told them that he needed to keep his job and, therefore, would sign the consent if they really wanted him to stay at SFIC. Bakerman and each of the defendants who were members of the LLC signed the consent. It is unclear whether Rodman ever signed the consent.

Two days later, on June 20, 2004, Bacardi announced the agreement to acquire Grey Goose Vodka. On June 25, 2004, SFIC, the LLC, SAS, and Bacardi signed the APA, pursuant to which Bacardi agreed to pay approximately $2.25 billion in cash, plus up to $300 million through an earn-out arrangement, to purchase the assets related to the Grey Goose Vodka line. The sale to Bacardi closed formally on August 3, 2004.

Three weeks later, on August 24, 2004, Einsidler informed Bakerman that he was being immediately terminated as an SFIC employee because he allegedly had been very unprofessional on the day that he signed the consent. Einsidler requested that Bakerman sign a

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

comprehensive release in conjunction with his termination. Bakerman refused to sign such a release, and Einsidler asked a security officer to escort Bakerman from the SFIC offices.

Following the termination, Einsidler called Bakerman on two occasions to persuade Bakerman to sign the release. During the second call, Einsidler told Bakerman that his refusal to sign the release must mean that he was planning to sue defendants. Bakerman did nothing to disabuse him of that notion. Einsidler was, in fact, correct.

Approximately sixteen months after his termination, and eighteen months after the Bacardi transaction was announced, Bakerman filed a complaint in this Court against defendants on December 15, 2005. Bakerman asserted both direct claims on his own behalf and derivative claims on behalf of the LLC challenging the transfer pricing paid by SFIC to the LLC, the allocation of the Bacardi transaction proceeds, and the alleged coercion that resulted in Bakerman's signing the consent.

**\*6** On March 13, 2006, defendants moved to dismiss the complaint. Among the myriad defenses presented, defendants argued that Bakerman's original interest in the LLC was void due to a conflict of interest that was never correctly consented to by Sidney Frank and SFIC.

Bakerman exercised his right to amend the complaint,[FN3] and filed his first amended complaint on April 27, 2006 (the "Amended Complaint"). Among certain additions and clarifications, the Amended Complaint addressed Bakerman's alleged acquisition of consent from Sidney Frank and SFIC. The Amended Complaint describes how "[o]n more than one occasion, Bakerman communicated to Sidney Frank and Lee Einsidler that he had a potential conflict of interest in obtaining a membership interest in [the LLC]." Defendant Sidney Frank, however, had passed away in early January 2006, after the original complaint had been filed, but months before the filing of the Amended Complaint.

   [FN3.] Ct. Ch. R. 15(a).

## II. CONTENTIONS

The Amended Complaint includes five claims: two derivative claims and three putative direct claims. The defendants move to dismiss on a number of grounds.

### A. Derivative Claims

Count I alleges breaches of fiduciary duty against the defendants as members and managers of the LLC. Count V alleges that the defendants have been unjustly enriched at the LLC's expense.

### B. Direct Claims

Count II alleges that defendants breached the LLC's Operating Agreement by depriving Bakerman of the benefit of the LLC Operating Agreement's unanimous consent requirement, by failing to inform Bakerman's decision and by obtaining the consent through coercion and economic duress.

Count III alleges that defendants tortiously interfered with Bakerman's contractual relations, as established by the LLC's Operating Agreement. Specifically, defendants misallocated the purchase price, did not disclose the justification for the misallocation to Bakerman, did not disclose to Bakerman their conflicted interests, and deprived Bakerman of his contractual entitlement to give informed and volitional consent to the transaction through the use of coercion, threat of litigation, and economic duress.

Count IV alleges that defendants breached the implied covenant of good faith and fair dealing by engaging in the actions that formed the bases of Counts II and III, and by additionally executing the Bacardi transaction, despite having knowledge of the deceptive and coercive nature of the consent obtained.

### C. Defendants' Contentions

In respect to each claim, defendants move under Rule 12(b)(6) to dismiss for failure to state a claim. In more general attacks, defendants argue the following: First, the complaint is barred by the doctrine of laches, and the amended complaint is barred by Bakerman's unreasonable delay in amending the complaint until after Sidney Frank's death. Second, the individual and direct claims are in fact derivative in nature. Third, Bakerman's demand futility allegations fail to meet a heightened burden of pleading. Fourth, Bakerman is not an adequate derivative representative.

### D. Legal Standard

**\*7** The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
(Cite as: Not Reported in A.2d)

reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." [FN4]

>    FN4. *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-7 (Del.2002)).

### III. ANALYSIS

*A. Defendants' Rule 23.1 Motion: Was Demand on the Managers Excused?*

Bakerman seeks to assert multiple derivative claims on behalf of the LLC. Bakerman concedes that demand was not made on the LLC's current managers, Einsidler and Thompson. The Court must therefore determine whether demand is excused.

Court of Chancery Rule 23.1 imposes on a plaintiff prosecuting a derivative action a pleading burden that is "more onerous" than the burden a plaintiff must satisfy when confronted with a motion to dismiss under Court of Chancery Rule 12(b)(6). [FN5] Rule 23.1 requires a plaintiff to "allege with particularity ... the reasons ... for not making" a demand. [FN6] In considering a motion to dismiss under Rule 23.1, the Court must accept the well-pled allegations of the amended complaint as true. [FN7] Conclusory allegations, however, will not be accepted as true. [FN8]

>    FN5. Ct. Ch. R. 23.1; *Levine v. Smith,* 591 A.2d 194, 207 (Del.1991), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000).
>
>    FN6. Ct. Ch. R. 23.1.
>
>    FN7. *Grobow v. Perot,* 539 A.2d 180, 186 (Del.1988).
>
>    FN8. *Id.* at 187; *see also Rales v. Blasband,* 634 A.2d 927, 931 (Del.1993).

Inquiry into whether demand is excused proceeds in this circumstance under the familiar test set forth by the Supreme Court in *Aronson v. Lewis.* [FN9] Under the two-pronged *Aronson* test, demand will be excused if the derivative complaint pleads particularized facts creating a

reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [FN10]

>    FN9. 473 A.2d 805 (Del.1984).
>
>    FN10. *Id.* at 814-15.

Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.... Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." [FN11]

>    FN11. *In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *8 (Del. Ch. Apr. 29, 2005) (quoting *Aronson,* 473 A.2d at 812, 816), *aff'd,* 2006 WL 585606 (Del. Mar. 8, 2006); *see also Rales,* 634 A.2d at 936.

*1. Were Einsidler and Thompson Interested Managers?*

Bakerman alleges that demand is excused because Einsidler and Thompson are interested in the allocation due to their holdings in SFIC, because they are beholden to SFIC and Sidney Frank, and because there is reasonable doubt that the transaction was the product of a valid exercise of business judgment.

Bakerman presents several particularized facts allegedly demonstrating Einsidler and Thompson's interest in misallocating the Bacardi proceeds to SFIC: (i) Einsidler and Thompson each owned a significant equity interest in SFIC; (ii) two other LLC members, Bakerman and Rodman, did not have any equity interest in SFIC and therefore did not stand to profit from any allocation to SFIC; (iii) wrongfully shifting proceeds to SFIC allowed defendants to avoid payment of French taxes, which would be owed on any proceeds distributed to SAS, and thereby reduce the overall profits to defendants; (v) and at a minimum, Einsidler and Thompson respectively received $70 million and $46 million from the Bacardi transaction. Alone, such benefits would clearly be significant enough "in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the shareholders without being influenced by her overriding personal interest." [FN12]

Not Reported in A.2d                                                                                      Page 7
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN12. *Orman v. Cullman,* 794 A.2d 5, 23 (footnotes omitted).

**\*8** Defendants argue that Einsidler and Thompson's large holdings in SFIC are rendered immaterial in light of their larger holdings in the LLC. The Amended Complaint notes that Einsidler and Thompson each possessed a 5% interest in the LLC. Their shares in SFIC appear smaller: dividing the portion of the proceeds Einsidler and Thompson received by the $2.24 billion allocated to SFIC reveals that Einsidler's and Thompson's interests in SFIC, as alleged by Bakerman, are at least 3.125% and 2.054%, respectively. For every dollar allocated to SFIC, it appears that Einsidler and Thompson received at least $0.03125 and $0.02054; for every dollar allocated to the LLC, Einsidler and Thompson received $0.05. Defendants argue that weighing Einsidler's and Thompson's interests demonstrates that their incentives were perfectly aligned with the LLC in respect to the allocation.

In certain limited circumstances, this Court has declined to weigh interests on one side of the table against interests on the other side of the table when conducting an analysis of independence at the pleading stage. In *Siegman v. Tri-Star Pictures, Inc.,* then-Vice Chancellor Jacobs refused to analyze whether the holdings of certain Tri-Star Pictures directors in Coca-Cola were insignificant in view of their allegedly more substantial holdings in Tri-Star.[FN13] Because the directors' Coca-Cola holdings resulted in their receipt of benefits from the challenged transaction not available to all Tri-Star stockholders, a reasonable doubt was created for demand excusal purposes.[FN14] In *Harbor Finance Partners v. Huzienga,* Vice Chancellor Strine similarly refused to weigh the holdings of a Republic director in Republic against his holdings in AutoNation, citing *Siegman.*[FN15] Both cases distinguish between the burden a plaintiff bears to plead reasonable doubt as to director disinterest under Rule 3.1 and its ultimate burden to demonstrate director interest later in the litigation through admissible evidence.[FN16]

FN13. 1989 WL 48746, at \*11 (Del. Ch. May 5, 1989), *rev'd on other grounds,* 634 A.2d 319 (Del.1989).

FN14. *Id.*

FN15. *Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 888 (Del.1999).

FN16. *Siegman,* 1989 WL 48746, at \*10; *Huzienga,* 751 A.2d at 888. Vice Chancellor Strine noted that while the Court would not

compare shareholdings but would look to the materiality of the director's holdings in the corporation across the table, a weighing analysis could be relevant in situations where directors address a transaction that has different effects on two classes of the corporation's own stock. *Id.* at 888 n. 28.

In those situations, the directors often own both classes of stock because corporations want to align the directors' interests with those of all the company's stockholders. Our case law has long recognized that necessity requires directorial action in these circumstances and that such ownership interests do not necessarily strip directors of their disinterested status.

*Id.* (quoting *Gilbert v. El Paso Co.,* 575 A.2d 1131, 1147-48 (Del.1990)); *see also Solomon v. Armstrong,* 747 A.2d 1098, 1117-18, 1124 (Del. Ch.1999); *Jedwab v. MGM Grand Hotels, Inc.,* 509 A.2d 584, 595 (Del. Ch.1986) (weighing controlling shareholder's interests in preferred and common stock of corporation to conclude that based on shareholdings alone, he did not have a self-interest to favor common over preferred); *Freedman v. Rest. Assocs. Indus.,* 1987 WL 14323, at \*10 (Del. Ch. Oct. 16, 1987).

At this stage, I decline to engage in a weighing analysis to determine the disinterestedness of Einsidler and Thompson for a number of reasons. Bakerman has pled a significant and material benefit that accrued to the LLC's mangers through the allocation of consideration to SFIC at the expense of the LLC. Further, allocations to the LLC were subject to certain taxes; these taxes might have diminished the value of an allocation to the LLC, and Einsidler and Thompson's beneficiary 5% interests in such allocation. Finally, discovery might show that Einsidler and Thompson had SFIC holdings greater than 3.125% and 2.054%, as the Amended Complaint suggests. In other words, it is too early and the facts are not as clear as necessary to engage in such a weighing analysis. Bakerman has therefore met his burden at this stage in demonstrating the futility of demand.

### 2. *Were Einsidler and Thompson Independent of Sidney Frank?*

Turning to the independence facet of *Aronson's* first prong, Bakerman alleges that Einsidler and Thompson were beholden to Sidney Frank. In the demand-futility context, to raise a question concerning the independence of a particular board member or LLC manager, a plaintiff "must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the

Not Reported in A.2d                                                                    Page 8
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

wishes or interests of the corporation (or persons) doing the controlling." ' [FN17] This lack of independence can be shown when a plaintiff pleads facts that establish "that the directors are 'beholden to [the controlling person] or so under their influence that their discretion would be sterilized." [FN18]

> FN17. *Aronson,* 473 A.2d at 816 (citation omitted).

> FN18. *Rales,* 634 A.2d at 936; *see also Friedman v. Beninson,* 1995 WL 716762, at *9 (Del. Ch. Dec. 4, 1995) ("The requirement that directors exercise independent judgment, (insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judgment), directs a court to an inquiry into all of the circumstances that are alleged to have inappropriately affected the exercise of board power. This inquiry may include the subject whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation.").

**\*9** Reasonable doubt surrounds the independence of the managers, raising a specter that their discretion was sterilized. The Amended Complaint alleges many particularized facts regarding the managers' independence, including: (i) SFIC and Sidney Frank were collectively controlling shareholders of the LLC, holding a 50% interest and 12.5% interest respectively; (ii) Sidney Frank controlled SFIC as founder, Chairman, CEO, and a 70% shareholder, and appointed and employed all of its directors and officers (including Einsidler and Thompson); (iii) SFIC was a party to and interested in the Bacardi transaction, and would receive all consideration allocated away from the LLC; (iv) Sidney Frank was interested in the transaction because he would receive $0.70 for every dollar allocated to SFIC, but only $0.50 for every dollar allocated to the LLC; and (v) as a result of the Bacardi transaction, Sidney Frank received approximately $1.6 billion.

These allegations create a reasonable doubt whether Einsidler and Thompson could make judgments independent of the interests of Sidney Frank and SFIC. Delaware courts have found a lack of independence in similar circumstances. [FN19]

> FN19. *Beam v. Stewart,* 833 A.2d 961, 978 (Del.

Ch.2003) (finding executive employee of one of Martha Stewart's companies beholden to Stewart); *California Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *9-10 (Del. Ch. Dec. 18, 2002) (explaining that interested director was superior of one non-interested director and owned company that employed another non-interested director's son); *In re The Limited,* 2002 WL 537692, at *5 (Del. Ch. Mar. 27, 2002) (noting that compensation from one's principal employment is typically of great consequence to the employee); *Rales,* 634 A.2d at 937 (finding no independence where non-interested directors employed by and could be removed by Rales brothers); *Kahn v. Tremont Corp.,* 1994 WL 162613, at *2 (Del. Ch. Apr. 21, 1994) (finding demand futility where complaint specifically alleged that controlling shareholder employed a majority of the directors at various of his entities).

### 3. Was the Challenged Decision the Product of a Valid Exercise of Business Judgment?

Under *Aronson'* s second prong, demand is also excused if the complaint raises a reasonable doubt that the challenged decision was the product of a valid exercise of business judgment. [FN20] Absent particularized allegations to the contrary, the managers of an LLC are presumed to have acted on an informed basis and in the honest belief that the decisions were in furtherance of the best interests of the LLC and its members. [FN21] The burden is on the party challenging the decision to establish facts rebutting the presumption; [FN22] typically such showing of facts must be tantamount to corporate waste to satisfy the second prong of the demand futility analysis. [FN23] Courts focus on "the substance of the transaction and the process by which the board approved it." [FN24] Additionally, a court will consider factors such as whether the directors (i) informed themselves of material information; (ii) considered expert opinion; (iii) provided board members with adequate and timely notice of the transaction and its purpose before the board meeting; or (iv) adequately inquired into the reasons for or terms of the transaction. [FN25]

> FN20. *Aronson,* 473 A.2d at 812.

> FN21. See *Highland Legacy Ltd. v. Singer,* 2006 WL 741939, at *7 (Del. Ch. Mar. 7, 2006) (elucidating a similar presumption in respect to directors of a corporation).

> FN22. *Aronson,* 473 A.2d at 812.

Not Reported in A.2d                                                    Page 9
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN23. *See Tremont Corp.,* 1994 WL 162613, at *6 ("The test for this second stage is thus necessarily high, similar to the legal test for waste.").

FN24. *Caruana v. Saligman,* 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 1990).

FN25. *Ash v. McCall,* 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000).

The Amended Complaint alleges particularized facts that the allocation was severely misallocated and that defendants did not employ the traditional processes (or any processes) that would have entitled them to the business judgment rule's protections. In respect to the process, Bakerman has pled particularized facts alleging that defendants failed to (i) obtain an independent expert appraisal to determine the value of SAS's assets, (ii) appoint a special committee to assess the fairness of the transaction or its terms, (iii) obtain sufficient information and data to assess the proposed allocation, (iv) bargain for the best possible result for the LLC, or (v) consider Bakerman's opinion that the allocation did not reflect the value of the LLC's assets.[FN26]

FN26. Am. Compl., ¶¶ 103-104.

**\*10** In respect to the adequacy of the $11 million allocated in total to the LLC and SAS, Bakerman has pled facts including: (i) the total allocation to SAS was insufficient even to cover its liabilities; (ii) the $5.5 million allocated for an SAS production facility in France was less than the $7.5 million loan used to build it only two years earlier; (iii) the $200,000 allocated for SAS's international trademarks was less than even the legal costs incurred to obtain such marks; and (iv) SFIC was paid for the trademark and distribution rights in the international market that SAS in fact controlled. Receiving only 0.49% of $2.25 billion appears to be a questionable abdication by a non-wholly owned subsidiary to the will of SFIC that is quite dubious given its insufficiency to even cover its own liabilities. Furthermore, the high value of SAS's contractual rights to the recipes, formulas, and production processes until 2013 was verified by a later transaction. After Bacardi correctly expressed concern that Mounier could assert ownership of the residual rights to those assets, SFIC purchased Mounier's residual interest for $15 million. SAS was not compensated at all for its contractual rights in the recipes, formulas, and production processes, but the residual interest in these rights alone was valued in an arms-length bargain at $15 million. In light of these well-pleaded facts and accepting them as true as I must, the allocation of only $11 million to SAS

appears so one sided that no business person of ordinary, sound judgment could reasonably conclude that it constituted adequate consideration.[FN27] The allegations in the Amended Complaint thus create (additionally) a reasonable doubt as to whether approval of the Bacardi transaction was the product of a valid exercise of business judgment by the managers. For this additional reason, I conclude that Bakerman has met his burden of demonstrating the futility of demand.

FN27. *Brehm,* 746 A.2d at 263.

*B. Bakerman's Adequacy as Derivative Representative*

Defendants next argue that plaintiff Bakerman is an inadequate derivative representative of the LLC because his position as SFIC's former chief legal counsel and his alleged violation of New York Disciplinary Rule 5-104(a) ("DR 5-104(a)") both impugn his integrity and void his interest in the LLC. Further, defendants insist Bakerman is not an adequate representative because the lawsuit is not supported by the other LLC members. Bakerman responds that he satisfies all factors required of a derivative representative, that a determination of whether a violation of DR 5-104(a) occurred is both inapposite and improper in either this Court or at this stage of the pleadings, and that opposition to the lawsuit by other members is irrelevant in these circumstances.

A plaintiff seeking to maintain derivative claims must satisfy the adequacy requirements implicit in Court of Chancery Rule 23.1.[FN28] "[A] derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity." [FN29] In a challenge to a particular plaintiff's adequacy, however, the burden rests with the defendant.[FN30] "The defendant must show a substantial likelihood that the derivative action is not being maintained for the benefit of the shareholders." [FN31]

FN28. *See, e.g., Youngman v. Tahmoush,* 457 A.2d 376, 379 (Del. Ch.1983). The analysis of Bakerman's capacity to serve as a derivative plaintiff will, in this instance, be the same as the analysis of the propriety of his service as class representative. *See, e.g., In re Fuqua Indus. S'holder Litig.,* 752 A.2d 126, 129 n. 2 (Del. Ch.1999) ("[A]nalysis of adequacy requirements is generally the same under Rules 23 and 23.1 as cases decided under Rule 23(a)(4), *i.e.,* the adequacy requirement of Rule 23, may be used in analyzing the adequacy requirements of Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                            Page 10
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

23.1." (citations omitted)).

FN29. *In re Fuqua Indus., 752 A.2d at 129* (citing *Katz v. Plant Indus., Inc., 1981 WL 15148, at \*1 (Del. Ch. Oct. 27, 1981)*).

FN30. *See Emerald Partners v. Berlin, 564 A.2d 670, 674 (Del. Ch.1989).*

FN31. *Id.; see also Canadian Commercial Workers Indus. Pension Plan, 2006 WL 456786, at \*8.*

**\*11** A number of factors may be considered in determining whether a plaintiff is deemed "adequate" for these purposes:
(1) economic antagonisms between the representative and the class;
(2) the remedy sought by plaintiff in the derivative litigation;
(3) indications that the named plaintiff was not the driving force behind the litigation;
(4) plaintiff's unfamiliarity with the litigation;
(5) other litigation pending between plaintiff and defendants;
(6) the relative magnitude of plaintiff's personal interests as compared to her interest in the derivative action itself;
(7) plaintiff's vindictiveness toward defendants; and
(8) the degree of support plaintiff was receiving from the shareholders she purported to represent.[FN32]

FN32. *In re Fuqua Indus., 752 A.2d at 130.*

This list, however, is not exhaustive.[FN33] "Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1." [FN34] It is possible that the inadequacy of a plaintiff may be demonstrated by a "strong showing of only one factor [; however,] that factor must involve some conflict of interest between the derivative plaintiff and the class." [FN35]

FN33. *See Katz, 1981 WL 15148, at \*2* (explaining that the factors are "[a]mong the elements which the courts have evaluated").

FN34. *Id.,* at \*2 (quoting *Davis v. Comed, Inc., 619 F.2d 588, 593-94 (6th Cir.1980)); see also In re Fuqua Indus., 752 A .2d at 130 n. 5.*

FN35. *In re Fuqua Indus., 752 A.2d at 130; see*

also *Canadian Commercial, 2006 WL 456786, at \*8* (explaining that "economic conflicts are often the primary consideration); *Youngman, 457 A.2d at 379* (noting exception that "fact that the plaintiff may have interests which go beyond the interests of the class, but are at least co-extensives with the class interest, will not defeat his serving as a representative of the class"). The Court in Youngman also explained that "purely hypothetical, potential or remote conflicts of interests never disable the individual plaintiff." *Id.* (citation omitted).

"The ethical considerations which bar an attorney from acting as counsel against his former client also preclude him from acting as a class or derivative plaintiff against his former client." [FN36] When a general counsel's former representation of his corporate employer involves issues that are "substantially related" to the claims he seeks to assert derivatively against his former client, he may be disqualified.[FN37]

FN36. *Ercklentz v. Inverness Mgmt. Corp., 1984 WL 8251, at \*4 (Del. Ch. Oct. 18, 1984)* (citing *Richardson v. Hamilton Int'l Corp ., 469 F.2d 1382 (3d Cir.1972); Doe v. A Corp., 709 F.2d 1043 (5th Cir.1983)).*

FN37. *See Ercklentz, 1984 WL 8251, at \*4-5; see also* Delaware Lawyers' Rules of Professional Conduct ("D.L.R.P.C.") 1.6, 1.9. *Cf. Richardson, 469 F.2d 1382; Doe v. A Corp., 330 F.Supp. 1352 (S.D.N.Y.1971), aff'd sub nom., Hall v. A Corp., 453 F.2d 1375 (2d Cir.1972).*

To determine whether matters are "substantially related" for purposes of a conflict of interest with a former client the Court must evaluate: the nature and scope of the prior representation at issue; the nature and scope of the present lawsuit against the former client; and whether during the course of the previous representation the client may have disclosed confidential information that could be used against the former client in the current lawsuit.[FN38] Matters may be substantially related if they involve the same transaction or legal dispute or there is substantial risk that confidential information obtained in the former representation could materially advance the client's position in the current matter. The former client is not required to reveal specific details of the information shared with the attorney; rather, the Court may determine whether information regularly shared in that type of representation creates an unavoidable conflict with the current case.[FN39]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 11
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN38. *Khanna v. McMinn,* 2006 WL 1388744, at *42 (Del. Ch. May 9, 2006).

FN39. *Hendry v. Hendry,* 2005 WL 3359078, at *4 (Del. Ch. Dec. 1, 2005) (citing *Sanchez-Caza v. Estate of Whetstone,* 2004 WL 2087922, at *3 (Del.Super.Sept. 16, 2004)); D.L.R.P.C. 1.9 cmt. 3.

Specifically, Comment 3 to D.L.R.P.C. 1.9 provides that "[a] conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." Additionally, "[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." [FN40] These principles govern the Court's analysis of whether Bakerman's prior representation of SFIC as its chief legal counsel is substantially related to the matters at issue in the present litigation.

FN40. D.L.R.P.C. 1.9 cmt. 3.

**\*12** Defendants' assertions fail to demonstrate that Bakerman's former representation of SFIC is substantially related to the current lawsuit. As alleged in the Amended Complaint, Bakerman was specifically excluded from the Bacardi negotiations, and never served as a legal advisor on the transaction. [FN41] Instead, Bakerman's knowledge of the Bacardi transaction was obtained in his capacity as a voting member of the LLC, and only at the eleventh hour. [FN42] Defendants must proffer evidence that Bakerman served as a legal advisor to SFIC in the Bacardi transaction or substantially related matters. This allegation is not substantiated by the facts as set forth in the Amended Complaint.

FN41. Am. Compl., ¶¶ 67-68.

FN42. Bakerman learned of a contemplated third/third/third split of the consideration among the different entities, a piece of knowledge possibly relevant to the LLC and its members. It is unclear in what capacity he received this hallway tidbit of information–whether as counsel to SFIC or member of the LLC. Because defendants bear the burden of proof, and because

a reasonable interpretation of Bakerman's hallway inquiry is that he was receiving such confidences as a member of the LLC, the hallway conversation will not disqualify Bakerman.

This case is different from two cases in which a former legal counsel was disqualified as a derivative lead plaintiff. In *Ercklentz v. Inverness Management Corp.,* this Court granted the defendants' motion to disqualify the plaintiff, who had formerly served as general counsel (and director) of the defendant corporation. [FN43] In granting the motion to disqualify the plaintiff, the Court found that as general counsel to the defendant corporation, plaintiff negotiated and drafted agreements for those transactions challenged by the lawsuit. [FN44] Such involvement and knowledge of specific facts gained as general counsel was highly relevant to the matter in question, where plaintiff alleged that a controlling shareholder had engaged in an ongoing manipulative scheme at the expense of the corporation and its shareholders. [FN45]

FN43. 1984 WL 8251 (Del. Ch. Oct. 18, 1984).

FN44. *Id.* at 5-6 (defendant director and shareholder "undoubtedly provided confidential information and received counsel from plaintiff as part of plaintiff's role as general counsel").

FN45. *Id.* at 2.

In *Khanna v. McMinn,* this Court granted the defendants' motion to disqualify Khanna as a derivative and class plaintiff. [FN46] Khanna served as general counsel to nominal defendant Covad during the relevant periods for all the transactions challenged. [FN47] According to his own testimony, Khanna "owned" corporate governance issues for Covad and had a role to play in such areas. [FN48] Following Khanna's termination from Covad, he threatened to bring a derivative and class action lawsuit against Covad unless he was rehired and promoted. [FN49] When his demands were not met, Khanna filed suit along with two other plaintiffs, and alleged breaches of fiduciary duty by certain directors for usurping corporate opportunities and enriching themselves at the company's expense through a series of transactions occurring over a period of at least three years. [FN50] In disqualifying Khanna, the Court relied on his prior position, his admitted involvement in the subject matter of the litigation, and "the cloud hanging over the litigation created by the tangential and acrimonious employment dispute between Khanna and his former employer." [FN51] Notably, two co-plaintiffs remained following Khanna's disqualification. [FN52]

Not Reported in A.2d                                                                                          Page 12
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN46. 2006 WL 1388744 (Del. Ch. May 9, 2006).

FN47. *Id.* at 42.

FN48. *Id.*

FN49. *Id.* at 43-44.

FN50. *Id.* at 5-10.

FN51. *Id.* at 44.

FN52. *Id.*

Here, Bakerman is not challenging a series of transactions in which he was a key participant, but rather is challenging the allocation in a single transaction from whose negotiations he was actively excluded. Additionally, Bakerman had a role as an LLC member in approving the transactions, distinct from his role as SFIC counsel. Finally, unlike *Khanna,* no co-plaintiffs remain to prosecute this action in the event of Bakerman's disqualification.[FN53]

FN53. This is a reasonable influence given Linda Rodman's connection to the Frank family, and her lack of involvement in this litigation to date. See n. 2, *supra,* p. 8.

**\*13** Defendants also argue that 95% of the ownership interests of the LLC do not support this lawsuit. A derivative claim may be maintained, however, without the support of a majority of ownership or even the support of the entire minority. Adequacy of representation is judged by how well a shareholder advances the interests of other similarly situated shareholders.[FN54] If it turns out that Bakerman is the only member disadvantaged by the lower allocation to the LLC, then one could not imagine a better representative than himself to pursue the appropriate remedies on behalf of the LLC. For these reasons, defendants' motion to disqualify Bakerman as a derivative representative is denied.

FN54. See *Emerald Partners,* 564 A.2d at 674.

*C. Bakerman's Derivative Claim for Breach of Fiduciary Duty*

Bakerman alleges a breach of fiduciary duty claim against defendants on three separate grounds: (i) their artificial suppression of the transfer pricing in the vodka sales from SAS to SFIC before the Bacardi sale;[FN55] (ii) their misallocation of the purchase price paid by Bacardi;[FN56] and (iii) failing to disclose their conflicts of interest related to the allocation.[FN57] Defendants respond to the first claim thusly: as a knowledgeable member of the LLC and lead counsel to SFIC, Bakerman was aware of the transfer pricing for a period of two years. Because he remained silent despite numerous opportunities to raise the issue, Bakerman acquiesced to the transfer pricing. In response to the second claim, defendants argue simply that Bakerman signed his consent to the transaction as a member of the LLC. Bakerman replies that his alleged consent was the product of coercion. In response to the third claim, defendants argue that as Chief Legal Counsel to SFIC, Bakerman was aware of Einsidler and Thompson's holdings of SFIC shares and options, making disclosure of their conflict of interest unnecessary.

FN55. Am. Compl., ¶¶ 62-63, 115.

FN56. *Id.* at ¶¶ 70-79, 115.

FN57. *Id.*

*1. Did Bakerman Consent to the Bacardi Transaction?*

The parties dispute what standard is relevant to determining whether or not Bakerman's consent was coerced. The term "coercion" itself-covering a multitude of situations-is not very meaningful.[FN58] For the word to have much meaning for purposes of legal analysis, it is necessary in each case that a normative judgment be attached to the concept.[FN59] Bakerman argues that because his consent effectively ratified the managers' actions, its integrity should be protected in the same manner as a shareholder vote ratifying a board action.[FN60] Roughly, if some other party causes stockholders to vote in favor of a proposed transaction for some reason other than the merits of that transaction, then the vote has been inequitably coerced.[FN61] Defendants argue that this doctrine of inequitable coercion is inapposite to the bilateral negotiation that took place between Bakerman and Einsidler. They point to a line of contract cases where the standards for proving coercion are much more difficult to meet.

FN58. *Katz v. Oak Indus. Inc.,* 508 A.2d 873 (Del. Ch.1986) ("A commonly used word-seemingly specific and concrete when used in everyday speech-may mask troubling ambiguities that upon close examination are seen to derive not simply from casual use but from

Not Reported in A.2d                                                                                    Page 13
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

more fundamental epistemological problems. Few words more perfectly illustrate the deceptive dependability of language than the term 'coercion.'")

FN59. *Lacos Land Co. v. Arden Group, Inc.,* 517 A.2d 271 (Del. Ch.1986).

FN60. See *Williams v. Geier,* 671 A.2d 1368, 1382 (Del.1996).

FN61. *See, e.g., Eisenberg v. Chicago Milwaukee Corp.,* 537 A.2d 1051, 1061 (Del. Ch.1987) (holding corporation's self tender to be impermissibly coercive); *AC Acquisitions Corp. v. Anderson, Clayton & Co.,* 519 A.2d 103, 112-15 (Del. Ch.1986) (same).

a. The Inequitable Coercion Doctrine is Inapplicable

***14** I agree with defendants that the inequitable coercion doctrine is inapplicable here, as it has been developed solely in cases dealing with diffuse shareholders. For example, in *Lacos Land Co. v. Arden Group, Inc.,* then-Chancellor Allen evaluated the integrity of a shareholder vote authorizing a proposed recapitalization.[FN62] The result of the recapitalization would have been to grant control of the corporation to the then-CEO, by effectively increasing the CEO's voting power from approximately 20% to 67% through the issuance of supervoting stock. In disclosures, shareholders were unmistakably told that unless they approved the recapitalization, the CEO would oppose transactions "which could be determined by the Board of Directors to be in the best interests of all of the stockholders." [FN63] The Chancellor found such a threat to undermine the structure of the shareholder vote to the point that it no longer satisfied the mandate of 8 *Del. C.* § 242(b) requiring shareholder consent to charter amendments.[FN64] Similarly, in *Eisenberg v. Chicago Milwaukee Corp.,* then-Vice Chancellor Jacobs found that a self-tender was inequitably coercive when a proxy statement seeking shareholder approval disclosed plans to delist the company's preferred stock, the board adopted a "no-dividend" policy, and timed the tender offer with a four-year low market price for the preferred stock.[FN65]

FN62. 517 A.2d 271.

FN63. *Id.* at 278.

FN64. *Id.* at 279.

FN65. 537 A.2d 1051, 1061-1062 (Del. Ch.1987).

These cases in which the doctrine has developed are premised on the proposition that "proxy voting has become the dominant mode of shareholder decision making in publicly held corporations." [FN66] This premise does not apply to a member of a closely held LLC. Unlike diffuse shareholders, Bakerman was not inhibited by the costs of collective action. He sat across the table from Einsidler on two occasions in the span of half an hour. The inequitable coercion doctrine is simply unhelpful, analytically, for adjudicating such negotiations and arguments. Instead, there is a well-developed body of law meant to govern negotiations between parties, which I will use to address Bakerman's coercion allegations. Before proceeding to that analysis, however, it is worth examining a certain aspect in which the negotiations here differ from an arm's length bargain reached across a negotiating table.

FN66. *Stroud v. Grace,* 606 A.2d 75, 86 (Del.1992).

b. Thompson and Einsidler Owed Bakerman a Duty to Disclose all Material Facts Bearing on the Decision at Issue

Einsidler was a manager of the LLC owing certain duties to members of the LLC such as Bakerman. When fiduciaries communicate with their beneficiaries in the context of asking the beneficiary to make a discretionary decision-such as whether to consent to a sale of substantially all the assets of an LLC-the fiduciary has a duty to disclose all material facts bearing on the decision at issue.[FN67] "An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote. To prevail on a claim of material omission, therefore, a plaintiff must demonstrate a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder. There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the 'total mix' of information made available." [FN68]

FN67. *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 137 (Del.1997) ("Delaware law of the fiduciary duties of directors ... establishes a general duty of directors to disclose to stockholders all material information reasonably available when seeking stockholder action.")

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 14
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN68. *Id.* at 143.

**\*15** If Bakerman was unaware of Einsidler and
Thompson's large holdings in SFIC, then Einsidler and
Thompson owed Bakerman a duty to disclose such
conflict of interest when they were urging him to consent
to the allocation. Such conflict of interest clearly would
have altered Bakerman's perception of Einsidler and
Thompson's counsel that the allocation was indeed fair.
Defendants argue that Bakerman nowhere alleges that he
was unfamiliar with the managers' relative interests in
SFIC, for whom he was Chief Legal Counsel, and in the
LLC, which he asserts he created. By virtue of his
position within SFIC, Bakerman would have, or should
have, known the actual amounts that the managers stood
to gain from the Bacardi transaction. Drawing all
reasonable inferences in favor of Bakerman, however, the
Amended Complaint avers that he was unaware of the
managers' holdings in SFIC. Possibly he was not involved
in establishing the Warrant Plan because he was not a
participant, and Sidney Frank delegated the details to
someone who would not be as disappointed at being
excluded from the plan as Bakerman likely was.
Discovery should uncover what Bakerman knew of the
Warrant Plan and Einsidler and Thompson's holdings in
SFIC, at the time he signed the consent to the transaction.
Therefore, I will not at this stage dismiss Bakerman's
claim of a breach of fiduciary duty for failure to disclose
the managers' conflicts of interest.

A material omission in the context of asking Bakerman to
consent to a sale of substantially all the assets of the LLC
could vitiate his consent, thereby ending the analysis of
the effect of his consent. Nonetheless, appreciating that
Bakerman's supposed ignorance of the managers' interests
might be a reasonable inference that is simultaneously
improbable, I proceed to examine whether or not
Bakerman was wrongfully coerced to give his consent.
This examination will be subject, as defendants urge, to
the well-developed set of standards governing products of
bilateral contract negotiations.

c. Was Bakerman Coerced?

A party alleging actionable coercion or duress must plead
(i) a wrongful act; (ii) which overcomes the will of the
aggrieved party; and (iii) that he has no adequate legal
remedy to protect himself.FN69 The "wrongful act" is often
the use of or threat to inflict immediate physical harm.
This state, like many others, has broadened this element
to include a wider range of wrongful acts, including
economic duress.FN70 Nevertheless, under the second
element, the wrongful act "must be of such a nature as to
actually over-ride the judgment and will of the other

party...." FN71 "The test for determining whether the duress
produced the assent is a subjective one that focuses on the
state of mind of the 'victim' of the duress." FN72 The third
prong focuses on whether the coercive conduct creates or
takes advantage of an exigent circumstance such that the
victim could not reasonably be expected to resist and seek
legal relief to protect his interests.FN73

FN69. *Cianci v. JEM Enter., Inc.,* 2000 WL
1234647, at \*9 (Del. Ch. Aug. 22, 2000).

FN70. *See, e.g., Fowler v. Mumford,* 102 A.2d
535 (Del.Super.1954) (recognizing "economic
duress" as a basis to find coercion in the
procurement of a contract); *Hanna Sys., Inc. v.
Capano Group, L.P.,* C.A. No. 7408, slip op.
(Del. Ch. Nov. 29, 1985) (same); *E.I. DuPont de
Nemours and Co. v. Custom Blending Int'l, Inc.,*
C.A. No. 16295, slip op. (Del. Ch. Nov. 24,
1998) (same).

FN71. *Fluharty v. Fluharty,* 193 A. 838, 840
(Del.Super.1937).

FN72. *Hanna Sys., Inc. v. Capano Group, L.P.,*
C.A. No. 7408, mem. op. at 7 (Del. Ch. Nov. 29,
1985) (citing Restatement (Second) of Contracts
§ 175, cmt. c. (1981)).

FN73. This prong is an outgrowth of the
principle that the victim must have no reasonable
alternative to accepting the bargain. *See*
Restatement (Second) of Contracts, § 175(a)
(1981).

i. Was There a Wrongful Act?

**\*16** Bakerman does not allege a threat of physical harm,
but alleges two forms of economic duress: a threat to file
a lawsuit against Bakerman and a threat to terminate his
employment.

Threats of litigation constitute "wrongful acts" for
purposes of a claim of coercion or duress, if such threats
were made without a good faith belief that a viable cause
of action existed.FN74 Defendants offer one justification
for the threat to litigate: Bakerman's purported violation
of DR 5-104(a) four years earlier (by accepting a 5%
membership in Grey Goose LLC) justified their
threatened law suit against him if he were to exercise his
rights as a member and refuse to consent. Whether that
threat was made in good faith raises factual issues that
may not be resolved at this juncture. The Amended
Complaint alleges facts that would provide no good faith

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 15
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

basis to threaten a lawsuit: (i) Bakerman acquired his interest in the LLC on fair and reasonable terms, which were identical to the terms on which defendants acquired their own interests in the LLC; [FN75] (ii) those terms were fully disclosed in writing to SFIC in a manner that could be reasonably understood by SFIC; [FN76] and (iii) the potential conflict of interest was disclosed to SFIC [FN77] Furthermore, it is unclear whether such a violation, without more, would support rescission of his interest in the LLC even if Bakerman had violated DR 5-104(a) [FN78] Finally, the timing of such threat-nearly four years after the alleged violation of DR 5-104(a)-only lends itself to the explanation that the threat was a bad faith attempt to elicit Bakerman's consent to the allocation of the purchase price. These allegations, when assumed to be true and viewed in the light most favorable to Bakerman, support a reasonable inference that defendants committed a wrongful act through a bad faith threat of litigation. [FN79]

FN74. *See Weber v. Kirchner,* 2003 WL 23190392, at *2 (Del. Ch. Dec. 31, 2003); *Edge of the Woods v. Wilmington Savs. Fund Soc'y, FSB,* 2001 WL 946521, at *5 (Del.Super.Aug. 16, 2001); *Way Road Dev. Co. v. Snavely,* C.A. No. 89C-DE-48, mem. op. at 9 (Del.Super. Jan. 31, 1992) ("As a general rule, a threat to enforce a legal right or to take legal measures by the filing of a civil lawsuit, cannot constitute duress so long as the party threatening filing the lawsuit did so in a good faith belief that a viable cause of action existed.").

FN75. Am. Compl., ¶ ¶ 38-40.

FN76. *Id.* at ¶ ¶ 41-42.

FN77. *Id.* at ¶ 42.

FN78. *See, e.g., Schafrann v. N.V. Famka, Inc.,* 787 N.Y.S.2d 315, 316 (N.Y.App.Div.2005) (dismissing client's malpractice claim where attorney accepted 10% partnership interest in violation of DR 5-104(a), but had otherwise disclosed conflict to client and client had consulted a disinterested third party). As *Schafrann* explained, "defendant's malpractice claim rests solely on an alleged violation of the Disciplinary Rules which, without more, does not support a malpractice claim." *Id. But see Schlanger v. Flaton,* 631 N.Y.S.2d 293 (N.Y.App.Div.1995) (affirming rescission of attorney's interest in client's four corporations where attorney obtained such interests in violation of DR 5-104(a)).

FN79. Defendants point out that Bakerman did not object during the June 18 meeting to the characterization that he was conflicted. Drawing all reasonable inferences in favor of Bakerman, however, the Amended Complaint suggests that Einsidler and the SFIC lawyers did not have a DR 5-104(a) conflict in mind, but rather some broader interpretation of the duties of a general counsel requiring him to abdicate his interests entirely when his interests as an LLC member diverged from those of his employer. Bakerman cannot be expected to correct the SFIC lawyers of their erroneous understanding of "conflict of interest," provide them with an only slightly more plausible theory (DR 5-104(a)), and then remind them of the facts making this latter theory an empty threat-all in a span of thirty minutes, and without the benefit of his own counsel.

Bakerman additionally contends that defendants' threat to terminate his employment constituted a wrongful act. Although Delaware possibly recognizes a covenant of good faith and fair dealing in at-will employment, [FN80] New York does not. [FN81] In New York, however, an employer's threat to terminate an at-will employee in order to obtain a release of claims is subjected to a standard apparently more stringent than ordinary contract principles. [FN82] Seven factors are considered: 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented or consulted with an attorney, 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law, and 7) whether an employer encourages or discourages an employee to consult an attorney. [FN83] As Einsidler and the lawyers argued that Bakerman's consent to the transaction was unnecessary in light of his conflict of interest, continued pursuit of Bakerman's consent was effectively an attempt to secure a release of claims that arose in the context of both Bakerman's holdings in the LLC and his employment for the SFIC.

FN80. *Reiver v. Murdoch & Walsh, P.A.,* 625 F.Supp. 998, 1014 (D.Del.1985) (holding that threats of termination of an at-will employee to obtain a release of already accrued benefits could form the basis of an action predicated on economic duress).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 16
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN81. *Robertazzi v. Cunningham,* 294 A.D.2d 418, 419 (N.Y.A.D. 2 Dept.2002) ("it is well established that there is no implied obligation of good faith and fair dealing in an employment at will"). In addition to Bakerman's residence and SFIC's doing business in New York, their employment relationship was centered in New York; New York law will therefore apply in determining the wrongful nature of threats made in New York to terminate such an employment relationship. *See Restatement (Second) of Conflicts,* § 145.

FN82. *Bormann v. AT & T Comm., Inc.,* 875 F.2d 399, 403 (2d Cir.1989).

FN83. *Id.; EEOC v. Am. Express Publ'g Corp.,* 681 F.Supp. 216, 219 (S.D.N.Y.1988).

**\*17** Under New York law, Einsidler's threat to terminate Bakerman in order to obtain his consent arguably constituted a wrongful act. Several factors raise sufficient question as to the voluntariness of the consent in the context of the threat to employment: Bakerman was only given a half hour to examine the consent and purchase agreement,[FN84] he was given no role in crafting the consent, he was arguably entitled to the $700,000 even without signing the consent, and he was not represented by nor encouraged to consult counsel.[FN85]

FN84. *Am. Express,* 681 F.Supp. at 220 ("Three days, while not conclusive as to involuntariness, is sufficiently short to create a question on the subject.").

FN85. Einsidler's response to Bakerman's request to speak with Sidney Frank could be viewed as discouraging Bakerman from consulting anyone during his thirty-minute deliberation period.

At this stage, the threat of litigation and termination of employment have been sufficiently pled to satisfy the wrongful act element of a claim of economic duress.

### ii. Was Bakerman's Will Over-Ridden?

As stated earlier, the second element of a claim of economic duress requires that the wrongful act "must be of such a nature as to actually over-ride the judgment and will of the other party...." [FN86] "The test for determining whether the duress produced the assent is a subjective one that focuses on the state of mind of the 'victim' of the

duress." [FN87] Defendants secretly negotiated with Bacardi for months and waited to seek Bakerman's consent to the transaction until shortly before the public announcement of the sale.[FN88] After finally revealing the transaction and a draft of its proposed terms to Bakerman, defendants did not provide any substantive information to support the allocation. Before discovery into the events surrounding the eleventh hour ultimatum, and at this stage where all reasonable inferences must be made in favor of plaintiff, it is reasonable to believe that Bakerman's will was overcome.

FN86. *Fluharty,* 193 A. at 840.

FN87. *Hanna,* at 7.

FN88. Am. Compl., ¶ ¶ 67-69; 80. *See Hanna,* 1985 WL 21128, at *4 (finding that unreasonable delay in seeking consent until shortly before the transaction contributed to overcoming party's will). According to the Amended Complaint, defendants intentionally surprised Bakerman on the eve of a multi-billion dollar transaction that might disintegrate unless he signed the consent.

### iii. Did Bakerman Have Adequate Legal Remedy to Protect Himself?

The final element of economic duress focuses on whether the coercive conduct creates or takes advantage of an exigent circumstance such that the victim could not reasonably be expected to resist and seek legal relief to protect his interests. Of particular note, therefore, is the manner in which the consent was requested, and the short time Bakerman was given to decide. Viewed in the light most favorable to Bakerman, Einsidler laid out a trap for Bakerman. The allocation was hidden from Bakerman until the eleventh hour,[FN89] he received an ultimatum threatening a lawsuit and employment termination, and he was given only 30 minutes to decide. Further, he was not permitted to speak with Sidney Frank; nor was he given adequate time or privacy to confer with counsel. Viewing the facts as pled in the light most favorable to Bakerman, his consent was coerced and does not preclude a claim for breach of the duty of loyalty.[FN90]

FN89. Bakerman was likely lulled by the misinformation of an allocation by thirds, delivered by Peltz in the SFIC hallways a day earlier.

FN90. At this point, there is no need to address Bakerman's alternative argument, that even if his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 17
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

consent had been given freely, it would only have the effect of shifting the burden of proof onto him in the entire fairness analysis.

### 2. Did Bakerman Acquiesce?

In addition to alleging that Bakerman's consent to the Bacardi transaction bars his claims, defendants additionally argue that Bakerman's acceptance of pecuniary benefits flowing from the transaction bars his claims under the doctrines of ratification and acquiescence. "Acquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." [FN91] Similarly, "[r]atification results if the party who executed the contract under duress accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or void it." [FN92]

> FN91. *Cantor Fitzgerald, L.P. v. Cantor,* 2000 WL 307370, at *24 (Del. Ch. Mar. 13, 2000) citing *NTC Group, Inc. v. West Point-Pepperell, Inc.,* C.A. No. 10665, slip op. (Del. Ch. Oct. 17, 1990).

> FN92. *Cianci,* 2000 WL 1234647, at *12.

### a. In Respect to the Transfer Pricing?

**\*18** It is unclear whether defendants properly challenged Bakerman's breach of fiduciary duty claim alleging defendants' artificial suppression of the transfer pricing in the vodka sales from SAS to SFIC during the years before the Bacardi transaction.[FN93] Regardless, drawing all reasonable inferences from the allegations in the Amended Complaint in favor of plaintiff, Bakerman was unaware of the transfer pricing and therefore did not acquiesce or ratify it.

> FN93. This issue was not directly addressed by defendants in their opening brief, and only footnoted in their reply brief. Defs.' Reply Br. at 15 n. 11.

According to the Amended Complaint, in 2003 SAS sold more than 2.3 million cases of Grey Goose Vodka, the majority of which was to SFIC at an unreasonably steep discount (the transfer price). Bakerman was terminated in August 2004. Although Bakerman's ignorance is not specifically pled, it is an inference that will be granted for the time being, keeping in mind that further discovery should quickly resolve what exactly Bakerman knew about the transfer pricing.

### b. In Respect to the Allocation?

Defendants assert that Bakerman acquiesced in or ratified the purchase price allocation by accepting an employee bonus following the Bacardi sale and by waiting eighteen months to bring this lawsuit. Drawing all reasonable inferences in favor of plaintiff, however, Bakerman did not acquiesce in or ratify the purchase price allocation. Bakerman, like all SFIC employees, received a substantial employee bonus following the Bacardi sale. That bonus resulted from his SFIC employment and was unrelated to the purchase price allocation or his membership interest in the LLC.[FN94] Bakerman has never received any distributions or other monetary payments for his membership interest.

> FN94. Am. Compl., ¶ 109.

Bakerman has not acquiesced in the purchase price allocation by inaction. Traditionally, the doctrine of acquiescence has included an additional showing that the plaintiff, by words or deeds, has acknowledged the legitimacy of the defendant's conduct.[FN95] An essential element of acquiescence is "that the acquiescing party shows unequivocal approval of the transaction." [FN96] Here, Bakerman did not show unequivocal approval of the allocation, as he vigorously objected to the allocation, even as he was allegedly coerced into consenting. Moreover, he repeatedly refused to sign a comprehensive release shortly after the transaction.[FN97]

> FN95. *See Clements v. Rogers,* 790 A.2d 1222, 1238 (Del. Ch.2001) (citing *Frank v. Wilson & Co., Inc.,* 9 A.2d 82, 87 (Del.Ch.1939), aff'd, 32 A.2d 277 (Del.1943)).

> FN96. *In re Best Lock S'holder Litig.,* 845 A.2d 1057, 1080-81 (Del. Ch.2001).

> FN97. Einsidler acknowledged Bakerman's lack of acquiescence by interpreting Bakerman's refusal to sign a release as indicating that Bakerman was going to sue defendants. Am. Compl., ¶ 112.

### D. Unjust Enrichment

Not Reported in A.2d                                                                Page 18
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Bakerman broadly alleges that as a result of defendants' wrongful and unjustified conduct, they have been unjustly enriched at the LLC's expense. Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience." [FN98] The elements of unjust enrichment are (i) an enrichment, (ii) an impoverishment, (iii) a relation between the enrichment and impoverishment, (iv) the absence of justification, and (v) the absence of a remedy provided by law. [FN99] Courts developed unjust enrichment as a theory of recovery to remedy the absence of a formal contract. [FN100] Therefore, claims of unjust enrichment may survive a motion to dismiss when the validity of the contract is in doubt or uncertain. [FN101] When the complaint alleges an express, enforceable contract that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed. [FN102] This is the case even when the enforceable contract gives rise to a fiduciary relationship between the parties. [FN103]

FN98. *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del. Ch.1999).

FN99. *Id.*

FN100. *ID Biomedical Corp. v. TM Technologies, Inc.,* 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995).

FN101. *See, e.g., Student Fin. Corp. v. Royal Indem. Co.,* 2004 WL 609329, at *7 (D.Del. Mar. 23, 2004) (rejecting motion to dismiss unjust enrichment claim where complaint alleged underlying contract was invalid and subject to rescission because of fraudulent conduct and omissions).

FN102. *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New York law, terms of contingent value rights controlled); *ID Biomedical.,* 1995 WL 130743, at *15 (applying Delaware law).

FN103. *Albert v. Alex. Brown Mgmt. Servs.,* 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005) (partnership agreement and fiduciary duties between managers and unitholders controlled, to the exclusion of unjust enrichment claim).

**\*19** Here, the relationship between the LLC and the defendants was expressly governed by the LLC's

Operating Agreement and the fiduciary duties that arose from such an agreement. Bakerman argues unavailingly that the LLC's rights to the allocation are governed by the APA. Count I (defendants' breach of fiduciary duty) and Count II (defendants' breach of contract), however, allege both a contract (the Operating Agreement) and fiduciary duties that governed both the substance of the allocation and the manner in which it was approved. Therefore, Bakerman's claim of unjust enrichment is dismissed.

### E. Tooley Analysis

Defendants argue that Bakerman's individual causes of action are derivative in nature. The distinction between derivative and direct claims has only academic import at this stage because demand is presently excused and because Bakerman remains a member of the LLC [FN104] and an adequate representative of the class. Nonetheless, acknowledging that this issue may arise again after discovery and that defendants have pressed it on this motion, I turn to it briefly.

FN104. A derivative claim may only be brought by a shareholder who continues to hold the shares of the corporation on whose behalf the shareholder is suing. *See* Ct. Ch. R. 23.1. *See also Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031 (Del.2004).

Whether a claim is derivative or direct depends solely upon two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders individually); and (2) who would receive the benefit of the recovery or other remedy (the corporation or the stockholders, individually)?" [FN105] In applying this test, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint. [FN106]

FN105. *Tooley,* 845 A.2d at 1033.

FN106. *In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del.Ch.2004).

Bakerman's contract and good faith and fair dealing claims are direct claims because they allege that defendants deprived Bakerman of his voting rights under the LLC's Operating Agreement, and because Bakerman would receive the benefit of any recovery. The deprivation of Bakerman's right to freely consent to the transaction is a harm unique to Bakerman that allegedly benefited certain controlling members of the LLC. [FN107] Consequently, Bakerman would be the eventual sole

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 19
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

recipient of the remedy. For these reasons, Counts II and IV will be treated as direct claims.

FN107. *See Gentile v. Rossette,* 2006 WL 2388934, at *7 (Del.2006) (finding public shareholders directly harmed by dilution of voting power redistributed to controlling shareholder).

### F. Breach of Contract

Bakerman has pled a claim for breach of contract. Under the notice pleading standard,[FN108] he need only allege the existence of a contract, the breach of an obligation imposed by that contract, and the resultant damage.[FN109] Bakerman has satisfied the notice pleading burden by alleging that: (i) the Operating Agreement is a contract between the managers and members of the LLC, including Bakerman and defendants;[FN110] (ii) defendants breached the Operating Agreement by obtaining Bakerman's consent through economic duress;[FN111] and (iii) Bakerman suffered substantial damages as a result.[FN112]

FN108. *See* Ct. Ch. R. 8(a)(1).

FN109. *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del.2003).

FN110. Am. Compl., ¶ 122.

FN111. *Id.* at ¶¶ 123-124.

FN112. *Id.* at ¶ 125.

### G. Breach of the Implied Covenant of Good Faith and Fair Dealing

Bakerman has adequately stated a claim for breach of the implied covenant of good faith and fair dealing. In Delaware, an implied covenant of good faith and fair dealing inheres in every contract.[FN113] The implied covenant is a "judicial convention designed to protect the spirit of the agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain."[FN114] Courts will find a breach of an implied covenant when it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith had they thought to negotiate with respect to that matter."[FN115]

FN113. *Chamison v. Healthtrust, Inc.,* 735 A.2d 912, 920 (Del.Ch.1999).

FN114. *Id.*

FN115. *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del.1998).

**\*20** "[I]n order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendants, and resulting damage to the plaintiff."[FN116] Bakerman claims that the implied contractual obligation arises from the Operating Agreement's requirement that members of the LLC unanimously approve certain fundamental transactions. Bakerman alleges that defendants have violated the implied contractual obligation by: (i) misallocating the transaction proceeds to serve their own self interests at Bakerman's expense; (ii) failing to disclose material information necessary to allow Bakerman to make an informed decision regarding the consent; (iii) depriving Bakerman of his right to give volitional consent to the transaction without coercion and duress; and (iv) executing the Bacardi transaction with knowledge of the coercive nature of the consent. These allegations are largely duplicative of earlier allegations of breaches of the duty of loyalty, the so-called duty of disclosure, and the Operating Agreement. Nonetheless, Bakerman may, after discovery, be able to show some independent breach of the duty of good faith and fair dealing that falls outside the ambit of these previously pled breaches.[FN117] For that reason, I decline at this stage of the matter to dismiss Count IV of the Amended Complaint.

FN116. *Fitzgerald v. Cantor,* 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

FN117. *See Bonham v. HBW Holdings, Inc.,* 2005 WL 3589419, at *10-11 (Del. Ch. Dec. 23, 2005).

### H. Laches

The Amended Complaint is not barred by laches. A claim is barred by the doctrine of laches if the plaintiff, having learned of his claim, unreasonably delayed in asserting his rights and the defendants were prejudiced by the plaintiffs' failure to assert their claim in a timely manner.[FN118] Bakerman likely became aware of his legal

options in the months following June 2004, and filed this lawsuit in December 2005. Following the filing of defendants' first motion to dismiss that attacked Bakerman's alleged conflict of interest, Bakerman filed the Amended Complaint that described communications with Sidney Frank and Lee Einsidler about such conflict. In the meantime, defendant Sidney Frank died in early January 2006, after the original complaint had been filed, but months before the filing of the Amended Complaint.

> FN118. *Steele v. Ratledge*, 2002 WL 31260990, at *2 (Del. Ch. Sept. 20, 2002).

According to defendants, the delay in filing the original complaint has deprived them of a crucial witness regarding the communications alleged in the Amended Complaint. Defendants misconstrue the Amended Complaint-Bakerman does not allege a one-on-one conversation with Sidney Frank, but discussions that involved both Sidney Frank and Lee Einsidler. Further, the less than eighteen-month delay was a reasonable delay necessary to ascertain the merits of Bakerman's claims and to retain counsel paid on a contingency basis. Finally, nothing suggests that Bakerman waited on the sidelines for Sidney Frank's death-Bakerman filed the original complaint in December 2005, nearly a month before Sidney Frank passed away. Bakerman amended the original complaint in order to respond to specific arguments raised by defendants in their first motion to dismiss. For these reasons, I conclude that the Amended Complaint is not barred by laches.

### I. Tortious Interference

**\*21** Bakerman cannot state a claim for tortious interference because the defendants are parties to the contract with which they allegedly interfered. [FN119] SFIC, Bruno, Sidney Frank, Einsidler, John Frank, Thompson, and Moselman, as members of the LLC, were parties to the Operating Agreement. They cannot be liable for tortiously interfering with their own agreement. Therefore, Count III must be dismissed.

> FN119. *Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 590 (Del. Ch.1994) ("It is rudimentary that a party to a contract cannot be liable both for breach of that contract and for inducing that breach."); *see also Winicki v. City of Olean*, 611 N.Y.S.2d 379 (N.Y.App.Div.1994).

### IV. CONCLUSION

Bakerman's claims for unjust enrichment (Count V) and tortious interference (Count III) are hereby dismissed. For the reasons set forth above, however, I deny defendants' motion to dismiss Bakerman's remaining claims. Counsel shall confer and submit a form of order implementing this decision. Counsel shall further confer and agree upon a scheduling order to move this case forward in an expeditious fashion.

Del.Ch.,2006.
Bakerman v. Sidney Frank Importing Co., Inc.
Not Reported in A.2d, 2006 WL 2987020 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 2388075 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Their Motion to Dismiss the Amended Complaint (Jun. 26, 2006)

• 2006 WL 1888764 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss (Jun. 2, 2006)

• 2006 WL 1888763 (Trial Motion, Memorandum and Affidavit) Defendants' Opening Brief in Support of the Motion to Dismiss the Amended Complaint (May 11, 2006)

• 2006 WL 1084061 (Trial Motion, Memorandum and Affidavit) Defendants' Opening Brief in Support of their Motion to Dismiss the Complaint (Mar. 13, 2006)

• 2005 WL 3670892 (Trial Pleading) Complaint (Dec. 15, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 2006 WL 3289623 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Healy v. HealyDel.Ch.,2006.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
            Court of Chancery of Delaware.
                    Re: HEALY
                        v.
                     HEALY.
               C.A. No. 19816-NC.

               Submitted: July 24, 2006.
               Decided: Oct. 31, 2006.


Henry A. Heiman, Esquire, Heiman, Gouge &
Kaufman, LLP, Wilmington, DE.
Deirdre M. Richards, Esquire, Obermayer Rebmann
Maxwell & Hippel LLP, Wilmington, DE.
JOHN W. NOBLE, Vice Chancellor.
*1 Dear Counsel:

This is an action for equitable contribution brought
by two guarantors against a third guarantor.


                I. BACKGROUND

Michael Healy ("Michael") and Plaintiff James V.
Healy ("James") are brothers and owned a
construction company known as The Healy Group,
Inc. which did business through two wholly-owned
subsidiaries, Healy Management Services and John
E. Healy & Sons, Inc. (collectively, the "Healy
Companies"). Plaintiff Sylvia T. Healy ("Sylvia") is
James's wife. Defendant Janet B. Healy ("Janet") is
Michael's wife.

During 1998 and 1999, the Healy Companies entered
into contracts for several construction projects
supported by performance and payment bonds issued
by Travelers Casualty and Surety Company of
America ("Travelers"). Travelers, apparently
uncomfortable with the financial status of the Healy
Companies, required additional security for its
undertaking, and Buckley & Company, Inc.
("Buckley") agreed to indemnify Travelers in the
event that claims were successfully placed against the
bonds. Buckley, however, required James, Michael,
Sylvia, and Janet (and others) to enter into guaranty
agreements under which they would be obligated to

reimburse Buckley for any payments that Buckley
was required to make to Travelers. Buckley did make
payments under its indemnity agreement to Travelers
and obtained a judgment against the four guarantors
for $925,000. That amount was negotiated down to
$750,000. James and Sylvia have paid Buckley
$389,212.[FN1]

          FN1. There is a discrepancy between the
          Complaint and James's Affidavit. Although
          it is immaterial for current purposes, the
          Complaint lists the payment amount as
          $398,212; the Affidavit shows the payment
          as $389,212.

In addition, the Healy Companies borrowed
substantial sums from Wilmington Savings Fund
Society ("WSFS"). James, Sylvia, Michael, and
Janet, together with others, guaranteed repayment of
the WSFS loans. When the Healy Companies
defaulted on the loans, WSFS settled its claims by
accepting payment in the amount of $909,203 from
James and Sylvia and a mortgage on real estate solely
owned by Sylvia.

James and Sylvia brought this action against Janet to
obtain reimbursement from her of their payments in
excess of a fair and equitable allocation of the
guaranty obligations among them.[FN2] Sylvia now
seeks partial summary judgment against Janet as to
Janet's liability (but not the amount thereof) to Sylvia.

          FN2. James and Sylvia could not seek
          recovery from Michael because his
          obligations have been discharged in
          bankruptcy.

                II. CONTENTIONS

Sylvia is seeking equitable contribution from Janet
for payments she has made under their jointly
executed guaranty of Healy Companies' debt. With
her motion for partial summary judgment, Sylvia
seeks a judgment of liability against Janet. To follow
would be a hearing to determine the amount of that
liability. She alleges that Janet, as one of three
guarantors, is responsible for one-third of all
payments pursuant to the guaranties, or $553,067.67.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2006 WL 3289623 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Janet claims that she has already paid $260,000 and should no longer be liable under any guaranty for any additional payments. She alleges that, in any event, James defrauded her and she has a claim in setoff against both plaintiffs which would extinguish any liability to them under the guaranty. In addition, Janet argues that Sylvia's claim is barred by the doctrine of unclean hands because Sylvia used corporate resources of the Healy Companies for her own personal construction jobs and she participated in James's fraudulent preparation of financial documents and manipulation of pension funds. She also alleges that Sylvia's claim is not ripe for judicial consideration because the granting of a mortgage (without payment or subsequent foreclosure) cannot be counted as payment toward the joint obligation. Janet finally argues that efficient case management would require keeping Sylvia as a party, thereby making inadvisable the separate relief sought by Sylvia.

### III. ANALYSIS

*A. Applicable Standard*

**\*2** Motions for summary judgment are, of course, evaluated under Court of Chancery Rule 56. If there are no genuine, material issues of fact, a party may obtain summary judgment if it is entitled to judgment as a matter of law. When assessing a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party.[FN3] In order to withstand a motion for summary judgment, the moving party is required to present some evidence, either direct or circumstantial, to support all of the elements of the claim. A motion for summary judgment is properly denied if the moving party fails to make a showing sufficient to establish the existence of each element essential to the party's case.[FN4] Also, "[o]nce the moving party presents evidence that if undisputed would entitle it to summary judgment, the burden then shifts to the opposing party to dispute the facts by affidavit or proof of similar weight." [FN5] A party invoking an affirmative defense and seeking to avoid a summary judgment on that defense bears the burden of producing evidence that rationally creates a triable issue of fact regarding the sustainability of its affirmative defense.[FN6] A motion for summary judgment does not allow the Court to weigh the evidence.[FN7]

FN3. *Judah v. Del. Trust Co.,* 378 A.2d 624, 632 (Del.1977).

FN4. *Watson v. Taylor,* 2003 WL 21810822, at *2 (Del. Aug. 4, 2003).

FN5. *Fleet Fin. Group, Inc. v. Advanta Corp.,* 2001 WL 1360119, at *1 n. 4 (Del. Ch. Nov. 2, 2001).

FN6. *Milford Power Co., LLC v. PDC Milford Power, LLC,* 866 A.2d 738, 746 (Del. Ch.2004).

FN7. *Sikander v. City of Wilmington,* 2005 WL 1953040, at *2 (Del . Super.2005).

*B. Sylvia's alleged inequitable conduct and her right to equitable contribution*

Equity requires that "when a party who seeks relief in this Court 'has violated conscience or good faith or other equitable principles in his conduct, then the doors of the Court of Equity should be shut against him." [FN8] The notion of a "no harm, no foul" exception to the application of this doctrine has been rejected.[FN9] Fraud will typically suffice to hold a party ineligible for relief under the unclean hands doctrine.[FN10]

FN8. *Monsanto Co. v. Rohm & Haas Co.,* 456 F.2d 592, 598 (3d Cir.1971) ("It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.... In fashioning a remedy for unclean hands, the Court has a wide range of discretion in refusing to aid the "unclean litigant."). *See, E.J. Stephen, Inc. v. Ceccola,* 1984 WL 8238, at *817 (Del. Ch. July 9, 1984) (*citing Bodley v. Jones,* 59 A.2d 463 (Del.1947)); *ONTI, Inc. v. Integra Bank,* Del. Ch., 1998 WL 671263, at *3 (Aug. 25, 1998).

FN9. *Nakahara v. The NS 1991 Am. Trust,* 739 A.2d 770, 791 (Del. Ch.1998). "Equity does not reward those who act inequitably, even if it can be said that no tangible injury resulted." *Id.* at 794.

FN10. *Ryan v. Ryan,* 1992 WL 2556, at *1

Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 2006 WL 3289623 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

(Del. Ch. Jan. 8, 1992); *Derickson v. Derickson,* 281 A.2d 487, 488 (Del. Ch.1971).

Janet asserts that Sylvia (1) used Healy & Sons laborers for her own personal construction business, (2) participated in the preparation of Healy Companies' financial statements which were materially misleading in that they failed to include pension misappropriations, and (3) used Healy & Sons equipment for personal use. Janet relies upon her deposition testimony and that of her husband to the effect that Sylvia used the business facsimile machine, had invoices sent to Healy & Sons, and utilized employees of Healy and Sons in her own personal construction projects.

Although Janet's contentions are far from compelling, the Court cannot conclude, after accepting Janet's factual assertions and giving her the favorable inferences that can reasonably be drawn from those facts, that Sylvia is entitled to judgment as a matter of law. The "facts" upon which Janet relies border on the speculative and may not withstand the process of trial, but that is the point: trial is the appropriate stage for resolving these issues .[FN11] Janet presents the following circumstantial evidence to support her defense: Sylvia used the fascimile machine at her husband's office, was frequently at her husband's office, and on occasion the laborers employed by Healy & Sons could also be found working on construction jobs for Sylvia Healy.[FN12] To resist Sylvia's motion, Janet merely needed to sponsor evidence that rationally creates a triable issue of fact regarding her affirmative defense, which she has achieved with the deposition testimony presented to the Court.[FN13]

FN11. Another question that may be significant is whether the "unclean hands" conduct "relate[s] directly to the matter in controversy." *Nakahara,* 739 A.2d at 792 & n. 107.

FN12. Deposition of Michael Healy at 3-5; Deposition of Janet Healy at 8-12.

FN13. *See Milford Power Co., LLC,* 866 A.2d at 746.

**\*3** The Court notes that Janet presented no evidence to support her allegation that Sylvia participated in the preparation of Healy Companies' falsified financial statements. Therefore, that contention played no part in this ruling.

### IV. CONCLUSION

For the reasons set forth above, Plaintiff Sylvia T. Healy's Motion for Partial Summary Judgment is denied.

**IT IS SO ORDERED.**

Very truly yours,

/s/ John W. Noble

Del.Ch.,2006.
Healy v. Healy
Not Reported in A.2d, 2006 WL 3289623 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.3d ----                                                                          Page 1
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

**H**

Briefs and Other Related Documents
Nisselson v. LernoutC.A.1 (Mass.),2006.Only the
Westlaw citation is currently available.
United States Court of Appeals,First Circuit.
Alan NISSELSON, Trustee of the Dictaphone
Litigation Trust, Plaintiff, Appellant,
v.
Jo LERNOUT et al. Defendants, Appellees.
**No. 05-1774.**

Heard Sept. 13, 2006.
Decided Nov. 8, 2006.

**Background:** Trustee for litigation trust of Chapter
11 debtor brought action against officers, directors,
investment bankers, attorneys, auditors, and related
entities of corporation that had acquired debtor
prepetition, asserting federal securities and
racketeering claims and state-law claims for fraud,
unfair trade practices, negligent misrepresentation,
and conspiracy. The United States District Court for
the District of Massachusetts, Patti B. Saris, J., 2004
WL 3953998 and 2004 WL 3954018, granted
defendants' motions to dismiss. Trustee appealed.

**Holdings:** The Court of Appeals, Selya, Circuit
Judge, held that:

(1) trustee had Article III standing to bring action;

(2) trustee acted in debtor's place and stead for
purposes of in pari delicto defense;

(3) alleged fraudulent conduct of acquiring
corporation had to be imputed to debtor for purposes
of in pari delicto defense;

(4) adverse interest exception did not apply to
preclude imputation of acquiring corporation's
alleged fraud to debtor; and

(5) allowing defendants to rely on in pari delicto
defense did not offend public policy.

Affirmed.

**[1] Federal Courts 170B** 🔑 0

170B Federal Courts
When district court rests its decision on alternative
grounds, an appellate court need not explore both,
and if it determines that one such ground fully
supports the order of dismissal, the court may end its
deliberations at that point.

**[2] Federal Civil Procedure 170A** 🔑 0

170A Federal Civil Procedure
Dismissing a case for failure to state claim upon
which relief may be granted on the basis of an
affirmative defense requires that (1) the facts
establishing the defense are definitively ascertainable
from the complaint and the other allowable sources
of information, and (2) those facts suffice to establish
the affirmative defense with certitude. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** 🔑 0

170A Federal Civil Procedure
In pari delicto doctrine does not implicate plaintiff's
standing to sue but, rather, constitutes an affirmative
defense.

**[4] Federal Civil Procedure 170A** 🔑 0

170A Federal Civil Procedure
Even though challenges to plaintiff's standing are
often considered threshold issues in federal cases,
such challenges must be addressed first only if they
call into question a federal court's Article III power to
hear the case. U.S.C.A.Const.Art. 3, § 2, cl. 1.

**[5] Federal Civil Procedure 170A** 🔑 0

170A Federal Civil Procedure
Constitutional prerequisites for Article III standing
are satisfied so long as plaintiff colorably alleges an
actual injury that is both traceable to defendant's
conduct and redressable by a favorable decision.
U.S.C.A.Const.Art. 3, § 2, cl. 1.

**[6] Federal Civil Procedure 170A** 🔑 0

170A Federal Civil Procedure
For purposes of motions to dismiss, trustee for
Chapter 11 debtor's litigation trust had Article III
standing to bring action against officers, directors,

--- F.3d ----                                                                                Page 2
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

investment bankers, attorneys, auditors, and related entities of corporation that had acquired debtor prepetition, given defendants' decision not to contest trustee's assertion that conduct attributed to them resulted in redressable injury, for purposes of motion, and to instead argue that trustee was seeking to prosecute claims which, though cognizable in federal court, belonged exclusively to former shareholders of debtor's predecessor. U.S.C.A.Const.Art. 3, § 2, cl. 1.

**[7] Federal Civil Procedure 170A** 🗝0

170A Federal Civil Procedure
Determination of who may maintain an otherwise cognizable claim turns on a question of prudential standing, not one of Article III standing. U.S.C.A.Const.Art. 3, § 2, cl. 1.

**[8] Federal Courts 170B** 🗝0

170B Federal Courts
Ban on federal court's hypothetical jurisdiction extends only to issues involving Article III jurisdiction and, hence, Article III standing; there is no counterpart rule that demands the resolution of objections based on prudential concerns before other issues can be adjudicated. U.S.C.A.Const.Art. 3, § 2, cl. 1.

**[9] Federal Courts 170B** 🗝0

170B Federal Courts
Although courts should not rush to rely on hypothetical jurisdiction, one situation in which hypothetical jurisdiction, if otherwise proper, may be invoked is when doing so would avoid the need to sort out thorny jurisdictional tangles.

**[10] Action 13** 🗝0

13 Action
"In pari delicto" is both an affirmative defense and an equitable defense that, broadly speaking, prohibits plaintiffs from recovering damages resulting from their own wrongdoing.

**[11] Action 13** 🗝0

13 Action
Massachusetts courts have warmly embraced the in pari delicto defense.

**[12] Action 13** 🗝0

13 Action
Application of the in pari delicto doctrine is restricted to those situations in which (1) plaintiff, as compared to defendant, bears at least substantially equal responsibility for the wrong he seeks to redress, and (2) preclusion of the suit would not interfere with the purposes of the underlying law or otherwise contravene the public interest.

**[13] Federal Courts 170B** 🗝0

170B Federal Courts
By failing to object to district court's one-size-fits-all approach to applying in pari delicto defense to his federal and state claims against parties involved in prepetition acquisition of Chapter 11 debtor's predecessor, trustee for litigation trust waived for purposes of appeal any argument either that claim-by-claim analysis was required or that some material differences existed between applicable federal and state law.

**[14] Bankruptcy 51** 🗝0

51 Bankruptcy
In asserting claims arising out of prepetition merger from which Chapter 11 debtor had emerged, trustee for debtor's litigation trust acted in debtor's place and stead, rather than that of debtor's predecessor acquired as part of merger, for purposes of determining viability in pari delicto defense. 11 U.S.C.A. § 541(a)(1); 8 West's Del.C. § 259(a).

**[15] Bankruptcy 51** 🗝0

51 Bankruptcy
Trustee for litigation trust created by Chapter 11 plan could assert only those claims that debtor could have asserted prior to seeking the protection of bankruptcy court. 11 U.S.C.A. § 541.

**[16] Bankruptcy 51** 🗝0

51 Bankruptcy
Trustee in bankruptcy cannot and does not acquire rights or interests superior to, or greater than, those possessed by debtor.

**[17] Bankruptcy 51** 🗝0

51 Bankruptcy
In pari delicto defense must be available to defendant in an action by bankruptcy trustee whenever that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

Page 3

--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))

**(Cite as: --- F.3d ----)**

defense would have been available in an action by debtor, and there is no "innocent successor" exception available to bankruptcy trustee in a case in which defendant could have mounted successfully an in pari delicto defense against debtor.

**[18] Federal Civil Procedure 170A** 🔑 0

170A Federal Civil Procedure
When a case hinges on imputation and the pleaded facts, construed in the light most flattering to the resisting party, dictate imputation, a court is free to decide that question on a motion to dismiss for failure to state claim.  Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[19] Corporations 101** 🔑 0

101 Corporations
Courts look to state law to ascertain when wrongful conduct should be imputed to a corporation for purposes of in pari delicto doctrine.

**[20] Corporations 101** 🔑 0

101 Corporations
Under Massachusetts law, a parent corporation and its wholly-owned subsidiary are generally regarded as separate and distinct entities.

**[21] Corporations 101** 🔑 0

101 Corporations
Under Massachusetts law, court may disregard the corporate form when doing so will defeat a fraud practiced by those who control a subsidiary corporation.

**[22] Corporations 101** 🔑 0

101 Corporations
Fraudulent conduct of persons or entities who exercise complete control over a corporation may be imputed to the corporation when those actors have used the corporation as a vehicle for facilitation of fraud.

**[23] Corporations 101** 🔑 0

101 Corporations
Under Massachusetts law, alleged fraudulent conduct of acquiring corporation had to be imputed to new subsidiary that resulted from merger for purposes of in pari delicto defense asserted in response to federal

and state-law claims of trustee for litigation trust in new subsidiary's Chapter 11 case by parties involved in prepetition acquisition, given that acquiring corporation played primary role in contriving alleged scheme to acquire new subsidiary's predecessor under false pretenses, created new subsidiary for express purpose of furthering that artifice, and exercised control over new subsidiary during course of alleged scheme.

**[24] Action 13** 🔑 0

13 Action
Inasmuch as first prong of the in pari delicto inquiry focuses on the unlawful activity that is the subject of an action, party's culpability vel non must be based on its status at the time the alleged illegality occurred.

**[25] Corporations 101** 🔑 0

101 Corporations
Although acquiring corporation's alleged actions in convincing acquired corporation to surrender its assets in exchange for worthless stock were adverse to acquired corporation and its shareholders, actions were not adverse to interests of new subsidiary created as part of acquisition scheme, and therefore adverse interest exception did not apply to preclude imputation of acquiring corporation's alleged fraud to new subsidiary for purposes of in pari delicto defense asserted by acquiring corporation's officers, directors, and others to federal and state-law claims based on acquisition that were brought by trustee of litigation trust created in new subsidiary's Chapter 11 case.

**[26] Action 13** 🔑 0

13 Action
Generally, under "adverse interest exception" to in pari delicto doctrine, a wrongdoer's fraudulent acts will not be imputed to a corporation when the wrongdoer is acting contrary to the corporation's present interests.

**[27] Corporations 101** 🔑 0

101 Corporations
Subsidiary that was surviving entity in merger that netted it more than $900,000,000 benefited from alleged chicanery of its parent company at the time purported fraud was consummated, and thus could not rely on adverse interest exception to avoid imputation of that fraud, for purposes of in pari

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                           Page 4
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

delicto defenses raised to claims arising from merger, on grounds that subsidiary was indifferent to whether acquired corporation received fair value for its assets or whether parent company, as acquiring corporation, used skullduggery to effect acquisition.

**[28]** Action 13 🔑0

13 Action
Adverse interest exception to in pari delicto doctrine applies only to those whom the fraud has disadvantaged. Restatement (Second) of Agency § 282(1).

**[29]** Action 13 🔑0

13 Action
Adverse interest exception to in pari delicto doctrine turns on how the alleged wrongdoing affected the immediate interests of the party who seeks its shelter.

**[30]** Action 13 🔑0

13 Action
When deciding whether to recognize an in pari delicto defense, an inquiring court must consider whether the party alleging injury bears substantially equal or greater responsibility as the party or parties asserting the defense.

**[31]** Action 13 🔑0

13 Action
Allowing officers, directors, investment bankers, attorneys, auditors, and related entities of acquiring corporation to rely in pari delicto defense to federal securities claims that arose from merger and were asserted by trustee of litigation trust created in Chapter 11 case of entity that survived merger did not offend public policy, despite trustee's contentions that allowing defense would impermissibly permit participants in fraudulent scheme to shield themselves from liability, that withholding defense would discourage wrongdoers from future misconduct, and that acquired corporation's creditors would ultimately benefit from any recovery, given that, due to imputation, trustee was bringing claims on behalf of complicit party and creditors remained free to proceed against defendants in their own right.

Appeal from the United States District Court for the District of Massachusetts, Patti B. Saris, U.S. District Judge.

Max Folkenflik and Regina Griffin, with whom Folkenflik & McGerity, Brauner Baron Rosenzweig & Klein, Karen D. Hurvitz, and Law Offices of Karen D. Hurvitz were on brief, for appellant.
George A. Zimmerman, with whom Matthew J. Matule and Skadden, Arps, Slate, Meagher & Flom LLP were on brief, for appellee SG Cowen and Company, LLC.
Janet B. Fierman, with whom Thomas W. Evans, Robert M. Cohen, and Cohen & Fierman, LLP were on brief, for appellee Mercator Assurances, S.A.
Robert J. Kaler, with whom Eric Neyman and Gadsby Hannah LLP were on brief, for appellees Flanders Language Valley Fund et al.
Michael P. Carroll, with whom Michael S. Flynn, Sean C. Knowles, Phineas E. Leahey, Davis Polk & Wardwell, Kevin J. Lesinski, William J. Hanlon, Kristin G. McGurn, and Seyfarth Shaw LLP were on brief, for appellee KPMG LLP.
Thomas J. Gallitano, Conn, Kavanagh, Rosenthal Peisch & Ford LLP, John B. Missing, Ada Fernandez Johnson, and Debevoise & Plimpton LLP on brief for appellee GIMV, N.V.
Michael J. Stone, Peabody & Arnold LLP, George A. Salter, Nicholas W.C. Corson, and Hogan & Hartson LLP on brief for appellee Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren.
Robert P. Trout, John Thorpe Richards, Jr. and Trout Cacheris, PLLC on brief for appellee Lessius Management Consulting, N.V.
Andrew Good, Good & Cormier, Roger E. Zuckerman, Steven M. Salky, P. Andrew Torrez, and Zuckerman Spaeder LLP on brief for appellee Louis-H. Verbeke.

Before SELYA, LIPEZ and HOWARD, Circuit Judges.
SELYA, Circuit Judge.
**\*1** This appeal requires us to explore an arcane corner of the world of corporate finance. In the underlying series of events, a corporate shark, using fraudulent means, induced an allegedly innocent target corporation to enter into an ill-advised merger. After both the shark and the merged entity drowned in red ink, plaintiff-appellant Alan Nisselson (the trustee), appointed by the bankruptcy court to prosecute any causes of action that the merged entity might possess, attempted to mount various claims arising out of the innocent target's legal rights. Those rights, of course, were twice removed from the damages that formed the basis of the suit: they were passed along once to the surviving corporation (at the time of the merger) and again to the trustee (during the bankruptcy proceedings).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 5
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

Emphasizing this genealogy, the district court dismissed the action on two grounds; it determined that the trustee lacked standing to pursue the claims and that, in all events, the rascality of the shark was as a matter of law imputed to the surviving entity in the merger (and that, therefore, the hoary in pari delicto doctrine barred the suit). *See Nisselson v. Lernout,* No. 03-10843, 2004 U.S. Dist. LEXIS 28655, at *20-21 (D.Mass. Aug. 9, 2004). Concluding, as we do, that the second of these determinations withstands scrutiny-the trustee's claims are incurably tainted because they derive from the itself-complicit surviving corporation-we affirm the judgment below.

# I. BACKGROUND

We glean the pertinent facts from the amended complaint, supplementing those facts as needed by documents fairly incorporated therein and matters susceptible to judicial notice. *See Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 5 (1st Cir.2005); *In re Colonial Mortg. Bankers Corp.,* 324 F.3d 12, 15-16 (1st Cir.2003). While the scheme that lies at the center of this case comprises a complex tale of sophisticated financial chicanery, we rehearse here only those features essential to an understanding of the present proceeding. We urge the reader who thirsts for greater knowledge to consult the array of published opinions emanating from related litigation. *See, e.g., Baena v. KPMG LLP,* 453 F.3d 1 (1st Cir.2006); *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,* 361 F.3d 11 (1st Cir.2004); *Bamberg v. SG Cowen,* 236 F.Supp.2d 79 (D.Mass.2002); *Filler v. Lernout,* 230 F.Supp.2d 152 (D.Mass.2002); *In re Lernout & Hauspie Sec. Litig.,* 208 F.Supp.2d 74 (D.Mass.2002).

By the time the new millennium dawned, Dictaphone Corporation (Old Dictaphone), a company chartered under the laws of Delaware, had established itself as a force in the healthcare speech and language applications market. Lernout & Hauspie, N.V. (L & H), a Belgian corporation that ran its United States operations from headquarters in Massachusetts, was itself an international leader in various speech and language sectors. In hopes of swallowing up its competitor, L & H began courting Old Dictaphone; it described in glowing terms its financial stability and the profitable synergies that a merger could generate. Negotiations ensued.

*2 Not surprisingly, Old Dictaphone conducted extensive due diligence investigations into L & H's fiscal health. During the course of that review, L & H's senior officers, investment bankers, attorneys, and auditors touted its financial prowess. Against this rose-colored backdrop, Old Dictaphone agreed to a stock-for-stock merger. The parties memorialized the terms in a merger agreement dated March 7, 2000.

The merger took place less than two months thereafter: L & H acquired all the outstanding stock of Old Dictaphone in exchange for approximately 9,400,000 shares of L & H common stock. Based on the trading price of L & H stock at the time of the closing, the exchange corresponded to a merger price of roughly $930,000,000.

As part and parcel of the transaction, Old Dictaphone merged into Dark Acquisition Corp. (Dark), a wholly-owned subsidiary of L & H created under Delaware law for the express purpose of effectuating the merger. L & H's chief executive officer, defendant-appellee Gaston Bastiaens, doubled in brass as Dark's chief executive and lone director. He also signed the merger agreement on its behalf.

Under the terms of the merger agreement, Dark inherited Old Dictaphone's assets (including any existing legal claims) and assumed Old Dictaphone's liabilities. This arrangement corresponded to the dictates of Delaware law. *See Del.Code Ann. tit. 8, § 259(a).* Dark survived the merger and Old Dictaphone ceased to exist. Dark then changed its name to Dictaphone Corporation (New Dictaphone).

The honeymoon was brief. Shortly after the merger had been consummated, L & H announced that the financial picture it had painted and displayed was not an accurate portrayal. As matters turned out, nearly two-thirds of L & H's reported revenue from 1998 through mid-2000 had been improperly recorded, so that an apparent $70,000,000 net profit for that period was in fact a net loss of a similar magnitude. The price of L & H shares plummeted and, on November 29, 2000, L & H and New Dictaphone filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

We fast-forward to New Dictaphone's approved plan of reorganization. As part of that plan, the corporation conveyed its interest in any claims arising out of the merger to the Dictaphone Litigation Trust (the Trust). That assignment galvanized this suit: acting on behalf of the Trust, the trustee filed a civil action in federal district court seeking damages

--- F.3d ----                                                                                            Page 6
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

to compensate for the "loss or diminution of [Old Dictaphone's] value as a going concern."

The trustee's amended complaint characterizes the gross misstatements of earnings as the mainspring of a fraudulent scheme designed to inflate the value of L & H's stock. As the trustee envisions it, this scheme, which played out over a four-year period, was concocted and executed by the defendants in this case (who include the officers, directors, investment bankers, attorneys, and auditors of L & H, and divers entities related to them). The fallout from it rendered worthless the consideration that Old Dictaphone and its shareholders received (assumption of Old Dictaphone's debt and shares of L & H stock).

**\*3** In his amended complaint, the trustee asserts federal securities and racketeering claims, *see* [15 U.S.C. §§ 78j(b)](#), [78t(a)](#); [18 U.S .C. § 1962(c)](#); [17 C.F.R. § 240.10b-5](#), as well as supplemental state-law claims for fraud, unfair trade practices, negligent misrepresentation, and conspiracy. The theory underlying each and all of these initiatives is that L & H, through its senior management, knowingly engaged in a scheme to classify research and development expenditures as fictional revenue in order to inflate the value of the company's stock. Then, knowing that they were selling a lie, L & H's hierarchs flaunted the company's ever-increasing stock price and used its apocryphal earnings to persuade Old Dictaphone and its shareholders to enter into a stock-for-stock merger. L & H relied on its investment bankers, attorneys, accountants, and related entities to substantiate its false claims; those parties, the trustee contends, knew that L & H was spinning a yarn, yet assisted it in perpetrating the fraud.[FN1]

Various defendants, led by SG Cowen (an investment banking house), filed motions to dismiss. *See* [Fed.R.Civ.P. 12(b)(6)](#). All of these motions argued, in relevant part, that the trustee lacked standing and that his claims were barred under the in pari delicto doctrine. Some of the motions advanced additional grounds for dismissing particular claims. The trustee vigorously opposed the motions.

In due course, the district court granted Cowen's motion and dismissed the trustee's federal claims against Cowen with prejudice. *See Nisselson,* 2004 U.S. Dist. LEXIS 28655, at *20-21. The court rested its decision on two alternative grounds. First, it concluded that the in pari delicto doctrine barred the claims because the trustee had inherited them from New Dictaphone, an entity itself implicated in the

alleged fraud. *See id.* at *12-15. Second, interpreting and applying the Delaware standard for distinguishing direct and derivative claims, it concluded that the trustee lacked standing because the claims asserted belonged to Old Dictaphone's former shareholders, not to Old Dictaphone itself. *See id.* at *15-20 (discussing, inter alia, [Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del.2004)](#)). For the same reasons, the court, in a series of subsequent orders, granted the other appellees' motions to dismiss.[FN2] This timely appeal followed.

## II. ANALYSIS

[1] We review [Rule 12(b)(6)](#) dismissal orders de novo, assuming the truth of all well-pleaded facts contained in the operative version of the complaint and indulging all reasonable inferences in the plaintiff's favor. *See [McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir.2006)](#)*. Facts distilled in that fashion may be augmented by reference to (i) documents annexed to it or fairly incorporated into it, and (ii) matters susceptible to judicial notice. *See [Centro Medico del Turabo, 406 F.3d at 5](#); [Rodi v. S. New Engl. Sch. of Law, 389 F.3d 5, 12 (1st Cir.2004)](#)*. Where, as here, a district court rests its decision on alternative grounds, an appellate court need not explore both; if it determines that one such ground fully supports the order of dismissal, the court may end its deliberations at that point. *See [Feinstein v. Resolution Trust Corp., 942 F.2d 34, 41 n. 7 (1st Cir.1991)](#)*.

**\*4** [2] This case presents an idiosyncratic procedural feature. While most [Rule 12(b)(6)](#) motions are premised on a plaintiff's putative failure to state an actionable claim, such a motion may sometimes be premised on the inevitable success of an affirmative defense. *See, e.g., [In re Colonial Mortg. Bankers, 324 F.3d at 16](#); [Blackstone Realty v. FDIC, 244 F.3d 193, 197 (1st Cir.2001)](#); [Keene Lumber Co. v. Leventhal, 165 F.2d 815, 820 (1st Cir.1948)](#)*. Dismissing a case under [Rule 12(b)(6)](#) on the basis of an affirmative defense requires that "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." *[Rodi, 389 F.3d at 12](#)*.

### A. *Standing.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

Page 7

[3] The district court characterized both the in pari delicto doctrine and the absence of cognizable injury as evincing a lack of standing. See Nisselson, 2004 U.S. Dist. LEXIS 28655, at *12-13. Part of this characterization is inapt: the in pari delicto doctrine does not implicate a plaintiff's standing to sue but, rather, constitutes an affirmative defense. See *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards,* 437 F.3d 1145, 1149-50 (11th Cir.2006); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 157 (2d Cir.2003); *see also Baena,* 453 F.3d at 6 (noting that the doctrine is, on occasion, "dubiously" referred to as implicating standing).

[4][5][6] This does not mean, however, that we must grapple with the district court's alternative "distinct injury" holding first. Even though challenges to a plaintiff's standing are often considered threshold issues in federal cases, see, e.g., *Pagán v. Calderón,* 448 F.3d 16, 26 (1st Cir.2006); *Eulitt v. Me. Dep't of Educ.,* 386 F.3d 344, 351 (1st Cir.2004), such challenges must be addressed first only if they call into question a federal court's Article III power to hear the case. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The constitutional prerequisites for Article III standing are satisfied so long as a plaintiff colorably alleges an actual injury that is both traceable to the defendant's conduct and redressable by a favorable decision. See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-62, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Ramírez v. Sánchez *Ramos,* 438 F.3d 92, 97 (1st Cir.2006).

[7] In this case, those prerequisites have been fulfilled. For purposes of their motions to dismiss, the defendants wisely choose not to contest the trustee's assertion that the conduct attributed to them resulted in a redressable injury; instead, they posit that the trustee is seeking to prosecute claims that, although cognizable in a federal court, belong exclusively to Old Dictaphone's former shareholders. The determination of who may maintain an otherwise cognizable claim turns on a question of prudential standing, not one of Article III standing. *See Baena,* 453 F.3d at 5; *see also Ramírez,* 438 F.3d at 98.

*5 [8] That frees our hands: *Steel Co.'s* ban on hypothetical jurisdiction extends only to issues involving Article III jurisdiction and, hence, Article III standing. There is no counterpart rule that demands the resolution of objections based on prudential concerns before other issues can be adjudicated. *See Baena,* 453 F.3d at 5; *McBee v.*

*Delica Co.,* 417 F.3d 107, 127 (1st Cir.2005).

[9] Mandatory rules aside, courts should not rush to rely on hypothetical jurisdiction. *See Berner v. Delahanty,* 129 F.3d 20, 23 (1st Cir.1997). Nevertheless, one situation in which hypothetical jurisdiction, if otherwise proper, may be invoked is when doing so would avoid the need to sort out thorny jurisdictional tangles. *See, e.g., McBee,* 417 F.3d at 127; *Parella v. Ret. Bd. of R.I. Employees' Ret. Sys.,* 173 F.3d 46, 56 (1st Cir.1999). As we explain briefly, just such a tangle exists here.

Although the decision in *Tooley* may have helped to clarify the often elusive distinction between direct and derivative claims, that distinction remains tenebrous. *See* Richard Montgomery Donaldson, *Mapping Delaware's Elusive Divide: Clarification and Further Movement Toward a Merits-Based Analysis for Distinguishing Derivative and Direct Claims in Agostino v. Hick and Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 30 Del. J. Corp. L. 389, 404 (2005) (listing the "determination of who suffered the harm-the corporation or the shareholder(s)" as one of the potentially confusing issues left open under *Tooley* ). More to the point, it is not immediately apparent how the Delaware court's newly announced two-part test, 845 A.2d at 1033, should apply to the unique facts of this stock-for-stock merger. Because the record reflects a clear and sufficient basis apart from standing for affirming the district court's judgment, we bypass these uncharted waters.

### B. The In Pari Delicto Doctrine.

[10] In pari delicto is both an affirmative defense and an equitable defense. Broadly speaking, the defense prohibits plaintiffs from recovering damages resulting from their own wrongdoing. *See Terlecky v. Hurd (In re Dublin Sec.),* 133 F.3d 377, 380 (6th Cir.1997). The label derives from the Latin phrase *in pari delicto potior est conditio possidentis,* which admonishes that "[i]n a case of equal or mutual fault ... the condition of the [defending party] is the better one." Black's Law Dictionary 791 (6th ed.1990).

The doctrine is grounded on twin premises. The first is that "courts should not lend their good offices to mediating disputes among wrongdoers." *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). The second is that "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[11] The in pari delicto defense has long been woven into the fabric of federal law. *See id.* at 307 (discussing the doctrine's historical development); *see also Fleming v. Lind-Waldock & Co.,* 922 F.2d 20, 28 (1st Cir.1990); *Duncan v. Me. Cent. R. Co.,* 113 F. 508, 509 (C.C.D.Me.1902). It does not make a difference that some of the trustee's claims are premised on state law. Those claims invoke the law of Massachusetts-and the Massachusetts courts, like the federal courts, have warmly embraced the in pari delicto defense. *See, e.g., Council v. Cohen,* 303 Mass. 348, 21 N.E.2d 967, 970 (Mass.1939); *Choquette v. Isacoff,* 65 Mass.App.Ct. 1, 836 N.E.2d 329, 332 (Mass.App.Ct.2005).

*6 [12] As originally conceived, the in pari delicto doctrine forged a defense of limited utility. Over time, however, courts expanded the doctrine's sweep, deploying it as a basis for dismissing suits whenever a plaintiff had played any role-no matter how modest-in the harm-producing activity. *See Bateman Eichler,* 472 U.S. at 307. Deploring this overly commodious construction, the Supreme Court later reined in the doctrine and returned it to its classic contours. *See Pinter v. Dahl,* 486 U.S. 622, 635, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *Bateman Eichler,* 472 U.S. at 310-11. This retrenchment, which governs here, restricts the application of the in pari delicto doctrine to those situations in which (i) the plaintiff, as compared to the defendant, bears at least substantially equal responsibility for the wrong he seeks to redress and (ii) preclusion of the suit would not interfere with the purposes of the underlying law or otherwise contravene the public interest. *See Bateman Eichler,* 472 U.S. at 311 (discussing the doctrine's application to federal securities laws); *see also Edwards,* 437 F.3d at 1154. Recent Massachusetts case law mirrors these refinements. *See, e.g., Choquette,* 836 N.E.2d at 332-33.

While the application of this binary paradigm may vary slightly depending on the nature of the particular claim asserted, courts nonetheless speak of a single doctrine. This is because the analysis ordinarily will be the same across a spectrum of different causes of action. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 345-46 (3d Cir.2001); *see also Coopers & Lybrand,* 322 F.3d at 160.

[13] The court below adopted this one-size-fits-all approach in addressing the in pari delicto defense; it neither distinguished among the various counts nor

differentiated between federal and state law. The trustee has not objected to this approach, so he has waived any argument either that a claim-by-claim analysis is obligatory or that some material differences exist between applicable federal and state law. *See Domegan v. Fair,* 859 F.2d 1059, 1065 (1st Cir.1988) ("It is too familiar to warrant string citation that we will not consider arguments which could have been, but were not, advanced below."). Consequently, we employ the same generic strain of the in pari delicto doctrine throughout our review.

### C. *Establishing the Appropriate Benchmark.*

[14] To apply the requisite two-part paradigm in the circumstances of this case, we must answer a threshold question: Who, exactly, are the proper parties for the purpose of determining relative blame? The trustee's answer to this query is straightforward. Because his claims originate with Old Dictaphone, he asseverates that this indisputably innocent party is the relevant entity for purposes of the comparison required by the binary in pari delicto test. Since Old Dictaphone was the victim rather than a perpetrator of the alleged fraud, the trustee's thesis runs, it bears less responsibility than any of the defendants and, therefore, the defendants fail to satisfy the first precondition for use of the in pari delicto defense. On that basis, the trustee claims an entitlement to recover for the injury that Old Dictaphone suffered when it was duped into proceeding with the merger.

*7 We assume, for argument's sake, that Old Dictaphone would have been a proper party to sue for the asserted injury. *See supra* Part II(A). Even so, the trustee's reasoning is flawed; his analysis entirely overlooks that, pursuant to both the merger agreement and the governing law, *see Del.Code Ann. tit. 8, § 259(a),* upon the consummation of the merger Old Dictaphone vanished into thin air and New Dictaphone inherited all of Old Dictaphone's choses in action. Under the approved plan of reorganization incident to New Dictaphone's bankruptcy, those litigation rights were passed along once more-this time to the Trust (and, thus, to the trustee). *See* 11 U.S.C. § 541(a)(1). Because the lineage of the trustee's claims passes directly through New Dictaphone, any right that the trustee may have to assert those claims derives directly from New Dictaphone. This chain of descent means that the trustee-despite his protestations to the contrary-is not acting in the place and stead of Old Dictaphone but, rather, in the place and stead of New Dictaphone.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                   Page 9
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

[15][16] This genealogy is important. Giving effect to it, the trustee may assert only those claims that New Dictaphone could have asserted prior to seeking the protection of the bankruptcy court. *See Mediators, Inc. v. Manney (In re Mediators, Inc.),* 105 F.3d 822, 826 (2d Cir.1997); *see also* 11 U.S.C. § 541. After all, a trustee in bankruptcy cannot and does not acquire rights or interests superior to, or greater than, those possessed by the debtor. *See Edwards,* 437 F.3d at 1150; 5 Collier on Bankruptcy § 541.04 (15th ed.2006) (noting that "nothing in section 541 [of the Bankruptcy Code, defining property of the estate] can revest a debtor with property lost prepetition" and describing property of the estate as including "causes of action").

[17] Given the line of descent delineated by operation of the corporation and bankruptcy laws, we think that the in pari delicto defense must be available to a defendant in an action by a bankruptcy trustee whenever that defense would have been available in an action by the debtor. *See Edwards,* 437 F.3d at 1152; *see also Baena,* 453 F.3d at 7 (assessing the debtor's culpability to determine whether the in pari delicto doctrine barred a bankruptcy trustee's claims). As a necessary corollary of that proposition, there is no "innocent successor" exception available to a bankruptcy trustee in a case in which the defendant successfully could have mounted an in pari delicto defense against the debtor. *See R.F. Lafferty,* 267 F.3d at 356-57.

The explication of these principles suffices to answer the threshold question here. Consistent with both precedent and analytic rigor, we hold that New Dictaphone is the relevant comparator vis-á-vis the defendants for the purpose of determining the viability of the latter's in pari delicto defense. Old Dictaphone's innocence is irrelevant to that inquiry.

### D. *Applying the Paradigm.*

**\*8** Having determined that New Dictaphone is the entity of interest for purposes of the required comparison, we move to the question of what actions can, at this stage of the proceedings, be imputed to it (and, thus, to the trustee). *See Baena,* 453 F.3d at 7. In an effort to mount a preemptive strike, the trustee posits that because all imputation inquiries entail fact-specific determinations, an in pari delicto defense that relies on imputed conduct cannot be adjudicated on a motion to dismiss. Although the trustee's premise is partially correct-the extent to which fraudulent conduct can be implied depends

heavily on the specific facts of a given case-he casts the net too wide.

[18] The reporters are replete with examples of fact-dominated questions, normally grist for the jury's mill, that may appropriately be resolved by a motion filed pursuant to Rule 12(b)(6). *See, e.g., Epstein v. C.R. Bard, Inc.,* 460 F.3d 183, 188 (1st Cir.2006); *Rodi,* 389 F.3d at 16. The key is whether the factual scenario, as pleaded, is clear enough to permit peremptory resolution of the dispositive issue. *See Rodi,* 389 F.3d at 16 (explaining that when the facts alleged in the complaint preclude a finding in the plaintiff's favor on a particular claim or defense, "a court may enter an order of dismissal under Rule 12(b)(6)"). When a case hinges on imputation and the pleaded facts, construed in the light most flattering to the resisting party, dictate imputation, a court is free to decide that question on a motion to dismiss. *See, e.g., Baena,* 453 F.3d at 8 (affirming dismissal on in pari delicto grounds after imputing fraudulent conduct to debtor corporation); *Coopers & Lybrand,* 322 F.3d at 164; (noting that the court historically "has affirmed the dismissal of ... claims on the pleadings upon findings that in pari delicto had been established in the complaints"); *Terlecky,* 133 F.3d at 380 (affirming dismissal when the debtor "admit[ted] in his complaint that the debtor's own actions were instrumental in perpetrating the fraud").

[19] We look to state law to ascertain when wrongful conduct should be imputed to a corporation. *See O'Melveny & Myers v. FDIC,* 512 U.S. 79, 84, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nickless (In re Advanced RISC Corp.),* 324 B.R. 10, 14 (D.Mass.2005).[FN3] Here, the case law leaves little doubt that Massachusetts law governs the imputation calculus. *See O'Melveny & Myers,* 512 U.S. at 83-85 (emphasizing the importance of the substantive law of the state in which the causes of action arose, rather than the law of the state of incorporation, to determine imputation).

[20][21][22][23] Under Massachusetts law, a parent and its wholly-owned subsidiary are generally regarded as separate and distinct entities. *See United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1091 (1st Cir.1992); *Berger v. H.P. Hood, Inc.,* 416 Mass. 652, 624 N.E.2d 947, 950 (Mass.1993). Courts may, however, disregard the corporate form when doing so will defeat a fraud practiced by those who control the subsidiary corporation. *See My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                          Page 10
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

748, 751 (Mass.1968). Relatedly, the fraudulent conduct of persons or entities who exercise complete control over a corporation may be imputed to the corporation when those actors have used the corporation as a vehicle for facilitation of the fraud. *See, e.g., Consove v. Cohen* (*In re Roco Corp.*), 701 F.2d 978, 984 (1st Cir.1983) (applying Massachusetts law and imputing fraudulent conduct of individual who, "as the company's president, director, and sole shareholder, ... was in a position to control the disposition of its property"); *Merrill Lynch,* 324 B.R. at 14-15 (applying Massachusetts law and imputing principals' fraudulent conduct to debtor corporation where the relationship was "one of complete control"); *Demoulas v. Demoulas,* 428 Mass. 555, 703 N.E.2d 1149, 1171 (Mass.1998) (applying Massachusetts law and denying bona fide purchaser status to a corporation, under an imputation theory, when the "sole voting trustee of 100 percent of the [corporation's] stock" had actual knowledge of adverse claims against the purchased property).

**\*9** With this backdrop in place, the trustee's remaining arguments against imputing L & H's fraudulent conduct to its wholly-owned subsidiary lack force. The trustee himself has observed that in pari delicto cases often result in imputation of fraudulent conduct to a corporation when those responsible for the scheme are "the sole decision-maker[s] for such entity, exercising complete control over its management." Appellant's Br. at 43 n. 21. This observation accurately reflects the case law. *See, e.g., Coopers & Lybrand,* 322 F.3d at 164-65 (imputing fraudulent conduct to debtor when complaint established that its controlling shareholders "dominat[ed] and controll[ed] the corporation" and were responsible for "orchestrat[ing] the fraudulent conduct"); *R.F. Lafferty,* 267 F.3d at 359-60 (imputing fraudulent conduct to debtor corporation and dismissing trustee's case on in pari delicto grounds where the individuals masterminding the fraud were the debtor's sole shareholders); *Merrill Lynch,* 324 B.R. at 14-16 (dismissing trustee's action on in pari delicto grounds when debtor corporation was formed by the defrauders for the express purpose of carrying out the fraudulent plan). Since New Dictaphone, not Old Dictaphone, is the proper focal point of our imputation inquiry, *see supra* Part II(C), this case fits snugly within that integument. We explain briefly.

Here, the amended complaint leaves no doubt but that L & H played the primary role in contriving the scheme to acquire Old Dictaphone under false pretenses. The amended complaint also establishes

that L & H created New Dictaphone (née Dark) for the express purpose of furthering this artifice. L & H's control over New Dictaphone during the course of the scheme is indisputable. In addition to owning all of New Dictaphone's stock, L & H installed its president, Bastiaens, as New Dictaphone's chief executive officer and sole director. Bastiaens, in turn, ensured New Dictaphone's complicity in the fraud's climactic event when he executed the merger agreement on its behalf.

These uncontroverted facts are telling. Because the amended complaint shows beyond hope of contradiction that L & H created and controlled New Dictaphone in order to perpetrate the harm-producing fraud, we have no principled choice but to impute its conduct to New Dictaphone for the purpose of applying the in pari delicto paradigm. *See Merrill Lynch,* 324 B.R. at 15; *Demoulas,* 703 N.E.2d at 1172; *My Bread Baking,* 233 N.E.2d at 751.

[24] The trustee tries to find sanctuary by pointing out that, *after* the merger, the directors of Old Dictaphone (presumably innocent) became directors of New Dictaphone. This datum does not alter our conclusion. The first prong of the in pari delicto inquiry focuses on "the unlawful activity that is the subject of the suit." *Pinter,* 486 U.S. at 636. Accordingly, a party's culpability vel non must be based on its status at the time the alleged illegality occurred. *See Baena,* 453 F.3d at 10 (finding no Massachusetts case law supporting a theory that in pari delicto is in any way modified when "prior management was at fault but the claim [is] asserted on behalf of creditors or shareholders").

**\*10** Here, of course, the fraud that underpins the trustee's claims was complete at the moment the companies merged. Therefore, any post-merger changes in New Dictaphone's corporate governance or management are beside the point. Simply put, bankruptcy trustees do not have access to an "innocent successor" exception as a way of shielding themselves from the operation of an in pari delicto defense. *See R.F. Lafferty,* 267 F.3d at 356-57; *see also Baena,* 453 F.3d at 10.

[25][26] The trustee's next attempt to elude the toils of the in pari delicto doctrine involves the well-recognized adverse interest exception. Generally, a wrongdoer's fraudulent acts will not be imputed to a corporation when the wrongdoer is acting contrary to the corporation's present interests. *See, e.g., Baena,* 453 F.3d at 8 (listing looting as a "classic example" of adverse conduct); *Sunrise Props., Inc. v. Bacon,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 11
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

*Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald,*
*P.C., 425 Mass. 63, 679 N.E.2d 540, 543*
*(Mass.1997)* (concluding that "unauthorized acts
[should] not [be] imputed to the principal when the
agent has acted fraudulently toward the principal").
Endeavoring to squeeze within these narrow
confines, the trustee contends that L & H's scurrilous
conduct is tantamount to looting because L & H
convinced Old Dictaphone to surrender its assets for
worthless paper.

This contention is ill-conceived, for the trustee's
sights are trained on the wrong entity. Accepting the
allegations of the amended complaint as true, L & H's
actions were adverse to Old Dictaphone and its
shareholders-but they were not adverse to New
Dictaphone (a corporate shell which, in effect, was in
league with the defrauder and as a result received
something for nothing). Since we already have
determined that New Dictaphone, not Old
Dictaphone, is the focal point of the imputation
inquiry, *see supra* Part II(C), the adverse interest
exception does not apply.

[27][28][29] The trustee has yet another string to his
bow. He argues that even if New Dictaphone is the
proper focal point of an in pari delicto analysis, the
adverse interest exception precludes us from
imputing L & H's fraud to its subsidiary because New
Dictaphone was "entirely indifferent" about whether
Old Dictaphone received fair value for its assets or
whether L & H used skulduggery to effect the
acquisition. Appellant's Reply Br. at 19. We find this
argument unpersuasive. In our view, mere
indifference is insufficient to show adversity. The
adverse interest exception applies only to those
whom the fraud has disadvantaged. *See* Restatement
(Second) of Agency § 282(1) (explaining that the
exception attaches only when an agent secretly acts
*adversely* to his principal). In this instance, the
allegations of the amended complaint make manifest
that New Dictaphone *benefitted* from the fraud: it
was the surviving entity in a merger that netted it
over $900,000,000. New Dictaphone, as a beneficiary
of L & H's chicanery at the time the fraud was
consummated,[FN4] cannot rely on the adverse interest
exception to avoid imputation. After all, a party
cannot accept the avails of fraudulent conduct
without also bearing responsibility for that conduct.
*See Tremont Trust Co. v. Noyes, 246 Mass. 197, 141*
*N.E. 93, 98 (Mass.1923).*

**\*11** [30] To summarize succinctly, L & H was the
main player in the alleged fraud and its parlous
behavior must be imputed lock, stock, and barrel to

its offspring (New Dictaphone). It follows inexorably
that New Dictaphone, in contemplation of law, bears
at least as much responsibility for the asserted
wrongdoing as any of the defendants.[FN5] Hence, the
moving defendants have satisfied the first
requirement for establishing an in pari delicto
defense.

[31] We move next to the second requirement. As
said, this prong implicates public policy concerns.
The trustee contends that allowing the defendants to
hide behind the in pari delicto doctrine would
frustrate the purpose of the securities laws because it
would allow participants in a fraudulent scheme to
shield themselves from liability. This contention is
wide of the mark.

As we have pointed out, the trustee is not bringing
claims on behalf of an innocent target of the fraud
but, rather, on behalf of a complicit party. Viewed in
that light, the trustee's policy concerns ring
hollow.[FN6] *See Edwards, 437 F.3d at 1155* (finding
public policy exception inapplicable in analogous
circumstances).

The trustee also asserts that withholding application
of the in pari delicto doctrine would promote the goal
of "discourag[ing] wrongdoers from engaging in
future fraudulent schemes and violations of the
securities laws." Appellant's Br. at 38. That
resupinate reasoning turns reality on its head. To
permit the trustee to proceed in these circumstances
would be equivalent to giving New Dictaphone a
second bite at the cherry, allowing it first to reap the
benefits of the fraud and then to attack the
defrauders. The securities laws were enacted to
protect investors from deceptive practices, *see Pinter,*
*486 U.S. at 638,* not to give the intended beneficiaries
of deceptive practices a back-door means of ensuring
a profit.

Finally, the trustee strives to persuade us that we
should repel the defendants' in pari delicto defense
because, in the absence of that defense, the creditors
of Old Dictaphone ultimately would receive the fruits
of any recovery. We find this argument
unconvincing; despite the interposition of the in pari
delicto defense, the creditors remain free to proceed
in their own right, untainted by New Dictaphone's
role in the alleged wrongdoing. *See Edwards, 437*
*F.3d at 1151; Terlecky, 133 F.3d at 380; Merrill*
*Lynch, 324 B.R. at 16.*

This arrangement is especially preferable because the
Trust beneficiaries may well include parties (most

--- F.3d ----                                                                                   Page 12
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

notably L & H) who were themselves complicit in the underlying fraud. If we were to suspend the operation of the in pari delicto defense in this case, creditors with unclean hands would profit equally with innocents. If, however, each creditor must proceed by individual suit, the righteous may recover while the tainted, unable to circumvent the in pari delicto bar, will be hoist by their own petard.

At oral argument, the trustee insisted that the alternative of direct suits by creditors is illusory because creditors lack contractual privity with the investment bankers, lawyers, and accountants who comprise the trustee's targets. Thus, the argument runs, if we afford these targets the safe haven of an in pari delicto doctrine, creditors will be completely foreclosed from accessing those pockets that are deep enough to compensate them at anything higher than pennies on the dollar.

**\*12** This jeremiad is unavailing. Even assuming that the trustee's premise is true-and we have some doubt about its validity-the equities are not nearly so clear-cut. First, the creditors (or the trustee, on their behalf) may well succeed in suits against Old Dictaphone's former directors, controlling shareholder, and outside accounting professionals. See *supra* note 1. Second-and more important-our holding today breaks no new ground. As such, the potential for default under these circumstances is something about which creditors had notice-something that should have been priced into their decisions to extend credit. Equity does not require courts to provide a belt when creditors had fair warning that they ought to have purchased suspenders.

### III. CONCLUSION

To summarize, we conclude that uncontroverted facts sufficient to establish the in pari delicto defense are definitively ascertainable from the amended complaint and other allowable sources of information. These include L & H's creation of New Dictaphone for the express purpose of effectuating the fraud-inspired merger and its exercise of complete control over New Dictaphone until the fraud was consummated. In these circumstances, L & H's conduct must be imputed to New Dictaphone. Consequently, New Dictaphone shares the culpability of the fraud's progenitor and, as such, bears as much or more responsibility for the wrongdoing as any of the named defendants. In the absence of any compelling public policy reason to allow New Dictaphone to seek damages from those that assisted

in executing the fraudulent scheme-and the trustee has identified none-the in pari delicto doctrine precludes New Dictaphone (and, hence, the trustee) from advancing the type of claims that are at issue here.

We need go no further. For the reasons elucidated above, we hold that the district court did not err in dismissing the trustee's amended complaint.

***Affirmed.***

> FN1. This suit comprised one of many filed in the wake of L & H's revenue restatement. In one such related action, Stonington Partners, Inc., which had owned ninety-six percent of Old Dictaphone prior to the merger, sued for damages allegedly incurred when it traded its once-valuable interest for what ended up being worthless paper.
> For his part, the trustee has brought separate actions for breach of fiduciary duty against Old Dictaphone's former directors and controlling shareholders and for breach of contract and negligence against the accountants and investment bankers who counseled Old Dictaphone during the merger negotiations.

> FN2. The lower court did not reach any of the additional arguments proffered by the defendants, nor do we.

> FN3. To the extent that the trustee's claims are premised on federal statutes, we arguably have discretion to use federal common law, as opposed to state law. *See O'Melveny & Myers, 512 U.S. at 84* (explaining that where a particular cause of action arises under a federal statute, a federal court, for this purpose, writes on a pristine page). Even so, license to apply a uniquely federal test is not tantamount to mandating such a test. Mindful that two of our sister circuits recently have opted for state-law tests of imputation in connection with federal claims, *see Edwards, 437 F.3d at 1149; R.F. Lafferty, 267 F.3d at 358,* and that no party to this litigation has requested us to fashion federal common law, we use Massachusetts jurisprudence as the yardstick for measuring imputation across the board.

> FN4. Because the adverse interest exception

--- F.3d ----
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))
**(Cite as: --- F.3d ----)**

Page 13

turns on how the alleged wrongdoing affected the immediate interests of the party who seeks its shelter, New Dictaphone's subsequent implosion is of no moment. *See Baena,* 453 F.3d at 7; *accord Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernst & Young, L.L.P.,* 144 F.3d 732, 736 (11th Cir.1998) (applying Florida law); *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 456 (7th Cir.1982) (applying Illinois law).

FN5. As a fallback, the trustee suggests that the relevant comparison entails matching New Dictaphone's culpability against the culpability of L & H. That suggestion is faulty. When deciding whether to recognize an in pari delicto defense, an inquiring court must consider whether the party alleging injury (here, the trustee, who stands in the shoes of New Dictaphone) bears substantially equal (or greater) responsibility as the party or parties asserting the defense (here, the defendants). *See Bateman Eichler,* 472 U.S. at 306 (emphasizing the relative culpability of the "[defending] party" as compared to the plaintiff (alteration in original)). L & H is not a defendant in this action.

FN6. In all events, dismissing the claims at issue here will not allow the defendants to escape unscathed. The amended complaint and matters susceptible to judicial notice reveal that many of the defendants are facing or have faced not only criminal charges but also a myriad of other civil suits relating to their respective roles in the alleged fraud.

C.A.1 (Mass.),2006.
Nisselson v. Lernout
--- F.3d ----, 2006 WL 3216998 (C.A.1 (Mass.))

Briefs and Other Related Documents (Back to top)

• 05-1774 (Docket) (May 31, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- B.R. ----                                                                    Page 1
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

In re Radnor Holdings
Corp.Bkrtcy.D.Del.,2006.Only the Westlaw citation
is currently available.
United States Bankruptcy Court,D. Delaware.
In re RADNOR HOLDINGS CORPORATION, et
al., Debtors.
The Official Committee of Unsecured Creditors of
Radnor Holdings Corporation, et al., Plaintiffs,
v.
Tennenbaum Capital Partners, LLC; Special Value
Expansion Fund, LLC; Special Value Opportunities
Fund, LLC; and José E. Feliciano, Defendants.
**Bankruptcy No. 06-10894 PJW.**
**Adversary No. 06-50909.**

Nov. 17, 2006.

Gregg M. Galardi, Mark L. Desgrosseilliers,
Matthew P. Ward, Sarah E. Pierce, Skadden Arps
Slate Meagher & Flom LLP, Wilmington, DE, for
Debtors.
Donald J. Detweiler, Victoria Watson Counihan,
Greenberg Traurig, LLP, Joseph H. Huston Jr.,
Thomas G. Whalen Jr., Stevens & Lee, Wilmington,
DE, Nancy A. Peterman, Greenberg Traurig, LLP,
Chicago, IL, for Plaintiffs.
Gregory A. Bray, Kenneth A. Ostrow, Fred Neufeld,
Milbank, Tweed, Hadley & McCloy, LLP, Los
Angeles, CA, Mark D. Collins, Paul N. Heath,
Russell C. Silberglied, Richards, Layton & Finger,
Wilmington, DE, for Defendants.

AMENDED
PETER J. WALSH, Bankruptcy Judge.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW [FN1]

**\*1** On August 21, 2006 (the "Petition Date"), Radnor
Holding Corp. and its affiliated chapter 11 debtors
("Debtors" or "Radnor") commenced the above-
captioned chapter 11 cases. On September 22, 2006,
the Court entered its "Final Order (1) Authorizing
Debtors (A) to Obtain Postpetition Financing ..." (the
"DIP Financing Order"). Also on Sept. 22, 2006, the
Court entered its "Order ... (I) Establishing Bid
Procedures Relating to Sale of Debtors' Assets ..."
(the "Bid Procedures Order"). On October 30, 2006,
the Court entered its "Order Granting Official

Committee ... Standing" (the "Standing Order").

Pursuant to the DIP Financing Order and the
Standing Order, the Court authorized the Official
Committee of Unsecured Creditors ("Plaintiff" or the
"Committee") to file a Complaint against
Tennenbaum Capital Partners, LLC, Special Value
Opportunities Fund, LLC, Special Value Expansion
Fund, LLC (collectively, "Tennenbaum" or "TCP"),
and José E. Feliciano (collectively with TCP,
"Defendants"). Pursuant to the Bid Procedures Order
(at ¶ 8), the Court ordered that the trial on the merits
of the Complaint would include a determination on
the allowance of the $128.8 million proof of claim
filed by the Defendants. Also pursuant to the Bid
Procedures Order (at ¶ 9), the Court ordered that the
Defendants would be authorized to credit bid any
allowed claim that survived adjudication of the
Complaint.

On October 31, 20006, Plaintiffs filed the Complaint.
By the time that trial commenced, the parties had
engaged in nearly two months of extensive pre-trial
discovery. The Court conducted eight full days of
trial between November 2 and November 14, 2006,
heard testimony from fourteen witnesses and
admitted more than 350 documents into evidence.
Based upon evidence presented at trial, the Court
hereby makes the following Findings of Facts and
Conclusions of Law. Based upon these Findings of
Fact and Conclusions of Law, and in accordance with
the requirements of Federal Rule of Bankruptcy
Procedure 9021, the Court has separately entered
judgment in favor of Defendants on all counts,
allowing Defendants' claim in the amount of
$128,835,557.26, and authorizing the holder of such
allowed claim to credit bid the allowed claim at any
sale of property of the Debtors that is subject to a lien
securing such allowed claim.

The findings and conclusions set forth herein
constitute the Court's findings of fact and conclusions
of law pursuant to Federal Rule of Bankruptcy
Procedure 7052. To the extent any of the following
findings of fact are determined to be conclusions of
law, they are adopted, and shall be construed and
deemed, conclusions of law. To the extent any of the
following conclusions of law are determined to be
findings of fact, they are adopted, and shall be
construed and deemed, as findings of fact.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                    Page 2
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

The Court has jurisdiction to hear and determine the causes of action and requests for relief contained in the Complaint pursuant to 28 U.S.C. § § 157(b)(1) and 1334(b). Venue of the adversary proceeding in this district is proper under 28 U.S.C. § § 1408 and 1409. Defendants have consented to the entry of final orders and judgments by this Court on all non-core proceedings pursuant to Fed. R. Bankr.Proc. 7012(b).


## FINDINGS OF FACT

*2 1. In the late summer of 2005, Tennenbaum partner Jose Feliciano learned from his partner Steven Chang that Radnor was looking for financing through its placement agent, Lehman Brothers. (Tr. 17:9-15; 18:3-6).

2. Lehman Brothers advised Radnor that a transaction to raise a combination of debt and equity capital was in Radnor's best interests. Radnor was seeking approximately $50 million in new debt and equity capital ($30 million of senior secured debt plus $20 million of convertible preferred stock) to fund an expansion of its growing polypropylene cup business and related working capital. (Tr. 351:3-7; 736:1-4; 876:14-24; 877:1-22; 950:3-12; 953:1-23). Radnor also contemplated a later IPO. According to Michael Kennedy, Radnor's CEO and majority shareholder, in a June 2005 e-mail to a Radnor board member and Radnor's in-house counsel, "we plan to follow this capital raise with the IPO, but if delayed to 2006 for any reason we should have plenty of liquidity." (JX 23). TCP was fully aware of Radnor's IPO intent prior to its first transaction in October, 2005. (JX 40). The Lehman plan to have an infusion of $30 million of debt and $20 million of equity contemplated that the $30 million of debt would be secured by collateral which was already the subject to a lien by a $70 million lender. The $30 million new senior secured debt would be secured pari passu with the existing $70 million obligation. However, Radnor would have to obtain the consent of the $70 million lender for the sharing of such collateral.

3. Lehman Brothers canvassed the market through a Private Placement Memorandum and contacted 40 potential investors. (Tr. 17:9-24; 33:6-34:22; 232:19-233:22; 1165:15-1166:6; JX 311). Lehman determined that the best strategy was a part debt, part equity transaction. (Tr. 1211:2-24).

4. Mr. Finigan, a member of the Board of Directors of Radnor, testified that management considered a range of options (Tr. 1175:1-22), and believed that

liquidation would have provided less value than operating the Company. (Tr. 1176:2-15; *cf.* Tr. 707:6-22).

5. TCP was chosen among the 40 entities solicited by Lehman because it was willing to move the most quickly. (Tr. 1756:19-1757:5).

6. The Company's projections showed that it expected to earn $48 million in EBITDA in 2005 and $81 million in EBITDA in 2006. (Tr. 21:24-22:3; 23:20-23; JX 311). Mr. Feliciano believed that an investment in Radnor was worth further consideration due in part to its potential for sustained growth. (Tr. 200:17-20).

7. Throughout the late summer and early fall of 2005, TCP engaged in extensive financial, business and legal due diligence. (Tr. 320:7-23; 523:12-524:20; 834-35; 838:16-839:8; 842:22-843:11; 987:8-988:17). Among other things, it met with Radnor personnel, customers and suppliers to gain a better understanding of the nature of Radnor's businesses and visited Radnor's operating facilities. TCP also assessed the Company's historical performance to help evaluate whether the Company's optimistic forecasts were justified. In mid-September 2005, TCP retained FTI Consulting, Inc. ("FTI") to perform accounting due diligence of Radnor's historical financial data. (Tr. 990:11-19; 991:2-10; 1088:6-1090:16; JX 58). FTI submitted to TCP its Financial and Accounting Due Diligence Report on October 10, 2005. (JX 58).

*3 8. Tennenbaum had no reason to doubt the financial information that was provided by Radnor management. (Tr. 1092:11-24). Indeed, while the FTI report disagreed with certain accounting adjustments made by Radnor, the types of accounting adjustments reflected in the FTI report were not in any way unusual or extraordinary. (Tr. 1091:6-13; 1091:23-1092:10).

9. Radnor exceeded forecasts in 2001 and met forecasts in 2002. As of October 27, 2005, the only full years it had missed forecasts were 2003 and 2004, the very year the company acquired Polar Plastics, a new line of business for the company, and the next year. Moreover, the Court credits the testimony of Mr. Palm of Lehman Brothers that as of October 2005, the Company's projections were well thought out "bottoms up" projections and that each assumption was supportable, even if in the aggregate the projections were optimistic. (Tr. 1748:9-1749:1).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10. In early October 2005, Mr. Feliciano and his colleagues provided to the TCP's Investment Committee a detailed update on TCP's due diligence efforts and gave the Investment Committee the opportunity to consider both the benefits and the risks of making an investment in Radnor. (Tr. 60:21-61:7; 197:18-24; JX 55). Mr. Feliciano also presented to the Investment Committee TCP's internal projections for 2006 EBITDA. Although Mr. Feliciano was hopeful that Radnor would reach its projection of $81 million in 2006 EBITDA, he prepared conservative internal projections that considered a "downside" scenario (of $61 million EBITDA) should the Company not perform as expected. (Tr. 61:12-18; 198:4-21). The preparation of conservative downside projections is customary for TCP and for many other investment firms. It does not indicate that TCP expected EBITDA to be at that level. (Tr. 55:22-56:15).

11. On October 27, 2005, TCP made its initial investment in Radnor through a commitment to purchase $25 million of Series A Preferred Stock (the "Preferred Stock") and to lend $95 million in senior secured debt to the Company (the "Tranche A and Tranche B Loans") (Tr. 234:14-235:4). The Tranche A and Tranche B Loans closed on December 1, 2005. (JX 91, 93). They were funded at 99.25% of par. (Tr. 92:22-93:2). The Preferred Stock included detachable warrants that would give TCP the right to own certain levels of Radnor common stock (not to exceed 15.625%), depending on the Company's actual EBITDA performance. (Tr. 496:1-24).

12. As noted above, Radnor believed that it would be able to obtain consents from its existing senior secured noteholders in connection with the new $30 million secured obligation. That turned out to be wrong. Thus, Radnor used the $95 million Tranche A and B loans proceeds to redeem all of the $70 million of senior secured notes. (Tr. 83:17-85:17). In addition, the TCP loan proceeds were used to pay down $4.7 million of equipment loans, pay down Radnor's revolving credit facility and fund working capital and growth initiatives. (Tr. 5-26; 67:1-21; 269:4-21; 397:7-398:15; 402:5-16; JX 91).

**\*4** 13. On October 27, 2005, TCP entered into an Investor Rights Agreement with Radnor's shareholders. (JX 78). The Investor Rights Agreement gave TCP several rights that are often given by an issuer to protect the interests of minority shareholders including the right to designate one member and one observer to the board, the right to increase its representation on the board if the Debtors

failed to achieve certain EBITDA levels, and the right to veto certain employment agreements and transactions with affiliates. (*Id.;* Tr. 502:5-9; 1356:23-1358:16). TCP never exercised any of those rights (Tr. 502:5-9, 502:23-503:9) other than the right to designate one member and one observer to Radnor's Board of Directors. (JX 78 § § 3.1, 3.2.). Mr. Kennedy retained the right to appoint the remaining three directors. TCP designated Mr. Feliciano and Mr. Mehrotra as the representative Board member and observer, respectively. (Tr. 120:22-121:2). Mr. Feliciano testified that the provisions set forth in the Investor Rights Agreement are "fairly typical" for such an equity investment. (Tr. 205:17-206:19). My experience fully supports that view. The Investor Rights Agreement reflects a reasonable and appropriate mechanism for protection of a minority equity interest. The Committee offered no expert testimony on practices relating to lender or investor protection provisions.

14. Mr. Feliciano testified that TCP did not plan to acquire the Debtors at the time that TCP made the initial investment in the Debtors, nor at any time thereafter. (Tr. 47:16-22). There is no reliable evidence to the contrary. None of the internal memoranda prepared by TCP when the first investment was made show that TCP had any intention of buying Radnor. (Tr. 243:23-244:22; JX 40, 66). The TCP memoranda prepared when the initial investment was made showed that TCP believed that even the liquidation preference of the Preferred Stock would be paid in a downside scenario, and that Radnor would comply with the $55m EBITDA covenant for 2006. (JX 55). The belief that the company could meet its EBITDA targets was shared by those on the Radnor board. (Tr. 1748:9-1749:1).

15. TCP received representations from the Company that it was solvent, including a solvency certificate from the CEO and CFO (Mr. Ridder) of Radnor at the time of the Tranche A and B loans. (Tr. 112:2-23; JX 91 at p. 14 § (ii), p. 55 § (I)). I find that it would be irrational to believe that TCP would have made a $25 million equity investment if it believed Radnor were insolvent at the time. Tennenbaum's infusion of $25 million in the form of preferred stock (with warrants and conversion rights) is a clear indication that Tennenbaum believed that there was an upside to its investment. If, as the Committee argues, Tennenbaum's scheme was a "loan to own," why would it make an equity investment in addition to the debt transaction? The logical alternative would be to make a debt investment only so that Tennenbaum

would have a better position in the event of a meltdown, i.e., a liquidation.

**\*5** 16. TCP understood in October 2005 that the Company was seeking a capital infusion to fund new product initiatives that were already in place. The Company had already executed agreements regarding new products, like its polypropylene cup line, at the time. (Tr. 39:7-12; 316:3-21; JX 81; 351:3-7; 516:19-517:1; 876:14-878:13; 949:14-954:9; 1048:16-1049:2; JX 58).

17. The Radnor board of directors believed that the capital infusion sought in June 2005, and occurring in October 2005, was in the best interests of the Company and would be favorable to its capital structure (Tr. 397:21-398:15; 936:16-937:12; 1163:12-1164:17; 1169:13-24). The Board similarly believed that the Tranche A and Tranche B transactions were in the best interests of the Company by providing liquidity to fund new business initiatives and paying down existing debt. (Tr. 1167:10-1169:24).

18. At all times, Radnor and Tennenbaum treated the Tranche A and B loans as debt investments. (Tr. 239:11-240:10, 577:3-578:11). All internal memoranda from TCP show that the Tranche A and B loans were referred to as debt. (JX 40, 66). The documents themselves contain typical terms and conditions of a secured debt instrument: the Tranche A and B loans provide fixed maturity dates; fixed interest payments; default provisions and common maintenance and incurrence covenants. (JX 91, p. 19, 20, 50; JX 171, § 1.9).

19. All internal memoranda from TCP both at the time of the Tranche A and B transactions and thereafter demonstrate that TCP's estimate of the "downside" scenario show that the debt and the liquidation preference of the preferred stock investment would be paid by the enterprise value of the Company. (JX 55; Tr. 60:20-64:5).

20. The collateral package for the loans under Tranche A and B included substantially all property, plant, and equipment of the Debtors, including real estate. (Tr. 18:20-19:12; JX 54; 71 Annex 1). Tennenbaum undertook a reasonable process to ascertain the value of its collateral package for the Tranche A and B loans. (Tr. 321:9-322:16; 834:4-835:4). Radnor provided Tennenbaum with appraisals that indicated the collateral available as security for the loans was equal to or greater in value than the outstanding amounts of the Tranche A and B

loans at the times they were issued. (Tr. 227:12-228:12; 1683:7-10; JX 54, 242).

21. Radnor's capitalization in October 2005 was not clearly insufficient to support a business the size and nature of Radnor's in light of the circumstances at the time the Tennenbaum loans were made. (Tr. 39:4-40:20, 898:9-899:2). At the time of the Tranche A and B loans, Radnor may have been able to borrow a similar amount from another lender, based on the number of interested investors identified by Lehman. (Tr. 33:6-23, 1165:15-1166:6). Mr. Kennedy testified that in Lehman's efforts in August/September 2005 it had contacted numerous potential investors and between 20 and 25 such potential investors signed confidentiality agreements to obtain more information from Radnor. (Tr. 355:23-356:10). This fact certainly suggests that there were a number of potential investors who, after reviewing the Lehman's August 2005 memorandum, did not believe it was not worth considering the proposed debt and equity investment.

**\*6** 22. The Debtors' creditors were not harmed by the Tranche A and B loans and preferred stock investment, but rather benefited from them. The Tranche A and B loans and preferred stock investment by TCP, in the aggregate, decreased Radnor's net debt. (Tr. 104:15-105:5; 241; 534; 939-40; 1674:3-1675:9).

23. In early 2006, TCP received preliminary indications from Radnor management that the fourth quarter 2005 earnings would be below expectations. (Tr. 512:23-513:11). Mr. Feliciano received the Debtors' actual fourth quarter and year-end results at a Radnor Board meeting held on February 9, 2006. (Tr. 123:10-124:1; JX 117). The numbers were dismal, and defied even the most conservative EBITDA estimates that had been given to TCP by the Debtors in January: $20 million of negative EBITDA in 2005, in contrast to the projection of $48 million of EBITDA that Radnor had used to induce the TCP Lenders to make their investment in Radnor. (Tr. 594:3-9; 23:15-23).

24. Upon receiving Radnor's fourth quarter results, TCP performed further investigations over the following weeks to get a better understanding of the reasons behind the losses and the nature and extent of the issues facing the Debtors in 2006. (Tr. 1062:13-21; 1065:16-1066:20; JX 133). The Debtors' bank lenders took similar steps, engaging Brandlin & Associates, a forensic accounting firm, to monitor the Debtors. (Tr. 560:3-24; 501:1-4). As part of its

investigations, and to better monitor the Debtors' performance, TCP requested that management provide TCP with more detailed and timely financial information. (Tr. 127:16-128:20). In addition to meetings with Radnor personnel, TCP requested that the Company provide it with Daily Performance Reports and borrowing base certificates on a regular basis. (Tr. 127:23-128:10; 132:23-133:4). As part of TCP's investigation in the first quarter of 2006, a group of TCP representatives traveled to Radnor, Pennsylvania in March. (Tr. 1061:20-1062:21; 1081:12-24; 1256:10-20). During this same period, in the interest of protecting the bank lenders, Brandlin & Associates was reviewing Radnor's forecasts (inside information). (JX 223).

25. Mr. Feliciano provided updates to the Investment Committee on or about February 9, 2006, February 14, 2006 and March 10, 2006, summarizing the team's efforts as they gathered more information about the Debtors' performance. (JX 117, 125, 133). Mr. Feliciano reported that the Debtors blamed the downturn in the fourth quarter on several factors, including higher than expected raw material costs, delays in expected price increases, and a more severe negative impact from the Gulf Coast hurricanes than the Debtors or TCP had ever expected. (JX 133 at 1). Mr. Feliciano remained cautiously optimistic about the Debtors' business prospects based on the anticipated roll-out of new products and advised the Investment Committee that he would continue to refine expectations for the Debtors' 2006 earnings. (JX 133 at 9).

**\*7** 26. As a result of the devastating decline in earnings in the fourth quarter of 2005 and the first quarter of 2006, the Debtors faced cash flow and liquidity problems and requested an additional advance from TCP to bridge the liquidity gap. (Tr. 529:9-530:20). Given the amount of capital TCP had invested in the Debtors, Mr. Feliciano and TCP were understandably concerned about the Debtors' liquidity issues and performed more diligence, with the assistance of TCP's Mr. Mehrotra and Mr. Berry, to evaluate the Debtors' needs and to update the Investment Committee. (Tr. 1062:13-21; 1065:16-1066:10; JX 133).

27. The unsecured noteholders received a $7.4 million interest payment on March 15, 2006. (Tr. 555:24-556:22).

28. In a memo to the Investment Committee dated March 28, 2006, Mr. Feliciano and his colleagues reported the results of their investigation, including

the Company's plans to stabilize the business, take advantage of the opportunities presented by its new products, and improve performance. (JX 155).

29. The Company had provided TCP with new projections showing that an additional advance would be sufficient to fund their operations and that, under its revised business plan, the Company expected to earn $60 million in EBITDA in 2006. ((JX 155 at 1). On this basis, Radnor requested that TCP provide an additional $23.5 million to fund what Radnor described as short term liquidity needs. (JX 155 at 8-9).

30. On April 4, 2006, TCP agreed to make an additional advance (the "Tranche C Loans") in the amount of $23.5 million. (Tr. 426:12-15; 435:23-24; 435:23-436:3; 554:8-10). The documentation for the Tranche C Loans included (a) an amendment to the Tranche A and Tranche B credit agreement; (b) an amendment to the Tranche A security agreement; and (c) two floating rate secured notes with a fixed maturity date of September 19, 2009. (JX 171, 172). In all material respects, the Tranche C loans had the same terms and conditions as the Tranche A and B Loans, except that the Tranche C Loans could be prepaid without penalty and were subject to an increase in their interest rate if not repaid within one year. (JX 176). The collateral package for the Tranche C Loans included substantially all property, plant, and equipment of the Debtors, including real estate. (Tr. 18:20-19:12).

31. Radnor had requested that TCP make an additional equity investment in Radnor instead of making the Tranche C Loans but TCP was consistently clear that it would only make an additional debt investment. (Tr. 416:1-417:15). From Tennenbaum's perspective an additional equity investment made no sense. It was facing the prospect of losing its October 27, 2005 Preferred Stock investment. Why would it put in more equity money? The answer is obvious.

32. At the time of the Tranche C Loans, Radnor represented that it was solvent. (Tr. 551:17-552:24; 553:1-18; 1366:15-1367:8; JX 179). Messrs. Kennedy and Ridder provided a solvency certificate to TCP on April 4, 2006, representing that Radnor was solvent, taking into consideration both the capital infusion and debt service represented under the Tranche C Loan. (Tr. 112:20-23; 552:3-553:1; 555:23-556:22; 1366-67; JX 139). In connection with preparing the solvency certificate, Mr. Ridder consulted with inside and outside counsel, Messrs.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

Page 6

Kennedy and Hastings and PriceWaterhouseCoopers. (Tr. 1366:18-1367:2).

**\*8** 33. Tennenbaum had no reason to doubt the financial information that was provided by Radnor management or the solvency certificates. (Tr. 1092:11-21). All internal memoranda from TCP when the Tranche C Loan was made show that TCP's estimate was that the Company was still solvent. (JX 133, 152, 155).

34. The Radnor board believed that the Tranche C Loan was in the best interest of the Company and was needed to address a short-term liquidity need. (Tr. 936:16-937:12; 1182:1-21). Mr. Kennedy at all times acted in the best interests of the Company and made decisions that he believed would benefit both Radnor and its shareholders. (Tr. 527:3-17; 528:3-529:22; JX 128).

35. Mr. Feliciano abstained from voting on the Tranche C transaction. (Tr. 185:14-18; 229:8-21; 1200:17-22; 1678:9-14; JX 165).

36. The Debtors' creditors were not harmed by the Tranche C loan, but rather benefited from it. (Tr. 936:16; 937:12; 939:9-940:7; 1163:12-23; 1169:1-24). The proceeds from Tranche C were used partly to the benefit of Radnor's unsecured noteholders. Tranche C proceeds were also used to pay down trade debt, but were mostly used for working capital purposes, which assisted the Company's efforts to turn the corner for the benefit of, *inter alia*, unsecured creditors. (Tr. 154:6-24). The noteholders also benefited from the Tranche C loan in the money they received from their consents, described below.

37. TCP converted $3.2 million of interest due on the Tranche A and B Loans into Tranche C loans, but never received cash from the Company. (Tr. 154:20-24).

38. TCP never declared a default based on the failure of the Company to meet the $55 million EBITDA covenant in the Credit Agreement. The earliest date that TCP could have declared a payment default acceleration would have been August 17, 2006. (Tr. 1693:7-1694:8). TCP never declared a default based on the alleged breach of the representation of solvency.

39. In connection with the Tranche C Loans, the TCP Lenders requested that Mr. Kennedy make a personal financial contribution to the Company to demonstrate Mr. Kennedy's commitment to returning the

Company to profitability. (Tr. 430:10-24). Mr. Kennedy also (i) agreed not to receive bonus compensation for calendar 2006; (ii) made a $1 million preferred stock investment in the Company; and (iii) personally guaranteed $10 million of the Tranche C Loans. (Tr. 547:1-6; 547:24-548:6). It would be irrational to believe that Mr. Kennedy would have done this if he believed that Radnor was insolvent or was headed for a bankruptcy filing.

40. TCP and the Radnor shareholders entered into a letter agreement dated April 4, 2006 ("Side Letter") under which the Radnor shareholders agreed that they would cause Radnor to appoint a Chief Operating Officer on or before September 30, 2006. (JX 173, Side Ltr. Pg. 2 ¶ 4; Tr. 557:14-17). TCP, at Radnor's request, gave up its right under the Side Letter to appoint a Chief Operating Officer of its choosing by agreeing in writing that the appointment of Stanford Springel satisfied the Side Letter. (Tr. 166:3-14). Mr. Springel's hiring was due in part to a demand from representatives of the Company's bank group that Radnor hire more senior executives-not at the insistence of Mr. Feliciano or TCP. (Tr. 1190:13-1191:14). Mr. Springel is a managing director with the turnaround management firm of Alvarez and Marsal. He has 17 years experience in the turnaround management business. (Tr. 1438:18-24).

**\*9** 41. The Side Letter also contains a covenant giving TCP the right to appoint a majority of Radnor's board following a payment default and subsequent acceleration of the TCP Loans. (JX 173; Tr. 558:3-24; 559:4-6). Given the trigger date of the payment default, TCP could not exercise this right earlier than August 17, 2006, and never exercised this right. (*Id.;* Tr. 459:4-9; 1691:16-1692:16; 1693:22-1694:8).

42. In 2004 Radnor issued unsecured notes in the face amount of $130 million. The unsecured noteholders had the right to stop the Tranche C loan from being made because the additional secured loans would have exceeded the maximum "indebtedness" permitted under the unsecured noteholders' Indenture. Radnor therefore solicited the consent of the noteholders to modify the Indenture. On or about April 3, 2004, 95% of the noteholders executed written consents to amend the Indenture, explicitly agreeing to an increase of secured indebtedness in the amount of $25 million. (Tr. 236:8-237:5;426:2-5; 435:23-436:3; JX 167). The price for the consent was $1,350,000. Radnor paid the first half of that fee, $675,000, upon execution of the consents. (Tr. 235:22-238:15; 533:2-541:22;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                                    Page 7
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

937:13-939:8; 1177:13-1178:2; Ex. 167). The consent of the unsecured noteholders is, in my view, clear evidence of the acknowledgment that the Company had serious liquidity problem and that the Tranche C secured debt transaction had the prospects of a solution to that problem. The Committee consists of seven unsecured creditors, four of whom are large holders of the unsecured notes. (Tr. 1670-71).

43. The consents that the unsecured noteholders signed acknowledged that Tranche C was a debt investment, referring to the need for additional "indebtedness." (Tr. 533:2-541:22; JX 167).

44. Article Seven of Radnor's Certificate of Incorporation provides that Radnor's directors cannot be liable for a breach of the duty of care. (JX 350).

45. Mr. Feliciano was a valuable member of the Radnor board and consistently acted in the best interest of Radnor. (JX 127; 1173:2-9). His conduct was confirmed by all other members of the Radnor board, who testified that he was a productive and valuable member of the board who made helpful suggestions and was interested in the welfare of Radnor. (Tr. 524:1-20; 527:3-17; 573:8-21; 577:7-15; 943:2-944:21; 1171:14-1173:9; 1187:8-24).

46. TCP appointed one board member out of a total of four, and did not control the Debtors' affairs. (Tr. 519:8-10; 576:13-577:15; 847:3-11). Neither TCP nor Mr. Feliciano ever controlled Radnor's operations. (Tr. 167:18-168:9; 171:3-173:13; 205:17-206:24; 241:2-242:11; 576:13-577:15; 602:12-604:8; 847:3-11). Mr. Kennedy, as majority shareholder and CEO, controlled Radnor at all times. (Tr. 43:13-44:20, 167:18-168:9, 171:3-173:13). TCP's board of directors seat flowed from its preferred equity investment. (Ex. 78, pg. 18 ¶ 3.1). For a minority shareholder to hold a seat on the board of directors is not uncommon. (Tr. 496:4-12 929:14-930:23; 1171:14-1173:9). No one at TCP ever exercised control over the Radnor board of directors. (Tr. 231:4-22; 459:4-9; 558:3-559:9). The Committee makes much of the fact that the Radnor board minutes of May 17, 2006 (more than a month after the Tranche C transaction) show that in house counsel for Tennenbaum (Mr. Hollander) attended a board meeting (JX 214). On its face this suggests no impropriety by Tennenbaum or Radnor and the Committee has offered no explanation of any possible wrongdoing. Presumably, he was invited to advise on the restructuring matters and it is clear that Radnor's board (controlled by insiders) was in need of all the help that it could get.

*10 47. There is only one financing transaction included in the Committee's complaint that occurred while Mr. Feliciano was a member of the Radnor board; the Tranche C loan. (Tr. 929). Mr. Feliciano abstained from voting on the Tranche C Loan. (Tr. 1200:8-22; JX 165).

48. As of April 13, 2006, the Debtors were still providing guidance to their public investors that they expected to earn $45-50 million in EBITDA in 2006. (Tr. 598:10-599:2). Unfortunately, these projections proved to be wrong, and the Debtors fell short of their business plan. Within approximately three weeks of the Tranche C Loans, the banks under the Company's revolving credit facility determined that the borrowing base information provided to them had been inaccurate, and that their loans were overadvanced. (Tr. 441:18-442:10). The loss of liquidity caused by the recalculation by the banks of the borrowing base was exacerbated by continued failures by Radnor to meet its projections.

49. During June 2006, Radnor's revolving lenders threatened to cut off funding under its working capital facility (Tr. 441:18-442:10), and did so in July 2006, which left the Company with no alternative but to file these bankruptcy cases. Thus, TCP transactions did not cause the bankruptcy cases.

50. The Debtors requested that TCP provide a stalking horse bid on terms that would ensure the highest and best offer for the Debtors' assets. (Tr. 177:3-15; 576:2-12). The TCP Lenders were reluctant to do so, but were convinced by the Debtors that without such a bid, there would likely be a "free-fall" bankruptcy, resulting in a chapter 7 instead of chapter 11 and attendant loss of value. (Tr. 1486:6-1487:4; 1736:11-14; 1738:15-1739:8). Thus, TCP reluctantly agreed to act as the stalking horse bidder, which led to negotiations on the Asset Purchase Agreement ("APA") dated August 21, 2006. (Tr. 177:3-178:17; JX 287).

51. Mr. Feliciano had already resigned from the Radnor board when the APA was negotiated in July and August of 2006 and did not pressure Radnor's other directors to approve it. (JX 287; Tr. 176:5-8; 576:1-24; 599:1-24; 1683:7-10; JX 242). Radnor approached TCP, not the reverse. (Tr. 529:2-22; 574:1-7; 1476:4-11). Indeed, rather than Mr. Feliciano twisting the board's arm to engage in sweetheart deals with TCP, (a) TCP entered into a forbearance agreement in July 2006 for no fee when Radnor failed to make an interest payment (Tr.

--- B.R. ----                                                         Page 8
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

1466:5-1467:14; JX 260); (b) agreed to subordinate a portion of its secured debt to the revolving lenders (also for no fee) (JX 259) and the APA was only reached after what Mr. Springel, the independent COO and later independent CRO, characterized as "spirited and arms length negotiations." (Tr. 1478:4-22; 1487:2-23). The principle negotiators on behalf of Radnor were Mr. Springel, Radnor's in-house counsel (Miss Carrie Williamson) and Radnor's outside counsel (Skadden Arps Slate Meagher & Flom).

52. The Radnor board believed that the APA was in the best interest of the Company and its constituents. (Tr. 941:22-942:15; 1515:20-1516:21). The Court previously ruled, in its bidding procedures order, that the decision to enter into the APA was "in the best interests of the Debtors, their estates, their creditors, and all other parties in interest." (Dkt. 144 at p. 2). The Court has previously ruled that the Committee has waived the right to object to the sale process. (Dkt. 144 at ¶ 1). At the bid procedure hearing on September 22, 2006, Radnor's counsel proffered the testimony of Mr. Shapiro on behalf of Lehman Brothers and Mr. Springel as Radnor's CRO in support of the bid procedure order. The Committee did not cross examine either witness or otherwise object to their testimony. I specifically herein incorporate by reference the testimony offered by Mr. Shapiro (Doc. # 369 at pp. 43 through 45) and Mr. Springel (Doc. # 369 at pp. 47 through 52). At the conclusion of the September 22, 2006 hearing the Committee's counsel stated the Committee's "support" of the bidding procedures order. (Doc. # 369, p. 71).

**\*11** 53. Radnor provided any party interested in bidding on the Debtors' assets in the bankruptcy cases with material non-public information if they agreed to sign a confidentiality agreement. (Tr. 487:6-488:11).

54. There is no evidence showing that TCP or Mr. Feliciano ever used insider information in an inappropriate manner. Mr. Feliciano served on Radnor's Board of Directors from February 9, 2006 until June 26, 2006. There is no evidence in the record showing that during this period TCP had access to "inside" information that was relevant to a purchase of Radnor's assets that was not also available to other potential purchasers in Radnor's data room-made available to potential purchasers who signed a confidentiality agreement.

55. On August 22, 2006, TCP filed the Declaration of

Jose Feliciano, to which was attached the Credit Agreement, guaranties, security agreements, and all lien and security interest filings, evidencing Tennenbaum's claims. (Dkt.27). On September 12, 2006, TCP filed its proof of claim in the amount of $128,835,557.26 (as of the Petition Date), to which was attached the Feliciano Declaration and all exhibits, as well as a detailed breakdown of components of the proof claim. (Dkt.156). The proof of claim included copies of properly recorded mortgages, fixture filings and UCC filing statements. (Dkt.156). The Committee did not submit any evidence contradicting the validity or enforceability of the liens and security interests securing such claim. The proof of claim is secured by all collateral described therein.

56. The only evidence before the Court shows that the collateral securing the Tennenbaum claim was valued at more than $132.2 million (JX 54; 71, Annex 1), more than Tennenbaum's $128.8 million petition date claim.

57. The Committee's Complaint challenges as a preference an interest payment made on April 4, 2006. This payment is outside the 90-day preference period. Thus, the Committee asserts that Tennenbaum was an insider. I find that Tennenbaum was not an officer, director, or partner of the Debtors, nor a relative of any of them, and Tennenbaum also never held 20% of the voting securities of the Debtors. At the time of the making of the interest payment on April 4, 2006, Tennenbaum held no voting securities of the Debtors.

58. Tennenbaum was not a "person in control of the Debtor." Mr. Kennedy, not Tennenbaum, was in control of the Debtors. *See* FOF 46.

59. Tennenbaum delivered $23.5 million as an additional Tranche C advance under the Credit Agreement, of which $3.2 million was credited as a payment of interest on the pre-existing Tranche A and B debt. Therefore, the net effect was new value in excess of $20 million. Thus, the Debtors' estates were enhanced by this infusion of new value. Tennenbaum was never repaid this $20 million.

60. Both the Debtors and Tennenbaum intended that the $3.2 million interest payment be part of a contemporaneous exchange. Two documents executed by the Debtors and Tennenbaum clearly evidence that intent. On March 15, 2006, the Debtors and Tennenbaum agreed in writing that the $3.2 million interest payment due that day would be paid

in connection with the funding of the Tranche C loan several weeks later. (Tr. 554:8-15; 556:11-22; 842:4-10; 1673:17-23; JX 139; JX 171 § 1.4). The final documentation of the Tranche C loan, Amendment No. 1 to the Credit Agreement, expressly provided that net proceeds of the Tranche C loan would be used to make the interest payment on the Tranche A and B loans due on March 15, 2006. (Tr. 441:14-17; 554:8-15; JX 171 § 1.4). Thus, the parties intended that the interest payment and the new value delivered by Tennenbaum would be contemporaneous exchanges.

**\*12** 61. The transfer of the interest payment by the Debtors and the delivery of new value to the Debtors, were contemporaneous. They occurred electronically at the exact same moment. On April 4, 2006, Tennenbaum actually delivered to the Debtors an amount equal to only the Tranche C loan of $23.5 million *minus* the $3.2 million interest payment which Tennenbaum credited as payment of the Tranche A & B interest payment.

62. The Committee makes much of the "thank you" e-mail sent by Mr. Ridder to Mr. Feliciano (JX 275). This is the only evidence that the Committee presented to suggest a sub rosa arrangement between Radnor (or any employee of Radnor) and Tennenbaum leading up to the Asset Purchase Agreement. However, Mr. Ridder explained in detail at the trial and in his prior deposition that this comment was made in the context of Mr. Feliciano's comment during a conference call that Radnor's financial group would be treated fairly in a transition. (Tr. 1307:17-1308:17). This does not support a conclusion that there were any improper dealings between Mr. Ridder and Tennenbaum leading up to the Asset Purchase Agreement. Mr. Springel confirmed that these "assurances" were nothing more than a reference to the transition arrangement and severance payments. (Tr. 1451:18-1452:6; 1452:18-1453:3). Mr. Springel was involved in the conference call and testified that nothing improper occurred. (*Id.;* Tr. 1455:70-1456:20). As to whether there were any promises of employment, Mr. Springel emphatically said "absolutely not." (Tr. 1457:3-5).

63. On June 14, 2006 Lehman was retained to assist Radnor in assessing various alternatives for solving the liquidity crisis. (Tr. 1470:2-1470:3). With that input, Mr. Springel concluded that a sale transaction was the most doable of the alternatives. (Tr. 1470:24-1471:3).

64. The Committee implies an impropriety in

Radnor's retention of Lehman Brothers in June 2006 because of Lehman's prior dealings with Tennenbaum. Lehman's long term relationship with Radnor made it a logical choice for Mr. Kennedy to pick as a financial advisor at the time of the financial crisis in the Spring of 2006. Furthermore, given Lehman's role in the August 2005 search for capital, and therefore its knowledge of the Company, this would seem like a logical selection by Radnor in June 2006. Mr. Feliciano understandably could have also believed that Lehman would be a logical choice for the engagement. It would follow that he saw no reason to inform Mr. Kennedy of Lehman's prior dealings with Tennenbaum on totally unrelated matters, assuming he was aware of them at the time. With respect to the late disclosure by Lehman of its prior relationship with Tennenbaurn, Mr. Shapiro (Lehman's manager leading the engagement) testified that even if he had been aware of it at the time of his application for retention, he would have still sought the engagement. In my view, he rightly could have.

65. Mr. Springel testified that the sale process was "full and fair" and no favorable treatment was given to Tennenbaum in the sale process. (Tr. 1543:4-11). The Committee focuses on the transition schedules developed by Mr. Ridder and sent to Tennenbaum but not put into the data room as evidence of an unlevel playing field. Mr. Springel testified that this transition schedule was not an important matter and that other bidders could do their own administrative cost analysis based upon data available in the data room. (Tr. 1523:19-1524:19).

## CONCLUSIONS OF LAW

### *Recharacterization*

**\*13** 1. The Court rules against Plaintiff and in favor of Defendants on Counts I and II of the Complaint and concludes that the Tranche A, Tranche B and Tranche C Loans are true debt instruments and should not be recharacterized as equity. Taking into account the terms of the documents themselves, the facts and circumstances surrounding the making of the loans, the reasonable inferences to be drawn therefrom, as well as the economic reality of the circumstances, the Court concludes that, at the time of the transactions, the parties intended that the transactions were debt transactions and not equity.

2. In *Cohen v. KB Mezzanine Fund II, (In re SubMicron Systems Corp.),* 432 F.3d 448 (3d.

--- B.R. ----                                                                    Page 10
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

Cir.2006), the Third Circuit explicitly rejected a "mechanistic" approach to the analysis of a recharacterization claim, under which the court weighs certain factors. Rather, the Court held that the overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by a applying any specific factor, but through a *common sense* evaluation of the facts and circumstances surrounding a transaction:

[C]ourts have adopted a variety of multi-factor tests borrowed from non-bankruptcy caselaw. While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.

*Id.* at 455-456.

3. The comprehensive analysis of "intent" adopted by the Third Circuit in *SubMicron,* leads this Court to conclude that Radnor and TCP intended that the Tranche A, Tranche B and Tranche C Loans were true debt investments. Considering the facts and circumstances surrounding the TCP Loans, as well as the reasonable and logical inferences drawn therefrom, the Court finds that the Tranche A, B and C loans were intended to be and were true debt and not equity. No evidence contradicts this intent. *See* FOF 18, 31.

4. Even were the Court to divine the parties' intent by applying the variety of factors considered by other courts in recharacterization cases, the Court's decision not to recharacterize the TCP Loans would be the same. The Court finds that the TCP Loans (a) are referred to as "debt" and/or "indebtedness" in the transaction documents; (b) are consistently referred to by all parties as "loans" and/or "indebtedness"; (c) contained a fixed maturity date of September 15, 2009; (d) gave TCP the right to enforce the payment of principal and interest; (e) contain no "voting rights"; (f) were treated as priority debt instruments, the proceeds of which were used for working capital and to replace and/or pay down existing debt; and (g) are secured interests given priority in a liquidation or insolvency. *See* FOF 18, 20. *See also* SubMicron, 432 F.3d at 456 n. 8.

**\*14** 5. TCP's knowledge that the Debtors were

experiencing a liquidity crisis when the Tranche C Loans were made, *see* FOF 26-28, is insufficient to support recharacterization. The *SubMicron* Court expressly considered this issue and rejected recharacterization because it found that it was legitimate for an existing lender to extend additional credit to a distressed borrower as a means to protect its existing loans. *See* SubMicron. 432 F.3d at 457 ("[W]hen existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company."); Bayer Corp. v. Mascotech, Inc. (In re AutoStyle Plastics), 269 F.3d 726, 748 (6th Cir.2001). Thus, the Court is not persuaded by the Committee's allegation in its complaint that "no prudent lender" would have made the TCP Loans.

6. Although not determinative of the issue of recharacterization, the Court further concludes that TCP did not exercise control over Radnor's day-to-day operations. *See* FOF 46. Mr. Feliciano's designation as a member of Radnor's four-member Board of Directors is immaterial. In *SubMicron,* the Third Circuit refused to recharacterize the debt as equity notwithstanding that the debtors' largest secured creditors held half of seats on the debtor's board. *See* id., 432 F.3d at 457-58 (it is "not unusual for lenders to have designees on a company's board, particularly when the company [is] ... distressed."). The Court therefore holds that Mr. Feliciano's role as one of four members of the board does not weigh in favor of recharacterization.

7. TCP's receipt of non-public information and *ability* to obtain more board seats is similarly immaterial. TCP never exercised its rights to obtain additional representation on the Radnor board. *See* FOF 13. The mere "right" or "ability" to control, without exercising that control, does not constitute the level control relevant to the issue of recharacterization. Mr. Feliciano's participation in board meetings, and TCP's receipt of information, were consistent with good faith efforts to provide valuable advice to the Debtors and to conduct due diligence.

8. The Court rejects the Committee's claim that TCP exercised undue "control" over Radnor due to the EBITDA covenants in ¶ 44 of the Credit Agreement. There is no evidence in the record to support the Committee's belief that TCP "knew" that Radnor could not and would not attain the EBITDA levels set forth in that agreement. Furthermore, the evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                    Page 11
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

does not support the Committee's claim that TCP exercised undue control over Radnor through the warrant matrix calculations based on Radnor attaining certain levels of EBITDA. The fact that TCP negotiated the acquisition of warrants for Radnor equity should the Company fail to meet certain projected EBITDA levels is unremarkable and did not constitute "control."

*Equitable Subordination*

**\*15** 9. Although the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest," 11 U.S.C. § 510(c)(i), equitable subordination is "drastic" and "unusual" remedy. *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron),* 291 B.R. 314, 327-29; *see also Waslow v. MNC Commercial Corp., (In re M. Paolella & Sons, Inc.),* 161 B.R. 107, 117 (E.D.Pa.1993) (stating that equitable subordination is an "extraordinary" departure from the "usual principles of equality of distribution and preference for secured creditors") (citations omitted).

10. The Committee failed to meet its burden of proving that (a) TCP engaged in inequitable conduct; (b) the misconduct caused injury to Radnor's creditors or conferred an unfair advantage on TCP; and (c) equitable subordination of the claim is not inconsistent with the Bankruptcy Code. *Citicorp Venture Capital, Ltd. V. Comm. Of Creditors Holding Unsecured Claims,* 160 F.3d 982 (3d Cir.1998); *see also SubMicron,* 432 F.3d at 462. Furthermore, the Court holds that TCP did not engage in "egregious conduct" tantamount to "fraud, overreaching or spoliation." *In re Mid-American Waste Sys., Inc.,* 284 B.R. 53, 70 (Bankr.D.Del.2002); *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.),* 290 B.R. 514, 524 (Bankr.D.Del.2003).

11. TCP was not an insider for purposes of equitable subordination, as it was not a "person in control of the debtor." 11 U.S.C. § 101(31)(B)(iii). [FN2] Evidence that TCP monitored the Company's business and attended Board Meetings is insufficient; the Committee failed to prove that TCP exercised "day-to-day control" over Radnor's business affairs and dictated Radnor's business. *See Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.),* 348 F.3d 234, 279 (Bankr.D.Del.2005) ("[t]here must be day-to-day control, rather than some monitoring or

exertion of influence regarding financial transactions in which the creditor has a direct stake.").

12. TCP's access to performance reports and other financial information from the Company is insufficient to establish insider status. *See, e.g., Meeks v. Bank of Rison (In re Armstrong),* 231 B.R. 746, 750 (Bankr.E.D.Ark.1999) ( "Even if the bank requires the debtor to submit frequent reports on receivables, invoices, and operations, receives all payments on the receivables, has the power to endorse checks, and obtain concessions from the debtor, the bank is not thereby an insider *because there is no control of the day-to-day decision making of the debtor.*") (emphasis added); *Gray v. Mankflow (In re Optical Techs., Inc.),* 252 B.R. 531, 539 (M.D.Fla.2000), *aff'd,* 246 F.3d 1332 (11th Cir.2001) (to be determined a person in control, the person must control the company so as to dictate corporate policy and disposition of corporate assets *without limits* ") (emphasis added). Indeed, National City Bank also received non-public information from Radnor on a regular basis. *See* FOF 24.

**\*16** 13. TCP did *not* engage in misconduct; TCP did *not* seek to benefit itself at the expense of others; TCP did *not* seek to mislead trade creditors, public noteholders or other stakeholders. TCP at all times acted in good faith with a view to maximize Radnor's value to all constituents. The testimony on these issues was consistent and credible. Furthermore, no member of the Committee appeared at trial to offer testimony inconsistent with the foregoing conclusions.

14. Principles of equity require a finding that the Loans should not be subordinated. The Loans advanced by TCP enhanced liquidity of the Company and, among other things, allowed the Company to continue operations. Contrary to the central theme of the Committee's case, the preferred stock transaction and the Tranche A and Tranche B loans resulted in a reduction of the Company's net debt. *See* FOF 22. Further, the unsecured bondholders expressly consented to the Tranche C Loans. *See* FOF 42-43.

15. Even were TCP's conduct viewed under the more stringent standards applied to insiders, the Court holds that the Committee has failed to prove that TCP engaged in wrongful conduct such as (a) fraud, illegal conduct or a breach of fiduciary duty; (b) undercapitalization; and (c) use of the Debtor as a mere instrumentality or alter ego. *In re Mid-American Waste,* 284 B.R. at 70; *See, e.g., In re Epic Capital,* 290 B.R. at 524; *In re M. Paolella & Sons,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                    Page 12
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

[161 B.R. at 118](161 B.R. at 118).


*Breach of Fiduciary Duty Claims*

A. *Claims Not Pled or Dropped After Trial.*


16. The Committee tried this case as if it were a "deepening insolvency" case. Presumably, none of the Counts of the Complaint were denominated "deepening insolvency" due to the recent rejection of such a cause of action under Delaware law. *See [Trenwick Am. Litig. Trust v. Ernst & Young, LLP, 906 A.2d 168 (Del.Ch.2006)](Trenwick); see also [Seitz v. Detweiler, Hershey & Assoc. (In re CitX Corp.), 448 F.3d 672 (3d Cir.2006)](Seitz)* (rejecting deepening insolvency as a theory of damages). However, simply calling a discredited deepening insolvency cause of action by some other name does not make it a claim that passes muster. As I conclude below, the *Trenwick* opinion made quite clear that under Delaware law, a board is not required to wind down operations simply because a company is insolvent, but rather may conclude to take on additional debt in the hopes of turning operations around. *See* COL 22.

17. I further conclude that deepening insolvency fares no better as a cause of action directly against Tennenbaum than it would against Radnor's board. As the Third Circuit discussed in *CitX,* stock investments like TCP's $25 million preferred stock investment lessen insolvency rather than increasing it. *[In re CitX, 448 F.3d at 677](In re CitX)*.

18. Moreover, the *CitX* court noted that the making of a loan similarly does not increase insolvency; it increases liabilities (the amount of the loan) and assets (the cash provided by the loan) in the same amount. *Id.* at 677 (citing Sabin Willett, *The [Shallows of Deepening Insolvency, 60 Bus. Law. 549, 552-57 (2005)](Shallows)*.) I find the Third Circuit's conclusion particularly relevant here: "Any increase in insolvency (*i.e.,* the several million dollars of debt incurred after the ... investment) was wrought by *CitX* 's management, not by [Detweiler." *In re CitX,* 448 F.3d at 677](Detweiler). No matter how the Committee titles its causes of action, the holding of *CitX* defeats the claim.

**\*17** 19. I also note that the Committee dropped after trial all of its causes of action for the breach of the duty of care. Undoubtedly, it did so because Article Seventh of Radnor's Certificate of Incorporation (JX 350) exculpates Radnor's directors from liability for

breach of the duty of care, a permissible provision pursuant to [8 DEL. CODE ANN. § 102(b)(7)](8 DEL. CODE ANN.). [Section 102(b)(7)](Section 102(b)(7)) provisions act as a complete bar to liability even when creditors or a trustee, rather than stockholders, are suing derivatively. *[Production Res. Group, L.L.C. v. NCT Group, Inc.,](Production Res.) 863 A.2d 772, 793 (Del.Ch.2004); [Pereira v. Farace,](Pereira) 413 F.3d 330, 342 (2d Cir.2005), cert. denied,* 2006 U.S. LEXIS 3965.

20. However, the fact that the Committee has dropped its duty of care claims does not render Article Seventh and [§ 102(b)(7)](§ 102(b)(7)) meaningless to this case. To the contrary, much of the Committee's case at trial at best would have implicated the duty of care, not the duty of loyalty. By way of example only, if the Radnor board should not have approved a $55 million EBITDA maintenance covenant because that number was too high (and the Court need not and does not make such a finding here), it did not do so in bad faith; rather, the only potential breach would have been in not understanding that the Company's projections were optimistic and that the maintenance covenant, set at the $55 million level, ran too high of a risk of causing a default. That is a quintessential duty of care claim. Simply alleging that Mr. Kennedy desired funding at any cost does not convert this claim into one implicating the duty of loyalty. Thus, Article Seventh and [§ 102(b)(7)](§ 102(b)(7)) would have barred any such claims against the board, and Tennenbaum and Mr. Feliciano therefore could not have possibly been held liable for aiding and abetting such claims.


B. *Aiding and Abetting Claim.*


21. TCP never aided and abetted a breach of fiduciary duty. The elements for aiding and abetting a breach of fiduciary duty under Delaware law are as follows: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant." *[Cantor Fitzgerald, L.P. v. Cantor,](Cantor Fitzgerald) 724 A.2d 571, 584 (Del.Ch.1998)*. The evidence does not support a finding that any of these elements have been satisfied.

22. Even if the Debtors were insolvent at the time of the Tranche A, B and C transactions, the Radnor Board's actions would not have breached any fiduciary duties owed to the Debtors' unsecured creditors. As the Court of Chancery acknowledged in *Trenwick,* Delaware law does not impose an absolute obligation on the board of an insolvent company to cease operations and liquidate. *See [Trenwick, 906 A.2d at 204](Trenwick)*. Rather, directors of an insolvent

--- B.R. ----                                                                    Page 13
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

company may pursue strategies to maximize the value of the company, including continuing to operate in the hope of turning things around. *See id.; Equity-Linked Investors, L.P. v. Adams,* 705 A.2d 1040 (Del.Ch.1997) (permitting board of company within days of a bankruptcy filing to incur new secured debt in aid of funding risky but promising new products over the objection of preferred stockholders with liquidation preference). Specifically, the Court in *Trenwick* stated as follows:
**\*18** If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, *but that also involves the incurrence of additional debt,* it does not become a guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action. Rather, in such a scenario the directors are protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law.

*Trenwick,* 906 A.2d at 205 (emphasis supplied). Thus, "the business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and that the creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm ." *Id.* at 195 n. 75.

23. The Court holds that the Radnor Board did not act disloyally in entering into the transactions with Tennenbaum. *See* FOF 4, 17, 34, 52. Given the company's prospects with its new products, the advice of competent financial advisors and the consideration of the board, I find no basis in the record for the Committee's repeated assertion that Mr. Kennedy was "swinging for the fences" just to protect his equity investment, rather than acting in the best interests of the company and its stakeholders. Indeed, the Court notes that Mr. Darr's concession that had the company liquidated in October 2005, even without considering transaction costs, such liquidation would have ensured a substantial loss for unsecured creditors (Tr. 670-71), provides a good faith basis for the Radnor board to have continued with its business plan rather than shutting down prematurely.

24. The Radnor Board's good faith decisions to enter into the subject transactions with Tennenbaum to aid Radnor in carrying out its business plan are afforded the protection of the business judgment rule. Radnor's business judgment against liquidation and in favor of attempting to continue operations and continue with

its business plan of expansion was not inherently wrongful. *See Official Comm. of Bond Holders of Metricom, Inc. v. Derrickson,* No. C 02-04756 JF, 2004 WL 2151336, at \*5 (N.D.Cal. Feb.25, 2004) (even in the zone of insolvency, it is not a breach of fiduciary duty under Delaware law to carry out the company's business plan).[FN3]

25. The Court also rejects the Committee's argument that TCP aided and abetted the board's breach of fiduciary duty of accepting TCP's stalking horse bid. That argument is precluded by the law of the case, since the Bidding Procedures Order already approved the stalking horse bid as in the best interests of the estates. FOF 52; *see also E. Pilots Merger Cmte. v. Cont'l Airlines, Inc.  (In re Continental Airlines, Inc.),* 279 F.3d 226, 232 (3d Cir.2002), *cert. denied,* 537 U.S. 944, 123 S.Ct. 345, 154 L.Ed.2d 252 (2002) (law of the case doctrine "limits relitigation of an issue once it has been decided.").

**\*19** 26. Additionally, the Committee has failed to demonstrate actual "knowing participation" on the part of Tennenbaum in any breach. Tennenbaum was a participant in the complained-of transactions, but that fact alone does not subject it to liability for aiding and abetting breaches of fiduciary duties. *See HMG/Courtland Properties, Inc. v. Gray,* 749 A.2d 94, 121 (Del.Ch.1999) (aiding and abetting claim must be supported by proof of an understanding between the parties "with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties"). Rather, a plaintiff must prove that the defendant knowingly participated not just in the transactions but in the breach of fiduciary duties. *See id; Malpiede v. Townson,* 780 A.2d 1075, 1097 (Del.2001) (to satisfy the "knowing participation" element, a plaintiff must establish that the defendant acted "with the knowledge that the conduct advocated or assisted constitutes such a breach [of fiduciary duty].") Tennenbaum reasonably relied on the Debtors' officers' representation that the Debtors were solvent at the time that the transactions at issue were entered into. *See* FOF 15, 32, 33. Given this representation, Tennenbaum would have had no reason to know that fiduciary duties were even owed to creditors, much less that they were breached.

C. *Claims Against Mr. Feliciano For Breach of Duty of Loyalty.*

27. The Court holds that Mr. Feliciano did not breach his duty of loyalty. The Committee has failed to prove that Mr. Feliciano was interested in any

--- B.R. ----                                                    Page 14
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

transaction and voted in favor of it due to his outside financial interests rather than voting in the best interests of Radnor. *Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 363 (Del.1993)* ("to establish a breach of duty of loyalty, [plaintiff] must present evidence that the director either was on both sides of the transaction or 'derive[d] any personal financial benefit from it in the sense of *self-dealing,* as opposed to a benefit which devolves upon the corporation or all stockholders generally." ') (emphasis in original).

28. Indeed, the Committee only complains of two transactions that occurred after Mr. Feliciano became a director. In connection with the first, the Tranche C Loan, the record evidence is that Mr. Feliciano *abstained* from the vote. *See* FOF 35, 47. The second is the stalking horse bid. The record reflects that Mr. Feliciano resigned from the board in June 2006, *see* FOF 51, and that Radnor first approached Tennenbaum about making a stalking horse bid in July. (Tr. 1476). Simply put, Mr. Feliciano did not vote on either transaction, much less vote in his self interest. Nor does the record support that Mr. Feliciano used his board seat to pressure the other directors into the Tranche C and stalking horse deals. *See* FOF 51.

29. To the extent the Committee relies on Tennenbaum's prior relationship with Lehman Brothers, or Mr. Feliciano's failure to disclose the prior relationship to the board, as support for this claim, the Court concludes that the prior relationship did not present an actual conflict. Nor is there evidence to support that the prior relationship had any influence on Lehman's conduct, provided an advantage to Tennenbaum, or resulted in any damage to any constituency. Both Mr. Feliciano's and Lehman's Mr. Shapiro's testimony about this issue-in particular the extent and tenuous nature of the prior relationship-is consistent with the Court's conclusion.

*20 30. I likewise find no merit in the separate allegation that Mr. Feliciano breached his duties by using his knowledge to bid on the assets of Radnor in this bankruptcy case. As a matter of law, there is no *per se* breach of fiduciary duty for an insider making a bid to purchase a company or its assets. Were it otherwise, every management led leveraged buyout would be a *per se* breach of fiduciary duty, yet the Delaware courts have held otherwise. *See, e.g., In re Cysive, Inc. S'holders Litig., 836 A.2d 531 (Del.Ch.2003); Lewis v. Leaseway Trans. Co.,* Civ. Act. No. 8720, 1990 Del. Ch. LEXIS 69 (Del. Ch. May 16, 1990). Moreover, as noted above, it is the

law of the case that it was in the Debtors' interest to enter into the stalking horse bid. COL 25. Therefore, there can be no breach of duty by Mr. Feliciano in using information about Radnor in formulating that bid, since that bid helped Radnor.

*Disallowance of Proof of Claim*

31. The proof of claim filed by Tennenbaum established the *prima facie* validity of the Tennenbaum claim in the amount of $128,835,557.26 as of the petition date, plus post petition accruals and expenses referred to therein. *See* Fed. R. Bankruptcy Procedure 3001(f) ("a proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim"). *See also In re International Wireless Communs. Holdings, Inc., 257 B.R. 739 (Bankr.D.Del.2001)* ("Initially, a claimant must allege facts sufficient to support a legal basis for the claim. If the assertions in the filed claim meet this standard of sufficiency, the claim is prima facie valid pursuant to Bankruptcy Rule 3001(f)."). Thus, Tennebaum has met its burden of proof, and its proof of claim is allowed until an objection supported by substantial evidence is presented to the Court. *See In re Mid-American Waste, 284 B.R. at 65* (party objecting to properly filed proof of claim bears the initial burden of presenting sufficient *evidence* to overcome the presumed validity and amount of claim); *Brown v. IRS (In re Brown), 82 F.3d 801 (8th Cir.1996)* (a claim's presumptive validity is not altered unless an objection is supported by *substantial evidence* ). The Committee has offered the Court no evidence, let alone substantial evidence, contesting any component of Tennenbaum's claims. Accordingly, Tennenbaum's proof of claim is allowed, as of the Petition Date, in the amount of $128,835,557.26, plus the amount of all post petition interest and expenses that constitute obligations under the TCP Credit Agreement.

32. The Court's Bid Procedures Order (Dkt.144) provided that Tennenbaum would be allowed to credit bid its allowed claim to the full extent allowed by Bankruptcy Code Section 363(k). Accordingly, Tennenbaum is authorized to credit bid the full amount of its claim, in an amount equal to $128,835,557.26, plus the amount of all post petition interest and expenses that constitute obligations under the TCP Credit Agreement.

*Avoidance of Liens*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*21 33. The proof of claim filed by Tennenbaum in the amount of $128,835,557.26 as of the petition date included copies of properly recorded mortgages, fixture filings and UCC financing statements. *See* FOF 55. The Committee submitted no evidence contradicting the validity or enforceability of the liens and security interests securing such claim. Once a secured creditor shows its properly filed financing statements, it has established a *prima facie* secured claim; and a secured creditor is not required to show that its security interests are not voidable in order to establish its secured status. *Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635, 642 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992).

34. Thus, I hold that Tennenbaum met its initial burden of proof with respect to its liens and security interests, and because the Committee submitted no substantial evidence contradicting such liens and security interests, Tennenbaum need present no further proof of the validity and enforceability of its liens and security interests.

*Preference Claim*

35. Under Bankruptcy Code Section 547(b)(5), the burden of proof is on the Committee to show that Tennenbaum was under-secured. *Batlan v. Transamerica Commer. Fin. Corp. (In re Smith's Home Furnishings, Inc.),* 265 F.3d 959, 963-64 (9th Cir.2001) (stating that transfers to fully-secured creditors are generally not preferential because fully-secured creditors are entitled to recover 100 percent of their claims in a liquidation); *Lease-A-Fleet v. Wolk (In re Lease-a-Fleet, Inc.),* 151 B.R. 341, 348 (Bankr.E.D.Pa.1993) (plaintiff in a preference action must prove defendant is unsecured or undersecured); *O'Neill v. Dell (In re O'Neill),* 204 B.R. 881, 892 (Bankr.E.D.Pa.1997) (same). Section 547(b)(5) is not a defense to a preference; rather it is a fundamental component of the case-in-chief of a preference claim, and, under Section 547(g), the burden of proof on every element of Section 547(b) is on the Committee. *Mellon Bank, N.A.,* 945 F.2d at 642; *Golden v. The Guardian (In re Lenox Healthcare, Inc.),* 343 B.R. 96, 107 (Bankr.D.Del.2006) (trustee must establish each element of section 547(b)(5)); *IT Litigation Trust v. Alpha Analytical Labs (In re IT Group, Inc.),* 331 B.R. 597, 601 (Bankr.D.Del.2005) (creditor's committee, as plaintiff, had burden of proving each of the elements under 547(b)).

36. The Committee offered no evidence at all on the issue of the value of the collateral securing Tennenbaum's claim. The Court finds that the only competent evidence admitted at trial shows that the collateral securing the Tennenbaum claim was valued at more than $132 million: millions of dollars more than Tennenbaum's $128.8 million petition date claim. FOF 56. Therefore, the Committee has failed to meet its burden of proof.

37. Additionally, the Court concludes that the interest payment at issue was made on April 4, 2006, outside the 90-day preference period. Therefore, the payment is a preference only if Tennenbaum was not insider for the purpose of the one-year reachback period of Section 547(b)(4)(B). However, I already have concluded that Tennenbaum was not an insider. *See* COL 11.

*22 38. Whatever influence Tennenbaum exerted on the direction of the Debtors was indirect, arising from the covenants and other provisions Tennenbaum contracted for in the Credit Agreement, which is not sufficient to turn a secured lender into an insider of the Debtors. Reasonable financial controls negotiated at arms' length between a lender and a borrower does not transform a lender into an insider. *See In re Winstar Commc'n., Inc.,* 348 B.R. at 279 (there must be *day-to-day control,* rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake); *In re Octagon Roofing,* 124 B.R. 522, 530 (Bankr.N.D.Ill.1991) (exercise of financial control by a creditor over a debtor which is incident to the creditor-debtor relationship, does not make the creditor an insider); *In re Huizar,* 71 B.R. 826, 832 (Bankr.W.D.Tex.1987) (creditor-lending institutions must be able to exercise a reasonable amount of debtor control without fear of being labeled an insider). Similarly, the mere opportunity to exercise control, if not exercised, also does not make a creditor a person in control of a debtor. *In re Wescorp, Inc.,* 148 B.R. 161 (Bankr.D.Conn.1992); *In re Tech. for Energy Corp.,* 56 B.R. 307, 316 (Bankr.E.D.Tenn.1985) (defendant held not to be an insider where it attained control of Debtors' voting stock but did not exercise such power); *In re Piece Goods Shop, Co., L.P.,* 188 B.R. 778 (Bankr.M.D.N.C.1995) (because right to elect directors was never exercised, defendant held not to be an insider).

39. The Court also finds that the interest payment cannot be avoided for an additional reason: it was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                            Page 16
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

made in connection with a contemporaneous exchange with Tennenbaum, in which Tennenbaum provided more than $20 million of net new value to the Debtors, and the parties clearly intended such interest payment and new value to be a contemporaneous exchange. *See* FOF 59. Under Bankruptcy Code Section 547(c)(1), a transfer is not a preference if it was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor, and (B) in fact a substantially contemporaneous exchange."

40. A creditor provides new value when it makes a loan to the debtor. *Laker v. Vallette (In re Toyota of Jefferson, Inc.), 14 F.3d 1088, 1091 (5th Cir.1994)*. Tennenbaum's delivery of more than $20 million to the Debtors on April 4, 2006 as an additional advance under the Credit Agreement is new value for the purposes of Section 547(c)(1). Even if some of the new value is used by a debtor to pay pre-existing debt, the transfer falls within the four corners of 11 U.S.C. § 547(c)(1) if the amount transferred to the debtor exceeds the amount repaid on pre-existing debt. *In re Arrow Air, Inc., 940 F.2d 1463, 1466 (11th Cir.1991); In re Erin Food Servs., Inc., 117 B.R. 21, 30-31 (Bankr.D.Mass.1990)*.

*Acquiescence*

**\*23** 41. The Committee's equitable subordination and breach of fiduciary duty Counts are causes of action sounding in equity. In addition to holding that the Committee has failed to prove its case-in-chief on these Counts, I conclude that the Committee's claims are barred by the equitable defense of acquiescence, as applied by the Delaware courts.

42. It has long been the law of Delaware that where a transaction cannot be accomplished without stockholder approval, a stockholder who either votes in favor of the transaction or accepts the consideration offered by the transaction is barred from asserting claims in connection with that transaction. *See, e.g., Kahn v. Household Acquisition Corp., 591 A.2d 166, 176-77 (Del.1991); Bershad v. Curtiss-Wright Corp., 535 A.2d 840, 848 (Del.1987); Elster v. Am. Airlines, 100 A.2d 219, 220-221 (Del.Ch.1953); Finch v. Warrior Cement Corp., 141 A. 54, 60 (Del.Ch.1928)*. Here, 95% of the noteholders, including *a majority of the members of the Committee,* did both: they voted in favor of Tranche C and accepted $675,000 in exchange for their consent. Thus, they have acquiesced to the

Tranche C Loans. Having acquiesced to it, they cannot now be heard to argue that Tranche C should be treated as equity, nor that entering into Tranche C was a breach of fiduciary duty.

43. While the Committee is a separate legal entity from the noteholders who approved Tranche C, the Delaware cases draw no such distinction. They typically arise in a class action context, where like the seven members of the Committee, a stockholder attempts to bring claims not only on his or her own behalf, but on behalf of *all* stockholders, including stockholders that did not acquiesce. Nevertheless, the Delaware courts have barred the stockholders who acquiesced from asserting such claims on behalf of those who did not. *See, e.g., Kahn, 591 A.2d at 176-77; In re Lukens Inc. S'holders Litig., 757 A.2d 720, 738 (Del.Ch.1999), aff'd sub. nom., Walker v. Lukens, Inc., 757 A.2d 1278 (Del.2000)* (TABLE) (noting, because a "large majority of the putative plaintiff class...both voted in favor of the merger and received the benefits of it," that "plaintiffs would confront substantial obstacles in continuing the action on behalf of those persons"). I find that the noteholders who control the Committee are in the same position and cannot maintain their equitable subordination and breach of fiduciary duty claims.

*Damages*

44. Even if I were to hold that the Committee had prevailed on one or more of its claims for breach of fiduciary duty, I would hold that it has failed to prove a recognizable measure and amount of damages. First, while Mr. Darr denied it, his damages calculation essentially is a deepening insolvency model, as it calculates the difference between the value that the unsecured creditors would have received if the Debtors filed for bankruptcy in October 2005 and the value available to them in this bankruptcy case.[FN4] (Tr. 692-93). The Third Circuit recently held that deepening insolvency is not a recognized form of damages. *In re CitX Corp., 448 F.3d at 677-78; cf.* COL 16-18. Because I find Mr. Darr's methodology to be indistinguishable from deepening insolvency and I find deepening insolvency to be an impermissible measure of damages, I find no basis in the record from which to compute damages.

**\*24** 45. Moreover, Mr. Darr's damages calculation is overstated. First, more than half of his computed damages assume that the Committee *loses* its subordination and recharacterization arguments. (Tr.

--- B.R. ----                                                          Page 17
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----)**

694-96). Second, he readily conceded that he did not subtract transaction costs from his analysis, but it is indisputable that to realize any value at October 27, 2005, Radnor would have had to file for bankruptcy or undertake an extraordinary corporate transaction, both of which are expensive. (Tr. 706-08). Third, Mr. Darr's damages model incorrectly assumes that Radnor's value as of October 27, 2005 would not have been further reduced by Radnor's poor operating performance even if it had been restructured in a bankruptcy on that date, an illogical assumption given the Company's financial performance after October 27.

46. Finally, I note that Mr. Darr opined that he had no opinion as to who caused the damages or any inequitable conduct engaged in connection therewith (Tr. 694:4-9) and the theories offered by the Committee are rejected as discussed above.

FN1. This amendment reflects (a) non-substantive changes and (b) fact finding additions to Doc. # 37. The judgment remains the same.

FN2. The Court also holds that TCP's role does not support "insider" status under the other provisions of 11. U.S.C. § 101. *See* 11 U.S.C. § 101(31)(B) (defining "insider" as (i) a director of the debtor; (ii) an officer of the debtor; (iii) a person in control of the debtor; (iv) a partnership in which the debtor is a general partner; (v) a general partner of the debtor; or (vi) a relative of a general partner, director, officer, or person in control of the debtor.); 11 U.S.C. § 101(31)(E) (insider may include an affiliate or an insider of an affiliate of the debtor); 11 U.S.C. § 101(2) ("affiliate" includes and entity that owns, controls, or holds power to vote 20% or more of the debtor's outstanding voting securities). The fact that Mr. Feliciano was a board member does not make TCP an insider. *See Gray v. Chace (In re Boston Publ'g Co., Inc.),* 209 B.R. 157, 169-70 (Bankr.D.Mass.1997) (person who was both a shareholder and a creditor of a debtor and who designated a board member was not an insider).

FN3. In this respect, the Court notes that it is strikingly odd to have a trial on aiding and abetting breach of fiduciary duties where the alleged primary wrongdoers (the board) are

not named as defendants. The Court is not aware of a single reported post-trial or appellate decision awarding or upholding damages for aiding and abetting breach of fiduciary duty where the primary wrongdoers were not named as defendants.

FN4. Mr. Darr's attempts to distinguish his model from deepening insolvency were unavailing. The fact that his model does *not* assume that the Defendants committed any wrong, Tr. 692-94, makes me *less* likely to apply the damages formulation, as that is a concession that there is no causation between the harm and the damages alleged. *See, e.g., Gannett Co., Inc. v. Kanaga, M.D., 750 A.2d 1174, 1188 (Del.2000)* ("Once liability is established, a plaintiff seeking recovery of damages in a tort action must establish causation and consequential damage."). Mr. Darr's other attempt to distinguish deepening insolvency, on the ground that he does not include new *unsecured* debt, Tr. 692-93, simply is irrelevant, since he is showing deterioration in value *above* the unsecured creditor level.

Bkrtcy.D.Del.,2006.
In re Radnor Holdings Corp.
--- B.R. ----, 2006 WL 3346191 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Maribeth L. Minella, Esquire, hereby certify that on this 12th day of December 2006, I caused a true and correct copy of the Appendix to the Opening Brief in Support of Defendant KPMG LLP's Motion to Dismiss to be filed with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Daniel Bartley Rath (rath@lrclaw.com)
Maribeth Leslie Minella (bank@ycst.com)
Kerri King Mumford (mumford@lrclaw.com)
Ross H. Parker (rparker@munsch.com)
Phil C. Appenzeller, Jr (pappenzeller@munsch.com)

I further certify that I have served the parties listed on the service list below in the manner indicated.

/s/ Maribeth L. Minella
Maribeth L. Minella

Jr. Phil C. Appenzeller, Esq
Ross H. Parker, Esq.
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard, Suite 3800
Dallas, TX 75201
(Astropower Liquidating Trust)
*First Class Mail*

Daniel B. Rath, Esq
Kerri K. Mumford, Esq.
James S. Green, Jr., Esq.
Landis Rath & Cobb LLP
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, DE 19899
(Atropower Liquidating Trust)
*Hand Delivery*

Michael D. Warden, Esq
David S. Petron, Esq.
Sidley Austin LLP
1501 K. Street, N.W.
Washington, D.C. 20005
(KPMG, LLP)
*First Class Mail*

Joseph Warganz
Associate General Counsel
KPMG LLP
757 Third Avenue
New York, NY  10017
*First Class Mail*