## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ASTROPOWER LIQUIDATING TRUST,  §
f/k/a ASTROPOWER, INC., §
 §
     Plaintiff, §
 §
v. §     Civil Action No. 06-469 (JJF)
 §
KPMG LLP, §
 §
     Defendant. §

## COMPENDIUM OF UNREPORTED OPINIONS TO
## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

LANDIS RATH & COBB LLP
Daniel B. Rath (No. 3022)
Kerri K. Mumford (No. 4186)
James S. Green, Jr. (No. 4406)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware 19899
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

- AND -

MUNSCH HARDT KOPF & HARR, P.C.
Phil C. Appenzeller, Jr. (Tex. Bar. #24003710)
Ross H. Parker (Tex. Bar #24007804)
David Mizgala (Tex. Bar #24031594)
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

Dated: February 16, 2007

## TABLE OF CONTENTS

Case Name ........................................................................................................................... Tab

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
    2005 Del. Ch. LEXIS 133 (Del. Ch. Aug. 26, 2005)...............................................................1

*Breakaway Solutions, Inc. v. Morgan Stanley & Co. Inc.*,
    2004 Del. Ch. LEXIS 125 (Del. Ch. Aug. 27, 2004).............................................................2

*Littleton v. Young*,
    1992 Del. LEXIS 15 (Del. Jan. 2, 1992).................................................................................3

*Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co.*,
    2005 Del. Super. LEXIS 57 (Del. Super. Ct. Feb. 23, 2005)....................................................4

*Norfleet v. Mid-Atl. Realty Co.*,
    2001 Del. Super. LEXIS 357 (Del. Super. Ct. Apr. 20, 2001) .................................................5

*Stanziale v. McGladrey & Pullen, LLP (In re Student Fin. Corp.)*,
    2006 U.S. Dist. LEXIS 56759 (D. Del. Aug. 10, 2006) ..........................................................6

# TAB 1

9 of 14 DOCUMENTS

⚠
Caution
As of: Feb 16, 2007

TODD ALBERT, JOSEPH M. BRYAN, JR., KEVIN CALDERWOOD,
KATHERINE D. CROTHALL, SCOTT W. FRAZIER, FU FAMILY REVOCABLE
TRUST, ROBERT B. GOERGEN, SR., ROBERT G. GOERGEN, JR., TODD A.
GOERGEN, HASAN 1995 LIVING TRUST, WAI YAN HO, WILLIS JAMES
HINDMAN, JOHNSON FAMILY LIVING TRUST, MICHAEL R. KIDDER
REVOCABLE TRUST, MARK AND ANN KINGTON, JEFFREY A. KOSER,
MARLENKO INC., ELAINE MCKAY FAMILY, LP, DAVID MIXER, MRW
TRUST, JAMES MURRAY, JIM K. OMURA 1996 TRUST, JENNIFER OWEN
AND MICHAEL J. ROSS, NICHOLAS PEAY, DOUGLAS G. SMITH,
FREDERICK G. SMITH, JANE VEI-CHUN SUN, MARK WABSCHALL, KAREN
L. WALSH, WARMENHOVEN 1995 CHILDREN'S TRUST, YAN 1996
REVOCABLE TRUST, BARBARA J. ZALE, and CHARLES A. ZIERING, Plain-
tiffs, v. ALEX. BROWN MANAGEMENT SERVICES, INC.; DEUTSCHE BANK
SECURITIES, INC.; DEUTSCHE BANK, AG; RICHARD HALE; GARY
FEARNOW; BRUNS GRAYSON; E. ROBERT KENT, JR.; TRUMAN T.
SEMANS; DC INVESTMENT PARTNERS, LLC; DOCTOR ROBERT CANTS,
III; and MICHAEL W. DEVLIN, Defendants. ELIZABETH J. BAKER, BENDER
1996 REVOCABLE TRUST, DR. STEVEN J. BERLIN, ESTATE OF ROBERT B.
BLOW, LUTHER C. BOLIEK, STEPHEN E. COIT, SARA CROWDER, GERALD
K. AND TERESA K. FEHR, FU FAMILY REVOCABLE TRUST, RALPH
GLASGAL, ROBERT G. GOERGEN, JR. 1985 TRUST, TODD A. GOERGEN
1985 TRUST, PETER O. HAUSMANN, WILLIS JAMES HINDMAN, WILLIAM
F. KAISER, MARK AND ANN KINGTON, TIMOTHY K. KRAUSKOPF,
WILLIAM T. MCCONNELL, PHILIP R. MCKEE, DAVID MIXER, MRW
TRUST, JAMES MURRAY, PAUL D. AND JUDITH F. NEWMAN, W.L.
NORTON, GREGORY PACKER, HOWARD E. ROSE, RUBEN FAMILY
LIMITED PARTNERSHIP, 5 S TRUST, SALADRIGAS FAMILY LTD.
PARTNERSHIP, RICARDO A. SALAS, JOSE M SANCHEZ, SAMUEL SIEGEL,
SILVERMAN 1996 IRREVOCABLE TRUST, DOUGLAS G. SMITH,
FREDERICK G. SMITH, RONALD B. STAKLAND, STRAUCH KULHANJAIN
FAMILY TRUST, BRUCE E. TOLL, ALEXANDER R. AND MARJORIE L.
VACCARO, YANOVER FAMILY LTD. PARTNERSHIP, MICHAEL YOKELL,
and JUSTIN A. ZIVIN, Plaintiffs, v. ALEX. BROWN MANAGEMENT SERVICES;
DEUTSCHE BANK SECURITIES, INC.; DEUTSCHE BANK, AG; RICHARD
HALE; E. ROBERT KENT, JR.; TRUMAN T. SEMANS; DC INVESTMENT
PARTNERS, LLC; DOCTOR ROBERT CRANTS, III, and MICHAEL W.
DEVLIN, Defendants.

C.A. No. 762-N, C.A. No. 763-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 133*

**July 22, 2005, Submitted**

2005 Del. Ch. LEXIS 133, *

**August 26, 2005, Decided**
**August 26, 2005, Filed**

**PRIOR HISTORY:** *Albert v. Alex. Brown Mgmt. Servs., 2005 Del. Ch. LEXIS 100 (Del. Ch., June 29, 2005)*

**COUNSEL:** [*1] Jeffrey S. Goddess, Esquire, Jessica Zeldin, Esquire, ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; Steven E. Fineman, Esquire, Hector D. Geribon, Esquire, Daniel P. Chiplock, Esquire, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, New York, New York, for Plaintiffs.

Michael D. Goldman, Esquire, Peter J. Walsh, Esquire, Melony R. Anderson, Esquire, POTTER, ANDERSON & CORROON LLP, Wilmington, Delaware; Christopher P. Hall, Esquire, Kevin Rover, Esquire, John Vassos, Esquire, Marilyn B. Ampolsk, Esquire, MORGAN, LEWIS & BOCKIUS,LLP, New York, New York, for Defendants Alex Brown Management Services, Inc., Deutsche Bank Securities, Inc. and Deutsche Bank A.G.

Daniel Griffith, Esquire, MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, Wilmington, Delaware, for Defendants DC Investment Partners, LLC, Dr., Robert Crants, III and Michael W. Devlin.

Richard D. Allen, Esquire, Thomas W. Briggs, Jr., Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, for Defendants Richard Hale, Gary Fearnow, Bruns Grayson, E. Robert Kent, Jr. and Truman T. Semans.

**JUDGES:** LAMB, Vice Chancellor.

**OPINION BY:** LAMB

**OPINION:**

### MEMORANDUM OPINION

LAMB, Vice Chancellor.

#### I. [*2]

In a recent opinion in these two related cases on the defendants' motion to dismiss under Court of Chancery Rule 12(b)(6), the court addressed the defendants' statute of limitations argument and concluded that any claims arising before November 11, 2000, the date upon which the parties entered into an agreement tolling the statute of limitations, were barred. n1 Because it was unclear which, if any, claims for relief set out in the complaints arise after that date, the court requested additional submissions from the parties.

n1 The facts alleged in the complaints are recited in detail in the earlier opinion. *Albert v. Alex. Brown Mgmt. Servs., 2005 Del. Ch. LEXIS 100, at *43-58 (Del. Ch. June 29, 2005).* Reference is made to that opinion for a complete recitation of the facts and for the definition of terms used herein. However, to avoid confusion, the court refers in this opinion to Alex. Brown Management Services, Inc. as "AB Management." Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

#### [*3]

In this opinion, the court now addresses the issues raised in the additional submissions as well as the remaining issues raised by the defendants' motion to dismiss. Included among the latter are: (i) whether any surviving claims are derivative, rather than direct claims as to which demand was neither made nor excused; and (ii) whether the court can exercise personal jurisdiction over several defendants (the "DCIP Defendants") who served as agents, or employees of agents, of the partnerships.

#### II.

In the earlier opinion, the court noted that some of the factual allegations in the complaints occurred after November 11, 2000 and that, therefore, viable claims based on these factual allegations are not time-barred. n2 The Plaintiffs' Response Brief n3 identified five other factual allegations in the complaints (all involving allegedly material misrepresentations or non-disclosures) which, they contend, support viable claims for relief. These are: (i) the Managers' failure in the December 2000 semi-annual reports (dated on or about February 28, 2001) to inform the defendants that hedging was desirable, but the Funds could not afford to do so; (ii) the allegedly misleading statement [*4] in the December 31, 2000 report to the unitholders that the Managers remained "comfortable with the broad diversification achieved by the Funds' portfolio of public securities and private investments. . . .;" (iii) the defendants' failure to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity," although these themes were the focus of the Management Committee meetings of October 3, 2000, March 23, 2001, and September 6, 2001; (iv) the defendants' failure to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds,

thereby leaving Bank of America as the only lender for the Funds; and (v) the defendants' failure to inform the unitholders of the Funds violation of their credit arrangements with their lenders, including their eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan).

n2 The factual allegations specifically discussed in the earlier opinion are as follows: First, the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law. Second, the Managers wrongfully allowed certain withdrawals from the Funds, thereby causing or exacerbating a liquidity crisis. Specifically, the Fund II Complaint alleges that three withdrawals from Fund II occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, the Fund I Complaint alleges approximately $ 8.0 million in withdrawals occurred in December of 2000 from Fund I (the "Fund I December 2000 Withdrawals"). Third, the Managers failed to provide active and competent management of the Funds. *Alex. Brown, 2005 Del. Ch. LEXIS 100, at *78-*79.*

[*5]

n3 The Plaintiffs' Response Brief is titled "Plaintiffs' Brief In Response To The Court's Memorandum Opinion And Order Of June 29, 2005" and was filed on July 15, 2005.

All five of these factual allegations are found in the complaints. Furthermore, they allegedly occurred after November 11, 2000. Therefore, claims based on these allegations are timely. However, a threshold question is whether the information that the plaintiffs allege should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If this information is not material as a matter of law, the allegations will not support claims that the Managers violated their disclosure duties. whether, under the facts alleged in the complaints, these disclosure (or non-disclosure) allegations support a reasonable inference of materiality. If they do not, these factual allegations cannot support a claim for relief.

The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings. n4 Therefore, the court cannot (and does not) make any final findings on the [*6] materiality of these

alleged disclosure allegations. However, on a Rule 12(b)(6) motion, the court must determine

n4 *O'Malley v. Boris, 742 A.2d 845, 850 (Del. 1999)*

An omitted fact is material if "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix' of information made available." n5

n5 *Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del. 1983)* (quoting *TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)).*

The first alleged non-disclosure is that the Managers' failed in the December 2000 semi-annual reports [*7] to inform the unitholders that hedging was desirable, but the Funds could not afford to do so. This allegation of non-disclosure, viewed in the context of the allegations contained in the complaints, supports a reasonable inference that this information is material. According to the complaints, the defendants marketed the Funds as being actively managed by experienced, professional managers. Viewed in this context, a unitholder would likely find it important to know that the Managers could not manage the Funds in what they believed to be the Funds' best interests, because they were facing liquidity problems and could not afford to purchase collars.

The second alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity." As alleged in the complaints, the real cause of the Funds' losses was the lack of liquidity. The lack of liquidity allegedly prevented the Managers from properly hedging the Funds as they (allegedly) thought was best for the Funds. Viewed in that context, a reasonable investor would likely find it important [*8] to know such information.

The third alleged non-disclosure is that the defendants failed to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds. Under the facts alleged,

the court cannot reasonably infer that this information is material. The complaints allege that the unitholders understood from the very beginning that the Funds would have to borrow money. This is because the contributed securities were illiquid and the Funds needed cash to purchase collars. Given that fact, it is unlikely that a reasonable investor would find it important to know that the Funds were borrowing from one lender as opposed to multiple lenders. In fact, such information would likely only confuse an investor by giving him more information than is necessary to understand the Funds. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The fourth alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' violations of the credit arrangements with their lenders, including the eventual defaults, on June 5, 2002 (for the [*9] Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan). This allegation supports a reasonable inference of materiality. As opposed to the information about a bank withdrawing from the credit syndicate, the fact that the Funds were in default on their loans directly speaks to the financial condition of the Funds. A reasonable investor would want to know this information.

Finally, the plaintiffs allege that the claim in the December 31, 2000 report that the Managers remained "comfortable with the broad diversification achieved by the Funds' portfolio of public securities and private investments" was materially false and misleading. This allegation does *not* support a reasonable inference that this information is material. It is simply a statement of the Managers' opinion. Furthermore, there is no allegation in the complaints that this statement of opinion was not honestly held, i.e. false. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The Non-Disclosure Allegations n6 relate to failures to disclose allegedly material information. There is not, of course, any general duty to disclose information. To bring a non-disclosure claim, [*10] a party must allege either a fiduciary duty or a contractual duty to disclose. The plaintiffs have attempted to allege both. Therefore, the court will address the Non-Disclosure Allegations in the context of the plaintiffs' claims for breach of fiduciary duty and breach of contract.

n6 Collectively, the court refers to the three remaining factual allegations of non-disclosure as the "Non-Disclosure Allegations."

**III.**

The allegations set out in the two complaints are nearly identical and the complaints are both set out in eleven counts: breach of fiduciary duty (Count 1); aiding and abetting a breach of fiduciary duty (Count 2); common law fraud (Count 3); aiding and abetting common law fraud (Count 4); breach of contract against AB Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II) (Count 5); breach of the covenant of good faith and fair dealing against AB Management (with respect to Fund I) and breach of the covenant of good faith and fair dealing against [*11] DCIP (with respect to Fund II) (Count 6); gross negligence (Count 7); unjust enrichment against all defendants (Count 8); conspiracy liability (Count 9); an accounting (Count 10); and agency liability against Deutsche Bank and DBSI (Count 11). The court first addresses each of the substantive claims (Counts 1, 3, 5-8, & 10). The court then considers the vicarious liability claims (Counts 2, 4, 9, & 11).

A. Breach Of Fiduciary Duty (Count 1)

1. Failure To Provide Financial Statements

The complaints allege that the Managers failed to provide the unitholders with the 2001 audited financial statements until 2003, and failed to provide any investor reports or audited financial statements for 2002. The plaintiffs argue that this amounted to a breach of the Managers' fiduciary duties.

There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such reports. n7 The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty. n8 Thus, this factual allegation does not state a claim for breach [*12] of fiduciary duty.

n7 Partnership Agreements § 11.2.

n8 In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

2. Withdrawal Allegations

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the

Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had sufficient financial resources' to accomplish their investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, oversight and management of the Funds." n9

n9 Pls.'s Resp. Br. at 7.

[*13]

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. Director liability for breaching the duty of care "is predicated upon concepts of gross negligence." n10 A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives. n11

n10 *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)*; accord *Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 66 (Del. 1989).*

n11 *Citron, 569 A.2d at 66*

[*14]

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness." n12 "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." n13 In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason." n14

n12 William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law, 56 BUS. LAW. 1287, 1300 (2001)*;accord *Tomczak v. Morton Thiokol, Inc., 1990 Del. Ch. LEXIS 47, at *35 (Del. Ch. Apr. 5, 1990)* ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are without the bounds of reason.'") (citations omitted).

[*15]

n13 *In re Walt Disney Co. Derivative Litig., 2005 Del. Ch. LEXIS 113, at *162,    A.2d.    , (Del. Ch. Aug. 9, 2005)* (internal citations and quotations omitted).

n14 *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc., 1996 Del. Ch. LEXIS 116, at *42 (Del. Ch. Sept. 3, 1996)* (citations omitted), *aff'd, 692 A.2d 411 (Del. 1997)* (TABLE); *see also Solash v. Telex Corp., 1988 Del. Ch. LEXIS 7, at *24-*25 (Del. Ch. Jan. 19, 1988)* (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests "in [their] [*16] sole discretion," n15 it is difficult to read that discretionary power as imposing a positive duty to exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had sufficient financial resources' to accomplish their investment objectives.'" Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

n15 Fund I Compl. P82; Fund II Compl. P94.

Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach of fiduciary duty.

### 3. Active And Competent Management And Disclosure Allegations

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers devoted inadequate time and attention to managing the Funds. The complaints also [*17] allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds. n16 The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly agreed that the Managers were sufficiently qualified to manage the Funds.

n16 *See* Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, [*18] is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged misstatements took place before November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing difficult challenges. The Managers originally set up the Funds with collars, attempting to limit the upside and downside potential of the Funds. n17 The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-

term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

n17 "Collaring" is financial jargon for purchasing offsetting calls and puts on a security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown, 2005 Del. Ch. LEXIS 100, at *9.*

[*19]

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost non-existent, [*20] meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those challenges. These alleged disclosure violations were potentially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the Man-

agers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing [*21]   (Counts 5 & 6)

In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff. n18

n18 *VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).*

1. Failure To Provide Financial Statements Allegations

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to [*22] sue for rescission or a like remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be dismissed.

2. Withdrawal Allegations

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch. However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years. n19 As alleged in the complaints, the unitholders' right to withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion." n20

n19 *See* Partnership Agreements PP6.3.

n20 Fund I Compl. P82, Fund II Compl. P94.

This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, [*23] it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be dismissed. n21

n21 In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

3. Active And Competent Management And Disclosure Allegations

The plaintiffs allege that the defendants owed them a contractual duty to provide active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only sporadically, less than once a year since the inception of the Funds.

As stated above, the [*24] Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue that the Managers failed to disclose certain material information-the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to dismiss.

C. Fraud (Count 3)

The plaintiffs' third claim is for fraud. Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to in-

duce the plaintiff to [*25] act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance. n22 In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. n23 Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby." n24

n22 *Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983).*

n23 *Id.*

n24 *York Linings v. Roach, 1999 Del. Ch. LEXIS 160, at \*25 (Del. Ch. July 28, 1999).* (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing [*26] to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1 s claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money that the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be dismissed without prejudice to [*27] the claims asserted in Count 1 or Count 5.

D. Gross Negligence (Count 7)

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct." n25 As such, the unitholders are forced to argue that the Managers' alleged misconduct amounted to gross negligence.

n25 Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated [*28] on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to dismiss. Therefore, this claim survives as well.

E. Unjust Enrichment (Count 8)

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls. n26 It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.

n26 *Rossdeutscher v. Viacom, Inc., 768 A.2d 8, 24 (Del. 2001)* (applying New York law); *ID Biomedical Corp. v. TM Tech., Inc., 1995 Del Ch. LEXIS 34, \*39, 1995 WL 130743, at \*15 (Del. Ch. Mar. 16, 1995)* (applying Delaware law).

[*29]

Notwithstanding the existence of these contractual relationships, the plaintiffs make the bald claim that the Managers were unjustly enriched at the unitholders ex-

pense. This is insufficient to state a claim for unjust enrichment, when the existence of a contractual relationship is not controverted. Thus, this claim must be dismissed.

F. Agency Liability (Count 11)

The plaintiffs also bring claims against Deustche Bank and DBSI (as controlling persons of AB Management) based on agency liability. A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where "piercing the corporate veil" is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, "the concept of complete domination by the parent is decisive." n27

n27 *Phoenix Canada Oil Co. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988).*

Second, while one corporation whose shares are owned by a second corporation [*30] does not, by that fact alone, become the agent of the second company, a corporation-completely independent of a second corporation-may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven. n28

n28 *Id.* (citing *RESTATEMENT (SECOND) OF AGENCY § 14M, cmt. (a) (1958)*).

With respect to DBSI, the plaintiffs argue that AB Management was dominated and controlled by DBSI. In essence, the plaintiffs ask the court to disregard AB Management's corporate form n29 and impose liability on DBSI. The complaints allege that: (i) DBSI and AB Management operate out of the same Maryland office; (ii) AB Management, although incorporated, has no functioning board of directors and [*31] no business other than the management of the Funds; (iii) AB Management is run by its Management Committee, which is comprised of employees and executives of DBSI; (iv) DBSI provided margin accounts for the Funds; and (v) DBSI served as the placement agent and custodian for the Funds' accounts. n30

n29 AB Management is a corporation, organized under the laws of Maryland.

n30 Fund I Compl. PP44, 45, 247, 250, 332, 334; Fund II Compl. PP54, 179, 253-259.

"Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears." n31 Allegations (i), (iv) and (v) above, while consistent with an obviously close relationship between DBSI and its wholly owned subsidiary, do not alone or together support any inference that would lead this court to disregard the separate legal existence of AB Management; nor does the allegation that AB Management's business is run by DBSI employees. However, the well pleaded factual [*32] allegation that AB Management has "no functioning board of directors," when viewed most favorably to the plaintiffs in light of the other facts alleged, if proven, could provide a basis to conclude that the corporate form should be ignored. The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent. n32 The complaints allege that AB Management does not have board meetings or follow other corporate formalities. Instead, employees of DBSI allegedly perform the activities that, in a properly functioning corporation, the board of directors would perform. If these facts are true and the other relationships are shown to exist, an adequate basis for piercing the corporate veil could be established. Therefore, this claim against DBSI cannot be dismissed.

n31 *Mason v. Network of Wilmington, Inc., 2005 Del. Ch. LEXIS 99, at *9 (Del. Ch. July 1, 2005)* (internal quotations omitted).

n32 *Mabon, Nugent & Co. v. Texas Amer. Energy Corp., 1990 Del. Ch. LEXIS 46, at *14-*15 (Del. Ch. Apr. 12, 1990); Phoenix Canada Oil, 842 F.2d at 1477.*

[*33]

The complaints make additional allegations as to why AB Management is a mere agent of Deutsche Bank. These are: (i) Deutsche Bank purchased Alex. Brown, Inc. (the parent company of AB Management) thereby acquiring 100% ownership of AB Management; (ii) Deutsche Bank changed the name of the Funds the reflect the "Deutsche Bank" name; (iii) when the liquidity crisis became acute, the Management Committee decided that it needed to alert officials at Deutsche Bank; and (iv)

in July of 2002, Deutsche Bank fired all the members of the Management Committee. n33

n33 Fund I Compl. PP153, 163, 239-240; Fund II Compl. PP179, 253-259.

First, these factual allegations do not give rise to a reasonable inference that Deutsche Bank dominated and controlled AB Management and the Management Committee. These factual allegations show little more than Deutsche Bank owned the parent company of AB Management and, indirectly, AB Management itself. Ownership alone is not sufficient proof of domination or control. n34 The complaints [*34] allege that Deutsche Bank bought AB Management in June of 1999 and changed its name a few months later. The complaints do not allege any action by Deutsche Bank to influence or control the management of the Funds until July of 2002, when it fired the majority of the Management Committee. From these bare factual allegations, the court simply cannot infer domination or control.

n34 *Aronson, 473 A.2d at 815*; *see also In re W. Nat'l S'holders Litig., 2000 Del. Ch. LEXIS 82, (Del. Ch. May 22, 2000)* (holding that a 46% shareholder does not control or dominate the board due to stock ownership alone).

Second, these factual allegations do not give rise to a reasonable inference that, in the managing and/or sale of the Funds, AB Management and the Management Committee were Deutsche Bank's agent. Under the rubric of agency liability, there are two main theories-actual authority and apparent authority. Because the plaintiffs do not describe which theory of liability they assert, the court [*35] addresses both.

Actual authority is that authority which a principal expressly or implicitly grants to an agent. n35 There is simply no allegation in the complaints that Deutsche Bank expressly gave either AB Management or the Management Committee the authority to bind it as its agent.

n35 *Billops v. Magness Constr. Co., 391 A.2d 196, 197 (Del. 1978)*.

Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds

him out as possessing. n36 In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable. n37 The plaintiffs have not alleged any facts showing that Deutsche Bank held out either AB Management or the Management Committee as its agent; nor have the plaintiffs alleged facts from which the court can reasonably infer reliance.

n36 *Henderson v. Chantry, 2002 Del. Ch. LEXIS 14, at *14 (Del. Ch. Feb. 5, 2002)*. 2002). [*36]

n37 *Billops, 391 A.2d at 198.*

For the above reasons, the plaintiffs have failed to plead sufficient facts to support a claim for agency liability against Deutsche Bank and Count 11 against Deutsche Bank must be dismissed. However, the plaintiffs plead sufficient facts to support a claim for liability against DBSI. Therefore, Count 11 against DBSI will not be dismissed.

G. Conspiracy, Aiding And Abetting Fraud, And Breach Of Fiduciary Duty (Count 2, 4, & 9)

The plaintiffs allege that the defendants conspired to commit fraud and to commit a breach of fiduciary duty. The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties. n38 While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting. n39 However, the basis of such a claim, regardless [*37] of how it is captioned, is the idea that a third party who *knowingly* participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship. n40

n38 *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., 871 A.2d 428, 437 n.8 (Del. 2005)*; *Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-50 (Del. 1987)*.

n39 *See Benihana of Tokyo, Inc. v. Benihana, Inc., 2005 Del. Ch. LEXIS 19, at \*26 (Del. Ch. Feb. 28, 2005).*

n40 *Gilbert v. El Paso Co., 490 A.2d 1050, 1057 (Del. Ch. 1984), aff'd, 575 A.2d 1131 (Del. 1990).*

However captioned, civil conspiracy is vicarious liability. n41 It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty. n42 Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty. Instead, the plaintiffs attempt to hold Deutsche Bank and DBSI responsible for the Managers' alleged breaches of fiduciary duty. [*38]

n41 *See, e.g., Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1238 (Del. Ch. 2001)* ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort."), *rev'd on other grounds, 817 A.2d 149 (Del. 2002).*

n42 *Gilbert, 490 A.2d at 1057.*

The defendants argue that the plaintiffs have not adequately alleged that Deustche Bank and DBSI had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." n43 While Rule 9(b) provides that "knowledge . . . may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts [*39] from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it. n44

n43 *Atlantis Plastics Corp. v. Sammons, 558 A.2d 1062, 1066 (Del. Ch. 1989)* (citing Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

n44 *IOTEX Communs., Inc. v. Defries, 1998 Del. Ch. LEXIS 236, at \*12-\*13 (Del. Ch. Dec. 21, 1998).*

Furthermore, Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal. n45 With respect to DBSI, the complaints allege repeatedly that its employees, acting within the scope of their employment, had knowledge of the underlying factual allegations. Specifically, the complaints allege that the Funds were run by the Management Committee, all the members of which were employees of DBSI. n46 This knowledge is thereby imputed to DBSI.

n45 *J.I. Kislak Mtg. Corp. v. William Matthews Bldr., Inc., 287 A.2d 686, 689 (Del. Super. 1972), aff'd, 303 A.2d 648 (Del. 1972).*

[*40]

n46 Fund I Compl. PP45, 47-51, 247-251; Fund II Compl. PP55, 57-61, 261-266.

With respect to Deutsche Bank, the plaintiffs allege that AB Management and the Management Committee are mere agents of Deutsche Bank. However, as discussed above, the factual allegations in the complaints are insufficient to infer that AB Management and the Management Committee are the agents of Deutsche Bank.

For the above reasons, the court holds that the plaintiffs have not adequately pleaded facts that, if proven, would support an inference that Deustche Bank had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. The plaintiffs have adequately pleaded that DBSI had knowledge of the alleged wrongful acts. Therefore, with respect to Deutsche Bank, Counts 2, 4, and 9 must be dismissed. With respect to DBSI, these counts will not be dismissed.

H. Accounting (Count 10)

The plaintiffs' tenth claim is for an accounting. An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be [*41] due to either as a result. n47 As it is a remedy, should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.

n47 *Jacobson v. Dryson Acceptance Corp., 2002 Del. Ch. LEXIS 4, at*12-*13 (Del. Ch. 2002).*

## V.

The defendants argue that several of the claims in the complaints are derivative and that, since the plaintiffs did not make demand upon the Funds, and demand was not excused, these claims should be dismissed pursuant to Rule 23.1. n48

n48 The claims that the defendants contend are derivative are as follows: breach of fiduciary duty (Count 1), aiding and abetting breach of fiduciary duty (Count 2), breach of contract (Count 5), breach of the covenant of good faith (Count 6), gross negligence (Count 7), unjust enrichment (Count 8), accounting (Count 10), and agency liability (Count 11). As the court has already dismissed the claim for unjust enrichment (Count 8) and agency liability as to Deutsche Bank (Count 11), and deferred granting the equitable remedy of an accounting (Count 10), it will not discuss those claims here.

**[*42]**

The demand requirement in the limited partnership context is codified in *6 Del. C. § 17-1001*. That statute states:

A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

Likewise, the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases. n49 Accordingly, throughout this decision, the court relies on corporate as well as partnership case law for its determination of this lawsuit's nature.

n49 *Litman v. Prudential-Bache Prop., Inc., 611 A.2d 12, 15 (Del. Ch. 1992).*

The Delaware Supreme Court's recent decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* **[*43]** revised the standard for determining whether a claim is direct or derivative. Now, the determination "turn[s] solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" n50 "Under *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." n51 "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." n52

n50 *845 A.2d 1031, 1033 (Del. 2004).*

n51 *In re Syncor Int'l Corp. S'holders Litig., 857 A.2d 994, 997 (Del. Ch. 2004).*

n52 *Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004).*

As they are factually distinct, the court deals with the claims separately. First, the court addresses the claims for breach of contract **[*44]** and the breach of fiduciary duty based on the Non-Disclosure Allegations. Second, the court addresses the claims for gross negligence and failing to provide active and competent management, and the fiduciary duty claims based thereon.

A. Breach Of Contract And The Non-Disclosure Allegations

The claims for breach of contract and the claims for breach of fiduciary duty based on the Non-Disclosure Allegations are direct. First, the unitholders, not the partnerships, suffered the alleged harm. In order to show a direct injury under *Tooley*, a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]." n53 The gravamen of these claims is that the Managers failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements, in violation of their contractual and fiduciary duties. Generally, non-disclosure claims are direct claims. n54 Moreover, the

partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds [*45] from the Managers, or to bring suit to force the Managers to redeem their interests.

n53 *Tooley, 845 A.2d at 1039.*

n54 *See, e.g., Dieterich, 857 A.2d at 1029* (characterizing non-disclosure claims as direct claims); *Abajian v. Kennedy, 1992 Del. Ch. LEXIS 6, at *10 (Del. Ch. Jan. 17, 1992)* (same).

Second, the unitholders would receive any recovery, not the Funds. Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will receive the benefit of any remedy. n55 While the best remedy for a disclosure violation is to force the partnership to disclose the information, due to the passage of time since the alleged wrongdoing, that remedy would likely be inadequate. In order to compensate the unitholders for their alleged harm, the court may find it appropriate to grant monetary damages. Such damages would be awarded to the unitholders, and not the partnerships.

n55 *Tooley, 845 A.2d at 1033.*

[*46]
For all of the above reasons, the court concludes that the claims based on the Non-Disclosure Allegations and the alleged breach of contract are direct claims and, thus, demand was not required.

B. Gross Negligence And Failure To Provide Competent And Active Management

The claims for gross negligence and failure to provide competent and active management are clearly derivative. First, as stated above, in order to show a direct injury under *Tooley,* a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]." n56 The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially, this a claim for mismanagement, a paradigmatic derivative claim. n57 The Funds suffered any injury that resulted from the Managers' alleged inat-

tention. Any injury that the unitholders suffered is derivative of the injury to the Funds.

n56 *Tooley, 845 A.2d at 1039.*

n57 *See, e.g., Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988)* ("A claim of mismanagement . . . represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").

[*47]
Second, the Funds, not the unitholders, would receive any recovery. Again, under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy. n58 If the court finds that the Managers violated their fiduciary duties by failing to devote adequate time and effort to managing the Funds, any recovery would go to the party harmed, namely the Funds. Thus, these claims are derivative claims.

n58 *Tooley, 845 A.2d at 1033.*

If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed. n59 In this case, the plaintiffs have not alleged that they made demand on the Fund, nor have they alleged why demand should be excused. Accordingly, the derivative claim must be dismissed. However, in the interest of justice, the court dismisses these claims with leave to replead. n60

n59 *Haber v. Bell, 465 A.2d 353, 357 (Del. Ch. 1983).*

[*48]

n60 In a letter to the court, the plaintiffs stated that AB Management sent letters to all the unitholders of the Funds (the "Redemption Letters"), stating that the Managers would allow the unitholders to redeem their units and that the Managers are pursuing the dissolution of the

Partnerships. The plaintiffs argue that the Redemption Letters bolster their contention that their claims are direct, not derivative. However, the complaints do not contain the information in the Redemption Letters and the Redemption Letters are not referenced in the complaints. Therefore, these documents are not properly before the court on a Rule 12(b)(6) motion.

## VI.

The DCIP Defendants argue that, with respect to the Fund I Complaint, this court lacks personal jurisdictions over them. With respect to the Fund II Complaint, they argue that this court lacks personal jurisdiction over Crants and Devlin. n61

> n61 DCIP is the General Partner of Fund II. As such, there is no dispute that the court has personal jurisdiction viz. Fund II. *See RJ Assocs. v. Health Payors' Org. Ltd. P'ship.*, 1999. *Del. Ch. LEXIS 161, at *12 (Del. Ch. July 16, 1999)* (quoting *6 Del. C. § 17-109(a)* and holding that, as a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law).

[*49]

In support of their Rule 12(b)(2) motion, the DCIP Defendants adduced affidavits of both Devlin and Crants. The plaintiffs have not adduced any affidavits rebutting the Devlin and Crants affidavits, nor have they asked to take discovery. Instead, they have decided to rely on the well-pleaded allegations in their complaint. Moreover, since they have not been rebutted, the court must take as true the facts contained in the Devlin and Crants affidavits. However, where the well-pleaded allegations in the complaints are not rebutted by affidavit, the court will, for the purposes of this Rule 12(b)(2) motion, assume the truthfulness of those allegations. n62

> n62 *See Hart Holding Co. v. Drexel Burnham Lambert, Inc., 593 A.2d 535, 539 (Del. Ch. 1991)* (citing *Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2nd Cir. 1981)*) (stating that a trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is resolved).

According to the [*50] Devlin and Crants affidavits, DCIP is a Tennessee limited liability company, with its principal place of business in Nashville, Tennessee. Both Crants and Devlin are residents of Tennessee and perform the vast majority of their duties from their office in Nashville. Neither Crants nor Devlin recall ever traveling to Delaware. None of the DCIP Defendants solicit any business in Delaware or engage in any regular conduct with Delaware.

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant. n63 In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process? n64

> n63 *See Plummer & Co. Realtors v. Crisafi, 533 A.2d 1242, 1244 (Del. Super. 1987); see also Finkbiner v. Mullins, 532 A.2d 609, 617 (Del. Super. 1987)* (stating that, on a Rule 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *Greenly v. Davis, 486 A.2d 669 (Del. 1984))*.

[*51]

> n64 *LaNuova D & B, S.P.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986)*.

### A. The Long-Arm Statute

The plaintiffs argue that the court has personal jurisdiction over the DCIP Defendants under *10 Del. C. § 3104*, the Delaware long-arm statute. *Section 3104(c)* provides, in relevant part: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident . . . who . . . (1) Transacts any business or performs any character of work or service in the State . . . [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State. . . ." *Section 3104* has been broadly construed to confer jurisdic-

tion to the maximum extent possible under the *due process clause*. n65 Furthermore, when *in personam* jurisdiction [*52] is challenged on a motion to dismiss, the record is construed most strongly against the moving party. n66

n65 *Id.*

n66 *RJ Assocs., 1999 Del. Ch. LEXIS 161, at *13.*

The complaints lay out detailed allegations of the connections between the DCIP Defendants and the Funds. The Funds were established as Delaware limited partnerships and are governed by Delaware law. DCIP is the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II. Crants and Devlin are the managing members and owners of DCIP. DCIP acts principally through Crants and Devlin. The PPMs touted the DCIP Defendants' experience and qualifications in order to sell units in the Funds.

The PPMs also state that DCIP is responsible for the day-to-day management of the Funds. DCIP, in the persons of Crants and Devlin, attended every meeting of the Management Committee (none of which took place in Delaware). Also, DCIP, which acted through Crants and Devlin, was primarily responsible for choosing the securities [*53] included in the Funds.

In *RJ Associates*, Justice (then-Vice Chancellor) Jacobs held that this court could exercise personal jurisdiction over a limited partner in a Delaware limited partnership under *Section 3104(c)(1)*. Justice Jacobs held that the following three contacts, taken together, were sufficient to constitute "transacting business" under the Delaware long-arm statute: (i) the limited partner participated in the formation of the limited partnership, (ii) the limited partnership indirectly participated in the limited partnership's management by controlling' the general partner, and (iii) the limited partner caused the Partnership Agreement to be amended to alter the method of distributions to the partners. n67

n67 *RJ Assocs., 1999 Del. Ch. LEXIS 161, at *18.*

The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates*. First, DCIP participated in the formation of the Funds. In fact, DCIP was primarily responsible for selecting the initial

[*54] securities accepted by the Funds. n68 Second, DCIP not only participated in the management of the Funds, DCIP was primarily responsible for the management of the Funds. The PPMs state that "the Sub-Advisor will provide day-to-day management and administration of the Fund and investment advisory services, including, among other matters, the screening of contributed securities, advice regarding the selection of the illiquid Assets and hedging and borrowing strategies." n69 Finally, DCIP received millions of dollars in fees to manage the two Delaware entities.

n68 *See* Fund I Compl. P71; Fund II Compl. PP82, 241.

n69 Fund I PPM at 3-4, Fund II PPM at 3.

With respect to Crants and Devlin, the complaints allege that they are the owners and managing partners of DCIP. The complaints further allege that DCIP only acts through Crants and Devlin. In essence, the complaints allege that it was Crants and Devlin who selected the securities for the Funds, and managed the Funds on a day-to-day basis.

The court [*55] finds that these contacts are sufficient to constitute "transacting business" under the long-arm statute.

B. Due Process

The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require it to defend itself in the courts of the state consistent with the traditional notions of fair play and justice. n70 In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts. n71 The minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum. n72 Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require it to submit to the forum's jurisdiction. n73

n70 *AeroGlobal, 871 A.2d at 440* (citing *Int'l Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945)).*

[*56]

n71 *Id.*

n72 *Sternberg v. O'Neil, 550 A.2d 1105, 1120 (Del. 1988).*

n73 *Id.; see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (U.S. 1985)* (requiring "purposeful availment" of the benefits of the state's laws to satisfy the minimum contacts test).

In addition to the contacts outlined above that the complaints allege between DCIP Defendants and the Funds, the plaintiffs also allege that the DCIP Defendants enjoyed the benefits of Delaware law. They claim that the DCIP Defendants have received millions of dollars in fees for managing the Delaware partnerships and are entitled to claim limited liability under the terms of the Partnership Agreements, which established the Funds and limit the DCIP Defendants' liability to cases of gross negligence. n74

n74 Partnership Agreements § 3.5.

In *RJ Associates*, Justice Jacobs found that the following contacts were sufficient **[*57]** to satisfy due process: (i) the limited partner took an active role in establishing the Delaware Partnership; (ii) the limited partner owned a 50% interest in the partnership's general partner, and appointed four of the general partner's seven board members; (iii) the limited partner received 49.5% of the partnership's cash flow distributions; (iv) the limited partner allegedly controlled the partnership; (v) the limited partner allegedly caused the partnership agreement to be amended under Delaware law to change the agreed-upon cash flow distribution payments to the limited partners; and (vi) the limited partner agreed to a Delaware choice of law provision in the partnership agreement. n75

n75 *RJ Assocs., 1999 Del. Ch. LEXIS 161, at *19-*20.*

While not exactly the same, the contacts that DCIP has with Delaware are substantially similar to those in *RJ*

*Associates.* DCIP took part in the formation of the Funds, two Delaware entities. DCIP managed the Funds on a day-to-day basis and received **[*58]** millions of dollars in fees for doing so. In addition, the Partnership Agreements which established the Funds limited the DCIP Defendants' liability to cases of gross negligence. n76 They have, thereby, benefited by expressly limiting their liability under Delaware law. Given all of these contacts, DCIP should have reasonably expected to be haled before the courts in Delaware.

n76 Partnership Agreements § 3.5.

Crants and Devlin also should have reasonably expected to be haled before the courts of this state. As stated above, the complaints allege that DCIP could only act through Crants and Devlin. All the actions attributed to DCIP were really performed by them. Moreover, in the case of Fund II, Crants and Devlin are alleged to be the managing partners of the general partner of a Delaware limited partnership. In the case of Fund I, Crants and Devlin are alleged to have managed a Delaware limited partnership, despite the fact that DCIP is not that entity's general partner.

In *In re USACafes*, former Chancellor **[*59]** Allen found that the directors of a corporation that was the general partner of a Delaware limited partnership were subject to the jurisdiction of this state's courts, due to their positions with the general partner. n77 Chancellor Allen focused on the important state interest that Delaware has in regulating entities created under its laws, and how that interest could only be served by exercising jurisdiction over those who managed the Delaware entity.

n77 *600 A.2d 43, 52 (Del. Ch. 1991).*

The relationship between the General Partner and the limited partners was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the **[*60]** internal affairs

or corporate governance issues that Delaware law is especially concerned with. n78

n78 *Id.*

Likewise, the wrongs alleged in this case go essentially to the management of a Delaware limited partnership. The DCIP Defendants voluntarily undertook to mange the Funds and received millions of dollars in compensation for doing so. Now, limited partners in the Delaware entity seek to hold them accountable for alleged wrongs they committed. It is both necessary and proper for the courts of this state to ensure that the managers of a Delaware entity are held responsible for their actions in managing the Delaware entity. When a person manages a Delaware entity, and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware. n79

n79 *See Assist Stock Mgmt. L.L.C. v. Rosheim, 753 A.2d 974, 975 (Del. Ch. 2000)* ("When nonresidents agree to serve as directors or managers of Delaware entities, it is only reasonable that they anticipate that . . . they will be subject to personal jurisdiction in Delaware courts.").

**[*61]**

For the above reasons, the court concludes that it has personal jurisdiction over the DCIP Defendants in both cases. Therefore, the DCIP Defendants' motion to dismiss pursuant to Rule 12(b)(2) must be denied.

**VII.**

For the above reasons, the defendants' motion to dismiss is GRANTED in part and DENIED in part. The defendants are directed to submit a form of order, on notice, within 10 days.

# TAB 2

2 of 2 DOCUMENTS



Positive
As of: Feb 16, 2007

**Breakaway Solutions, Inc. v. Morgan Stanley & Co. Inc., et al.**

C.A. No. 19522

**COURT OF CHANCERY OF DELAWARE, KENT**

*2004 Del. Ch. LEXIS 125*

**October 21, 2003, Submitted
August 27, 2004, Decided**

**NOTICE:** **[*1]** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Complaint dismissed at, in part, Motion granted by, in part, Motion denied by, in part *Breakaway Solutions, Inc. v. Morgan Stanley & Co., 2005 Del. Ch. LEXIS 200 (Del. Ch., Dec. 8, 2005)*

**DISPOSITION:** Defendants' motion to dismiss granted in part and denied in part. Counts dismissed.

**COUNSEL:** For Jeffrey S. Goddess, Esquire, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE.

For Jon E. Abramczyk, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For David C. McBride, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE.

For Samuel A. Nolen, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE.

**OPINION:**

Plaintiff Breakaway Solutions, Inc. ("Breakaway") is a bankrupt publicly held, internet-related corporation. Defendants Morgan Stanley & Co. Inc., Lehman Brothers, Inc., and Deutsche Bank Securities, Inc. (collectively the "Defendants" or the "Underwriters") are among this nation's leading underwriters of Initial Public Offerings ("IPOs").Breakaway brought this purported class action on behalf of the technology companies that hired the Defendants as underwriters for their IPOs in the late 1990's and into 2000, and saw the price of their stock increase dramatically in a short period of time following their IPOs. Breakaway alleges that the Defendants allocated the newly issued stock to favored clients who then shared with **[*2]** the Defendants a portion of the profits realized from the large increase in stock price following the IPO. Breakaway has set forth five causes of action under state law: breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, and indemnification. The Defendants have moved to dismiss the Complaint n1 under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

n1 References to the "Complaint" are to the Plaintiffs Amended Class Action Complaint.

**I. BACKGROUND**

This dispute grew out of the stock market boom of the late 1990's and the technology stocks which fueled it. More specifically, this boom was spearheaded by companies which, seeking capital for their new businesses, engaged in an IPO. Those companies retained underwriters who used their expertise to evaluate the corporation, to determine the number of shares to offer and the offering price of those shares, and to distribute the shares **[*3]** to the public in order that the shares might be subsequently traded by the public.

The relationship between underwriters and the issuer is established by the underwriting agreement. Among other things, the underwriting agreements obligate the underwriters to acquire the IPO securities from the issuers at a fixed price and then to resell the securities to the public in accordance with the terms set forth therein. Moreover, the agreements typically provide for indemnification and contribution in the event a claim or liability results from the issuance of the shares.

The underwriters derive the compensation for their services from the spread between the fixed, discounted price at which they acquire the securities from the issuer and the public offering price at which they resell the securities to investors. This agreed upon spread is customarily 7% of the total IPO proceeds.

Amid the stock market boom, reports began to surface regarding two interrelated practices allegedly engaged in by underwriters, such as the Defendants. The first of these practices, known as "underpricing," involved efforts of the underwriters to set the price of the IPO stock lower than its true value. The second [*4] alleged practice was that the underwriters would profit from this underpricing by allocating IPO securities to favored clients in exchange for payments ("kickbacks") or other consideration from those clients pursuant to side agreements. These payments were in addition to the fees received by the underwriters by way of the underwriting spread.

Breakaway, an internet company, provided technical, operational, management, and other services to electronic and other businesses. Breakaway's shares were initially offered to the public on or about October 6, 1999, in accordance with an underwriting agreement (the "Agreement") with the Defendants, dated October 5, 1999. Breakaway alleges that the terms of the Agreement, to which Breakaway agreed in reliance upon the Defendants' expertise, were as follows: Breakaway sold 3,000,000 shares of its common stock to the Defendants and other members of the underwriting syndicate for $ 13.02 per share, or $ 39,060,000 total. The underwriters were to sell the shares to the public at $ 14 per share; their 7% spread amounted to $ 0.98 per share. Subsequently, the Defendants and the other members of the syndicate exercised their "over-allotment" option [*5] in the Agreement to acquire a contractual maximum of 450,000 addition shares from Breakaway, also at $ 13.02 per share, for $ 5,859,000. As a result, Breakaway's IPO generated gross proceeds of $ 48.3 million, or approximately $ 44.9 million to Breakaway net of the underwriting fee.

Breakaway's stock price soared the day it began trading, rising as high as $ 71.00 per share from the initial $ 14.00 and closing at $ 42.25, more than triple the offering price. Breakaway alleges that, at these trading prices, it "left money on the table" in an amount between $ 196 million ($ 71.00 per share times 3,450,000 shares minus $ 48 million raised by the IPO) and $ 97 million ($ 42.25 per share times 3,450,000 shares minus $ 48 million). Breakaway was not alone in experiencing this rapid growth, and the tripling of its IPO price was far from the most extreme example of such rapid escalation. n2

n2 Breakaway points to numerous other examples of such rapid stock price increases. The Complaint refers to data published by Professor Jay Putter of the University of Florida. The ten largest first-day IPO percentage increases all took place within the period covered by the Complaint. For instance, VA Linux closed on December 9, 1999 with a 697.50% increase, Globe.com closed on November 13, 1998 with a 606% increase, Foundry Networks closed on September 28, 1999 with a 525% increase, Webmethods closed on February 11, 2000 with a 507.5% increase, Free Markets closed on December 10, 1999 with a 483.33% increase, Cobalt Networks closed on November 5, 1999 with a 482% increase, Marketwatch.com closed on January 15, 1999 with 474% increase, Akamai Technologies closed on October 29, 1999, with a 458% increase, Cacheflow closed on November 19, 1999, with a 426.56% increase, and Sycamore Networks closed on October 22, 1999 with a 386% increase.

[*6]

The Complaint focuses on side agreements between the Defendants and their favored clients or the "kickbacks" (as characterized by Breakaway) which the Defendants received in relation to the underpriced IPO shares described above. These side agreements frequently took the form of allowing the Defendants to share directly in the profits of clients who quickly sold (or "flipped") the particular IPO stock to other investors in the after-market; increased or excessive trading commissions paid by the favored clients in connection with the IPO stock or other securities transactions; and other similar arrangements. If the client declined to compensate the Defendants with at least part of its profits, the client would be denied future allocations of similarly underpriced IPO shares.

These allocation and compensation practices, according to Breakaway, permitted the Defendants to obtain millions of dollars in compensation from IPOs in

addition to their contracted 7% underwriting fee. More-over, this additional compensation frequently exceeded -- Breakaway alleges that it often dwarfed -- the underwriting fee that the Defendants contractually agreed to charge.

## II. CONTENTIONS

In its Complaint, [*7] Breakaway alleges that the offending conduct sustains five causes of action based on state law. n3 The first is a "standard" breach of contract claim. Breakaway claims that the Defendants' IPO allocation and profit sharing concerning the underpriced shares breached the Agreement. Specifically, Breakaway contends that express contract terms related to pricing and compensation were breached by the Defendants' receiving more compensation than that allowed by the Agreement and that, by selling to favored clients, the IPO was not a "public" one. Second, Breakaway contends that the Defendants breached the implied covenant of good faith and fair dealing through the selective sale of the IPO shares because the "spirit and intent" of the Agreement were violated as consideration was diverted away from Breakaway and into the Defendants' own pockets. Third, Breakaway claims that the Defendants were its fiduciaries and they breached their fiduciary duties through the challenged practices. Fourth, Breakaway asks for indemnification or contribution for federal securities actions that have been brought against it and those similarly situated and which arose out of their IPOs. Finally, Breakaway brings [*8] a claim for unjust enrichment and restitution, asserting that the Defendants should be required to surrender their excessive compensation since it would. be inequitable for them to retain it.

n3 The Agreement expressly provides that New York law will govern, and the parties agree that New York law applies.

The Defendants have moved to dismiss the Complaint. Their primary argument is that Breakaway's claims are preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). n4 They argue that, although Breakaway does not affirmatively allege fraud, the substance of its claims, all premised on state law, is based on fraud, especially the focus on underpricing and kickbacks, thus bringing its claims within the grasp of SLUSA. They also allege that Breakaway has failed, as a matter of law, to state claims for breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment, and that the indemnification claim is not ripe for judicial review. [*9]

n4 *15 U.S.C. §§ 77p, 78bb.*

Breakaway, not surprisingly, disputes these contentions.

## III. ANALYSIS

### A. *Standard of Review*

Under Court of Chancery Rule 12(b)(6), the Court is bound to consider only the allegations of the complaint and any documents that are considered integral to it. n5 In deciding the motion, the Court must assume the truthfulness of all well-pled facts in the complaint and view those facts, as well as all inferences that may be drawn reasonably from them, in the light most favorable to Breakaway. n6 However, conclusory allegations, unsupported by the facts in the complaint, will not be taken as true. n7 No motion under Rule 12(b)(6) may be granted unless it appears with reasonable certainty that the plaintiff would not be entitled to relief under any set of facts which could be proven at trial to support a cause of action n8.

n5 *Beam v. Stewart, 833 A.2d 961, 970 (Del. Ch. 2003), aff'd 845 A.2d 1040 (Del. 2004).*

[*10]

n6 *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l. Fund, L.P., 829 A.2d. 143, 148-49 (Del. Ch. 2003); Orman v. Cullman, 794 A.2d 5, 15-16 (Del. Ch. 2002).*

n7 *Anglo Am. Sec. Fund, 829 A.2d at 149.*

n8 *Rabkin v. Philip A. Hunt Chem. Corp., 498 A.2d 1099, 1104 (Del. 1985).*

### B. *SLUSA*

Congress enacted the Private Securities Litigation Reform Act n9 (the "PSLRA") in 1995 in response to what it perceived to be frivolous private securities lawsuits that were damaging the market. n10 The PSLRA imposed more stringent procedural and substantive requirements for private securities actions in the federal courts as a way to deter meritless suits. n11 To avoid these requirements and the reach of the PSLRA, many actions alleging fraud in the sale of securities were filed

in the state courts based on state statutory or common law. n12 To end this practice, which it perceived as a loophole, Congress enacted SLUSA in 1998 to preempt completely certain securities fraud claims, thereby making federal law the exclusive [*11] source of substantive rules and to force those claims generally into the federal courts. n13

n9 *15U.S.C. §§ 78u-4to78u-5.*

n10 *Zoren v. Genesis Energy, L.P., 195 F. Supp. 2d 598, 602 (D. Del. 2002);* H.R. CONF. REP. NO. 104-369, at 31-32 (1995).

n11 *Gibson v. PS Group Holdings, Inc., 2000 U.S. Dist. LEXIS 3158, 2000 WL 777818, at *2 (S.D. Cal. Mar. 8, 2000).*

n12 *See, e.g., Korsinsky v. Salomon Smith Barney, Inc., 2002 U.S. Dist. LEXIS 259, 2002 WL 27775, at *3 (S.D.N.Y. Jan. 10, 2002); Feitelberg v. Credit Suisse First Boston LLC, 2003 U.S. Dist. LEXIS 19116, 2003 WL 22434098, at *2 (N.D. Cal. Oct. 24, 2003).*

n13 *Araujo v. John Hancock Life Ins. Co., 206 F. Supp. 2d 377, 380 (E.D.N.Y. 2002). See also* H.R. CONF. REP. No. 105-803, at 13 (1998) (The aim of SLUSA is "to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than in Federal Court.").

SLUSA provides, in pertinent part: [*12]

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging --
(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
(2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security. n14

n14 *15 U.S.C. § 77p(b).* "SLUSA contains two identical preemption and removal provisions; one is found at *15 U.S.C. § 77p(b)* and the other is found at U.S.C. *§ 78bb(f).* The difference is that the former applies to remedies available under the Securities Act of 1933 and the latter applies to remedies available under the Securities Exchange Act of 1934." *Gray v. Seaboard Sec., Inc., 241 F. Supp. 2d 213, 218 n.8 (N.D.N.Y. 2003).* While the two formulations may be substantively the same, the phrase "untrue statement" in *§ 77p(b)*, quoted above, appears as "misrepresentation" in the corresponding provision of *§ 78bb(f).*

[*13]

Therefore, this action must be dismissed if it is (1) a "covered class action" (2) based on state law (3) involving a "covered security" (4) alleging either (a) a misrepresentation or omission of a material fact or (b) the use of any manipulative or deceptive device or contrivance (5) "in connection with" the purchase or sale of a covered security. n15 Breakaway concedes that this action is a "covered class action" and that its claims are based on state law. n16 However, it asserts, and the Defendants dispute, that it did not allege a misrepresentation or omission of a material fact or the use of any manipulative device, that this action does not involve a "covered security," and that the conduct in question was not undertaken "in connection with" the purchase or sale of a covered security. n17 For the reasons that follow, I conclude that Breakaway, through the Complaint, has not alleged, within the meaning of SLUSA that any misrepresentations (or untrue statements) or omissions of material fact were made on the part of the Defendants or that any manipulative or deceptive devices were used by the Defendants. n18 Accordingly, this action will not be dismissed under SLUSA.

n15 *Zoren, 195 F. Supp. 2d at 603.* It should be noted that there is a debate as to whether SLUSA even applies to suits brought by issuers against non-issuers since SLUSA's primary aim was to protect issuers and not those otherwise involved in securities markets. *Compare Gutierrez v. Deloitte & Touche, LLP, 147 F. Supp. 2d 584, 591 (W.D. Tex. 2001)* ("From the language of the statute, it is possible Congress intended the SLUSA to apply only to actions brought against issuers of publicly traded stock, not accounting firms which perform audits for the issuer or intermediaries of the issuer.") *with Prager v. Knight/Trimark Group, Inc., 124 F. Supp. 2d 229,*

*233 (D.N.J. 2000)* ("Neither the language of [the PLSRA and SLUSA] nor their legislative history indicate that they were intended to apply only to situations in which issuers of securities are accused of misrepresentation.").

**[*14]**

n16 Pl. Breakaway Solutions Inc.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 20.

n17 The Defendants correctly note that the so-called "Delaware carve-out," *15 U.S.C. §§ 77p(d)(1), 78bb(f)(3)(A)*, is inapplicable here because New York law governs this dispute and the case was brought in Delaware.

n18 Since the Defendants must meet all five prongs for SLUSA's preemptive effect to result, I decline to rule on whether the "in connection with" prong and the "covered security" prong are met.

1. Complete Preemption Standard of Review

SLUSA is something of an anomaly in our federal system: within its scope, it completely preempts state law. As a general proposition, a case or controversy gains federal jurisdiction only by means of the "well-pleaded complaint" rule. That is, "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." n19 Thus, "the plaintiff, as the master of the complaint, 'may avoid federal jurisdiction by exclusive reliance on state law.'" n20

n19 *Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 96 L. Ed. 2d 318, 107 S. Ct. 2425 (1987)*.

**[*15]**

n20 *McPhatter v. Sweitzer, 2003 U.S. Dist. LEXIS 15878, 2003 WL 22113455, at *2 (M.D.N.C. Sept. 8, 2003)* (quoting *Caterpillar Inc., 482 U.S. at 392)*.

SLUSA, as a statute which completely preempts certain securities class actions, stands as an exception to the well-pleaded complaint rule. n21 The complete preemption doctrine "holds that once an area of state law has been completely preempted, any claim purportedly based on that preempted state law is considered, from its inception, a federal law claim, and thus arises under federal

law.'" n22 One court has described the doctrine of complete preemption:

> We read the term [complete preemption] not as a crude measure of the breadth of the preemption (in the ordinary sense) of a state law by a federal law, but rather as a description of the specific situation in which a federal law not only preempts a state law to some degree but also substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to permit removal. n23

It should, however, also be noted that, "because of the obvious **[*16]** federalism implications of the complete-preemption doctrine, its application has been extremely limited by the courts." n24

n21 *Zoren, 195 F. Supp. 2d at 602.*

n22 *Id.* (quoting *Caterpillar Inc., 482 U.S. at 393)*.

n23 *Schmeling v. NORDAM, 97 F.3d 1336, 1342 (10th Cir. 1996).*

n24 14B WRIGHT, MILLER, & COOPER, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 3d § 3722.1, at 517. *But see Spehar v. Fuchs, 2003 U.S. Dist. LEXIS 10406, 2003 WL 23353308, at *9 (S.D.N.Y. June 18, 2003)* ("Because SLUSA was enacted in order to prevent plaintiffs from avoiding federal court, courts will interpret claims broadly in determining whether they are removable under SLUSA.").

In this case, one of the main topics of debate is whether Breakaway is actually alleging the occurrence of a fraud in the Complaint -- which would be preempted -- or if it is only stating an action under state law for, as an example, breach of contract -- which would not be preempted. Generally, **[*17]** as noted above, on a Rule 12(b)(6) motion, the Court will view all the facts properly alleged in the Complaint and draw all reasonable inferences from those facts as broadly as reasonable in favor of the survival of an action. n25 However, given the ease with which many breach of contract actions could be pled alternatively as fraud actions -- perhaps with nothing more than a simple allegation of intent at the time of entering into the contract n26 -- drawing the

reasonable inferences from the Complaint as expansively as possible could lead to an inference in favor of the Defendants, that a fraud claim has been alleged, and, thus, run counter to the values underlying Rule 12(b)(6).

n25 *See, e.g., Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC, 832 A.2d 116, 123 (Del. Ch. 2003).*

n26 *See infra* note 61 and accompanying text.

On the other hand, in light of the express mandate of Congress, manifested in the terms of SLUSA, that causes of action under state law that, **[*18]** as alleged, amount to securities fraud claims of a certain nature be preempted, this Court cannot avoid drawing any reasonable inference of fraud that can be perceived through the allegations of the Complaint. n27 In other words, just as the facts and inferences cannot be drawn as narrowly as possible to favor defendants in their efforts to secure early dismissal of a complaint, neither can they be drawn as narrowly as possible as to avoid any reasonable inference of fraud occurring in connection with a sale of securities. Thus, when determining whether SLUSA has preempted the claims advanced in the Complaint, for the purposes of Rule 12(b)(6), the Court will "fairly read" n28 the allegations it contains and then draw necessary inferences from them.

n27 "Courts interpreting SLUSA assess preemption based upon whether the *complaint read as a whole* sets out fraudulent misconduct, regardless of the prayer for relief." *Zoren, 195 F. Supp. 2d at 604* (emphasis added).

n28 *Dudek v. Prudential Sec., Inc., 295 F.3d 875, 880 (8th Cir. 2002).*

**[*19]**

2. Breakaway has not alleged any untrue statement or misrepresentation, omission of material fact, or use of any manipulative or deceptive device in its Complaint.

a. The Express Allegations of the Complaint

The starting point for any case involving the application of a statute is the words of the statute itself. As noted earlier, SLUSA preempts suits alleging "an untrue statement or omission of a material fact" or "that the defendant used or employed any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a covered security. n29 Unfortunately, SLUSA provides no definition of these terms. n30

n29 Although it has been held that "the requirement of a misrepresentation or omission is satisfied where a plaintiff alleges a misrepresentation "concerning the value of the securities sold . . . or the consideration received in return."" *Korsinsky, 2002 U.S. Dist. LEXIS 259, 2002 WL 27775, at *4* (quoting *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 2001 U.S. Dist. LEXIS 15943, 2001 WL 1182927, at *3 (S.D.N.Y. Oct. 9, 2001)* (quoting *Saxe v. E.F. Hutton & Co., 789 F.2d 105, 108 (2d Cir. 1986)))*, the defining of a misrepresentation as a "misrepresentation" does not help with the question: what is a misrepresentation in this context?

**[*20]**

n30 Typically, courts implementing SLUSA have looked to the meanings ascribed to its terms elsewhere among federal securities laws. *See, e.g., French v. First Union Sec., Inc., 209 F. Supp. 2d 818, 824 (M.D. Term. 2002).*

A brief review of the concepts involved may be helpful. For example, the "untrue statement or omission of a material fact" prong is met when false or misleading statements are alleged to have appeared in a registration or proxy statement. n31 Also, an affirmative pleading that a misrepresentation has occurred will satisfy this element. n32 " Manipulative' is virtually a term of art when used in connection with securities markets.' The term refers generally to practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." n33 Use of a "manipulative device or contrivance" has been found where there is a general business or marketing plan to engage in a deceptive activity. For example, in *Dudek v. Prudential Securities, Inc.*, n34 plaintiffs alleged unlawful marketing **[*21]** of tax-deferred annuities to accounts that already enjoyed tax-deferred status. The primary allegation was that, because the tax-deferred accounts did not need the tax benefits, the extra fees and costs the annuities entailed were a waste of the investors' money. n35 In addition to noting that this set of facts

would amount to a misrepresentation or omission of material facts, the court also concluded that the complaint "alleged that defendants used or employed [a] deceptive device or contrivance in connection with the purchase or sale of a covered security.'" n36

> n31 *See Gibson, 2000 U.S. Dist. LEXIS 3158, 2000 WL 777818, at \*1* (misrepresentations in proxy statements); *Zoren, 195 F. Supp. 2d at 603* (involving misrepresentations and/or omissions in IPO, Secondary Public Offering, and proxy statements). *See, e.g., TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)* ("An omitted fact is material if there is substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."). To define materiality as "what a reasonable issuer would consider important in determining to issue shares" would be to extend the holding of *TSC Indus,* beyond its intended reach of protecting investors when they chose to purchase or sell shares. Furthermore, such a standard would mean that a failure of an underwriter to fully inform the issuer of every material fact in their dealings would be subject to SLUSA (assuming the other prongs are satisfied). Thus, such a standard would run counter to the policy concern about "converting every common-law fraud that happened to involve securities into a violation of § 10(b)" which the courts have sought to avoid when interpreting securities laws. *SEC v. Zandford, 535 U.S. 813, 820, 153 L. Ed. 2d 1, 122 S. Ct. 1899 (2002).*

[*22]

> n32 *See, e.g., Behlen v. Merrill Lynch, 311 F.3d 1087, 1094 (11th Cir. 2002)* ("Behlen specifically alleged that the defendants negligently, recklessly or intentionally misrepresented the fact that Plaintiff and the class would be sold Class A shares,' but sold them more expensive Class B shares.'. . . . It is clear that the crux of the complaint was that the defendants either misrepresented or omitted crucial facts about the Class A and Class B shares, thus causing him and the class to invest in inappropriate securities."); *McCullagh v. Merrill Lynch & Co., 2002 U.S. Dist. LEXIS 3758, 2002 WL 362774, at \*3 (S.D.N.Y. Mar. 6, 2002)* ("Plaintiffs' . . . allegations that investment recommendations that were supposed to be objective were in fact motivated by Defendant's desire to boost their investment

banking business" was sufficient to meet this prong of SLUSA.).

> n33 *Santa Fe Indus, v. Green, 430 U.S. 462, 476, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977)* (citations omitted) (quoting *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)).* In *Santa Fe,* the Supreme Court held that use of Delaware's Short Form Merger Statute was not "manipulative" within the meaning of the securities fraud statutes. "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this 'term of art' if it had meant to bring within the scope of § 10(b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Id. at 477.*

[*23]

> n34 *295 F.3d 875 (8th Cir. 2002).*
>
> n35 *Id. at 878.*
>
> n36 Mat *Id. at 880.*

Nothing comparable to these bright line examples is alleged in the Complaint. Indeed, the Complaint is devoid of any facts or allegations that the underpricing or kickbacks were done fraudulently or as a scheme to induce Breakaway to pursue an IPO. This is not a case of a buyer of stock complaining about an inducement to buy from a misstatement or omission in a proxy. Nor is this a case where there was a fraudulent advertising or marketing scheme in relation to the sale of the securities.

First, with regard to underpricing, although it may be fraudulent or deceptive in certain instances, the Complaint does not allege that the underpricing was done fraudulently. While Breakaway does refer to underpricing as "money [left] on the table," notes that "absent underpricing . . . Breakaway would have realized significantly greater proceeds from issuing its IPO," n37 and even asserts that the "additional compensation was effectively paid' by the IPO issuers in [*24] that the source of this additional compensation was the underpricing of these IPOs in the first place," it never directly states that it was harmed by the underpricing itself, that the underpricing was wrongfully done, or asks for underpricing as a measure of damages. In fact, Breakaway observes that "other factors may contribute in determining the amount" at which the IPO shares issued n39 and argues in its brief that "there may have been -- and may still be -- many

reasons for underpricing that are beneficial to issuers." n40

n37 Am. Compl. P 23.

n38 *Id.* P 27.

n39 *Id.* P 23.

n40 Pl. Breakaway Solutions Inc. Mem. of Law at 4.

Second, the "kickbacks," as alleged, cannot be seen as any kind of manipulative device that had an artificial effect on market activity. Breakaway's claim is merely that the additional payments (or other compensation) constituted a breach of contract (or other duty imposed by state law) -- the Defendants contracted to sell at $ 14 per share and sold [*25] at a higher price. Indeed, the almost insatiable demand for technology stocks, such as Breakaway's, was well known during this stock market "bubble" and the Defendants' selling of shares to favored clients is not alleged to have increased or decreased materially the demand for the stock.

With regard to omission of a material fact, Breakaway has alleged that it "could not, in the exercise of reasonable diligence, have uncovered Defendants' wrongful conduct." n41 Knowledge that the Underwriters were going to receive kickbacks might have been important to Breakaway in choosing to close its deal with them and to issue its stock and, thus, was at least in one sense material. However, contrary to the Defendants' arguments, the mere fact that something was not disclosed does not make it an "omission of a material fact" within the meaning of SLUSA. n42 Ascertaining the scope of this concept in the context of the issuer-underwriter relationship is something of a difficult endeavor because most cases applying SLUSA have had investors as one set of parties.

n41 Am. Compl. P 61. The "wrongful" conduct grew from the Underwriters' relationships with their "favored customers." Breakaway does not allege, directly or indirectly, that the first day run-up in the price of its stock came as a surprise.

[*26]

n42 The word "kickback" carries unsavory connotations. Breakaway chose to use it and it, in part, defines the substance of Breakaway's allegations.

Although the Defendants did not disclose to Breakaway the "fact" of additional compensation from "favored" clients, Breakaway has not alleged that the Defendants were under any obligation to make such a disclosure. Thus, by reference to the allegations advanced by Breakaway, there is no basis for concluding that Breakaway has alleged a material omission.

Finally, Breakaway has not directly alleged any "untrue statement" or misrepresentation made by the Defendants. Accordingly, the Complaint, by its express allegations, is not preempted by SLUSA. n43

n43 In reaching this conclusion, I have looked to *Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc., 341 F. Supp. 2d 258, 2004 U.S. Dist. LEXIS 3703, 2004 WL 435058 (S.D.N.Y. Mar. 9, 2004)* and *MDCM Holdings, Inc. v. Credit Suisse First Boston Corp., 216 F. Supp. 2d 251 (S.D.N.Y. 2002)*, both of which considered the application of SLUSA to allegations comparable to those set forth in the Complaint. Although *Xpedior* questions a portion of the analysis underlying *MDCM* (especially its reluctance to look beyond the express allegations of the complaint), it firmly reconfirms the conclusion that SLUSA does not preempt state law claims based on the facts asserted here.

[*27]

b. Behind the Complaint

The Defendants correctly point out that overt claims of misrepresentation, omission, or deception are not necessary for SLUSA to apply -- that courts are required to "look behind the labels" to the nature, essence, substance, or gravamen of what is alleged in order to determine whether preemption has occurred. n44 SLUSA preempts certain types of securities fraud claims, and two competing considerations are at work. First, not every breach of contract (or even every fraud) involving securities is within the scope of SLUSA. Second, for example, if the claim "sounds in fraud" and the pleadings otherwise meet the standards set by SLUSA, careful and creative drafting will not be sufficient to avoid SLUSA. The gap is largely one of inference; for if the reasonable inference from the facts alleged in the complaint is that fraud occurred, the plaintiffs' express protestations to the contrary, however they may be splattered across the

complaint, will not allow for an escape from SLUSA's reach.

n44 This is because, when Congress intends "complete preemption," that overcomes the well-pleaded complaint rule and deprives the plaintiff of his status as "master of the claim." *See, e.g., Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 116, 123-24 (2d Cir. 2003); Zoren, 195 F. Supp. 2d at 602.*

[*28]

One test that courts have used in making this determination is the "necessary component" test, under which:

[A] court must determine whether the state law claim relies on misstatements or omissions as a necessary component' of the claim. In this context, necessary component' encompasses both technical elements of a claim as well as factual allegations intrinsic to the claim as alleged. Thus, under the necessary component test, a complaint is preempted under SLUSA only when it asserts (1) an explicit claim of fraud (*e.g.*, common law fraud or fraudulent inducement), or (2) other garden-variety state law claims that 'sound in fraud.' But SLUSA does not preempt claims which do not have as a necessary component misrepresentations, untrue statements, or omissions of material facts' made in connection with the purchase or sale of a security. n45

n45 *Xpedior, 2004 U.S. Dist. LEXIS 3703, 2004 WL 435058, at *4* (footnotes omitted) (quoting *McEachern v. Equitable Life Assur. Soc. of the U.S.*, 2001 WL 747320, at * 2 (N.D. Ala. June 15, 2001)).

[*29]

This test's basic inquiry is whether the plaintiff is pleading fraud in words or substance. n46 It does not, however, allow facts that are not pled to be read into the complaint to find preemption as the "plaintiff is ordinar-

ily free to choose the legal theories upon which she relies and to discard others." n47

n46 *Id. 2004 U.S. Dist. LEXIS 3703, at *5-*6.*

n47 *Id. 2004 U.S. Dist. LEXIS 3703, at *6.*

Most of the cases applying the necessary component test have found preemption because the complaint contained counts which alleged fraud or misrepresentation which tainted subsequent counts in the complaint. n48 For instance, in *Hines v. ESC Strategic Funds, Inc.,* n49 the plaintiffs brought claims based on state securities fraud, common law fraud, breach of fiduciary duty, and breach of implied contract. While the court found the third claim was not preempted because the "in connection with" requirement was not met, it concluded that the other three were preempted under SLUSA. The court relied on the complaint's allegations of a fraudulent [*30] scheme in the first two counts; the fourth count recited representations made to the plaintiffs that were described in the first two counts as having been fraudulent. Thus, the fourth count, although alleging a breach of an implied covenant claim, sounded in fraud. Similarly, in *In re Livent, Inc. Noteholders Securities Litigation*, n50 three of the plaintiffs' four state law claims -- for fraud, negligence, and negligent misrepresentation -- explicitly alleged fraud and were found preempted. The fourth claim for tortious interference with contract was also found preempted because the plaintiffs alleged a manipulative device or contrivance by alleging that "all the defendants *schemed* to demote and suspend [certain employees] rather than discharge them." n51

n48 Similarly, a majority of the cases which purport to "look behind the complaint" to find preemption, but did not apply the necessary component test, also dealt with specific allegations of fraud, misrepresentation or the like. *See, e.g., Behlen, 311 F.3d at 1094* ("Behlen specifically alleged that the defendants negligently, recklessly or intentionally misrepresented the fact that Plaintiff and the class would be sold Class A shares' . . . suppressed the true facts concerning the repeated sales . . . and concealed and suppressed the illegality of their conduct.'"); *McCullagh, 2002 U.S. Dist. LEXIS 3758, 2002 WL 362774, at *6* (alleging "misrepresentation regarding the quality of investment advice . . . [plaintiffs] received advice tainted by a company policy requiring employees to issue 'buy' recom-

mendations"); *Korsinsky, 2002 U.S. Dist. LEXIS 259, 2002 WL 27775, at *1, *4* (Complaint "outlined several instances of alleged misrepresentations made by SSB and Grubman with regard to the value of AT&T."); *Prager, 124 F. Supp. 2d at 234-35* (Plaintiff alleged that "[defendant] falsely stated in various public filings that it guaranteed to execute retail customers' trades" and "alleged . . . false and misleading statements").

[*31]

n49 *1999 U.S. Dist. LEXIS 15790, 1999 WL 1705503 (M.D. Tenn. Sept. 17, 1999).*

n50 *151 F. Supp. 2d 371 (S.D.N.Y. 2001).*

n51 *Id. at 443.*

By contrast, the complaint in *Xpedior*, similar to the one in this action, contained no such allegations and was found not to have been preempted. In that case, the court observed that a claim "sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim," n52 and that, since none of Xpedior's allegations sounded in fraud, there was no SLUSA preemption. The court found that no "untrue statements or omissions" were alleged with regard to the kickbacks and side agreements (the same conduct as alleged here) because

> Xpedior alleges only that DLJ [the defendant underwriter] acted contrary to its express and implied duties. That DLJ might, in fact, never have intended to perform under the terms of the contract is irrelevant; that is not what Xpedior is alleging. Xpedior's claims require no evidence of DLJ's mental state at [*32] all, nor has Xpedior made any allegations about DLJ's mental state at the time that the parties entered into the underwriting contract. n53

n52 *Xpedior, 2004 U.S. Dist. LEXIS 3703, 2004 WL 435058, at * 6.*

n53 *Id.* at * 7.

Similarly, the court found no use of a manipulative or deceptive device because, "although the conduct as alleged may (or may not) constitute manipulation if brought in a securities fraud lawsuit, that is not what Xpedior alleges in its Complaint." n54 Finally, the court noted that "it [was] unnecessary for Xpedior to prove that DLJ manipulated the market in order to prevail on its contract claim, as pleaded." n55

n54 *Id.*

n55 *Id.*

The Defendants claim that the Complaint is preempted by SLUSA because "it is clear that the alleged conduct Breakaway challenges hinges on material omissions, [*33] deception or manipulation by which defendants exploited 'underpriced' IPO securities and secret 'side agreements' to take compensation that should have belonged to the issuers." n56 To put it another way, "because Breakaway's claim is based on the notion that Defendants deceived Breakaway in negotiations over the price of its IPO stock, or failed to disclose the existence of supposed side agreements by which Defendants would enrich themselves at the expense of Breakaway, this case is based on alleged conduct that is SLUSA preempted." n57 I reject this argument because, especially in light of the standards for assessing a Rule 12(b)(6) motion, it necessarily reads facts into the Complaint which are not present. In other words, the allegations of the Complaint do not sound in fraud.

n56 Defs.' Mem. in Supp. of Mot. to Dismiss at 23.

n57 Defs.' Reply Br. in Further Supp. of Mot. to Dismiss at 8.

The Court's charge at this stage of the proceedings is to interpret the Complaint as written, not as it might [*34] have been written. n58 The substance of Breakaway's Complaint is that the Defendants contracted to do one thing -- sell at $ 14.00 a share -- and did something else -- sold for a higher value. That the shares were underpriced makes this claim possible. After all, no kickbacks could be received on shares that were priced at value if one presumes that no rational investor would pay more than that for them. n59 However, Breakaway does not allege that this underpricing was deceptive. Instead, it alleges that the Defendants "[took] advantage of and

accepted as their own benefits from the underpricing through the [kickbacks]" n60 and profit sharing. Drawing the factual inferences as one must at this stage, it can be inferred that underpricing, in and of itself, could have been beneficial or helpful to Breakaway. In short, the "underpricing" itself, based on the allegations of the Complaint, was not the result of the Underwriters' efforts to develop the opportunity to capture a portion of the differential which would result from the underpricing.

n58 "While plaintiffs may not avoid SLUSA preemption simply by artful pleading that avoids the actual words 'misrepresentation' or 'fraud,' neither may defendants avoid every possible claim by recasting any lawsuit in which a securities broker is a defendant into a securities fraud action." *Norman v. Salomon Smith Barney, Inc., 2004 U.S. Dist. LEXIS 10619, 2004 WL 1287310*, at * 3 (S.D.N.Y. June 9, 2004).

[*35]

n59 The relevance or accuracy of this presumption at the time when Breakaway issued its shares may easily be doubted.

n60 Am. Compl. P 49.

Similarly, the Defendants' argument that SLUSA bars these claims because they rest on the existence of "secret side agreements" with regard to their reselling of the shares for more than the amount set by the Agreement reads too much into the Complaint. "The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not become fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform.'" n61 At least in the typical case, when the question is whether the defendant intended to perform under the agreement, the conduct in which the defendant subsequently engages is easily recognized as a breach of the contractual undertaking. Here, the Underwriters agreed to sell the Breakaway shares at $ 14 and turn over to Breakaway $ 13.02 for each share sold. That they did. For an intent not to perform under a contract to be fraudulent,  [*36]  the conduct must be readily perceived as a breach at the time of entry into the contract. Otherwise, if two parties entered into a contract with different subjective understandings and a dispute arose when each acted in accordance with its subjective understanding, the party who loses on the proper interpretation of the contract would be deemed to have perpetrated a fraud -- obviously, an unreasonable conclusion. This

distinction demonstrates the fundamental difference between breach of contract and fraud and, ultimately, provides the basis for the Court's denial of the Defendants' motion to dismiss because of preemption under SLUSA. Thus, drawing the inferences as required, I am satisfied that the failure to disclose the "secret side agreements" was not an "omission" that can be found "behind the Complaint" and within the meaning of SLUSA. Instead, the Complaint speaks solely of a dispute related to performance of duties imposed by the Agreement and state law that has not been preempted by SLUSA.

n61 *Gurary v. Winehouse, 190 F.3d 37, 44 (2d Cir. 1999)* (quoting *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993)).* There is no dispute that the Defendants had the capacity to perform the agreement in accordance with its terms.

[*37]

Finally, Breakaway's initial complaint should also be mentioned. In *Dudek,* the court found SLUSA preemption, in part by relying on earlier versions of the complaint. When the plaintiffs there first filed their complaint, they alleged nine state law causes of action which included explicit claims of fraud. They voluntarily dismissed that complaint and filed a new complaint from which it deleted "the allegations of fraud, misrepresentation, and non-disclosure that permeated their [first] complaint." n62 The court found preemption because, even after the deletions, "the essence of both complaints is the unlawful marketing of tax-deferred annuities, either by misrepresenting their suitability for tax-deferred retirement plans, or by failing to disclose their unsuitability for such accounts. In substance, both complaints allege that defendants misstated or omitted material facts in connection with the purchase and sale of tax-deferred annuities." n63 The court also noted that the new complaint "fairly read . . . allege[d] that defendants 'used or employed a deceptive device or contrivance in connection with the purchase or sale of a covered security.'" n64

n62 *Dudek, 295 F.3d at 879.*

[*38]

n63 *Id. at 880.*

n64 *Id.*

In addition, *Xpedior* acknowledges that the approach of comparing a prior complaint to the pending one "may have merit in those instances where there was a prior complaint, and the later complaint alleged identical facts but different theories in a transparent attempt to avoid preemption." n65 This, however, does not mean that simply because a prior complaint would have been pre-empted the pending complaint must be preempted as well. While Breakaway's initial complaint in this matter may have been preempted because it may have stated a cause of action for intentional underpricing, and perhaps could have been read to allege that the underpricing was done fraudulently, those allegations are not in the Complaint. Indeed, absent those allegations, there is a different factual background and, unlike *Dudek*, there are no longer any express allegations of fraud remaining in the Complaint that can be fairly read as implicating SLUSA. To sanction Breakaway for the previous version of its complaint would be to ignore the rules [*39] of this Court which provide that "leave [to amend] shall be freely given." n66 Although a previous version of a complaint may, in the appropriate circumstances, help to interpret a new version if the key factual allegations remain the same, here, where the new complaint contains different allegations from those which may have called for preemption, there is no longer any cause to focus on the previous allegations.

n65 *Xpedior, 2004 U.S. Dist. LEXIS 3703, 2004 WL 435058*, at * 6.

n66 Del. Ct. Ch. R. 15(a).

Because Breakaway has not alleged "misrepresentation or omission of a material fact" or the use of a "manipulative or deceptive device," the state law claims asserted in this action have not been preempted by SLUSA, and the Defendants are not entitled to dismissal under SLUSA. n67

n67 The Court's determination that the Complaint survives SLUSA should not be perceived as excluding SLUSA's presence from this proceeding. During the course of litigation, as facts are developed and legal theories are refined, the substance of the litigation evolves. The allegations in this case come close to the line drawn by SLUSA; this case may not evolve in a manner that crosses that line.

**[*40]**

### C. The State Law Claims

With the conclusion that Breakaway's state law claims have not been preempted by SLUSA, the Court must now consider those state law claims and determine whether they survive analysis under Rule 12(b)(6). Although it is necessary to evaluate each of Breakaway's state law claims separately, the Court's analysis will be guided by *EBC I, Inc. v. Goldman Sachs & Co.*, n68 and a brief overview of that opinion may be helpful. The claims under New York law that were raised in *EBC I* are, in many ways, similar to the, claims before this Court.

> The complaint [in *EBC I*] alleges that defendant underpriced plaintiff's shares in order to reap an additional profit, beyond the amount realized on the spread between the price of its own subscription and the higher public offering price, when it "flipped" its shares in the balloon-priced aftermarket, and that such underpricing was also the consideration given for "kickbacks" from defendant's favored customers, to whom defendant had allocated shares in the IPO that were also flipped in the aftermarket, disguised as commissions on unrelated transactions. n69

n68 *7 A.D.3d 418, 777 N.Y.S.2d 440 (N.Y. App. Div. 2004)*.

**[*41]**

n69 *Id. at 442-43.*

Thus, the core of the allegations in *EBC I* is the same as in this action except that, in *EBC I*, it was alleged that the underwriters underpriced the initial offering in order to create the opportunity to take advantage of the post-issuance jump in share price. The court in *EBC I* concluded that the plaintiff had adequately alleged, under New York law, claims for a breach of fiduciary duty, for breach of the implied covenant of good faith and fair dealing, and for unjust enrichment.

### 1. Breach of Contract

The Agreement provides, in pertinent part:

> 2. **Agreement to Sell and Purchase.** The Company hereby agrees to sell to the several Underwriters, and each Underwriter . . . agrees . . . to purchase from the Company [shares of Breakaway] at $ 13.02 a share (the **"Purchase Price"**).
>
> 3. **Terms of Public Offering.** The Company is advised by you that the Underwriters propose to make a public offering of their respective portions of the Shares as soon after the Registration Statement and this Agreement have become effective [*42] as in your judgment is advisable. The Company is further advised by you that the Shares are to be offered to the public initially at $ 14.00 a share (the **"Public Offering Price"**) . . .

Breakaway does not contend that the Defendants breached paragraph 2 of the Agreement; Breakaway, in fact, was paid $ 13.02 per share. Breakaway does, however, charge the Defendants with failing to comply with the terms of paragraph 3. Count I of the Complaint alleges that the Defendants breached the Agreement by (1) not selling to the public, and (2) not selling at the agreed upon price of $ 14 per share.

"The essential elements to pleading a breach of contract under New York law are the making of an agreement, performance by the plaintiff, breach by the defendant, and damages suffered by the plaintiff." n70 To survive a motion to dismiss, the plaintiff must identify which provisions or terms of the contract were breached by the conduct at issue. n71

n70 *Startech, Inc. v. VSA Arts, 126 F. Supp. 2d 234, 236 (S.D.N.Y. 2002).*

n71 *Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001).*

[*43]

The Defendants argue that Breakaway has not identified a specific provision of the Agreement that has been breached. The Complaint alleges:

> PP 2 and 3 of Plaintiff's underwriting agreement with Defendants established a fixed amount of compensation Defendants were to receive in connection with Plaintiff's IPO by setting forth the underwriting spread. In particular, P 2 of the parties' underwriting agreement provided the per share price at which Defendants would acquire the IPO shares from Plaintiff, and P 3 of the parties' underwriting agreement provided the per share price at which Defendants would resell Plaintiffs IPO shares to the public, with the difference being the underwriting compensation. n72

n72 Am. Compl. P 33.

Breakaway asserts that its shares were not sold "to the public" because they were sold to favored investors. The interpretation of this term which Breakaway advances is inconsistent with the broadly held understanding that the phrase "public offering" simply refers to an offering [*44] that is not exempt from the federal securities laws. n73 To hold that all or a certain percentage of an IPO must be sold to the populace in general (or any particular subset thereof) would be inconsistent with the use of the term "public" in the Agreement. n74 Thus, to the extent that Breakaway is alleging its shares were not sold "to the public" because they were sold to favored clients of the Defendants, the motion to dismiss is granted.

n73 *See, e.g., SEC v. Ralston Purina Co., 346 U.S. 119, 123-24, 97 L. Ed. 1494, 73 S. Ct. 981 (1954).* "In its broadest meaning the term "public" distinguishes the populace at large from groups of individual members of the public segregated because of some common interest or characteristic. Yet, such a distinction is inadequate for practical purposes; manifestly, an offering of securities to all redheaded men, to all residents of Chicago or San Francisco, to all existing stockholders of the General Motors Corporation or the American Telephone & Telegraph Company, is no less "public," in every realistic sense of the word, than an unrestricted offering to the world at large. Such an offering, though not open to everyone who may choose to apply, is nonetheless "public" in character, for the means used to select the particular individuals to whom the offering is to be made bear no sensible relation to the purposes for which selection is made."' *Id.* (quoting *SEC v. Sunbeam Gold Mines Co., 95 F.2d 699, 701 (9th Cir. 1938)).*

[*45]

n74 One can argue that the Agreement's use of the word "public" creates an ambiguity that may allow for consideration of extrinsic evidence, that the Court has looked to extrinsic evidence to give meaning to the term public, that the extrinsic evidence is not in the Complaint and, thus, that the Court should not have garnered the meaning of public in this fashion at this stage. The Complaint makes clear that the Agreement was drafted and negotiated for performance within the federal securities regulatory system. In that venue, the term "public" has a well-known meaning, reflected in the case law, and that meaning can reasonably be viewed, even for purposes of a motion to dismiss, as an integral part of the understanding reached by the parties.

The second aspect of Breakaway's breach of contract claim arises from its allegation that the Defendants received something more than $ 14 for each share of Breakaway. The Agreement, according to Breakaway, required the Underwriters to sell at $ 14 per share, not higher and not lower. The Defendants agreed to handle Breakaway's IPO for the spread of [*46] $ 0.98 (the difference between the $ 14 offering price and the $ 13.02 paid to Breakaway). By obtaining more than the agreed upon spread of $ 0.98 per share, the Defendants, in Breakaway's view, breached the Agreement.

Breakaway concedes that the underpricing did not breach the Agreement and that it asserts.no claim for underpricing. n75 Instead, it argues that the sale of its shares at more than $ 14 (that is, $ 14 plus the benefits received by the Defendants from their favored clients) failed to meet the specific sale price set by the Agreement. n76 In substance, Breakaway argues that, while the underpricing is unobjectionable, the Defendants were precluded by contract from benefiting from it. For purposes of a motion to dismiss, Breakaway has sufficiently alleged a breach of the Agreement. It may well be, when the record is more fully developed, that Breakaway's interpretation of the Agreement is untenable, but that cannot be resolved at this stage of the proceedings. n77 Accordingly, that portion of Count I alleging that the Defendants breached their contractual obligations to sell Breakaway's shares at $ 14 each survives the Defendants' efforts under Rule 12(b)(6).

n75 "Nowhere in the Complaint does Breakaway allege . . . that underpricing . . . itself breached

the contract." Pl. Breakaway Solutions, Inc.'s Memo of Law at 4.

[*47]

n76 The Agreement contains no express prohibition on sales at an effective price in excess of $ 14 per share.

n77 Under New York law, in order to prove a claim for breach of contract, proof of damages is essential. *See, e.g., Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc., 241 F. Supp. 2d 246, 260 (S.D.N.Y. 2002).* Because Breakaway does not challenge the underpricing, the proper measure for contract damage is not clear. In the context of a motion to dismiss, however, it is enough that Breakaway has alleged that the Defendants were paid in excess of what they were allowed under the Agreement.

2. Breach of the Covenant of Good Faith and Fair Dealing

Count II of the Complaint asserts that the Defendants breached the implied covenant of good faith and fair dealing by "benefiting from Breakaway's underpriced IPO securities, by allocating Breakaway's undervalued shares to favored clients, and by directly or indirectly requiring and receiving additional compensation therefrom." n78 The Defendants have argued that because Breakaway received all the monetary compensation [*48] called for in the Agreement, it received the full benefit of its bargain and this Count should be dismissed.

n78 Am. Compl. P 45.

The covenant of good faith and fair dealing is implied in every contract under New York law. n79 "The implied obligation encompasses 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" n80 This covenant is breached when "one party seeks to prevent the contract's performance or to withhold its benefits." n81 This covenant assures "'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" n82 It "arises only to control how the parties carry out the rights and duties they have undertaken under the contract" n83 and "cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract." n84

n79 *See, e.g., Smith v. Gen. Ace. Ins. Co., 91 N.Y.2d 648, 697 N.E.2d 168, 170, 674 N.Y.S.2d 267 (N.Y. 1998).*

[*49]

n80 *Rossdeutscher v. Viacom, Inc., 768 A.2d 8, 20 (Del. 2001)* (quoting *Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 663 N.E.2d 289, 291, 639 N.Y.S.2d 977 (N.Y. 1995))* (applying New York law).

n81 *Metro. Life Ins. Co. v. R.J.R. Nabisco, Inc., 716 F. Supp. 1504, 1517, (S.D.N.Y. 1989).*

n82 *Dalton, 663 N.E.2d at 291* (quoting *Kirke LaShelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163, 167 (N.Y. 1933)).*

n83 *Warner Theatre Assocs. LP v. Metro. Life Ins. Co., 1997 U.S. Dist. LEXIS 17217, 1997 WL 685334, at * 6 (S.D.N.Y. Nov. 4, 1997).*

n84 *Wolff, 171 F. Supp. 2d at 359.* It may be that the heart of Breakaway's claim lies closer to the implied covenant of good faith and fair dealing than it does to a precisely-defined and enforceable contractual right.

The Defendants argue that "the sum total" of Breakaway's entitlement under the Agreement was $ 13.02 a share, which it received, and therefore there was no breach of any implied covenant. However, whether the Defendants "frustrate[ed] the overarching purpose of [*50] the offering" n85 by taking advantage of their position to control how the Agreement was implemented presents a fact-based inquiry that is not well suited for a motion to dismiss. Breakaway's allegations are sufficient to withstand a motion to dismiss its claim that the implied covenant of good faith and fair dealing was breached.

n85 *EBCI, 777 N.Y.S.2d at 443.*

### 3. Breach of Fiduciary Duty

Count III of the Complaint purports to state a claim for breach of fiduciary duty. It alleges the Defendants, as underwriters, "were fiduciaries of Breakaway," n86 "owed Plaintiff . . . duties of loyalty, due care and fair dealing," n87 and "violated their fiduciary duties . . . by virtue of their taking, advantage of and accepting as their own benefits from the underpricing through the allocation and profit sharing practices alleged herein, and by placing their own financial interests and those of its investor clients above those of its IPO issuer clients." n88

n86 Am. Compl. P 48.

[*51]

n87 *Id. P 49.*

n88 *Id. P 50.*

Under New York law, where a contract controls the parties' dealings, such a claim can only exist where "'a legal duty independent of the contract itself has been violated'" and this duty "'springs from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.'" n89 "The focus is on whether a noncontractual duty was violated; a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contractual agreement." n90

n89 *Bristol-Myers Squibb Indus. Div. v. Delta-Star, Inc., 206 A.D.2d 177, 620 N.Y.S.2d 196, 197 (N.Y. App. Div. 1994)* (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 516 N.E.2d 190, 193-94, 521 N.Y.S.2d 653 (N.Y. 1987))* (citations omitted).

n90 *Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 529 N.Y.S.2d 279, 282 (N.Y. App. Div. 1988).*

[*52]

A fiduciary duty is an example of a duty which "must be separate and beyond any contractual duties." n91 "A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge, but an arms-length business relationship does not give rise to a fiduciary obligation." n92 Furthermore, it has been held that, at least in certain circumstances, "the positions of the underwriter and the [company] are adverse." n93 However, the underwriter is a fiduciary of a corporation when it comes to the use of inside information learned about

that company for the underwriter's own personal benefit. n94

n91 *Global Entm't, Inc. v. N.Y. Tel. Co., 2000 U.S. Dist. LEXIS 16038, 2000 WL 1672327, at * 6 (S.D.N.Y. Nov. 6, 2000).*

n92 *WIT Holding Corp. v. Klein, 282 A.D.2d 527, 724 N.Y.S.2d 66, 68 (N.Y. App. Div. 2001)* (citations omitted). *See also Global Entm't, 2000 U.S. Dist. LEXIS 16038, 2000 WL 1672327, at * 6.*

n93 *Escott v. BarChris Constr. Corp., 283 F. Supp. 643, 696 (S.D.N.Y 1968)* (underwriters and company's officers are adverse with respect to the truth of the prospectus).

[*53]

n94 *See, e.g., Frigitemp Corp. v. Fin. Dynamics Fund, Inc., 524 F.2d 275, 279 (2d Cir. 1975); Dirks v. SEC, 463 U.S. 646, 655 n.14, 77 L. Ed. 2d 911, 103 S. Ct. 3255 (1983).*

Whether or not an underwriter in a firm-commitment underwriting agreement is a fiduciary as a matter of New York Law with respect to the manner in which the shares are sold to the public has been subject to debate. n95 However, all that is required for purposes of surviving a motion to dismiss are "allegations showing a pre-existing relationship between plaintiff and defendant that justified the alleged trust the former placed in the latter in setting the price of its shares." n96 Indeed, the argument that "the alleged fiduciary relationship [between underwriters and issuers] is necessarily negated by the limited statement of [the underwriter's] agency status vis-a-vis other underwriters contained in the prospectus," has recently been rejected. n97 Thus, Breakaway has sufficiently alleged a fiduciary relationship with its description of its relationship with the Defendants. In the context of a fiduciary relationship, [*54] the Court cannot conclude that Breakaway would be able under no set of facts that it could prove to demonstrate that the Defendants took undue advantage of that relationship for their advantage. Accordingly, the Defendants' motions to dismiss Count III of the Complaint are denied.

n95 *See, e.g., Blue Grass Partners v. Burns, Nordeman, Rea & Co., 75 A.D.2d 791, 428 N.Y.S.2d 254, 255 (N.Y. App. Div. 1980)* (noting, but not reaching, the trial court's determination that "an

underwriter, in a best efforts underwriting, owes no fiduciary duty to an issuer" with regard to selling the assets it acquired from the issuer to the public).

n96 *EBC I, Inc., 777 N.Y.S.2d at 443.*

n97 *Id.*

4. Unjust Enrichment

In Count V of the Complaint, Breakaway alleges that the Defendants were unjustly enriched by their allocation practices and, thus, should be required to pay those profits over to it, as an alternative to its breach of contract claim in Count I. The Defendants have moved [*55] to dismiss by arguing that the allegations necessary to support an unjust enrichment claim have not been set forth.

The elements of an unjust enrichment claim under New York law are: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant did not adequately compensate plaintiff for the benefit; and (3) it would be inequitable for defendants to retain the benefit. n98 Breakaway has pled that: (1) it "conferred benefits upon Defendants in the form of compensation for underwriting [its] IPO;" n99 (2) the "Defendants took advantage of and used for their own benefit the underpriced IPOs issued by Plaintiff . . . by obtaining direct and indirect compensation therefrom at the expense of Plaintiff;" n100 and (3) "through their inequitable conduct, the Defendants obtained excessive underwriting and other compensation [which] would be inequitable for Defendants to retain." n101 At this stage of the proceedings, this pleading is sufficient. Drawing the inferences as the Court must, the Complaint states a claim that Breakaway suffered as a result of the sale of its stock to the public at a higher than agreed upon price and that this resulted in an unjust benefit for the [*56] Defendants.

n98 *See Smith v. Chase Manhattan Bank, 293 A.D.2d 598, 741 N.Y.S.2d 100, 102-103 (N.Y. App. Div. 2002).*

n99 Am. Compl. P 60.

n100 *Id. P 61.*

n101 *Id. P 62.*

More importantly, an unjust enrichment claim is not to be dismissed because it is pled in the alternative to the

breach of contract claim. While "'the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter,'" n102 there are situations where alternative pleading is allowed under both theories. n103 "This is generally so, however, only when there is doubt as to the enforceability or meaning of the terms of the contract in question." n104 Although the Agreement primarily governs the relationship between the parties, the Defendants have argued that its terms are in dispute with respect to the excess or additional compensation. For instance, the Defendants have argued:

> Sections [*57] 2 and 3 of the Underwriting Agreement . . . set no "cap" on the amount of money the underwriters were 'allowed' to earn from Breakaway's initial public offering. Indeed, the Agreement does not even contain a specific provision specifying defendants' compensation. To be sure, the contract makes clear that the underwriters might earn $ 0.98 per share on Breakaway's stock, because it recites the price at which Breakaway agreed to sell shares to the underwriters (i.e., $ 13.02) and identified the price at which the underwriters advised Breakaway they proposed to offer shares to the public (i.e. $ 14.00). But nothing in the Agreement prohibits the underwriters from earning more than $ 0.98 per share for allocation by receiving payments from other sources, even assuming that such payments actually took place. n105

n102 *Rossdeutscher, 768 A.2d at 23* (quoting *Clark-Fitzpatrick, Inc., 516 N.E.2d at 193*) (applying New York law).

n103 Id. See also *Stenberg, Inc. v. Walber 36 nth St. Assocs., 187 A.D.2d 225, 594 N.Y.S.2d 144, 145 (N.Y. App. Div. 1993)* (" [It] has never been New York law" that "a claim in contract and one in quasi contract are mutually exclusive in all events and under all circumstances.").

[*58]

n104 *Rossdeutscher, 768 A.2d at 23. See also Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.*

*1996)* ("Where the complaint asserts claims on theories of both contract and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between those theories; he is entitled to have the case submitted to the jury on both counts.").

n105 Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 8 (internal citations omitted).

Perhaps the better interpretation of the Agreement is that the Underwriters are limited in the amount which they could receive for the shares sold; perhaps, the Defendants will be able to demonstrate that the Agreement did not address and, therefore, did not resolve the question of whether the Defendants could also profit from their relationships with their "favored clients" as well. Under New York law in this context, it is enough that the Defendants are alleged to have received, at Breakaway's expense, benefits to which they were not entitled within the context of the relationship that Breakaway had with the Defendants. n106 For this reason, this Count [*59] cannot now be dismissed.

> n106 Any argument that Breakaway has no claim for unjust enrichment because the "kickbacks" were paid by its clients, and not by Breakaway, fails in light *of EBC I.* That New York law apparently does not necessarily require that the enrichment be *at the expense* of the plaintiff distinguishes *Xpedior* which dismissed the claim there for unjust enrichment.

### 5. Indemnification

In Count IV, Breakaway makes a claim for indemnification or contribution against the Defendants based on a series of cases in which shareholders filed suit against issuers, such as Breakaway; the cases have been consolidated as *In re IPO Securities Litigation* n107 in the Southern District of New York. Breakaway alleges that its underwriting agreement contained a provision for indemnification, as did those of every issuer in the class, and that

> The Defendants should be required to indemnify and hold harmless Plaintiff Breakaway and other members of the Subclass from the claims of the plaintiff shareholders asserted in *In re Initial Public Offering Securities Litigation* [*60] to the full extent available, including without

limitation for any judgments which may be entered against Breakaway and related persons and for attorney fees and related costs in connection therewith. To the extent such indemnification is for any reason unavailable, then the Defendants should be required to provide contribution to Plaintiff and the other members of the Subclass as set forth in the parties' underwriting agreements. n108

n107 No. 21 MC 92 (SAS). One of the cases consolidated was *Longman v. Breakaway Solutions, Inc.*, 01 Civ. 6995 (S.D.N.Y). The Court has been informed that, once lead counsel and lead plaintiff were chosen for *In re IPO Securities Litigation*, they decided not to press claims against Breakaway and it appears that it is no longer named as a defendant. This, however, is a factual matter beyond the Complaint.

n108 Am. Compl.

As this Count is not ripe for adjudication at this time, it is dismissed without prejudice.

As a general matter, indemnification [*61] claims do not accrue "until the party seeking indemnification has made payment to the injured person." n109 However, "departure from this general rule may be warranted where the interests of justice and judicial economy so dictate." n110 Typical examples supporting such departure are where indemnification is asserted in a third party action n111 or where the court has "all the information [needed] to adjudicate [the] demands for indemnification." n112

n109 *McDermott v. New York*, 50 N.Y.2d 211, 406 N.E.2d 460, 461, 428 N.Y.S.2d 643 (N.Y. 1980).

n110 *New York v. Syracuse Rigging Co.*, 249 A.D.2d 758, 671 N.Y.S.2d 801, 802 (N.Y. App. Div. 1998).

n111 *Harris v. Rivera*, 921 F. Supp. 1058, 1062 (S.D.N.Y. 1995).

n112 *Muller v. Walt Disney Prods.*, 876 F. Supp. 502, 505 (S.D.N.Y. 1994).

In this case, there is no reason to depart from the general rule. n113 The indemnification provision of the Agreement provides as follows:

> Each Underwriter agrees, severally [*62] and not jointly, to indemnify and hold harmless the Company . . . but only with reference to information relating to such Underwriter furnished to the Company in writing by such Underwriter through you expressly for use in the Registration Statement, any preliminary prospectus, the Prospectus or any amendments or supplements thereto.

The Agreement also requires Breakaway

> to indemnify and hold harmless each Underwriter . . . from and against any and all losses, claims, damages and liabilities . . . caused by any untrue statement or alleged untrue statement of material fact contained in the Registration Statement . . .[,] preliminary prospectus or the Prospectus . . ., or caused by any omission or alleged omission to state therein a material fact required to be stated therein. . . .

n113 Because Breakaway has been threatened with suit and, at least at one time, was a party at risk in the litigation, it has standing (except to the extent that the concepts of ripeness and standing may overlap) to pursue this claim. Whether Breakaway would be an appropriate class representative is a different question.

[*63]

Thus, whether or not Breakaway and the class are entitled to indemnification depends on specific facts and an interpretation of comparable clauses in the various underwriting agreements. The underlying facts are currently being litigated in *In re IPO Securities Litigation*. No "judicial economy" would be achieved in this different forum from considering Breakaway's request at this

time. For this reason, the Defendants' motions to dismiss are granted, without prejudice, with respect to Count IV.

## IV. CONCLUSION

For the foregoing reasons, Count I of the Complaint is dismissed to the extent that it alleges that the Defendants breached the Agreement by failing to make a "pub-

lic offering." Count IV of the Complaint is dismissed, without prejudice. Otherwise, the Defendants' motions to dismiss are denied.

**IT IS SO ORDERED.**

**John W.Noble**

# **TAB 3**

.

1 of 2 DOCUMENTS



Positive
As of: Feb 16, 2007

**BARBARA E. LITTLETON, Plaintiff Below, Appellant, v. LESTER E. YOUNG, Defendant Below, Appellee.**

**No. 157, 1991**

**SUPREME COURT OF DELAWARE**

*1992 Del. LEXIS 15*

**November 12, 1991, Submitted**
**January 2, 1992, Decided**

**SUBSEQUENT HISTORY:** [*1] Released for Publication January 21, 1992. Mandate.

**PRIOR HISTORY:** Court Below: Superior Court of the State of Delaware in and for New Castle County. C.A. No. 89C-OC-187-1-CV

**DISPOSITION:** REVERSED and REMANDED

**JUDGES:** Before CHRISTIE, Chief Justice, HORSEY, and WALSH, Justices.

**OPINION BY:** BY THE COURT; JOSEPH T. WALSH

**OPINION:**

ORDER

This 2nd day of January, 1992, upon consideration of the briefs of the parties, it appears to the Court that:

(1) This is an appeal from a Superior Court jury award of damages to the appellant, Barbara E. Littleton ("Littleton") on a claim of misrepresentation arising out of the purchase of a residence in New Castle County. The jury determined that the appellees, Lester E. Young and Mildred A. Young, actively concealed evidence of wager damage to the garage and basement of the residence and awarded compensatory damages in the amount of $ 12,991.46. Littleton appeals from the trial judge's refusal to instruct the jury on a request for punitive damages.

(2) The facts underlying Littleton's claim as presented at trial reflect the following events. In early 1989, Littleton, who was interested in purchasing a larger house, became [*2] aware through her real estate agent, Carla Farley, that the Youngs' property had been multi-listed. The two visited the property and determined it to be in fairly good condition. The basement seemed clear and appeared to have been recently painted. Mildred Young, who was present during the inspection, declined to answer questions about the property and referred inquiries to her husband, Lester. It was agreed that a second inspection would occur when Lester Young was available.

On the second visit, Lester Young was present. The basement against was inspected and Lester Young was asked specifically whether there were any water problems in the basement. He replied that on one occasion, ten years previously, water had backed up through a basement drain during a heavy rain. The visitors also noticed an asphalt barrier in front of the garage door which might suggest a blockage to divert the flow of water away from the garage. When asked about a possible water problem in the garage, Lester Young replied that the asphalt barrier had solved the garage water problem.

The Youngs' listing agent, Mary Beth Adelman, testified that upon securing the listing she had inspected the house and asked Lester [*3] Young if there were any problems regarding the roof or basement. She was advised that the house was in excellent condition. She claimed that, had she known or discovered any major

problems, repairs would have been recommended and disclosure made to potential buyers.

On April 25, 1989, Littleton entered into an agreement of sale with the Youngs to purchase the residence for $ 167,000. Approximately one month after settlement, and electric meter installer noticed water in the corner of the basement. Upon closer inspection, wallboard near the water site was found to be soaked and rotten. The following week, after a heavy rain the basement was inundated with water and water was also noticed entering the garage. The water problems continued and a contractor employed to make repairs testified that the water was coming through the cinder block wall of the basement and the wood framing in the basement was rotted. In his opinion the basement had suffered from "years of water penetration."

Mildred Young testified as a witness on behalf of Littleton after securing a joint tortfeasor's release through settlement. She testified that she and her husband were the original owners of the residence [*4] and had lived there for 31 years. Five years previous to listing the house for sale they had experienced severe water problems in the basement with water seeping through the walls. The garage also had longstanding water problems. When she and her husband considered selling the property she asked him to fix the water problems. He refused and told her to "tend to your own business." She claimed to be in fear of her husband and separated from him by the time of trial. Mildred Young also testified that, prior to listing the house for sale, her husband removed water damaged paneling in the basement and applied fresh white paint to the walls. Littleton's expert witness testified that this painting had the effect of concealing the true condition of the basement walls.

The only witness to testify for the defendant was Lester Young. A retired airline pilot, Young, has worked for the last sixteen years as a part-time maintenance man at various apartment complexes. He denied the existence of any serious water problems in his former residence, contending that the only incident occurred ten years previously. He also denied being asked about water problems by Littleton or her agent and claimed [*5] that his wife's testimony about persistent water problems was not true.

The jury awarded Littleton compensatory damages of $ 12,991.46 for repairs and cleaning of the basement and garage. It apportioned liability 99 percent to Lester Young and 1 percent to Mildred Young. Prior to submission of the case to the jury, Littleton requested a charge on punitive damages based on Lester Young's behavior in concealing the water problems. The trial judge declined to give such a charge on the ground that the amount of compensatory damages claimed, in relation to

the purchase price of the house, did not support a finding of egregious or outrageous conduct. Viewing Littleton's plight as more of an inconvenience, the trial court ruled that Young could not, as a matter of law, be assessed punitive damages for his conduct. In our view, this ruling was erroneous.

(3) The standard which governs the award of punitive damages in Delaware is well settled. In tort actions punitive damages are appropriately imposed "in situations where the defendant's conduct, though unintentional, has been particularly reprehensible, i.e., reckless, or motivated by malice or fraud." *Jardel Co. Inc. v. Hughes, Del. Supr., 523 A.2d 518 (1987).* [*6] In actions arising ex contractu, punitive damages may be assessed if the breach of contract is characterized by willfulness or malice. *Casson v. Nationwide Ins. Co., Del. Super., 455 A.2d 361 (1982).* In either setting, the focus is upon the defendant's state of mind. If the defendant's conduct reflects a conscious indifference to a foreseeable result punitive damages may be imposed to punish such indifference and to deter others from similar conduct. *Jardel, 523 A.2d at 529.* The extent of the harm for which compensatory damages may be awarded is a significant factor in testing the proportionality of punitive damages, but punitive damages "subsist on grounds other than making the plaintiff 'whole.'" *Id., 523 A.2d at 528.* Thus, even though the amount of compensatory damages claimed may be deemed slight in relation to the value of the entire transaction in which the defendant's conduct was manifested, an award of punitive damages is nonetheless appropriate if the defendant's state of mind meets the applicable standard.

For purposes of gauging the appropriateness of a requested instruction on damages, the trial court must [*7] determine whether the evidence favoring the proponent's position, if believed, would support an award. *Odenton Development v. Lamy, Md. Ct. App., 575 A.2d 1235, 1239 (1990).* Here there was substantial, perhaps compelling, evidence of Lester Young's conduct to justify the imposition of punitive damages. His concealment of the water problems was deliberate and persistent. He misled his own listing agent as well as Littleton and her agent. He ignored his wife's request to repair or disclose the problem and threatened her if she, as a joint contracting party, made such a disclosure. He not only actively concealed the longstanding water problems but resorted to cosmetic measures to prevent their discovery by others. He was motiviated solely by financial gain and, in view of his age and experience, clearly as knowledgeable of the harm that would result from his dishonesty.

While the amount of compensatory damages may have relevance in determining an award of punitive damages it does not control the question of whether a basis for punitive damages exits.

1992 Del. LEXIS 15, *

Given the egregious and deceitful nature of Lester Young's conduct, Littleton was entitled to a jury instruction permitting **[*8]** the assessment of punitive damages proportionate to the amount of compensatory damages. It was error not to give such an instruction. Accordingly, this matter must be remanded to the Superior Court for a new trial limited to the claim for punitive damages.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be and the same hereby is, REVERSED and the matter REMANDED for further proceedings consistent with this decision.

BY THE COURT:

Joseph T. Walsh, Justice

# TAB 4

1 of 1 DOCUMENT


**MIDLAND RED OAK REALTY, INC. AND MRO SOUTHWEST, INC. Plaintiffs, v. FRIEDMAN, BILLINGS & RAMSEY & CO., INC. AND VELASCO GROUP, L.L.C. Defendants.**


**C.A. No. 04C-05-091 CLS**


**SUPERIOR COURT OF DELAWARE, NEW CASTLE**


*2005 Del. Super. LEXIS 57*


**November 15, 2004, Submitted
February 23, 2005, Decided**


**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Motion To Dismiss DENIED IN PART; GRANTED IN PART.


**COUNSEL:** Attorneys for Plaintiffs Midland Red Oak Realty, Inc. and MRO Southwest, Inc.: Jonathan L. Parshall, Esquire, Murphy Spadaro & Landon, Wilmington, Delaware, Shawn L. Raymond, Esquire, J. Hoke Peacock III, Esquire, Susman Godfrey LLP, Houston, Texas.

Attorneys for Defendant Friedman, Billings & Ramsey, Co., Inc.: Arthur G. Connolly, III, Esquire, Connolly Bove Lodge & Hutz, LLP, Wilmington, Delaware, Howard W. Gutman, Esquire, William B. Pittard, IV, Esquire, Williams & Connolly LLP, Washington, D.C.

Attorneys for Defendant Velasco Group, L.L.C.: Judith M. Kinney, Esquire, Reed Smith, Wilmington, Delaware, Richard C. Sullivan, Jr., Esquire, Anne M. Devens, Esquire, Falls Church, Virginia.

**JUDGES:** Calvin L. Scott, Jr., Judge.

**OPINION BY:** Calvin L. Scott , Jr.

**OPINION:**

    **ORDER**

**SCOTT, J.**

    I. Facts

In this action, Plaintiffs Midland Oak Realty, Inc. and MRO Southwest, Inc. ("MRO") are suing Defendants Friedman, Billings, Ramsey & Co., Inc. ("FBR") and Velasco Group, L.L.C. ("Velasco") [*2] over a real-estate financing contract. MRO is a Delaware corporation with its principal office in Midland, Texas. FBR is a Delaware corporation with its principal office in Arlington, Virginia. Velasco is a limited liability Virginia corporation.

MRO is a real-estate investment firm engaged in buying, developing, and managing undervalued commercial properties in Texas, Oklahoma, and Arizona. In June 1999, MRO entered into a three-year financing contract with Lehman Brothers. The financing was to cover fifteen properties. MRO was required to pay the principal balance and a $ 5.275 million exit fee when the credit facility expired on July 1, 2002.

During the summer of 2001, MRO began to search for financing to replace the Lehman contract. MRO was put in touch with FBR to discuss possible financing options. In the beginning of 2002, MRO also interviewed other financing consultants. Ultimately, MRO chose FBR and Holliday Fenoglio Fowler ("Holliday") to discuss financing options. MRO informed each of the firms that it needed to re-finance before the Lehman contract expired. FBR and Holliday suggested that the financing be split into an "A" piece and a "B" piece in order to optimize financing. [*3]

FBR made its pitch to MRO on January 28, 2002. Jeff McClure, then vice-president of FBR, made several representations to MRO. He first stated that FBR had expertise in real estate financing, specifically, it was their specialty and they knew the market "better than anyone." McClure also represented to MRO that $ 24 million was a reasonable amount for financing of the "B" piece.

McClure was confident in "B" piece financing. He suggested that MRO find the cheapest price for the "A" piece.

In February, 2002, MRO assigned the "B" piece to FBR and the "A" piece to Holliday. MRO told Lehman about the re-financing effort. Lehman agreed in front of a Velasco representative to waive the $ 5.275 million fee if MRO re-financed the "A" and "B" pieces before the Lehman contract expired. While FBR had already begun work on financing, its contract with MRO had not been signed. The contract was not signed until May 6, 2002. The terms of engagement specified that FBR would find financing on "a best efforts basis."

Holliday secured financing for the "A" piece with Greenwich Corporate Products. FBR, however, had not found financing as of April, 2002. In mid-April, McClure left FBR to start his own [*4] consulting group, Velasco. FBR assured MRO that McClure departure would not affect the "B" piece financing.

At a May 1, 2002 status conference between MRO, FBR and Holliday, FBR notified the parties that it had enlisted the help of Velasco to obtain financing. MRO was not a party to this contract. McClure attended the meeting on behalf of Velasco and stated that "I have the deal done" in regard to the "B" piece. MRO informed Velasco that a Texas financier, Smith Brownlie, wanted to underwrite the transaction, but would need at least sixty days. McClure responded that the "B" piece was done, and did not need Brownlie's money.

On June 4, 2002, Holliday, Velasco, FBR, and MRO met in Texas. Brownlie was also present. Brownlie asked McClure about the status of the "B" piece. McClure responded that he had not finalized any financing. In addition, he stated that MRO's "B" piece financing was "in good shape." Brownlie became agitated because he had wished to finance the project but was told that the financing was already completed. Velasco and FBR indicated to MRO after the meeting that they had sent several proposals to different sources.

When asked to provide evidence of potential financers, [*5] Velasco provided MRO and Holliday with a list of people not regularly in the real estate finance market. This caused MRO and Holliday to be alarmed. A lack of pitch book for the real estate financing also alarmed MRO. When Velasco finally did produce offers they had received for the "B" piece, MRO realized that they were well below the price needed to replace the Lehman contract. FBR assured MRO that "the deal would get done" and "not to worry."

Ultimately, the Lehman contract expired without financing for the "B" piece. Holliday had tried at the last minute to obtain financing, but was unsuccessful. As a result of not obtaining re-financing, MRO became in default to Lehman. Subsequently, MRO and Lehman entered into a forbearance agreement. MRO has liquidated the vast majority of its portfolio holdings.

## II. Standard of Review

Delaware has clear standards for granting a Rule 12(b)(6) Motion to Dismiss. The Court must accept all well-pled allegations as true. n1 The Court must then apply a broad sufficiency test: "whether a plaintiff may recover under any reasonable conceivable set of circumstances susceptible of proof under the complaint." n2 Dismissal will not be granted if the [*6] complaint "gives general notice as to the nature of the claim asserted against the defendant." n3 Further, a complaint "will not be dismissed unless it is clearly without merit, which may be either a matter of law or of fact." n4 "Vagueness or lack of detail," standing alone, is insufficient to dismiss a claim. n5

> n1 *Spence v. Funk, 396 A.2d 967, 968 (Del. Supr. 1978).*

> n2 *Id.* (Internal citation omitted).

> n3 *Diamond State Tel. Co. v. Univ. of Delaware, 269 A.2d 52, 58 (Del. Supr. 1970).*

> n4 *Id.*

> n5 *Id.*

## III. Discussion

In determining how to rule on the Motion, this Court must look to the contract between FBR and MRO. FBR contends that the contract language permits recovery only for "willful misconduct or gross negligence." It is their position that the Motion to Dismiss should be granted because MRO has failed to plead either willful misconduct or gross negligence in their First Amended Complaint. MRO counters that the Motion should [*7] not be dismissed because the indemnity provision does not apply until this Court issues a final ruling on the merits.

The Indemnity Provision of the FBR/MRO contract states in pertinent part:

> The Company agrees to indemnify and
> hold harmless FBR and its affiliates . . .
> and their respective directors, officers,

employees, agents and controlling persons . . . The Company will not be liable to any Indemnified Party under the foregoing indemnification and reimbursement provisions . . . to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from FBR's *willful misconduct or gross negligence.* (emphasis added) . . .

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to or arising out of this engagement of FBR pursuant to, or the performance by FBR of the services contemplated by, this Agreement except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent [*8] jurisdiction to have resulted primarily from FBR's *willful misconduct or gross negligence.* (emphasis added).

A. *Plain Meaning Rule*

In Delaware, the principles governing contract interpretation are well settled. n6 "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning." n7 If the parties disagree as to the proper interpretation of the contract, the disagreement does not automatically create an ambiguity. n8 Instead, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." n9

n6 *Northwestern Nat'l Ins. Co., v. Esmark, Inc., 672 A.2d 41, 43 (Del. Supr. 1995).*

n7 *Id.* (Internal citation omitted).

n8 *Id.*

n9 *Id.* (citing *Rhone-Poulenc Basic Chemicals Co., Inc. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. Supr. 1992)).*

[*9]

In the case *sub judice*, the express language of the FBR/MRO agreement reserves Plaintiff's right to deny indemnification to Defendant if a court has rendered a final judgment holding that FBR acted with willful misconduct or gross negligence. By employing the Plain Meaning Rule, this Court agrees with MRO that a determination of indemnification cannot be made with respect to the parties, on at least a few of the claims, until after this case has gone to trial and been decided.

B. *Recovery of Breach of Contract in Tort Law*

FBR asserts that Counts III and IV must be dismissed against them because a plaintiff may not recover in tort for breaches of contract agreements. This Court agrees.

"As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." n10 In both *Pinkert v. Olivieri* and *Tristate Courier and Carriage, Inc. v. Berryman,* n11 the Delaware courts held that a breach of contract claim could not be "bootstrapped into a fraud claim merely by adding the words 'fraudulently induced' [*10] or alleging that the contracting parties never intended to perform." n12

n10 *Pinkert v. Olivieri, 2001 U.S. Dist. LEXIS 8133, 2001 WL 641737 *5 (D. Del. 2001).*

n11 *2004 Del. Ch. LEXIS 43, 2004 WL 835886 *11 (Del. Ch. 2004).* (Internal citation omitted).

n12 *Pinkert, 2001 U.S. Dist. LEXIS 8133, 2001 WL 641737 at *5; Tristate Courier and Carriage, Inc., 2004 Del. Ch. LEXIS 43, 2004 WL 835886 at *11.*

MRO's claims of Fraud and Negligence are based entirely on obligations owed by FBR under the contractual agreement. The alleged material misrepresentations made by FBR are not collateral issues in this case. FBR has not violated any common law duty independent of the financing contract terms. In addition, MRO has not pointed to a representation or obligation other than the existence of the financing agreement upon which it can base a fraud or negligence claim. FBR's Motion to Dismiss is **Granted** as to Counts III and IV.

*C. Willful Conduct and Gross Negligence May be Averred Generally*

Moreover, FBR argues that MRO has failed **[*11]** to sufficiently plead a cause of action because MRO's First Amended Complaint does not use the word "willful." This Court disagrees.

Delaware Superior Court Civil Rule 9(b) describes the causes of actions that are to be pled with particularity. It reads:

> *(b) Fraud, negligence, mistake, condition of mind.* In all averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake should be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

Willful and wanton each refer to a "distinct state of mind." n13 Accordingly, willful and wanton need only be averred generally as required in Rule 9(b).

> n13 *Johnson v. Pritchett*, 2001 WL 1222100 *3 (Del. Super)(citing *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 529-30 (Del. Supr. 1987)).

In *Hedrick v. Webb*, n14 the Court held that "the term aver [] implies that there must be at least a positive assertion of the state of mind. **[*12]** " n15 There, the plaintiffs failure to mention wanton negligence or willful intent in their Complaint was fatal. n16 The Court held that the plaintiffs had no cause of action under the *Tort Claims Act* because they failed to mention the state of mind. n17

> n14 *2004 Del. Super. LEXIS 379, 2004 WL 2735517 (Del. Super.).*

> n15 *2004 Del. Super. LEXIS 379, [WL] at *7.*

> n16 *Id.*

> n17 *Id.*

While Plaintiffs do not use the word "willful" in their Complaint, this Court does not find the omission to be fatal. As discussed below, Plaintiffs have alleged sufficient facts to withstand a Motion to Dismiss.

*D. Wanton Conduct is a Question for the Jury*

Generally, the issue of whether facts and circumstances amount to willful conduct or gross negligence is a fact question for the jury. n18 It is a matter of law when the "conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence." n19 Willful conduct has been defined as a "conscious indifference" or **[*13]** "I don't care attitude which is the prerequisite of wanton behavior." n20 Wanton conduct is a "conscious indifference to consequences in circumstances where [the] probability of harm to another within the circumference of the conduct is reasonably apparent, although harm to such others in not intended." n21

> n18 *Eustice v. Rupert*, 460 A.2d 507, 509 (Del. Supr. 1983); *Nicholson v. Mount Airy Lodge, Inc.*, 1997 U.S. Dist. LEXIS 21035, 1997 WL 805185 *4 (E.D.Pa).* (Internal citations omitted).

> n19 *Id.*(citing *Albright v. Abington Mem'l Hosp.*, 548 Pa. 268, 696 A.2d 1159,1165 (Pa. 1997)).

> n20 *Eustice*, 460 A.2d 509. (Internal citations omitted).

> n21 *Id.* (citing *Law v. Gallegher*, 39 Del. 189, 9 W.W. Harr. 189, 197 A. 479, 482 (Del. Supr. 1938)).

*1. Breach of Contract*

This Court finds that there is evidence from which a reasonable jury could find that FBR was grossly negligent or engaged in willful conduct in breaching the financing contract with MRO. First, the contract **[*14]** language stated that FBR conduct the Offering on a "best efforts basis only after execution of an underwriting agreement." As of May 1, 2002, FBR contended that the "deal was done." The deal, however, was not done and these representations were made merely three months before the expiration of the Lehman credit facility. In addition, the statements that led MRO to believe that the B piece was proceeding to the underwriting stage may not have been boasting. Finally, the issue of whether FBR was grossly negligent when they told Brownlie, who wanted to secure financing for the Lehman project,

that he need not finance the project because it was done is best suited for a determination by the fact-finder.

### 2. Breach of Covenant of Good Faith and Fair Dealing

The concept that a covenant of good faith and fair dealing is implied in a contractual relationship is well accepted in Delaware. n22 Good faith has been defined as "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." n23 Although MRO's allegations of the breach of covenant of good faith are vague at best, this Court does not believe that the count is so clearly without merit [*15] that it be dismissed. Accepting all well-pled allegations as true, FBR may have acted in disregard to MRO's expectations that financing be obtained when it told a possible financier that the "deal was done," when in fact, it was not.

> n22 *Merrill v. Crothall-American, Inc., 606 A.2d 96, 101 (Del. Supr. 1992)*. At common law, fair dealing and good faith was impliedly a part of every kind of contract. *See Restatement (Second) of Contracts § 204 (1979)*.

> n23 *Restatement (Second) of Contracts § 205, cmt. a. (1979)*.

This Court **DENIES** FBR's Motion to Dismiss Counts I and II because it cannot be concluded as a matter of law that FBR's conduct was not willful or grossly negligent.

### E. Velasco's Relationship with FBR

FBR and Velasco both asserted at the Motion that Velasco was in fact FBR's agent under the FBR/MRO contract. It is FBR's position that MRO must concede that Velasco is an agent of FBR [*16] because some of the causes of action against FBR stem from Velasco's actions. In contrast, MRO contends that previous to the hearing, FBR would not admit that Velasco was its agent. This Court believes that at this stage in the pro-

ceedings, there is a basis upon which the Plaintiffs may recover against Velasco. Velasco's Motion to Dismiss Counts III, IV, and V of the First Amended Complaint is **DENIED.**

"Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." n24 On the other hand, if the agent is an independent contractor, and the employer does not retain control over him, the employer is not liable for the independent contractor's negligent actions. n25

> n24 Restatement (First) of Agency § 1(1) (1933).

> n25 *Restatement (Second) of Torts § 414 (1977)*.

In the pleadings before the Court, there is insufficient evidence [*17] to determine if Velasco was an agent or an independent contractor for purposes of this Motion.

This Court is cognizant that FBR enlisted the help of Velasco, however, the status of their relationship remains an issue to be determined. This Court, with so little information, cannot conclude as a matter of law what Velasco's status was in the contract. The Motion, therefore, will not be dismissed with regard to the claims against Velasco.

### IV. Conclusion

Based on the foregoing reasons, Counts III and IV are DISMISSED against FBR. Counts I and II remain against FBR. Counts III, IV, and V remain against Velasco.

IT IS SO ORDERED.

J. Calvin L. Scott, Jr.

# TAB 5

3 of 4 DOCUMENTS



Analysis
As of: Feb 16, 2007

**ALLISSIA NORFLEET, ALLISSIA NORFLEET, Next Friend for RYAN
NORFLEET and AARON FRUITS; RONELL HACKETT, STACY NAPIER,
JEONGH TAE LEE and DUCKSON LEE Individually and as Guardians Ad Litem
for WON KI LEE and HYUNGH LEE, Minors, Plaintiffs, v. MID-ATLANTIC
REALTY CO., INC., a Delaware corporation; and DEVON WEDGEWOOD
PARTNERS, a Delaware general partnership and/or DEVON PLACE TRUST, De-
fendants-Third Party, Plaintiffs, v. ANTHONY W. RICH, Third Party Defendant.**

**C.A. No. 95C-11-008 WLW**

**SUPERIOR COURT OF DELAWARE, KENT**

*2001 Del. Super. LEXIS 357*

**February 26, 2001, Submitted
April 20, 2001, Decided**

**DISPOSITION:** [*1] Plaintiffs' Motion for Reargu-
ment Denied. Defendants' Renewed Motion for Sum-
mary Judgment Denied in part, Granted in part. Plain-
tiffs' Motion to Exclude Testimony of Defendants' Ex-
pert Denied. Defendants' Motion to Exclude Testimony
of Plaintiffs' Expert Granted.

**COUNSEL:** Edward Curley, Esquire, Whitehurst &
Curley, Dover, Delaware, attorneys for the Plaintiffs.

Robert K. Pearce, Trzuskowski Kipp Kelleher & Pearce,
P.A., Wilmington, Delaware, attorneys for the Defen-
dants-Third Party Plaintiffs.

Roy S. Shiels, Brown Shiels Beauregard & Chasanov,
attorneys for Third Party Defendant.

**JUDGES:** William L. Witham Jr., Judge.

**OPINION BY:** William L. Witham Jr.

**OPINION:** WITHAM, J.

OPINION AND ORDER

This case involves the duties and responsibilities of
a landlord to tenants for injuries sustained following a
fire at the Towne Pointe apartment complex.

In February of this year, the Court granted Mid-
Atlantic Realty Co., Inc.'s ("Defendant") motion for
summary judgment in part and denied the motion in part.
Essentially, the Court granted summary judgment with
respect to the negligence *per se* claims brought against
the Defendant and denied summary judgment as to the
remaining claims. This decision [*2] has earned a
wealth of motions from all parties. The offensive began
with Allissia Norfleet, Ryan Norfleet, Aaron Fruits, Ro-
nell Hackett, Stacy Napier, Jeongh Tae Lee, Duckson
Lee, Won Ki Lee and Hyungh Lee (collectively "Plain-
tiffs") filing a motion for reargument pursuant to *Supe-
rior Court Civil Rule 59*. Also outstanding is the Plain-
tiffs' motion in limine to exclude the testimony of Fred
V. Quercetti ("Quercetti"), Defendant's standard of care
expert for professional apartment owners and managers.
The Defendant counter-attacked with a renewed motion
for summary judgment. In addition, Defendants have
pending before the Court a motion in limine to exclude
the testimony of Plaintiffs' expert, Thomas D. Schneiders
("Schneiders"), and a motion to preclude evidence re-
lated to the codes cited by Schneiders. On the eve of the
Trial Calendar Conference, April 19, 2001, the defendant
filed a motion in limine to exclude present and future
damages for lost earnings from an intended farming op-
eration. Because the Plaintiffs have not had the opportu-
nity to respond, the Court will not address this motion in
this opinion.

The facts of the case are described in the earlier summary judgment [*3] motion and will not be rehashed at this time. In answering all of these motions, the Court will clarify its ruling in the earlier summary judgment decision and apply that decision to the expert testimony and evidence that will be permitted at trial.

## I. Plaintiffs' Motion for Reargument.

Plaintiffs claim in their motion for reargument that in construing *16 Del. C. § 7501* n1 the Court did not consider the legislative intent of the statute, did not determine the statute's plain meaning and did not determine whether any ambiguity exists. Plaintiffs also raised concerns about the meaning of this Court's reference to Schneiders' testimony in deciding the summary judgment motion. Defendants' first line of defense on the motion for reargument is that it was not timely filed. Pursuant to *Superior Court Rule 59(e)*, "[a] motion for reargument shall be served and filed within 5 days after the filing of the Court's opinion or decision." Under *Superior Court Civil Rule 6(b)* the Court may not enlarge the time for taking action under Rule 59(e). The Court's decision was entered on February 16, 2001, and the Plaintiffs' motion for reargument was [*4] not filed until February 26, 2001; therefore, the Court will not decide the motion for reargument because the motion is untimely.

> n1 *16 Del. C. § 7501*. Buildings requiring fire escapes; exceptions.
>
> (a) The owner of any building which is more than 2 stories in height and which is used in the third or any higher story in whole or in part as . . . a tenement-house, or when rooms are let to families or lodgers or for the accommodation of organized associations of any description, shall be required to furnish such building with sufficient permanent fire escapes from the third and all higher stories, which escapes shall be kept and maintained in good order.

## II. Defendants' Renewed Motion for Summary Judgment.

Defendants' renewed motion for summary judgment raises three issues: first, Defendants claim that Plaintiffs have no evidence to support a common law claim in which a reasonable landlord does more than is required in the applicable statutes, codes and regulations; second, [*5] Defendants claim that *16 Del. C. § 6634* precludes a cause of action based upon failure to have an automatic fire detection system; and third, Defendants claim that

there is no common law action for breach of the covenant of quiet enjoyment.

Defendants' first argument pertains to the common law negligence claim which still exists in the case. According to the Defendants, Plaintiffs have no evidentiary proof that the common law standard of care for a reasonable landlord is higher than the minimums established by the applicable codes, statutes and regulations. In this renewed motion for summary judgment, the issue before the Court is whether the Plaintiffs' evidence, viewed in a light most favorable to them, raises a question of fact as to whether the real estate community follows a higher standard of care than the minimum standards set forth in the codes. The Court addressed this issue in the earlier summary judgment decision and noted as an example of a factual dispute Schneiders' statements that in his opinion the landlord was negligent and that this negligence was the proximate cause of the Plaintiffs' injuries. The Court is neither adopting this testimony, [*6] making a finding of relevancy, nor declaring the testimony admissible. Consistent with the summary judgment standard, the Court must view the testimonial evidence as supplied by affidavit and deposition transcript in the light most favorable to the Plaintiffs. In this case, it becomes apparent that a factual dispute still exists as to the common law standard of care for apartment owners and managers. Defendants' also argue the admissibility of Schneiders' testimony. However, the Court will address the admissibility of all the experts' opinions at a later point.

The Defendants also argue that the Court did not address their argument with respect to *16 Del. C. § 6634* n2 in the summary judgment order. Pursuant to § 6634, the Defendants were required to have an automatic fire detection system by July 1, 1996, which is after the fire that occurred on November 7, 1993. Defendants argue that no cause of action arises under this statute for two reasons: first, because the time had not expired for them to install the automatic fire detection system, and second, the Fire Prevention Code states in § 6636 that "failure to comply with this sub-chapter shall not [*7] be admissible in any trial of any civil action or insurance claim adjudication." In the earlier summary judgment order the Court inadvertently considered this statute as part of the numerous statutes, codes and other regulations which did not support a negligence *per se* cause of action. The Court agrees that § 6634 cannot support a cause of action for the reasons argued by the Defendants. Therefore, no cause of action can be brought against the Defendants for failure to comply with Title 16 of Chapter 66.

> n2 1 *6 Del. C. § 6634* states the dates by which different ages and types of buildings must comply with the statutory standards for smoke detectors.

Lastly, the Defendants argue that no common law action exists for breach of the covenant of quiet enjoyment. Defendants make this claim based on the Landlord-Tenant Code's express statement that it "shall regulate and determine all legal rights, remedies, and obligations of the parties and beneficiaries of any rental agreement of [*8] a rental unit within this State." n3 In the summary judgment motion, the interaction of the common law breach of the warranty of habitability and the Landlord-Tenant Code was discussed. The interaction of the breach of the covenant of quiet enjoyment and the Landlord-Tenant Code is similar in some respects. One similarity between the covenant of quiet enjoyment and the warranty of habitability is the damages that flow from a breach of either one. In both instances the damages are contractual in nature. In *Colt Lanes of Dover, Inc. v. Brunswick Corp.*, the Court stated that "as a general rule, damages, upon breach of the covenant of quiet enjoyment, are the natural and direct consequences of the breach or an amount representing the difference between the actual value of the unexpired term and the rent reserved." n4 Delaware law has found that *25 Del. C. § 5303(a)(2)* of the Landlord-Tenant Code contains a warranty of habitability. n5 The covenant of quiet enjoyment is different in that the Court is unable to point to one specific code section which encapsulates the entire common law breach of the covenant of quiet enjoyment standard. However, a careful [*9] reading of the Landlord-Tenant Code shows that in many instances the statutes have codified the problems covered by the covenant of quiet enjoyment. For example, in *25 Del. C. § 5305* the Code addresses "any condition which deprives the tenant of a substantial part of the benefit and enjoyment of his bargain." This is similar to the covenant of quiet enjoyment which protects the tenant's right to a peaceful and undisturbed enjoyment of his leasehold. The next few sections of the Landlord-Tenant Code go on to specify the duties of the landlord and tenant in specific situations such as the repair of minor defects, failure to provide heat and hot water, and damage by fire or casualty. n6 The Landlord-Tenant Code in the aggregate provides for many of the same situations that would give rise to a claim for breach of an implied covenant of quiet enjoyment. There is no need to imply a duty at common law when there is an express, statutory duty. n7 Therefore, in this case, no common law action exists for breach of the implied covenant of quiet enjoyment.

n3 *25 Del. C. § 5103(a).*

[*10]

n4 *Colt Lanes of Dover, Inc. v. Brunswick Corp., Del. Supr., 281 A.2d 596, 599 (1971).*

n5 *Brown v. Robyn Realty Co., Del. Super., 367 A.2d 183, 193 (1976).*

n6 See, *25 Del. C. §§ 5304-5308.*

n7 *Hand v. Davis, 1990 Del. Super. LEXIS 254, *6*, Del. Super., C.A. No. 87C-OC-6, Ridgely, J. (June 8, 1990).*

Upon review of the Plaintiffs' claims against the Defendants, the Plaintiffs seek tort liability for the alleged negligence of the Defendants, not contract damages for loss of the apartment. Therefore, Plaintiffs may bring their contractual type claims under the Landlord-Tenant Code, but not as a common law cause of action.

## III. Plaintiffs' and Defendants' Evidentiary and Expert Testimony Motions.

Plaintiffs and Defendants each brought motions in limine against the other parties' expert. The Court recognizes the complexity and importance of these motions and will begin by addressing them generally and then rule on the individual motions.

Of the remaining issues in the case, the most significant is the claim for ordinary [*11] common law negligence against the Defendants. In deciding the summary judgment motion, this Court found that Defendants were not negligent *per se* as a matter of law but found that the claim for common law negligence remained viable. While common law negligence sounds like a simple matter based on well-established legal principles, the onslaught of motions in this case show that proving common law negligence may prove extremely difficult. The difficulty lies in the fact that distinguishing between the common law standard of care and the statutory standard of care is apparently quite challenging. Due to the extensive regulation of the landlord-tenant relationship by federal, state and local governments and agencies the applicable statutes, regulations and codes appear to have become the standard of care or at a minimum have formed a baseline standard of care. The crux of the problem therefore lies in establishing the landlord's duty or the standard of care under principles of ordinary, common law negligence beyond those statutes.

Establishing the standard of care beyond the applicable statutes is a difficult task. The Court's earlier summary judgment decision found that no cause [*12] of action would lie for negligence *per se* because the Defendants were not, and in many instances could not have

been, cited for code violations and because a number of the applicable statutes left the enforcing authority with discretion and were therefore not specific enough to support a negligence *per se* cause of action. On the other hand, the Court found that a cause of action remained under the claim of ordinary negligence. Therefore, the Court has found as a matter of law that the Defendants were not negligent *per se* with respect to the applicable statutes and regulations. Proving that the Defendants were ordinarily negligent beyond those same statutes complicates the case. The following questions remain: first, what type of expert, if any, is necessary to establish such a standard of care; and second, how can the statutes be used by these experts in establishing the standard of care even though they cannot form the basis of a claim for negligence *per se*. The Court will address the qualifications of the experts involved and then discuss what testimony will be permissible at trial.

To prove ordinary negligence, Plaintiffs must prove that the landlord failed to maintain [*13] the premises in a reasonably safe condition. Plaintiffs argue in their motion in limine that no expert is required to establish the standard of care because in this case that issue is within the knowledge of laymen. Interestingly, Plaintiffs have called their own expert to establish the Defendant landlord's standard of care with respect to fire safety. The complexity of the interactions of the various codes and regulations and what may be reasonable in addition to those codes is the type of issue on which expert testimony is helpful to the trier of fact. The Court in *Miley v. Harmony Mill Limited Partnership* stated that to succeed, plaintiffs must "produce a witness with expertise of the Delaware real estate community." n8 In light of this complexity, the Court finds that expert testimony will be of assistance to the fact finder in determining a fair issue, mainly the applicable standard of care. Therefore, Defendants' expert, Quercetti, will not be precluded from testifying to the standard of care for apartment owners and managers.

n8 *Miley v. Harmony Mill Limited Partnership, D. Del., 826 F. Supp. 824, 826 (1993).*

**[*14]**

On the other hand, Defendants argue that expert testimony is necessary and that they should be considered "professional apartment owners and managers." In *Weaver v. Lukoff*, the Supreme Court discussed the need for expert testimony when the standard of care must be determined for professionals and stated that:

"as a general rule the standard of care applicable to a professional can only be es-

tablished through expert testimony. An exception to this rule exists, however, when the professional's mistake is so apparent that a layman, exercising his common sense, is perfectly competent to determine whether there was negligence." n9

Considering the apartment owners and managers as professionals not only requires expert testimony but also impacts the type and qualifications of the expert that may be called to testify. Common law has created a local standard of care for professionals in which the fact finder evaluates whether the actions of the professional conform to the profession's standards of skill, care and competence, as adhered to by professionals who are in good standing in the community. n10 Essentially, this represents a requirement that the expert be familiar [*15] with the local standard of care as opposed to a national standard of care or that "bridging" testimony be presented which states the similarity between the local and national standards. n11 The use of a local standard when considering professional negligence is also consistent with the *Restatement (Second) Torts § 299A* n12 and *Delaware Pattern Jury Instruction Civil § 8.1.* n13 Defendants further argue that *Miley* establishes that expert testimony about the local standard of care is required to prove ordinary negligence in landlord-tenant cases. In *Miley*, the Court excluded an expert "since his area of expertise was limited to Pennsylvania, not Delaware." n14

n9 *Weaver v. Lukoff, Del. Supr., 511 A.2d 1044, 1986 Del. LEXIS 1165, *2 (1986)* [Citations omitted].

n10 *See, Seiler v. Levitz Furniture Co. of the Eastern Region, Inc., Del. Supr., 367 A.2d 999, 1007 (1976)* (referring to the standard of care for architects/engineers).

n11 *See Baldwin v. Benge, Del. Supr., 606 A.2d 64, 67 (1992)* (excluding testimony in medical negligence case because expert could not apply his nationwide standard to the locality). The Delaware Legislature has changed the standard of care by statute to be a nationwide standard in medical negligence cases; however, this is in derogation of common law therefore the locality rule still applies to other experts.

**[*16]**

n12 Undertaking In Profession Or Trade. Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities. *Restatement (Second) of Torts § 299A* (1965).

n13 [Plaintiff's name] has alleged that [Defendant's name] was negligent in [identify the alleged negligent conduct]. One who undertakes to render services in the practice of a profession or trade is always required to exercise the skill and knowledge normally held by members of that profession or trade in good standing in communities similar to this one. *Delaware Pattern Jury Instruction Civil § 8.1* (2000).

n14 *Miley* at 826.

The Court is not persuaded that apartment owners and managers are "professionals" in the way that term is used in the Pattern Jury Instructions and the *Restatement (Second) of Torts § 299A*. The Court's opinion in *Miley* does not state that a Delaware real estate [*17] expert was necessary because apartment owners and managers are professionals. The Court found that to prove ordinary negligence the Plaintiffs would have to show that the reasonable landlord does more than meet the minimum requirements of the applicable codes. While the Court did not consider apartment owners professionals explicitly, the Court held the experts to a similar standard likely because of the extent of the regulation of the landlord tenant code. The *Miley* Court specifically stated that

> Plaintiffs might succeed if they presented evidence of an industry practice which replaced glass in intervals of time less than every twenty years, or if they presented evidence of an industry practice which conformed specifically exempted structures to present BOCA code standards in a time less than twenty years, despite the code's "grandfather clause." n15

The common law standard of care for landlords is formulated by the extent to which the reasonable landlord exceeds federal, state and local codes. This is very similar to the standard of care for a local industry or trade practice for professionals. Even though the Court has not chosen to accept that apartment owners [*18] and managers are professionals, expert testimony to the local industry practice will be helpful and required. Therefore, to establish that the standard of care in the Delaware real estate rental community is higher than the minimum requirements mandated by the applicable codes, statutes and regulations the experts must be familiar with the local standard of care. Based on the affidavits and deposition testimony of Plaintiffs' expert Schneiders, he is not familiar with the local standard of care in Delaware and will not be allowed to testify unless the Plaintiffs provide "bridging" testimony.

n15 *Miley v. Harmony Mill Limited Partnership, D. Del., 803 F. Supp. 965, 970 (1992).*

The final question that remains is the extent to which the experts will be allowed to use the codes, statutes and regulations in formulating and testifying to their opinions. As Plaintiffs' expert does not meet the qualifications of being an expert on the local standard of care for the Delaware real estate community, the [*19] Court need not decide what testimony will be admissible from Schneiders.

For the parties guidance as the litigation proceeds, the Court recognizes that an expert testifying to the standard of care may need to reference some of the codes, statutes and regulations which were found not to support a claim for negligence *per se*. However, the expert cannot simply opine that a certain statute was violated and therefore caused harm to the Plaintiffs as the Court has found that no negligence *per se* exists as a matter of law. For example, the expert could testify that even though it has been found that a second means of egress was not required by law, the reasonably prudent landlord would make any necessary repairs or adjustments to provide tenants with a second means of egress in this type of structure as some statutes provide. Provided that the expert has some basis for this opinion under a local standard of care, the expert may testify that even though some older buildings are technically "grandfathered" out of certain code requirements, reasonably prudent landlords follow these requirements.

In summary, the Court finds the following with respect to the parties' motions in limine: [*20] expert testimony will be helpful to the fact finder in establishing the standard of care in this case; the expert must be familiar with the local standard of care; and finally, the experts will be permitted to use the applicable codes, statutes and regulations in a limited fashion discussed by example in this decision as a factor in their opinions. Specifically, this means that Plaintiffs' motion in limine to preclude defendants' standard of care expert, Quercetti, from testifying is denied. Defendants' motion

2001 Del. Super. LEXIS 357, *

to preclude Schneiders from testifying is granted because of his unfamiliarity with the standard of care in Delaware. The Defendants' final motion concerning specific elements of Schneiders' testimony is moot based on these findings.

The Court recognizes that Plaintiffs did not anticipate that a local standard of care expert would be required; therefore, the trial will be stayed for six (6) months to allow the Plaintiffs the opportunity to find an expert qualified to testify. Should the Plaintiffs be unable to locate such an expert, summary judgment will be granted in favor of the Defendants. This Court will consider an appropriate modified pretrial order encompassing this decision **[*21]** for trial purposes.

IT IS SO ORDERED.

William L. Witham Jr.

Judge

# TAB 6

1 of 1 DOCUMENT



Analysis
As of: Feb 16, 2007

IN RE: STUDENT FINANCE CORPORATION, Debtor. CHARLES A.
STANZIALE, JR., CHAPTER 7 TRUSTEE OF STUDENT FINANCE
CORPORATION, Plaintiff, v. McGLADREY & PULLEN, LLP, and MICHAEL
AQUINO, Defendants.

Chapter 7, Bankruptcy Case No.02-11620(DDS), Adversary No. 04-58003, District
Case No. 05-00072-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2006 U.S. Dist. LEXIS 56759*

**August 10, 2006, Decided**

**PRIOR HISTORY:** *Stanziale v. Pepper Hamilton LLP
(In re Student Fin. Corp.), 335 B.R. 539, 2005 U.S. Dist.
LEXIS 34927 (D. Del., 2005)*

**COUNSEL:** [*1] Michael S. Waters, Esquire, Lois H.
Goodman, Esquire, Donald J Crecca, Esquire, and Can-
dice E. Chesson, Esquire, of McELROY, DEUTSCH,
MULVANEY, & CARPENTER LLC, Newark, New
Jersey; Daniel K. Astin, Esquire and Ashley B. Stitzer,
Esquire of THE BAYARD FIRM LLP, Wilmington,
Delaware. Attorneys for Plaintiff Charles A. Stanziale,
Jr., Chapter 7 Trustee of Student Finance Corporation.

Richard P. Swanson, Esquire, Veronica E. Rendon, Es-
quire and Jason M. Butler, Esquire of ARNOLD &
PORTER LLP, New York, New York; Michael R. Las-
towski, Esquire and Christopher M. Winter, Esquire of
DUANE MORRIS LLP, Wilmington, Delaware. Attor-
neys for Defendants McGladrey & Pullen, LLP and Mi-
chael Aquino.

Steven M. Farina, Esquire, Thomas H.L. Selby, Esquire,
and Amber M. Mettler, Esquire of WILLIAMS &
CONNOLLY LLP, Washington, D.C. Attorneys for De-
fendants McGladrey & Pullen.

**JUDGES:** Joseph J. Farnan Jr., UNITED STATES
DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION:**

**MEMORANDUM OPINION**

August 10, 2006
Wilmington, Delaware

**Farnan, District Judge.**

Pending before the Court is a Motion To Dismiss In
Part Pursuant To *Fed. R. Civ. P. 12(b)(6)* filed by Defen-
dants, McGladrey & Pullen, [*2] LLP and Michael
Aquino (D.I. 52). Defendants seek to dismiss the profes-
sional malpractice claim in Count VI of the Trustee's
Amended Complaint (D.I. 48) on the grounds that the
claim is barred by the affirmative defense of in pari
delicto. For the reasons set forth below, the Court will
deny the Motion.

**BACKGROUND**

Charles A. Stanziale, Jr., Chapter 7 Trustee (the
"Trustee") of Student Finance Corporation ("SFC"), filed
a claim against Defendants, McGladrey & Pullen, LLP
("McGladrey") and Michael Aquino ("Aquino"), for pro-
fessional malpractice. (D.I. 48). The Trustee asserts the
claim in the Amended Complaint pursuant to *Section 541
of the United States Bankruptcy Code.*

SFC is a Pennsylvania corporation currently in
Chapter 7 bankruptcy proceedings. McGladrey was
SFC's independent accountant and auditor and Aquino
was one of McGladrey's accountants. Aquino was re-
tained by SFC in 1998 to perform auditing and account-

ing services. Although Aquino changed employers several times, he consistently provided these services to SFC and continuously represented the corporation through at least 2001. (D.I. 48 at 15.) McGladrey employed Aquino from approximately 2000 through the present. [*3] Id. The Trustee contends that Aquino's knowledge that SFC's business was a Ponzi-like scheme should be imputed to McGladrey, and that both McGladrey and Aquino are liable for professional malpractice.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits the Court to dismiss a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or reach a conclusion about the merits of the case. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In ruling on a motion to dismiss, a court must accept the factual allegations in the complaint as true. Graves v. Lowery, 117 F.3d 723, 726 (3d Cir. 1991). A court also accepts as true all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991). However, the court need not credit a complaint's legal conclusions or bald assertions when deciding the motion. Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir. 1997). [*4] The burden lies with the moving party to show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). Courts are hesitant to dismiss claims at the pleadings stage that could be better examined following development of facts through discovery. Dismissal of the complaint is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Graves, 117 F.3d at 726.

## DISCUSSION

### I. The Parties' Contentions

In Count VI of the Amended Complaint, the Trustee alleges that Defendants, as accountants to SFC, breached their contractual obligations to SFC and failed to exercise necessary, proper and ordinary skill and knowledge required of members of the accounting profession. (D.I. 28 at 33.) Specifically, the Trustee contends that creditors and investors were deceived by reports issued by Defendants and continued to invest and transact with SFC as if it were a legitimate business. (D.I. 48 at 5.) The Trustee further alleges that the foregoing breaches of Defendants' [*5] professional duties proximately caused SFC's insolvency and resulting bankruptcy. Id. By their Motion, Defendants contend that the Trustee's profes-

sional malpractice claim should be dismissed because it is barred by the doctrine of in pari delicto. (D.I. 53 at 7.) Defendants argue that SFC, cannot sue Defendants for participating in a fraud of SFC's own making. Id.

In response, the Trustee claims the affirmative defense of in pari delicto is only available when both parties are equal in fault and the defense will not protect the Defendants here, because they bear greater fault in the wrongdoing. (D.I. 57 at 9.) The Trustee also contends that upon further discovery Aquino may be found to have operated as an insider of SFC and, therefore, may be precluded from asserting in pari delicto as a defense to the professional malpractice claim. (D.I. 57 at 19.)

In reply to the Trustee's contentions, Defendants argue that the doctrine of in pari delicto does not require the court to balance the relative fault of the parties. (D.I. 58 at 2.) Defendants further contend that the Trustee has not sufficiently alleged that Aquino was an insider of SFC in his Amended Complaint. [*6] (D.I. 58 at 11.)

### II. Analysis

In pari delicto is an equitable doctrine providing "that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 354 (3d Cir. 2001). The Third Circuit has held that the doctrine may be applied to bar a bankruptcy trustee, who stands in the shoes of the wrongdoing debtor, from bringing an action under section 541 against a third party defendant who participated in the same wrongdoing. Id. at 360. In pari delicto is an affirmative defense that a court generally should not consider on a motion to dismiss. OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.), 340 B.R. 510 (Bankr. D. De. 2006). However, where the affirmative defense appears on the face of the complaint, a court may properly grant dismissal. Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001) (quoting ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994)). Furthermore, the in pari delicto defense will not operate to bar claims made against insiders of the debtor corporation. Official [*7] Comm. of Unsecured Creditors v. Shapiro, 2001 U.S. Dist. LEXIS 18734, *5, No 99-526, 2001 WL 1468250 (E.D. Pa. 2001) (citing In re Granite Partners, L.P., 194 B.R. 318, 332 (S.D.N.Y 1996)). "Any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny may qualify as an 'insider.'" Walsh v. Dutil (In re Demko), 264 B.R. 404, 408 (Bankr. W.D. Pa. 2001) (citing Butler v. David Shaw, Inc., 72 F.3d 437, 443 (4th Cir. 1996)). Whether an individual qualifies as an insider is a fact intensive inquiry and should be decided only on a case-by-case basis. Walsh v. Dutil (In re Demko), 264 B.R. at 408 (citing ABC Elec.

*Servs. v. Rondout Elec. (In re ABC Elec. Servs.), 190 B.R. 672, 675 (Bankr. M.D. Fla. 1995)).*

Reviewing the allegations of the Complaint in the light most favorable to the Trustee, as the Court must do on a motion to dismiss, the Court concludes that the affirmative defense of in pari delicto is not apparent on the face of the complaint. The Court is further persuaded that the allegations of the Complaint give rise to a possible inference that **[*8]** Aquino acted as an insider such that the affirmative defense of in pari delicto may not bar claims against Aquino. The Trustee alleged that Aquino was aware of SFC's fraudulent scheme as early as 1998 but continued to work closely with the corporation and was actively involved in the preparation and validation of its allegedly misleading financial reports. (D.I. 57 at 21.) The Trustee, as the Plaintiff in this action, is not required to "contemplate and plead in anticipation of all affirmative defenses" that may lie against him. *Rosener v. Majestic Mgmt. (In re OODC, LLC), 321 B.R. 128, 137 (Bankr. D. Del. 2005)* (citing *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.), 299 B.R. 732, 752 (Bankr. D. Del. 2005)).* Therefore, it is of no consequence that the Trustee did not specifically raise the factual issue as to Aquino's possible "insider status" in the Amended Complaint. In addition, the Court agrees with the Trustee that further discovery may reveal information related to the Trustee's allegations that Aquino operated as an insider of SFC, which would consequently bar him from assert-ing in pari delicto as an affirmative defense. Given the early stage of this litigation and the nature **[*9]** of the allegations alleged in the Complaint, the Court concludes that the Trustee must have the opportunity to develop claims. Whether Aquino's relationship with SFC was sufficiently close so as to subject the relationship to scrutiny is a fact intensive inquiry that can be addressed after the factual record has been developed. Accordingly, the Court will deny Defendant's Motion To Dismiss with respect to Count VI of the Trustee's Amended Complaint.

## CONCLUSION

For the reasons discussed, the Court will deny Defendant's Motion To Dismiss.

An appropriate order will be entered.

## ORDER

At Wilmington, this 10 day of August, 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendant's Motion To Dismiss In Part Pursuant To *Fed. R. Civ. P. 12(b)(6)* (D.I. 52) is **DENIED.**

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I, James S. Green, Jr., hereby certify that on this 16th day of February 2007, I caused a true and correct copy of *Compendium of Unreported Opinions to Plaintiff's Response In Opposition to Defendant's Motion to Dismiss* to be filed with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Daniel Bartley Rath (rath@lrclaw.com)
> Maribeth Leslie Minella (bank@ycst.com)
> Kerri King Mumford (mumford@lrclaw.com)
> Phil C. Appenzeller, Jr. (pappenzeller@munsch.com)
> Ross H. Parker (rparker@munsch.com)
> David Mizgala (dmizgala@munshc.com)

I further certify that I have served the parties listed on the service list below in the manner indicated:

Michael D. Warden, Esq.
David S. Petron, Esq.
Sidley Austin LLP
1501 K. Street, N.W.
Washington, DC 20005
***First Class Mail***

John T. Dorsey, Esq.
Maribeth L. Minella, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
***Hand Delivery***

Joseph Warganz, Esq.
Associate General Counsel
KPMG LLP
757 Third Avenue
New York, NY 10017
***First Class Mail***

James S. Green, Jr. (No. 4406)